

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

BRUCE E. LISKER,

                    Petitioner,

          v.

MICHAEL KNOWLES, WARDEN,

                    Respondent.

CASE NUMBER:

CV 04-02687-VAP(RZ)

NOTICE OF FILING OF
MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

TO:    All Parties of Record

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

          You are hereby notified that pursuant to the Local Rules Governing Duties of Magistrate Judges, the Magistrate Judge's report and recommendation has been filed on **May 4, 2006**, a copy of which is attached. Any party having objections to the report and recommendation shall, not later than **May 23, 2006**, file and serve a written statement of objections with points and authorities in support thereof before the Honorable Ralph Zarefsky, U.S. Magistrate Judge.

          Failure to so object within the time limit specified shall be deemed a consent to any proposed findings of fact. Upon receipt of objections, or upon lapse of the time for filing objections, the case will be submitted to the District Judge for disposition. Following entry of judgment and/or order, all motions or other matters in the case will be considered and determined by the District Judge.

          The report and recommendation of a Magistrate Judge is not a final appealable order. A notice of appeal pursuant to Federal Rules of Appellate Procedure 4(a)(1) should not be filed until the judgment and/or order by the District Judge has been entered.

                                        CLERK, UNITED STATES DISTRICT COURT

Dated: May 4, 2006                      By: _Ilene Bernal_
                                            Ilene Bernal, Deputy Clerk



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BRUCE E. LISKER,                )     CASE NO. CV 04-02687 VAP (RZ)
                               )
                  Petitioner,  )
                               )     REPORT AND RECOMMENDATION
        vs.                    )     OF UNITED STATES MAGISTRATE
                               )     JUDGE
MICHAEL KNOWLES, WARDEN,       )
                               )
                  Respondent.  )

Pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California, the undersigned submits this Report and Recommendation to the Honorable Virginia A. Phillips, United States District Judge.

In 1985, Petitioner Bruce E. Lisker was convicted in state court of murdering his mother. In 2004, he filed the present action, seeking a federal writ of habeas corpus. Respondent has moved to dismiss, arguing that the one year statute of limitations bars the action. *See* 28 U.S.C. § 2244(d). Petitioner counters that barring the action would work a miscarriage of justice under the theory of *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). The Court of Appeals has instructed courts to fully develop the factual record when faced with a credible claim of innocence. *Majoy v. Roe*, 296 F.3d 770 (9th Cir. 2002). After holding an extensive evidentiary hearing, the undersigned recommends that the Court deny the motion to dismiss.

# I.

## SUMMARY OF THE CASE AGAINST PETITIONER

### A.   The Crime

At 11:26 a.m. on March 10, 1983, Petitioner telephoned paramedics to report that his mother, Dorka Lisker, had been stabbed. The paramedics arrived shortly thereafter and administered emergency care, then transported Mrs. Lisker to the hospital. There she died around 3:00 that afternoon.

Mrs. Lisker had been stabbed multiple times, more than twice in the back, with two knives which were recovered at the house. Also at the scene were a trophy and an exercise bar, known by its brand name as a "Bullworker." Police suspected both were used to bludgeon Mrs. Lisker, who had extensive injuries to her head and one arm. Mrs. Lisker had a rope loosely on her neck, but it did not appear that she had been strangled.

Los Angeles Police transported Petitioner to jail where Detective Andrew Monsue interviewed him at length. Petitioner was seventeen years old at the time. He told police that, from outside the house through the back windows, he saw his mother lying on the floor in the front entryway. Detective Monsue did not believe this or other aspects of Petitioner's account. Detective Monsue also eventually determined that all the bloody shoe prints found inside the house and shoe impressions in the dirt outside the house were made by shoes similar to the Pacer brand of shoes Petitioner wore. Petitioner had a small amount of blood on him but not enough, according to police, to support his statement that he hugged and cradled his dying mother. Police knew that Petitioner had moved out of his parents' house, that Petitioner and his parents argued frequently, and that money was missing from Mrs. Lisker's purse. Police found no sign of forced entry beyond the kitchen window louvers removed by Petitioner, and found no indication that anyone besides Petitioner and his mother had been present inside the house. Soon after the interview with Detective Monsue, Petitioner was charged with murder.

1          Petitioner continued to assert his innocence to police, telling Detective

2    Monsue that he believed the actual killer was another juvenile named Michael Ryan.

3    Detective Monsue investigated Ryan's possible involvement and traveled to Mississippi

4    to interview Ryan. Monsue's notes state that Ryan was "convincingly cleared" by further

5    investigation. The case against Petitioner went forward.

6

7    **B.    The Proceedings**

8          Petitioner's murder trial began in November 1984, but was aborted on

9    December 4, 1984, when Petitioner agreed to plead guilty conditioned on his being placed

10   in the California Youth Authority. Such placement would have meant that Petitioner could

11   not be held beyond his 25th birthday. State officials determined, however, that Petitioner

12   was not amenable for such placement and, the condition to the plea having failed,

13   Petitioner withdrew his guilty plea.

14         Trial began anew in October 1985. At the close of the prosecution case, the

15   defense successfully moved to dismiss the first degree murder charge. The jury convicted

16   Petitioner of second degree murder on November 21, 1985, and the court sentenced

17   Petitioner to 16 years to life in state prison. (Clerk's Transcript ("CT") 368, 378-79;

18   Reporter's Transcript ("RT") 1221-23, 1237.) The California Court of Appeal affirmed

19   Petitioner's conviction on December 22, 1988. (Motion to Dismiss, Exh. B.) The

20   California Supreme Court denied habeas relief on April 25, 1989. (Motion to Dismiss,

21   Exhs. F, G.)

22         Petitioner again sought collateral review in State court fourteen years later.

23   On January 31, 2003, he signed a petition for writ of habeas corpus which then was filed

24   in the Los Angeles County Superior Court; that court denied the petition on March 6,

25   2003. (Motion to Dismiss, Exhs. H, I.) On July 28, 2003, Petitioner filed a petition for

26   writ of habeas corpus in the California Court of Appeal which the court denied on

27   August 5, 2003. (Motion to Dismiss, Exhs. J, K.) In both of these state court petitions,

28   Petitioner argued that his delay in raising the claims therein should be excused under

1   California's "fundamental miscarriage of justice" exception.  (*See* Motion to Dismiss,

2   Exhs. H at 127-28, J at 238-40.)  *See In re Clark*, 5 Cal. 4th 750, 797 (1993) (a petition's

3   untimeliness may be excused where a petitioner presents facts showing that an error of

4   constitutional magnitude led to a trial so unfair that absent the error, no reasonable juror

5   could have convicted the petitioner).  In denying the petitions, the trial and appellate courts

6   did not rule them untimely.  On August 18, 2003, Petitioner filed a petition for review in

7   the California Supreme Court which that court denied without comment on October 29,

8   2003.  (Motion to Dismiss, Exhs. L, M, at 304.)  Justices Werdeger and Kennard stated

9   that the petition should have been granted.  (*See* Motion to Dismiss, Exh. M at 304.)

10          On April 16, 2004, Petitioner filed a Petition for Writ of Habeas Corpus by

11  a Person in State Custody pursuant to 28 U.S.C. § 2254, initiating the present action.

12  Petitioner filed his First Amended Petition, deleting an unexhausted and non-cognizable

13  claim, on May 12, 2004.  After Respondent moved to dismiss the action and the matter was

14  briefed fully, the Court held its evidentiary hearing over seven days from December 1 to

15  December 9, 2005.  Having reviewed the testimony from the hearing, the exhibits before

16  the Court, and the proceedings in Petitioner's trial, and having considered the written and

17  oral arguments of the parties, the Court now recommends that the motion to dismiss be

18  denied.

19

20                                              **II.**

21                        **THE TIMELINESS OF THE ACTION**

22          In enacting the Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

23  in 1996, Congress imposed a statute of limitations on habeas petitions which provides:

24

25          (d)(1)   A 1-year period of limitation shall apply to an

26          application for a writ of habeas corpus by a person in custody

27          pursuant to the judgment of a State court. The limitation period

28          shall run from the latest of --

(A)     the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review;

(B)     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Petitioner's conviction became final in 1989, well before the enactment of the AEDPA. Therefore, the one-year limitations period started running against Petitioner on the date of the AEDPA's enactment, April 24, 1996. *Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001). Petitioner had until April 24, 1997 to timely file a federal petition.

Petitioner suggests that he is entitled to equitable tolling because the attorneys who represented him between 1996 and 2001 performed deficiently or committed misconduct. (*See* Opposition to Motion to Dismiss, at 39-45.) Like all circuits which have considered the issue, the Ninth Circuit has held that AEDPA's limitations period is not

1  jurisdictional and therefore is subject to tolling.  *Miranda v. Castro*, 292 F.3d 1063, 1066

2  (9th Cir. 2002).  A diligent petitioner may be entitled to equitable tolling where his

3  attorney acts with extreme malfeasance.  *See Spitsyn v. Moore*, 345 F.3d 796, 800 (9th Cir.

4  2003).

5            Petitioner's allegations in this regard are troubling.  Petitioner presents

6  evidence that the two attorneys who represented him between 1996 and 2001 did little

7  work on his case despite prodding from Petitioner.  (*See* Opposition to Motion to Dismiss,

8  Exh. 34.)  But in 2001 Petitioner hired new attorneys, the team of lawyers who filed his

9  2003 round of state court petitions and then the present action in this Court.  Nowhere in

10 the record is there any allegation that the lawyers hired in 2001 were deficient in their

11 representation of Petitioner.  (On June 9, 2005, Petitioner substituted his current attorneys

12 as counsel.)  Because more than a year passed between the hiring of new attorneys in 2001

13 and the beginning of collateral attacks in 2003, equitable tolling based on attorney

14 malfeasance does not render the present action timely.

15           Petitioner also argues that the statute of limitations should not bar him from

16 litigating the merits of the First Amended Petition because the application of such a bar,

17 in his case, would effect a miscarriage of justice.  He relies on the doctrine enunciated in

18 *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), in the procedural

19 default context.  In that case, the Supreme Court wrote that "[i]f a petitioner such as

20 Schlup presents evidence of innocence so strong that a court cannot have confidence in

21 the outcome of the trial unless the court is also satisfied that the trial was free of

22 nonharmless constitutional error, the petitioner should be allowed to pass through the

23 gateway and argue the merits of his underlying claims."  *Id.*, 513 U.S. at 316.  This

24 argument raises both factual and legal issues.  As noted, the Court of Appeals has

25 instructed that the legal issues should be addressed only in the context of a fully developed

26 factual record.  That record follows.

27 ///

28 ///

# III.

## THE 1985 TRIAL

The prosecution presented the case against Petitioner as follows:

(1)     Petitioner could not have seen his mother from outside the house as he told Detective Monsue.  This was the critical lie told by Petitioner, and the fact that Petitioner would lie about being able to see his mother from outside demonstrated in itself that he was guilty, for Petitioner already must have known that she lay dying in the foyer.

(2)     There was no evidence that anyone other than Petitioner and his mother had been inside the house at the time of the murder; only Petitioner's shoe prints and fingerprints were found in the house and there was no sign of forced entry, just the carefully removed louvers from the kitchen window.

(3)     Besides the lie about seeing his mother, Petitioner's statement to Detective Monsue was filled with inconsistencies and Petitioner's actions at the scene were suspicious.

(4)     Petitioner had blood on his clothing.

(5)     Petitioner had ongoing difficulties with his parents. He was living in an apartment and his parents' house had been locked to him.  He had stolen from his parents in the past and argued often with his mother, sometimes about his drug use. Robbery and animosity towards his mother were suggested as motives for the crime. Missing was $150 cash given to his mother the evening before the murder.

(6)     Petitioner confessed to a jailhouse informant, Robert Hughes, who repeated Petitioner's confession at trial.

(7)     The defense did not suggest anyone else who might have committed the murder; it did not appear anyone else had either the motive or the opportunity to commit the crime.

The trial evidence is explicated below.

///

///

**A.      Petitioner Could Not Have Seen His Mother From Outside The House**

According to the prosecution, this was the critical lie told by Petitioner; it was the necessary and sufficient indicator of his guilt. (RT 1081-82, 1092.) Prosecutor Phillip Rabichow explained that not only was the lie important because it showed that Petitioner must have known his mother was lying in the entryway, but also because there was no reason for Petitioner to lie to police unless he was guilty. (RT 1082.)

Petitioner did not testify at trial. His statements to police were introduced in a tape of his interrogation by Detective Monsue and, to a lesser extent, through reports by other officers. (*See* RT 321, 833, 868-71.) In his statement to Monsue, Petitioner said that he went to his parents' house to fix his car and became suspicious that something was wrong when his mother did not answer his knock at the front door. (Exh. 86:158-59.) [1] Petitioner went to the back of the house to try to look inside. (Exh. 86:160.) Petitioner looked first through a back living room window, from which he thought he was able to see his mother's feet on the ground. (Exh. 86:170, 86:184.) Not sure what he had seen, Petitioner moved to the dining room sliding glass door, also on the back of the house, where he definitely saw his mother lying on the floor. (Exh. 86:170-71; RT 272, 333, 347-54.)

The prosecution disputed Petitioner's story with evidence showing (a) that the day of the murder, March 10, 1983, was a bright, sunny day and the glare from the sun made it impossible to see into the house (*see* RT 268, 272-73, 996-97); and (b) that the victim's body lay in such a position that it was not visible from either the living room or dining room windows. (RT 272-73.)

Detective Monsue and police photographer Mike Wilson each testified that March 10, 1983 was a bright, sunny day and thus that there was a glare on the windows. (*See also* RT 489, 971-72, 984, 992-93.) Wilson took a series of photographs outside and

---

[1] "Exh.," standing alone, refers to an exhibit introduced at the evidentiary hearing.

1   inside the Lisker home on March 10, 1983, the day of the murder. (*See* RT 971.) He

2   testified that after "our discussion this morning we established that it was approximately

3   at 11:30" in the morning when he took the photographs on March 10; this was soon after

4   the estimated time of the murder. (RT 979.) The sky in some of Wilson's photographs

5   from March 10 appears white or gray; Rabichow argued to the jury that it was white

6   because the photos were overexposed.   (RT 1187-88.)   Wilson did not mention

7   overexposure in his testimony. (*See* RT 969-97.)

8           Petitioner's father Robert Lisker testified that March 10 may have been an

9   overcast morning; Lisker family friend and attorney Robert Johnson testified he did not

10  recall the weather that morning. (RT 896-97, 947-48.)

