1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | PAMELA C. HAMANAKA
Senior Assistant Attorney General
4 | KRISTOFER JORSTAD
Deputy Attorney General
5 | JOHN YANG
Deputy Attorney General
6 | ROBERT DAVID BRETON
Deputy Attorney General
7 | State Bar No. 73686
   300 South Spring Street, Suite 1702
8 |    Los Angeles, CA  90013
   Telephone: (213) 897-2279
9 |    Fax: (213) 897-6496
   Email:  DocketingLAAWT@doj.ca.gov
10

Attorneys for Respondent

11

12 | IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| **BRUCE E. LISKER,** | CV-04-02687-VAP(RZ) |
| Petitioner, | **ANSWER TO SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| **v.** | |
| **MICHAEL KNOWLES, Warden,** | |
| Respondent. | |

1

# TABLE OF CONTENTS

2

**Page**

3   MEMORANDUM OF POINTS AND AUTHORITIES                                          1

4   PROCEDURAL BACKGROUND                                                         1

5   STATEMENT OF FACTS                                                            5

6   PETITIONER'S CONTENTIONS                                                     22

7   STANDARD OF REVIEW                                                           23

8   ARGUMENT                                                                     26

9   I.    PETITIONER IS NOT ENTITLED TO FEDERAL
        HABEAS RELIEF ON GROUND ONE OF HIS
10       PETITION (*MASSIAH* VIOLATION AND
        PRESENTATION OF FALSE EVIDENCE)                                         26
11

        A.   Relevant State Court Proceedings                                   27
12

        B.   The State Courts' Determination Was Not Contrary To, Or An
13           Unreasonable Application Of, Supreme Court Authority Regarding
             The *Massiah* Claim                                                29
14

    II.   PETITIONER IS NOT ENTITLED TO FEDERAL
15        HABEAS RELIEF ON GROUND TWO OF HIS
        PETITION (INEFFECTIVE ASSISTANCE OF TRIAL
16       COUNSEL)                                                               34

17       A.   Applicable Law                                                    34

18       B.   The State Court Reasonably Applied The Two Prongs Of *Strickland*
             In Finding That Defense Counsel Had Provided Effective
19           Representation And That Petitioner Had Failed To Demonstrate
             Actual Prejudice From Any Failure                                  37
20

             1.   State Court Rejection Of The Ineffectiveness Claim            37
21

             2.   Applicable Law                                               38
22

             3.   Analysis Of Claim                                            42
23

                 a.   No Motive Evidence                                       48
24

                 b.   No Evidence Linking Ryan To Scene                        53
25

                 c.   Mark On Mrs. Lisker's Skull                              54
26

                 d.   Inconsequential Phone Call From Lisker Residence         59
27

                 e.   Summary                                                  61
28

i

## TABLE OF CONTENTS  (continued)

Page

III.  PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND THREE OF HIS PETITION (PROSECUTOR'S PRESENTATION OF FALSE EVIDENCE) ............................................................. 63

    A.  Ground Three Is Untimely ...................................................... 63

    B.  Ground Three Is Procedurally Defaulted ............................... 64

    C.  Ground Three Is Without Merit ............................................. 67

        1.  Applicable Law ............................................................. 67

        2.  Analysis Of False Evidence Claim ............................... 69

            a.  The Weather On March 10, 1983 ........................ 69

            b.  Comparison Of March 23, 1983 And March 10, 1983 .................................................. 71

            c.  Time When Crime-scene Photographs Were Taken ... 72

            d.  The Victim's Body In Position Not Visible To Petitioner ........................................................ 73

            e.  Shoeprints Inside The Bathroom, In The Kitchen, And Outside The House .................................... 77

            f.  Bloody Shoeprints Not Made By Anyone Other Than Lisker ...................................................... 78

            g.  Summary ............................................................. 84

IV.  PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND FOUR OF HIS PETITION (CUMULATIVE IMPACT OF CONSTITUTIONAL VIOLATIONS IN GROUNDS ONE, TWO AND THREE) ............................................................. 87

    A.  Ground Four Is Untimely ...................................................... 87

    B.  Ground Four Is Procedurally Barred ..................................... 87

    C.  Ground Four Is Without Merit ............................................... 87

CONCLUSION ............................................................................................. 89

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Allen v. Woodford*
395 F.3d 979 (9th Cir. 2005)                                                      69

5

*Anderson v. Calderon*
232 F.3d 1053 (9th Cir. 2000)                                                    40

6

7

*Babbitt v. Calderon*
151 F.3d 1170 (9th Cir. 1998)                                                36, 39

8

*Baja v. Ducharme*
187 F.3d 1075 (9th Cir. 1999)                                                    44

9

10

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*
289 F.3d 589 (9th Cir. 2002)                                                     78

11

*Bashor v. Risley*
730 F.2d 1228 (9th Cir. 1984)                                                    40

12

13

*Bean v. Calderon*
163 F.3d 1073 (9th Cir. 1998)                                                    40

14

*Bell v. Cone*
535 U.S. 685
122 S. Ct. 1843
152 L. Ed. 2d 914 (2002)                                                  23, 24, 35

15

16

*Bell v. Cone*
543 U.S. 447
125 S. Ct. 847
160 L. Ed. 2d 881 (2005)                                                         25

17

18

19

*Bennett v. Mueller*
322 F.3d 573 (9th Cir. 2003)                                                     66

20

*Bittaker v. Woodford*
331 F.3d 715 (9th Cir. 2003)                                                     43

21

22

*Bonin v. Calderon*
59 F.3d 815 (9th Cir. 1995)                                                36, 39, 64

23

*Boyde v. Brown*
404 F.3d 1159 (9th Cir. 2005)                                                    31

24

25

*Brewer v. Hall*
378 F.3d 952 (9th Cir. 2004)                                                     25

26

27

28

## TABLE OF AUTHORITIES  (continued)

Page

1
2
3    *Brown v. Payton*
     544 U.S 133
     125 S. Ct. 1432
4    161 L. Ed. 2d 334 (2005)                                    24
5    *Burger v. Kemp*
     483 U.S. 776
6    107 S. Ct. 3114
     97 L. Ed. 2d 638 (1987)                                     36
7
     *Cacoperdo v. Demosthenes*
8    37 F.3d 504 (9th Cir. 1994)                                  39
9    *Campbell v. Wood*
     18 F.3d 662 (9th Cir. 1994)                                  38
10
     *Carothers v. Rhay*
11   594 F.2d 225 (9th Cir. 1979)                                 68
12   *Carriger v. Stewart*
     132 F.3d 463 (9th Cir. 1997)                                  4
13
     *Chambers v. Mississippi*
14   410 U.S. 284
     93 S. Ct. 1038
15   35 L. Ed. 2d 297 (1973)                                      87
16   *Clark v. Murphy*
     331 F.3d  1062 (9th Cir. 2003                                24
17
     *Coleman v. Calderon*
18   150 F.3d 1105 (9th Cir. 1998)                                36
19   *Coleman v. Thompson*
     501 U.S. 722
20   111 S. Ct. 2546
     115 L. Ed. 2d 640 (1991)                                     64
21
     *Cooks v. Spalding*
22   660 F.2d 738 (9th Cir. 1991                                38, 42
23   *Cooper v. Calderon*
     255 F.3d 1104 (9th Cir. 2001)                                41
24
     *Crotts v. Smith*
25   73 F.3d 861 (9th Cir. 1996)                                  38
26   *Delgado v. Lewis*
     223 F.3d 976 (9th Cir. 2000)                                 35
27
     *Denham v. Deeds*
28   954 F.2d 1501 (9th Cir. 1992)                                41

iv

# TABLE OF AUTHORITIES  (continued)

Page

*Dows v. Wood*
211 F.3d 480 (9th Cir. 2000) .......................... 35, 41

*Early v. Packer*
537 U.S. 3
123 S. Ct. 362
154 L. Ed. 2d 263 (2002) .......................... 24, 25

*Earp v. Stokes*
431 F.3d 1158 (9th Cir. 2005) .......................... 44

*Fellers v. U.S.*
540 U.S. 519
124 S. Ct. 1019
157 L. Ed. 2d 1016 (2004) .......................... 31

*Furman v. Wood*
190 F.3d 1002 (9th Cir. 1999) .......................... 35

*Gallego v. McDaniel*
124 F.3d 1065 (9th Cir. 1997) .......................... 40

*Gentry v. Roe*
320 F.3d 891 (9th Cir. 2003) .......................... 36

*Gerlaugh v. Stewart*
129 F.3d 1027 (9th Cir. 1997 .......................... 35

*Giglio v. United States*
405 U.S. 150
92 S. Ct. 763
31 L. Ed. 2d 104 (1972) .......................... 68

*Guam v. Santos*
741 F.2d 1167 (9th Cir. 1984) .......................... 39

*Hamilton v. Vasquez*
17 F.3d 1149 (9th Cir. 1994) .......................... 41

*Hardamon v. United States*
319 F.3d 943 (7th Cir. 2003 .......................... 40

*Harris v. Reed*
489 U.S. 255
109 S. Ct. 1038
103 L. Ed. 2d 308 (1989) .......................... 64

*Harris v. Vasquez*
949 F.2d 1497 (9th Cir. 1990) .......................... 39, 40

*Hasan v. Galaza*
254 F.3d 1150 (9th Cir. 2001) .......................... 42

v

# TABLE OF AUTHORITIES  (continued)

**Page**

*Hayes v. Brown*
399 F.3d 972 (2005)                                          68

*Hayes v. Woodford*
301 F.3d 1054 (9th 2002)                                     36

*Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002)                                24

*Holland v. Jackson*
542 U.S. 649
124 S. Ct. 2736
159 L. Ed. 2d 683 (2004)                                     24

*House v. Bell*
126 S. Ct. 2064 (2006)                                       67

*Hunter v. Aispuro*
982 F.2d 344 (9th Cir. 1992)                                 25

*In re Clark*
5 Cal.4th 750
21 Cal. Rptr. 2d 509 (1993)                             4, 64, 65

*In re Hardy*
41 Cal.4th 977 (2007)                                         4

*In re Lawley*
___ Cal.4th ___
2008 WL 755825, *4-6 (2008)                                   4

*In re Miller*
17 Cal. 2d 734 (1941)                                      5, 28

*In re Robbins*
18 Cal. 4th 770
77 Cal. Rptr. 2d 153 (1998)                             4, 64, 65

*In re Weber*
11 Cal.3d 703 (1974)                                          4

*Insyxiengmay v. Morgan*
403 F.3d 657 (9th Cir. 2005)                                 44

*Jackson v. Brown*
513 F.3d 1057 (9th Cir. 2008)                                68

*Jackson v. Calderon*
211 F.3d 1148 (9th Cir. 2000)                                37

*James v. Borg*
24 F.3d 20 (9th Cir. 1994)                                   37

## TABLE OF AUTHORITIES  (continued)

**Page**

*Kane v. Garcia Espitia*
546 U.S. __
126 S. Ct. 407
163 L. Ed. 2d 10 (2005)                                    24

*Kimmelman v. Morrison*
477 U.S. 365
106 S. Ct. 2574
91 L. Ed. 2d 305 (1986)                                    35

*Kuhlmann v. Wilson*
477 U.S. 436
106 S. Ct. 2616
91 L. Ed. 2d 634 (1986)                                    30

*La Crosse v. Kernan*
244 F.3d 702 (9th Cir. 2001)                           28, 65

*Lacy v. Lewis*
123 F. Supp. 2d 533 (C.D. Cal. 2000)                        25

*LaGrand v. Stewart*
133 F.3d 1253 (9th Cir. 1998)                               38

*Lambert v. Blackwell*
387 F.3d 210 (3d Cir. 2004)                                 69

*Lambert v. McBride*
365 F.3d 557 (7th Cir. 2004)                                31

*Lang v. Callahan*
788 F.2d 1416 (9th Cir. 1986)                               40

*Lockyer v. Andrade*
538 U.S. 63
123 S. Ct. 1166
155 L. Ed. 2d 144 (2003)                               23, 24

*Lowry v. Lewis*
21 F.3d 344 (9th Cir. 1994)                                 62

*Luna v. Cambra*
306 F.3d 954 (9th Cir. 2002)
*amended* 311 F.3d 928 (9th Cir. 2002)                      25

*Lurie v. Wittner*
228 F.3d 113 (2d Cir. 2000)                                 26

*Maine v. Moulton*
474 U.S. 159
106 S. Ct. 477
88 L. Ed. 2d 481 (1985)                                26, 30

# TABLE OF AUTHORITIES  (continued)

**Page**

*Martinez-Villareal v. Lewis*
80 F.3d 1301 (9th Cir. 1996)                                    66

*Massiah v. United States*
377 U.S. 201
84 S. Ct. 1199
12 L. Ed. 2d 246 (1964)                                     1, 30, 31

*McCain v. Gramley*
96 F.3d 288 (7th Cir. 1996)                                     26

*McClain v. Lewis*
283 F. Supp. 2d 1104 (C.D. Cal. 2003)                           69

*McCleskey v. Zant*
499 U.S. 467 (1991)                                             66

*McElvain v. Lewis*
283 F. Supp. 2d 1104 (C.D. Cal. 2003)                           68

*McKinney v. Artuz*
326 F.3d 87 (2d Cir. 2003)                                      26

*McKnight v. Comstock*
445 F.2d 317 (9th Cir. 1971)                                    44

*Miller-el v. Cockrell*
537 U.S. 322
123 S. Ct. 1029
154 L. Ed. 2d 931 (2003)                                        24

*Miranda v. Arizona*
384 U.S. 436
86 S. Ct. 1602
16 L. Ed. 2d 694 (1966)                                          1

*Mitchell v. Esparza*
540 U.S. 12
124 S. Ct. 7
157 L. Ed. 2d 263 (2003)                                        25

*Mitchell v. Gibson*
262 F.3d 1036 (10th Cir. 2001)                                  26

*Moore v. Deputy Commissioners of Sci-Huntington*
946 F.2d 236 (3d Cir. 1991)                                     36

*Morales v. Calderon*
85 F.3d 1387 (9th Cir. 1996)                                    65

*Morales v. Woodford*
388 F.3d 1159 (9th Cir. 2004)                                   68

viii

# TABLE OF AUTHORITIES  (continued)

**Page**

*Morgan v. Bunnell*
24 F.3d 49 (9th Cir. 1994)                                          40

*Morris v. California*
966 F.2d 448 (9th Cir. 1992)                                       35

*Morris v. California*
966 F.2d 448 (9th. Cir. 1992)                                      37

*Morris v. Ylst*
447 F.3d 735 (9th Cir. 2006)                                       68

*Murray v. Carrier*
477 U.S. 478
106 S. Ct. 2639
91 L. Ed. 2d 397 (1986)                                            66

*Murtishaw v. Woodford*
255 F.3d 926 (9th Cir. 2001)                                       68

*Napue v. Illinois*
360 U.S. 264
79 S. Ct. 1173
3 L. Ed. 2d 1217 (1959)                                         67, 68

*Nix v. Whiteside*
475 U.S. 157
106 S. Ct. 988
89 L. Ed. 2d 123 (1986)                                         36-38

*Ortiz v. Stewart*
149 F.3d 923 (9th Cir. 1998)                                       41

*Paradis v. Arave*
954 F.2d 1483 (9th Cir. 1992)                                      40

*Pavao v. Cardwell*
583 F.2d 1075 (9th Cir. 1978)                                      68

*Penry v. Johnson*
532 U.S. 782
121 S. Ct. 1910
150 L. Ed. 2d 9 (2001)                                             23

*People v. Alcala*
4 Cal. 4th 742
15 Cal. Rptr. 2d 432 (1992)                                        45

*People v. Alvarez*
14 Cal 4th 155
58 Cal. Rptr. 3d 385 (1996)                                        46

# TABLE OF AUTHORITIES  (continued)

**Page**

*People v. Avila*
38 Cal.4th 491
43 Cal. Rptr. 3d 1 (2006)                                      46

*People v. Babbitt*
45 Cal. 3d 660
248 Cal. Rptr. 69 (1988)                                    46, 48

*People v. Blankenship*
167 Cal. App. 3d 840
213 Cal. Rptr. 666 (1985)                                    46

*People v. Bradford*
15 Cal. 4th 1229 (1997)                                       45

*People v. Clark*
3 Cal. 4th 41
10 Cal. Rptr. 2d 554 (1992)                                   45

*People v. Edelbacher*
47 Cal. 3d 983
254 Cal. Rptr. 586 (1989)                                     47

*People v. Green*
27 Cal. 3d 1
164 Cal. Rptr. 1 (1980)                                       45

*People v. Hall*
41 Cal. 3d 826
226 Cal. Rptr. 112 (1986)                                  45, 47

*People v. Karis*
46 Cal. 3d 612
250 Cal. Rptr. 659 (1988)                                     46

*People v. Kegler*
197 Cal. App. 3d 72
242 Cal. Rptr. 897 (1987)                                     46

*People v. Lewis*
26 Cal. 4th 334
110 Cal. Rptr. 2d 272 (2001)                                  45

*People v. Marshall*
13 Cal. 4th 799
55 Cal. Rptr. 2d 347                                          46

*People v. Mendez*
193 Cal. 39
223 P. 65 (1924)                                             45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES  (continued)

**Page**

*People v. Pride*
3 Cal. 4th 195
10 Cal. Rptr. 2d 636 (1992)                              45

*People v. Sandoval*
4 Cal. 4th 155
14 Cal. Rptr. 2d 342 (1992)                              47

*People v. Von Villas*
10 Cal. App. 4th 201
13 Cal. Rptr. 2d 62 (1992)                               46

*People v. Wright*
39 Cal. 3d 576
217 Cal. Rptr. 212 (1984)                                46

*Pizzuto v. Arave*
280 F.3d 949 (9th Cir. 2002)                             41

*Poland v. Stewart*
169 F.3d 573 (9th Cir. 1998)                             64

*Price v. Vincent*
538 U.S. 634
123 S. Ct. 1848
155 L. Ed. 2d 877 (2003)                                 24

*Ranieri v. Terhune*
366 F. Supp. 2d 934 (C.D. Cal. 2005)                     65

*Richmond v. Ricketts*
774 F.2d 957 (9th Cir. 1985)                             44

*Rios v. Rocha*
299 F.3d 796 (9th Cir. 2002)                             41

*Roe v. Flores-Ortega*
528 U.S. 470
120 S. Ct. 1029
145 L. Ed. 2d 985 (2000)                                 39

*Routly v. Singletary*
33 F.3d 1279 (11th Cir. 1994)                            69

*Sandgathe v. Maass*
314 F.3d 371 (9th Cir. 2002)                             35

*Schlup v. Delo*
513 U.S. 298
115 S. Ct. 851
130 L. Ed. 2d 808 (1995)                                  3

# TABLE OF AUTHORITIES  (continued)

1

2

Page

3  *Schlup v. Deno*
   513 U.S. 298 (1995)                                      66, 67

4  *Schriro v. Landrigan*
5  ___ U.S. ___
   127 S. Ct. 1933 (2007)                                       44

6  *Shackleford v. Hubbard*
   234 F.3d 1072 (9th Cir. 2000)                            25, 35
7

8  *Siripongs v. Calderon*
   133 F.3d 732 (9th Cir. 1998)                                 39

9  *Siripongs v. Calderon*
   35 F.3d 1308 (9th Cir. 1994)                                 65
10

   *Smith v. Stewart*
11 140 F.3d 1263 (9th Cir. 1998)                                42

12 *Stephens v. Hall*
   407 F.3d 1195 (11th Cir. 2005)                               69
13

   *Strickland v. Washington*
14 466 U.S. 668
   104 S. Ct. 2052
15 80 L. Ed. 2d 674 (1984)                             34-36, 38-41

16 *Strickler v. Greene*
   527 U.S. 263 (1999)                                          66
17

18 *Summers v. Dretke*
   431 F.3d 861 (5th Cir. 2005)                                 31

19 *Thompson v. Calderon*
   109 F.3d 1358 (9th Cir. 1997)                                35
20

21 *Totten v. Merkle*
   137 F.3d 1172 (9th Cir. 1998)                                44

22 *Townsend v. Sain*
   372 U.S. 293
23 83 S. Ct. 745
   9 L. Ed. 2d 770 (1963)                                       44
24

25 *Trice v. Ward*
   196 F.3d 1151 (10th Cir. 1999)                               41

26 *Turk v. White*
   116 F.3d 1264 (9th Cir. 1997)                                40
27

28

# TABLE OF AUTHORITIES  (continued)

**Page**

*United States v. Agurs*
427 U.S. 97
96 S. Ct. 2392 (1976)                                                                68

*United States v. Bagley*
473 U.S. 667
105 S. Ct. 3375
87 L. Ed. 2d 481 (1985)                                                              68

*United States v. Berry*
814 F.2d 1406 (9th Cir. 1989)                                                        41

*United States v. Chambers*
918 F.2d 1455 (9th Cir. 1990)                                                    37, 38

*United States v. Ferreira-Alameda*
804 F.2d 543
*amended* 815 F.2d 1251 (9th Cir. 1986)                                           39, 42

*United States v. Henry*
447 U.S. 264
100 S. Ct. 2183
65 L. Ed. 2d 115 (1980)                                                          30, 31

*United States v. Layton*
855 F.2d 1388 (9th Cir. 1988)                                                        37

*United States v. Lewis*
786 F.2d 1278 (5th Cir. 1986)                                                        40

*United States v. Mayo*
646 F.2d 369 (9th Cir. 1981)                                                         40

*United States v. Murray*
751 F.2d 1528 (9th Cir. 1985)                                                        41

*United States v. Necoechea*
986 F.2d 1273 (9th Cir. 1993)                                                        69

*United States v. Olson*
925 F.2d 1170 (9th Cir. 1991)                                                    38, 42

*United States v. Popoola*
881 F.2d  811 (9th Cir. 1989)                                                        41

*United States v. Rogers*
769 F.2d 1418 (9th Cir. 1985)                                                        39

*United States v. Sherlock*
962 F.2d 1349 (9th Cir. 1992)                                                        69

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES  (continued)**

**Page**

1

2

*United States v. Vincent*
3    758 F.2d 379 (1985)                                                        39

4    *United States v. Weatherspoon*
     410 F.3d 1142 (9th Cir. 2005)                                              78
5

*United States v. Zuno-Arce*
6    44 F.3d 1420 (9th Cir. 1995)                                          68, 69

7    *Wade v. Calderon*
     29 F.3d  1312 (9th Cir. 1994)                                         41, 42
8

*Weidner v. Thieret*
9    932 F.2d 626 (7th Cir. 1991)                                               43

10   *Weighall v. Middle*
     215 F.3d 1058 (9th Cir. 2000)                                             35
11

*Wiggins v. Smith*
12   539 U.S. 510
     123 S. Ct. 2527
13   156 L. Ed. 2d 471 (2003)                                              23, 35

14   *Wildman v. Johnson*
     261 F.3d 832 (9th Cir. 2002)                                          35, 39
15

*Williams v. Calderon*
16   52 F.3d at 1465 (9th Cir. 1995)                                           42

17   *Williams v. Taylor*
     163 F.3d  860 (4th Cir. 1998)                                             41
18

*Williams v. Taylor*
19   529 U.S. 362
     120 S. Ct. 1495
20   146 L. Ed. 2d 389 (2000)                                      23, 24, 35, 36

21   *Williams v. Woodford*
     384 F.3d 567 (9th Cir. 2004)                                              31
22

*Woodford v. Visciotti*
23   537 U.S. 19
     123 S. Ct. 357
24   154 L. Ed. 2d 279 (2002)                                                  35

25   *Yarborough v. Alvarado*
     541 U.S. 652
26   124 S. Ct. 2140
     158 L. Ed. 2d 938 (2004)                                                  36
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

*Yarborough v. Gentry*
540 U.S. 1
124 S. Ct. 1
157 L. Ed. 2d 1 (2003)                                          24, 35

*Ylst v. Nunnemaker*
501 U.S. 797
111 S. Ct. 2590
115 L. Ed. 2d 706 (1991)                                       25, 26

**Statutes**

28 U.S.C. § 2254                              24, 35, 43, 44, 62, 63

Cal. Evid. Code § 350                                           45

Cal. Evid. Code § 352                                           45

Cal. Penal Code § 31                                            62

Rule 7, 28 U.S.C. foll. § 2254                                  43

Rule 8, 28 U.S.C. foll. § 2254                                  44

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
PAMELA C. HAMANAKA
Senior Assistant Attorney General
KRISTOFER JORSTAD
Deputy Attorney General
JOHN YANG
Deputy Attorney General
ROBERT DAVID BRETON
Deputy Attorney General
State Bar No. 73686
    300 South Spring Street, Suite 1702
    Los Angeles, CA  90013
    Telephone: (213) 897-2279
    Fax: (213) 897-6496
    Email: DocketingLAAWT@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRUCE E. LISKER,**<br><br>Petitioner,<br><br>v.<br><br>**MICHAEL KNOWLES, Warden,**<br><br>Respondent. | CV-04-02687-VAP(RZ)<br><br>**ANSWER TO SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

Respondent Michael Martel, Warden,[1/] Kern Valley State Prison at Delano, California, hereby files this Answer to the Second Amended Petition For Writ Of Habeas Corpus (Petition), and alleges as follows:

1.  Petitioner is properly in the custody of Respondent pursuant to a valid judgment and felony conviction in Los Angeles County Superior Court case number

---

1.  Petitioner is housed at Mule Creek State Prison, where Michael Martel is the warden.  Substitution of the proper respondent is authorized by Federal Rule of Civil Procedure 25(c).

1

A804566.  (Clerks's Transcript (CT)[2/] at 379.)

2.  The Petition, filed on April 16, 2004, first amended on May 18, 2004, and again amended on January 12, 2007, is subject to the Antiterrorism and Effective Death Penalty Act of 1996.

3.  All Grounds are barred by the applicable statute of limitations (28 U.S.C. § 2244(d)).

4.  It would appear that all Grounds are exhausted, but Petitioner's claim of actual innocence (as a gateway to excuse untimeliness) is still unexhausted.

5.  Grounds Three and Four are procedurally barred.

6.  All Grounds alleged herein should be denied and dismissed with prejudice because the California court's denial of relief on these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor was the denial of relief based upon an unreasonable determination of the facts presented in the state court proceedings.  *See* 28 U.S.C. § 2254(d).

7.  Except as herein expressly admitted, Respondent denies each and every allegation of the Petition and specifically denies that Petitioner's custody is in any way improper, that the judgment of conviction underlying Petitioner's custody is in any way invalid, and that Petitioner's constitutional rights are being violated in any way.

8.  Respondent joins in Petitioner's request for an evidentiary hearing under 28 U.S.C. § 2254(e) on the issue of whether he "was illegally removed from the custody of a juvenile institution and placed in the 7000 module for the express purposed [sic] of obtaining jailhouse informant testimony to use at petitioner's trial." (Pet. at 5(a).)  In addition, Respondent requests an evidentiary hearing under 28 U.S.C. § 2254(e) in order to resolve disputed facts regarding (1) trial counsel's effectiveness and reasonable tactical decisions; (2) the prosecutor's alleged

---

2.  Copies of the Clerk's and Reporter's Transcripts and of the briefs filed in connection with Petitioner's direct appeal have already been lodged with this Court.

knowledge of the falsity of certain facts; and (3) the jailhouse informant's possession of any police reports.

9.   This Answer is based on the attached Memorandum of Points and Authorities, this Court's file, and the records and files in this case, including the clerk's transcript (CT) and reporter's transcript (RT) prepared in connection with Petitioner's direct appeal, which have been lodged with this Court, and on such other matters as are properly submitted to the Court.

WHEREFORE, Respondent respectfully requests that the Second Amended Petition for Writ of Habeas Corpus be denied and that this action be dismissed with prejudice.

Dated:  April 2, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

PAMELA C. HAMANAKA
Senior Assistant Attorney General

KRISTOFER JORSTAD
Deputy Attorney General

JOHN YANG
Deputy Attorney General


/s/ Robert David Breton
ROBERT DAVID BRETON
Deputy Attorney General
Attorneys for Respondent

RDB:lh
LA2004FH0213
LISKER ANSWER - FINAL.wpd

## MEMORANDUM OF POINTS AND AUTHORITIES
### PROCEDURAL BACKGROUND

On February 7, 1986, judgment was entered convicting Petitioner of murdering his adoptive mother with deadly weapons (Cal. Penal Code §§ 187, 189, 12022(b)) and sentencing him to state prison for an indeterminate term of sixteen years to life. (CT at 379; MTD Ex. A.)[3] On December 22, 1988, the California Court of Appeal affirmed the judgment after finding that (1) the admission of Petitioner's statements in violation of Petitioner's *Miranda*[4] rights was harmless beyond a reasonable doubt; and (2) there was no evidence that a jailhouse informant had been placed as an agent of the state to interrogate Petitioner, in violation of *Massiah*[5]. (MTD, Ex. B.) Petitioner's petition for rehearing was denied on January 20, 1989. (MTD, Exs. C, D.)