11          The extent to which there was a glare on the windows on March 10 also was

12  proven with Wilson's photographs taken on March 23, 1983, 13 days after the murder, at

13  11:00 a.m., also near the estimated time of the murder. (RT 265-66, 972.) Monsue and

14  Wilson both testified that March 23, 1983 was a bright, sunny day, just like March 10,

15  1983. (RT 265-66, 268-69, 976.)

16          Although Robert Lisker and Robert Johnson took photographs purportedly

17  showing that Petitioner could have seen the victim from outside, the photographs they took

18  did not develop correctly; the defense offered nothing to support their testimony.

19  (RT 903-04.) In closing argument, Rabichow seized on this failure. (RT 1190-91.)

20          The second problem with Petitioner's story, according to the prosecution, was

21  that Mrs. Lisker's body was positioned such that it would have been impossible to see her,

22  even without the glare. When paramedics arrived at the scene, Mrs. Lisker's body was

23  inside the foyer, lying in a pool of blood on an entryway rug. (RT 179, 184, 197-200.)

24  Paramedic Jay Lovato testified that the victim was bleeding onto the rug most heavily from

25  her back and upper torso. (RT 183-84, 197-98.) Detective Monsue did not see the victim

26  in the house; he based his assessment of the victim's position on his interpretation of a

27  sketch drawn by Petitioner during the jailhouse interview. (*See* RT 333-66, 407, 431-35.)

28

1 | Robert Lisker testified that Monsue and his partner, Detective Landgren, assisted him in

2 | throwing away the blood-stained entry rug later in the day on March 10.[2] (RT 919-20.)

3 |        Rabichow argued that Mrs. Lisker's head was positioned on top of the biggest

4 | bloodstains on the entryway rug. (RT 1083-85; *see also* Exh. 86:172.) Rabichow argued

5 | to the jury, based solely on Monsue's observations, that this placement of the victim's

6 | body was not in either of the lines of sight described by Petitioner even though it was "not

7 | contested" that one could see all the way to the entry hall from the dining room window.

8 | (RT 1087-92.)

9 |

10 | **B.    There Was No Evidence That Anyone Else Was In The House**

11 |        The prosecution argued that, with the exception of shoe prints left by the

12 | paramedics on the front porch, only Petitioner's shoe prints were found in or around the

13 | house. (RT 1121.) Detective Monsue testified that bloody shoe prints found in the guest

14 | bathroom and in front of and facing the kitchen sink, and shoe print impressions found

15 | outside in the dirt, "resembled quite closely" Petitioner's Pacer shoes. (RT 278-79, 300-

16 | 06, 326.) The jury was shown photographs of the prints in the guest bath and outside the

17 | house; no photographs were taken of the bloody print left in front of the kitchen sink. (*See*

18 | RT 304-05.) The shoe print found in front of the kitchen sink was important to the

19 | prosecution case because it discredited Petitioner's statement to Monsue that he had not

20 | approached the kitchen sink that morning. (RT 307, 326.) No shoe print expert was

21 | utilized by the police in the investigation or called as a witness by the prosecution; only

22 | Detective Monsue offered his opinion that the shoe prints were a match for Petitioner's

23 | Pacers. (*See* RT 326, 423-26, 468-69, 1121, 1195.)

24 | ///

25 | _____

26 |    [2] Monsue said he did not do anything with the rug at any time, including taking it into evidence (RT 407-09), but notably in rebuttal did not contest Robert Lisker's testimony that Monsue threw the rug

27 | away on the day of the murder. In fact, on cross-examination, Rabichow asked Robert Lisker only whether Mr. Lisker had requested that the rug be thrown away, not whether it actually was thrown away.

28 | (RT 946.)

1    At trial, the defense called Los Angeles police officers Greg DeRousseau and

2    George Prado to testify that Petitioner exhibited concern for his mother when the police

3    arrived at the scene. (*See* RT 829-38, 866-71.) Responding to one of the first questions

4    from prosecutor Rabichow on cross-examination, each testified that he had been careful

5    not to disturb the scene and had been careful not to step in blood. (RT 855-56, 874.)

6    Rabichow suggested that the officers would not have left these shoe prints because "they

7    preserved the scene." (RT 1121.)

8    The totality of the fingerprint evidence was that only Petitioner's prints were

9    found in the house and that they were found only on the window Petitioner told authorities

10   he removed to enter the house. (RT 766.) There was no sign of forced entry other than

11   through this same window. (RT 248, 263, 274-75.) According to Rabichow's closing

12   argument, there was no reason anyone other than Petitioner might have committed the

13   crime, there was no suggestion that anyone else had either motive or opportunity to do so

14   and there was no evidence anyone else had been in the house that morning – "[o]nly his

15   footprint is in the blood." (RT 1117-21.)

16

17   **C.    Petitioner's Statements To Police And Actions At The Scene Were Suspicious**

18   Petitioner was hysterical at his parents' house when paramedics and police

19   arrived. (RT 814, 821-22, 841-42, 868-71.) He yelled at both to help his mother, and he

20   had to be restrained from trying to re-enter the house. (*Id.*)

21   Once Petitioner was transported to the police station from his parents' house

22   on the morning of March 10, 1983, he was interrogated by Detective Monsue. (RT 245-

23   46; Exh. 86:158.) At some point in the interview, Detective Monsue told Petitioner that

24   many of the things Petitioner was saying could not be true; Rabichow argued at trial that

25   although he could not prove many of the statements were lies, Petitioner said many

26

27

28

1  suspicious things to Monsue.[3]  (RT 1072-81.)  The jury heard a redacted version of the

2  interrogation.  (*See* RT 17, 319-21.)

3

4  **D.   The Blood Evidence Proved Petitioner's Guilt**

5  The photographs introduced at trial showed blood spatters on the walls, floor,

6  carpet, and rug inside the Lisker house.  (*See* RT 295-311, 715, 725-33.)  Petitioner also

7  had some amount of blood on his person and clothing.  (*See* RT 315-17, 734-44.)  The

8  prosecution called blood-spatter-analysis expert Ronald Linhart to explain the significance

9  of the blood evidence.  The blood in the house demonstrated to Linhart that the attack on

10  Mrs. Lisker started in the master bedroom, went down the hall, and ended in the foyer

11  where Mrs. Lisker lay on the entry rug.  (RT 711-14, 725-34.)  There was a large pool of

12  blood on the entry rug.  (*See* RT 310-11, 1083-84.)

13  Besides the two knives Petitioner removed from Mrs. Lisker's back, two other

14  implements were found with blood on them: a trophy and an exercise bar (the

15  "Bullworker"), both found in the master bedroom.  (RT 295-99, 312-13.)

16  Linhart testified that the blood on Petitioner's clothing was the result of blunt

17  force trauma or castoff, but that the spatters could have resulted from the acts Petitioner

18  described in tending to his mother.  (RT 734-53.)  In total, Petitioner had seven small

19  drops and a small number of smears of blood on all of his clothing.  (RT 735-44, 767-68.)

20  ────────────────

21  [3]  The statements or actions Rabichow argued were suspicious, and therefore some proof of
Petitioner's guilt, included the following: Petitioner took the knives out of his mother's body to preserve

22  evidence; Petitioner only described being in rooms where there were obvious signs of struggle; when
Monsue asked Petitioner about a knife in his car, Petitioner responded, "I wouldn't kill my mom";

23  Petitioner didn't want to get blood on himself; Petitioner's statements indicated he was concerned about
how his actions would be interpreted by authorities; there was no mess around the kitchen sink where

24  Petitioner said he entered the house; Petitioner checked his mother's purse to see if she had been robbed;

25  Petitioner carefully removed the window panes when he entered the house; Petitioner did not break in
immediately once he saw his mother lying on the floor; and Petitioner mentioned the book about Charles

26  Manson, *Helter Skelter*.  (RT 1072-81, 1120.)  Rabichow characterized Petitioner's lie about seeing his

27  mother from outside as the only one of Petitioner's statements that Rabichow could prove was false.  (*See*
RT 1081-82.)

28

1    The officer who drove Petitioner and Monsue to the police station observed no blood on

2    Petitioner. (RT 823.) Rabichow argued to the jury that despite bludgeoning his mother

3    with the trophy and the exercise bar, Petitioner did not have more blood on his clothing

4    because most of the victim's blood would spatter away from Petitioner as he was

5    "swinging away, obviously" when he hit the victim with the weapons. (RT 1116-17.)

6    Linhart did not testify similarly.

7          Based on Petitioner's statement to Monsue that he hugged his bleeding

8    mother, and based on Monsue's description of how Petitioner physically showed him that

9    he hugged the victim, Rabichow argued that Petitioner should have had *more* blood on him

10    and that the lack of blood on Petitioner further demonstrated Petitioner's deceit and guilt.

11    (RT 345-46, 1093-95.)

12

13    **E.     Petitioner's Difficulties With His Parents And Robbery Were The Motives For**

14    **        The Murder**

15          The prosecution introduced evidence that Petitioner had a poor relationship

16    with his parents and with his mother in particular. The Liskers had asked Petitioner to

17    move out of the house and were renting him an apartment at the time of the murder.

18    (Exh. 86:179.) Petitioner admitted to Monsue that he used drugs and had stolen money

19    from his parents on previous occasions. (*See* Exh. 86:169, 86:179.)

20          The other motive for the murder was robbery. Robert Lisker testified that he

21    gave Mrs. Lisker $150 in cash the night before the murder. (RT 223, 226.) Mr. Lisker

22    testified that Petitioner was present at the Liskers' house when Mr. Lisker gave his wife

23    the money. (RT 223-24.) Detective Monsue testified that no cash was found in the

24    victim's purse, where she usually kept her money, and that the missing money never was

25    recovered. (RT 224, 442.) Monsue testified that he could not remember if Petitioner

26    possessed any cash when arrested. (RT 411-12.)

27    ///

28    ///

1   **F.    Petitioner Confessed His Guilt To Inmate Robert Hughes In Jail**

2           The prosecution introduced the testimony of Robert Hughes, a former inmate

3   who had been housed in the cell next to Petitioner. (RT 546-48.) Hughes testified that he

4   met Petitioner when, in April 1983, he ministered to Petitioner through a hole in the wall

5   between their cells. (RT 548-50, 579-80, 646.) Petitioner immediately told Hughes that

6   he wanted to confess to him. (RT 549-50.) Petitioner told Hughes, "I killed my mother

7   and I fucked up." (RT 550.) Per Hughes, Petitioner's mistake was forgetting to get rid of

8   his clothes which were spattered with blood from beating the victim. (RT 550-51.)

9           Hughes recounted that Petitioner told him he needed money to buy PCP but

10  that his mother would not give him any money. (RT 551.) When she refused, Petitioner

11  began looking through her purse to take money from her. (*Id.*) Mrs. Lisker caught

12  Petitioner going through her purse and she ripped his shirt and slapped him. (RT 552.)

13  Petitioner went to the kitchen, retrieved two steak knives and found his mother in the hall

14  where he stabbed her in the back and left the knives in her body. (*Id.*)

15          According to Hughes, when Mrs. Lisker did not die from the stab wounds,

16  Petitioner got the trophy and hit her in the head. (RT 553.) Hughes relayed that Petitioner

17  told him, "It started in the bedroom." (*Id.*) After hitting his mother with the trophy,

18  Petitioner got the exercise bar and "wailed on her with that for a while." (RT 554.)

19  Finally, according to Hughes, Petitioner put a rope around his mother's neck. (RT 557.)

20          Petitioner told Hughes that his "alibi" was the story he told police and that he

21  "did good because [he] called [his] father, the paramedics and the police" in that order.

22  (RT 554-55.) Hughes remembered specifically that Petitioner said he called his father first

23  before calling the paramedics. (RT 610-11.) Robert Lisker testified that Petitioner already

24  had called the paramedics when Petitioner called him at work. (RT 230-32.) Rabichow

25  argued that if Mr. Lisker's version was true, the defense should have brought in the phone

26  records to prove it. (RT 1110-11.)

27          Hughes testified that he immediately wrote notes of Petitioner's confession,

28  but he did not have those notes at trial and could not remember anything about the physical

appearance of the notes. (RT 581-82, 631-32, 689-90.) Hughes testified he destroyed or threw away the notes. (RT 582, 632, 649, 683.) He also testified that he either did give or may have given the notes to police. (RT 581-82, 632.) Hughes said he was sure he had the notes during his interview with police but there is no indication in the interview transcript that Hughes had any notes. (RT 582, 633-34.)

Rabichow argued that Hughes' story was reliable because the confession contained details only the killer would know and because Hughes accurately described the sequence of events suggested by the police investigation. (RT 1103.) Mr. Lisker and Petitioner's first defense attorney testified, however, that Petitioner had with him in jail as early as March 1983, and therefore by the time when he spoke with Hughes, the police records from his case which Petitioner could have shared with Hughes. (RT 793-94, 927-28.) Rabichow argued that even if Hughes saw the reports, no one would be clever enough to manufacture a confession from reading the police reports. (RT 1103-04.) Rabichow told the jury that Hughes "adds a lot" to the prosecution case, but even without the confession to Hughes, the evidence was sufficient to convict Petitioner of murder. (RT 1098-99.)

Perhaps Rabichow offered this last concession because Hughes' testimony was inconsistent in numerous respects. Hughes both denied and admitted asking Petitioner for money and goods. (RT 575-80, 588, 591-92, 606, 937.) Hughes denied, but Rabichow agreed, that Hughes wrote letters to Petitioner acknowledging Petitioner's innocence. (RT 602-06, 620-21, 626-30, 644-45, 657-58.) Hughes remembered minute details about Petitioner's confession, but remembered essentially nothing about how he "ministered" to Petitioner. (*See* RT 595-98.) Robert Lisker testified that Hughes told Petitioner and Mr. Lisker he knew Petitioner was innocent. (RT 936, 941.)

At some point during the proceedings against Petitioner, Hughes indicated he did not want to testify against Petitioner but changed his mind again when he saw Petitioner give him some sort of signal. (RT 673-75, 694-95.) Hughes previously had testified against at least two other defendants in murder cases. (RT 574, 660-62.) Hughes

- 15 -

1  stated that he "always" expected to get something in return for testifying against a
2  defendant. (RT 584-85.) Hughes testified against Petitioner hoping to get assistance from
3  Rabichow in reducing his sentence. (RT 599, 663-76; Augmented Clerk's Transcript 261-
4  66.) Hughes was released early because of Rabichow's efforts on his behalf. (RT 571-73,
5  663-76; Augmented Reporter's Transcript ("ART") 372.)

6        Before Hughes approached the police with information about Petitioner,
7  police were contacted by two other inmates who reported that they also had solicited
8  confessions from Petitioner. (Exh. 86:311-21.) Robert Lisker testified that Hughes told
9  him that he too had been approached by these same inmates but that once Hughes
10  questioned Petitioner about the crime, Hughes knew that the others were lying and were
11  trying to "frame" Petitioner. (RT 935, 961-62.)