Petitioner attempted to file a untimely petition for review, but the California Supreme Court denied his request for leave to file the petition late. (MTD, Ex. E.) On March 31, 1989, Petitioner filed a habeas corpus petition in the California Supreme Court, alleging that (1) his conviction was based on the false testimony of the jailhouse informant; (2) his trial attorney provided ineffective representation with regard to the missing money evidence, the blood spatter evidence, and the jailhouse informant evidence; and (3) the California Court of Appeal's harmless error determination should have been submitted to a jury. (MTD, Ex. F.) On April 25, 1989, the habeas corpus petition was denied on the merits "for failure to allege sufficient facts." (MTD, Ex. G.)

---

3. Petitioner pled guilty and admitted there was a factual basis for the plea, but was returned to the superior court after the California Youth Authority found him to be unamenable for treatment and rehabilitation. (CT at 229.)

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

5. *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

1      Fourteen years later, on February 24, 2003, Petitioner filed a habeas corpus

2   petition in the Los Angeles County Superior Court, alleging (1) the same *Massiah*

3   violation; (2) ineffective assistance of counsel as a result of defense counsel's alleged

4   failure to present third-party-culpability evidence; and (3) presentation of false

5   evidence through the testimony of the jailhouse informant. (MTD, Ex. H.) On March

6   6, 2003, the Superior Court denied the habeas petition on the merits, finding that

7   Petitioner's assertions were based on false assumptions, were not supported by the

8   facts, and were "a stretch of credibility immersed in speculation," and noting that

9   Petitioner had previously entered a guilty plea (before he was found unsuitable for

10  placement at the Youth Authority and was sent back for trial), and that he had

11  admitted to counselor for the Youth Authority before trial and to the parole board

12  after his conviction that "he did kill the victim." (MTD, Ex. I.)

13     On July 28, 2003, Petitioner filed a habeas petition in the California Court

14  of Appeal, presenting the same claims of *Massiah* violation, ineffective assistance of

15  counsel regarding presentation of third-party-liability evidence, and presentation of

16  false testimony. (MTD, Ex J.)  The California Court of Appeal denied the petition

17  on the merits on August 5, 2003.  (MTD, Ex. K)

18     On August 18, 2003, Petitioner filed in the California Supreme Court a

19  petition for review following the Court of Appeal's denial of the habeas corpus

20  petition.  In the petition for review, he advanced the same three claims that he had

21  presented to the California Court of Appeal. (MTD, Ex. L.) The California Supreme

22  Court denied the petition on October 29, 2003.  (MTD, Ex. M.)

23     On April 16, 2004, Petitioner filed a Petition for Writ of Habeas Corpus with

24  this Court, and then amended it on May 12, 2004 (to delete a freestanding actual

25  innocence claim), alleging the *Massiah* violation and ineffective assistance of

26  counsel.  Respondent moved to dismiss, arguing that the action was barred under the

27  one-year statute of limitations of the Antiterrorism and Effective Death Penalty Act

28  of 1996 (AEDPA) because it was filed seven years past the one-year deadline and

1    also arguing that the actual innocence claim was unexhausted.  Petitioner countered

2    that he should be exempt from the timeliness bar because he could make a credible

3    gateway showing of actual innocence under *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct.

4    851, 130 L. Ed. 2d 808 (1995) (*Schlup*).   After considerable briefing on the legal

5    issue of whether a *Schlup* gateway innocence showing could excuse untimeliness

6    under the AEDPA, and following an evidentiary hearing to develop some of the facts

7    surrounding the actual innocence claim, this honorable Court issued a Report and

8    Recommendation recommending that the motion to dismiss be denied and that the

9    merits of the Petition be reached despite its untimeliness.  On October 10, 2006, the

10   District Court issued its Order accepting the Report and Recommendation, adopting

11   it as its own findings and conclusions, denying the motion to dismiss, and referring

12   the matter back to this Court for further proceedings.

13         On November 3, 2006, Petitioner filed a motion to amend his Petition to add

14   a false evidence claim based on certain evidence developed at the evidentiary hearing,

15   and a cumulative error claim, conceding that these two claims were unexhausted.

16   Respondent opposed the motion on exhaustion grounds, maintaining that the

17   California Supreme Court should be given the opportunity to consider the new facts

18   and order an evidentiary hearing on the two new grounds, the still unexhausted actual

19   innocence claim, and on the interrelated actual innocence and false evidence claims.

20   On January 12, 2007, this Court granted Petitioner's motion to file a Second

21   Amended Petition and then stayed the proceedings so that Petitioner could seek relief

22   in the California Supreme Court on the unexhausted grounds.

23         On February 13, 2007, Petitioner filed his third habeas corpus petition in the

24   California Supreme Court.   In his 2007 state habeas corpus petition, Petitioner

25   asserted three constitutional claims, and then added on a fourth claim regarding the

26   cumulative prejudicial effect of the three alleged errors.  The three claims were:  (1)

27   the presentation of false evidence material to the verdict, resulting in a violation of

28   Petitioner's rights to due process and a fair trial (Ground Three herein); (2)

1    ineffective assistance of counsel as a result of trial counsel's failure to investigate and

2    advance a third-party culpability defense (Ground Two herein); and (3) the state's

3    knowing exploitation of an opportunity to confront Petitioner without counsel

4    (*Massiah* violation) (Ground One herein).  (State Petition For Writ of Habeas Corpus,

5    filed in the California Supreme Court on February 13, 2007 (hereafter "Third state

6    petition"), at 3-4b.)  Petitioner conceded that the first and second claims (Grounds

7    Three and Two herein) were untimely, that the second claim (Ground Two herein)

8    was successive in that it had been previously presented and denied by the California

9    Supreme Court in a prior habeas corpus petition, and that the third claim (Ground One

10   herein) had been previously raised and rejected by the California Supreme Court in

11   a prior habeas corpus petition and by the California Court of Appeal on appeal.

12   (Third state petition, at 5-6; state Memorandum of Points and Authorities, at 57, 60,

13   68-70.)

14          Petitioner requested the supreme court to excuse the procedural defaults, but

15   notably did not present an actual innocence claim, either as a freestanding claim (*see*

16   *In re Lawley*, ___ Cal.4th ___, 2008 WL 755825 at *4-6 (2008); *In re Hardy*, 41

17   Cal.4th 977, 1015-18 (2007); *In re Clark*, 5 Cal.4th 750, 790, 796-97, 21 Cal. Rptr.

18   2d 509 (1993), *In re Weber*, 11 Cal.3d 703, 724 (1974)) or as an exception to

19   procedural default (*In re Clark*, 5 Cal.4th at 759, 797-98).  *See Carriger v. Stewart*,

20   132 F.3d 463, 476 (9th Cir. 1997) (suggesting that "a habeas petitioner asserting a

21   freestanding innocence claim must go beyond demonstrating doubt about his guilt,

22   and must affirmatively prove that he is probably innocent").  Instead, he asserted that

23   he "satisfie[d] the fundamental miscarriage of justice exception to the procedural bar

24   for successive and/or untimely petitions because error of constitutional magnitude

25   rendered his trial so fundamentally unfair that absent the error, no reasonable judge

26   or jury would have convicted him."  The California Supreme Court denied the habeas

27   corpus petition on November 14, 2007, on procedural grounds, citing *In re Clark*, 5

28   Cal.4th 750 (1993) (claim is untimely); *In re Robbins*, 18 Cal. 4th 770, 780, 77 Cal.

1  Rptr. 2d 153 (1998) (claim is successive); and *In re Miller*, 17 Cal. 2d 734 (1941)

2  (claim previously raised on appeal).  (Petitioner's Unopposed Ex Parte Application

3  For Order Vacating Stay and Directing Respondent to File Answer to Second

4  Amended Petition (Application), Ex. A.)

5       On December 4, 2007, this Court vacated the stay of proceedings and ordered

6  Respondent to file an answer to the merits of the second amended petition, to include

7  any procedural grounds Respondent wanted to raise simultaneously.

8                            **STATEMENT OF FACTS**

9       In March, 1983, Robert Lisker, Petitioner's father, and Dorka Lisker,

10  Petitioner's mother, resided at 15472 Huston Street in Sherman Oaks.  (RT at 223.)

11  Petitioner no longer lived with them, but there was a room in the house which had

12  been his bedroom.  (RT at 224, 953.)  Petitioner still had some of his belongings in

13  this bedroom.  (RT at 228, 953.)

14       Petitioner, who was 17 years old, was living in an apartment. (RT at 480;

15  Aug. RT at 146; Peo. Ex. 5IB, p. 22.)  His parents had kicked him out of the house

16  when he dropped out of high school.  (RT at 950, 952-53.)  Petitioner was not getting

17  along with his parents and had several heated arguments with them.  (RT at 551, 950-

18  52, 960.)  His parents objected to Petitioner's use of drugs.  (RT at 551, 952.)

19       Mr. Lisker was an attorney.  (RT at 224, 225.)  He and Mrs. Lisker had been

20  married for 37 years.  (RT at 225, 914.)  Mr. Lisker was paying the rent on his son's

21  apartment.  (RT at 480, 953.)  Petitioner's parents took away Petitioner's key to their

22  house.  (RT at 953.)  They nailed all the windows shut.  (RT at 954.)  They told him

23  to find a job and to start supporting himself.  (RT at 953, 955.)  They told him to get

24  a haircut and to look for a job.  (RT at 955, 958. )

25       On the evening of March 9, 1983, Mr. Lisker gave Mrs. Lisker $150 in cash

26  for shopping, as was his customary practice. (RT at 223-26.)  She placed it in her

27  purse or in her dresser.  (RT at 224.)  Petitioner was present at the time.  (RT at 224;

28  Peo. Ex. 5IB, at 36-37.)

1    The following morning, March 10, 1983, Mr. Lisker left at 7:l5 a.m. to go to

2    court in downtown Los Angeles.  (RT at 224, 226, 228.)  Mrs. Lisker was planning

3    to go to FEDCO to do some shopping and then to a beauty parlor, where she had a

4    1:30 p.m. appointment.  (RT at 224-27.)  When Mr. Lisker left, only his wife and the

5    dog were in the house.  (RT at 226.)  Mrs. Lisker  was not expecting anyone to come

6    to the house that morning.  (RT at 226.)

7    There was a trophy on the shelf in Petitioner's old bedroom.  (RT at 225.)

8    There was an exercise bar or rod in the master bedroom next to the laundry basket.

9    (RT at 225.)

10    Mrs. Lisker customarily wore a diamond ring, a wedding band, a third ring

11    with a large stone, and a wrist watch.  (RT at 227.)  However, she never wore these

12    jewelry items to bed.  (RT at 227.)  She would always take them off and keep them

13    in a small flowered ashtray on the bottom shelf of a cupboard in the kitchen which

14    was over the divider between the kitchen and the breakfast nook.  (RT at 227-28.)

15    When Mr. Lisker left for work, he went into the master bedroom and kissed

16    Mrs. Lisker goodbye.  (RT at 228.)  She was just getting up out of bed. (RT at 228.)

17    He noticed that her hands and wrists were bare and that she did not have her wrist

18    watch or jewelry on yet.  (RT at 228.)

19    Mr. Lisker went to court and made an appearance at a rather prolonged

20    hearing in probate court.  (RT at 229.)  He then went to his law office in Hollywood

21    and arrived there at about 11:05 or 11:l0 a.m.  (RT at 229, 230.)  Mr. Lisker's

22    secretary, Mrs. Lois Bowen, was there.  (RT at 229.)  She had been Mr. Lisker's

23    secretary for about six years.  (RT at 229.)

24    At about 11:30 a.m., Mr. Lisker received a telephone call from Petitioner, his

25    son, who was calling from Mr. Lisker's house.  (RT at 230-31, 802-03.)  His secretary

26    answered the call.  (RT at 230, 806, 807.)  Petitioner sounded hysterical and

27    distraught.  (RT at 231, 803, 806.)  Mr. Lisker's secretary tried to calm Petitioner

28    down and used Petitioner's name in the process of doing so.  (RT at 231.)  Mr. Lisker

1  overheard this from his desk and knew that his secretary must be talking to his son.

2  (RT at 231.)

3       Mr. Lisker picked up his telephone receiver and talked to Petitioner.  (RT at

4  231.)  Petitioner was attempting to talk to his father, but was so hysterical that Mr.

5  Lisker could not understand him.  (RT at 231.)  Mr. Lisker stated, "Please, Bruce,

6  calm down. Tell me what has happened. What is wrong?"  (RT at 231.)  Mr. Lisker

7  kept trying to calm Petitioner down until finally Petitioner got out words that Mr.

8  Lisker could understand.  (RT at 231.)

9       Petitioner said, "Dad, something happened to Mom.  Come home quick." (RT

10  at 232.)  Mr. Lisker asked, "What happened?", and Petitioner replied, "She's been

11  hurt.  She's stabbed."  (RT at 232.)  Mr. Lisker asked, "Have you called the

12  paramedics and the police?"  (RT at 232.)  Petitioner said that he had.  (RT at 232.)

13  It was later documented that Petitioner indeed had called the paramedics at 11:26 a.m.

14  (RT at 497, 757-58.)

15       Mr. Lisker said, "Bruce, try to calm down. I am on my way. Call the

16  paramedics and police again."  (RT at 232.)  Mr. Lisker said this because he was not

17  certain whether Petitioner in his condition had actually done so.  (RT at 232.)

18  Petitioner said he would and added, "[B]ut, hurry, hurry, hurry.  It is a mess."  (RT

19  at 233.)

20       Mr. Lisker hung up the phone, told Lois, his secretary, that there was an

21  emergency, and left.  (RT at 233.)  As he was driving up Highland Avenue to the

22  freeway, he stopped a motorcycle policeman and asked him to radio the Van Nuys

23  police station and find out whether someone had called to report the stabbing.  (RT

24  at 233-34.)

25       The first to arrive at the Lisker home were two paramedics from the Los

26  Angeles City Fire Department, Jay Lovato and Steve Lillienthal. (RT at 172, 191,

27  867.)  They had extensive training and experience as a paramedics.  (RT at 172-75.)

28  They arrived at 11:36 a.m. (RT at 176, 191.)  Two police officers arrived right after

1   the paramedics did and pulled up behind the ambulance.  (RT at 177, 810, 830-31,

2   867.)  The paramedics had been told at the fire station that there had been a stabbing.

3   (RT at 177.)

4          Petitioner was yelling and running around the front yard stating that his

5   mother was dying and that the paramedics should get in there and hurry up and help.

6   (RT at 176, 177, 191-93, 831-33, 868.)  As the paramedics walked toward the house,

7   they asked Petitioner whether the attackers were still in the house and whether it was

8   safe to enter. (RT at 177, 178, 192-93.) Petitioner stated that he was not sure and that

9   they should just go in the house and try to save his mother.  (RT at 178, 193, 210,

10  835.)  Petitioner was screaming hysterically (RT at 193-210, 833, 868), but Petitioner

11  was calm and coherent when he talked (RT at 219).  (Peo. Ex. 5IB at 23.)  There was

12  fresh blood on both of his hands.  (RT at 848.)

13         The paramedics approached the house, with the police officers leading the

14  way.  (RT at 178-79, 193-95, 834.)  As soon as they reached the porch, they saw two

15  knives on the porch.  (RT at 179, 195, 838, 847, 873.)  The police officers entered the

16  house and the paramedics followed closely behind.  (RT at 179, 195, 205, 834, 869.)

17  As soon as they entered the hallway, they saw Mrs. Lisker lying face down on the

18  floor about three or four feet from the front door and bleeding. (RT at 179, 184, 185-

19  187, 195, 196, 199-200, 205-07, 210, 217-18, 836-38, 869.) She was unconscious.

20  (RT at 179, 838.)  She had suffered trauma to the head.  (RT at  179.)  Her arm was

21  fractured.  (RT at 180.)

22         She was bleeding profusely from two extensive wounds and had no blood

23  pressure.  (RT at 179-80, 183, 856.)  She had blood all over her chest and back and

24  clothes, (RT at 196, 202.)  She was barely breathing.  (RT at 180.)  Without any aid,

25  Mrs. Lisker probably would have died within the next five to ten minutes. (RT at

26  188.)

27         The police officers searched throughout the house for suspects and secured

28  the residence.  (RT at 834, 838-39, 869, 874.)

The paramedics treated Mrs. Lisker for 15 to 20 minutes.  (RT at  181, 197, 207.)  They gave her oxygen.  (RT at 180.)   They monitored her heart. (RT at 180.) They started two intravenous injections.  (RT at 180.)  They cut off all her clothes to expose any other visible wounds.  (RT at 180, 202.)  They placed a mast suit on her legs and abdomen and inflated it to build up the blood pressure in her upper body and head where the vital organs were.  (RT at 180-81.)  They also requested additional manpower because of the extensiveness of the wounds.  (RT at 180.)

When the paramedics rolled Mrs. Lisker over on to her back, they noticed two steak knives on the floor underneath her body.  (RT at 182, 198, 200, 216, 217, 847.)  Paramedic Lovato moved them out of the way so that Mrs. Lisker would not sustain further injury.  (RT at 183, 212.)

While the paramedics were busy giving first aid to Mrs. Lisker and trying to save her life, Petitioner was yelling and running around hysterically.  (RT at 181, 201, 210, 214-16, 840, 856, 863, 869.)  He started interfering with their efforts to treat her. (RT at 181, 857, 863, 871, 876.)   He was getting into the paramedics' way continually.  (RT at 182, 857, 871, 876.)  He said he wanted to help his mother.  (RT at 841, 842, 843, 856, 861, 863.)

The paramedics kept asking Petitioner to wait outside.  (RT at 182, 201.) Several times the police warned him to stay outside.  (RT at 857, 861, 863, 864, 870-71, 875, 876.)  Finally, it got so bad that the paramedics had to ask the police to physically restrain Petitioner and to remove him from the area.  (RT at 182, 842, 857, 864.)   He was "more or less uncontrollable."  (RT at 842, 869.)   The police handcuffed Petitioner and placed Petitioner in the back seat of their patrol car.  (RT at 811, 819, 823-24, 841-46, 857-58, 861-62, 863-65, 869-72, 876, 914-15.)  Even then, Petitioner did not calm down, but continued to be excited and hysterical.  (RT at 812, 813-14, 825, 845-46, 850.)

The paramedics transported Mrs. Lisker to the hospital.  (RT at  182, 207.) Mrs. Lisker died about three hours later at the hospital of severe head injuries

1 | produced by blunt force trauma and multiple stab wounds in her back. (RT at 47,
2 | 144, 917.) She was five feet four inches tall and weighed 170 pounds. (RT at 107-
3 | 08, 124.) She was 66 years old. (RT at 123.)

4 |       If Mrs. Lisker had not received emergency life-saving medical assistance and
5 | first aid treatment, she would not have survived more than 15 minutes from the time
6 | of the infliction of the blunt force trauma and stab wounds. (RT at 74, 108- 09, 127,
7 | 152-53, 170.)

8 |       Mrs. Lisker had at least ten deep and gaping lacerations in her scalp, some
9 | of which produced hemorrhaging. (RT at 49-52, 54-55, 66, 93, 129-30, 154-57.)
10 | These severe gashes, including one which separated the ear lobe and cartilage from
11 | the rest of the ear, were caused by the application of blunt force. (RT at 50-52, 55,
12 | 71-72, 93, 131-34, 156-57.) There were multiple fractures of the cranium at the top
13 | of the skull and at the base of the skull and multiple bruises of the brain. (RT at 49,
14 | 66-70.) The eye sockets were completely shattered. (RT at 68.) These fractures of
15 | very hard bones were caused by severe force. (RT at 68-69.) There was extensive
16 | hemorrhaging at the base of the skull. (RT at 68.)

17 |       There were many other abrasions and bruises on Mrs. Lisker's head, face,
18 | and neck. (RT at 52-54.) Some of these abrasions on both sides of her face and neck
19 | were "pattern" abrasions, which had parallel lines caused by a particular blunt
20 | instrument or object. (RT at 52-54, 72.) There was also a stab wound on her right
21 | cheek below her right eye which penetrated down to the cheekbone. (RT at 65-66.)
22 | She had two black eyes due to the skull fracture. (RT at 146-50.)

23 |       There were several stab wounds in Mrs. Lisker's back. (RT at 55-59, 92.)
24 | Some of these were superficial wounds, but one was fatal because it perforated the
25 | lung and caused massive bleeding into the chest. (RT at 55-61.) The stab wounds
26 | were from 3-1/2 to 5 inches deep and were made with a single-edged blade which was
27 | sharp on one side and flat on the other. (RT at 59-60.)

28 |       There were numerous bruises on Mrs. Lisker's left upper arm, right forearm,

1  and right upper arm.  (RT at 61, 135-36.)  Mrs. Lisker's right upper arm, the humerus,

2  was completely broken in two pieces.  (RT at 61-63, 72, 151.)  There were several

3  cuts on Mrs. Lisker's left hand which were probably sustained as she tried to defend

4  herself by warding off the assailant's stabs or blows.  (RT at 63-64, 90-92, 135-36,

5  146.)

6       The exercise bar taken from the master bedroom, if used as a weapon and

7  applied with severe force, could have caused the arm fracture and the skull fractures

8  sustained by Mrs. Lisker.  (RT at  93-94, 98.)  The trophy found in the hallway, if

9  used as a weapon, could have caused many of the lacerations on Mrs. Lisker's scalp

10  and face.  (RT at 98; Peo. Ex. 51B at 39.)

11       The steak knives and the paring knife found underneath Mrs. Lisker's body

12  had measurements consistent with having inflicted the deep stab wounds in Mrs.

13  Lisker's back.  (RT at 99-103, 143.)  The two kitchen knives found on the front porch

14  had measurements inconsistent with having inflicted the deep stab wounds received

15  by Mrs. Lisker through the back.  (RT at 104-05.)  The superficial slicing wounds

16  inflicted on Mrs. Lisker's back and hands could have been caused by any one of these

17  knives.  (RT at 104, 143.)  There was no visible evidence of strangulation.  (RT at

18  115, 118-121.)

19       Detectives Roger Pida, Howard Landgren, and Andrew Monsue and

20  Lieutenant Lee Durrer of the Los Angeles Police Department arrived at the scene at

21  12:00 noon and carried out a complete investigation.  (RT at 240-43, 245, 248, 403,

22  809, 830, 866-67, 918.)  Officers Prado, Johnson, and De Rousseau were already

23  there.  (RT at 243, 406.)  Mrs. Lisker's body had already been taken away.  (RT at

24  407.)

25       With the exception of the kitchen window, there were no signs of forced

26  entry at any door or window to the Lisker house.  (RT at 248-49, 274-75, 289-90,

27  851-52.)  The side doors and back door to the house were locked from the inside. (RT

28  at 248, 851-52.)  There was no damage to these doors or to the front door. (RT at 248-

1   49.)  The panels around the front door were intact.  (RT at 248-49.)  The windows

2   were locked and the window screens were nailed shut.  (RT at 262-63.)

3          Officer Johnson talked to Petitioner in the police car in order to find out what

4   had happened.  (RT at 812, 819, 827.)  Petitioner told him he had come to his parents'

5   house to work on his car.  (RT at 812, 820.)  He knocked on the front door for 10

6   minutes and received no response.  (RT at 812, 820.)  He told Officer Johnson he

7   went around the side and back of the house, looked through a window, and saw a

8   head on the floor.  (RT at 812-13, 816, 820.)  He told Officer Johnson he broke into

9   the house through the kitchen window and went to the hallway where his mother was.

10  (RT at 813, 820, 821.)  Petitioner said she had two steak knives in her back and a rope

11  around her neck.  (RT at 813, 821.)  He could tell her arm was broken.  (RT at  821.)

12         Petitioner told Officer Johnson he tried to help his mother.  (RT at 813, 821.)

13  He pulled the two knives out of her back.  (RT at 816.)  He said he checked her purse

14  and found no money in it.  (RT at 821.)  He said he called the paramedics and then

15  his father.  (RT at 816, 821.)  Petitioner said he looked around the house to see if

16  someone was still there.  (RT at 816.)

17         Petitioner was still hysterical.  (RT at 812-814, 825, 917.)  His father arrived

18  and tried to calm him down.  (RT at 814-15, 820, 825, 849-50, 914-16.)  His father

19  told him to tell Officer Johnson what happened.  (RT at 820, 916. )

20         Petitioner lapsed into hysterical outbursts from time to time.  (RT at 821.) He

21  cried out to God to save his mother.  (RT at 821.)  He said she was a kind lady. (RT

22  at 821.)  Petitioner continued to ramble and cry.  (RT at 822, 825.)

23         Detective Monsue transferred Petitioner to his patrol car.  (RT at 438-39.)

24  Detective Monsue and Officer Johnson took Petitioner to the Van Nuys Police

25  Station.  (RT at 822-23.)  On the way to the police station, Petitioner asked about his

26  mother's condition.  (RT at 327, 439-41, 443, 476, 492.)  Petitioner told Detective

27  Monsue that he had checked inside his mother's purse to see if the assailant had taken

28  the $150 his father had given her the night before.  (RT at 327, 399-400, 442; Peo.

12

1    Ex. 51B at 40.)  Petitioner told Detective Monsue that he had read a book entitled

2    "Helter Skelter" and that the bloody murder of his mother and the smearing of blood

3    on the walls resembled what he had read about in that book.  (RT at 327, 443; *see* RT

4    at 372.)

5        Once they got to the police station, Detective Monsue interviewed Petitioner.

6    (RT at 246-47, 321, 778; Peo. Exs.51A [tape] and 51B [transcript].)  Petitioner told

7    Detective Monsue that at about 10:30 or 11:00 a.m. he went to his parents' house to

8    work on his car.  (Peo. Ex. 5IB at 1-2.)  He was out of money. (Peo. Ex. 51B at 2.)

9    He went to the front door; he knocked on the front door and rang the doorbell several

10   times. (Peo. Exs. 51B at 2.)  He told Detective Monsue that he heard a "thump . . .

11   like if [his mother] had rolled over and hit her arm." (*Ibid*.)  The dog was barking just

12   inside the front door.  (*Ibid*.)  Petitioner told Detective Monsue that he began to

13   suspect that something was wrong. (*Ibid*.)

14       Petitioner stated that he went around the back yard to retrieve a magnetic

15   hide-a-key box from an outside utility cabinet in the patio.  (RT at 348, 362-63, 470-

16   72, 480-81, 498; Peo. Ex. 5IB at 3, 12.)  When he walked around the side of the

17   house, he looked through the living room window and saw his mother's feet as she

18   lay on the floor about 30 feet north of the window where the hallway meets the living

19   room.  (RT at 264, 266-67, 333, 342-43, 349, 352-53, 362, 364, 447, 452; Peo. Ex.

20   5IB at 3, 8, 12, 13, 24.)  Detective Monsue later stood in the very spot where

21   Petitioner said he had stood, but could not see anything more than three feet beyond

22   the window pane and drapes.  (RT at 268-69, 411, 436, 445-47, 452, 455-56, 489,

23   494-95, 759-54, 776, 779-782, 925-27.)  Detective Monsue later approached the

24   living room window and could see no footprints or impressions at all in the muddy

25   planter in front of the living room.  (RT at 269-70, 358, 445.)  It had rained for two

26   or three days just prior to the day of the murder.  (RT at 502.)

27       Petitioner told Detective Monsue that he then looked through the window in

28   the patio door between the patio and the dining room and saw his mother's head and

1   hair as she lay on the floor.  (RT at 271-72, 275-76, 347-48, 352, 362, 447-48; Peo.

2   Ex. 51B at 3, 13, 24.)  Detective Monsue later stood at the same spot and found that

3   it was impossible to see what Petitioner claimed to have seen.  (RT at 272-74, 448,

4   489. )

5          According to Petitioner, he went around the back of the house, retrieved the

6   magnetic hide-a-key box, and discovered that it was empty.  (RT at 275-89, 360, 949;

7   Peo. Ex. 51B at 3, 12, 13, 25.)  He threw it away in some bushes.  (RT at 358, 362-63,

8   495, 892-93, 924, 942-43; Peo. Ex. 51B at 14, 25.)  Petitioner stated that he attempted

9   to get into the house through the kitchen window, as he had done on three other

10  occasions, but could see that his parents had nailed the screen shut, since they knew

11  that Petitioner had stolen money from them before.  (RT at 289, Peo. Ex. 5IB  at 3,

12  12, 22, 25.)  He tried to take the nails out with his fingers, but was unable to do so.

13  (RT at 289; Peo. Ex. 51B at 19, 25, 29.)