12

13  **G.    There Was No Other Likely Suspect**

14        In Petitioner's first trial, Rabichow moved to suppress any evidence that
15  Michael Ryan committed the murder. (ART 389-99.) The trial court granted the motion
16  because the defense did not provide any persuasive evidence of Ryan's involvement.
17  (ART 399.) The court ruled identically in the second trial. (RT 2-13.) The jury heard
18  nothing about another suspect, a fact Rabichow relied on in closing argument. (*See* RT
19  1121.)

20

21  **H.    The Crime Scene Evidence**

22        The only police officer who testified regarding the collection of evidence
23  from the crime scene was Detective Monsue, yet when he was questioned by the defense
24  about items of evidence, his answer often was that he was not the officer responsible for
25  the evidence. (*See* RT 457-59, 469, 503-04.) Monsue testified he did not test the house
26  or any of the weapons for fingerprints (RT 457-59), did not have any police expert
27  examine the shoe prints (RT 424, 469), did not take any photographs of Petitioner (other
28  than the booking photograph) on March 10, 1983 (RT 477), and did not obtain or examine

1  the Liskers' telephone bill from March 10, 1983 to determine the order of calls made by

2  Petitioner, as there was "no need" to do so. (RT 497-98, 519-20, 523.) No one other than

3  Monsue analyzed the shoe prints. (RT 424-25, 469.)

4         Certainly most troubling in this regard given the importance of the victim's

5  position in the house, Detective Monsue did not preserve, and instead, according to Robert

6  Lisker, personally threw away on March 10, 1983, the bloodied entryway rug upon which

7  the victim was found. (RT 919-20, 946.)

8

9                                    **IV.**

10   **THE CASE IN LIGHT OF THE NEWLY PRESENTED EVIDENCE**

11        The evidence adduced at the evidentiary hearing in this Court effectively

12  dismantled the case the prosecution presented at trial. The weather and lines of sight were

13  not as represented by police witnesses. The critical shoe prints were not made by

14  Petitioner's shoes. The blood evidence was equivocal. At least some of the missing

15  money appears to have remained in the victim's purse. Hughes' credibility was even less

16  than it appeared at trial. There was a likely suspect whose culpability appears not to have

17  been investigated thoroughly by police. Detective Monsue's credibility, which was central

18  to the prosecution case against Petitioner at trial, has been called into question in

19  significant ways.

20        On the other hand, what remains to suggest his guilt are Petitioner's own

21  words. In 1984 and 1985, Petitioner pleaded guilty conditioned on his being found

22  amenable for placement in the Youth Authority, and then admitted his culpability in

23  proceedings testing his amenability for such placement. In later parole proceedings,

24  Petitioner again admitted his guilt. Petitioner now argues that these statements were made

25  only to gain favorable treatment in the penal system. All of these circumstances are

26  discussed below.

27  ///

28  ///

## A.    Petitioner Could Have Seen His Mother As He Described

March 10, 1983, the day of the murder, was not a bright, sunny day as Monsue and Wilson repeated so many times at trial.   At the evidentiary hearing, meteorologist Kenneth Clark provided meteorological charts and satellite images which demonstrated that the morning of March 10, 1983 between 10:30 a.m. and 11:45 a.m. in the area of the Lisker house was "pretty cloudy" to "overcast" and also hazy. (Evidentiary Hearing Transcript ("EHT") I 150-51, 157-60, 165-67; Exhs. 18:2-3, 18A:2-3, 19:1.) From these charts and satellite images, Clark testified that the weather did not change significantly that day until sometime after 2:00 p.m., when the clouds moved away. (EHT I 161, 166-67; Exhs. 18:2-3, 18A:5, 19:1.)   Clark testified that the clouds were of a high elevation on the morning of March 10, which would have allowed the penetration of more light than low clouds, but that these clouds also were thick, all of which left only dull sunshine. (EHT I 157-60, 165-67, 181-83.)   According to Clark, there would have been shadows cast that morning, but it was not "sunny" out, especially because there was haze in the morning as well. (*Id.*; Exhs. 18:2-3, 18A:2-4, 19:1.)

In response, Respondent introduced the testimony of Mike Wilson, the police photographer who took the photographs in 1983 and testified at Petitioner's 1985 trial. (EHT II 64-65; Exh. 64.)   The sum of Wilson's testimony was that his photographs show that the morning of March 10, 1983 was "bright" and "sunny."

Contrary to his testimony at trial, however, it turns out that Wilson did not in fact take any photographs of the Lisker house on the morning of March 10, 1983. He was not even called to the scene until after noon. (EHT II 85-86; Exh. 86:2, 86:10, 86:16.) Wilson numbered his photographs in the order they were taken and the photograph in exhibit 64:43 (therefore, the 43rd photograph taken by Wilson on March 10, 1983) shows a clock with a time of 1:42. (EHT II 67, 71; Exh. 64:43.)   Wilson testified that he could assume it took about one minute to take each photograph, so that he likely took his first photograph near 1:00 p.m. on March 10. (EHT II 72-73; Exh. 64.)   This is in accordance with the police records which show that detectives were not notified until 11:35 a.m. and

1    the photo department was not notified until 12:35 p.m. (EHT II 85-86; Exh. 86:2, 86:10,

2    86:16.)

3        Wilson testified that the photograph in Exhibit 64:2 (therefore, the second

4    photograph taken by Wilson on March 10, 1983 and taken close to 1:00 p.m.) shows it was

5    a sunny day because there are distinct shadows visible in the photograph. (EHT II 67;

6    Exh. 64:2.) Meteorologist Clark, however, testified that this same photograph was taken

7    in the afternoon given the position of the sun in the sky, and that the visible sky comports

8    with his weather reports; the sky was gray or white which does not suggest that it was a

9    bright sunny day. (EHT I 163-64, 171-74; Exh. 64:2.)

10        Mr. Clark's description of this photograph is far more accurate that

11    Mr. Wilson's; the sky in the photograph is not blue. Rabichow acknowledged this at trial,

12    speculating that the photograph had been "overexposed." Just as at trial, Wilson did not

13    offer a similar theory in his testimony at the evidentiary hearing.

14        The Court was troubled by Wilson's testimony here. Wilson testified that he

15    now had, over 20 years after the event, an independent recollection of the view from

16    outside the back windows into the Lisker house on March 10, 1983, and remembered that

17    he "could see little or nothing inside the residence from outside" due to "[t]he reflection

18    and the brightness level outside as contrasting to the lack of light inside." (EHT II 76-77.)

19    At trial in 1985, however, when asked if he had a recollection of looking through this same

20    window on March 10, 1983, Wilson answered, "I don't remember doing it." (RT 987.)

21        Moreover, at trial in 1985, Wilson's answer to many questions on cross-

22    examination was that he had no recollection of the particular photographs because it had

23    been so long since he had taken them and he had taken so many other pictures since then.

24    (RT 979-89.) And, at the evidentiary hearing here, Wilson also had no memory that he had

25    returned to the residence and taken pictures there on July 1, 1983. (EHT II 78-79;

26    Exh. 16:4.)

27        At the evidentiary hearing, Wilson also had an unreasonably hard time

28    acknowledging that there might be, in general, different degrees of sunniness or

- 19 -

cloudiness. (EHT II 79.) Wilson was asked to compare what appears to be blue sky visible in photograph 83, taken near 2:20 p.m., with the gray or white sky clearly visible in photographs 2 and 5, taken closer to 1:00 p.m. (EHT II 80-81; Exhs. 64:2, 64:5, 64:83.) After a long pause, Wilson offered the following: "I would say that in 64:2 and 64:5, there are – there might have been some haze, but it was a bright, sunny day." (EHT II 80-81.) Wilson similarly refused to acknowledge the hazy or gray sky in other photographs as well. (EHT II 81.)

Further, of course, is the serious misstatement in Wilson's 1985 testimony, given after discussion with unnamed persons, that he began taking photographs on March 10 at 11:30 in the morning. When asked at the evidentiary hearing about this discrepancy, Wilson suggested that his testimony had been that 11:30 would have been the time he received the call, not the time he went to the residence. (EHT II 84). This would not have been accurate either, however. (Exh. 86:2, 86:10, 86:16.) Rabichow asked him at trial if he was misremembering the date. (RT 990-91.)

The evidence before this Court overwhelmingly showed that the morning of March 10, 1983 in the area of the Lisker home was not bright and sunny. It was overcast, cloudy and hazy. On the other hand, March 23, 1983, the date on which photographs were taken showing a bright glare on the back windows of the Lisker house, was, without question, a "bright, sunny day." According to the charts and satellite images provided and interpreted by meteorologist Clark, at 10:45 a.m. on March 23, there were only scattered clouds, which was a "considerable difference" from the morning of March 10, 1983. (EHT I 168-69; Exhs. 18:5, 18A:8-9, 19:2.) According to Clark, the morning of March 23, 1983 was a "bright sunny morning" with "puffy little clouds." (EHT I 168-69.) In satellite photographs from March 23, one can see almost all of the ground, in contrast to the images from March 10 showing heavy cloud cover. (EHT I 169; Exhs. 18A:8-9, 19:2.)

Wilson testified that he remembered being at the house on March 23, 1983 and taking the photographs there. (EHT II 73; Exh. 74.) Although this point was not pursued, Wilson testified that he did not believe he had used a flash for the photograph

- 20 -

1   looking through the sliding door on March 23 as he had on March 10. (EHT II 74-75;

2   Exh. 64:10.) The photographs taken on March 23 looking through the back windows

3   show a bright glare on the windows; they were taken looking in through the windows and

4   sliding door on the back of the house. (EHT II 82; Exh. 74:1-5.) Wilson did not dispute

5   that March 23 was "quite a bright day." (EHT II 83.)

6          In this Court's review of the photographs taken on the two days, there is a

7   noticeable difference in the brightness of items outside the house, especially the pool and

8   plants in the backyard. (*Compare* Exh. 74:1 *with* Exhs. 64:9 and 64:34.) On the other

9   hand, photographs taken from outside the sliding door on March 23 appear to show that

10  even with the glare on that day, it was possible to see through all the way to the entryway

11  of the house. (*See* Exhs. 74:3-5.)

12         Also important to the question of whether Petitioner could have seen his

13  mother from the back yard windows were the placement of her body and the lines of sight

14  from the two windows. At the evidentiary hearing, Petitioner and Respondent offered

15  testimony from reconstruction experts Frank Terrio (for Petitioner) and Michael Varat (for

16  Respondent) who agreed that they were able to determine, with various specialized

17  techniques, the placement of specific objects inside the house such that they were able to

18  theorize where Mrs. Lisker's body might have lain on March 10, 1983. (*See* EHT I 104-

19  19, EHT IV 102-27; Exhs. 20, 154, 155.) The experts agreed on the placement of the

20  entryway rug (and the blood stains thereon), the planter abutting the entryway, and the

21  dining room table. (EHT I 115-19, 139-40, EHT IV 104-27.)

22         Terrio concluded that when he placed a model with her head in the position

23  where the largest blood stain was located on the entry rug, in accordance with the

24  prosecution theory at trial (*see* EHT I 102-03; RT 197-98, 1083-85), the model's head and

25  upper body were visible through the closed dining room sliding glass door from any

26  vantage point over five feet. (EHT I 119-30; Exh. 20:16-17.) Varat agreed that when the

27  body was placed in this position, her head and upper body were visible through the dining

28  room door except through the westernmost side on the door. (EHT IV 137-39, 154, 159-

1   61; Exh. 155:10.) Varat concluded that the model's feet would have been visible from the

2   living room window, while Terrio thought this view was inconclusive. (EHT I 130-31,

3   EHT IV 138-39; Exh. 155:9.)

4          Varat also tested two other body placements; he labeled them the "Monsue

5   version" and "Lovato version." Varat concluded that only in the "Monsue version" would

6   the victim's head not have been visible through the dining room window. (EHT IV 133-

7   37; Exh. 155:3, 155:7.)  This placement of the body, however, is not supported by the

8   reconstruction and placement of the entry rug and is not in accord with the prosecution's

9   arguments at trial; Monsue himself never saw the victim at the scene. (RT 336-39, 358-59,

10  433-35; Exh. 86:13, 86:16.)  In fact, this placement of the victim's body – lying entirely

11  off the hallway rug – is contrary to even Monsue's description of Petitioner's sketch,

12  which placed the victim's body at least partially on that rug. (*Compare* RT 431-35 *with*

13  Exh. 155:1.)

14         The reconstruction diagrams and photographs, in conjunction with the crime

15  scene photographs, convince this Court that the victim's head, if not her whole upper

16  body, would have been visible from the dining room sliding glass door, as Petitioner

17  described.

18         In fact, when he returned to complete a reconstruction of the scene in 2005

19  with two reporters from the Los Angeles Times, prosecutor Rabichow was surprised to

20  discover that from outside the dining room door he was able to see a person lying in the

21  position in which he had argued the victim had lain. (EHT I 61-74, 102-03.) Rabichow

22  had not visited the crime scene prior to trial; his argument that Petitioner lied – the "critical

23  lie" – was based only on information provided by Detective Monsue and through Mike

24  Wilson's photographs. (EHT I 50-51.) Rabichow testified he had been made aware that

25  Detective Monsue threw away the bloodied rug on March 10. (EHT I 52.)

26  ///

27  ///

28  ///

**B.** **Shoe Impressions In The Guest Bathroom, Outside The House And, Possibly, On The Victim's Head, Were Not Left By Petitioner**

In 2004, Ronald Raquel, a criminalist with the Los Angeles Police Department for 19 years, analyzed photographs of the shoe impressions which the prosecution had argued at trial were made by Petitioner's shoes.[4] (EHT I 185-88; Exhs. 6, 11, 65-68.) Raquel concluded that the shoe impression left outside in the dirt ("print B") actually contained the impressions of two different shoes. (EHT I 188-89; Exhs. 6, 11, 14, 65, 67.) One of these prints, labeled by the parties "print B-1," was consistent with Petitioner's shoes, but the other print, labeled "print B-2," was made by a shoe with a herringbone pattern on the sole and could not have been made by Petitioner's shoes, which had a wave pattern. (EHT I 188-90, 194-95; Exhs. 6, 11, 14, 65, 67.) Raquel concluded that the bloody shoe print left in the guest bathroom ("print G") also was made by a shoe with a herringbone pattern and could not have been made by Petitioner's shoes. (EHT I 190, 194-95; Exhs. 6, 11, 14, 65, 66.) Raquel concluded that the shoes which left prints B-2 and G had a similar herringbone design; the prints could have been made by the same shoes. (*Id.*) Raquel's supervisor concurred with his findings. (EHT I 190.)