14         Petitioner told Detective Monsue that he ran north along the east side of the

15  house to his car, got a pair of pliers, ran back along the east side of the house, and

16  returned to the kitchen window.  (RT at 289-90, 364-65; Peo. Ex. 51B at 4, 18-19, 26,

17  29.)  According to Petitioner, he used the pliers to remove the nails from the screen.

18  (RT at 275-90; Peo. Ex. at 4, 14, 19.)  He then removed the screen, carefully removed

19  three window panes from the louvered window so as not to break them, and entered

20  the house.  (RT at 275, 290, 334, 354, 394-395; Peo. Ex. 51B at 4, 14, 19, 29-31.)

21         Detective Monsue later inspected the area outside the house next to the

22  kitchen window and found three panels of glass, a pair of pliers, and some nails on

23  the ground.  (RT at 274-75, 468.)  The three panes were lined up on top of the screen

24  in a very neat row.  (RT at 275, 456.)  Petitioner's fingerprints were on the kitchen

25  window sill and panes.  (RT at 766.)  There were several footprints on the east side

26  of the house leading to the kitchen window.  (RT at 271, 281-83, 290, 421-24, 506-

27  09.)  However, there was absolutely no dirt on the kitchen floor or in the kitchen sink

28  which was just inside the kitchen window.  (RT at 290-91.)  Furthermore, the opening

1   in the kitchen window was only 30 inches by 18 inches.  (RT at 401, 758-59.)

2       Petitioner told Detective Monsue that after he entered the house through the

3   kitchen window over the kitchen sink, he went down the hallway to the entry way

4   where his mother was.  (RT at 307, 354, 358-59, 395-96, 432-33.)  He saw that his

5   mother's entire head was dark red with blood.  (Peo. Ex. 51B at 4, 8, 14, 29, 31-32.)

6   He stated that he went back to the kitchen through a bathroom and the service porch

7   to get two large butcher knives to protect himself with.  (RT at  307, 346-47, 395;

8   Peo. Ex. 51B at 10-11, 16, 21, 33, 40, 43.)  Petitioner said he later returned to the

9   kitchen to get a dish towel to try to stop the bleeding and then went back to the entry

10  way.  (RT at 307, 361-62, 487; Peo. Ex. 51B at 21, 43.)  His mother was still alive.

11  (Peo. Ex. 51B at 5, 9, 10, 14, 32.)  Petitioner somehow knew his mother had been

12  attacked only 20 minutes before.  (Peo. Ex. 5IB at 37.)

13      Petitioner did not say that he had gone to the kitchen sink to wash his hands.

14  (RT at 307.)  However, bloody footprints from the hallway bathroom and service

15  porch pointed toward the kitchen and led to the kitchen sink.  (RT at 295-98, 300-06,

16  424-26, 468-69.)  One bloody footprint was only a foot and a half from the sink and

17  was facing it.  (RT at 326.)

18      Petitioner told Detective Monsue that when he attempted to take his mother's

19  pulse, he lifted her up to get her arm out from underneath her body.  (RT at 335, 516-

20  17; Peo. Ex. 5IB at 5.)  When he did so, he noticed that her arm "was completely

21  shattered and it must be because it moved so freely."  (RT at 335, 473-74, 516-17;

22  Peo. Ex. 51B at 5.)  Petitioner somehow knew that it was his mother's upper arm that

23  had been broken.  (RT at 335.)

24      According to Petitioner, he took the two knives out of Mrs. Lisker's back by

25  holding or pinching the knife handles with the thumb and forefinger of each hand and

26  pulling up.  (RT at 335-36, Peo. Ex. 51B at 14, 32.)  He told Detective Monsue that

27  he set the bloody knives down on the floor next to a big puddle of blood.  (RT at 336-

28  37; Peo. Ex. 5IB at 15.)  He said that he screamed twice, "Oh, my God." (RT at 335;

Peo. Ex. 51B at 5.)  He then stated that he placed the rope on the plants in the planter box by the front door.  (RT at 337-38; Peo. Ex. 51B at 6-7.)  Petitioner volunteered that he would never think of murdering his mother.  (Peo. Ex. 51B at 11, 42.)  He did admit that he and his mother did not get along and fought a lot.  (Peo. Ex. 51B at 4, 5, 21, 22, 38, 42.)

Petitioner told Detective Monsue that he went to the den and made his telephone calls to the paramedics and to his father.  (RT at 359; Peo. Ex. 51B at 5-6, 16, 29, 40-41.)  He stated that he opened the doors to all of the closets and went to all the rooms looking for the assailant.  (RT at 360-61, 396-98; Peo. Ex. 5IB at 9, 17-18, 20, 21, 33-36.)  He said that he then ran outside to the front door to look for somebody to help him.  (RT at 359-60, 362; Peo. Ex. 51B at 15, 42.)  He somehow knew that there were no signs of forced entry; he then suggested that maybe the cleaning lady or her boyfriend had robbed and stabbed his mother. (Peo. Ex. 5IB at 6, 16.)

There was a small amount of blood on the telephone that was on the front porch.  (RT at 249-51, 415.)  The blood was on the base of the telephone, not on the receiver.  (RT at 250-51.)  Petitioner stated to Detective Monsue that he used that telephone to call the paramedics and his father and that before using the telephone he had touched and held his mother.  (RT at 251, 258, 345, 413, 418, 431-35, 449-50, 503, 511-12; Peo. Ex. 5IB at 10, 15, 16, 43.)  She was "fighting for breath."  (RT at 491.)

The tennis shoes which Petitioner was wearing were seized.  (RT at 259, 314.)  The plaid shirt, T-shirt and corduroy pants that Petitioner was wearing were also seized.  (RT at 261, 314-17, 460-62, 848, 858.)  There was blood on the shoes and clothing.  (RT at 767, 848.)  The bottoms of the soles of Petitioner's tennis shoes resembled quite closely the patterns of the bloody footprints on the floor.  (RT at 326, 469.)

Mrs. Lisker's purse was on a love seat in the living room.  (RT at 293, 317,

16

399-400, 468.)  The contents of the purse had not been dumped, but the $150 in cash which Mr. Lisker had given her in Petitioner's presence the night before was missing. (RT at 442, 786.)

There was a rope on the carpet in the entry way by the front door.  (RT at 318.)  There were two small knives--a steak knife and a paring knife--on the floor in the entry hall.  (RT at 291-313, 426.)  There was blood on the blade and the handle of these knives.  (RT at 291-92, 767.)  In the hallway by the master bedroom were a trophy, a towel, and a lady's shoe.  (RT at 295, 312-13, 474, 496.)  A screw was loose at the base of the trophy.  (RT at 313.)  There was an exercise bar -- called a "bull worker" -- with blood on it in the master bedroom.  (RT at 299, 312, 496.)  There were two knives on the front porch.  (RT at 313-14.)  Petitioner's fingerprints were on one of these knives.  (RT at 766.)  There was blood on the handle, but not on the blade of one of these knives.  (RT at 767.)

There was a set of keys on top of a desk in the bedroom that had previously been Petitioner's bedroom.  (RT at 294, 325, 374-472, 493.)  One key was to a Cadillac which was in the garage.  (RT at 325, 493.)  Petitioner stated to Detective Monsue that there was a safe in the den.  (RT at 344-45; Peo. Ex. 51B at 9, 35.) Detective Monsue later checked the den and could see that nothing had been disturbed in that room.  (RT at 345.)  Nothing was disturbed in any of the bedrooms or in the sewing room.  (RT at 396.)

Various photographs were taken of blood pools, spots, spatters, stains, smears and footprints of blood which were throughout the house.  (RT at 249-50, 257-62, 295-98, 300-06, 310-11, 325-26, 400, 408-09, 417, 419-21, 427-28, 504-06, 520-22.)  These photographs and Petitioner's clothing were submitted to Ron Linhart, a blood pattern expert, for examination and analysis.  (RT at 260, 261.)

Ronald Linhart, a supervising criminalist in the office of the Los Angeles County Coroner's Office, and an expert in forensic serology and bloodstain pattern interpretation, examined the clothing Petitioner had been wearing on the day his

17

mother was murdered and examined the photographs taken of the crime scene. (RT at 700-05, 724-25.) He determined from their shape that the blood droplets deposited on Petitioner's clothing, i.e., shoes and rights shirt-cuff, had not been transferred through direct contact with the victim, but had resulted from either the application of force to a source of blood or from blood being cast off from a source. (RT at 705-10, 735-41; *see also* RT at 1113-17.)

He also concluded from the blood stain patterns on the wall that Mrs. Lisker had been hit with a blunt force blow while she was already bleeding and that she was knocked into the wall. (RT at 711-13, 725-33.) This spattering of blood could have been caused by someone striking Mrs. Lisker's bloody head with a bar or a trophy while she was down on the floor. (RT at 732-33.) The blood on Petitioner's clothes and shoes was type AB, the same blood type as that of Mrs. Lisker. (RT at 767-68.)

When Petitioner was detained at the Los Angeles County Jail during April, 1983, he was in a room (in module 7000) which had plaster walls dividing it from the adjacent rooms on either side. (RT at 547-48.) Robert Hughes was in the adjacent room. (RT at 547-48, 569.) There was a hole in the common wall between the two rooms which had a diameter of about four to six inches. (RT at 548, 569-70, 578.) Hughes noticed a special tag on the door to Petitioner's room which meant that the inmate in that room was a juvenile who was suicidal. (RT at 541-45, 549, 580.) Hughes began talking to Petitioner through the hole in their common wall about God and religion. (RT at 549-550, 575, 579, 594-98, 603-04, 636, 639, 646.) Hughes was more or less "ministering to him . . .[and] trying to help him . . . [because] he was down." (RT at 550, 578, 580, 625, 628-29, 642, 644, 943.) Hughes had not talked to anyone else about Petitioner's case before he started talking to Petitioner. (RT at 570.) Hughes had been a "born-again Christian" for about a year. (RT at 575.)

Petitioner told Hughes he wanted to confess what he had done. (RT at 550, 588, 638, 642-43.) Hughes had no idea what crime Petitioner was accused of committing. (RT at 550.) Hughes did not pump Petitioner for information or ask him

1  questions concerning the crime. (RT at 557-58, 594-95, 637-38.) Hughes was not

2  trying to get information in order to be a snitch in exchange for a reduction in his

3  prison term. (RT at 594-95, 639, 648.)

4        Petitioner told Hughes that he had killed his mother. (RT at 550, 601.) He

5  said, "I killed my mother and I fucked up." (RT at 550.) He told Hughes that he

6  "blew it" when he forgot to get rid of his clothes, and that the clothes he was wearing

7  when he killed his mother had blood splattered on them. (RT at 550-51, 599-600.)

8        Petitioner then went into further detail as to how and why he had murdered

9  his mother. (RT at 551.) He related that he had gone to his mother's house in

10  Sherman Oaks to get some money from her. (RT at 551.) Petitioner said that he had

11  been "using his folks in the past [to support] his drug habit and [that] he was using

12  a lot of PCP at the time and he didn't have the money to get the drugs . . . ." (RT at

13  551, 608, 651.) He and his mother had not gotten along for some time. (RT at 551.)

14        Petitioner told Hughes that he asked his mother to give him some money.

15  (RT at 551.) She said, "No." (RT at 51.) They had a heated argument. (RT at 551.)

16  Petitioner then waited for his mother to go to another part of the house and then tried

17  to steal the money from her purse without her seeing him. (RT at 551.) The purse

18  was on the sofa. (RT at 552.)

19        Petitioner told Hughes that his mother returned to the room Petitioner was

20  in and caught him in the act of going through her purse. (RT at 552.) She grabbed

21  his shirt and ripped it and slapped him around a bit. (RT at 552, 602, 606-08. )

22        Petitioner told Hughes that he then went into the kitchen, and got two steak

23  knives. (RT at 552, 610, 616-17, 634.) He then caught up with his mother in the

24  hallway and stabbed her in the back with both knives, leaving the knives embedded

25  in her back. (RT at 552, 601, 616.) She apparently fell down, but did not die

26  immediately. (RT at 552-53.) Petitioner told Hughes that he panicked when he

27  realized that she was not dead and would probably live to tell the police what had

28  happened. (RT at 552-53.) He got a trophy and started smashing her head in. (RT

1    at  553, 602, 608-09.)  Mrs. Lisker was still breathing. (RT at  553.)

2          Petitioner told Hughes that he became even more "paranoid." (RT at  553.)

3    Petitioner went and got a "bull worker," which he described as an isometric physical

4    exercise bar with a handle on each side and a strong spring in the

5    middle.  (RT at  554.)  Petitioner then "wailed on" his mother, with that exercise bar

6    "for a while."  (RT at 554, 601-02, 609.)  Petitioner told Hughes that he put a rope

7    around his mother's neck.  (RT at 557, 601, 609.)

8          At no time did Hughes ever see the Lisker residence or any photographs of

9    the Lisker residence.  (RT at 562.)  Before trial, Hughes had never seen the knives,

10   exercise bar, or trophy to which Petitioner had referred in his confession. (RT at 562,

11   564.)

12         Petitioner told Hughes that he did not believe he could be convicted because

13   he had concocted an alibi that was plausible and because he had called his father, the

14   paramedics, and the police.  (RT at  554-56, 610.)  He explained to Hughes that he

15   had told the police that he had gone to his mother's house, that it was locked up, and

16   that his dog was barking.  (RT at 555.)  He told the police that he started looking

17   through the windows and saw his mother lying on the floor with blood all over the

18   place.  (RT at 555.)  He told the police that he could not get into the house through

19   a door so he went in through the kitchen window.  (RT at 555, 617-19.)  He told the

20   police that he then found his dying mother. (RT at 555, 620.)

21         Hughes had been convicted in Orange County on January 27, 1982, of first-

22   degree burglary, grand theft auto, and receiving stolen property.  (RT at 560, 574-75.)

23   He was sentenced to state prison.  (RT at 560.)  He had been convicted previously in

24   Orange County on March 22, 1978, of attempted robbery.  (RT at  560, 575.)

25   Hughes' release date was October 11, 1984.  (RT at 572, 659.)

26         With regard to this earlier 1978 case, a deputy district attorney in Orange

27   County, Patty Manewkian, had told Hughes that she would try to get the trial court

28   to modify Hughes' sentence pursuant to Penal Code section 1170, subdivision (d), in

20

1    exchange for Hughes' willingness to testify in a case she was handling.  (RT at  561,

2    574, 584-85, 611, 640, 650-63.)  At a later point in time, a deputy district attorney in

3    Los Angeles County by the name of Denton had told Hughes that he would try to

4    follow up on processing the paperwork for the modification of the sentence in

5    exchange for Hughes testifying in a case he was handling.  (RT at  561, 574, 584,

6    599, 640-41, 660-63.)

7             Hughes decided to contact the authorities and to tell them about Petitioner's

8    confession.  (RT at  558-59, 639-41.)  In return for this information, Hughes wanted

9    whichever deputy district attorney was handling Petitioner's case to find out what was

10   happening on the other deputy's request for modification of Hughes' sentence.  (RT

11   at  560-61.)  Hughes talked to Detectives Landgren and Monsue about Petitioner's

12   confession.  (RT at  558-59, 577, 633.)  District Attorney Phil Rabichow assured

13   Hughes that he would contact Deputy District Attorney Denton to find out what was

14   going on with the paperwork he was supposed to be processing.  (RT at 561-62, 573-

15   74, 663-64.)

16            Hughes testified at Petitioner's preliminary hearing in this case on October

17   6, 1983.  (RT at  571-72, 681; Supp. C.T. pp. 148-203.)  The hearing was continued

18   to November 14, 1983.  (RT at  681, Supp. C.T. pp. 203-07.)

19   When Hughes was transported to the courthouse on November 14, 1983, he was told

20   by Deputy District Attorney Rabichow that the request for reduction of prison

21   sentence had been denied.  (RT at  664-66, 674.)  Hughes realized that if he continued

22   to testify that day he would lose any bargaining power he had

23   with regard to Deputy Rabichow's offer to look into the prison term reduction matter.

24   (RT at 673-74.)   In addition, during the various times that Hughes had been

25   transported to Los Angeles County on this case and the other cases, he lost

26   his prison job and the opportunity to earn half-time work credits.  (RT at 664-665,

27   684-88.)

28            Hughes decided not to testify and told Deputy District Attorney Rabichow

21

of his decision not to testify.  (RT at 673; Supp. C.T. p. 263.)  Deputy District Attorney Rabichow explained to Hughes that he would do what he could to help Hughes, including talking to District Attorney Robert Philibosian, regardless of whether Hughes testified or not.  (RT at 674, 688-89; Supp. C.T. p. 263.)  Hughes then walked into the courtroom and decided to go ahead and testify when he saw Petitioner's gleeful reaction to the news that Hughes was not going to testify.  (RT at 675, 676-79, 690-92.)  It was a matter of principle and "morals" to him. (Supp. C.T. pp. 265, 266. )

Hughes continued to testify at the preliminary hearing even though he had been told his sentence could not be reduced.  (RT at  674-76; Supp. C.T. at 263-66.)  Hughes was released from prison on December 27, 1983, six weeks after Petitioner's preliminary hearing, and nine months earlier than his previously-set release date, with the assistance of Deputy Rabichow.  (RT at 572-74, 611-12, 691.)  When Hughes testified at Petitioner's trial two years later, he was not in custody and was no longer on parole.  (RT at 676.)

## PETITIONER'S CONTENTIONS

1.  (a) Petitioner was denied his right to counsel when State authorities placed him in Module 7000 at the Los Angeles County Jail before trial, which resulted in the knowing exploitation of an opportunity to confront Petitioner without counsel and the intentional elicitation of a confession from Petitioner by a jailhouse informer acting as a government agent to interrogate Petitioner, in the absence of defense counsel; and (b) Petitioner was denied his right to due process and a fair trial when the prosecutor was permitted to present false evidence of a confession through the testimony of the jailhouse informant.  (Pet. at 5.)

2.  Petitioner was denied his right to the effective assistance of counsel by virtue of his trial attorney's failure to investigate and advance a third-party culpability defense with evidence strongly implicating a third party in the murder, to wit:  (a) evidence that at the time of the murder a telephone call was placed from the Lisker

22

1  residence to a number that was to a number similar to the mother of Ryan; (b) a

2  marked impression on Mrs. Lisker's forehead that might have been left by a shoe that

3  did not match Petitioner's shoe print; and (c) Ryan's contradictory statements to

4  police officers regarding his whereabouts on the morning of the murder.  (Pet. at 5.)

5      3.  The prosecutor committed misconduct by presenting the following false

6  evidence to the jury:  (a) evidence that the glare against the living room window from

7  the rear patio would have prevented Petitioner from seeing his dying mother, as he

8  had claimed to the arriving police; (b) evidence that a bloody footprint in the kitchen

9  had been placed by Petitioner; (c) evidence that the blood spatter evidence showed

10  that Petitioner was present during the assault on his mother; and (d) evidence that

11  money was missing from Mrs. Lisker's wallet.  (Pet. at 6.)

12      4.  Petitioner's constitutional rights to due process and a fair trial were violated

13  as a result of the cumulative effect of the constitutional violations alleged in Grounds

14  One, Two, and Three.

15                          **STANDARD OF REVIEW**

16          The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA")

17  became effective on April 24, 1996.  A state court decision is "contrary to" federal

18  law if it either "applies a rule that contradicts the governing law" as set forth in

19  Supreme Court opinions, or reaches a different decision from a Supreme Court

20  opinion when confronted with materially indistinguishable facts.  *Williams v. Taylor*,

21  529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (*Williams*); *accord*

22  *Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001); *Bell*

23  *v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (*Bell I*).  A

24  state court makes an "unreasonable application" of federal law if it identifies the

25  correct governing legal principle from the Supreme Court's decisions but

26  unreasonably applies that principle to the facts of the prisoner's case.  *Williams*, 529

27  U.S. at 412-13; *accord Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2534-35, 156

28  L. Ed. 2d 471 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L.

1    Ed. 2d 144 (2003) (*Andrade*) ("AEDPA does not require a federal habeas court to

2    adopt any one methodology in deciding the only question that matters under §

3    2254(d)(1) -- whether a state court decision is contrary to, or involved an

4    unreasonable application of, clearly established Federal law"). The Supreme Court

5    has "made it clear that whether a state court's decision is unreasonable must be

6    assessed in light of the record the court had before it." *Holland v. Jackson*, 542 U.S.

7    649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam) (*citing Yarborough

8    v. Gentry*, 540 U.S. 1, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) (per curiam) (italics

9    added); *Miller-el v. Cockrell*, 537 U.S. 322, 348, 123 S. Ct. 1029, 154 L. Ed. 2d 931

10    (2003), and *Bell I*, 535 U.S. at 697 n.4).

11        It is not enough merely to show that the state court was "incorrect." *Brown

12    v. Payton*, 544 U.S 133, 125 S. Ct. 1432, 1439-40, 161 L. Ed. 2d 334 (2005); *Price

13    v. Vincent*, 538 U.S. 634, 643, 123 S. Ct. 1848, 155 L. Ed. 2d 877 (2003) (even where

14    reviewing court might find that error occurred, relief is not warranted where state

15    court denial is "at least reasonable"). Thus, relief is not available simply because a

16    federal court independently concludes "that the relevant state-court decision applied

17    clearly established federal law erroneously or incorrectly. Rather, that application

18    must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Andrade*, 538 U.S.

19    at 75-76; *Early v. Packer*, 537 U.S. 3, 11, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002);

20    *Bell I*, 535 U.S. at 694. Moreover, decisions of the Supreme Court are the only ones

21    that can form the basis justifying habeas relief, and the principle on which Petitioner

22    seeks to rely must be found in the holdings, not dicta, of the Supreme Court decisions.

23    *Andrade*, 538 U.S. at 71-72; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003);

24    *Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002).

25        If there is no Supreme Court precedent that controls a legal issue raised by

26    a petitioner in state court, the state court's decision cannot be contrary to, or an

27    unreasonable application of, clearly established federal law. *See Kane v. Garcia

28    Espitia*, 546 U.S. __, 126 S. Ct. 407, 408, 163 L. Ed. 2d 10 (2005) (per curiam);

1    *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).  Also, a state court's failure to cite

2    any federal law in its opinion does not run afoul of the AEDPA.  *Mitchell v. Esparza*,

3    540 U.S. 12, __, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003).  In fact, a state court need

4    not even be aware of applicable Supreme Court precedent "so long as neither the

5    reasoning nor the result of the state-court decision contradicts them."  *Early v.*

6    *Packer*, 537 U.S. at 8; *Bell v. Cone*, 543 U.S. 447, 125 S. Ct. 847, 853, 160 L. Ed. 2d

7    881 (2005) (per curiam) (*Bell II*).

8         Here, the California Court of Appeal affirmed Petitioner's conviction on

9    direct appeal, after rejecting Ground One on the merits in its written, reasoned

10   opinion.  (Ex. A.)  In addition, the Los Angeles County Superior Court (Superior

11   Court) rejected the merits of Grounds One and Two when it denied Petitioner's

12   second state habeas corpus petition with a reasoned decision.  (Ex. I.)  The California

13   Court of Appeal and California Supreme Court also reached the merits of Grounds

14   One and Two when the California Supreme Court denied Petitioner's first habeas

15   corpus petition without discussion or citation to authority and when the California

16   Supreme Court and the California Court of Appeal issued silent denials to Petitioner's

17   second habeas corpus petition, thereby rejecting them on the same grounds as the

18   Superior Court.  (Exs. D, E; *see Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct.

19   2590, 115 L. Ed. 2d 706 (1991); *Hunter v. Aispuro*, 982 F.2d 344, 347-48 (9th Cir.

20   1992).

21        Therefore, this Court should look through the California Supreme Court's

22   unexplained rejection of Grounds One and Two to the reasoning of the California

23   Court of Appeal on direct appeal (Ex. A) and to the Los Angeles County Superior

24   Court's explained denial of the habeas corpus petition (Ex. C).  *See Ylst v.*

25   *Nunnemaker*, 501 U.S. at 803-04; *Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir.

26   2002), *amended* 311 F.3d 928 (9th Cir. 2002); *Shackleford v. Hubbard*, 234 F.3d

27   1072, 1079 n.2 (9th Cir. 2000); *Lacy v. Lewis*, 123 F. Supp. 2d 533, 539-40 (C.D. Cal.

28   2000).  "Where there has been one reasoned state judgment rejecting a federal claim,

later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. at 803.    Thus, these determinations by the lower courts are entitled to deference under the AEDPA.  *See*, *e.g.*, *McKinney v. Artuz*, 326 F.3d 87, 89 (2d Cir. 2003) (state trial court); *Mitchell v. Gibson*, 262 F.3d 1036, 1059 (10th Cir. 2001) (state trial court); *Lurie v. Wittner*, 228 F.3d 113, 127 (2d Cir. 2000) (state trial court); *McCain v. Gramley*, 96 F.3d 288, 290 (7th Cir. 1996) (intermediate state appellate court).

As to Grounds Three and Four, the California Supreme Court denied these claims on procedural grounds, finding that they were abusive and untimely.  In addition, it rejected Petitioner's argument that he came within the miscarriage-of-justice exception because without the allegedly false evidence, no jury would have convicted him.  These procedural bars are adequate and independent state grounds and render Grounds Three and Four procedurally defaulted.

However, Ground Three was previously presented to, and rejected by, the California Supreme Court on the merits in a prior habeas corpus petition.  Petitioner conceded in his state habeas corpus petition that Ground Two herein (ineffective assistance of counsel) was successive in that it had been previously presented and denied on the merits by the California Supreme Court in a prior habeas corpus petition.  (State Memorandum of Points and Authorities, at 57, 60.)  Thus, this previous denial of Ground Two is entitled to deference under the AEDPA.

As will be demonstrated below, the AEDPA precludes any relief in this case.

## ARGUMENT

## I.

### PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND ONE OF HIS PETITION (*MASSIAH* VIOLATION AND PRESENTATION OF FALSE EVIDENCE)

In Ground One, Petitioner contends that his constitutional rights, as enunciated in *Massiah* and *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985), were violated through the state's knowing exploitation of an

1   opportunity confront him through conversations with a fellow county jail inmate

2   without counsel being present.  Petitioner complains that the state, through certain jail

3   personnel and Detective Monsue, exploited an opportunity to place a known jailhouse

4   informant next to Petitioner's jail cell for the purpose of eliciting a confession without

5   counsel present, in violation of *Massiah*.  He claims, as he did on appeal, and later in

6   his multiple habeas corpus petitions, that Robert Hughes was acting as an agent for

7   the state and that Hughes, whose credibility was suspect, and impeached at trial,

8   provided false testimony regarding a confession that Petitioner never made.  The

9   assertion is unavailing.

10          Respondent notes that Petitioner is advancing two inconsistent arguments by

11  averring that he confessed to Hughes without counsel and then alleging that he did

12  not confess to Hughes.  He asserts his right to counsel was violated when he was

13  unlawfully housed in "module 700 (the snitch tank)" and the state arranged for him

14  to be interrogated by a "professional" jailhouse informant to elicit a full confession

15  in the absence of counsel.  However, he also argues that his rights to due process and

16  a fair trial were violated when the jailhouse informant provided false testimony

17  regarding a non-existent, "fabricat[ed], convincing-sounding 'confession.'"  (Pet. at

18  5.)

19          Petitioner cannot have it both ways:  he cannot obtain relief on an absence-

20  of-counsel *Massiah* claim if the confession never took place and Hughes merely made

21  it up out of whole cloth, in which case it would irrelevant whether Hughes was acting

22  as a government agent or talking to Petitioner without counsel present.  And he

23  cannot obtain relief on a false evidence or perjury claim if he insists that he was

24  entitled to have counsel present when Hughes spoke with him and elicited the

25  confession.  In reality, both of these claims were reasonably rejected by the state

26  courts, and the contradictory allegations are unavailing.

27  **A.  Relevant State Court Proceedings**

28          Petitioner presented these claims on direct appeal (MTD, Ex. B), in his 2003

27

habeas corpus petitions filed in the Superior Court, California Court of Appeal, and California Supreme Court.  (MTD, Exs. H, J, L.)  The California Supreme Court and California Court of Appeal issued silent denials (MTD, Exs. G, K, M), and the Superior Court denied the claim in a reasoned decision.  (MTD, Ex. I.)  The California Supreme Court's citation of *In re Miller*, 17 Cal.2d at 735 in its denial of Petitioner's third petition (Application, Ex. A) does not preclude federal review or militate against deference, since invocation of this bar merely stands for the proposition that the issue was raised and rejected on appeal. and cannot be renewed in a petition for writ of habeas corpus.  *La Crosse v. Kernan*, 244 F.3d 702, 705 n.11 (9th Cir. 2001).