Called as a witness by Respondent, FBI Analyst Sandra Wiersema, an expert working exclusively in shoe prints and tire tread evidence, agreed, as substantiated in her July 2005 report, with Raquel's findings that print B-2 and G had characteristics similar to one another and could not have been made by Petitioner's shoes. (EHT IV 54-64, 69-71; Exh. 15.)

To cast doubt on Petitioner's suggestion that the shoe impressions were left by the perpetrator of the crime, Respondent introduced the testimony of former Los Angeles police officers DeRousseau and Prado, the two officers who had responded first to the crime scene in 1983. (EHT III 5-18, 36-48.) Both claimed now to remember

---

[4] Obviously, no analysis was possible of the print allegedly left in the kitchen since it was never documented in a photograph or otherwise.

1     details not contained in their contemporaneous written reports or mentioned in their trial

2     testimony about their two-to-three minute "protective sweep" of the Lisker house. (See

3     RT 839, 869; EHT III 25-30, 45-48, 52.) Both officers testified at the evidentiary hearing,

4     in accordance with their testimony at trial, that they attempted not to disturb the crime

5     scene or step in blood. (EHT III 10, 21, 44, 52.) DeRousseau also testified here, contrary

6     to his trial testimony, that during this sweep, he "probably" stepped in blood. (EHT III

7     10.) Prado reluctantly answered that he avoided stepping in the blood near the victim's

8     body but also testified that it was possible he left the bloody shoe print in the guest

9     bathroom even though he didn't notice himself leaving bloody shoe prints at the time.

10     (EHT III 46, 54-56.) Further, DeRousseau testified here that he now could see in crime

11     scene photographs blood stains on the carpeting in the house that he independently

12     remembered he did not see in 1983. (EHT III 34-35; Exhs. 64:93-95, 64:101, 64:103.)

13     Prado did not go this far, but did testify that many times, officers cannot see blood on the

14     floor or in carpet. (EHT III 44.)

15             Both officers testified here that in their March 10, 1983 protective sweep they

16     entered the guest bathroom where print G was found.   (EHT III 12-13, 42-43.)

17     DeRousseau also testified here, contrary to his trial testimony, that during this sweep, he

18     "probably" stepped in blood. (EHT III 10.) Prado reluctantly answered that he avoided

19     stepping in the blood near the victim's body but also testified that it was possible he left

20     the bloody shoe print in the guest bathroom even though he didn't notice himself leaving

21     bloody shoe prints at the time. (EHT III 46, 54-56.) In their reports written on March 10,

22     1983, however, wherein both officers listed the rooms they searched, neither officer

23     indicated that he had entered the guest bathroom. (EHT III 28-29, 50-51; Exh. 86:365-

24     365a, 86:366-67.) Nor did either officer testify at trial that he entered the guest bathroom.

25     (See RT 838-39, 869, 874-75.) DeRousseau explained at the evidentiary hearing that he

26     never said he entered that bathroom because nobody ever asked him specifically whether

27     he searched that bathroom – even though he was asked which rooms he searched. (EHT

28     III 25-28.) He also testified here that he went outside to search, although Prado did not

1    see him do so, and therefore that his shoes could have made the impression in print B-2.

2    (EHT III 15-16; RT 839; Exh. 67.)

3          The officers' testimony regarding their search was not credible for many

4    reasons, not the least of which was the officers' claimed ability to remember minute details

5    such as whether they noticed specific blood stains during their quick search 20 years

6    earlier. This Court also is troubled by the fact that the officers' reports and trial testimony

7    were at odds with their testimony here. (*See* EHT III 23-30.)  Of course, neither officer

8    remembered anything about the shoes he wore that day, so any suggestion that one of the

9    two left the prints would be pure speculation.  (EHT III 13-14, 45, 54-55.)

10         Petitioner demonstrated to this Court that the bloody shoe print in the guest

11   bathroom and one of the shoe impressions in the dirt outside the house were left by

12   someone other than himself, disproving the State's 1985 theory of his guilt.  Moreover, it

13   appears likely that the shoe prints were not left by police personnel.   There is no

14   suggestion that any other official party might have left the prints.  The importance of the

15   shoe print evidence, as conceded by Rabichow at the evidentiary hearing, is that it is

16   inconsistent with the prosecution's argument at trial that Petitioner committed the murder

17   by himself and that there was no one else present. (*See e.g.* EHT I 39-42.)

18         Petitioner suggests that one more shoe print has been found as well.   In

19   reviewing autopsy photographs as part of his recent investigation of Petitioner's case,

20   Los Angeles police officer Albert James Gavin noticed what appeared to him to be a shoe

21   impression on the victim's head.   (EHT II 187-88.)   He contacted Raquel with the

22   information.  Raquel reported to Gavin that the impression on the victim's head, which

23   measured 1.5 inches by .5 inches, was made by a shoe. (EHT I 192-93, EHT II 24-25, 35-

24   37; Exhs. 12, 14, 16:1, 16:3.) Raquel testified here, "I do foresee that there is a possibility

25   out there in the world that there is a tool [that could make this impression]. I haven't seen

26   it yet. But I do see shoe prints, and this is similar to what I see in shoe comparison."

27   (EHT II 26.)

28   ///

1    Respondent disputes that the impression on the victim's head was made by

2    a shoe. However, Steven Dowell, a tool mark expert for the Los Angeles County

3    Coroner's office, did not determine any specific tool that could have or did produce the

4    impression; nor was he provided with any such implement by the State. (EHT V 37-43.)

5    Raquel concluded that the impression could not have been made by

6    Petitioner's shoe; it had no characteristics in common with the Pacer shoe. (EHT I 193-96,

7    EHT II 17-18, 38; Exhs. 12, 14.) The impression, however, had characteristics in common

8    with prints B-2 and G; it appeared to be a herringbone pattern with similar spacing

9    between the lines. (*Id.*)

10    While FBI expert Wiersema did not find anything to suggest that the mark

11    was made by a shoe, presumably aside from the fact that it matched to a degree the known

12    shoe prints in this case, she also could not conclude it was not a shoe print; she was

13    provided with no object by the State which might have made the impression. (EHT IV 74-

14    79, 94-96.) In comparing prints B-2 and G with the impression on the head using one of

15    the autopsy photographs, Wiersema concluded that the spacing between the lines did not

16    match. (EHT IV 73; Exh. 16:1.) Using a different autopsy photograph, however, which

17    showed a ruler placed closer to the impression on the victim's head and which therefore

18    may have offered a more reliable measurement of the marking, the spacing between the

19    lines in prints B-2, G, and the head impression was the same. (EHT IV 74-77, 90-94;

20    Exhs. 15:11, 71:2-3.) Because no other measurements could be made, Wiersema could not

21    conclude the three prints were made necessarily by the same item. (EHT IV 94.)

22    Of course, both officers DeRousseau and Prado testified that they did not step

23    on the victim's head or any other part of her body. (EHT III 21, 32-33, 56.) Rabichow

24    testified that at trial he was not aware of the patterned impression on the victim's head; he

25    had not previously reviewed the autopsy photograph showing the mark. (EHT I 36-38.)

26    Dr. Golden, who performed the autopsy of the victim and testified at trial, testified here

27    that the most severe injury to the victim's head was a fracture on the right side to the base

28    of the skull, presumably near the location of the impression similar to the shoe prints in

1  prints B-2 and G; the mark near the ear was noted in the March 1983 autopsy. (EHT IV

2  166-73; Exhs. 72:4, 73:5.)

3

4  **C.   Contrary To The California Court of Appeal's Characterization Of The**

5  **Evidence, The Blood On Petitioner Was As Consistent With His Innocence As**

6  **With His Guilt**

7  Petitioner had a very slight amount of blood on his clothing.  For example,

8  the single drop of blood found on his left shoe was 2 millimeters by 3.5 millimeters; the

9  drop on the right shoe was 1 millimeter in diameter. (EHT III 88; *see also* Exhs. 69, 77.)

10  As noted, blood expert Ronald Linhart testified at trial that the blood evidence was as

11  consistent with Petitioner's explanation of his innocence as it was with the prosecution's

12  theory of guilt.  Moreover, Linhart did not testify either at trial or at the evidentiary

13  hearing, as Rabichow argued to the jury at trial, that Petitioner likely would have had no

14  blood on him after bludgeoning his mother because the blood would spatter away from

15  Petitioner's body as he "swung away" with a weapon; such a conclusion appears to this

16  Court as tenuous at best.

17  Respondent called Linhart as a witness at the evidentiary hearing here.  When

18  offered hypothetical situations by Respondent and Petitioner, Linhart's testimony was

19  consistent: whether Petitioner would have been spattered with any specific amount of

20  blood as he held or hugged his mother was entirely dependent on Petitioner's and his

21  mother's body positions. (EHT III 68-86.) The evidence in this regard was inconclusive;

22  no significant evidence was added from the trial testimony.

23  Linhart made clear, however, that he could not conclude from the blood

24  evidence that Petitioner murdered his mother.  (EHT III 87; *see also* Exh. 86:29.)  He

25  characterized the blood evidence as "insufficient by itself for such a conclusion." (EHT III

26  87.) Moreover, Linhart stated that he did not reach the conclusion attributed to him by the

27  California Court of Appeal, that blood was transferred onto Petitioner's clothing at the

28

1 | moment when the victim suffered a blunt force injury. (*Id.*; *see also* Motion to Dismiss,
2 | Exh. B, at 29.)

3

4 | **D.     One Of The Suggested Motives For The Murder, The Robbery Of Mrs. Lisker,**
5 | **Is Not Supported By The Evidence**

6 |      The prosecution theory at trial was that Petitioner, who said he went through
7 | his mother's purse, actually took the $150 cash from the purse. There is nothing to suggest
8 | that any money was found on Petitioner, although Monsue testified at trial he had no
9 | memory one way or the other. (*See* RT 411-12.) A recent review of the Superior Court
10 | file, however, disclosed a post-trial inventory of the contents of Mrs. Lisker's purse which
11 | listed the purse as containing $120 cash. (EHT IV 44-48; Exh. 21.) Prosecutor Rabichow
12 | was not aware at or before the 1985 trial that there was cash in the purse. (EHT I 23.)

13 |      The other motive for the murder, animosity between Petitioner and his
14 | mother, was attested to by a witness at the evidentiary hearing. While the witness noted
15 | that the two argued or had a contentious relationship, he never saw Petitioner use physical
16 | violence against his mother. (EHT IV 177-86; *see also* Exh. 109.)

17 |      On March 10, 1983, Police Officer DeRousseau described Petitioner as
18 | concerned about his mother and hysterical, yelling repeatedly, "Help my mother, help my
19 | mother. Someone stabbed her." (EHT III 19, 24, 49; *see also* Exh. 86:369-375.) This
20 | Court has listened to Petitioner's 911 call wherein Petitioner certainly could be described
21 | as hysterical. (Exh. 97.) Neither Petitioner's statements to authorities at his house nor his
22 | statements to Monsue in the jailhouse interview themselves strike this Court as unusual.
23 | Whether they were contrived depended on *other* evidence, all of which has been
24 | undermined.

25 | ///
26 | ///
27 | ///
28 | ///

1  **E.    A Claim That Petitioner Confessed To Robert Hughes Is Not Credible**

2                    Aside from the inconsistencies and motive for falsification apparent from

3  Hughes' trial testimony[5] and aside from the fact that Hughes already had offered testimony

4  in two other murder cases (*see* Exh. 86:712-17),[6] it was disturbing to learn that inmates

5  other than Hughes told police that Petitioner also confessed to them.[7] (EHT II 163-64;

6  Exh. 86:311-321.)  Detective Monsue and his partner, Detective Landgren, interviewed

7  one of these other inmates, Michael Dowtu, in April 1983. (EHT II 165-66; Exh. 86:314-

8  321.)  That interview contains the following exchange between Dowtu and the detective:

9

10                    Dowtu: If this guy – I'd be talking to him.  If he comes up with

11                    something else.

12                    Detective: Well, a, now if I was to tell you to go ahead and talk

13                    to him some more, you'd be acting as my agent.

14                    Dowtu: Oh, I see.

15                    Detective: And you can't do that, but we will be coming back up

16                    here to see you again.

17  ────────────────────

18      [5] As noted at trial, Rabichow vowed to follow up on other prosecutors' promises of assistance
to Hughes in return for his help in Petitioner's case; Rabichow even tried to call the Los Angeles County
19  District Attorney on Hughes' behalf. (EHT III 90-91, 97, EHT IV 25-26.)  Rabichow admitted he was
the "moving force" behind Hughes' early release. (EHT IV 24; Exh. 86:685, 86:714-15.)

20      As a further example of the unreliability of Hughes' account, Hughes testified he was certain that
Petitioner told him he called his father before calling 911.  Phone records introduced at the evidentiary
21  hearing show to the contrary.  Petitioner dialed 911 at 11:26 a.m. (Exh. 97.)  The only other call made
from the Lisker home between 11:00 a.m. and 11:30 a.m. was made to a Los Angeles number dialed
22  frequently from the home – presumably Mr. Lisker's office number – and this call was made three
23  minutes *later*, at 11:29 a.m. (Exh. 40:2.)

24      [6] *Compare Williamson v. Reynolds*, 904 F. Supp. 1529, 1550-51 (E.D. Ok. 1995), *aff'd* 110 F.3d
1508 (10th Cir. 1997), *overruled on other grounds in Nguyen v. Reynolds*, 131 F.3d 1340 (10th Cir.
25  1997), in which the court found counsel ineffective for failing to bring to the jury's attention the
26  "troubling" issue that the informant who reported the defendant's confession earlier reported to police
hearing another inmate confess to previously unsolved murder.

27      [7] One inmate reported that Petitioner told him he stabbed his mother with a fork.  (*See*
28  Exh. 86:315.) There was no evidence to support this assertion.

1  (EHT II 167-68.)  The detective was correct.  It would have been illegal for him to tell the

2  prisoner to talk with Petitioner, because police then would have violated Petitioner's Sixth

3  Amendment right to counsel.  *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12

4  L. Ed. 2d 246 (1964).  Yet to investigator Gavin, this exchange showed the detective telling

5  Dowtu through a "wink and a nod" to question Petitioner.  (EHT II 168.)

6          This information adds further doubt to the reliability of the already shaky

7  testimony from Hughes, an experienced informant housed next to a juvenile on suicide

8  watch. (*See e.g.* Exh. 38.)  In addition to the lingering question of whether Hughes relied

9  during his interview with police on notes which were not preserved by police, the only

10  recorded contact with Hughes was his July 6, 1983 interview with Monsue, but in that

11  interview, Hughes said he previously had spoken with Detective Landgren.  (EHT II 169-

12  70; Exh. 99:8.)  (Hughes told Monsue that Petitioner confessed to him in April 1983.