In rejecting the merits of this claim, the Superior Court found that "[t]he six (6) inches of papers submitted by petitioner make many assumptions and assertions that are not supported by facts.  The logic offered by petitioner . . . is a stretch of credibility immersed in speculation."  The state court observed that, according to Petitioner, "[he] at one time entered a [guilty] plea, falsely admitted to the California Youth Authority workers and falsely admitted to Parole Board members that he did kill the victim.  Petitioner is now recanting his former positions."  The court concluded,  "[T]here is no basis to grant [relief], [and] nothing in the lengthy petition gives this court any reason to grant the relief."  (MTD Ex. I.)

Thus, the Superior Court reasonably concluded that the trial court reasonably exercised its discretion in ruling that Robert Hughes's testimony regarding Petitioner's confession was admissible and was not the fruit of any *Massiah* violation.  The Superior Court also found no basis upon which to conclude that Robert Hughes had committed perjury or that the prosecutor had knowingly presented false evidence.  The Superior Court also noted that the claim had been rejected when the conviction was affirmed on appeal.  These findings are entitled to deference.

In addition, the California Court of Appeal rejected the merits of Ground One(a) when it affirmed the conviction on direct appeal.  The California Court of

Appeal began by reviewing the applicable Supreme Court authority on the issue. (MTD B at 32, 34.)  The court expressly found that "Hughes commenced speaking with [Petitioner] *on his own initiative*," that "Petitioner confessed the murder to Hughes before Hughes ever spoke of him to the authorities," that Petitioner described the events surrounding the killing of his mother "in considerable detail," and that "Hughes did not speak with [Petitioner] after reporting his confession to the authorities." (MTD, Ex. B at 33; italics added.)  The Court of Appeal also noted that "Although Hughes had supplied information to the authorities in connection with other cases, he was *not* asked to do so by the police."  (MTD, Ex. B at 33; italics added.)

The court found that "Although the informant's contacts with the police may have arisen from his expectation that he would receive a return for his information, . . . there was no prior arrangement with the informant."  (MTD, Ex. B at 34.)  The court observed that Hughes decided not to testify when informed that the effort to reduce his sentence had been unavailing, but changed his mind because he was "upset by [Petitioner]'s apparent pleasure with his decision not to testify."  (MTD, Ex. B at 33-34.)  The court remarked that at the time Hughes testified, "it appeared that he would be penalized for testifying against [Petitioner], in that he lost conduct credits against his term while absent from state prison for that purpose."  (MTD, Ex. B at 34.)

The California Court of Appeal concluded, "There is nothing in the record to suggest Hughes was acting as an agent of the police when he heard the confession."  (MTD, Ex. B at 34.)

**B.  The State Courts' Determination Was Not Contrary To, Or An Unreasonable Application Of, Supreme Court Authority Regarding The *Massiah* Claim**

The state courts' analysis and rejection of the *Massiah* claim were a reasonable application of federal law.

The government's use of an agent to deliberately elicit and receive a defendant's admission or confession in the absence of his attorney violates the Sixth

1   Amendment.  *United States v. Henry*, 447 U.S. 264, 270-74, 100 S. Ct. 2183, 65 L.
2   Ed. 2d 115 (1980); *Massiah*, 377 U.S. at 206.  It is a denial of the Sixth Amendment
3   right to counsel to admit evidence of an indicted defendant's incriminating statements
4   deliberately elicited from the defendant by a government agent in the absence of his
5   counsel.  *Kuhlmann v. Wilson*, 477 U.S. 436, 456-60, 106 S. Ct. 2616, 91 L. Ed. 2d
6   634 (1986).  A government agent includes a jailhouse informant whom the state has
7   hired or instructed *beforehand* to obtain incriminating statements, and such
8   statements are inadmissible even if made voluntarily and without solicitation.  *Maine*
9   *v. Moulton*, 474 U.S. at 170-176; *United States v. Henry*, 447 U.S. at 274.

10          The Sixth Amendment right is *not* implicated, however, where the state, "by
11   luck or happenstance," obtains evidence of an incriminating statement the accused
12   made in the absence of counsel, such as where an accused voluntarily makes
13   statements to a cellmate who is not acting as a government agent.  Thus, where a
14   cellmate interrogates an accused, but acts on his own initiative rather than at the
15   behest of the government, the government may not be said to have deliberately
16   elicited the statements.  *Kuhlmann v. Wilson*, 477 U.S. at 458-59.  The inquiry is
17   whether police have deliberately created a situation for the specific purpose of
18   eliciting incriminating statements, and the informant has agreed with the authorities
19   *beforehand* to assist them as their surrogate or secret agent by ingratiating himself,
20   initiating conversations, eliciting incriminating information, and thereby engaging in
21   indirect and surreptitious interrogation of the defendant without benefit of counsel.
22   *United States v. Henry*, 447 U.S. at 270-73.  An informant's history of testifying for
23   the government in other cases does not automatically make an informant a state agent,
24   and no constitutional question arises unless the informant is an agent of the state *at*
25   *the time* he or she elicited the statements that would be the subject of later testimony.
26   *Maine v. Moulton*, 474 U.S. at 170-176.

27          In deciding whether information has been deliberately elicited, the courts
28   must focus on the state's conduct as a whole, rather than on the informant's.

*Massiah*, 377 U.S. at 206.  Thus, if the informant's contacts with the police arise from his own expectation or hope that he might receive a return for his information, but where there was no prior arrangement with the informant, the mere acceptance of his information, even with the promise to talk to the prosecutor, is not sufficient encouragement to hold the police accountable for the informant's subsequent actions. The informant's conduct cannot be attributable to the government where his actions in another case were unknown to the police, received no lenient treatment for his testimony, and had not been promised any quid pro quo in return for evidence before he testified.  *United States v. Henry*, 447 U.S. at 270-274; *see also Fellers v. U.S.*, 540 U.S. 519, 523-24, 124 S. Ct. 1019, 157 L. Ed. 2d 1016 (2004).

A state's finding that a witness was not placed as a government agent removes any basis for a *Massiah* claim.  *Williams v. Woodford*, 384 F.3d 567, 599 (9th Cir. 2004); *see also Summers v. Dretke*, 431 F.3d 861, 871 (5th Cir. 2005).  A state's finding that no promise had been made and that no deal had been struck between the prosecution and a witness for the witness's testimony is similarly binding.  *Boyde v. Brown*, 404 F.3d 1159, 1163-65 (9th Cir. 2005); *Lambert v. McBride*, 365 F.3d 557, 565 (7th Cir. 2004).

Here, it is patently clear from the entire record, including the pre-trial hearing on the *Massiah* issue (Aug. RT 366-80; Supp. CT 51, 140-203, 207-81, 296; RT 1-2, 11-12, 1227), that the government in no way induced, asked, or instructed Hughes to obtain a confession from Lisker (Supp. CT 152, 255; RT 1-2, 11, 570), that Robert Hughes was "not an agent of the police in any way" (RT 12; Aug. RT 354-55, 371, 379-80), and that Hughes was acting completely on his own initiative (Aug. RT 379-80; Supp. CT 255-56).  Moreover, it is clear that Hughes received no benefit from testifying in this case, received no inducement or promise from any law enforcement officer before Lisker confided in him, and did not contact any officer until *after* Petitioner had confessed to him.  (Supp. CT 161, 194, 199-202, 220-22; Aug. RT 367.)  When he relayed Petitioner's confession to the authorities, he merely asked if

1   they could check on the status of a pending request by an Orange County judge to the

2   Board of Prison Terms to recall the sentence in that case, after which the prosecutor

3   in this case -- without promising anything -- indicated only that he would follow up

4   on Hughes's request and "check on the progress of the [paperwork]," but that he

5   would *not* speak on Hughes behalf to the Orange County Superior Court.  (Supp. CT

6   161-63, 180, 184-89, 198, 215, 217, 222, 224, 257, 259-62; Aug. RT 365-67; RT

7   560-61, 572, 574-75, 584-85, 599, 611, 640-41, 650-63.)

8           Furthermore, when the prosecutor later informed Hughes that he could

9   nothing to help him regarding his present prison sentence and that the Board of Prison

10  Terms had rejected the Orange County judge's recommendation that he be given a

11  slightly earlier parole release date, Hughes told the prosecutor he had decided not to

12  testify in this case, but then changed his mind and decided to testify anyway because

13  he did not like the smirk on Petitioner's face ("this big smile on his face like he had

14  gotten away with something") when Petitioner was told that Hughes would not be

15  testifying.  (RT 664-66, 673-679, 690-92; Supp. CT 173-74, 188, 214-17, 261-66;

16  Aug. RT 367-72.)  Thus, although Hughes approached the detective with the hope

17  that the Los Angeles County Deputy District Attorney handling Lisker's case could

18  make an inquiry as to the status of an Orange County judge's pre-existing offer to

19  write a letter to the Department of Corrections in another case, the prosecutor entered

20  into no quid pro quo agreement to ascertain the status, and he offered no leniency

21  whatsoever to Hughes.  (RT 560-62, 573-74, 663-64, 674, 688-89; Supp. CT 184-88,

22  198, 215, 217, 259-63; Aug. RT 366.)  In the end, Hughes was prejudiced by his

23  voluntary decision to testify in this case, since he lost valuable conduct credits that

24  he could have been earning had he not been in the county jail.  (RT 1-2, 11-12, 570,

25  664-65, 684-88, 1227; Aug. RT 354-55, 365-69, 371, 379-80; Supp. CT 152-53, 187,

26  202, 215-16, 219, 236-37, 252, 255-56, 296.)

27          Thus, the record conclusively confirms that Hughes acted completely on his

28  own initiative and that no *Massiah* violation occurred.  (RT 549-50, 575, 578, 580,

588, 625, 628-29, 638-42, 644, 943; Supp. CT 264-66.)  Hughes adamantly denied

that anyone other than Petitioner talked to him about the case or that Petitioner or

anyone else had ever shown him a police report or crime scene photos.  (RT 562, 564,

570, 608.)  Hughes had no idea what crime Petitioner was accused of committing, did

not pump him for information or ask him any questions concerning the crime, and

was not trying to get information in exchange for a reduction of his prison term.  (RT

at 550, 557-58, 594-95, 637-39, 648.)  The record at trial affirmatively demonstrates

that there was no prior arrangement with the police, no indication by any officers to

whom Hughes had supplied information in the past that he should call them if he ever

had other information on anybody else, and no suggestion by any officer that Hughes

should speak to Petitioner about anything.  (RT at 558-85, 599, 611, 633, 639-41,

650-66, 673-89; Supp. CT 152, 194-98.)

Thus, there is no evidence in the record to show that Petitioner was

deliberately delivered to, and detained at, the county jail (after his fitness hearing) for

the purpose of placing him in an environment where he would be more likely to make

incriminating statements and where his right to counsel could be circumvented.

Indeed, the *only* evidence on this point is *to the contrary*:  that is, that Petitioner's

temporary placement at the county jail was merely due to an inadvertent mistake that

was promptly rectified.  (Supp. CT at 273-75, 280-83, 296; Aug. RT 336, 339, 343-

45, 351; *see also* MDT Ex. B at 31-32.)  Likewise, there was no showing at all that

an individual who wants to relieve his conscience is more likely to confide in his

fellow inmates at county jail than at juvenile hall or that Petitioner would not have

confessed just as readily to a fellow inmate at juvenile hall.

As noted above, the identical claim advanced herein was rejected on the

merits by the California Court of Appeal on direct appeal and by the California

Supreme Court when it denied the 1989 and 2003 habeas petitions.  The California

Court of Appeal correctly concluded that the record supported the conclusion of the

trial court that Hughes was gathering information on his own initiative, not that of the

33

1    state, and that, as such, he was not a government agent.  (MTD, Ex. B at 33-34.)

2    Petitioner has not shown that the state court determination contravened or

3    unreasonably applied  Supreme Court precedent on this issue.

4         Petitioner presents no new facts in support of the claim, other than some

5    irrelevant facts about two other jail informants, Dowtu and Wallace, whose

6    information was clearly fabricated and *never* credited by the police or introduced by

7    the prosecutor at trial.  Nothing in the record herein demonstrates that any "wink-and-

8    nod" method described by Dowtu or Wallace was ever used with Hughes, and any

9    suggestion that it was is purely speculative and totally groundless.  Therefore, no

10   prima facie case for relief has been stated as to this claim in these proceedings.

11        Thus, the claim must be rejected.

## II.

### PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND TWO OF HIS PETITION (INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL)

15        In Ground Two, Petitioner contends he was denied his right to effective

16   assistance of trial counsel as a result of defense counsel's failure to investigate and

17   present evidence of third party culpability.  He urges that certain minor pieces of

18   evidence, such as the facts that Ryan liked knives, had done odd jobs for Mrs. Lisker

19   in the past, was in Hollywood on the day of the murder, and was in need of money,

20   and somehow inexplicably obtained sufficient money to buy a bus ticket back to

21   Mississippi, demanded further investigation and presentation to the jury to exonerate

22   Petitioner from the murder.  (Pet. at 5-5b.)  The contention is clearly without merit in

23   that the state court's rejection of this claim was not contrary to established Supreme

24   Court precedent or an unreasonable application thereof.

### A.  Applicable Law

26        A claim of ineffective assistance of counsel is cognizable as a claim of denial

27   of the Sixth Amendment right to counsel, which guarantees not only assistance, but

28   effective assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686, 104

34

1    S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (*Strickland*).    To prevail on a claim of

2    ineffective assistance of counsel, a defendant must show both that counsel's conduct

3    fell below an objective standard of reasonableness, and that the defendant was

4    prejudiced by counsel's acts or omissions.    *Id*. at 687-88; *accord Bell I*, 535 U.S. at

5    695; *Williams v. Taylor*, 529 U.S. at 390.    *Strickland* imposes a "highly demanding"

6    standard upon the defendant to prove "gross incompetence" (*Kimmelman v.*

7    *Morrison*, 477 U.S. 365, 382, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)), and sound

8    tactical decisions are virtually immune from attack (*Strickland*, 466 U.S. at 699).    *See*

9    *also Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997); *Thompson v.*

10    *Calderon*, 109 F.3d 1358, 1365-65 (9th Cir. 1997); *Morris v. California*, 966 F.2d

11    448, 456 (9th Cir. 1992).

12        Judicial review of a *Strickland* claim is "highly deferential," and "*doubly*

13    deferential when it is conducted through the lens of federal habeas." *Yarborough v.*

14    *Gentry*, 540 U.S. at 5 (per curiam) (italics added); *see Wiggins v. Smith*, 539 U.S. at

15    521; *Delgado v. Lewis*, 223 F.3d 976, 981 (9th Cir. 2000) (*Strickland* standard is

16    "very forgiving"); *Dows v. Wood*, 211 F.3d 480, 484 (9th Cir. 2000).    The principles

17    set forth in *Strickland* are "clearly established Federal law" under the AEDPA.    *Bell*

18    *I*, 535 U.S. at 693; *Sandgathe v. Maass*, 314 F.3d 371, 380 (9th Cir. 2002); *Wildman*

19    *v. Johnson*, 261 F.3d 832, 837 (9th Cir. 2002); *Shackleford v. Hubbard*, 234 F.3d at

20    1079-80.    Under the AEDPA, federal courts have a "limited" scope of review with

21    respect to claims raised on habeas regarding allegations of ineffective assistance of

22    counsel.    *Dows v. Wood*, 211 F.3d at  484; *Wildman v. Johnson*, 261 F.3d at 837.

23        Thus, a petitioner must show that the state court applied *Strickland* to the

24    facts of his case in an objectively unreasonable manner.    *Woodford v. Visciotti*, 537

25    U.S. 19, 25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002); *Weighall v. Middle*, 215 F.3d

26    1058, 1063 (9th Cir. 2000); *Furman v. Wood*, 190 F.3d 1002, 1008 (9th Cir. 1999).

27    In applying § 2254(d)'s deference standard, "evaluating whether a rule application

28    was unreasonable requires considering the rule's specificity[;] [t]he more general the

35

1  rule, the more leeway [state] courts have in reaching outcomes in case by case

2  determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158

3  L. Ed. 2d 938 (2004). Because the *Strickland* standard is a general one, state courts

4  have great leeway in applying it. *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct.

5  3114, 97 L. Ed. 2d 638 (1987) (issue is not what might have been prudent, only what

6  is constitutionally compelled); *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S. Ct. 988,

7  89 L. Ed. 2d 123 (1986) (wide range of conduct acceptable).

8          In assessing a trial attorney's pre-trial acts and omissions, a reviewing court

9  must conduct an objective review of counsel's performance, measured for

10 "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.

11 This includes a context-dependent consideration of the challenged conduct as seen

12 "from counsel's perspective at the time," and "every effort [must] be made to

13 eliminate the distorting effects of hindsight." *Id*. at 689; *see also Babbitt v. Calderon*,

14 151 F.3d 1170, 1174 (9th Cir. 1998). Even the best lawyers would not defend their

15 client in the same way, and the question is not what the best lawyer would have done

16 or even what most good lawyers would have done, but whether a reasonable lawyer

17 at trial could have acted as defense counsel did. *Strickland*, 466 U.S. at 689;

18 *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998); *Moore v. Deputy*

19 *Commissioners of Sci-Huntington*, 946 F.2d 236, 246 (3d Cir. 1991).

20         With respect to the required showing of prejudice, it is not enough for a

21 petitioner to show that counsel's errors had some conceivable effect on the outcome

22 of the trial. *Strickland*, 466 U.S. at 693. He must demonstrate how the defective

23 performance actually "prejudiced the defense." *Id*. at 687-88; *see Gentry v. Roe*, 320

24 F.3d 891, 900 (9th Cir. 2003); *Hayes v. Woodford*, 301 F.3d 1054, 1066 (9th 2002);

25 *Bonin v. Calderon*, 59 F.3d 815, 833 (9th Cir. 1995). Unsupported speculation or

26 conclusory allegations as to the effect of an attorney's substandard performance are

27 not sufficient to show prejudice; there must be a real likelihood that an attorney's

28 deficiencies negatively impacted the petitioner's case. *Williams*, 529 U.S. at 399;

36

1  *Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000); *James v. Borg*, 24 F.3d

2  20, 26 (9th Cir. 1994); *Morris v. California*, 966 F.2d 448, 455-56 (9th. Cir. 1992).

3       Tactical decisions regarding which evidence to present and which witnesses

4  to put on are left to the sound judgment of the defense attorney. *See Nix v. Whiteside*,

5  475 U.S. at 165 (courts must "counteract" the "natural tendency to fault an

6  unsuccessful defense"); *United States v. Chambers*, 918 F.2d 1455, 1461-62 (9th Cir.

7  1990) (refusing to second-guess defense counsel's strategic decision to forego a

8  particular theory of defense when decision was reasonable under the circumstances);

9  *United States v. Layton*, 855 F.2d 1388, 1418-20 (9th Cir. 1988) .  In addition, a

10  petitioner must show that the failure to call the witness resulted in prejudice.

11  **B.  The State Court Reasonably Applied The Two Prongs Of *Strickland* In
12     Finding That Defense Counsel Had Provided Effective Representation And
      That Petitioner Had Failed To Demonstrate Actual Prejudice From Any
13     Failure**

14       Petitioner finds fault with his retained trial attorney for failing to carry out

15  certain investigative leads in an attempt to show that Ryan committed the murder.

16  However, defense counsel *did* investigate and attempt to present evidence of third

17  party culpability.  (Aug. RT at 389-95; RT 12.)  Defense counsel assiduously argued

18  at a pre-trial hearing on an in-limine motion that he be allowed to present evidence

19  of Ryan's possible culpability. (Aug. RT 390-98.)  Thus, the record shows that

20  defense counsel was extremely vigilant and aggressively pursued and protected

21  Petitioner's rights to discovery.

22       Petitioner has failed to demonstrate that counsel's performance was

23  constitutionally deficient or prejudicial.

24       **1.  State Court Rejection Of The Ineffectiveness Claim**

25       The Superior Court found no basis for the claim of ineffective assistance of

26  trial counsel.  The court noted that when defense counsel was preparing to try the

27  case, Petitioner entered a guilty plea, and then admitted to staff members at the

28  California Youth Authority that he did kill his mother.  The court refused to conclude

1    that Petitioner's attorney had been derelict in his duties and expressly found  that

2    Petitioner "had more than his day in court," "was [well] represented by counsel at that

3    trial," and that "nothing in the lengthy petition gives this court any reason to grant the

4    writ."  (MTD Ex. I.)

5        The Superior Court thus determined that Petitioner's ineffective assistance

6    claim was  meritless.  The California Supreme Court subsequently denied this claim

7    on the merits in a silent, postcard denial.  (MTD, Ex. L, M.)  Petitioner has failed to

8    show that this rejection of his ineffective-assistance-of-counsel claim was contrary

9    to, or an unreasonable application of, Supreme Court precedent.   Furthermore,

10   Petitioner could not have been prejudiced by defense counsel's alleged failing, since

11   the evidence of third-party culpability is speculative at best.

12       Here, Petitioner has not met any of his burdens.  He has provided no reason

13   to depart from the general rule that counsel's informed, tactical decisions about what

14   defense to present and what evidence to proffer will not be second-guessed.  *See Nix*

15   *v. Whiteside*, 475 U.S. at 165; *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994)

16   (reviewing court should "neither second-guess counsel's decisions, nor apply the

17   fabled twenty-twenty vision of hindsight"); *United States v. Chambers*, 918 F.2d at

18   1462.   Moreover, he has not demonstrated that the assistance rendered, even if

19   substandard, substantially affected the outcome.  *Strickland*, 466 U.S. at 692-93;

20   *Cooks v. Spalding*, 660 F.2d 738, 740 (9th Cir. 1991) (speculation that a different

21   strategy would have changed result is an insufficient showing of prejudice); *United*

22   *States v. Olson*, 925 F.2d 1170, 1174 (9th Cir. 1991).

23   **2.  Applicable Law**

24       A defense attorney's reasonable tactical decisions do not constitute

25   ineffective assistance, even if they prove unsuccessful.  *Strickland*, 466 U.S. at 689;

26   *Crotts v. Smith*, 73 F.3d 861, 866 n.4 (9th Cir. 1996); *United States v. Layton*, 855

27   F.2d at 1418-20.  "Strategic choices made after thorough investigation of law and

28   facts relevant to the plausible options are virtually unchallengeable." *LaGrand v.*

1  *Stewart*, 133 F.3d 1253, 1271 (9th Cir. 1998), *citing Strickland*, 466 U.S. at 490-91;

2  *see also Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985

3  (2000). "A tactical decision by counsel with which the defendant disagrees cannot

4  form the basis of a claim of ineffective assistance of counsel." *Guam v. Santos*, 741

5  F.2d 1167, 1169 (9th Cir. 1984); *see also Strickland*, 466 U.S. at 689; *Wildman v.*

6  *Johnson*, 261 F.3d at 839; *Bonin v. Calderon*, 59 F.3d at 838; *United States v.*

7  *Vincent*, 758 F.2d 379, 382 (1985).

8          As stated above, to prevail on a claim of ineffective assistance of counsel, an

9  inmate must show *both* that counsel's conduct fell below an objective standard of

10  reasonableness *and* that he was prejudiced by counsel's incompetence. *Strickland*,

11  466 U.S. at 687-88. A deficient performance prejudices a defense only if there is a

12  reasonable probability that, but for counsel's unprofessional errors, the result of the

13  proceeding would have been different, and the petitioner must show that counsel's

14  errors were so serious as to deprive the defendant of a fair trial, leading to an

15  unreliable result. *Id*. at 687-88, 690, 694. Judicial scrutiny of counsel's performance

16  must be highly deferential, and a court must indulge a strong presumption that

17  counsel's conduct falls within the wide range of reasonable professional assistance.

18  *See Strickland*, 466 U.S. at 689.

19          The relevant inquiry is not what defense counsel could have done, but rather

20  whether the choices made by defense counsel were reasonable and informed. *Babbitt*

21  *v. Calderon*, 151 F.3d at 1173; *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir.

22  1998); *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990). Strategic choices

23  made after thorough investigation of law and facts relevant to plausible options are

24  virtually unchallengeable. *Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir.

25  1994) (decision whether to introduce evidence largely question of professional

26  judgment); *United States v. Ferreira-Alameda*, 804 F.2d 543, 546-47, *amended* 815

27  F.2d 1251, 1254 (9th Cir. 1986); *United States v. Rogers*, 769 F.2d 1418, 1425 (9th

28  Cir. 1985). A difference of opinion as to trial tactics does not constitute denial of

1    effective assistance, and tactical decisions are not ineffective assistance simply

2    because in retrospect better tactics are known to have been available. *Lang v.*

3    *Callahan*, 788 F.2d 1416, 1418 (9th Cir. 1986); *Bashor v. Risley*, 730 F.2d 1228,

4    1241 (9th Cir. 1984); *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

5          A defense attorney has a general duty to make reasonable investigations, but

6    defense counsel can reasonably decide not to carry out a particular investigation or

7    can make a reasonable strategic decision that makes a particular investigation

8    unnecessary. *Strickland*, 466 U.S. at 691. Thus, if counsel reviews the preliminary

9    facts of the case and reasonably decides to pursue only one of two conflicting defense

10   theories, for example, he need not investigate the abandoned defense theory further.

11   *Anderson v. Calderon*, 232 F.3d 1053, 1095 (9th Cir. 2000); *Bean v. Calderon*, 163

12   F.3d 1073, 1082 (9th Cir. 1998); *Turk v. White*, 116 F.3d 1264, 1266-67 (9th Cir.

13   1997). In addition, the attorney's performance is not constitutionally defective when

14   the decision not to proceed any further down a particular avenue of investigation is

15   made as a result of a reasonable evaluation of the defendant's own statements to the

16   police or to defense counsel, which disclose that such a pursuit will only lead to a

17   dead end. *Paradis v. Arave*, 954 F.2d 1483, 1491 (9th Cir. 1992) (counsel may be

18   influenced by defendant's statements); *Harris v. Vasquez*, 949 F.2d at 1525 (counsel

19   cannot be faulted for following the defendant's out-of-court version); *Morgan v.*

20   *Bunnell*, 24 F.3d 49, 52 (9th Cir. 1994).

21         A claim of deficient investigation is undeveloped where it fails to show how

22   the investigation was deficient and what would have been produced if done correctly.

23   *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003). Allegations of failure

24   to investigate are deficient where they fail to show what additional investigation

25   would uncover. *United States v. Lewis*, 786 F.2d 1278, 1283 (5th Cir. 1986). Thus,

26   ineffectiveness is not shown where the petitioner provides no information as to what

27   further investigation would have produced that might have changed the result of the

28   trial. *Gallego v. McDaniel*, 124 F.3d 1065, 1077 (9th Cir. 1997).

1      A claim of failure to investigate must show exactly what information would

2  be obtained with investigation, and whether, assuming the evidence is admissible, it

3  would have produced a different result. *Hamilton v. Vasquez*, 17 F.3d 1149, 1157

4  (9th Cir. 1994); *Wade v. Calderon*, 29 F.3d 1312, 1316-18 (9th Cir. 1994); *United

5  States v. Popoola*, 881 F.2d 811, 813 (9th Cir. 1989). Claims of failure to interview

6  or call witnesses are deficient where there is no showing what the interview would

7  obtain and how it might change the outcome. *United States v. Berry*, 814 F.2d 1406,

8  1409 (9th Cir. 1989); *United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985).

9  And, if counsel has stated a reason for not calling a witness, the reason will likely

10  show effectiveness. *Denham v. Deeds*, 954 F.2d 1501, 1505-06 (9th Cir. 1992).

11      An alleged lack of preparation fails the prejudice prong where the inmate

12  fails to show what should have been done and how the allegedly insufficient

13  preparation prejudiced him. *Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998). An

14  alleged lack of preparation is not ineffective assistance where there is no showing of

15  prejudice, i.e., how preparation would have differed or how it would have changed

16  the result. *Pizzuto v. Arave*, 280 F.3d 949, 974 (9th Cir. 2002); *Trice v. Ward*, 196

17  F.3d 1151, 1161 (10th Cir. 1999). An alleged lack of preparation was unsupported

18  by the record that showed familiarity with the facts and defense theory. *Dows v.*

19  *Wood*, 211 F.3d at 486.

20      Moreover, strong evidence of guilt reduces the potential for prejudice.

21  *Pizzuto v. Arave*, 280 F.3d at 955. Petitioner must show more than a possibility of

22  prejudice, but must demonstrate that the errors actually caused prejudice. *Cooper v.*

23  *Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001). *Strickland* prejudice may not be

24  predicated on the mere possibility that at least one juror might be swayed by different

25  evidence; the results cannot depend upon the idiosyncrasies of a single juror.

26  *Williams v. Taylor*, 163 F.3d 860, 868 (4th Cir. 1998).