13  (Exh. 99:6.))   In the chronological record contained in the police "murder book,"

14  moreover, the first entry regarding Hughes is noted, out of chronological order in the

15  record, as having occurred on October 10, when a Beverly Hills Police Department

16  sergeant reported that he had an informant to whom Petitioner had "copped out."  (EHT

17  II 170-72; Exh. 86:8.)

18          Moreover, Hughes' version of the crime does not follow what the police, or

19  at least Detective Monsue, said was the sequence of events on March 10.  In a 1998 letter

20  to the parole board urging that Petitioner be denied parole, Monsue wrote that Petitioner

21  beat his mother with the exercise bar, then stabbed her as part of a cover story. (Exh. 2.)

22  This is entirely different from Petitioner's confession as related by Hughes.[8] (Exh. 99:1-

23  7.)

24          Finally, the police file contains the original handwritten notes of the

25  detectives' interview with Hughes.  Those notes show some confusion over the exact

26

27

28      [8] In fact, it is entirely different, also, from the version of events Monsue described in Petitioner's 1985 probation report. (*See* Exh. 100:14-15.)

1   words in one instance, but the handwritten notes seem to report that Hughes said, "I don't

2   want to blow my cover" with Petitioner, whereas the final typed transcript says, "I don't

3   want to pull my covers." (*Compare* Exh. 99:7 *with* Exh. 86:752.) What is important about

4   this discrepancy is both that the handwritten version appears more sinister in terms of

5   Hughes' motivation and that it could suggest that police might have changed the substance

6   of Hughes' statement in any respect. In all, the trial transcript and evidence presented at

7   the evidentiary hearing demonstrate that Hughes was not credible and his report of

8   Petitioner's confession cannot be accorded any significant weight.

9

10  **F.    There Was Another Likely Suspect In The Murder**

11          At trial, the prosecution successfully moved to suppress any evidence

12  suggesting Michael Ryan was a likely suspect. As early as March 30, 1983, Petitioner had

13  requested that Detective Monsue investigate Ryan, who Petitioner told Monsue was at the

14  Lisker house on March 9, 1983, the day before the murder. (Exhs. 42, 43.) Monsue spoke

15  with Petitioner regarding Ryan on April 1, 1983 at Sylmar Juvenile Hall. (Exh. 43.)

16  Monsue interviewed Ryan in Mississippi in 1983 and concluded that, by early 1985 at the

17  latest, Ryan had been "convincingly cleared." (Exh. 100:15.) Gavin reported that

18  Rabichow trusted Monsue's decision not to pursue Ryan as a suspect and did not review

19  any interview with Ryan. (EHT II 136.)

20          The evidence here suggests no reason why Ryan should have been considered

21  "cleared." Ryan had a close link to Petitioner; he was Petitioner's former roommate.

22  (Exh. 48:2.) Ryan knew Petitioner's mother and had done work for her at her house in the

23  past. (Exh. 48:7, 48:20, 48:22.) Ryan said he went to the Lisker house the day before the

24  murder, March 9, 1983, to use the telephone there. (Exhs. 44, 45:2, 48:7.) Ryan's

25  whereabouts on the morning of March 10, 1983 are the subject of debate – but what does

26  appear from the evidence is that, apparently even before he was told that the murder likely

27  occurred around 11:00 that morning, Ryan lied to police about where he had been at 10:00

28

1   or 11:00 a.m. that day. (Exhs. 44:1, 45, 48:8, 48:13.) Ryan also left for Mississippi on

2   March 11, 1983. (Exhs. 44:2, 45:3, 48:9.)

3         Ryan told Monsue that he came to California in early March 1983 to join "Job

4   Corps" and that he always planned to return to Mississippi. (EHT II 140-41; Exh. 48:5.)

5   This was false. Evidence at the evidentiary hearing showed that Ryan was on probation

6   in Mississippi and that his probation was transferred to California so that he could live

7   with his mother, and for that reason, Ryan was placed on a bus to California. (EHT II 141-

8   42.) At the time he interviewed Ryan on May 4, 1983, Monsue knew Ryan's correct

9   birthdate, but Monsue's apparently earlier check of Ryan's police record did not show any

10  criminal history because Monsue had used an incorrect birth date to run the search. (EHT

11  II 142-43; Exhs. 41, 86:796.) In fact, Ryan had a significant and violent criminal record

12  both prior to and after 1983. (EHT II 156-62; *see also* Exhs. 49-53, 59.)

13        Ryan told Monsue that he stopped by the Liskers' house to use the telephone

14  on March 9, 1983. (EHT II 143-44; Exhs. 45:2, 48:7.) Monsue testified that he never

15  obtained the Lisker phone bill. (EHT II 144; RT 497-98, 519-20, 523.) Had he done so,

16  however, he would have made an important discovery. The Lisker's telephone bill shows

17  that, at 10:22 a.m., on the *next* day, March 10, 1983 – the day of the murder – a maximum

18  one-minute call was placed from the Lisker phone to a phone number different by one digit

19  (and without the area code) from Ryan's mother's home phone number. (EHT II 145-46,

20  162; Exhs. 39, 40:1.) There was no call made to Ryan's mother on March 9. (EHT II 144-

21  45; Exhs. 39, 40:1.) Rabichow had no phone records before trial and was not aware of the

22  March 10 call. (EHT I 26.) Ryan's mother had no memory of having spoken on the phone

23  with Mrs. Lisker or ever having met her. (Exh. 107:1.)

24        When talking to Monsue, Ryan was inconsistent with respect to whether

25  Mrs. Lisker was home on March 9 when he said he went to the Lisker house, and the

26  inconsistency appeared to depend on how Monsue framed the question to him, *i.e.*,

27  whether Monsue was accusing Ryan of involvement in the murder. (EHT II 146-48; *see*

28  Exh. 48:7 (victim was home), 48:12 (victim was not home), 48:14 (victim was home).)

1  Ryan earlier told investigators Mrs. Lisker was home on March 9 when he went to her

2  house. (Exhs. 44:1, 45:2.)

3          Ryan told Monsue that he checked into a motel in Hollywood at 11:00 a.m.

4  on March 10; Monsue found the motel records which indicated Ryan did not check in until

5  3:00 p.m. that day. (EHT II 148-50; Exhs. 46:1, 48:8, 48:13.) Earlier, Ryan said that he

6  checked into the motel at 10:00 a.m. (Exh. 44:1.) When Ryan checked into the motel on

7  March 10, he used an alias, Mark Smith. (EHT II 150-51; Exhs. 44, 45:3, 47, 48:25.)

8  Ryan told Monsue he used the alias because he was scared after being in an altercation in

9  which he stabbed a "colored guy." (EHT II 151-53; Exh. 48:8-9, 48:25.) This too was

10  inconsistent; Ryan earlier described that he checked into the motel before he supposedly

11  was involved in the knife fight. (EHT II 153; Exhs. 45:3, 48:8-9, 48:25.)

12          Monsue also questioned Ryan briefly about the fact that he spent more money

13  in California than the $53 he had with him when he left Mississippi. (EHT II 154-56;

14  Exh. 48:9-11.) At the conclusion of his interview with Ryan, Monsue told Ryan, "I do not

15  think you have helped kill his mom, I think Bruce killed his mom. I never thought you

16  killed his mom. . . . The biggest problem I have is the money." (EHT II 172-73;

17  Exh. 48:29.) Monsue told Ryan, "I'm just trying to eliminate you more than I am anything

18  else." (Exh. 48:33.) If Monsue was trying to eliminate Ryas as a suspect, that view was

19  hardly universal: Ryan's own father subsequently told Officer Gavin that he was

20  convinced that his son committed the murder. (EHT II 134-35.) Ryan died of a drug

21  overdose on June 28, 1996. (Exh. 58.)

23  **G.    The Investigator's Credibility Has Been Further Undermined**

24          In his 1998 letter to the Parole Board, Detective Monsue wrote that a

25  lingering mystery within the case since had been solved. The missing $150 cash, he

26  stated, had been found stashed in the attic above Petitioner's old room. (Exh. 2.) Monsue

1 | wrote that he had been informed of the discovery of the money by the "new owners" of the

2 | Lisker house.[9] (*Id.*) As it turns out, however, those "new owners" said nothing of the sort.

3 |      Martin Borenstein and his wife bought the Lisker house from Robert Lisker

4 | in April 1984, knowing that a murder had occurred there the year before. (EHT II 43-44.)

5 | The Borensteins did not sell the house until 1995. (EHT II 46-47.)  Borenstein did contact

6 | Detective Monsue on one occasion, but that was prior to purchasing the home in 1984.

7 | (EHT II 45.)

8 |      Borenstein testified that he had no memory that either he or his wife ever

9 | found any money anywhere in the house. (EHT II 47.)  He had no memory of contacting

10 | Detective Monsue to report finding money. (*Id.*)  Borenstein, who was a criminal defense

11 | attorney, testified that he "just couldn't believe that such a significant thing would have

12 | totally escaped me." (EHT II 62.)  Further, it was apparent that Borenstein's wife, who

13 | was not well, would not have found money in the attic, which could be accessed only with

14 | a ladder, and then called Monsue without Mr. Borenstein's knowledge. (EHT II 46-51.)

15 | Moreover, according to Gavin, if Monsue had recovered any money, it should have been

16 | booked into evidence, which it never was. (EHT II 107.)

17 |      Gavin interviewed Monsue on May 6, 2004.  (EHT II 180.)  Monsue told

18 | Gavin "that he received a phone call from a female, and the female stated that several years

19 | prior, she had discovered money in her house; and when talking to neighbors, they

20 | indicated to her that a murder had occurred in that house and money was missing." (*Id.*)

21 | This is not what Monsue stated in his letter to the parole board. (EHT II 180-81; Exh. 2.)

22 | On June 23, 2005, Los Angeles Police Chief William Bratton wrote to the parole board

23 | instructing them that they should not consider Monsue's April 7, 1998 letter because the

24 | facts contained therein could not be verified. (EHT II 196; Exh. 13A.)

25 | ///

26 |

27 |     [9] In the police murder book, someone starred and underlined a passage in Petitioner's amenability

28 | interview where Petitioner said that the stolen money "must still be there" hidden in his room. (*See* Exh. 86:442.)

**H.    Petitioner's Statements Since 1983**

The evidence shows that Petitioner maintained his innocence consistently from the time of his arrest until December 3, 1984, when he pleaded guilty conditional on his being transferred to the Youth Authority which could house him only until he turned 25. (CT 229; Reporter's Transcript of the Plea Proceedings ("RT Plea"); EHT III 106.) Petitioner did not himself offer a factual basis for the plea; counsel stipulated that a factual basis existed from evidence and testimony at the preliminary hearing and from that part of the trial which already had begun. (RT Plea 10.) This trial evidence, of course, is the evidence discussed above which may have appeared overwhelming at the time, but now has been discredited. Petitioner since has stated that his attorney was trying to get him into the Youth Authority with the plea bargain and that he pleaded guilty on the advice of family friend and attorney Robert Johnson because Petitioner was facing a first degree murder charge. (Exhs. 60:3, 104:61; *see also* RT Plea 2-3.)

In attempting to gain placement in the California Youth Authority, Petitioner admitted his guilt as part of various evaluations. In each of these "confessions," however, there was little detail – seemingly none beyond what was contained in the police reports – and the statements contained facts which conflict with other circumstances. (*See* EHT V 46-47, 93-94, 100-04; Exh. 96:11-12, 96:41.) For instance, the January 1985 probation report quoted Petitioner as saying that all he could remember was that his mother hit him with the trophy and then he hit her with the trophy. (Exh. 100:12-13.) When an interviewer asked Petitioner where the money went, Petitioner responded "rather reluctantly" that he hid the money in a shelf in a closet. (Exh. 96:11.) Outside of Monsue's discredited 1998 letter, however, there is no suggestion that any of the missing money ever was found in the Lisker house. Certainly there was no evidence to that effect in the 1985 trial, soon after Petitioner made this statement.

One interviewer testified at the evidentiary hearing that she felt Petitioner was telling her what she wanted to hear so that he would appear amenable to placement in the Youth Authority, although she was unwilling to concede that Petitioner appeared also to

1  be feigning guilt in order to be considered amenable for treatment. (EHT V 104-07.) She

2  testified that whether Petitioner accepted responsibility for the crime and showed remorse

3  were important factors in determining his amenability to placement in Youth Authority.

4  (EHT V 99, 105-06.)

5           Petitioner immediately withdrew his guilty plea when he was rejected for

6  placement in the Youth Authority. (CT 233-34.)

7           Later, Petitioner admitted his guilt in parole proceedings, where an inmate's

8  "past and present attitude toward the crime" and showing signs of remorse are factors

9  demonstrating one's suitability for parole. 15 CAL. CODE REGS. § 2402 (b)-(d).[10] In 1991,

10  Petitioner told interviewer Linda Rianda that "he was going to tell [her] what he had told

11  no one else, and that he did, in fact, remember everything that occurred during this crime,

12  even though he had told other people he didn't, he was telling [Rianda] that he did

13  remember everything; and then he started talking to [Rianda] about what he remembered."

14  (EHT V 16.) Rianda remembered that Petitioner told her about hitting his mother with the

15  trophy, chasing her down the hall with the trophy in his hand and striking her repeatedly,

16  but nothing about ropes or knives or stabbing or using an exercise bar as a weapon, all of

17  which are details, Ms. Rianda testified, that she would have recorded had Petitioner

18  mentioned them. (EHT V 16-19, 32-33; Exh. 101:1.) Rianda was struck by Petitioner's

19  lack of emotion. (EHT V 19.)

20           At the time Petitioner was interviewed in 1991, he had a fairly good prison

21  record. (EHT V 33; Exh. 101:3.) Petitioner was denied parole in 1991.

22           In parole proceedings in 1992, Petitioner did not make any changes to the

23  "Prisoner's Version" of events as reported in 1991; Petitioner expressed remorse. (EHT V

24

25           [10] A correctional counsel also wrote in 1987 that Petitioner "expressed guilt, showed remorse."
26  (Exh. 106:7.) The counselor testified here that he had no memory of the interview or report. (EHT V
    71-72.) The substance of and reason for the statement were not developed further. Just previously,
27  however, in his 1986 probation report, Petitioner stated he was innocent. (Supplemental Probation
    Report, at 3.) Petitioner said he pleaded guilty on poor advice from Robert Johnson because Petitioner
28  was facing a first degree murder charge. (Id.)