27      A reviewing court may reject a claim of ineffective assistance by going

28  straight to the prejudice prong of *Strickland*. *Strickland*, 466 U.S. at 697; *Rios v.*

1   *Rocha*, 299 F.3d 796, 805 (9th Cir. 2002); *Hasan v. Galaza*, 254 F.3d 1150, 1154 (9th

2   Cir. 2001); *Williams v. Calderon*, 52 F.3d at 1465, 1470 n.3 (9th Cir. 1995). Merely

3   arguing that the jury may have reached a different result if the case had been tried

4   differently will not carry the day. and speculation that a different strategy would have

5   changed the outcome is an insufficient showing prejudice. *Smith v. Stewart*, 140 F.3d

6   1263, 1273 (9th Cir. 1998); *United States v. Ferreira v. Alameda*, 815 F.2d at 1254;

7   *Cooks v. Spalding*, 660 F.2d at 740. The petitioner must demonstrate a reasonable

8   probability of a different result. *Williams v. Calderon*, 52 F.3d at 1469-70; *Wade v.*

9   *Calderon*, 29 F.3d at 1318; *United States v. Olson*, 925 F.2d at 1174.

10     **3. Analysis Of Claim**

11          Petitioner takes his attorney to task for failing to investigate the case and

12   prepare properly for trial. Petitioner's position is untenable, for the simple reason that

13   he has failed to cite specific facts in support of the claim or to provide an affidavit

14   from his trial attorney regarding his pre-trial preparation. Here, defense counsel

15   thoroughly read and analyzed the police reports, after which he filed extensive

16   motions to exclude certain evidence and to admit other evidence, but he obviously

17   made a strategic decision, after doing some legal research and preliminary factual

18   investigation as to Ryan's possible involvement, that it would not be fruitful, either

19   because Petitioner had already pled guilty, had told the personnel at the California

20   Youth Authority how and why he killed his mother, and had explained how he had

21   tried to make it look like Ryan did it, or because counsel believed that, even if Ryan

22   had been involved tangentially, he was merely Petitioner's accomplice and could

23   provide devastating and explosive incriminating testimony of Petitioner's active

24   participation that would conclusively demonstrate Petitioner's guilt.

25          It bears noting that this claim was advanced only after Ryan died, and it bears

26   repeating that Petitioner's allegations of defective representation are wholly

27   conclusory and unsupported by any affidavit by his trial attorney, Dennis Mulcahy,

28   regarding his tactical decisions regarding the pre-trial investigation and his

42

1  preparation of the in limine motion regarding the admissibility of evidence regarding

2  Ryan.   It is obvious that with Petitioner's guilty plea and highly detailed and

3  incriminating statements to Robert Hughes, to the probation officer, and to the CYA

4  – and especially his statements about how he tried to make it look like Ryan did it –

5  defense counsel was not ethically bound to suborn perjury or present evidence to

6  support a theory that he knew not to be true.   Petitioner has failed to demonstrate,

7  through a reasonably available affidavit, the probability that learned counsel fully

8  considered and rejected doing that which Petitioner alleges should have been done.

9  It remains his burden to eliminate the possibility that counsel's decisions were guided

10  by reasonable tactical decision-making.

11      Respondent has reason to believe that defense counsel's strategy regarding

12  whether to continue to investigate and attempt to present evidence of third-party

13  culpability was a product of his conversations with Petitioner and Petitioner's father,

14  Robert Lisker.   Further factual development into counsel's tactical reasons is

15  necessary to a fair and proper resolution of the issue of his asserted ineffectiveness.

16  Rather than second-guess his choices with speculative hindsight, it is only fair to

17  examine his performance from his perspective at the time and in light of the facts

18  known to him.   Petitioner's trial counsel, Dennis Mulcahy, has so far refused to

19  provide an affivadit unless ordered to do so by this Court, invoking the attorney-client

20  privilege, even though by making the ineffectiveness claim, Petitioner has waived the

21  privilege (*see Bittaker v. Woodford*, 331 F.3d 715, 716-18 (9th Cir. 2003) (en banc)),

22  and even though Commissioner Mulcahy, as a judge, is entitled to submit testimony

23  through a declaration without having to interrupt his trial schedule.   28 U.S.C. §

24  2245; *see*, *e.g.*, *Weidner v. Thieret*, 932 F.2d 626, 630-31 (7th Cir. 1991).

25      For this reason, Respondent requests that the Court (1) issue an order

26  directing Commissioner Mulcahy to provide a declaration addressing the allegations

27  of ineffective representation; (2) expand the record to include the declaration and the

28  necessary protective order (Rule 7, of the Rules Governing Section 2254 Petitions,

28 U.S.C. foll. § 2254); and then (3) decide whether an evidentiary hearing is desirable to allow Petitioner the opportunity to examine him (Rule 8, of the Rules Governing Section 2254 Petitions, 28 U.S.C. foll. § 2254).   In the alternative, Respondent  submits that an evidentiary hearing is required to resolve the factual dispute as to whether valid tactical reasons existed and to permit both parties to question Commissioner Mulcahy as to his representation of Petitioner. *See Townsend v. Sain*, 372 U.S. 293, 313-18, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963); *see also Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999) *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998); *Richmond v. Ricketts*, 774 F.2d 957, 962 (9th Cir. 1985); *McKnight v. Comstock*, 445 F.2d 317 (9th Cir. 1971). This is necessary, of course, only in the event this Court determines that the state courts' rejection of the claim "was based on an unreasonable determination in light of the evidence presented in the State court proceedings (*Earp v. Stokes*, 431 F.3d 1158, 1166-67 (9th Cir. 2005); *see* 28 U.S.C. § 2254(d)(2); *Schriro v. Landrigan*, ___ U.S. ___, 127 S. Ct. 1933, 1939-40 (2007); *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005)).

        The record shows that defense counsel *did* litigate the third-party liability issue before trial, and that he presented many of the same proffers of proof that Petitioner now insists should have been offered.  Defense counsel pointed to statements made by Ryan that he was at the Lisker house the day before the murder, that he left the state the day after the murder, that he was unable to account for the money he spent while in California, and that he had a knife.  He offered to prove that Ryan was in the neighborhood on the night before the murder, that he needed money, that he had tried to borrow money from Mrs. Lisker in the past, and that the money missing from Mrs. Lisker's purse was not found on Lisker.  (Aug. RT 390-93, 398; RT 12.)

        The record demonstrates that the trial court reasonably exercised its discretion in finding that there was no evidence directly connecting Ryan to the actual perpetration of the murder and in ruling that the proffered evidence about Ryan was

so collateral as to be only minimally relevant under California Evidence Code section
350 and so speculative as to be unduly prejudicial, confusing and misleading under
California Evidence Code section 352. (RT 1-12; Aug. RT 56-69.) Defense counsel
had a very difficult evidentiary burden to overcome, and nothing offered by Petitioner
in these proceedings closes the evidentiary gap or even remotely rises to the level of
approaching that burden. The evidence that Petitioner insists defense counsel was
derelict in not finding only tenuously suggests that Ryan may have had a motive to
commit a burglary or a theft somewhere in Los Angeles County, but there is still
nothing that ties him "directly" to the "actual perpetration" of the murder. *See
People v. Mendez*, 193 Cal. 39, 51-52, 223 P. 65 (1924).

In California, evidence offered to show that a third party committed the crime
requires physical or other evidence directly linking the third party to the "actual
perpetration" of the crime, and mere evidence of motive, general disposition, or
opportunity, without more, will not suffice to *raise a reaso*nable doubt about the
defendant's guilt. *People v. Hall*, 41 Cal. 3d 826, 831-35, 226 Cal. Rptr. 112 (1986);
*see also People v. Pride*, 3 Cal. 4th 195, 237-38, 10 Cal. Rptr. 2d 636 (1992); *People
v. Clark*, 3 Cal. 4th 41, 131-33, 10 Cal. Rptr. 2d 554 (1992); *People v. Green*, 27 Cal.
3d 1, 22-23, 164 Cal. Rptr. 1 (1980). In addition, it is not enough to present evidence
proving, through direct or circumstantial evidence, that the third party committed the
crime; the proffered evidence must at the same time exonerate or at least raise a
reasonable doubt as to the defendant's own culpability by showing that the defendant
did not commit the crime. In other words, the evidence offered must exculpate the
defendant at the same time that it inculpates the third party. It must raise a reasonable
doubt as to the defendant's guilt by excluding the possibility that the third party
committed the crime *with* the defendant and was merely the defendant's accomplice
or an innocent on-looker. *People v. Hall*, 41 Cal. 3d at 831; *see also People v. Lewis*,
26 Cal. 4th 334, 372, 110 Cal. Rptr. 2d 272 (2001); *People v. Bradford*, 15 Cal. 4th
1229, 1324-25 (1997); *People v. Alcala*, 4 Cal. 4th 742, 792, 15 Cal. Rptr. 2d 432

45

1    (1992).

2          Here, Petitioner has not shown that the trial court would have ruled any
3    differently on the in-limine motion regarding the admissibility of third-party-liability
4    evidence even if defense counsel had investigated the matter further, presented the
5    new facts Petitioner now alludes to, and made the same speculative arguments to the
6    trial court that Petitioner presents herein.  *See People v. Marshall*, 13 Cal. 4th 799,
7    836, 55 Cal. Rptr. 2d 347 (trial court not required to allow "unlimited inquiry into
8    collateral matters; the proffered evidence must have more than slight relevancy");
9    *People v. Karis*, 46 Cal. 3d 612, 637, 250 Cal. Rptr. 659 (1988); *People v. Wright*, 39
10   Cal.3d 576, 588, 217 Cal. Rptr. 212 (1984).  Petitioner still has failed to demonstrate
11   any direct link by Ryan to the actual perpetration of the murder.  Indeed, in denying
12   Petitioner's habeas corpus petition on this claim of ineffective assistance of counsel,
13   the superior court decried Petitioner's assertions of ineffective assistance of counsel
14   as being based on false "assumptions" that were "not supported by facts" and were
15   "a stretch of credibility immersed in speculation."  (MTD, Ex. I at 161-62; *see People
16   v. Von Villas*, 10 Cal. App. 4th 201, 264-65, 13 Cal. Rptr. 2d 62 (1992); *People v.
17   Kegler*, 197 Cal. App. 3d 72, 80, 242 Cal. Rptr. 897 (1987); *People v. Blankenship*,
18   167 Cal. App. 3d 840, 848, 213 Cal. Rptr. 666 (1985).)

19         Even now, Petitioner continues to engage in conjecture, and the remote
20   evidence he claims should have been discovered and presented to the trial court still
21   does not meet the minimum threshold in California for admitting evidence of third
22   party culpability that would tend to exculpate Petitioner.  *See People v. Avila*, 38
23   Cal.4th 491, 576-78, 43 Cal. Rptr. 3d 1 (2006) ("evidence which produces only
24   speculative inferences is irrelevant"); *People v. Alvarez*, 14 Cal 4th 155, 201, 58 Cal.
25   Rptr. 3d 385 (1996); *People v. Babbitt*, 45 Cal. 3d 660, 682, 248 Cal. Rptr. 69 (1988).
26   Petitioner has not shown that Ryan went to the Lisker residence on the morning of the
27   murder.  Even if he could show this, that would not show that Petitioner did not
28   commit the murder.  The motive for this vicious and horrendous "overkill" --

1   committed with multiple types of weapons on a small, elderly lady -- was not theft,

2   but rather hatred and rage.

3           There was no evidence that Ryan had ever displayed any animosity toward

4   Mrs. Lisker or that he had any animus against her.  There is nothing in the purported

5   motive or alias evidence that would distinguish Ryan from any other person in Los

6   Angeles who needed some money that morning.  And even if Ryan did obtain money

7   unlawfully that morning and then took steps to avoid detection, he could have done

8   so in any number of ways and at any number of places in Los Angeles County,

9   thereby supposedly proving a reason for him to check in to a motel under an assumed

10  name.

11          Petitioner posits that evidence of Ryan's having checked into a motel in

12  Hollywood on the day of the murder under an alias is suspicious because it shows he

13  wanted to elude detection.  He theorizes that Ryan's sudden decision not to stay in

14  California but to return immediately to Mississippi also shows that he was trying to

15  escape from something, and hypothesizes that his having obtained money from some

16  unknown source to pay for the return bus trip shows that he must have done

17  something that prompted him to flee.  Finally, he postulates that a phone call made

18  to a number that is different than the phone number for Ryan's mother was so close

19  to her number that it might have been Ryan trying to call his mother, or using this as

20  a pretext to get into the Lisker residence.

21          But none of these conjectures link Ryan to the actual perpetration of the

22  murder of Mrs. Lisker.  They point only remotely to a possible motive or a

23  conceivable opportunity or an imaginable consciousness of guilt after having

24  committed some theft or robbery somewhere in the County of Los Angeles.  These

25  facts do not add up to relevant evidence to show third-party complicity, since they

26  would merely show "a *possible* ground of *possible* suspicion."  *People v. Hall*, 41

27  Cal.3d at 832; italics added; *see also People v. Sandoval*, 4 Cal. 4th 155, 176, 14 Cal.

28  Rptr. 2d 342 (1992); *People v. Edelbacher*, 47 Cal. 3d 983, 1017-18, 254 Cal. Rptr.

47

586 (1989); *People v. Babbitt*, 45 Cal.3d at 684.

Ryan may well have had other reasons to lie to the police about the time that he registered into the motel in Hollywood, and he may have obtained money from any number of legitimate or illegitimate sources to pay for his return trip to Louisiana. Indeed, by pointing to evidence that money was found in Mrs. Lisker's wallet, Petitioner has proven that Ryan did not obtain his money from Mrs. Lisker and has also shown that the true motive for the murder was not robbery. Ryan may have had any number of reasons to depart and travel back to Louisiana. Even if Ryan were involved some way as Petitioner's accomplice, that did not exclude Petitioner's status as principal.

Thus, Petitioner's leap of logic – that because Ryan told Mrs. Lisker the night before the murder that he needed money, and because Ryan had money with which to purchase a bus ticket back to Mississippi the day after the murder, he must have gotten his money from Mrs. Lisker's wallet – must fail. In addition, Ryan may have had any number of reasons to depart and travel back to Louisiana, and any argument that it might have been an attempt to avoid being arrested for the murder of Mrs. Lisker is utterly speculative.

Moreover, the following evidence demonstrates that in assessing the totality of the evidence already established against Petitioner, defense counsel had valid and plausible reasons for reaching the conclusion that any further investigation of Ryan would be futile and would not yield the type of evidence that would meet the test for admissibility of third-party evidence. For instance, the neatly stacked window panes disproved that this was a break-in by a common burglar and showed that Petitioner was not in a panic when breaking into the house to supposedly save his mother. The blood spatter from blunt force applied to the victim's body, which appeared on both of Petitioner's sneakers, pointed to his presence when his mother was beaten.

### a.   No Motive Evidence

There is no evidence whatsoever to demonstrate that Ryan had any motive

to kill Dorka Lisker with two knives, an exercise bar, a trophy, and a rope. No evidence has been presented to show that he had ever fought with her or had ever said anything bad about her. No evidence has been presented to indicate why, if he actually did try to take money from her and she caught him, he would not simply leave, or if she confronted him and he felt he needed to prevent her from calling the police by knocking her out or even by killing her, why he would not simply kill her with one knife, instead of two, or just with the bullworker.

That Ryan might have had a temper does not show identity. That he was in the Los Angeles area (Hollywood) does not show identity. That he was Petitioner's former friend and roommate does not show identity. That he had done yard work for Mrs. Lisker in the past does not show identity. And that he went to the Lisker residence the night before the murder to use the telephone does not show identity.

Thus, Ryan had no motive to *kill* Mrs. Lisker -- much less to commit such an "overkill" with *two* knives, an exercise bar, a trophy, and a rope -- if he was there only to steal money from her. The crime was much more consistent with a rage-killing by a violent, out-of-control drug-addicted teenager. Moreover, if Ryan borrowed or stole money from someone to return to Mississippi, it was not from Mrs. Lisker, since money was found in a compartment of Mrs. Lisker's wallet, and since Petitioner admitted having taken other money from the same wallet and having hidden it in the attic.

This Court concluded that Monsue's credibility had been undermined when his letter to the parole board -- indicating the "new owners" of the Lisker residence told him that they found the missing $150 in the attic above Petitioner's old room -- was contradicted by Martin Borenstein, who bought the house from Robert Lisker. (R&R at 33-34.) However, there are plausible and persuasive alternative arguments pointing to a contrary conclusion.

Monsue's letter to the parole board, written on April 7, 1998, states in pertinent part:

49

Several years after this crime occurred, I met with the new owners of the house where this crime occurred.  They informed me they had found some money and several other items hidden in the attic of Bruce Lisker's old bedroom.  The amount of cash found by the new owner was approximately $150, which is the amount of money that was reported missing from the victim's purse the day of the  murder.  This revelation confirmed our initial theory that Mr. Lisker had in fact robbed his mother.

(Hg. Ex. 2.)

This court  noted that Borenstein, who bought the house in April of 1984 and sold the house in 1995, had no memory that either he or his wife ever found money in the house.  This Court also noted that Borenstein testified that he "just couldn't believe that such a significant thing would have totally escaped me."  (Pet. Ex. CC 264.)  However, there are several aspects of Borenstein's testimony which allow for the possibility that Mrs. Borenstein may in fact have called Monsue about the money.

First, there is significant evidence that Borenstein's memory was severely flawed.  Prior to the above-quoted testimony about "such a significant thing" not escaping him, Borenstein testified that there is a possibility, which he characterizes as "slim" but nonetheless a possibility, that he had indeed forgotten this event.  He explained that it would have occurred during an especially stressful time during which his wife died after a prolonged illness, so that "because of the stress of what had occurred and the passage of time, I put it out of my mind somehow."  (Hg. Tr. at 264.)

This possibility may not be as slim as Borenstein represents.  Indeed, Borenstein demonstrated significant memory confusion when testifying that he could not recall having researched Monsue's reputation.  After being shown a transcript detailing his statement to Detective Gavin to this effect, he speculated that he perhaps was confusing Monsue with another police detective, Rick Swanston.  But this explanation is questionable, because if Swanston, who played no part in the Lisker

1  case at all, was the person he had in mind, there is no plausible explanation why he

2  would try to ascertain Swanston's reputation in connection with the Lisker murder.

3  Indeed, the very fact that he forgot he told Gavin on July 11, 2003, about his research

4  of a detective's reputation also demonstrates that his memory was fallible.  And, if he

5  in fact confused Swanston and Monsue during Gavin's interview of him, that in and

6  of itself also demonstrates that Borenstein was capable of forgetting significant

7  events.  The fact that he was a defense attorney means he must involve himself  in

8  many criminal investigations and acquaint himself with numerous cases and facts,

9  thus posing a greater likelihood of his confusing one set of facts for another.

10        Moreover, there was other evidence that was consistent with money being

11  found in the attic.  As Borenstein admitted during the hearing, after buying the house,

12  a significant amount of work was done to it, including major constructions involving

13  the flooring, the driveway, the plumbing, and the roof.  (Hg. Tr. at 257-59.)  These

14  projects required workers to be inside the house at times when Borenstein was not

15  there.  (Hg. Tr. at 259.)  When asked whether these projects would require workers

16  to enter the attic, such as when electrical circuits are involved, he could only say, "I

17  don't know."  (Hg. Tr. at 258.)

18        Under these circumstances, there was a likelihood that a particular

19  construction project required a worker to enter the attic, where the  money was found.

20  This court did not address this point when it suggested the unlikelihood of Mrs.

21  Borenstein, while frail from cancer, finding the money after accessing the attic

22  through a ladder.  Indeed, during the interview with Gavin, Monsue clarified that it

23  was a female caller who informed him of the money: "He received a phone call from

24  a female, and the female stated that several years prior, she had discovered money in

25  her house; and when talking to neighbors, they indicated to her that a murder had

26  occurred in that house and money was missing."  (Hg. Tr. at 382.)

27        Under these circumstances, it would be reasonable to infer that Mrs.

28  Borenstein had made the call to Monsue after the money was found in the attic during

51

1    a construction project and that she had informed Mr. Borenstein, who due to the stress

2    of her illness and the passage of time had simply forgotten that piece of information.

3    Indeed, Borenstein acknowledged that his wife was able to use the telephone and

4    could have used it in his absence.  (Hg. Tr. at 259.)

5        Respondent acknowledges that Monsue wrote in his letter that he received

6    this information about the money when he  "met with the new owners of the house."

7    (Hg. Ex. 2.)  On its face, this account is not the same as saying a female had called

8    him about the money.  This Court stresses this fact.  (Hg. Tr. at 34.)

9        However, it is difficult to conclude, based on this fact alone, that the letter

10   was somehow a product of intentional fabrication.  Monsue presumably knew at the

11   time that this letter would be kept as part of the parole records, and if it contained

12   fabrications which could easily be discovered, it might very well one day affect his

13   reputation and his employment.  It appears highly unlikely that Monsue would

14   deliberately engage in such a course of conduct in light of the fact that whether the

15   new owners had given a certain information could easily be verified by speaking with

16   those new owners.

17       Moreover, the letter was written in opposition to Lisker's parole.  To engage

18   in the extra effort of setting forth a considerably detailed fabrication, just to convey

19   a relatively unimportant point that Petitioner intended to rob his mother, does not

20   make sense.  If there was anything that would keep Petitioner behind bars, it would

21   be the viciousness of the murder, Petitioner's sophisticated and deliberate efforts to

22   stage the crime scene to make it look like another person did it, his subsequent cold-

23   blooded attempt to lay the blame on a former friend, and his lack of remorse, all of

24   which were also detailed in the same letter written by Monsue.  Motive, ranking very

25   low in this hierarchy, was already substantiated by various evidence produced at trial.

26   Indeed, money was just one conceivable motive, and pure rage -- arising from the past

27   history of the relationship –  would arguably be a better explanation of the crime and

28   would better convey to the parole board Petitioner's dangerousness.  In sum, there

52

1    simply was very little incentive for Monsue to go out of his way to risk his career by

2    fabricating new evidence relating to an unimportant issue that was already amply

3    supported by trial evidence.

4          In light of all this, an innocent explanation exists which would much better

5    account for the discrepancy between the letter and the facts.  Mrs. Borenstein died in

6    April of 1992 (Hg. Tr. 249), but Monsue wrote his letter on April 7, 1998.  Hence, if

7    Mrs. Borenstein was the caller who informed Monsue about the money, the letter

8    would have been written at least six years, if not more, *after* the conversation.  It

9    could very well be the case that, just as Borenstein had forgotten at the time of the

10   Gavin interview whether he was thinking of Monsue or Swanston, Detective Monsue

11   could have had a confused  memory regarding: (1)  whether he talked to both of the

12   owners or just one of them and (2)  the method of contact.  Such innocent mis-

13   recollections are commonplace, as recognized by standard jury instructions.

14         In sum, there are innocent explanations for Monsue's letter that a reasonable

15   juror would evaluate before coming to the conclusion that the letter undermined

16   Monsue's credibility.

17         **b.  No Evidence Linking Ryan To Scene**

18         Here, there was no confession.  Indeed, Michael Ryan told his mother he did

19   not do it.  Ryan never confessed to the crime, but Mulcahy's client (Petitioner) did.

20   What is more, there was a complete lack of eyewitness testimony placing Ryan at the

21   scene of the crime.  There were no eyewitnesses who said they saw Ryan enter or

22   leave the Lisker residence that morning.

23         All the evidence recovered at the scene shows that the murder was committed

24   by Petitioner.  There was no forced entry, and the front door was locked.  The murder

25   was carried out with multiple weapons and showed unmistakable signs of overkill,

26   committed out of hatred, in a fit of rage, apparently triggered by Petitioner's mother's

27   refusal to give him money for drugs.  Furthermore, valuable items were left behind

28   in the house, and no one was seen leaving the residence at or after the time that,

53

1    according to the deputy coroner, the victim was receiving the fatal blows, i.e., the

2    blows and stab wounds that would have lead to immediate death if resuscitation had

3    not taken place within 20 minutes.  *See* RT at 1117-20.

4        Moreover, the murderer took the time to find a rope and place it around the

5    victim's neck, to carry the bloody Bullworker all the way back to the master bedroom,

6    to wipe off the fingerprints with a towel, and to neatly place it in corner.  Those are

7    not the actions of a thief who kills upon being suddenly and unexpectedly discovered

8    and confronted by the victim.  No thief would go to the trouble of returning an

9    exercise bar to its proper place in the farthest room of the house from the entry way

10    after bashing in the skull of his victim.  *See* RT at 1120-21.

11        Thus, there was no physical evidence connecting Ryan to the crime -- no

12    fingerprints, no hair, no blood, and no footprints or shoe prints.  The only fingerprints

13    found were Petitioner's, and they were on one of the kitchen window panes.  (RT 248,

14    263, 274-75, 766.)

15       **c.   Mark On Mrs. Lisker's Skull**

16        With regard to the patterned impression on Mrs. Lisker's skull, defense

17    counsel cannot be faulted for failing to see it or question anyone about it.  It was

18    clearly too small an impression to be identified as to its source, and even now, there

19    is no evidence to support Petitioner's suggestion that this was a footprint at all, much

20    less Ryan's footprint.

21        This Court summarized certain testimony relating to the impression found

22    on the skull at the back of the victim's head behind her ear, but did not draw any

23    immediate conclusion.  (R&R at 25-27.)  Nonetheless, this Court also appeared to

24    draw a conclusion that the impression was "possibly" a shoeprint.  (R&R at 56.)

25    Respondent respectfully submits that this conclusion is not only speculative, but also

26    is contrary to the evidence.

27        This Court cited testimony by LAPD Criminalist Ronald Raquel, Coroner's

28    Office tool mark expert Steven Dowell, and FBI analyst Wieserma, to highlight the

1   fact no tool was ever produced to match the head impression.  (R&R at 25-26.)  This

2   observation unduly magnified the significance of this fact and unfortunately

3   overlooked evidence that militated against the suggestion that the impression in

4   question was caused by a shoe.  It bears noting that if the tool had been produced in

5   the early 1980's and late 1970's, which it would have been, it would be extremely

6   difficult to locate now or to reproduce that exact object.

7           More directly, however, there is simply no credible evidence that

8   demonstrates that the head impression was a shoeprint.  Any reliance on Raquel's

9   opinion that the impression was made by a shoe (Hg. Ex. B at 25), would fail to

10  acknowledge that the opinion was formed with significant qualifiers that rendered it

11  rather meaningless, and would fail to take into consideration the critical problems that

12  plagued Raquel's analysis.  First, as Raquel had to acknowledge, he rendered that

13  opinion within the "little world" of shoe comparison, and he went on to agree that he

14  could "see that there are other things that are made that are not shoes that could have

15  . . . made this impression." (Hg. Tr. at 227.)  Moreover, even within this "world" of

16  shoe impressions, Raquel had to acknowledge that the head impression contained

17  none of the usual features of a footwear impression, i.e., the heel area, the arch area,

18  the toe reach, and the edge contours.  (Hg. Tr. at 227-28.)

19          Furthermore, although a tool was not produced at the evidentiary hearing to

20  match the mark, no shoe or shoe impression matched the mark either.  As Raquel

21  acknowledged, a disparity in dimensions between the head impression and

22  impressions G and B2 exists, i.e., the head impression exhibited six bars per inch and

23  impressions G and B2, five bars per inch.  (Hg. Tr. at 194 [impression G and B2 had

24  five bars per inch]; Hg. Tr. at 219-20 [head impression had six bars per inch].)

25  Indeed, the most that Raquel was willing to conclude regarding the comparisons was

26  that the spacing of the impression was *more similar* to that of G and B2 than to

27  Petitioner's Pacer shoes.  (Hg. Tr. at 194.)  Nor did Raquel render an opinion at the

28  hearing that the impression on the back of the victim's head was of a herringbone

55

1   pattern.

2        Thus, the only basis upon which Raquel rested his current opinion that the

3   head impression was a shoe impression is that he had seen, on one single past

4   occasion, a similar impression on a human body, in the shoulder area, that was left

5   by a shoe.  (Hg. Tr. at 226-27.)  This observation was further weakened by his

6   admission that he was not a pathologist or a medical doctor (Hg. Tr. at 228), had no

7   idea regarding the distance between the skin and bones of the shoulder area as

8   compared to the human head (Hg. Tr. at 231-232), and could envision other tools that

9   could cause that mark (Hg. Tr. at 227).  In short, a reasonable juror would readily

10  decide that his opinion carried very little weight.

11       Indeed, the FBI shoe impression expert, Wieserma, confirmed as much.  She

12  testified unequivocally that there is no evidence that the impression on the head, a

13  mere one inch by a half inch in size, was a shoe impression.  (Hg. Tr. at 591, 594.)