1   55.)  At the hearing, when a parole board member outlined the facts of the murder, the

2   weapons used and other details, and asked whether Petitioner wished to make any

3   additions or corrections, Petitioner answered only that the board member had

4   mispronounced his mother's name. (Exh. 104:20-21.)  Petitioner offered no insight into

5   the details of the murder.  (Exh. 104:21-22, *see also* Exh. 104:57-59.)  This response

6   stands in contrast to Petitioner's reaction to a question about an earlier "road rage"

7   incident where, in response to a single question, Petitioner volunteered a detailed answer.

8   (Exh. 104:24-25.)

9         When questioned whether he set up the murder to appear as if someone else

10  committed it, Petitioner answered:

11

12         A:  As soon – the instant that I had committed the act, I,

13         first of all, it's very foggy, very hazy, but I do remember

14         everything, I'm not trying to deny that I remember everything.

15         I was in and out and I really lost it.  I did a few things that I –

16         I – there was – the money was all over the ground.  I threw that

17         in my old bedroom, I believe, and I told the officers afterwards

18         that –

19                        *    *    *

20         Q:  You set – you set the scene up so that it looked like

21         somebody had broken into the house and killed your mother.

22         A:  And then I went an[d] took the panes out of the

23         window . . . Made it look like somebody broke in.

24  ///

25  ///

26  ///

27  ///

28  ///

1 (Exh. 104:55, *see also* Exh. 104:81.)[11] This exchange illustrates not only that Petitioner

2 did not describe the crime in any detail, but also that his later statements do not make sense

3 when compared to the events of March 10, 1983. Petitioner stated in his 911 call on

4 March 10, and in all discussions with police after that, that *he* broke into the house by

5 removing the window panes. (Exh. 97.) If Petitioner already consciously had decided to

6 make it look like *someone else* had broken in through the window, as he stated nearly ten

7 years later in his 1992 parole hearing, then it made no sense for him, on the day of the

8 murder and consistently thereafter, to tell authorities that *he* broke in through the window.

9 In this same 1992 hearing, Petitioner also stated that he put the $150 in his bedroom "to

10 the best of [his] knowledge." (Exh. 104:69-70.) Petitioner was denied parole in 1992.

11 (Exh. 104:99.)

12    Petitioner did not appear at his 1993 parole proceedings; he had been

13 disciplinary-free for the year. (Exhs. 101:5-6, 104:105-125J.) Petitioner was denied

14 parole in 1993. (Exh. 104:125G.)

15    In 1996, the parole report notes that the offense summary was to remain as

16 previously reported. (EHT V 62-63; Exh. 101:9.) The counselor who wrote the report

17 testified that Petitioner told her he remembered "hitting" the victim as part of a fight over

18 money for drugs. (EHT V 63.) The counselor did not remember, however, that Petitioner

19 said anything about hitting his mother with a trophy, stabbing his mother, hitting his

20 mother with an exercise bar, or creating a cover-up story. (EHT V 63-65.) The counselor

21 noted Petitioner was "emotionless" when describing the crime. (EHT V 64.)

22    In 1996, there was no parole hearing; Petitioner waived parole.

23 (Exh. 104:127.)

24 ///

25

---

26    [11] When asked why he was equivocating on whether he planned the murder in the fashion of the
Manson murders or whether he even had read the book *Helter Skelter*, Petitioner answered: "Well, I'm

27 – it's a long time ago, first of all, I'm doing the very best of – to recall accurately and if – I – I don't want
to make a mistake." (Exh. 104:71.) A board member asked Petitioner why he wasn't emotional and why

28 he couldn't remember because it wasn't that long ago that the crime had occurred. (Exh. 104:77-78.)

1    Petitioner waived parole in 1998; his version of the crime remained the same
2    according to the 1998 report. (Exhs. 101:12-13, 104:130.)

3    In 1999, Petitioner declined to discuss the crime. (Exh. 101:14.) In the parole
4    hearing held on August 11, 1999, Petitioner proclaimed his innocence and recanted
5    everything he had said in prior hearings. (Exh. 104:143.) He stated that he was not just
6    claiming innocence since his father died; he said his father always knew he was innocent
7    and both brought to the attention of law enforcement the identity of the more likely
8    perpetrator. (Exh. 104:178-179.) Petitioner was denied parole in 1999. (Exh. 104:181-
9    84.)

10    In the 2001 parole report, Petitioner stated he was innocent. (Exh. 101:16.)
11    At the 2001 hearing, Petitioner said it was his opinion that denying responsibility or
12    claiming innocence is interpreted by psychologists as "minimizing," which is a negative
13    thing. (Exh. 104:221.) Petitioner was denied parole in 2001.

14    In the 2003 parole report, Petitioner again stated he was innocent.
15    (Exh. 101:18.) Petitioner stated that his lies about being guilty were meant to match the
16    law enforcement version. (Exh. 101:19.) No parole hearing transcript was furnished for
17    2003. Petitioner was denied parole in 2003.

18    In the 2005 parole report, Petitioner stated he was innocent. (Exh. 101:23.)
19    No parole hearing transcript was furnished for 2005. Petitioner was denied parole in 2005.

20

21                                        **V.**

22            **THE RELEVANCE OF PROBABLE INNOCENCE**

23                  **TO AN UNTIMELY PETITION**

24    Given the strength of Petitioner's factual showing, this Court must wrestle
25    with the question left unanswered in *Majoy*: may a petitioner's demonstration of his
26    probable innocence excuse his noncompliance with the AEDPA statute of limitations?
27    *Majoy*, 296 F.3d 770.   The answer is that such a showing may excuse a petition's
28    untimeliness, as explained below.

## A.      The Meaning of *Schlup*

The Supreme Court in *Schlup* described what is known as a "gateway" claim of innocence, alternatively referred to as the "actual innocence" exception. *Id.*, 513 U.S. at 315. The innocence gateway allows a petitioner who can demonstrate his innocence to have his otherwise procedurally defaulted claims heard on their merits. A gateway claim of innocence differs from a freestanding claim of innocence that might independently entitle a petitioner to habeas relief. *Id.* Here, Petitioner argues only that because he can demonstrate his probable innocence, the Court should allow him to present his otherwise untimely claims for review on their merits.

Even though the term "actual innocence" is used in *Schlup*, the *Schlup* Court did not require that the evidence in fact exonerate a habeas petitioner. Rather, under *Schlup*, a petitioner must demonstrate that it is more probable than not that no reasonable juror would find him guilty beyond a reasonable doubt in light of the new evidence. *Id.*, 513 U.S. at 327. As the Supreme Court explained,

> To be credible such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

*Id.*, 513 U.S. at 324.

The innocence gateway, or fundamental miscarriage of justice exception, "seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Id.* Such claims do not pose a great threat to finality, comity, or scarce judicial

1    resources because successful claims of innocence are "extremely rare." *Id.* On the other
2    hand, the "individual interest in avoiding injustice is most compelling in the context of
3    actual innocence," and it is in those "extremely rare" situations where the normal balance
4    favoring finality, comity, and conservation of scarce judicial resources tips the other way.
5    *Id.*

6

7    **B.    *Schlup* and Timeliness**

8            Neither the Supreme Court, nor the Ninth Circuit, *see Majoy, supra,* has
9    decided whether a showing of actual innocence tolls AEDPA's limitations period. Some
10   circuits have taken an approach, similar to the Ninth Circuit's, of declining to rule on the
11   issue absent a factual showing of actual innocence. *Whitley v. Senkowski,* 317 F.3d 223,
12   225 (2d Cir. 2003); *Wyzykowski v. Dept. of Corr.,* 226 F.3d 1213, 1218 (11th Cir. 2000).
13   Some courts have suggested they might find such an exception were they confronted with
14   a showing of innocence.  *Felder v. Johnson,* 204 F.3d 168, 171 n.8 (5th Cir. 2000)
15   (suggesting that a showing, as opposed to a claim, of innocence might entitle a petitioner
16   to equitable tolling); *Burger v. Scott,* 317 F.3d 1133, 1141 (10th Cir. 2003) (noting that
17   "equitable tolling would be appropriate, for example, when a prisoner is actually
18   innocent"); *cf. Flanders v. Graves,* 299 F.3d 974, 978 (8th Cir. 2002) (finding that
19   innocence may be relevant to tolling where the petitioner could not have discovered the
20   facts underlying his claim of innocence within the limitations period). On the other hand,
21   the courts which have found that actual innocence does not toll the statute of limitations
22   have done so when no such showing had been made. *See Araujo v. Chandler,* 435 F.3d
23   678, 681-82 (7th Cir. 2005), *pet. for cert. filed,* 74 U.S.L.W. 3544 (March 15, 2006) (No.
24   05-1183);[12] *David v. Hall,* 318 F.3d 343, 347-48 (1st Cir. 2003) (finding no miscarriage

25

26   _____

27           [12] Although the Seventh Circuit in *Araujo* cited *Escamilla v. Jungworth,* 426 F.3d 868 (7th Cir.
     2005), for the proposition that innocence is irrelevant to the statute of limitations, in fact *Escamilla*
     claimed to rely on an earlier Seventh Circuit case, *Gildon v. Bowen,* 384 F.3d 883 (7th Cir. 2004), *cert.*
28   *denied,* 543 U.S. 1168, 125 S. Ct. 1348, 161 L. Ed. 2d 144 (2005), in which the court suggested an actual

1  of justice exception to the AEDPA statute of limitations in case where the petitioner did

2  not make even a predicate showing of innocence).

3          The only circuit thus far faced with a case in which a petitioner made a

4  persuasive showing of his innocence is the Sixth Circuit. In *Souter v. Jones*, 395 F.3d 577

5  (6th Cir. 2005), the Court of Appeals held the petitioner's showing of innocence, which

6  met the requirements of *Schlup*, equitably tolled the AEDPA statute of limitations. *Souter*,

7  395 F.3d at 597-601.[13]   The court found further that a refusal to toll the statute when a

8  petitioner makes such a showing would implicate serious constitutional questions which

9  must be avoided where reasonably possible. *Id.*, 395 F.3d at 601-02.  This Court agrees

10  with that analysis.

11

12  **1.     Equity**

13          A core function of the federal writ of habeas corpus is the protection of

14  prisoners from unjust incarceration and the correction of miscarriages of justice.  *See*

15  *Schlup*, 513 U.S. at 325 (noting that the "concern about the injustice that results from the

16  conviction of an innocent person has long been at the core of our criminal justice system");

17  *see also O'Neal v. McAninch*, 513 U.S. 432, 442, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995)

18  (describing as a "basic purpose[ ] underlying the writ" the correction of an error "that risks

19  an unreliable trial outcome and the consequent conviction of an innocent person"); *Teague*

20  *v. Lane*, 489 U.S. 288, 311-13, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (retroactivity on

21  collateral review limited to those new rules of constitutional law which either "place[ ]

22

23  ─────────────

24  showing of innocence *could* require tolling the statute. *See Gildon*, 384 F.3d at 887 (agreeing with Eighth
     Circuit that equitable tolling might be available to petitioner who demonstrated his innocence if he could
25  not have discovered facts underlying claim of innocence within the limitations period); *see also*
     *Balsewicz v. Kingston*, 425 F.3d 1029, 1033-34 (7th Cir. 2005) (suggesting showing of innocence might
26  require tolling if presented in conjunction with a claim of equitable tolling), *cert. denied*, __ U.S. __, 126
     S. Ct. 1160, 163 L. Ed. 2d 1011 (2006).

27

28  [13] In *Garcia v. Portuondo*, 334 F. Supp. 2d 446 (S.D.N.Y. 2004), the district court held the same:
     the petitioner there demonstrated his innocence pursuant to *Schlup* and was entitled to equitable tolling.

certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe or are designed to eliminate procedure[s] which create an impermissibly large risk that the innocent will be convicted") (quotations omitted); *Kuhlmann v. Wilson*, 477 U.S. 436, 454, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986) (federal court may entertain successive habeas petitions only where colorable showing of actual innocence is made); *Stone v. Powell*, 428 U.S. 465, 491 n. 31, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976) (Fourth Amendment claims not cognizable in federal habeas because petitioner "is usually asking society to redetermine an issue that has no bearing on the basic justice of his incarceration" and does not remove a "safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty"). As Chairman of the Senate Committee on the Judiciary Senator Orrin Hatch commented in discussing the AEDPA: "I firmly believe that the writ is necessary to ensure that innocent people are protected from illegal imprisonment." *Federal Habeas Corpus Reform: Eliminating Prisoners' Abuse of the Judicial Process: Hearing on S. 623 Before the S. Comm. on the Judiciary*, 104th Cong. 3 (1996) (remarks of Sen. Orrin Hatch, Chairman, Sen. Comm. on the Judiciary).[14]

Moreover, it is clear that the AEDPA statute of limitations, although statutory, is subject to equitable restrictions. Every circuit has reached this conclusion. *See e.g. Miranda*, 292 F.3d at 1066; *Cordle v. Guarino*, 428 F.3d 46, 48 (1st Cir. 2005); *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000); *Fahy v. Horn*, 240 F.3d 239, 244 (3d Cir. 2001); *Harris v. Hutchinson*, 209 F.3d 325, 329-30 (4th Cir. 2000); *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998); *Souter*, 395 F.3d 577; *Taliani v. Chrans*, 189 F.3d 597, 598 (7th Cir. 1999); *Kreutzer v. Bowesox*, 231 F.3d 460, 463 (8th Cir. 2000); *Miller v. Marr*,

---

[14] *As quoted in* Brittany Glidden, *When the State is Silent: An Analysis of AEDPA's Adjudication Requirement,* 27 N.Y.U. REV. L. & SOC. CHANGE 177, 208-09 (2002); *see also* Jake Sussman, *Unlimited Innocence: Recognizing an "Actual Innocence" Exception to AEDPA's Statute of Limitations,* 27 N.Y.U. REV. L. & SOC. CHANGE 343, 359 n.74 (2002) ("'Congress' reforms carefully preserve the most important function of habeas corpus, to guarantee that innocent persons will not be illegally imprisoned or executed . . . '") (quoting Orrin Hatch, *Tighter Rules Were Needed*, USA TODAY, Jan. 20, 2000, at 16A).