14  And, as this Court acknowledged, because the available photographs yielded

15  conflicting measurements, Wieserma found no basis to draw the conclusion from

16  those photographs that the impression in question had the same dimensions as B2 and

17  G.  (R&R at 26.)

18       On the other hand, there is substantial evidence that the impression was not

19  a shoeprint, much less one caused by the shoe that left impressions B2 and G.  First,

20  if the impression behind Mrs. Lisker's ear was made by a shoe that impacted her

21  head, there is no explanation why only an incredibly minute fraction of that shoe,

22  about the size of half a quarter (U.S. currency), became imprinted on the head, and

23  not more.  Wieserma testified that in all her years of experience, she had never seen

24  any shoe impression that small on a human body.  (Hg. Tr. at 591.)  Second, even

25  Raquel had to acknowledge a feature showing that the impression behind the victim's

26  ear was a herringbone pattern.  He admitted that as to that impression, the second bar

27  from the left not only hooked toward the front of the face at the top of the bar, it also

28  hooked toward the front of the face at the bottom.  (Hg. Tr. at 235-236.)  The logical

1 consequence is that all the bars, like the second bar, were not herringbone patterns,

2 i.e., patterns that "zig zag" (Hg. Tr. at 210), but formed a series of "C" shaped

3 impressions.

4      Raquel conditioned this concession on the predicate that the hook at the

5 bottom of the second bar was part of the contusion forming the bar, and not a separate

6 abrasion. (Hg. Tr. at 234.) A careful examination of Hearing Exhibit 16-1 and a

7 close-up photograph, Hearing Exhibit 16-3, reveals that while there was a separate

8 abrasion at the bottom of the first bar, the part of the second bar that hooked back at

9 the bottom was a continuous part of the same contusion that formed the second bar.

10 In fact, when these photographs are examined more closely, the bottom of the third

11 and fourth bars, counting from the left, also hooked toward the front of the face. As

12 such, there exists significant evidence that this impression was not a herringbone

13 pattern and thus, could not have been made by the shoe that left impressions B2 and

14 G.

15      On the other hand, the smallness of the impression and the fact that it

16 comprises "C" figures are consistent with a bracelet or wristwatch probably worn by

17 Mrs. Lisker when she was being beaten. This very real possibility, strongly supported

18 by the evidence, was presented at the close of the hearing. (Hg. Tr. at 766-67.)

19 According to Robert Lisker's trial testimony, Mrs. Lisker regularly wore jewelry,

20 including a wristwatch.[6/] (RT at 227.) Meanwhile, Steven Dowell, the tool expert,

21 confirmed that the patterned impression on the victim's head would be consistent

22 with a bracelet or a watchband that had features capable of producing the observed

23 pattern. (Hg. Tr. at 767-768.) Thus, there is a reasonable alternative explanation for

24 this impression.

25      Various other evidence shows why such jewelry would account for the

26 impression. As the defensive stab wounds on Mrs. Lisker's hands demonstrate (*see*

27

28     6. Lovato could not recall whether Mrs. Lisker was wearing a watch or any jewelry when he first found her at the foyer. (RT at 203.)

1    Hg. Ex. 71:10, 16), Mrs. Lisker shielded herself by holding her arms up throughout

2    the assault.  And, when the blunt object (e.g., the exercise bar that had blood on it (RT

3    at 93-94, 98, 299, 312, 496)) which caused the serious fractures to the back of her

4    head (Hg. Ex. 16:1 [showing the head fracture]), was being used against her, it stands

5    to reason that at some point, she shielded that general area of her head with her arms

6    to protect against the blows.  This would mean that she held her hands up against her

7    the sides of her head, with her elbows forward, and her right wrist would at some

8    point have been pressed against her right ear.  Under these circumstances, as the

9    exercise bar impacted her right arm, the resulting force caused her wrist area (where

10   the bracelet or watch was worn) to impact the area behind her right ear, thereby

11   leaving the impression in question.  This conclusion is reasonable.

12         Dr. Golden's autopsy report confirms this version of events as it documented

13   a fracture to Mrs. Lisker's right arm (Hg. Ex. 73:2); this fracture is an indication that

14   the right arm was in the way of a vicious blow to a part of the body.  Just as

15   important, the autopsy report documented a bruise to Mrs. Lisker's right wrist (Hg.

16   Ex. 73:6), a physical sign consistent with the bracelet or watchband bruising the wrist

17   as it impacted the back of the head.  With such physical evidence pointing to this

18   sequence of events involving a bracelet or a wristband, any speculation that the

19   impression in question was left by a shoe becomes even less worthy of consideration.

20         It is true that Dr. Golden testified that a major fracture to the head was found

21   on the right side, near the base of the skull.  This court has observed that the fracture

22   was presumably near the impression in question and has postulated that the same

23   force that caused the impression in question also caused the major head fracture.

24   (R&R at 26.)  But if that were the case, then similar patterned impressions from the

25   alleged shoe would presumably appear near that fracture.  Yet, when Hearing Exhibit

26   16-1 is reviewed, no such patterned impressions appear at or near that fracture.

27         For these reasons, Respondent suggests that any finding that the patterned

28   impression on the back of the victim's head was possibly a shoe impression is

58

1  contrary to the evidence.  At the very least, it is reasonable to assume that the

2  discovery of this impression would be viewed as an inconsequential fact having no

3  effect upon the strength of the prosecution case.

4  **d.  Inconsequential Phone Call From Lisker Residence**

5  Petitioner appears to give considerable weight to what a telephone record

6  shows to be a 10:22 a.m. telephone call placed from the Lisker residence to the

7  number "492-8972," which was different by one digit (and without the area code)

8  from Ryan's mother's home phone number.[7/]  Petitioner's interpretation of this call

9  is that Ryan must have made it.

10  This conclusion does not make sense.  Ryan's mother, Linda Clelland,

11  attested that Ryan had lived with her for some time at her home and when not living

12  with her, often called her from various places in the country.  (Hg. Ex. 107:1.)

13  Meanwhile, it is undisputed that Ryan had, for a period of time, lived with Petitioner

14  at Petitioner's apartment minutes away from the Lisker residence.  (Hg. Ex. 48: 37,40

15  [Ryan talking about living with Petitioner]; Hg. Ex. 86:98 [Petitioner's address being

16  listed as "6500 Sepulveda Blvd. Van Nuys"]; Hg. Ex. 86:141 [Petitioner informing

17  Monsue that Ryan lived with him for two months].)  Knowing his mother's number

18  by heart, and knowing the difference in the area code after having lived with

19  Petitioner, it is not plausible that Ryan would mis-dialed in this way.  And if he

20  misdialed, there was no conceivable reason he would not dial again, using the correct

21  telephone number.

22  Petitioner has apparently connected the March 10, 1983 call with Ryan's

23  account to Monsue of his visit to the Lisker residence on March 9, 1983, to make a

24  call.  It is true that the telephone records showed that no call was placed to Clelland's

25  residence from the Lisker residence on March 9, 1983.  But this assumes, without any

26  _____

27  7.  The telephone number of Ryan's mother, Linda Clelland was and is (805)

28  492-8976.  (Hg. Ex. 107:1.)  The telephone number for the Lisker residence was (213) 789-2535 in 1983.  (Hg. Ex. 40:1.)

1    basis, that the person Ryan *planned* to call at the Lisker residence was his mother and

2    not someone else.  Indeed, Ryan only said during the interview, "I stopped by Mrs.

3    Lisker's house to use her phone and a to see how she was, you know, and I was gonna

4    ask her if she had some work for me to do."  (Hg. Ex. 48:7.)

5         There is a very plausible explanation for the telephone call near the time of

6    the murder.  Mrs. Lisker had actually met Linda Clelland at the Palmer Drug Abuse

7    Center.  This is shown by various pieces of evidence.  First, as James Zeilan, former

8    counselor at the Palmer Drug Abuse Center, has testified, both Petitioner and Ryan

9    attended counseling sessions at the center.  (Hg. Tr. at 692.)  There, the youths

10   formed a group while their parents formed another group.  (Hg. Tr. at 690-92.)  Zeilan

11   remembered Mrs. Lisker attending the adults meetings.  (Hg. Tr. at 692.)  Although

12   Zeilan could not remember one way or the other whether Clelland attended (Hg. Tr.

13   at 692), Clelland said that she did go to meetings with Ryan.  (Hg. Tr. at 107:2.)

14        That Mrs. Lisker and Clelland became acquainted during those group

15   meetings and had possibly exchanged telephone numbers is confirmed by the police

16   interview notes of Linda Clelland.  Those notes reflect that when interviewed on

17   April 12, 1983, Clelland told the police that she received a call from Ryan, on March

18   7, 1983[8/], informing her that he was leaving Mississippi to come to California.  (Hg.

19   Ex. 86:354.)  Apparently, Ryan never contacted her after his arrival and Clelland

20   began "calling around" to find him.  Apparently, *Clelland had Mrs. Lisker's*

21   *telephone number*, which she used to reach Robert Lisker, who in turn, informed

22   Clelland about the murder.  (Hg. Ex. 86:354.)

23        Under these circumstances, rather than assuming what is almost impossible,

24   that Ryan has misdialed and had not called again, the more plausible explanation was

25   that Mrs. Lisker had misdialed.  That is, after having spoken to Ryan on March 9,

26   _____

27        8.  Respondent assumes the "April 7, 1983" date written on the interview note
     as the date Clelland received a call from Ryan about leaving Mississippi was a
28   mistake and that the correct date should have been March 7, 1983.  (Hg. Ex. 86: 354.)

1983, Mrs. Lisker had decided to call Clelland on March 10, 1983, to inform her that her son had arrived in California and had actually been to her house.  Possibly because Mrs. Lisker had made a mistake in jotting down Clelland's number, she dialed a telephone number that was off by one digit and was missing the required area code.  This interpretation is reasonable.

Furthermore, Petitioner has offered no declaration from defense counsel with regard to this matter or regarding the inconsequential phone call that was *not* made to Ryan's mother, but to another number in another area code.

### e.    Summary

Thus, the entire, multifaceted claim is completely conjectural.  In addition, Petitioner has failed to show that evidence uncovered at the evidentiary hearing was exculpatory in any way, or that defense counsel did not reasonably consider and then decide against calling the potential witnesses to the witness stand because their testimony would have been potentially prejudicial.  Defense counsel did the best he could with what he had.

In assessing defense counsel's pre-trial performance regarding his efforts to investigate the possibility of Ryan's involvement, it is quite plausible to consider and evaluate another obvious and highly relevant possibility: that Ryan, if involved at all, was Petitioner's accomplice.  *None* of the evidence presented at the actual innocence hearing eliminated the possibility that Ryan was merely present when Petitioner murdered his adoptive mother and then fled.  Thus, even if the completely speculative evidence accurately implicated Ryan in any way, it would show only that Ryan merely Petitioner's accomplice, acting in concert with Petitioner, or acting as an astonished, and then frightened, eyewitness who then fled upon witnessing the "overkill."

It bears repeating that during the 911 call, when the dispatcher asked Petitioner, "Did you have a stabbing there?," Petitioner tellingly responded, "Yes, *we* did."  Thus, Petitioner has not demonstrated deficient representation unless his

1  conjectural third-party-liability evidence shows that the third-party acted *without*

2  Petitioner.  Under California law, if Petitioner acted in concert with Ryan, he still was

3  guilty of the murder as a principal.  (Cal. Penal Code § 31.)

4          In sum, Petitioner has failed to demonstrate that his attorney was negligent

5  in preparing for trial or in interviewing the witnesses.  The contention must fail since

6  Petitioner has not shown, by affidavit or declaration supplied by defense counsel, that

7  defense counsel did *not* in fact consider – and decide against – presenting some or all

8  of this flimsy evidence, or that the trial court would have permitted this highly

9  speculative and irrelevant evidence to be introduced.  Petitioner has failed to

10  demonstrate that counsel's performance was constitutionally deficient or prejudicial.

11          Defense counsel must play with the cards he is dealt, which in this case was

12  (1) a heinous "overkill"-type murder not at all characteristic of that committed during

13  an ordinary burglary, but committed in a fit of rage and hatred, and (2) a client who

14  had pled guilty, had confessed multiple times, and had admitted trying to frame Ryan.

15  Thus, Petitioner has failed to show that a reasonably diligent and competent attorney

16  inevitably would have continued to pursue and follow through with further

17  investigation on a lead that had no reasonable chance of providing exculpatory

18  evidence.  It must be remembered that counsel's performance must be evaluated from

19  the perspective he had at the time, in light of all the circumstances that were present.

20  Petitioner has filed no affidavit from his trial attorney to eliminate the possibility that

21  defense counsel in fact conducted further investigation into Ryan's possible

22  complicity and reasonably concluded that it was not worth pursuing.  *See Lowry v.*

23  *Lewis*, 21 F.3d 344, 346-47 (9th Cir. 1994).  Even if debatable, deference is owed to

24  trial counsel's decision not to do so, and additional deference is owed to the state

25  court's determination that defense counsel's decision did not fall below the objective

26  standard of counsel competence (28 U.S.C. § 2254(d)).

27          Moreover, Petitioner has failed to show that counsel's alleged deficiencies

28  probably affected the outcome at trial.  The evidence of Petitioner's guilt was

1    particularly strong, and that any evidence of Ryan's complicity would not have
2    excluded Petitioner from being a principal. Petitioner has failed to demonstrate that
3    his attorneys' representation on this point was deficient.

4          The state court's rejection of this claim was neither contrary to, nor an
5    unreasonable application of, Supreme Court precedent, nor an unreasonable
6    determination of the facts. It is therefore entitled to deference. 28 U.S.C. § 2254(d).
7    Consequently, the claim must be rejected.

8                                        **III.**

9    **PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS**
     **RELIEF ON GROUND THREE OF HIS PETITION**
10   **(PROSECUTOR'S PRESENTATION OF FALSE EVIDENCE)**

11         Petitioner's next assignment of error is that the prosecution presented
12   allegedly false evidence to the jury. (Pet. at 6-6a.) This claim was presented on
13   habeas corpus to the California Supreme Court, which denied it on procedural
14   grounds. (Ex. F.) In rejecting the claim, the court cited *Clark* and *Robbins*, which
15   stand for the proposition that claims presented in an untimely, piecemeal manner are
16   procedurally barred. (Application, Ex. A.)

17   **A.  Ground Three Is Untimely**

18         Since the one-year statute of limitations (28 U.S.C. § 2244(d)(1)) had expired
19   long before Petitioner filed his original Petition in this Court, all his claims, including
20   his new claims, are untimely and must be dismissed, for the reasons set forth in
21   Respondent's Motion To Dismiss. In addition, as this Court found in the Report and
22   Recommendation, Petitioner is not entitled to any equitable tolling of the one-year
23   period of limitations. To the extent that Petitioner argues he is entitled to pass
24   through the *Schlup* gateway to excuse his untimeliness as to Grounds Three and Four,
25   Respondent reiterates all the arguments previously made in the memoranda on the
26   inapplicability of actual innocence to excuse untimeliness under the AEDPA and at
27   the conclusion of the evidentiary hearing on actual innocence.

28

63

**B.   Ground Three Is Procedurally Defaulted**

Ground Three is procedurally barred because it was presented in a habeas corpus petition to the California Supreme Court and rejected by that court with citations to *In re Robbins*, 18 Cal. 4th at 780 and *In re Clark*, 4 Cal.4th 750, which meant, as conceded by Petitioner, that the claim was procedurally barred because it was untimely and successive.

A federal court may not review a claim if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support it.  In other words, in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1998); *Bonin v. Calderon*, 59 F.3d at 842-43.  A habeas petitioner who has failed to meet the state's procedural requirements for presenting federal claims has deprived the state courts of an opportunity to address those claims in the first instance, just as a petitioner who has failed to exhaust state remedies.  *Coleman v. Thompson*, 501 U.S. at 732; *see also Harris v. Reed*, 489 U.S. 255, 265-66, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989) (state court must, however, clearly and expressly invoke the default by providing a "plain statement" of default).

In *In re Robbins*, 18 Cal. 4th 770, the California Supreme Court discussed its policies concerning the timely presentation of habeas corpus petitions.  Where a petition is filed after a long delay, the supreme court noted, the petitioner has the burden of establishing absence of substantial delay, good cause for the delay, or that the claim falls within an exception to the bar of untimeliness, such as actual innocence, or error of constitutional magnitude leading to a trial so fundamentally

1  unfair that absent the error no reasonable jury would have convicted the petitioner.

2  *In re Robbins*, 18 Cal. 4th at 780, 797-98.  Respondent submits the denial of a claim

3  because of its delayed presentation is a state procedural ground that is both

4  independent and adequate.

5       In *In re Clark*, 5 Cal.4th 750, the California Supreme Court set forth its long-

6  settled rule proscribing abuse of the writ through piecemeal presentation of claims.

7  The supreme court noted that it was the policy of California courts to deny second or

8  successive petitions unless the failure to present the claims in a prior petition had

9  been adequately explained and justified, such as by showing that the recently

10  discovered facts could not have been discovered earlier, or by showing a change in

11  the law retroactively applicable to final judgments.  *Id*. at 769.  Respondent submits

12  the denial of a claim because of its unjustified, piecemeal presentation in a successive

13  petition is a state procedural ground that is both independent and adequate.

14       Here, when the California Supreme Court denied Petitioner's habeas petition

15  (filed on February 13, 2007), it was presumably because that petition was filed in the

16  supreme court eighteen years after Petitioner's direct appeal had concluded.  This

17  procedural bar precludes federal relief in this case, as it was imposed long after the

18  California Supreme Court's decision in *In re Clark*, 5 Cal. 4th 750, and, needless to

19  say, after the actual *Robbins* decision itself.  *See generally La Crosse v. Kernan*, 244

20  F.3d at 705 ("[T]he California Supreme Court was applying the untimeliness bar

21  because [petitioner] delayed nearly twelve years between his direct appeal and his

22  state petition for habeas corpus"); *Morales v. Calderon*, 85 F.3d 1387, 1389-93 (9th

23  Cir. 1996) (invalidating pre-*Clark* denials based upon delay or untimeliness because

24  no standards were provided in the Supreme Court's policies for what would excuse

25  delay beyond the specified periods); *Siripongs v. Calderon*, 35 F.3d 1308, 1318 (9th

26  Cir. 1994); *Ranieri v. Terhune*, 366 F. Supp. 2d 934, 942 (C.D. Cal. 2005)

27  (concluding that the respondent had "adequately pled" that the untimeliness rule is

28  an independent and adequate state procedural ground).

1    In addition, the California Supreme Court applied the successive-petition bar,
2  presumably because this was Petitioner's third petition, and this procedural bar also
3  precludes relief in this case. Petitioner conceded to the California Supreme Court in
4  his 2007 habeas corpus "exhaustion" petition that his claims were untimely and
5  successive. He nevertheless contended that the claims in his untimely and abusive
6  writ should be considered because he could show that he fit under the miscarriage-of-
7  justice exception for error of constitutional magnitude leading to a trial that was so
8  fundamentally unfair that absent the error no jury would have convicted him, but in
9  applying the procedural bars, the California Supreme Court necessarily rejected this
10  assertion.

11    If a state prisoner fails to show cause and prejudice with respect to his delay
12  and abuse of the writ in seeking state habeas relief, the claims in question are
13  procedurally barred in federal court. *See generally Murray v. Carrier*, 477 U.S. 478,
14  488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); *Martinez-Villareal v. Lewis*, 80 F.3d
15  1301, 1305 (9th Cir. 1996); *see also McCleskey v. Zant*, 499 U.S. 467, 497 (1991)
16  (cause is external impediment such as government interference or reasonable
17  unavailability of claim's factual basis); *Bennett v. Mueller*, 322 F.3d 573, 586 (9th
18  Cir. 2003). Thus, he can overcome procedural default and obtain federal review of
19  the merits of his claims either by demonstrating actual innocence sufficient to bring
20  him within the narrow class of cases implicating a fundamental miscarriage of justice,
21  or by making an adequate showing of cause and prejudice. *Strickler v. Greene*, 527
22  U.S. 263, 282 (1999); *Schlup v. Deno*, 513 U.S. 298, 315 (1995); *McCleskey v. Zant*,
23  499 U.S. at 494. Thus, since the procedural defaults imposed by the California
24  Supreme Court are adequate and independent state bars, and since Petitioner has
25  failed to  sustain his burden to show cause and prejudice, Ground Three is
26  procedurally defaulted and must be rejected on that ground.

27    Respondent has no quarrel with the proposition that a sufficient *Schlup*
28  showing of actual innocence is sufficient to overcome any state procedural default.

1    *House v. Bell*, 126 S. Ct. 2064 (2006); *Schlup*, 513 U.S. at 327.    In this case,

2    however, this Court has found that Petitioner satisfied the *Schlup* showing, not as a

3    gateway to excuse procedural default, but rather as an alleged gateway to equitably

4    toll the one-year limitations period of AEDPA.  Respondent still maintains that actual

5    innocence is not a gateway exception for untimeliness under the AEDPA.

6        Nonetheless, Respondent acknowledges that the gateway applies to allow

7    presentation of procedurally defaulted claims where a state prisoner can demonstrate

8    actual innocence.  While Respondent does not contest the applicability of the *Schlup*

9    gateway to procedurally defaulted claims, Respondent respectfully disagrees with the

10   sufficiency of the *Schlup* showing made by Petitioner, as found by this honorable

11   Court, in order to preserve the issue.  Respondent adheres to the assertion that

12   Petitioner's assertion of actual innocence was not supported by "new *reliable*

13   evidence –whether it be exculpatory *scientific* evidence, *trustworthy eyewitness*

14   accounts, or *critical physical* evidence–that was not presented at trial." (*Schlup*, 513

15   U.S. at 324.)

16       Thus, the claim must be rejected as procedurally barred.

17   **C.  Ground Three Is Without Merit**

18       In Ground Three, Petitioner maintains that the prosecution's presentation of

19   false evidence violated his right to due process and rendered the trial constitutionally

20   unfair.  He insists that the evidence presented at the federal evidentiary hearing

21   regarding weather conditions, sight line conditions, outside light conditions, bloody

22   shoeprint patterns, blood spatter evidence, and unfound money in Mrs. Lisker's purse,

23   all show that the prosecutor presented false evidence at the trial. (Pet. at 6-6a.)  The

24   contention is not supported by logic or the law.

25       **1.  Applicable Law**

26       It is fundamentally unfair for a prosecutor to knowingly present false

27   testimony to the trier of fact. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3

28   L. Ed. 2d 1217 (1959).  The prosecution's knowing presentation of false evidence

67

1   violates due process and renders a defendant's trial unfair if the false evidence is
2   material to the verdict. *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392
3   (1976).  Thus, a conviction obtained through the knowing presentation of material
4   false evidence or perjured testimony must be set aside if there is any reasonable
5   likelihood that the false testimony could have affected the judgment of the trier of
6   fact. *Giglio v. United States*, 405 U.S. 150, 154-55, 92 S. Ct. 763, 31 L. Ed. 2d 104
7   (1972).

8          The due process requirement voids a conviction where the false evidence is
9   "known to be such by representatives of the State." *Napue v. Illinois*, 360 U.S. at
10  269.  The basis of the due process violation is the misconduct by the government, not
11  merely perjury by the witness or the falsity of the evidence itself. *Morales v.
12  Woodford,* 388 F.3d 1159, 1179 (9th Cir. 2004); *Pavao v. Cardwell*, 583 F.2d 1075,
13  1077 (9th Cir. 1978); *McElvain v. Lewis*, 283 F. Supp. 2d 1104, 1114 (C.D. Cal.
14  2003) (no evidence prosecution knew of alleged error in allegedly mistranscribed
15  tape).  Thus, the mere allegation that false testimony was introduced is *not* a violation
16  absent *knowing* use by the prosecution. *Morales v. Woodford*, 336 F.3d 1136, 1152
17  (9th Cir. 2003), amended on other grounds, 338 F.3d at 1179; *Murtishaw v.
18  Woodford*, 255 F.3d 926, 959 (9th Cir. 2001); *Carothers v. Rhay*, 594 F.2d 225, 229
19  (9th Cir. 1979).

20         Under *Napue*, the defendant must show that: (1) the prosecution knowingly
21  presented false evidence or testimony at trial; and (2) there is a reasonable likelihood
22  that the false evidence or testimony could have affected the judgment of the jury.
23  *Jackson v. Brown*, 513 F.3d 1057, 1071-76 (9th Cir. 2008); *Hayes v. Brown*, 399 F.3d
24  972, 984-85 (2005); *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006).  False evidence
25  is material if it is reasonably probable that it could have affected the outcome. *United
26  States v. Bagley*, 473 U.S. 667, 678-82, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).
27  Mere inconsistencies in testimony do not establish knowing use of perjured
28  testimony.  *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995).  "There

1  is no due process violation resulting from prosecutorial non-disclosure of false

2  testimony if defense counsel is aware of it and fails to object." *Routly v. Singletary*,

3  33 F.3d 1279, 1286 (11th Cir. 1994); *see Stephens v. Hall*, 407 F.3d 1195, 1206 (11th

4  Cir. 2005).

5      To prevail upon the claim, there must be an allegation of specific evidence

6  that the prosecutor knew to be false, and the state prisoner must show the falsity of

7  some statement or piece of evidence actually presented to the jury. *Workman v. Bell*,

8  160 F.3d 276, 284-85 (6th Cir. 1998) (physical evidence did not show falsity, but

9  only a different interpretation); *McClain v. Lewis*, 283 F. Supp. 2d 1104, 1114 (C.D.

10 Cal. 2003).  Mere inconsistencies in testimony do not establish knowing use of

11 perjured or false testimony.  *Allen v. Woodford*, 395 F.3d 979, 995 (9th Cir. 2005);

12 *United States v. Zuno-Arce*, 44 F.3d at 1423; *United States v. Sherlock*, 962 F.2d

13 1349, 1364 (9th Cir. 1992).  Discrepancies in testimony are insufficient to show

14 perjury, and even the prosecution's presentation of contradictory evidence is not

15 improper.  *Lambert v. Blackwell*, 387 F.3d 210, 249, 252 (3d Cir. 2004); *United*

16 *States v. Necoechea*, 986 F.2d 1273, 1280 (9th Cir. 1993).

17      **2.    Analysis Of False Evidence Claim**

18          **a.    The Weather On March 10, 1983**

19      Petitioner first claims the prosecution presented the following false evidence,

20 that March 10, 1983 was a bright and sunny day and glare on the widows made it

21 impossible to see inside.  Petitioner fails to show falsity.

22      Evidence presented at the trial and at the evidentiary hearing showed that it

23 was bright and that the sun was out.  Exhibit 64-2, a photograph of two detectives

24 outside the Lisker residence on the day of the murders, reflects the two detectives

25 casting distinct shadows and the wall of the house being distinctively bright where

26 not covered by the shadows of the roof.  (*See* RT at 1188-90.)  In fact, Robert Lisker

27 testified at trial that at noon on the day of the murders, "there was some sun."  (RT

28 at 948.)  No falsity can be shown in this regard.

1    More importantly, the evidence also shows that because of the disparity of

2  brightness between the outside and the inside of the house, there would have been

3  glare  or reflections on any of the windows of the house to obstruct one's view of the

4  inside from the outside.  As the evidence at the evidentiary hearing discloses, the

5  crime scene photographs, including Exhibit 64-2, were taken at a time, around 1:10

6  p.m., when the weather was approximately the same as 11:00 a.m., the time Petitioner

7  claimed to have looked through the widows. (Hr. Tr. at 172-73.) These photographs,

8  also including Exhibit 64-18, also show a huge contrast in lighting conditions

9  between the inside of the house and the outside.  It is this intense disparity that would

10  have caused window reflections that prevented anyone outside the house looking

11  inside the house through a window from seeing any appreciable distance.  (Hr. Tr. at

12  65.)  Meanwhile, photographs of the windows in question taken on March 23, 1983

13  (Ex. 74-1, 74-2), while not taken on the same day of the crime, demonstrate how

14  intense the reflections can  become.

15    During closing argument, the prosecutor pointed out why Petitioner, who

16  said he was standing ten feet away from the living room window when he looked into

17  the extremely dark interior, could not have seen his mother on the floor of the front

18  entryway on the other side of the living room.

19    [L]ooking through a window where there is a reflection, you know how

20    you can see in if you block off all the outside light, but if you step back, you

21    can't see in, and it depends on how much light *difference* [there is].  [¶]  I

22    mean, if you go right up there [against the glass] and you put blinders on the

23    sides of your face, you could see in.  But [Petitioner] didn't go there [into the

24    large planter area] to put his face up against the glass], and he [therefore]

25    couldn't see in.

26  (RT at 1087-88; italics added.)  And the prosecutor also argued that when Petitioner

27  was standing next to his dying mother after he assaulted her and realized that he had

28  to come up with an explanation as to why he broke into the locked house, he looked

1    up and decided to say that he saw her from the living room window and the patio

2    window, but "it didn't dawn on him that the living room would have a reflection if

3    you were looking the other way [from the outside in]; it never occurred to him.  He

4    just stood by [her] body and he looked out [toward the rear windows] [and] tried to

5    come up with something.  But he couldn't think of everything."  (RT at 1092.)