141 F.3d 976, 978 (10th Cir. 1998); *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000). In the Ninth Circuit, this doctrine of equitable tolling has been characterized by extraordinary circumstances, beyond the petitioner's control, which prevented him from asserting his claims in a timely fashion. *See Miranda*, 292 F.3d at 1066. The formulation has evolved similarly in other circuits. *See e.g. Davis*, 158 F.3d at 811-12; *Souter*, 395 F.3d at 588; *Steed*, 219 F.3d at 1300. Although this formulation will not serve all situations, its existence is important because it demonstrates a shared recognition that the AEDPA limitations period *is*, in fact, subject to equitable considerations. *See also Pace v. DiGuglielmo*, 544 U.S. 408, __, 125 S. Ct. 1807, 1814 n.8, 161 L. Ed. 2d 669 (2005) (assuming without deciding that AEDPA statute of limitations is subject to equitable tolling). As the Supreme Court has noted, equitable doctrines must be those grounded in history and applicable to particular fact situations. *Lonchar v. Thomas*, 517 U.S. 314, 323-24, 116 S. Ct. 1293, 134 L. Ed. 2d 440 (1996). And that is the role which the actual innocence exception has played. *See Souter*, 395 F.3d at 598 (finding that the existence of other equitable tolling mechanisms supports the application of the *Schlup* innocence exception).

The 1996 enactment of the AEDPA created the first federally imposed statute of limitations on habeas petitions. Before that, however, state law often imposed timeliness requirements on collateral review petitions. Failure to abide by these state limits could then foreclose federal review, but not if there had been a fundamental miscarriage of justice, *i.e.*, a showing by a habeas petitioner that his flawed conviction resulted in the incarceration of one probably innocent. The conclusion that justice would miscarry if such a timeliness requirement prevented federal review allowed the case to proceed. *Coleman v. Thompson*, 501 U.S. 722, 748-50, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). Thus, through the conduit of the procedural default doctrine, the Court has recognized that equity will halt a limitations period to prevent a miscarriage of justice. In *Schlup* and its predecessors, *McCleskey v. Zant*, 499 U.S. 467, 494-95, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) and *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91

1 │ L. Ed. 2d 397 (1986), the Court has acknowledged the miscarriage of justice concept as

2 │ a firmly entrenched doctrine.

3 │       Did Congress intend to change this doctrine by enacting a statute of

4 │ limitations in the AEDPA? Respondent argues that for a court to hold otherwise violates

5 │ the Separation of Powers doctrine. This argument proves too much, however, for it would

6 │ preclude a court from applying any equitable doctrine to a legislatively-created statute of

7 │ limitations. In fact, the Supreme Court has indicated to the contrary. *See Irwin v. Dep't*

8 │ *of Veterans Affairs*, 498 U.S. 89, 95-96, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1991) (noting

9 │ the rebuttable presumption of equitable tolling of federal statutes of limitations absent

10 │ congressional language to the contrary). As noted, the courts uniformly have held that

11 │ equity can require tolling of the AEDPA's limitations period; this Court can find no

12 │ support for an assertion that equitable restrictions on a federal statute of limitations violate

13 │ the Separation of Powers doctrine. *See Schlup*, 513 U.S. at 319 n. 35 ("This Court has

14 │ repeatedly noted the interplay between statutory language and judicially managed

15 │ equitable considerations in the development of habeas corpus jurisprudence.").

16 │       Moreover, the tensions between the societal interests and the individual

17 │ interests with which *Schlup* wrestled in the procedural default context are eased somewhat

18 │ when considering a *federal* statute of limitations. Underlying the doctrine of procedural

19 │ default are the interests of comity – respect for State court applications of State law – and

20 │ finality of State court decisions. Comity is not at issue, however, in the application of the

21 │ federal statute of limitations as the federal action would be authorized, if it were timely,

22 │ notwithstanding respect for State law. Principally at issue with the statute of limitations

23 │ is the finality of the State court judgment. While that is a serious interest to be

24 │ safeguarded, it must give way where necessary to avoid a miscarriage of justice. *Calderon*

25 │ *v. Thompson*, 523 U.S. 538, 557, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998) (noting the

26 │ State's strong interest in finality, but also noting that the interest may be outweighed where

27 │ a petitioner makes a strong showing of actual innocence); *O'Neal v. Lampert*, 199

28 │ F. Supp. 2d 1064, 1066-67 (D. Or. 2002) ("When an innocent state prisoner's violation of

1  the federal habeas corpus statute of limitations is at issue, the federalism and comity

2  interests are not nearly as strong as when a federal court must forgive an innocent

3  prisoner's procedural default of a state's habeas corpus statute of limitations."). Further,

4  "[a]ny concerns that recognition of an actual innocence exception to the limitations period

5  will result in a deluge of untimely frivolous constitutional claims is belied by this court's

6  experience that a credible claim of actual innocence is extremely rare." *Souter*, 395 F.3d

7  at 600.

8          Nor does the structure of the AEDPA indicate that Congress prohibited

9  application of the miscarriage of justice doctrine to the AEDPA statute of limitations.

10  Respondent argues that because the AEDPA addresses a showing of innocence only with

11  respect to two rules (regarding obtaining an evidentiary hearing and filing a second or

12  successive petition),[15] Congress intended that innocence would be irrelevant in all other

13  circumstances. However, in both instances, Congress merely limited the use of already-

14  existing pre-AEDPA innocence exceptions.  The fact that Congress did not similarly

15  disturb the *Schlup* innocence standard in the procedural default context – *Schlup* was

16  decided the year before the AEDPA was enacted – demonstrates that Congress intended

17  only to restrict the innocence gateway in the two specific instances of successive petitions

18  and evidentiary hearings, not to prevent innocence from being considered in all other

19  situations. *Souter*, 395 F.3d at 598-99.

20          In fact, prior to the enactment of the AEDPA, when there was no set time

21  limit for filing a federal habeas petition and a State could allege only that laches barred a

22  late-filed petition, *see* RULE 9(A) OF THE RULES GOVERNING SECTION 2254 CASES IN THE

23  UNITED STATES DISTRICT COURT, 28 U.S.C. FOLL. §2254, it appears that there was a

24  recognition that a showing of innocence could rebut a defense of laches.  Dissenting from

25  the denial of certiorari in *Spalding v. Aiken*, 460 U.S. 1093, 103 S. Ct. 1795, 76 L. Ed. 2d

26  361 (1983) (mem.), Justice Blackmun wrote,

27

28      [15] 28 U.S.C. §§ 2244(b)(2)(B)(ii), 2254(e)(2)(B).

1          I would allow summary dismissal of habeas petitions

2    when the state can prove that the lapse of time has made

3    reprosecution impossible. Exceptions should be limited to cases

4    where the petitioner can make a colorable claim of innocence,

5    demonstrate that a significant miscarriage of justice has

6    occurred or show that his claim is based on grounds that, with

7    the exercise of reasonable diligence, could not have been

8    discovered earlier.

9

10   *Id.*, 460 U.S. at 1097-98 (Blackmun, J., dissenting from denial of certiorari); *see also*

11   *United States v. Stifel*, 594 F. Supp. 1525, 1539 n.13 (N.D. Ohio 1984) (finding petitioner

12   not barred by laches where he presented a colorable claim of innocence); *Carson v. Burke*,

13   178 F.3d 434, 437 (6th Cir. 1999) (finding petitioner barred by laches from bringing

14   petition; noting that petitioner did not demonstrate a miscarriage of justice or raise even

15   a colorable claim of innocence).

16          Finally, there is no countervailing equitable consideration in this case. In the

17   pre-hearing order, fashioned by Petitioner and Respondent and entered by the Court

18   pursuant to Local Rule 16, Respondent asserted a "laches" defense to Petitioner's

19   innocence gateway claim. However, Respondent introduced no evidence on that point

20   despite introducing much evidence on other topics and thus presented no factual reason

21   that equitable considerations should not apply.

22

23   **2.   Constitutional Concerns**

24          Foreclosing habeas review of constitutional claims to a prisoner who can

25   demonstrate his innocence would raise serious constitutional questions. The most serious

26   question concerns the Suspension Clause which provides, "The Privilege of the Writ of

27   Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the

28   public Safety may require it." U.S. CONST. art. I, § 9, CL. 2. As the Supreme Court has

1 explained, an unconstitutional suspension of the writ of habeas corpus occurs when the
2 habeas remedy is rendered ineffective or inadequate. *Swain v. Pressley*, 430 U.S. 372,
3 381, 97 S. Ct. 1224, 51 L. Ed. 2d 411 (1977). As shown below, it is an open but serious
4 question whether the habeas remedy is rendered ineffective or inadequate where an
5 innocent prisoner is disallowed from pursuing his constitutional claims. Also potentially
6 at issue in the case of a prisoner who can demonstrate his innocence is the Eighth
7 Amendment ban on cruel and unusual punishment. *See e.g. Herrera v. Collins*, 506 U.S.
8 390, 432 n.2, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (Blackmun, J., dissenting) ("It also
9 may violate the Eighth Amendment to imprison someone who is actually innocent.").

10          Respondent argues that the Suspension Clause does not apply, asserting that
11 a state prisoner enjoys no constitutional right to a federal writ of habeas corpus. Chief
12 Justice Burger advanced this theory in his concurrence in *Swain*. *Id.*, 430 U.S. at 384-85.
13 This argument hinges on the office of the writ at the time the Constitution was enacted.
14 *Id.*; *Felker v. Turpin*, 518 U.S. 651, 663, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996). At
15 that time as well, however, the Constitution contained no prohibition on state
16 infringements of liberty, and it was only with the enactment of the Fourteenth Amendment,
17 which was ratified in 1868, that the Constitution adopted such proscriptions and thereby
18 guaranteed federal constitutional rights against state intrusions. *See City of Rome v.*
19 *United States*, 446 U.S. 156, 179, 100 S. Ct. 1548, 64 L. Ed. 2d 119 (1980) (noting that
20 the "Civil War Amendments" were "specifically designed as an expansion of federal
21 power and as an intrusion on state sovereignty"). At virtually the same time that Congress
22 enacted the Fourteenth Amendment, it passed the legislation that is the precursor to 28
23 U.S.C. § 2254, the federal habeas corpus statute, which allowed the federal courts to
24 review state criminal convictions. *Wainwright v. Sykes*, 433 U.S. 72, 78, 97 S. Ct. 2497,
25 53 L. Ed. 2d 594 (1977) (noting that 1868 statute allowed the review of state court
26 convictions); *Daniels v. Allen*, 344 U.S. 443, 499, 73 S. Ct. 437, 97 L. Ed. 469 (1953)
27 (mem.) (Opinion of Mr. Justice Frankfurter), *overruled in part on other grounds in Fay*
28 *v. Noia*, 372 U.S. 391, 83 S. Ct. 822, 9 L. Ed. 2d 837 (1963); *Ex Parte McCardle*, 73 U.S.

1 318, 325-26, 18 L. Ed. 816, 6 Wall. 318 (1867) (finding that 1867 legislation "brings

2 within the habeas corpus jurisdiction of every court and of every judge every possible case

3 of privation of liberty contrary to the National Constitution . . . . It is impossible to widen

4 this jurisdiction."). Thus, the extension of federal constitutional rights as against State

5 privations of liberty was accompanied by the vesting of jurisdiction in all federal courts

6 to redress those privations.

7         It may well be understood, therefore, that a component of the due process

8 guaranteed against state action includes the right to federal habeas review of state court

9 criminal judgments. *See* Jordan Steiker, *Incorporating the Suspension Clause: Is There*

10 *a Constitutional Right to Federal Habeas Corpus for State Prisoners?*, 92 MICH. L. REV.

11 862, 872-73 (1994); *cf. Rodriguez v. Artuz*, 990 F. Supp. 275, 282-83 (S.D.N.Y. 1998)

12 (considering Steiker's analysis and finding that AEDPA statute of limitation does not

13 necessarily violate the Suspension Clause; court is "prepared to say the following: at least

14 where no claim of actual or legal innocence has been raised . . . the [AEDPA's time] limits

15 do not render habeas inadequate or ineffective"), *aff'd* 161 F.3d 763 (2d Cir. 1998). The

16 Supreme Court has assumed, without deciding, that there is a constitutional right to federal

17 habeas review of state court judgments. *Felker*, 518 U.S. at 663-64.

18         If such a right exists, then the writ could well be rendered ineffective or

19 inadequate, *Swain*, 430 U.S. at 381, by a limitations period which prevents a petitioner,

20 who can demonstrate probable innocence, from proceeding in a first federal petition. *See*

21 *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir. 1997); *Miller*, 141 F.3d at 978; *United States*

22 *v. Zuno-Arce*, 25 F. Supp. 2d 1087, 1100-01 (C.D. Cal. 1998), *aff'd on other grounds*, 209

23 F.3d 1095 (9th Cir. 2000); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1189-90 (E.D. Mich.

24 2001); *Alexander v. Keane*, 991 F. Supp. 329, 335-38 (S.D.N.Y. 1998); *see also Majoy*,

25 296 F.3d at 776-77 (citing preceding cases for the proposition that foreclosing review of

26 innocent petitioner's claims raises serious constitutional concerns).

27         This Court need not resolve the constitutional question, however. It is enough

28 to recognize how serious it is. Given its seriousness, it is difficult to believe that Congress

1    would have left the matter to implication by its silence on the subject.  Moreover, this

2    Court is bound to "construe a federal statute to avoid constitutional questions where such

3    a construction is reasonably possible." *Arnett v. Kennedy*, 416 U.S. 134, 162, 94 S. Ct.

4    1633, 40 L. Ed. 2d 15 (1974); *see also Immigration and Naturalization Service v. St. Cyr*,

5    533 U.S. 289, 299-300, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001) (considering

6    constitutionally required scope of habeas review in immigration cases).  The Suspension

7    Clause and other constitutional questions raised by barring federal review on federal

8    procedural grounds in the case of a petitioner who can persuasively demonstrate his

9    innocence are serious ones. *See also Triestman v. United States*, 124 F.3d 361, 378-79 (2d

10   Cir. 1997) (considering Eighth Amendment and Due Process concerns); *Holloway*, 166

11   F. Supp. 2d at 1189-90 (considering Suspension Clause and Eighth Amendment concerns);

12   *cf. also Lonchar*, 517 U.S. at 324 ("Dismissal of a *first* federal habeas petition is a

13   particularly serious matter, for that dismissal denies the petitioner the protections of the

14   Great Writ entirely, risking injury to an important interest in human liberty.") (emphasis

15   in original); *Rodriguez*, 990 F.Supp. at 282-83 (finding AEDPA statute of limitations

16   constitutional, at least where no credible claim of innocence has been made).[16]

17           In order to avoid the clear constitutional issues, because the fact that equity

18   can toll a limitations period is well-accepted, and because the *Schlup* miscarriage of justice

19   concept is a well-established equitable doctrine, the Court concludes that AEDPA's statute

20   of limitations must be tolled when an evidentiary showing demonstrates that its application

21   would work a miscarriage of justice under *Schlup*. *See St. Cyr*, 533 U.S. at 301 n.13, 314

22   (where court otherwise would be required to "answer the difficult question of what the

23   Suspension Clause protects" there is reason to avoid restrictive construction of AEDPA,

24   especially where there is no clear intent from Congress that it intended restrictive

25   interpretation and there is no alternative forum for federal review).