6           Indeed, Robert Lisker himself conducted a visibility test the day after the

7    murder on March 11, 1983, and could "barely see through the window to the

8    fireplace" and "was unable to see beyond that point."  (RT at 925.)  He himself

9    admitted that "the 10th was very similar to the 11th" in terms of weather condition.

10   (RT at 948.)  This trial testimony show that any evidence and argument that Petitioner

11   could not have seen Mrs. Lisker from where he stood outside the house was not false

12   at all.

13          It must also be emphasized that the witnesses who testified that it was bright

14   and sunny were basing their testimony on memory.  It was not disputed that Detective

15   Monsue and Mike Wilson were at the scene until and/or during the afternoon, when

16   the conditions were not the same as the time of the murder in the morning, when it

17   was cloudy according to an estimated cloud-cover report (Ex. 18-3).  Hence, their

18   descriptions regarding the weather conditions "that day" were based on their memory

19   of the conditions the entire time they were at the crime scene.  Examining the cloud-

20   cover report in question (Ex. 18-3), it cannot be disputed that the weather conditions

21   were better during the afternoon than that of the morning.  Viewing Monsue and

22   Wilson's testimony from this light, there simply can be no basis to impugn their

23   testimony as being false.

24          As such, Petitioner has completely failed to demonstrate that the prosecution

25   presented false testimony as to the weather condition, the existing "glare" on the

26   windows on the day of the murder, and the ability to see through those windows.

27          **b.  Comparison Of March 23, 1983 And March 10, 1983**

28   Petitioner also argues that the prosecution falsely presented evidence that the

1    sun and sky cover "was the same" on March 23, 1983 as it was on March 10, 1983.

2    Petitioner is incorrect.

3    Petitioner exaggerates the prosecution's evidence when he characterizes it

4    as attesting to "sky cover" and equating the "sky cover" of both days.  Detective

5    Monsue's testimony was only that the sun was "very bright" on both March 10 and

6    March 23.  (RT at 268.)  LAPD photographer Mike Wilson likewise testified, when

7    asked about each day, that they were bright and sunny days.  (RT at 971, 976, 984,

8    993.)  As explained previously, such descriptions of the weather conditions on the

9    day of the murder were anything but false.

10            **c.    Time When Crime-scene Photographs Were Taken**

11    Petitioner next complains about Wilson's testimony that the photographs

12    were taken at about 11:30 a.m. on the day of the murders.  (Pet. 7.)  Respondent

13    acknowledges that, as previously argued by Respondent (Objections to R&R at 37),

14    it appears from the clocks depicted in the photographs that they were taken at about

15    1 p.m.  But,  Petitioner's attempt infer *Napue* error from the trial  testimony is

16    untenable.

17            First, it must be noted that Mr. Wilson was not in any way attempting to give

18    false testimony.  The exact exchange was as follows:

19        Q    About what time of the day were you out there taking the photographs?

20            Do you recall?

21        A    I believe during our discussion this morning we established that it was

22            approximately at 11:30.

23        Q    So about 11:30 in the morning on March 10?

24        A    Yes, sir.

25    (RT at 979.)  It was clear from this exchange that prior to the testimony, both Wilson

26    and the prosecutor had attempted in good faith to approximate the time of the

27    photographs.  It appears that Wilson simply misrecollected in the process, having to

28    remember an incident that took place years earlier and after which he naturally had

1  photographed numerous other crime scenes  from other cases he worked on.

2  In any event, Petitioner has not shown that the prosecutor, Mr. Rabichow,
3  knew at the time of trial that the approximation of the timing was inaccurate.
4  Furthermore, the prosecutor made it clear to the jury during closing argument that the
5  photographs were not taken in the morning, but rather "a few hours *after* the killing."
6  (RT at 1189.)  This failure to demonstrate knowledge of falsity means Petitioner's
7  *Napue* claim must fail.

8  Nor can Petitioner demonstrate that the inaccuracy was material, as is
9  required for a *Napue* claim.  As demonstrated during the evidentiary hearing, even
10  Petitioner's own expert witness acknowledged that the photographs taken
11  approximated the lighting conditions of the time period when Petitioner claimed to
12  have looked inside the house from the two windows.  (Hr. Tr. at 172-73.)  Hence, as
13  to the factual issue to which the timing of the photographs pertained, the inaccuracy
14  of the trial testimony was immaterial.  In this respect, Petitioner's *Napue* claim must
15  also fail.

16  **d.   The Victim's Body In Position Not Visible To Petitioner**

17  Petitioner next claims that the evidence that the Petitioner's body was not
18  visible from the living room and dining room windows was false.  (Pet at 7.)  This
19  contention is without merit.

20  The evidence in question is Detective Monsue's testimony at trial that he,
21  himself on the day of the murder could not see past the reflections of the living room
22  windows due to the brightness outside (RT at 268) and could not see the location of
23  the body based on the following:

24  The window itself because it has light reflecting on to it, the dining room
25  table, the plants, the way they were arranged inside of the planter and the
26  size and shape of the planter in relationship to where he had stated he had
27  observed his mother.

28  (RT at 273.)

73

1   But, as explained previously, the view from the living room window was

2   obstructed because of the strong reflections resulting from the intense disparity in

3   lighting conditions between the inside and the outside of the house.

4   As to the dining room sliding door, the evidence adduced at the hearing

5   confirmed Monsue's testimony.  For purposes of evaluating the truth of Petitioner's

6   claim to have seen his mother through the door,  what matters is where Petitioner said

7   the body was located when he looked in and whether physical evidence contradicted

8   or supported what he said.  This is where the "Monsue" version of where the body

9   was located became important, because it is the version that is based on Petitioner's

10  own descriptions of where the body was located.

11  Petitioner drew a diagram for Detective Monsue during his interview, which

12  was marked at trial as Exhibit 53 and shown to all parties, the judge, and the jury.

13  (RT at 332.)  This exhibit is no longer available as it apparently had been destroyed

14  along with all other exhibits from trial.  That exhibit however, contained a rough

15  diagram of the Lisker residence layout and a stick figure representing Mrs. Lisker's

16  body.  (RT at 338.)  Monsue described this diagram for the record at different points

17  during trial, on direct and on cross-examination, thereby providing enough facts upon

18  which a body-placement reconstruction could be done based on Petitioner's

19  descriptions.  These descriptions by Monsue are highly credible because they were

20  made in open court in front of both the prosecutor and the defense, both of whom had

21  Petitioner's diagram (Exhibit 53) in hand to immediately verify the accuracy of those

22  descriptions.

23  Concerning how far east the body was, Monsue testified:  "He places the

24  head right next to the northwest corner of the planter with the body in this direction

25  which is west from the head with the feet resting in this area here."  (RT at 338.)

26  Later, Monsue again testified that Mrs. Lisker's head "lay adjacent" to the northwest

27  corner of the planter.  (RT at 359.)  Under cross-examination, in reference to the

28  diagram, Monsue clarified that the head was at the western portion of the planter but

74

1  closer to the middle than to the edge.  (RT at 434.)

2       As far as the body's proximity to the planter, Detective Monsue testified that

3  Petitioner told him Mrs. Lisker's arms were "curled up against the planter."  (RT

4  473.)  This was confirmed by Petitioner's statement in the interview that Mrs. Lisker

5  "was on her side, she was like this, with her arms like up to her face."  (Ex. 86-164.)

6  Petitioner also indicated, "She like bleeding, she was leaning on this Ok."  (Ex. 86-

7  172.)  This evidence showed that Mrs. Lisker was so close to the planter that her

8  arms, curled up in front of her while she lay on her side, were "leaning" against the

9  planter.

10      Based on these descriptions, Varat generated a three-dimensional diagram

11  in which an observer, looking through the dining room sliding door from the best

12  vantage point possible, could *not* see Mrs. Lisker's body.  (Ex. 155-3.)  This more

13  than confirms Monsue's trial testimony and clearly defeats Petitioner's current

14  attempt to label that trial testimony as false.

15      The earlier R&R by this Court discounts this version merely because it is

16  contrary to "Monsue's description of Petitioner's sketch, which  placed the victim's

17  body at least partially on that rug."  (R&R at 22.)  But, the R&R fails to consider the

18  fact that the rug was not stationary, while the planter was, and that there were three

19  paramedics who entered the foyer and performed emergency treatment on that rug.

20  During the flurry of activity to save Mrs. Lisker, the paramedics moved the body

21  several times, at least once turning it over (RT at 182) and another time, placing it in

22  a pressure suit (RT at 180).  The rug most certainly shifted during this commotion,

23  and the fact that it appears awkwardly skewed (see, e.g., Ex. 155-1) confirms this fact.

24  The proximity of the southwest corner of the carpet to the victim's head in the

25  Monsue version also supports a strong possibility that the rug, during the commotion

26  of the treatment, was shifted from an earlier location where its southwest corner was

27

28

75

1    touching parts of the victim's body.[9/]  Petitioner himself, who moved Mrs. Lisker's

2    body at least once by "hugging, holding her" (Ex. 86 at 167) and had admittedly

3    hurried around the house in panic (*see* Ex. 86 at 164-66), could also have caused the

4    rug to move some more.  Between a stationary planter and a movable rug that showed

5    indications of being shifted and in fact was the locus of the crime and the subsequent

6    rescue effort, the most reliable choice of reference to reconstruct a body position has

7    to be the planter.  Hence, contrary to the R&R's finding, the Monsue version of the

8    body placement is fundamentally reliable.

9        Indeed, corroborating the Monsue version is Exhibit 68:89, which is a

10   photograph of the northern edge of the planter showing blood spots on the northern

11   wall of the planter.  The photograph also reflects that directly below those spots were

12   what Frank Terrio and the prosecutor both acknowledged to be discolorations or

13   stains to the wooden floor.  (Hr. Tr. at 78, 137.)  The fact that the stains were below

14   the bloody spots on the planter supports the reasonable inference that the victim's

15   head, consistent with the Monsue version, had at some point in time been very close

16   to that area, depositing blood stains to the wooden floor and possibly serving as a

17   source of blood, to which the application of blunt force would have caused tiny blood

18   drops to be deposited on the wall of the planter.

19       Finally, it bear emphasis that as some of the crime scene photographs show,

20   the inside of the house was dark.  This means that even if Petitioner had a vantage

21   point from the dining room window that technically allowed him to see Mrs. Lisker

22   based on the Terrio version of where the body was located (based on the blood spot

23   on the carpet), Petitioner would have to know where to look to see her, demonstrating

24   that he knew the location of the body before looking in.  The darkness of the inside

25

26       9.  In light of the blood evidence, violent activity obviously occurred on the
     rug.  Thus, the rug may have shifted from an earlier position prior to the struggle.
27   Ultimately, it is entirely possible that at some point in time, the rug was touching the
     victim as she was "curled up" against the planter (Monsue version).
28

1  of the house is confirmed by the very photographs the R&R cites to show one can see

2  all the way to the entryway.  Close examination of  the photographs in Exs. 74-3

3  through 74-5, which were taken on what the R&R characterizes as a brighter day than

4  March 10, 1983, shows that as the view moves from the ceiling of the entryway to the

5  floor, it becomes so dark that any attempt to discern objects near the floor becomes

6  difficult.  If the R&R is correct that March 10, 1983 was a darker day because it was

7  cloudy and hazy (R&R at 20), it further supports the inference that the inside of the

8  house on March 10, 1983 was that much darker, and it was that much more difficult

9  for Petitioner to obtain a view of his mother from the dining room window, even

10 under the Terrio version.

11       For these reasons, Petitioner's *Napue* claim as to the trial testimony in

12 question must fail.

13       **e.    Shoeprints Inside The Bathroom, In The Kitchen, And Outside The House**

14

15       Petitioner next claims the prosecution knowingly presented false evidence

16 that various shoeprints belonged to Petitioner and that the prints matched his Pacer

17 brand footwear.  (Pet. at 7 [sub-issues (e) and (f)].)  This contention is meritless.

18       Petitioner mischaracterizes the testimony given.  As to the bloody shoeprints

19 inside the bathroom and the kitchen, the prosecutor's question was "Did you see any

20 shoes that had a similar pattern on them?"  Monsue's answer was that the pattern of

21 Petitioner's shoe sole "resembled quite closely the patterns that were imprinted on the

22 floor."  (Pet. 326.)  Hence, Monsue did not claim the shoeprints actually "matched"

23 Petitioner's shoes, but only that they were similar.  And during his closing argument,

24 the prosecutor only commented that the shoe prints were of the "same design."  (RT

25 at 1121.)  While subsequent evidence showed that the shoeprints do not match

26 Petitioner's shoes, Petitioner cannot demonstrate that they were not similar.  As such,

27 he cannot demonstrate the trial testimony was false.

28       As to the shoeprints outside the house, Petitioner does not cite, and

1    Respondent cannot find, any testimony within the trial transcript where a witness

2    attested Petitioner to be the source of those outside shoeprints.  As no such testimony

3    was given, no false evidence was possible.

4         Indeed, when the prosecutor, during closing argument, was discussing this

5    issue, he did little more than ask the jury to compare the prints for themselves.  (RT

6    1121 [We got the photographs.  You can look at Bruce Lisker's shoe."].)

7         In sum, no false testimony was presented regarding the shoe prints.  As such,

8    the instant claim must fail.

9              **f.    Bloody Shoeprints Not Made By Anyone Other Than Lisker**

10        Petitioner lastly argues that the prosecution presented false evidence that the

11   bloody shoeprints inside the house were not made by anyone other than Petitioner.

12   (Pet. at 7.)    Respondent observes that no one testified to this effect at trial.

13   Petitioner's complaint, perhaps, is directed at the prosecutor's argument to this effect

14   at the closing argument:

15        If he is running through the house really quickly to look for something and

16        he had all of these footprints, why isn't there an intruder's footprint

17        somewhere? . . . Only his footprint is in the blood.

18   (RT at 1121.)  But, this clearly would not be a "false evidence" claim, but one that

19   challenges the propriety of the prosecutor's argument.  *See Barcamerica Int'l USA*

20   *Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n. 4 (9th Cir. 2002) (counsel's

21   argument not evidence).  As such, Petitioner's *Napue* claim in this regard  must fail.

22        Even assuming arguendo that the propriety of the prosecutor's argument is

23   examined, Petitioner's complaint falls short.   "[P]rosecutors must have reasonable

24   latitude to fashion closing arguments, and thus can argue reasonable inferences based

25   on the evidence, including that one of the two sides is lying."  *United States v.*

26   *Weatherspoon*, 410 F.3d 1142, 1147 (9th Cir. 2005).  Here, the prosecutor, faced with

27   apparently similar shoe patterns, did not act unreasonably in arguing that Petitioner

28   was in fact the one that left those shoeprints.  Although the position advanced was

78

1  eventually disproven years after the trial, Petitioner can point to nothing to show that

2  the argument was not made in good faith and not reasonably based on the evidence.

3       In the Report and Recommendation, this Court concluded that Petitioner had

4  demonstrated "that the bloody shoe print in the guest bathroom and one of the shoe

5  impressions in the dirt outside the house were left by someone other than himself,

6  disproving the State's 1985 theory of his guilt.  Moreover, it appears likely that the

7  shoe prints were not left by police personnel."  (R&R at 25.)  Respondent concurs

8  that there were shoe prints, found outside the house ("shoeprint B2") and in the guest

9  bathroom ("shoeprint G"), which were similar in characteristics to each other but did

10 not belong to Petitioner, as testified by FBI analyst Sandra Wieserma.  (Hg. Tr. at

11 567-577, 582-584.)  Respondent, however, takes exception to the conclusion that "it

12 appears likely that the shoe prints were not left by police personnel."

13      This Court questioned Officer DeRousseau's credibility by indicating that

14 his testimony at the evidentiary hearing -- that he "probably" stepped in blood -- was

15 contrary to his trial testimony.  (R&R at 24.)  However, DeRousseau's testimony at

16 the hearing is readily reconcilable with his trial testimony.  At trial, DeRousseau

17 responded, "yes" when asked whether he was "careful not to disturb any potential

18 evidence."  (RT at 874.)  He also answered, "Yes" when asked whether he "avoid[ed]

19 stepping in any blood spots."  He clarified that he was told by the homicide unit not

20 to step in blood spots.  (RT at 874.)  This testimony was true as far as DeRousseau's

21 knowledge was concerned at the time of trial.  There was no indication that he

22 reviewed any other document in preparation for trial other than the "notes and reports

23 that [he] made regarding the incident."  (RT at 867.)

24      However, this all changed prior to the evidentiary hearing.  As DeRousseau

25 testified, he refreshed his recollection before the hearing with the crime scene

26 photographs.  (Hg. Tr. at 410, 413, 415.)  As he looked at the photographs, he noticed

27 red stains he could not remember seeing when he was engaged in his protective

28 sweep.  (See, e.g., Hg. Tr. at 436-37.)  But even then, he was careful not to rush to

1   a conclusion that he in fact stepped on blood.  Rather, knowing more now than he did

2   at trial, he reasonably left open a possibility which he had excluded at trial.  Indeed,

3   George Prado, who entered the house with DeRousseau, testified that officers often

4   could not see blood on the floor or carpet as they conduct their preliminary search of

5   a premise. (Hg. Tr. at 446.)  Under these circumstances, there was nothing incredible

6   about DeRousseau's modification to his trial testimony.

7        This Court also questioned the officers' credibility by finding that, contrary

8   to the officers' testimony at the evidentiary hearing, neither of them indicated in their

9   March 10, 1983, reports, and did not testify at trial, that they entered the guest

10  bathroom containing shoeprint "G." (R&R at 24.)  However, attacking the credibility

11  of officers based not on directly inconsistent statements but on what was omitted from

12  their past reports, overlooks the purpose of a police report, i.e., to summarize

13  activities and observations, as opposed to recording all details.  Moreover, the

14  questions asked of these officers at trial were not of the type that would elicit answers

15  which this Court faulted the officers for not supplying.

16       It is true that neither the officers' report nor their testimony at trial

17  specifically indicate their entrance into the guest bathroom (Hg. Ex 86:365-366;Pet.

18  RT at 829-65, 866-76).  It is also true, however, that the officers conducted a

19  protective sweep in order to secure the *entire* residence, verifying that no criminal

20  suspect was still inside the house.  (RT at 838-39 [Prado searched closet doors in

21  every room, "went through" the entire house], 869 [DeRousseau "checked the house

22  with Officer Prado for suspects"].)  It is also undisputed that this procedure is of

23  utmost importance as the officers' safety depended on it.  (Hg. Tr. at 412, 446.)  It

24  bears noting that the guest bathroom was part of the house which undoubtedly needed

25  to be checked, and was almost certainly checked for possible suspects during the

26  protective sweep.

27       In any event, the fact that the officers in the past omitted mention of the guest

28  bathroom is of little or no consequence.  They also omitted mention of two other

1  bathrooms in the house (RT at 874-75 [DeRousseau checked the master bedroom and
2  bathroom]; RT at 838-39 [Prado testifying, "(DeRousseau) went to the right and I
3  went to the left.  So we covered different rooms"]; Hg. Ex. 86:365-365a [Prado's
4  report indicating he searched the den, kitchen area, living room, two small bedrooms,
5  exterior of residence]; Hg. Ex. 8: 366-367 [DeRousseau's report indicating he
6  checked the master bedroom].)  These other bathrooms, again, had to be, and
7  unquestionably were checked, for suspects.  The omitted mentions were not
8  surprising.  The officers' reports were summaries which detailed only the most
9  important facts and may very well have left out mention of relatively unimportant
10 parts of the house.

11         Likewise, at trial, the focus of their testimony was the appearance, demeanor,
12 and statements of Petitioner (see, e.g., RT at 831-53, 867-72), not a comprehensive
13 list of every area searched during the protective sweep.  The testimony about which
14 areas they searched was at best peripheral.  (RT at 839, 872-73).  Indeed, Prado did
15 not even specify which rooms he went into, other than to say DeRousseau searched
16 the right portion of the house while he handled the left.  (RT at 839.)  Hence, it is not
17 fair to discount the officers's credibility simply because they had not specifically
18 mentioned the guest bathroom while answering questions at trial propounded with an
19 entirely different focus.  In this regard, it bears emphasis that at no point was either
20 officer directly asked at trial about entrance into any of the bathrooms.

21         Furthermore, the evidence strongly suggests that shoeprint "G" in the guest
22 bathroom was left by one of the officers during the sweep.  As the crime scene
23 photographs show (see, e.g., Hg. Ex. 64: 89, 90, 91, 93, 95, 98, 99, 100, 101, 102,
24 103, 104, 105, 106, 107), and as both officers acknowledged (RT at 423, 446), there
25 was an abundance of blood in the residence.  Although the officers were doing their
26 best to avoid stepping on blood, their attention during the protective sweep was
27 devoted to the search of suspects, so it was not possible to guarantee non-disturbance
28 of the scene.  (RT at 446-47.)  Meanwhile, shoeprint "G" was not located in the

middle of the bathroom, but was inches from the threshold and appears to point into the bathroom.  (Hg. Ex. 66-1)  This was perfectly consistent with an officer (who had previously stepped on blood accidentally) taking one quick step into the bathroom, ascertaining that no suspects was inside, and proceeding on to the next room.

In this regard, that shoeprint G may have been made by the same shoe that left the shoeprint on the dirt walkway east of the house (shoeprint B2) is no surprise.  (See Hg. Tr. 567-77, 582-84 [FBI Analyst testifying that prints B2 and G had characteristics similar to one another].)  If anything, it confirms that both shoeprints were left by police personnel.  This is because both Prado and DeRousseau had been to the east side of the house.  (Hg. Ex. 86-365 [Prado's report indicating he checked exterior of residence including the east side];  RT at 873 [DeRousseau, in reply to question at trial about searching "exterior circumference of the residence," testifying he went to the east side of the house where he observed a broken window].)  At the time they searched that part of the property, either of them could have walked through the dirt walkway in question and were thus perfectly capable of leaving shoeprint B2.

In attacking the credibility of the officers, this Court cited the fact that DeRousseau had testified he went to the exterior of the house to search, but Prado did not see DeRousseau do so.  (R&R at 25.)  This places unwarranted significance on this observation.  Prado testified expressly and unmistakably that he would not know whether DeRousseau had searched the side of the house, because during the times when he (Prado) was not at the east side of the house, DeRousseau "may have been tending to Mr. Lisker, or he could have been checking a portion of the perimeter of the house.  [He] just [didn't] know."  (Hg. Tr. at 571.)

This Court also found the officers not credible because of their "claimed ability to remember minute details such as whether they noticed specific blood stains during their quick search 20 years earlier."  (R&R at 25.)  But the memory of minute details of a gruesome murder scene, which not all officers come across on a regular basis, is not inherently implausible.  And memory can be refreshed by past written

1    accounts and extensive crime-scene photographs now shown to the officers.

2        Citing the fact that "neither officer remembered anything about the shoes he

3    wore that day," this Court concluded that "any suggestion that one of the [officers]

4    left the prints would be pure speculation." (R&R at 25.)  Respondent disagrees.  The

5    fact that a protective sweep had to be conducted at a bloody murder scene, the

6    location of shoeprint "G" being near the threshold, and that both of the officers that

7    conducted the sweep had also been to the side of the house where a similar shoeprint

8    was found, combined to yield a reasonable likelihood that the shoeprints in question

9    were left by police personnel.  This is certainly a reasonable conclusion.

10       Adding to this likelihood is the fact that such contamination is common,

11   almost inevitable, and that it did in fact occurred in this case.  FBI analyst Wieserma

12   testified that according to her experience, there were "many cases" in which she was

13   called to assist as a shoeprint analyst where she had determined that the scene was

14   contaminated by paramedics or law enforcement officers.  (Hg. Tr. at 595.)  In fact,

15   one such shoeprint contamination was detected in the instant case because of the

16   print's extreme dissimilarity with Petitioner's shoe.  It was established at trial that

17   paramedic Lovato was the one who left shoeprint D, a shoe impression appearing to

18   be in blood, found at the porch of the residence.  (RT at 184-85; Hg. Ex. 68:3-4.)  If

19   paramedics stepped on blood in the foyer where they treated Mrs. Lisker and

20   unwittingly left a shoeprint, then it is highly likely that the police officers who walked

21   through that same foyer to conduct the protective sweep had unwittingly left bloody

22   shoeprints at the scene.

23       Another important set of facts renders it unlikely that shoeprints B2 and G

24   belonged to another assailant.  According to police investigation, all doors, except the

25   front door -- which Petitioner had apparently found to be initially locked but had later

26   opened from the inside after he allegedly broke in -- were locked and all windows

27   were nailed shut except the kitchen window, which was dismantled.  The front door

28   was not damaged in any way.  (RT at 262-63, 248-49, 274-75, 289-90, 851-52.)

1  Under these circumstances, the two possible ways this alleged third-party assailant

2  could have gained entry into the house was to either break in through the kitchen

3  window or enter through the front door.

4  The first possibility was excluded, as Petitioner took responsibility for the

5  forced entry into the kitchen window. (Hg. Ex. 86:161.) This means that the alleged

6  assailant had entered through the front door, thus rendering the need to walk around

7  the perimeter of the house unnecessary. This scenario appears inconsistent with

8  evidence tending to show that shoeprint B2, found at the dirt walkway, and shoeprint

9  G in the bathroom were made by the same shoe. The combined circumstances, on the

10  other hand, are more consistent with either Prado or DeRousseau being the source of

11  both shoeprints G and B2 as a result of their activities in and out of the house.

12  In sum, there is substantial evidence supporting the reasonable inference that

13  the shoeprints were left by police personnel. Respondent acknowledges that the

14  prosecution case at trial was based in part on the premise that all shoeprints inside the

15  house belonged to Petitioner. But the prosecutor's argument must be reasonably

16  understood to have meant that all shoeprints other than those of law enforcement

17  personnel were those of Petitioner. In other words, the prosecutor was arguing that,

18  based on the evidence, the only shoeprints left by anyone other than police officers

19  or paramedics were Petitioner's. And given the evidence summarized indicating that

20  the shoeprints likely belonged to police personnel, it is much more reasonable to infer

21  that all the shoeprints found inside the house belonged to either Petitioner or police

22  personnel rather than to a mysterious third-party assailant.

23  **g.  Summary**

24  Here, the "false evidence" that to which Petitioner refers  merely consisted

25  of reasonable inferences from the evidence that was actually presented at trial. As

26  argued above, none of the evidence upon which the prosecutor based these arguments

27  to the jury was false. Monsue and Robert Lisker testified truthfully that when they

28  tried to look, *they* could not see through the windows because of the reflection of the

1  pool on the glass and because of the dark interior.  In addition, Monsue testified

2  truthfully that the unidentified footprint looked "similar" to the shoes worn by

3  Petitioner, not that they were identical.  Monsue testified truthfully that he could find

4  no money in the wallet.

5       Thus, the prosecutor was merely asking the jurors to draw certain reasonable

6  inferences, based on the evidence presented, that the reflections in the patio window

7  and sliding door prevented viewing the body that lay in the dark entryway, that there

8  was no evidence of an intruder, that all of the bloody shoeprints that were made

9  before the police and paramedics arrived were those of Petitioner, and that no money

10  was found in the wallet.  These were not factual contentions or assertions of facts that

11  had been proved, but rather reasonable inferences from the evidence presented.

12       Evidence presented at the evidentiary hearing demonstrates that the bloody

13  footprint found in the bathroom was likely left by paramedics or by police officers

14  sweeping the scene and accidentally stepping in blood, which was present in several

15  areas of the house.  There also is absolutely no evidence the abrasion to the back of

16  the victim's head was the made by a shoe. The victim was acquainted with Ryan's

17  mother from drug counseling and hence, she would have her telephone number.  The

18  victim probably mis-dialed her number in an attempt to inform her that Ryan had

19  returned to California.  Ryan, of course, knew his mother's number by heart, and

20  would either not mis-dial, or would redial correctly.