26

27   _____

28   [16] Less compelling to this Court are the potential Equal Protection and substantive Due Process
     concerns because they suggest a free-standing claim of innocence, not the gateway claim at issue here.

1    Remaining to be considered, then, are the following: What is the correct
2    standard for determining innocence?; and, has Petitioner satisfied that standard?

3

4                                    **VI.**

5              **THE STANDARD FOR DETERMINING INNOCENCE**

6            Petitioner contends that the probabilistic standard of *Schlup* is the correct one
7    for determining his innocence. Respondent contends that Petitioner must demonstrate by
8    clear and convincing evidence that no juror would find him guilty in light of the new
9    evidence. The Court agrees with Petitioner.

10           As noted, under *Schlup*, a petitioner is "actually innocent" if it is more
11   probable than not that no reasonable juror would find the petitioner guilty beyond a
12   reasonable doubt in light of the new evidence. *Schlup*, 513 U.S. at 327. As described by
13   Judge Kozinski in his dissenting opinion in *Carriger v. Stewart*, 132 F.3d 463 (9th Cir.
14   1997), *Schlup* requires the habeas court to posit a hypothetical jury that is entitled to
15   consider both admissible and inadmissible evidence, so long as the inadmissible evidence
16   is reliable. *Carriger*, 132 F.3d at 485-86 (Kozinski, J., dissenting). The habeas court's
17   function is to determine if that jury, possessed of that evidence, would find the petitioner
18   guilty beyond a reasonable doubt. In *Schlup*, the Supreme Court refers to this decision as
19   a "probabilistic determination," *id.*, 513 U.S. at 330; the habeas court must determine the
20   probability that this hypothetical jury would acquit. If the habeas court concludes that it
21   is more likely than not that all reasonable jurors would acquit, then a petitioner has
22   satisfied the *Schlup* standard.

23           Respondent argues here that the *Schlup* probabilistic standard has been
24   superseded by the AEDPA, and in particular by 28 U.S.C. § 2254(e)(2) which provides
25   that where a petitioner has "failed to develop the factual basis" of his claim in state court,
26   then he cannot be entitled to an evidentiary hearing in federal court unless he can show by
27   "clear and convincing evidence" that no reasonable juror would have convicted him. 28
28   U.S.C. § 2254(e)(2). A petitioner "fails to develop" his claim where he is not diligent in

                                    - 51 -

1  developing the factual basis of his constitutional claim in state court. *See Williams v.*

2  *Taylor*, 529 U.S. 420, 432, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000).

3       The Ninth Circuit was presented with this same argument in *Jaramillo v.*

4  *Stewart*, 340 F.3d 877 (9th Cir. 2003), a case in which the petitioner alleged his innocence

5  to overcome a procedural default.  Presumably because section 2254(e)(2)(B) also

6  addresses an innocence exception, the State argued in *Jaramillo* that the language of

7  section 2254(e)(2)(B) should apply to any innocence exception applied in any proceedings

8  governed by the AEDPA.

9       The Ninth Circuit rejected the argument in *Jaramillo* and found instead that

10  2254(e)(2)'s "clear and convincing" standard did not apply because the petitioner had been

11  diligent in developing the factual basis of his underlying prosecutorial misconduct claim

12  in state court. *Jaramillo*, 340 F.3d at 881-82.  The Ninth Circuit has not adopted the

13  State's position in *Jaramillo*. *See e.g. Griffin v. Johnson*, 350 F.3d 956 (9th Cir. 2003)

14  (applying *Schlup* "more likely than not" test to merits of petitioner's claim of innocence),

15  *cert. denied*, 541 U.S. 998, 124 S. Ct. 2039, 158 L. Ed. 2d 510 (2004); *Majoy*, 296 F.3d

16  at 776-77 (discussing only the *Schlup* standard and requiring the district court to determine

17  whether the petitioner could demonstrate a miscarriage of justice pursuant to *Schlup*);

18  *accord Souter*, 395 F.3d at 590 n.5 (noting that, after the passage of AEDPA, the Supreme

19  Court "has continued to apply the more lenient *Schlup* standard in defining a miscarriage

20  of justice in other circumstances, which reinforces the conclusion that Congress was not

21  acting to alter the actual innocence standard beyond the two specific provisions in

22  AEDPA."); *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (assuming *Schlup* standard

23  applies while declining to decide whether there is an innocence exception to the AEDPA),

24  *cert. denied*, __ U.S. __, 126 S. Ct. 489, 163 L. Ed. 2d 364 (2005); *Sibley v. Culliver*, 377

25  F.3d 1196, 1205-06 (11th Cir. 2004) (same).[17]

26

27 ───────────

28  [17] In any event, Petitioner here did not "fail to develop" his claim in state court, so section 2254(e)(2)(B) does not apply. *Jaramillo*, 340 F.3d at 881-82.

1    Pursuant to *Majoy*, *Jaramillo*, and *Griffin*, then, this Court finds that in order

2    to pass through the innocence gateway, Petitioner is required to show that it is more likely

3    than not that no reasonable juror would convict him in light of the new evidence.

4    Respondent also has argued that "new evidence" under *Schlup* should include

5    only evidence which Petitioner had not discovered at the time of trial.  The Ninth Circuit

6    has held to the contrary; "new evidence" is evidence which was not *presented* at trial.

7    *Griffin*, 350 F.3d at 963

8    Finally, this Court has read *Bousley v. United States*, 523 U.S. 614, 118 S. Ct.

9    1604, 140 L. Ed. 2d 828 (1998), and cases interpreting it, as instructing the Court to

10   consider not only newly-presented exculpatory evidence, but also newly-presented

11   inculpatory evidence.  *See also Carriger*, 132 F.3d at 485-86 (Kozinski, J., dissenting);

12   *United States v. Montano*, 398 F.3d 1276, 1285 (11th Cir. 2005); *Martin v. Perez*, 391

13   F.3d 799, 802 (6th Cir. 2004).  Thus, this Court must consider not only the evidence

14   presented by Petitioner at the evidentiary hearing which undermined the evidence

15   presented at his trial in 1985; this Court also must consider the evidence Respondent

16   presented at the evidentiary hearing which Respondent asserts shows that the trial verdict

17   was correct, even if not based on the trial evidence.

18

19   **VII.**

20   **PETITIONER HAS SATISFIED THE *SCHLUP* STANDARD**

21   This Court retains no confidence in the verdict achieved through the

22   presentation of evidence at Petitioner's trial because none of the evidence from that trial,

23   upon which the conviction rested, withstands scrutiny in light of the newly presented

24   evidence here. Petitioner could have seen his mother from outside the house; the weather

25   was not bright or sunny and the line of sight allowed one to see the victim's body.  The

26   shoe prints inside and around the house did not all belong to Petitioner.  An object

27   resembling the unidentified shoe which left prints in the guest bath and outside the house

28   also made a mark on the victim's head.  The blood on Petitioner did not suggest guilt any

1   more than innocence. The victim's purse contained most of the missing money. Hughes'
2   testimony was not credible either in isolation or in conjunction with other evidence. There
3   was a different suspect who was not "convincingly cleared" and whose involvement police
4   appear to have ignored in spite of compelling evidence. Under all of these circumstances,
5   this Court has no confidence in the 1985 trial or conviction. *Majoy*, 296 F.3d at 776;
6   *Carriger*, 132 F.3d at 478.

7       The Court further finds that it is more likely than not that no reasonable juror
8   would convict Petitioner in light of the new evidence. *Schlup*, 513 U.S. at 327. The
9   evidence Respondent relied on consists primarily of the conditional guilty plea Petitioner
10  entered when he was to be considered for placement in the California Youth Authority, the
11  statements Petitioner made to officials considering his suitability for such placement, and
12  the statements Petitioner made during his parole proceedings from 1991 to 1998. Despite
13  this evidence, however, the Court finds that the hypothetical *Schlup* jury probably would
14  acquit Petitioner.

15      At first blush a guilty plea seems quite damning. But the mere existence of
16  the guilty plea itself is not conclusive. The Supreme Court in *Bousley* specifically
17  authorized consideration of a *Schlup* claim in the face of a guilty plea. *Bousley*, 523 U.S.
18  614. This particular plea cannot be considered very reliable.

19      During the plea colloquy, Petitioner did not state any specific facts about the
20  crime. Nor did counsel do so. Rather, the prosecution and defense counsel stipulated that
21  a factual basis for the plea existed. (RT Plea 10.) Defense counsel so stipulated based on
22  a reading of the preliminary hearing transcript, and upon the testimony taken at trial. (*Id.*)
23  The trial court too found a factual basis for the plea based on this evidence. (RT Plea 11.)
24  Petitioner's having pled guilty "because in truth and in fact you are guilty" (RT Plea 10),
25  thus was based on the assumptions of what the evidence would have shown at the time,
26  and that is the very evidence which the hearing in this Court undermined in its entirety.

27      Petitioner's plea was understood by all involved to be both conditional and
28  strategic. It was conditioned on Petitioner's being found suitable for commitment to the

- 54 -

1   California Youth Authority, and it was strategic because Petitioner could be confined to

2   the Youth Authority only until he was 25, as the prosecutor told Petitioner, as opposed to

3   potential confinement for life in state prison if he did not accept the deal. (RT Plea 6-7.)

4   Importantly, Petitioner immediately withdrew his plea when the court denied placement

5   in the Youth Authority.

6          Moreover, in none of Petitioner's statements surrounding the plea did

7   Petitioner offer any real insight into any of the lingering questions of the case. One might

8   expect that in at least one of his statements regarding the crime he might have answered,

9   for example, why his fingerprints were not on any of the murder weapons, how he had so

10   little blood on his clothing despite the viciousness of the crime, or why he consistently told

11   authorities he came in the kitchen window if he in fact set up the window to blame

12   someone else. Of course there also is no suggestion anywhere why someone else's

13   footprints were left in blood or of what actually happened to the missing money, if there

14   was any. That a defendant's confession was so devoid of detail might not be as troubling

15   in a case where the evidence was straightforward. Here, however, these questions seem

16   like obvious and compelling ones to this Court – and nowhere in any of Petitioner's bare-

17   boned statements can any answers be found.

18          Lacking in any detail, made when the evidence against him seemed

19   overwhelming, and offering the hope of a short sentence, Petitioner's 1984 conditional

20   plea – and his corresponding vague inculpatory statements in pursuit of Youth Authority

21   placement – are not strong evidence of his guilt. *Compare Doe v. Menefee*, 391 F.3d at

22   165-69 (in considering petitioner's claim of innocence, petitioner's detailed confession

23   made when petitioner did not have an incentive to admit guilt provides strong evidence of

24   his guilt).

25          Petitioner's admissions of guilt in parole proceedings are even less persuasive

26   evidence of Petitioner's guilt. Parole officials noted more than once that Petitioner

27   showed no emotion in admitting responsibility and seemed to remember little about the

28   crime. Of course, these admissions were made with everything to gain and nothing to lose,

1    especially considering Petitioner's record of good behavior in prison which could have
2    suggested to him that he had a realistic chance at parole. Most important to this Court, like
3    Petitioner's earlier inculpatory statements, the admissions either were almost entirely
4    devoid of details which might give them verisimilitude or contained statements that
5    conflicted with the evidence – especially concerning Petitioner's supposed premeditated
6    attempt to "frame" an intruder by removing window panes which, in 1983, he immediately
7    told authorities *he* had removed.

8            Thus, the hypothetical jury envisioned by the Supreme Court in *Schlup* would
9    have before it the following evidence of Petitioner's guilt: (1) Petitioner was found at the
10   scene of his mother's murder with blood on him; (2) he previously pleaded guilty,
11   although that conditional guilty plea immediately was withdrawn when he was not
12   committed to the Youth Authority; (3) he admitted responsibility to Youth Authority
13   officials and to parole officials at certain points; and (4) he had a poor relationship with
14   his mother, and due at least in part to his use of drugs, he had moved out of the house, and
15   his parents had nailed shut various entry points to the house.

16           On the other hand, the jury also would know:  (1) the weather and lines of
17   sight were such that Petitioner could have seen from his reported vantage point outside the
18   house his mother lying in the foyer as he stated to police; (2) bloody shoe prints not
19   belonging to Petitioner or identified as belonging to police personnel were found in the
20   house and possibly on the victim's head; (3) the blood evidence was equivocal; (4) at least
21   some of the missing money actually was in the victim's purse after her murder; (5) the
22   already discredited jailhouse informant to whom Petitioner supposedly confessed offered
23   similar testimony in other cases, had access to information about Petitioner's case which
24   was a potential source of a manufactured confession, was one of at least three inmates who
25   offered police details of a confession by Petitioner, recounted facts in conflict with the
26   evidence, and appeared to have had undocumented prior contacts with police in
27   Petitioner's case; (6) a likely suspect with a violent criminal record gave very suspicious
28   statements to police soon after the murder but was investigated no further even though

1 phone records showed that someone using Mrs. Lisker's telephone near the time of the

2 murder dialed a number off by only one digit from that of the likely suspect's mother; and

3 (7) missteps in the investigation likely tainted the original jury verdict as suggested by

4 various facts including that the detective in charge of the case threw away, or at least did

5 not preserve, key evidence and made misstatements to state authorities about the case years

6 later. In sum, the jury would know that there is essentially no evidence of Petitioner's

7 guilt outside his own brief statements, self-serving when they were made and

8 unaccompanied by verifying details, and that there is a strong suggestion that someone else

9 was responsible for the crime. In such circumstances, it is more probable than not that no

10 reasonable juror would find Petitioner guilty of murder beyond a reasonable doubt.

11 *Schlup*, 513 U.S. 298.

12

13                                         **VIII.**

14                                  **CONCLUSION**

15          In light of the new evidence presented by Petitioner and by the State, it would

16 be a miscarriage of justice for this Court to dismiss the First Amended Petition as

17 untimely.

18

19                                          **IX.**

20                            **RECOMMENDATION**

21          For the foregoing reasons, IT IS RECOMMENDED that the District Court

22 (1) issue an Order accepting and adopting this Report and denying the motion to dismiss

23 the action; and (2) refer this case back to the undersigned for further proceedings.

24          DATED:  May  4  , 2006

25

26

27                          _____
                                          RALPH ZAREFSKY
28                            UNITED STATES MAGISTRATE JUDGE