21       Furthermore, any inaccuracy in Detective Monsue's letter did not compare

22  to its striking accuracy as to the occurrence of a remodeling, nor would it be odd for

23  a homicide detective who handled numerous murder cases to mis-recollect minor

24  inconsequential details as to whether in a particular case he personally spoke with the

25  husband or the wife or whether he spoke in person or over the telephone.  Nor did

26  Detective Monsue have any reason to falsely add one minor piece of motive evidence

27  to a case clearly evidencing that the murder was the explosion of pent-up rage.  If

28  Detective Monsue intended to fabricate and risk his career in doing so, there was no

1   reason to fabricate a verifiable fact.  Finally, the presence of money inside the

2   victim's purse shows nothing other than that it was so well hidden that not even

3   Petitioner, Detective Monsue, or the prosecutor found it.

4          Thus, as set forth in more detail above, Petitioner's claim about being able

5   to see his mother from either of two windows was disproved by the reflection of the

6   light-colored swimming pool that was present on the glass (*see* RT at 1176-77) -- in

7   stark contrast with the darkness of the inside of the house -- and the location,

8   described by him during police interviews, of his mother's body next to the planter

9   making it nearly impossible to see from any standpoint at the dining room sliding

10  door.  That it was a bright enough day to cause a reflection was not false.  The single

11  bloody shoeprint in the bathroom and the shoeprint in the kitchen had to have been

12  left by one of the police officers or paramedics, and Detective Monsue did not testify

13  that these two footprints were identical to Petitioner's, but merely that the pattern was

14  "similar" to Petitioner's – a fact that the jury could accept or reject upon viewing the

15  photographs themselves.

16         And since *no one* – the prosecutor, Detective Monsue, or defense counsel –

17  ever happened to look in the hidden compartment of Mrs. Lisker's wallet and find the

18  money that only the very thorough exhibits clerk later found, the prosecutor cannot

19  be accused of presenting false evidence regarding the missing money.  After all, the

20  wallet was an exhibit, and the jurors themselves could have looked to see if it

21  contained any secret compartment.  What is more, the prosecutor only argued that

22  which Petitioner admitted – that money had been taken from the purse – which, by

23  definition was not false.

24         The prosecutor's arguments, and the inferences the prosecutor asked the jury

25  to draw, were not misleading or false.  They are certainly not what Petitioner labels

26  as assertions of fact.  Petitioner has failed to demonstrate that the actual evidence

27  presented was truly "false" or that it was material.

28         Thus, Ground Three must be rejected.

# IV.

## PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND FOUR OF HIS PETITION (CUMULATIVE IMPACT OF CONSTITUTIONAL VIOLATIONS IN GROUNDS ONE, TWO AND THREE)

Petitioner insists that the cumulative effect of the constitutional violations alleged in Grounds One, Two and Three constituted a deprivation of due process. He maintains that his conviction must fall because the prejudice resulting from the separate constitutional errors was compounded to such a degree that, taken collectively, the individual errors entitle him to relief, even if no single error is sufficient to establish prejudice. (Pet. at 6.) The argument cannot withstand scrutiny.

### A.   Ground Four Is Untimely

As noted above, (Arg. III, *ante*), this Ground is untimely under the AEDPA.

### B.   Ground Four Is Procedurally Barred

As noted above (Arg. III, *ante*), this claim is procedurally barred in that it was found by the California Supreme Court to be untimely.

### C.   Ground Four Is Without Merit

The cumulative effect of constitutional errors can constitute a basis for relief even if the errors individually do not. *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). However, all of the reasons set forth above as to how each of the individual claimed errors is without merit and non-prejudicial preclude the establishment of cumulative prejudice. Petitioner has failed to sustain his burden to show any violation of his constitutional rights and therefore can demonstrate no resulting prejudice.

None of the above three Grounds have any merit, in that Petitioner has failed to show that the state court's disposition of these claims was contrary to, or an unreasonable application of, Supreme Court precedent. As noted above, each of his three claims of error, fails for the reasons stated and is without merit. Because there were no errors which, whether considered individually or cumulatively, deprived

87

1    Petitioner of a fair trial, he is entitled to no relief on this claim.

2        In his 2007 state habeas corpus petition, Petitioner urged the California

3    Supreme Court to disregard his procedural defaults because "errors of constitutional

4    magnitude led to a trial that was so fundamentally unfair that absent the error, no

5    reasonable judge or jury would have convicted [him]."  (State habeas petition at 73.)

6    Petitioner went on to argue that  "[a]ny doubt as to whether Lisker meets the

7    fundamental miscarriage of justice exception is resolved by considering the false

8    evidence constitutional error together with the ineffective assistance of counsel

9    constitutional error" and that the California Supreme Court need only look at the

10   finding by this Court regarding the *Schlup* gateway to satisfy itself as to whether no

11   reasonable juror would convict Petitioner as a result of the errors, whether taken

12   individually or collectively.  (State habeas petition, at 75.)   However, the supreme

13   court necessarily rejected Petitioner's argument regarding cumulative impact from the

14   alleged fundamental errors, thereby impliedly finding that Petitioner had received due

15   process and a fair trial and that, even assuming error, the cumulative impact did not

16   render the trial unfair.  (Application, Ex. A.)

17       To summarize, in Ground Four, Petitioner assigns as federal constitutional

18   error the cumulative impact of the errors asserted as Grounds One, Two and Three.

19   Petitioner has failed to establish a prima facie case for relief as to any individual

20   alleged error.  *A fortiori*, Petitioner has failed to make a prima facie case from any

21   cumulative effect of errors.

22       There were no constitutional errors which, whether considered individually

23   or cumulatively, deprived Petitioner of a fair trial.  Therefore, no prima facie case for

24   relief has been stated as to this claim.  Thus, he is entitled to no relief, and Ground

25   Four must be rejected.

26   //

27   //

28   ////

1

## CONCLUSION

2      For the foregoing reasons, Respondent requests that the Petition for Writ of

3  Habeas Corpus be denied and dismissed.

4      Dated:  April 2, 2008

5                              Respectfully submitted,

6                              EDMUND G. BROWN JR.
                               Attorney General of the State of California

7                              DANE R. GILLETTE
                               Chief Assistant Attorney General

8                              PAMELA C. HAMANAKA
                               Senior Assistant Attorney General

9

10                             KRISTOFER JORSTAD
                               Deputy Attorney General

11                             JOHN YANG
                               Deputy Attorney General

12

13                             /s/ Robert David Breton

14                             ROBERT DAVID BRETON
                               Deputy Attorney General

15                             Attorneys for Respondent

16  RDB:lh
    LA2004FH0213

17  LISKER ANSWER - FINAL.wpd

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2                                                                      **Page**

3   MEMORANDUM OF POINTS AND AUTHORITIES   1

4   PROCEDURAL BACKGROUND   1

5   STATEMENT OF FACTS   5

6   PETITIONER'S CONTENTIONS   22

7   STANDARD OF REVIEW   23

8   ARGUMENT   26

     I.    **PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND ONE OF HIS PETITION (*MASSIAH* VIOLATION AND PRESENTATION OF FALSE EVIDENCE)**   26

        A.   Relevant State Court Proceedings   27

        B.   The State Courts' Determination Was Not Contrary To, Or An Unreasonable Application Of, Supreme Court Authority Regarding The *Massiah* Claim   29

     II.   **PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND TWO OF HIS PETITION (INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL)**   34

        A.   Applicable Law   34

        B.   The State Court Reasonably Applied The Two Prongs Of *Strickland* In Finding That Defense Counsel Had Provided Effective Representation And That Petitioner Had Failed To Demonstrate Actual Prejudice From Any Failure   37

            1.   State Court Rejection Of The Ineffectiveness Claim   37

            2.   Applicable Law   38

            3.   Analysis Of Claim   42

                a.   No Motive Evidence   48

                b.   No Evidence Linking Ryan To Scene   53

                c.   Mark On Mrs. Lisker's Skull   54

                d.   Inconsequential Phone Call From Lisker Residence   59

                e.   Summary   61

i

**TABLE OF CONTENTS  (continued)**

Page

III.   PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND THREE OF HIS PETITION (PROSECUTOR'S PRESENTATION OF FALSE EVIDENCE) ... 63

A.  Ground Three Is Untimely ... 63

B.  Ground Three Is Procedurally Defaulted ... 64

C.  Ground Three Is Without Merit ... 67

   1.  Applicable Law ... 67

   2.  Analysis Of False Evidence Claim ... 69

     a.  The Weather On March 10, 1983 ... 69

     b.  Comparison Of March 23, 1983 And March 10, 1983 ... 71

     c.  Time When Crime-scene Photographs Were Taken ... 72

     d.  The Victim's Body In Position Not Visible To Petitioner ... 73

     e.  Shoeprints Inside The Bathroom, In The Kitchen, And Outside The House ... 77

     f.  Bloody Shoeprints Not Made By Anyone Other Than Lisker ... 78

     g.  Summary ... 84

IV.   PETITIONER IS NOT ENTITLED TO FEDERAL HABEAS RELIEF ON GROUND FOUR OF HIS PETITION (CUMULATIVE IMPACT OF CONSTITUTIONAL VIOLATIONS IN GROUNDS ONE, TWO AND THREE) ... 87

A.  Ground Four Is Untimely ... 87

B.  Ground Four Is Procedurally Barred ... 87

C.  Ground Four Is Without Merit ... 87

CONCLUSION ... 89

1

# TABLE OF AUTHORITIES

2                                                                     **Page**

3  **Cases**

4  *Allen v. Woodford*
   395 F.3d 979 (9th Cir. 2005)                                        69
5

6  *Anderson v. Calderon*
   232 F.3d 1053 (9th Cir. 2000)                                       40
7
   *Babbitt v. Calderon*
   151 F.3d 1170 (9th Cir. 1998)                                    36, 39
8

9  *Baja v. Ducharme*
   187 F.3d 1075 (9th Cir. 1999)                                       44

10 *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*
   289 F.3d 589 (9th Cir. 2002)                                        78
11
   *Bashor v. Risley*
12 730 F.2d 1228 (9th Cir. 1984)                                       40

13 *Bean v. Calderon*
   163 F.3d 1073 (9th Cir. 1998)                                       40
14
   *Bell v. Cone*
15 535 U.S. 685
   122 S. Ct. 1843
16 152 L. Ed. 2d 914 (2002)                                    23, 24, 35

17 *Bell v. Cone*
   543 U.S. 447
18 125 S. Ct. 847
   160 L. Ed. 2d 881 (2005)                                            25
19
   *Bennett v. Mueller*
20 322 F.3d 573 (9th Cir. 2003)                                        66

21 *Bittaker v. Woodford*
   331 F.3d 715 (9th Cir. 2003)                                        43
22
   *Bonin v. Calderon*
23 59 F.3d 815 (9th Cir. 1995)                                  36, 39, 64

24 *Boyde v. Brown*
   404 F.3d 1159 (9th Cir. 2005)                                       31
25
   *Brewer v. Hall*
26 378 F.3d 952 (9th Cir. 2004)                                        25

27

28

**TABLE OF AUTHORITIES** (continued)

**Page**

*Brown v. Payton*
544 U.S 133
125 S. Ct. 1432
161 L. Ed. 2d 334 (2005)                                            24

*Burger v. Kemp*
483 U.S. 776
107 S. Ct. 3114
97 L. Ed. 2d 638 (1987)                                             36

*Cacoperdo v. Demosthenes*
37 F.3d 504 (9th Cir. 1994)                                         39

*Campbell v. Wood*
18 F.3d 662 (9th Cir. 1994)                                         38

*Carothers v. Rhay*
594 F.2d 225 (9th Cir. 1979)                                        68

*Carriger v. Stewart*
132 F.3d 463 (9th Cir. 1997)                                         4

*Chambers v. Mississippi*
410 U.S. 284
93 S. Ct. 1038
35 L. Ed. 2d 297 (1973)                                             87

*Clark v. Murphy*
331 F.3d 1062 (9th Cir. 2003                                        24

*Coleman v. Calderon*
150 F.3d 1105 (9th Cir. 1998)                                       36

*Coleman v. Thompson*
501 U.S. 722
111 S. Ct. 2546
115 L. Ed. 2d 640 (1991)                                            64

*Cooks v. Spalding*
660 F.2d 738 (9th Cir. 1991                                      38, 42

*Cooper v. Calderon*
255 F.3d 1104 (9th Cir. 2001)                                       41

*Crotts v. Smith*
73 F.3d 861 (9th Cir. 1996)                                         38

*Delgado v. Lewis*
223 F.3d 976 (9th Cir. 2000)                                        35

*Denham v. Deeds*
954 F.2d 1501 (9th Cir. 1992)                                       41

iv

# TABLE OF AUTHORITIES  (continued)

Page

*Dows v. Wood*
211 F.3d 480 (9th Cir. 2000)                                    35, 41

*Early v. Packer*
537 U.S. 3
123 S. Ct. 362
154 L. Ed. 2d 263 (2002)                                        24, 25

*Earp v. Stokes*
431 F.3d 1158 (9th Cir. 2005)                                   44

*Fellers v. U.S.*
540 U.S. 519
124 S. Ct. 1019
157 L. Ed. 2d 1016 (2004)                                       31

*Furman v. Wood*
190 F.3d 1002 (9th Cir. 1999)                                   35

*Gallego v. McDaniel*
124 F.3d 1065 (9th Cir. 1997)                                   40

*Gentry v. Roe*
320 F.3d 891 (9th Cir. 2003)                                    36

*Gerlaugh v. Stewart*
129 F.3d 1027 (9th Cir. 1997)                                   35

*Giglio v. United States*
405 U.S. 150
92 S. Ct. 763
31 L. Ed. 2d 104 (1972)                                         68

*Guam v. Santos*
741 F.2d 1167 (9th Cir. 1984)                                   39

*Hamilton v. Vasquez*
17 F.3d 1149 (9th Cir. 1994)                                    41

*Hardamon v. United States*
319 F.3d 943 (7th Cir. 2003                                     40

*Harris v. Reed*
489 U.S. 255
109 S. Ct. 1038
103 L. Ed. 2d 308 (1989)                                        64

*Harris v. Vasquez*
949 F.2d 1497 (9th Cir. 1990)                                   39, 40

*Hasan v. Galaza*
254 F.3d 1150 (9th Cir. 2001)                                   42

v

# TABLE OF AUTHORITIES  (continued)

**Page**

*Hayes v. Brown*
399 F.3d 972 (2005)                                                68

*Hayes v. Woodford*
301 F.3d 1054 (9th 2002)                                           36

*Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002)                                      24

*Holland v. Jackson*
542 U.S. 649
124 S. Ct. 2736
159 L. Ed. 2d 683 (2004)                                           24

*House v. Bell*
126 S. Ct. 2064 (2006)                                             67

*Hunter v. Aispuro*
982 F.2d 344 (9th Cir. 1992)                                       25

*In re Clark*
5 Cal.4th 750
21 Cal. Rptr. 2d 509 (1993)                                   4, 64, 65

*In re Hardy*
41 Cal.4th 977 (2007)                                               4

*In re Lawley*
___ Cal.4th ___
2008 WL 755825, *4-6 (2008)                                         4

*In re Miller*
17 Cal. 2d 734 (1941)                                            5, 28

*In re Robbins*
18 Cal. 4th 770
77 Cal. Rptr. 2d 153 (1998)                                   4, 64, 65

*In re Weber*
11 Cal.3d 703 (1974)                                                4

*Insyxiengmay v. Morgan*
403 F.3d 657 (9th Cir. 2005)                                       44

*Jackson v. Brown*
513 F.3d 1057 (9th Cir. 2008)                                      68

*Jackson v. Calderon*
211 F.3d 1148 (9th Cir. 2000)                                      37

*James v. Borg*
24 F.3d 20 (9th Cir. 1994)                                         37

## TABLE OF AUTHORITIES  (continued)

Page

*Kane v. Garcia Espitia*
546 U.S. __
126 S. Ct. 407
163 L. Ed. 2d 10 (2005)                                          24

*Kimmelman v. Morrison*
477 U.S. 365
106 S. Ct. 2574
91 L. Ed. 2d 305 (1986)                                          35

*Kuhlmann v. Wilson*
477 U.S. 436
106 S. Ct. 2616
91 L. Ed. 2d 634 (1986)                                          30

*La Crosse v. Kernan*
244 F.3d 702 (9th Cir. 2001)                                  28, 65

*Lacy v. Lewis*
123 F. Supp. 2d 533 (C.D. Cal. 2000)                            25

*LaGrand v. Stewart*
133 F.3d 1253 (9th Cir. 1998)                                   38

*Lambert v. Blackwell*
387 F.3d 210 (3d Cir. 2004)                                     69

*Lambert v. McBride*
365 F.3d 557 (7th Cir. 2004)                                    31

*Lang v. Callahan*
788 F.2d 1416 (9th Cir. 1986)                                   40

*Lockyer v. Andrade*
538 U.S. 63
123 S. Ct. 1166
155 L. Ed. 2d 144 (2003)                                      23, 24

*Lowry v. Lewis*
21 F.3d 344 (9th Cir. 1994)                                     62

*Luna v. Cambra*
306 F.3d 954 (9th Cir. 2002)
*amended* 311 F.3d 928 (9th Cir. 2002)                          25

*Lurie v. Wittner*
228 F.3d 113 (2d Cir. 2000)                                     26

*Maine v. Moulton*
474 U.S. 159
106 S. Ct. 477
88 L. Ed. 2d 481 (1985)                                      26, 30

# TABLE OF AUTHORITIES  (continued)

**Page**

*Martinez-Villareal v. Lewis*
80 F.3d 1301 (9th Cir. 1996)                66

*Massiah v. United States*
377 U.S. 201
84 S. Ct. 1199
12 L. Ed. 2d 246 (1964)                1, 30, 31

*McCain v. Gramley*
96 F.3d 288 (7th Cir. 1996)                26

*McClain v. Lewis*
283 F. Supp. 2d 1104 (C.D. Cal. 2003)                69

*McCleskey v. Zant*
499 U.S. 467 (1991)                66

*McElvain v. Lewis*
283 F. Supp. 2d 1104 (C.D. Cal. 2003)                68

*McKinney v. Artuz*
326 F.3d 87 (2d Cir. 2003)                26

*McKnight v. Comstock*
445 F.2d 317 (9th Cir. 1971)                44

*Miller-el v. Cockrell*
537 U.S. 322
123 S. Ct. 1029
154 L. Ed. 2d 931 (2003)                24

*Miranda v. Arizona*
384 U.S. 436
86 S. Ct. 1602
16 L. Ed. 2d 694 (1966)                1

*Mitchell v. Esparza*
540 U.S. 12
124 S. Ct. 7
157 L. Ed. 2d 263 (2003)                25

*Mitchell v. Gibson*
262 F.3d 1036 (10th Cir. 2001)                26

*Moore v. Deputy Commissioners of Sci-Huntington*
946 F.2d 236 (3d Cir. 1991)                36

*Morales v. Calderon*
85 F.3d 1387 (9th Cir. 1996)                65

*Morales v. Woodford*
388 F.3d 1159 (9th Cir. 2004)                68

**TABLE OF AUTHORITIES  (continued)**

1

2

**Page**

3    *Morgan v. Bunnell*
     24 F.3d 49 (9th Cir. 1994)                                          40

4    *Morris v. California*
5    966 F.2d 448 (9th Cir. 1992)                                        35

6    *Morris v. California*
     966 F.2d 448 (9th. Cir. 1992)                                       37

7    *Morris v. Ylst*
     447 F.3d 735 (9th Cir. 2006)                                        68
8

9    *Murray v. Carrier*
     477 U.S. 478
     106 S. Ct. 2639
10   91 L. Ed. 2d 397 (1986)                                             66

11   *Murtishaw v. Woodford*
     255 F.3d 926 (9th Cir. 2001)                                        68
12

13   *Napue v. Illinois*
     360 U.S. 264
     79 S. Ct. 1173
14   3 L. Ed. 2d 1217 (1959)                                         67, 68

15   *Nix v. Whiteside*
     475 U.S. 157
16   106 S. Ct. 988
     89 L. Ed. 2d 123 (1986)                                         36-38
17

18   *Ortiz v. Stewart*
     149 F.3d 923 (9th Cir. 1998)                                        41

19   *Paradis v. Arave*
     954 F.2d 1483 (9th Cir. 1992)                                       40
20

21   *Pavao v. Cardwell*
     583 F.2d 1075 (9th Cir. 1978)                                       68

22   *Penry v. Johnson*
     532 U.S. 782
23   121 S. Ct. 1910
     150 L. Ed. 2d 9 (2001)                                              23
24

25   *People v. Alcala*
     4 Cal. 4th 742
     15 Cal. Rptr. 2d 432 (1992)                                         45
26

27   *People v. Alvarez*
     14 Cal 4th 155
     58 Cal. Rptr. 3d 385 (1996)                                         46
28

# TABLE OF AUTHORITIES  (continued)

**Page**

*People v. Avila*
38 Cal.4th 491
43 Cal. Rptr. 3d 1 (2006)                                               46

*People v. Babbitt*
45 Cal. 3d 660
248 Cal. Rptr. 69 (1988)                                            46, 48

*People v. Blankenship*
167 Cal. App. 3d 840
213 Cal. Rptr. 666 (1985)                                               46

*People v. Bradford*
15 Cal. 4th 1229 (1997)                                                 45

*People v. Clark*
3 Cal. 4th 41
10 Cal. Rptr. 2d 554 (1992)                                             45

*People v. Edelbacher*
47 Cal. 3d 983
254 Cal. Rptr. 586 (1989)                                               47

*People v. Green*
27 Cal. 3d 1
164 Cal. Rptr. 1 (1980)                                                 45

*People v. Hall*
41 Cal. 3d 826
226 Cal. Rptr. 112 (1986)                                           45, 47

*People v. Karis*
46 Cal. 3d 612
250 Cal. Rptr. 659 (1988)                                               46

*People v. Kegler*
197 Cal. App. 3d 72
242 Cal. Rptr. 897 (1987)                                               46

*People v. Lewis*
26 Cal. 4th 334
110 Cal. Rptr. 2d 272 (2001)                                            45

*People v. Marshall*
13 Cal. 4th 799
55 Cal. Rptr. 2d 347                                                    46

*People v. Mendez*
193 Cal. 39
223 P. 65 (1924)                                                       45

**TABLE OF AUTHORITIES  (continued)**

**Page**

*People v. Pride*
3 Cal. 4th 195
10 Cal. Rptr. 2d 636 (1992)                                                45

*People v. Sandoval*
4 Cal. 4th 155
14 Cal. Rptr. 2d 342 (1992)                                                47

*People v. Von Villas*
10 Cal. App. 4th 201
13 Cal. Rptr. 2d 62 (1992)                                                 46

*People v. Wright*
39 Cal. 3d 576
217 Cal. Rptr. 212 (1984)                                                  46

*Pizzuto v. Arave*
280 F.3d 949 (9th Cir. 2002)                                               41

*Poland v. Stewart*
169 F.3d 573 (9th Cir. 1998)                                               64

*Price v. Vincent*
538 U.S. 634
123 S. Ct. 1848
155 L. Ed. 2d 877 (2003)                                                   24

*Ranieri v. Terhune*
366 F. Supp. 2d 934 (C.D. Cal. 2005)                                       65

*Richmond v. Ricketts*
774 F.2d 957 (9th Cir. 1985)                                               44

*Rios v. Rocha*
299 F.3d 796 (9th Cir. 2002)                                               41

*Roe v. Flores-Ortega*
528 U.S. 470
120 S. Ct. 1029
145 L. Ed. 2d 985 (2000)                                                   39

*Routly v. Singletary*
33 F.3d 1279 (11th Cir. 1994)                                              69

*Sandgathe v. Maass*
314 F.3d 371 (9th Cir. 2002)                                               35

*Schlup v. Delo*
513 U.S. 298
115 S. Ct. 851
130 L. Ed. 2d 808 (1995)                                                    3

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Schlup v. Deno*
513 U.S. 298 (1995)                                                      66, 67

*Schriro v. Landrigan*
___ U.S. ___
127 S. Ct. 1933 (2007)                                                      44

*Shackleford v. Hubbard*
234 F.3d 1072 (9th Cir. 2000)                                          25, 35

*Siripongs v. Calderon*
133 F.3d 732 (9th Cir. 1998)                                               39

*Siripongs v. Calderon*
35 F.3d 1308 (9th Cir. 1994)                                               65

*Smith v. Stewart*
140 F.3d 1263 (9th Cir. 1998)                                              42

*Stephens v. Hall*
407 F.3d 1195 (11th Cir. 2005)                                             69

*Strickland v. Washington*
466 U.S. 668
104 S. Ct. 2052
80 L. Ed. 2d 674 (1984)                                              34-36, 38-41

*Strickler v. Greene*
527 U.S. 263 (1999)                                                        66

*Summers v. Dretke*
431 F.3d 861 (5th Cir. 2005)                                               31

*Thompson v. Calderon*
109 F.3d 1358 (9th Cir. 1997)                                              35

*Totten v. Merkle*
137 F.3d 1172 (9th Cir. 1998)                                              44

*Townsend v. Sain*
372 U.S. 293
83 S. Ct. 745
9 L. Ed. 2d 770 (1963)                                                     44

*Trice v. Ward*
196 F.3d 1151 (10th Cir. 1999)                                             41

*Turk v. White*
116 F.3d 1264 (9th Cir. 1997)                                              40

## TABLE OF AUTHORITIES  (continued)

1

**Page**

2

*United States v. Agurs*
3  427 U.S. 97
96 S. Ct. 2392 (1976) ............................................................. 68

4

*United States v. Bagley*
5  473 U.S. 667
105 S. Ct. 3375
6  87 L. Ed. 2d 481 (1985) ........................................................ 68

7  *United States v. Berry*
814 F.2d 1406 (9th Cir. 1989) ............................................... 41
8

*United States v. Chambers*
9  918 F.2d 1455 (9th Cir. 1990) .......................................... 37, 38

10  *United States v. Ferreira-Alameda*
804 F.2d 543
11  *amended* 815 F.2d 1251 (9th Cir. 1986) .......................... 39, 42

12  *United States v. Henry*
447 U.S. 264
13  100 S. Ct. 2183
65 L. Ed. 2d 115 (1980) .................................................... 30, 31
14

*United States v. Layton*
15  855 F.2d 1388 (9th Cir. 1988) ............................................... 37

16  *United States v. Lewis*
786 F.2d 1278 (5th Cir. 1986) ............................................... 40
17

*United States v. Mayo*
18  646 F.2d 369 (9th Cir. 1981) ................................................. 40

19  *United States v. Murray*
751 F.2d 1528 (9th Cir. 1985) ............................................... 41
20

21  *United States v. Necoechea*
986 F.2d 1273 (9th Cir. 1993) ............................................... 69

22  *United States v. Olson*
925 F.2d 1170 (9th Cir. 1991) .......................................... 38, 42
23

24  *United States v. Popoola*
881 F.2d  811 (9th Cir. 1989) ................................................ 41

25  *United States v. Rogers*
769 F.2d 1418 (9th Cir. 1985) ............................................... 39
26

27  *United States v. Sherlock*
962 F.2d 1349 (9th Cir. 1992) ............................................... 69

28

**TABLE OF AUTHORITIES  (continued)**

**Page**

*United States v. Vincent*
758 F.2d 379 (1985)                                    39

*United States v. Weatherspoon*
410 F.3d 1142 (9th Cir. 2005)                          78

*United States v. Zuno-Arce*
44 F.3d 1420 (9th Cir. 1995)                       68, 69

*Wade v. Calderon*
29 F.3d  1312 (9th Cir. 1994)                      41, 42

*Weidner v. Thieret*
932 F.2d 626 (7th Cir. 1991)                           43

*Weighall v. Middle*
215 F.3d 1058 (9th Cir. 2000)                          35

*Wiggins v. Smith*
539 U.S. 510
123 S. Ct. 2527
156 L. Ed. 2d 471 (2003)                           23, 35

*Wildman v. Johnson*
261 F.3d 832 (9th Cir. 2002)                       35, 39

*Williams v. Calderon*
52 F.3d at 1465 (9th Cir. 1995)                        42

*Williams v. Taylor*
163 F.3d  860 (4th Cir. 1998)                          41

*Williams v. Taylor*
529 U.S. 362
120 S. Ct. 1495
146 L. Ed. 2d 389 (2000)                   23, 24, 35, 36

*Williams v. Woodford*
384 F.3d 567 (9th Cir. 2004)                           31

*Woodford v. Visciotti*
537 U.S. 19
123 S. Ct. 357
154 L. Ed. 2d 279 (2002)                               35

*Yarborough v. Alvarado*
541 U.S. 652
124 S. Ct. 2140
158 L. Ed. 2d 938 (2004)                               36

# TABLE OF AUTHORITIES  (continued)

**Page**

*Yarborough v. Gentry*
540 U.S. 1
124 S. Ct. 1
157 L. Ed. 2d 1 (2003)                                                24, 35

*Ylst v. Nunnemaker*
501 U.S. 797
111 S. Ct. 2590
115 L. Ed. 2d 706 (1991)                                             25, 26


**Statutes**

28 U.S.C. § 2254                                  24, 35, 43, 44, 62, 63

Cal. Evid. Code § 350                                                    45

Cal. Evid. Code § 352                                                    45

Cal. Penal Code § 31                                                     62

Rule 7, 28 U.S.C. foll. § 2254                                           43

Rule 8, 28 U.S.C. foll. § 2254                                           44