1   William J. Genego (Calif. Bar No. 103224)
    wgenego@gmail.com
2   Vicki I. Podberesky (Calif. Bar No. 123220)
    Nasatir, Hirsch, Podberesky & Genego
3   2115 Main Street
    Santa Monica, California 90405
4   Telephone:  310-399-3259

5   Counsel for Petitioner
    Bruce Lisker
6

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

                         WESTERN DIVISION
10

11  BRUCE E. LISKER,              )    **Case No. CV 04-02687-VAP(RZ)**
                                  )
12        Petitioner,             )
                                  )
13        vs.                     )    Petitioner's Traverse to Respondent's
                                  )    Answer to Second Amended Petition
14                                )    For Writ of Habeas Corpus;
    MICHAEL MARTEL,  Warden,      )    Memorandum In Support of Traverse
15  Mule Creek State Prison,      )
                                  )
16        Respondent.             )
    ――――――――――――――――――――――        )
17

18        Petitioner Bruce Lisker, by counsel, submits the following traverse to

19  Respondent's answer to his Second Amended Petition For Writ of Habeas Corpus

20  and the accompanying memorandum in support of the traverse.

21                                  Respectfully submitted,

22  Dated: 06/02/2008

23                                  _____/s/_____
                                    William J. Genego
24
                                    Counsel for Petitioner
25                                  Bruce Lisker

26

27

28

―――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――
Pet's Traverse & Supporting Memorandum              Case No. CV 04-02687 VAP (RZ)

1

## Table of Contents

2   Table of Authorities ............................................... iv

3   Traverse ......................................................... 1

4   Memorandum In Support of Traverse ................................ 4

5   I.   Introduction and Summary of Argument ........................ 4

6   II. Procedural History ........................................... 8

7   III.    Statement of Facts ....................................... 10

8       A. Trial Evidence ........................................... 10

9           1.  Report of crime and arrival at crime scene ........... 10

10          2.  Injuries and cause of death .......................... 12

11          3.  Detective Monsue's initial crime scene observations ...... 12

12          4.  Lisker's statement ................................... 13

13          5.  View evidence ........................................ 14

14          6.  Shoeprint evidence ................................... 18

15          7.  Blood-spatter evidence ............................... 18

16          8.  Jailhouse informant testimony ........................ 19

17          9.  Summation ............................................ 21

18      B. Post-Conviction Evidence Relevant to Claims For Relief ...... 25

19          1.  Weather Conditions on March 10 and March 23, 1983 ...... 25

20          2.  View Evidence and Line of Sight ...................... 27

21          3.  Shoe print evidence .................................. 29

22          4.  Blood spatter evidence ............................... 32

23          5.  Motive ............................................... 33

24          6.  Jailhouse informant testimony ........................ 34

25          7.  Alternative suspect .................................. 36

26          8.  Investigating officer's credibility .................. 39

27  IV.     Argument ................................................. 41

28      A. The Court Should Deny Respondent's Procedural Defenses ...... 41

1.  Respondent's Statute of Limitations Defense Should Be Denied . . . . . 41

2.  Respondent's Procedural Default Defense Should Be Denied . . . . . . . 42

    (a)    Miscarriage Of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    (b)    The State Rule Is Not An Adequate Ground . . . . . . . . . . . . . . . 43

    (c)    Judicial Estoppel Precludes Respondent's Procedural
          Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

B.  The Court's Decision Is Not Constrained by or Subject
to § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

C.  Ground 1:    Petitioner's Sixth Amendment Right Was Violated By the
State's Knowing Exploitation of An Opportunity to Confront
Him Without Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

1.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

2.  Relevant Facts and Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    (a) Trial Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    (b) Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    (c) Prior Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    (d) Additional Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

3.  The Evidence Shows that the State Knowingly Exploited an Opportunity
to Confront Petitioner Without Counsel . . . . . . . . . . . . . . . . . . . . . 52

4.  The Violation Had a Substantial and Injurious Effect . . . . . . . . . . . 53

5.  The State Court Decision Does Not Preclude Federal
Habeas Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

D.  Ground 2:    Petitioner Was Denied the Effective Assistance of Counsel by
His Counsel's Failure to Investigate and Advance a Third-Party
Culpability Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

1.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

2.  Relevant Facts and Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    (a) Trial Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    (b) Prior Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    (c) Additional Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

3.  Counsel's Objectively Unreasonable Failure to Investigate and Advance
the Third-Party Culpability Defense Prejudiced Petitioner . . . . . . . . . 59

(a)    Counsel's Failure to Investigate and Advance a Third-Party
       Culpability Defense Was Objectively Unreasonable . . . . . . . . . 59

(b)    Counsel's Objectively Unreasonable Error
       Prejudiced Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

4.  Respondent Fails to Offer a Plausible Strategic Justification For the
    Error and His Arguments That It Was Not Prejudicial Are Defeated by
    the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

5.  The State Court Decision Does Not Preclude Federal
    Habeas Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

E.  Ground 3:    Petitioner's Conviction Violates Due Process Because It Was
                 Based on False Evidence Material to the Verdict . . . . . . . . . 66

1.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

2.  The False Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

3.  The False Evidence Was Material . . . . . . . . . . . . . . . . . . . . . . . . . 69

4.  Respondent's Attempt to Defend the Testimony As Not
    False Fails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    (a)    The Weather on March 10, 1983 . . . . . . . . . . . . . . . . . . . . . . 73

    (b)    Comparison of March 23, 1983 and March 10, 1983 . . . . . . 74

    (c)    Time at which the crime scene photographs were taken . . . . 75

    (d)    The position of the body was not visible to Lisker . . . . . . . . 75

    (e)    The shoeprints were Lisker and not another intruder . . . . . . 75

F.  Ground 4:    The Cumulative Effect of the Errors Entitle
                 Petitioner to Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Exhibit A    Respondent's Informal Response

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aiken v. Spalding,*
  841 F.2d 881 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 54,65

*Arizona v. Fulminate,*
  499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) . . . . . . . . . . . . 70

*Brecht v. Abrahamson,*
  507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) . . . . . . . . . . . . 53

*Burns v. Wilson,*
  346 U.S. 137, 73 S. Ct. 1045, 97 L. Ed. 1508 (1953) . . . . . . . . . . . . . . 77

*Calderon v. U.S. District Ct. (Bean),*
  96 F.3d 1126 (9th Cir.), *cert. denied,* 117 S. Ct. 1569 (1997) . . . . . . . . . 43

*Chambers v. Mississippi,*
  410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) . . . . . . . . . . . . . 77

*Coleman v. Thompson,*
  501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) . . . . . . . . . . . . 43

*Cooper v. Calderon,*
  255 F.3d 1104 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Dennis v. Brown,*
  361 F. Supp. 2d 1124 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . 44,46

*Dugger v. Adams,*
  489 U.S. 401 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Fields v. Calderon,*
  125 F.3d 757 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Giglio v. United States,*
  405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 102 (1972) . . . . . . . . . . . . . 66

*Hall v. Department of Corrections,*
  343 F.3d 976 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Harmon v. Ryan,*
  959 F.2d 1457 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 43

*Hathorn v. Lovorn,*
  457 U.S. 255, 102 S. Ct. 2421 (1982) . . . . . . . . . . . . . . . . . . . . . 43

*Hayes v. Brown,*
  399 F.3d 972 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 67,70

*Hoots v. Allsbrook,*
  785 F.2d 1214 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 56

-iv-

*Jackson v. Brown,*
    513 F.3d 1057 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67,75

*Jackson v. Calderon,*
    211 F.3d 1148 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Johnson v. Mississippi,*
    486 U.S. 578 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Killian v. Poole,*
    282 F.3d 1204 (9th Cir. 2002), *cert. denied*
    537 U.S. 1179 (2003) . . . . . . . . . . . . . . . . . 47,48,55,66,67,70,71,72,75

*King v. La Marque,*
    464 F.3d 963 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Kotteakos v. United States,*
    328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53,54

*Kyles v. Whitley,*
    514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) . . . . . . . . . . . . 62

*Lisker v. Knowles,*
    463 F. Supp. 2d 1008 (C.D. Calif. 2006) . . . . . . . . . . . . . . . . . . . . . . . 9

*Maine v. Moulton,*
    474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985) . . . . . . . . . 49,51,53

*McMann v. Richardson,*
    397 U.S. 759, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970) . . . . . . . . . . . . . . 56

*Mooney v. Holohan,*
    294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Morales v. Calderon,*
    85 F.3d 1387 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43,44

*Napue v. Illinois,* 3
    60 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) . . . . . . . . . . . . 66,67

*Rissetto v. Plumbers & Steamfitters Local,*
    343, 94 F.3d 597 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*O'Neal v. McAninch,*
    513 U.S. 432, 115 S.Ct. 992(1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Russell v. Rolfs,*
    893 F.2d 1033 (9th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Schlup v. Dello,*
    513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) . . . . . . . . 1,2,5,8,9

*Strickland v. Washington,*
    466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) . . . . . . . . . . 56,62,

*Strickler v. Greene,*
    527 U.S. 263, 119 S. Ct. 1936 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 62

*Towns v. Smith,*
    395 F.3d 660 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Agurs,*
    427 U.S. 97, 96 S. Ct. 2397, 49 L. Ed. 2d 342 (1976) . . . . . . . . . . 67,70,73

*United States v. Bagley,*
    473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) . . . . . . . . 67,70,72

*United States v. Henry,*
    447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980) . . . . . . . . . . . 49

*United States v. Tucker,*
    716 F.2d 576 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Young,*
    17 F.3d 1201(9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 67,72,75

*Wagner v. Prof'l Eng'rs in Cal. Government,*
    354 F.3d 1036 (9th Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Whaley v. Belleque,*
    ____ F.3d ____, 2008 WL 763774 (9th Cir. 2008) . . . . . . . . . . . . . . . . . 47

*Whelchel v. Washington,*
    232 F.3d 1197 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Williams v. Taylor,*
    529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) . . . . . . . . . 55,66

**STATE CASES**

*Ayala v. Ayers,*
    2007 WL. 2853934 (S.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 46

*In re Clark,*
    5 Cal. 4th 750 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 9,42,44,45

*Jones v. Ayers,*
    2008 WL. 906302 (E.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . 44,45,46

*In re Miller,*
    17 Cal.2d 734 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Robbins,*
    18 Cal. 4th 770 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## FEDERAL CONSTITUTION/STATUTES

28 U.S.C. § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,2,5,6,7,47,48,54,55,65,66

U.S. Const., Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## STATE CONSTITUTION/STATUTES

Calif. Const., Art I, § 15, clause 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Penal Code § 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Penal Code § 12022(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Traverse**

1  Petitioner Bruce Lisker, by his undersigned counsel, submits this verified
2  Traverse and accompanying Memorandum in response to Respondent's Answer.

3  Petitioner re-alleges and incorporates by reference in its entirety his Second
4  Amended Petition for Habeas Corpus and also incorporates his Traverse
5  Memorandum and re-alleges each and every fact alleged therein.

6  Petitioner specifically alleges the following in response to the allegations
7  made in the Answer:

8  1.  Petitioner denies that he is "properly in the custody of the Respondent"
9  and denies that his custody is "pursuant to a valid judgment and felony
10  conviction," in that his conviction was obtained in violation of his federal
11  constitutional rights as alleged in his second amended petition and his resulting
12  custody is improper because it is based on his unconstitutional conviction.

13  2.  Petitioner admits that his petition is subject to the to the Anti- Terrorism
14  and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110
15  Stat. 1214 (Apr. 24, 1996) in that it was filed after April 24, 1996, but denies that
16  the adjudication of his claims are subject to 28 U.S.C. § 2254(d).

17  3.  Petitioner denies that his grounds for relief are barred by the statute
18  of limitations, and affirmatively alleges that the limitations period is tolled
19  because its application would work a miscarriage of justice within the meaning of
20  Schlup v. Dello, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed.2d 808 (1995), in that it
21  is more probable than not that no reasonable juror would find him guilty in light of
22  the new evidence that was not presented to the jury that convicted him.

23  4.  Petitioner admits that his grounds for relief are exhausted and otherwise
24  denies the allegations in paragraph 4.  Petitioner denies he is required to "exhaust"
25  the miscarriage of justice gateway exception, and also affirmatively alleges that
26  even if exhaustion of his miscarriage of justice defense was required, he in fact
27  exhausted it by presenting the "fundamental miscarriage of justice exception to the

procedural bar for successive and/or untimely petitions" in his petition to the California Supreme Court.

5.    Petitioner admits that the California Supreme Court denied his petition in a one sentence order that cited three cases that indicate the Court denied the petition on procedural grounds without consideration of the merits of the claims, but denies that this Court's consideration of his claims are procedurally barred.

6.    Petitioner denies all of the allegations of paragraph 6 of the Answer, including the allegation that 28 U.S.C. § 2254(d) governs this Court's adjudication of his claims, and alleges that the state courts' rulings denying his claims were contrary to or based on an unreasonable application of federal constitutional law as established by the United States Supreme Court and/or based upon an unreasonable determination of the facts presented in the State court proceedings.

7.    Except as otherwise expressly admitted, Petitioner denies all allegations of fact made by Respondent in his Answer, the accompanying Memorandum of Points and Authorities and exhibits.

8.    The existing factual record, as developed at the December, 2005 evidentiary hearing, establishes that Petitioner is entitled to relief without the need for a further evidentiary hearing.  Respondent's request for a further evidentiary hearing should be denied as he has not proffered or alleged facts that provide a basis or grounds for a further hearing.

9.    Petitioner alleges that the California Supreme Court's order of November 14, 2007, denied all of his four grounds for relief on procedural grounds and did not adjudicate the claims on the merits and this Court's adjudication of his claims are therefore not subject to 28 U.S.C. § 2254(d).

10. Petitioner alleges that any procedural bar resulting from the state court's ruling denying his claims on procedural grounds does not bar his right to federal relief for three separate reasons: (a) application of the procedural default would work a miscarriage of justice within the meaning of Schlup v. Dello, 513

1  U.S. 298, 115 S. Ct. 851, 130 L. Ed.2d 808 (1995), in that there is new evidence

2  not presented at Petitioner's trial which make it more probable than not that no

3  reasonable juror would find him guilty in light of the new evidence; (b) neither the

4  state procedural bar against delayed petitions nor the bar against successive

5  petitions are adequate grounds to bar federal review, as Respondent has not and

6  cannot establish that the state rules against delayed and successive pe state are

7  clear and that they are consistently applied; and (3) Respondent's procedural

8  default defense should be precluded under the doctrine of judicial estoppel, based

9  on the on inconsistent and contrary positions Respondent advanced before this

10  Court (that Petitioner had available state court remedies in 2006) and before the

11  state court (that Petitioner did not have state court remedies and should be denied

12  on procedural grounds).

13      11.  For the reasons set forth in the Petition and accompanying Traverse

14  Memorandum, Petitioner's conviction was obtained in violation of his rights under

15  the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution and the state

16  court's denial of his grounds for relief was contrary to and involved an

17  unreasonable application of clearly established federal law as determined by the

18  U.S. Supreme Court, and an unreasonable determination of the facts presented in

19  the state court proceedings.

20      WHEREFORE, petitioner prays that this Court:

21      1.  Issue a conditional Writ of Habeas Corpus and order that the writ shall

22  issue and petitioner be discharged unless the State retries him within 60 days; and

23      2.  Grant such other and further relief as may be appropriate and dispose of the

24  matter as law and justice require.

25                          Respectfully submitted,

26  Dated: 06/02/2008

27                          _____/s/_____
                           William J. Genego
                           Counsel for Petitioner
28                          Bruce Lisker

# MEMORANDUM IN SUPPORT OF TRAVERSE

## I.

### Introduction and Summary of Argument

Bruce Lisker is in custody based on a state court judgment of conviction for second degree murder entered pursuant to a 1985 jury verdict finding him guilty of the brutal killing of his mother on March 10, 1983.  Mr. Lisker was sentenced to and is serving a term of fifteen years to life plus one year and has been in continuous custody since the day his mother was murdered, more than 25 years.

Mr. Lisker's Second Amended Petition for a writ of habeas corpus presents four grounds for relief:

Ground One    denial of right to counsel by the State's knowing exploitation of an opportunity to confront Petitioner without counsel by use of a jailhouse informant, in violation of the Sixth and Fourteenth Amendments ;

Ground Two    denial of effective assistance of counsel by his counsel's failure to investigate and advance a third party culpability defense, in violation of the Sixth and Fourteenth Amendments;

Ground Three    violation of the due process right not to be convicted based on false evidence, in violation of the Fifth and Fourteenth Amendments; and

Ground Four:    denial of due process by the cumulative effect of individual errors, in violation of the Fifth and Fourteenth Amendments.

CR 136 (Second Amended Petition).

On April 2, 2008, Respondent filed his Answer to the Second Amended Petition.  CR 164.  Respondent's Answer asserts two procedural defenses, first that all four claims are time barred and second that Grounds Three and Four are procedurally barred as well by the November 14, 2007 order of the California Supreme Court denying Mr. Lisker's state petition on procedural grounds.

1    Respondent's Answer ("RA") at ¶¶ 3 & 4; Respondent's Memorandum ("RM") at

2    64, 87.

3        Respondent alternatively contends that Mr. Lisker's claims should be denied

4    on the merits.  Specifically, Respondent asserts that Grounds One and Two were

5    rejected on the merits by state court decisions and are therefore subject to 28

6    U.S.C. § 2254(d) and should be denied because the state court decisions were not

7    objectively unreasonable RA at ¶ 6; RM at 29, 37.  Respondent implicitly

8    concedes that Grounds Three and Four are not subject to 28 U.S.C. § 2254(d), but

9    argues they should nonetheless be denied as lacking merit.  RM at 67, 87.

10    Respondent further requests an evidentiary hearing.  RA at ¶ 8.

11        The Court should reject and deny Respondent's first procedural defense – that

12    Mr. Lisker's claims are barred by the statute of limitations – based on, and for the

13    same reasons as, the Court's earlier ruling denying Respondent's motion to

14    dismiss the First Amended Petition as time-barred.  (Clerk's Record ("CR") 112.)

15    The Court's ruling denying that motion on grounds that Mr. Lisker satisfied the

16    miscarriage of justice gateway exception of <u>Schlup</u> and that <u>Schlup's</u> miscarriage

17    of justice exception tolled the limitations period, is law of the case and

18    Respondent does not suggest any reason why it should not be applied as such.

19        The Court should deny Respondent's second procedural defense  – that Mr.

20    Lisker's claims, as set forth in Grounds Three and Four, are procedurally barred by

21    the California Supreme Court's order denying the claims on procedural grounds –

22    for three separate reasons: (1) the application of a procedural default would result

23    in a miscarriage of justice within the meaning of <u>Schlup v. Dello</u>, 513 U.S. 298,

24    115 S. Ct. 851, 130 L. Ed.2d 808 (1995), in that (as this Court has previously

25    found) there is new evidence that was not presented at Petitioner's trial which

26    make it more probable than not that no reasonable juror would find him guilty in

27    light of the new evidence; (2) the state rule resulting in the procedural default is

28    not an adequate ground to bar federal review because the clear is not clear and

1   Respondent has not and cannot show that it is consistently applied; and (3)

2   Respondent should be precluded by the doctrine of judicial estoppel from relying

3   on the November 14, 2007 order of the California Supreme Court to raise a

4   procedural default defense, given that Respondent took inconsistent and contrary

5   positions before this Court and the California Supreme Court, first arguing to this

6   Court that Mr. Lisker should be made to return to state court because he had

7   available state court remedies to exhaust, and then arguing to the California

8   Supreme Court that he did not.

9       The Court should adjudicate the merits of Mr. Lisker's Petition based on the

10  existing factual record as developed at the December, 2005 evidentiary hearing.

11  Respondent's request for a further evidentiary hearing should be denied as he has

12  not proffered or alleged facts that provide a basis or need for a further hearing.[1]

13      This Court's decision on the merits of all four of Mr. Lisker's claims is not

14  subject to or constrained by 28 U.S.C. § 2254(d) because the claims were not

15  adjudicated on the merits by the state court, but instead were all denied on

16  procedural grounds by the November 14, 2007 order of the California Supreme

17  Court.  Respondent wrongly contends that two of Mr. Lisker's claims – Grounds

18  One and Two – are subject to § 2254(d) by asserting they were adjudicated on the

19

20      [1] Respondent represented in his informal response to the California Supreme

21  Court that if an order to show cause were issued, he was prepared to offer

22  declarations from Lisker's trial counsel and from Robert Hughes in support of his

attempt to rebut Lisker's proof, but did not submit any declarations, or other

23  evidence, in support of his answer.  *See,* Respondent's Informal Response at pp.

24  101 & 105.  At the hearing on Petitioner's motion for bail, the federal court asked

    Respondent's counsel what additional evidence he had to offer as to Petitioner's

25  claims.  Respondent's counsel was unable to identify any witnesses who had not

    already testified at the federal evidentiary hearing, nor was Respondent's counsel

26  able to identify any new evidence that needed to be elicited from the witnesses

27  who did testify.  (CR 145 at p. 5, n. 3 ("At the hearing, counsel for Respondent

    had difficulty articulating why a further evidentiary hearing would be required

28  before the Court could consider the merits of Petitioner's claims.")).

1  merits by earlier state court rulings.  The legal claims alleged in Grounds One and

2  Two of the Second Amended Petition (denial of right to counsel and denial of the

3  effective assistance of counsel), were alleged in earlier state court proceedings, but

4  Mr. Lisker's 2007 state petition presented new and additional facts in support of

5  the legal allegations.  The  presentation of new and additional facts rendered them

6  new grounds for relief, even though the underlying legal right was the same, and

7  consequently the earlier state court rulings cannot be deemed to have adjudicated

8  the merits of those 2007 grounds for relief.

9       Alternatively, if the Court concludes that Grounds One and Two are subject to

10  28 U.S.C. § 2254(d), it would not affect Mr. Lisker's right to relief on those

11  grounds as the earlier state court denial of those claims was objectively

12  unreasonable under both § 2254(d)(1) & (d)(2).

13       In sum, the evidentiary record before the Court establishes the factual elements

14  of each of Mr. Lisker's grounds for relief by a preponderance, *i.e.*, (1) the state

15  exploited an opportunity to confront Mr. Lisker outside the presence and without

16  the knowledge of his counsel; (2) his counsel's failure to investigate fully and

17  advance a third party culpability defense was objectively unreasonable and could

18  not have been based on or justified by a legitimate or plausible strategic reason;

19  and (3) the prosecution presented testimony it knew or should have known was

20  false, and also failed to correct the false and misleading testimony.  Consideration

21  of those facts and the record as a whole further establishes that Mr. Lisker is

22  entitled to relief on each of his claims, in that (1) the violation of Mr. Lisker's

23  right to counsel had a substantial and injurious effect; (2) he was prejudiced by his

24  counsel's objectively unreasonable errors and thus denied his right to effective

25  assistance of counsel; (3) the false evidence was material to the verdict and thus

26  Mr. Lisker's conviction violates due process; and (4) Mr. Lisker's conviction

27  violates due process based on the cumulative effect of the errors.

28

## II.

### Procedural History

Petitioner Bruce Lisker was convicted by a jury on November 21, 1985 of second degree murder with use of a deadly weapon; he was sentenced on February 7, 1986, to a term of fifteen years to life for the murder (Penal Code § 187) plus one year for the weapon (Penal Code § 12022(b)), for a total term of 16 years to life imprisonment. (Clerk's Transcript ("CT") 368, 378-79; Reporter's Transcript ("RT") 1221-23, 1237.) The California Court of Appeal affirmed Lisker's conviction on December 22, 1988 and denied his request for reconsideration on January 20, 1989. (Motion to Dismiss, Exh B.)

Lisker filed a petition for a writ of habeas corpus with the California Supreme Court on March 31, 1989 which was denied on April 25, 1989 "for failure to allege sufficient facts." (Motion to Dismiss, Exhs F, G.)

Lisker filed a petition for a writ of habeas corpus with the Los Angeles County Superior Court on February 24, 2003 which was denied March 6, 2003. (Motion to Dismiss, Exhs H, I.) He then filed a petition for a writ of habeas corpus with the California Court of Appeal on July 28, 2003 which was denied August 5, 2003. (Motion to Dismiss, Exhs J, K.) Lisker petitioned the California Supreme Court on August 18, 2003 to review the Court of Appeal's denial of his habeas petition. (Motion to Dismiss, Exh L.) The Supreme Court denied the petition in a summary order issued October 29, 2003, with Justices Kennard and Werdegar voting to grant the petition. (Motion to Dismiss, Exh M, at 304.)

On April 16, 2004, Lisker initiated the present action, by filing a federal petition for a writ of habeas corpus. (CR 1.) Respondent moved to dismiss Lisker's Petition on grounds that it was time-barred. (CR 10.) Lisker opposed the motion arguing, *inter alia*, that he was actually innocent and was therefore entitled to have his claims heard on the merits pursuant to the "miscarriage of justice" gateway of <u>Schlup v. Dello</u> 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed.2d 808

1 | (1995). (CR 20.)

2 |     This Court held an evidentiary hearing on Mr. Lisker's assertion of the

3 | miscarriage of justice exception in December, 2005, at which both parties were

4 | allowed to present, and the Court considered, new evidence not presented at trial

5 | of Mr. Lisker's guilt or innocence. (CR 78, 79, 80, 90, 92, 93, 94.) The Court

6 | ruled that in light of the new evidence presented at the hearing, and taking into

7 | account the trial record, Mr. Lisker satisfied the miscarriage of justice gateway of

8 | Schlup v. Dello, as the Court found "it is more probable than not that no

9 | reasonable juror would find petitioner guilty beyond a reasonable doubt in light of

10 | the new evidence." (CR 112, Report and Recommendation at 51: 10-12, *citing*,

11 | Schlup, 513 U.S. at 327); Lisker v. Knowles, 463 F. Supp.2d 1008, 1040 (C.D.

12 | Calif. 2006). The Court also ruled that the miscarriage of justice gateway

13 | exception tolled the statute of limitations and accordingly denied Respondent's

14 | motion to dismiss. (CR 112 at 50, 57.) The Court's findings and rulings were

15 | adopted by the District Court. (CR 118.)

16 |     Lisker filed a Second Amended Petition on February 13, 2007, which added

17 | two new claims to his First Amended petition, and added additional facts to the

18 | two original claims. (CR 123.) Further proceedings were stayed to allow Lisker

19 | an opportunity to exhaust his state remedies as to his new claims. Lisker filed a

20 | petition with the California Supreme Court on February 13, 2007, in which he

21 | presented each of the four claims set forth in his Second Amended Petition. (CR

22 | 138.) On November 14, 2007, the California Supreme Court issued a one sentence

23 | order denying the Petition which cited three cases, indicating it denied the petition

24 | on procedural grounds without reaching the merits.[2] (CR 150.) On April 2, 2008,

25 |

26 |

27 |    [2] In re Clark, 5 Cal.4th 750 (1993) (untimely); In re Robbins, 18 Cal.4th 770, 780 (1998) (successive petition) and In re Miller, 17 Cal.2d 734 (1941) (claim

28 | previously raised on appeal).

1 | Respondent filed his Answer.  (CR 164.)

2 | <center>**III.**</center>

3 | <center>**Statement of Facts**</center>

4 | **A.  Trial Evidence**

5 |     1.  <u>Report of crime and arrival at crime scene</u>

6 |     On March 10, 1983 at approximately 11:26 a.m. Bruce Lisker ("Lisker" or

7 | "Petitioner"), then 17, called 911 from 15472 Huston Street, the Sherman Oaks

8 | home of his parents, Dorka and Robert Lisker.  Lisker told the operator his mother

9 | had been stabbed and needed help immediately.  Lisker then called his father,

10 | Robert Lisker.  His son was hysterical and crying, and the elder Lisker rushed

11 | home from his law office.  (RT 176, 191, 230, 231, 757, 931.)[3]

12 |     Paramedics arrived at the location at 11:36 a.m.  Lisker was in the front yard,

13 | running around and screaming loudly.  He pleaded with them to help his mother,

14 | asking them to "please help.  My mother is dying."   (RT 176, 192, 215.)

15 |     The paramedics entered the house through the front door and saw Dorka

16 | Lisker laying on the floor, stomach down.  She was unconscious and had a very

17 | weak pulse but was still alive.  She had stab wounds and head trauma. (RT 176,

18 | 179-182, 196-199, 215.)

19 |     Her body was between the front door (located on the north side of the house),

20 | and an interior planter which was approximately ten feet from the front door.

21 | (Evidentiary Hearing Exhibit 63 ("EH Exh.")).  The interior planter was

22 | approximately four feet wide (east to west) and was estimated to be approximately

23 | 12 inches high.  Mrs. Lisker's body was at a slight angle, with her head to the east

24 | (to the left as one entered the front door) and her feet to the west.  Paramedic Jay

25 | Lovato estimated the position of her head to be 6-12 inches to the left (east) of the

26 |

27 |    [3] The transcript of the trial is consecutively paginated and totals 1238 pages.

28 | All citations to the trial transcript are to the reporter's transcript (RT) page.

1    northeast corner of the planter.  (RT 184-187, 215-18, 339, 1084; EH. Exh. 63)

2         Lovato noticed two small steak knives under the body, as he rolled the body

3    over to be face-up.  There was blood all over Mrs. Lisker's body, and most of it

4    appeared to come from her back where there were stab wounds on her  upper

5    torso.  Lovato stepped in the blood and identified a bloody shoeprint outside the

6    front door as having come for from his Vibram sole shoes.  There was a carpet in

7    the entryway and there was noticeable discoloration from two pools of blood.  (RT

8    182-84, 205.)  The distance between the rug and the planter was approximately 18

9    inches to two feet.  (RT 429, 435.)

10         Los Angeles Police Department officers responded to the scene shortly after

11    the paramedics.  According to one officer, Lisker was "crying to God to save his

12    mother."  (RT 821, 833.)  He was yelling and said "someone stabbed my mother in

13    the head," and that he was "going to get the person that did this."  (RT 835, 868.)

14    Lisker was hysterical about helping his mother and had to be handcuffed because

15    he was uncontrollable.  (RT 842, 857, 868, 870.)  He had fresh blood on both his

16    hands.  (RT 848, 871.)  After being handcuffed he was placed in a police vehicle.

17    (RT 811.)

18         LAPD Officer Johnson arrived on the scene after Lisker was handcuffed in the

19    police vehicle.  Lisker was still in a "near hysterical" state but Johnson was able to

20    get a "basic" statement from him about how he had come to discover his mother.

21    (RT 809-812, 814.)  According to Johnson's notes, Lisker told him that after job-

22    seeking in the morning, he had come to the house to work on his car, got no

23    response when he knocked on the door, went around the back and looked through

24    a sliding glass door and saw a head in the entrance hallway.  He entered the house

25    through the kitchen window, found his mother with two knives in her which he

26    removed.  (RT 812, 821.)

27

28

2.  <u>Injuries and cause of death</u>

The paramedics transported Dorka Lisker to the hospital where she was pronounced dead at 3:27 p.m.  (RT 108.)  At the time of her death, she was approximately 5'4" and 170 pounds.  (RT 761-64.)  The cause of death was determined to be blunt-force head injuries and multiple stab wounds.  (RT 47.) There were approximately ten tears or lacerations on the scalp that had been caused by blunt-force trauma.  (RT 49-50.)  There were three stab wounds in the upper back, at chest level.  (RT 55.)  There were also bruises on both arms, and the bone of her right upper arm had been fractured.  (RT 61-62.)

3.  <u>Detective Monsue's initial crime scene observations</u>

LAPD Detective Andrew Monsue arrived at the scene at approximately noon. (RT 242.)  Mrs. Lisker had already been transported to the hospital and Lisker remained handcuffed in the police vehicle.  (RT 244, 438.)

Monsue went through the house and observed that all the doors except the front door were locked from the inside.  (RT 245, 248-249.)  He saw a sports trophy and a "Bullworker" isometric exercise bar on the floor, both appeared to be bloodstained.  (RT 295, 299, 312,-313.)  He saw a bloody shoeprint in the guest bathroom (bathroom #3).  (RT 326; EH Exh. 63)  There was a purse sitting on a couch in the living room.  He did not find any money in the purse or anywhere else in the house.[4]  (RT 317, 411-412, 442, 473.)

Detective Monsue also walked around the exterior of the house.  (RT 268.) Along the east side of the house, he saw that the glass slats or louvers from the kitchen window had been taken out and were lying on the ground.  (RT 274.)

---

[4]  Lisker had been at the house the evening before (March 9) and received money from his father, Robert Lisker, for gas because he intended to go job hunting the next day.  (RT 958-959.)  Robert Lisker also gave Dorka Lisker $150 in his son's presence that evening.  (RT 223.)

1    4.  Lisker's statement

2    Detective Monsue spent approximately 30 minutes at the crime scene and

3    conversing with other officers. (RT 245, 421.)  He then had Lisker moved to a

4    different police vehicle and transported him to the LAPD Van Nuys station.  (RT

5    245-46.)  Monsue interviewed Lisker for a period of hours.  An edited tape

6    recording of Lisker's statement was played for the jury, and a redacted transcript

7    was prepared.  (EH. Exh. 86: 210-237(transcript of statement); RT 319-21.)

8    Lisker told Monsue that he had come to his parents' house to  work on his car.

9    Prior to doing so he had been applying for jobs.[5]  He knocked at the front door and

10   received no answer.  Lisker thought something might be wrong because he could

11   hear the family dog barking inside the house.  (EH. Exh 86: 210-237.)

12   Lisker went to the backyard, traveling south along the right (west) side of the

13   house.  Once in the backyard, he looked into the house through the large living

14   room window on the southwest wall of the house.  (EH Exh 63; RT 289; EH Exh

15   86: 212)  There was an awning extending off the roof at the location, and between

16   the side of the house and the sidewalk there was a distance of approximately five

17   feet filled with plants.  (RT 269.)  As Lisker looked in the window from the patio,

18   bending slightly, he thought he saw his mother's feet in the entryway area.  (EH

19   Exh. 86: 212, 222; RT 266, 267, 352.)

20   Lisker continued east along the back of the house to look through the sliding

21   glass door that separated the patio from the dining room.  (RT 362; EH Exh. 63)

22   Standing outside the glass patio door, and looking through the dining room toward

23   the entryway, Lisker saw his mother's head on the floor.  (EH Exh. 86: 212, 236)

24   He headed to the kitchen window, which was on the east side of the house,

25   planning to gain entry to the house through that window, as he had done on other

26

27   _____

     [5]  Police found two job applications in Lisker's car which was parked in the

28   driveway in front of the house.  (RT 404.)

1   occasions.  The screen had been nailed shut, however, and so Lisker went to his
2   car to get a pair of pliers.  Lisker said he continued along the east side of the house
3   (in a northerly direction) to the front where his car was parked, and then returned
4   the same way (in a southerly direction).  (EH Ex 86:213-214; RT 289.)

5        He removed the nails from the screen and the glass slats from the window; he
6   climbed in and went to his mother who was lying on the floor of the entryway.
7   She was covered with blood and there were two steak knives protruding from her
8   back which he removed.  (EH Exh. 86:223))  Lisker kneeled beside her, and "was
9   hugging her . . . holding her," and told her "it's going to be o.k., I love you."  (EH
10  Exh 86:219; RT 258, 345, 418, 434, 450-451.)  Lisker drew a diagram for
11  Detective Monsue to explain his movements and the location where he found his
12  mother and kneeled next to her.  (EH Exh. 86:221,224.)

13       Lisker admitted during the questioning that his parents had asked him to move
14  out of the house and were renting an apartment for him.  (EH Exh. 86:226,230.)
15  He also admitted he had used drugs and had stolen money from his parents on
16  prior occasions.  (EH Exh. 86:230-231.)

17       At the conclusion of the interview, Monsue arrested Lisker for the murder of
18  his mother.  (RT 247.)

19       5. View evidence

20       Monsue returned to the crime scene that afternoon and "looked around," and
21  testified he "checked some of the locations [Lisker] had mentioned to me during
22  the interview."  (RT 247, 442.)

23       He looked in through the living room window from the position on the patio
24  where Lisker said he was standing when he looked in and thought he saw his
25  mother's feet in the entryway area.  (RT 267, 445.)  The living room window was
26  approximately four feet wide and six and a half feet high.  (RT 411.)  Detective
27  Monsue testified he could "just see inside of that particular window . . . probably
28  about two or three feet within the room on the carpet," and that he could not see

1  through to the entryway at all. (RT 268.) When asked why he could not see more

2  than a few feet into the room, he answered: "The major consideration was the

3  reflection that was coming off that particular window . . . [b]ased upon the sun

4  being very bright . . ." (RT 268.)

5  Detective Monsue testified that he also attempted to determine if Lisker

6  could have seen his mother's head, as he had said during the interview. (RT 272.)

7  Monsue fixed the location of Dorka Lisker's head as being where the two large

8  blood stains were on the carpet, based on Lisker's diagram and statements.[6] (RT

9  332, 338, 432-33, 434, 760-61.) Monsue stood outside the glass sliding door on

10  the patio and looked in through the dining room to the entryway. He testified he

11  "could not see" the location where Mrs. Lisker's head would have been. When

12  asked why, he responded: "The window itself because it has light reflecting on it,

13  the dining room table, the plants, the way they were arranged inside the planter

14  and the size and shape of the planter in relation to where [Lisker] had stated he

15  had observed his mother." (RT 273.) No photographs were introduced or

16  identified that depicted the view on March 10, 1983 as it appeared from outside

17  the house looking into either the living room window or the glass patio door.

18  Monsue returned to the scene on March 23, 1983, with a photographer to

19  reconstruct the scene and examine the view. He selected March 23 because of the

20  "similar conditions" between the 23rd and the 10th, and stated the sun was "very

21  bright" both days. (RT 265, 266, 268.) Detective Monsue had a woman who was

22  5'4" and weighed 110 to 120 pounds lie on the entryway floor with her head in the

23  _____

24  [6]  A copy of a photograph of the blood stained rug taken at the crime scene is

25  provided at page three of the appendix. (EH Exh 20-12.)

        This put the head in a considerably different location than Lovato testified.

26  Rather than the head extending 6-12 inches to the left (east) of the northeast corner

27  of planter as one entered the front door, as Lovato had testified, it put the head to

     the right (west) of the northeast corner. (EH Exh 63.)

28

1    location of where he recalled the blood stains on the carpet would have been

2    located.[7]  (RT 761-64.)

3       He identified two photographs which he said were taken shortly after 11:00

4    a.m. on March 23, from the position Lisker said he was in when he looked into the

5    house through the living room window.  (RT 263-65.)  The photographs depicted

6    glare on the window which blocked the view into the house.  (RT 268.)  Detective

7    Monsue testified the photographs "accurately reflected" the conditions on March

8    10. (RT 269.)  He represented that the view depicted in the March 23rd

9    photographs and his view on March 10th was the same, and said that the glare

10   limited the view into the house "[b]ased upon the sun being very bright on those

11   two particular days."  (RT 268.)

12      Photographs of the view from outside the glass patio door through the dining

13   room toward the entryway were also taken on March 23.  (RT 271.)  Detective

14   Monsue referred to the photographs in testifying that when he returned to the

15   scene on March 10, he "could not see" the location where Lisker said he had

16   observed his mother's head.  (RT 272.)  Monsue also referred to the March 23rd

17   photographs in explaining why on March 10th Lisker would not have been able to

18   see his mother's head from outside the dining room, "because [the window] has

19   light reflecting on to it," and because the line of sight was blocked by the table and

20   planter.  (RT 273.)

21      Robert Johnson, an attorney and friend of the Lisker family, testified that on

22   March 11, 1983, the day after the murder, he and Robert Lisker sought to

23   determine if Dorka Lisker's body would have been visible from the backyard.  (RT

24   878.)  Robert Lisker, who was six feet, laid on the floor of the entryway.  His head

25

26

27      [7]  Detective Monsue did not take the rug into evidence or otherwise attempt to
     preserve it, nor were measurements taken of its exact location within the entryway.
28   (RT: 409, 920.)

1   was to the east, approximately a foot to the left of the planter as one entered the

2   front door (the position of Mrs. Lisker's head according to Paramedic Lovato), and

3   his feet extended west to the right of the planter. (RT 885-91, 906.) Johnson

4   testified that March 11, 1983 was "cloudy and the sun was not shining." (RT 879.)

5       Johnson examined the view from the backyard into the house through the

6   living room. There was no glare on the window that impeded his view. He was

7   able to see Robert Lisker's feet extending beyond the western side of the planter.

8   (RT 887, 8928-884.)   He also looked in from the patio outside the dining room

9   through the glass door and was able to see Robert Lisker's head. (RT 889-90.)

10   Johnson and Robert Lisker repeated this experiment a year later, on March 10,

11   1984, also a cloudy, overcast day, with the same results. (RT 890-93; 897-911.)

12       On cross-examination, Johnson admitted he did not know the weather

13   conditions of March 10, 1983. (RT 896-897.) The prosecutor also asked Johnson

14   if he had taken photographs that would show his view into the house and Robert

15   Lisker's body. Johnson said he had taken photographs but they did not "turn out."

16   (RT 903-904.)

17       The prosecution called LAPD photographer Mike Wilson in rebuttal. He took

18   photographs at the Lisker residence on March 10 and again on March 23. He

19   testified he had examined the photographs taken on March 10 and determined it

20   was a "bright, sunny day." (RT 971.) He explained that he was able to make this

21   determination by referring to a photograph of two investigators in which their

22   shadows were visible in the foreground. (RT 972.) When asked the time of day

23   he was taking photographs on March 10 he answered, "I believe during our

24   discussion this morning we established that it was approximately 11:30 a.m." (RT

25   979.) When asked if March 10 was "partly cloudy," he responded, "No, sir. I

26   believe it was bright and sunny." (RT 984, 993.)

27       Wilson also identified the photographs he took on the 23rd of the view looking

28   into the house through the living room window and through the glass patio door.

1    (RT 972-974.)  When asked if he could determine whether March 23rd was similar

2    to March 10th , he described both as being " a bright, sunny day."  (RT 976.)

3        6.   Shoeprint evidence

4        Detective Monsue observed a shoeprint or shoeprints on the dirt pathway on

5    the east side of the house.  (RT 283, 290.)  He identified a photograph of what he

6    testified was a single shoeprint he had observed in the dirt.  (RT 283.)  The

7    shoeprint was pointed south; he did not see any shoeprints heading north.  (RT

8    283, 290.)

9        Monsue observed a shoeprint in the guest bathroom near the entryway that was

10   made with what appeared to be blood.  (RT 300-03; Appdx: 1 (bathroom #3).)

11   The shoeprint was pointed east and headed toward the kitchen.  (Id.)  Monsue

12   identified a photograph of the shoeprint, labeled 'G.'  (RT 300-03.)

13       Detective Monsue also  identified a location in the kitchen where he "observed

14   another print of a shoe of a substance that resembled blood."  (RT 304-05.)   It was

15   pointed directly toward the kitchen sink.  (Id.)  The shoeprint was very light and

16   was not photographed.  (RT 306.)  When interviewed by Monsue, Lisker never

17   said he went to the sink. (RT 306.)

18       Detective Monsue was asked whether he saw any shoes that had a pattern

19   similar to the footprints he had identified.  (RT 326.) He answered, "I saw the

20   shoes that were on Bruce Lisker's feet, the bottom of the soles of those particular

21   shoes resembled quite closely the patterns that were imprinted on the floor."  (Id.)

22   Detective Monsue identified a photograph of Lisker's shoes, which were "Pacer"

23   brand tennis shoes or sneakers.  (RT 314.)

24       7. Blood-spatter evidence

25       Ronald Linhart, a criminalist with the Los Angeles County Coroner's Office,

26   testified as an expert in blood-spatter analysis.  (RT 698.)  Photographs of the

27   crime scene showed blood spatter on the walls, floor, carpet, and rug in the

28   entryway.  (RT 295-311, 715, 725-733.)  Linhart testified that to him this evidence

1  demonstrated the attack started in the master bedroom, went down the hall, and

2  ended in the entryway where Mrs. Lisker was found on the rug.  (RT 711-714,

3  725-734.)  The trophy and the "Bullworker" exercise bar, which were both found

4  in the bedroom, had blood on them.  (RT 295-299, 312-313.)

5      There was one drop of blood (1 millimeter in diameter) on Lisker's right tennis

6  shoe, one drop on his left tennis shoe (2 millimeters by 3.5 millimeters), five small

7  droplets on the right cuff of Lisker's outer shirt, plus some smeared blood on the

8  front of the shirt, and a few "light smears" of blood on the front of Lisker's pants;

9  there was no blood on Lisker's tee-shirt.  (CR 112 at 27; RT 735-740.)  Linhart

10  testified that the blood on Lisker's clothing was the result of blunt force trauma or

11  castoff.  (RT 734-53.)  Linhart conceded that Lisker's statement about his contact

12  with his mother, including dropping her arm, could account for the blood on his

13  clothing and shoes.  (Id.)  His analysis could not determine that Lisker, as opposed

14  to someone else, had stabbed or beaten Mrs. Lisker.  (RT 747-748.)

15      8.  Jailhouse informant testimony

16      Robert Hughes, a former inmate, had been in a cell next to Lisker's at the

17  county jail for what Hughes estimated to be a period of two weeks in April, 1983.

18  (RT 576.)  Hughes had testified as a prosecution witness in at least two other

19  murder cases in which he claimed defendants made incriminating admissions to

20  him.  (RT 574, 660-662.)

21      The cell on the other side of Lisker's was occupied by two inmates, Dowtu and

22  Wallace, who approached Hughes to talk about Lisker's case.  (RT 577.)  Dowtu

23  and Wallace claimed Lisker had confessed to them, but Hughes didn't talk to

24  them.  (RT 577, 586.)

25      Hughes was able to communicate with Lisker through a hole in the wall

26  between their cells.  (RT 567-69, 574.)  Hughes testified that in his first

27  conversation with Lisker he started to "minister" to him and Lisker immediately

28  told Hughes he wanted to confess.  (RT 549-550.)  Lisker told Hughes, "I killed

1  my mother and I fucked up." (RT 550.)  The mistake Lisker said he made,

2  according to Hughes, was forgetting to get rid of his clothes which were spattered

3  with blood.  (RT 550-551.)

4      As related by Hughes, Lisker told him he needed money to buy PCP but his

5  mother refused to give him any money.  Lisker started to go through his mother's

6  purse.  His mother saw him and ripped his shirt and slapped him.  Lisker went to

7  the kitchen, got two steak knives and found his mother in the hall where he

8  stabbed her in the back and left the knives in her body.  (RT 550-552.)

9      Hughes further testified that Lisker told him that when his mother did not die

10  from the stab wounds, he got the trophy and hit her in the head.  Lisker then got

11  the exercise bar and "wailed on her with that for a while."  (RT 554.)  According

12  to Hughes, Lisker told him "[i]t started in the bedroom."  (RT 553.)

13      Hughes said that Lisker told him his "alibi" was the story he told the police

14  and that he "did good because [he] called [his] father, the paramedics and the

15  police in that order.  (RT 554-555.)  Hughes remembered specifically that Lisker

16  said he called his father first before calling the paramedics.  (RT 610-611.)

17      Hughes testified that immediately after Lisker confessed to him, he made notes

18  of what he had said.   However, Hughes no longer had the notes and could not

19  remember what they looked like.  He said he destroyed or threw the notes away,

20  and then testified he may have given them to the police.  (RT 581-582, 631-632,

21  649, 683, 689-690.)

22      Lisker's first attorney, Dennis Riley, testified that Lisker had the police report

23  with him in jail as early as March, 1983 and Lisker could have shared the report

24  with Hughes or told him what it said.  (RT 793-794, 927-928.)

25      On cross-examination, Hughes was confronted with notes he had written to

26  Lisker in which he  acknowledged Lisker's innocence.  Hughes responded by

27  denying he had written the notes, even though the prosecutor conceded he had

28  authored them.  (RT 602-606, 620-621, 626-630, 644-645, 657-658.)  Hughes both

1  denied and also admitted asking Lisker for money and goods. (RT 575-580, 588,

2  591-592, 606, 937.)  Hughes could not remember how he "ministered" to Lisker,

3  even though he could remember Lisker's supposed confession in response to his

4  ministering in detail. (RT 595-598.)

5      Robert Lisker met with Hughes while he was in county jail, and Hughes told

6  him he knew his son was innocent. (RT 936, 941.)  Hughes talked to Robert

7  Lisker about Dowtu and Wallace, the two inmates in the other cell next to Bruce

8  Lisker's, who were reportedly claiming Bruce had confessed to them.  Hughes

9  admitted he told Robert Lisker that Dowtu and Wallace were lying. (RT 586.)

10  Robert Lisker also testified that his son had already called the paramedics when he

11  called him at work. This contradicted Hughes' testimony about the order in which

12  Lisker said he had placed the calls. (RT 230-232.)

13      Hughes said he "always" expected to get something in return for testifying

14  against a defendant. (RT 584-585.)  Hughes admitted he testified against Lisker

15  in the hope that the prosecutor, Deputy District Attorney Philip Rabichow, would

16  help him get his sentence reduced. (RT 599, 663-676.)  In fact, Hughes was

17  released early as a result of Rabichow's efforts. (RT 571-573, 663-676;

18  Augmented Reporter's Transcript ("ART") 372.)

19      9.  <u>Summation</u>

20      The prosecutor began his summation by quickly explaining that the crime that

21  was committed was second degree murder (as opposed to manslaughter). (RT

22  1063-1070.)  He then turned to what he said was "obviously the main issue of the

23  trial" which was "the evidence that shows it is the defendant who committed this

24  crime." (RT 1071.)  He immediately focused on Lisker's statement to Monsue,

25  telling the jury it contained not only a number of statements that were

26  "unreasonable" but that it also contained "outright lies." (RT 1072.)  This was

27  important, the prosecutor explained, because "if he's guilty he's got to come up

28  with a story." (RT 1074.)

1    The prosecutor then went through a number of statements in the transcript of
2    Lisker's interview that he considered "unreasonable." (RT 1072-73.) These were
3    statements the prosecutor suggested were "not the kind of things that one would
4    do or say if someone was innocent," and statements of fact which the prosecutor
5    believed were unreasonable in light of the evidence. (Id.; CR 112 at 12, n.3.)
6        These included Lisker's statement that he took the knives out of his mother's
7    back with two fingers to preserve any fingerprints (RT 1074); his speculation
8    about where in the house the assault started (RT 1075); the rooms he said he
9    searched were the rooms where it appeared the assault had occurred (RT 1075-76);
10   his statement that he didn't want to get blood on his body because "they will think
11   I did it or something" (RT 1076); his statement that he would never think of
12   murdering his mother (RT 1077); the apparent care he took in getting through the
13   kitchen window as indicated by his removal and placement of the louvered panes
14   of glass on the ground (RT 1079-80); his statement that he checked his mother's
15   purse because it should have had $150 and he wanted to see if it was missing (RT
16   1080); and his statement that he hugged or cradled his mother, given the absence
17   of blood on his shirt. (RT 1093-94.)
18       The prosecutor acknowledged that although he believed these statements were
19   "unreasonable," he could not prove they were not true. He then announced, "But
20   he did lie and there are statements I can prove he lied about." (RT 1081.) The
21   prosecutor then turned to what he said was a "crucial" lie, and "obviously
22   devastating," which was "the view in the windows and whether he could see his
23   mother or not." (RT 1081.)
24       The reason the question of whether he could see his mother was so important,
25   the prosecutor explained, was because to be innocent "he obviously had to have a
26   reason for getting into the house, for breaking into the house":
27           So why would he break in the house then? Well, he's got to
28           say he's seen his mother in the house. If he is innocent, he has to

---

1    be able to see his mother in there.  If he is guilty, he has to lie about

2    it.  He has to because how else is he in there?

3  (RT 1082.)

4       The prosecutor then asserted that if Lisker lied about being able to see his

5  mother, it meant he was guilty, and that there were "no two ways about it":

6         **This is a crucial piece of evidence because this one is an**

7         **absolutely necessary lie if he is guilty and it is absolutely**

8         **necessary for him to be able to view it if he is innocent.  There**

9         **are no two ways about it.**

10  (RT 1082 (emphasis added.))

11      Relying on Monsue's testimony, the prosecutor then told the jury that "there is

12  no doubt that his statement cannot be true and it must be a lie . . ." (RT 1082.)

13      The prosecutor first focused on Lisker's statement that he thought he saw his

14  mother's feet as he looked into the house from the living room window.  The

15  prosecutor pointed to exhibits 18 and 19 which were the two photographs looking

16  into the house through the living room window taken by LAPD photographer

17  Wilson on March 23, and which Monsue said accurately reflected his view on

18  March 10.  (RT 1086.)  The prosecutor repeatedly emphasized that from the

19  position Lisker said he was standing the glare from the sun would have prevented

20  him from seeing into the house for more than a few feet.  (RT 1086-88).  The

21  prosecutor told the jury it was "**impossible, not improbable, but impossible**" that

22  Lisker could have seen his mother's feet looking in through the living room

23  window because his view would have been blocked by the "reflection" off the

24  window.  (RT 1086.)

25      The prosecutor then turned to Lisker's statement that he saw his mother's head

26  as he looked in from outside the sliding glass door through the dining room to the

27  entryway.  (RT 1088.)  The prosecutor fixed the location of Mrs. Lisker's head as

28  being where the two large blood stains were on the carpet. (RT 1085.)

1    With the head in that position, Lisker would not be able to see his mother's

2  head, the prosecutor told the jury, because just as Monsue had testified, his view

3  and line of sight would be blocked by the planter – **"you could not see it.  You**

4  **just can't. It is impossible."** (RT 1091.)  The prosecutor emphasized that this

5  was Lisker's **"most condemning lie."** (RT 1092.)

6    He dismissed Robert Johnson's testimony that he was able to see Robert

7  Lisker's head in the entryway while looking in from outside the dining room

8  because"what [Lisker's] father and his friend [Robert Johnson] tried to do is just

9  not accurate because Mr. Lisker was not in the right place." (RT 1085.)

10    The prosecutor also argued Bruce Lisker had to be guilty because there was no

11  evidence of an intruder.  The prosecutor pointed out that "if the defendant didn't

12  do this," then somebody else had to do it but, as the prosecutor also pointed out,

13  there would be evidence of an intruder– "Wouldn't you expect a bloody footprint

14  somewhere?"

15    The prosecutor explicitly relied on the bloody shoeprints to assert that there

16  was no evidence of an intruder or that anyone else was present except Lisker.  The

17  prosecutor rhetorically asked"why isn't there an intruder's footprint somewhere?,"

18  and concluded by asserting, "[o]nly his footprint is in the blood." (RT 1121,

19  1195.)

20    The prosecution also relied on the fact that the $150 was not found as evidence

21  of guilt, because it proved a motive: "He went over there to get the money and he,

22  in fact, got the money because there was no money found . . .." (RT 1080.)

23    The only other evidence the prosecutor pointed to was the cast-off blood

24  spatters on Lisker's clothing, (RT 1115-17), and the jailhouse informant testimony

25  of Hughes. (RT 1099-1113.)  The prosecutor pointed to the similarities in what

26  Hughes testified Lisker had said to him and the crime scene, and asserted each of

27  the similarities corroborated Hughes' story. (RT 1104-13.)  The prosecutor

28  dismissed as simply not believable the defense contention that Hughes acquired

1  the information from the police report, and never addressed the other problems

2  with Hughes' credibility, such as his false denial of having authored the notes in

3  which he conceded Lisker's innocence.  (RT 1103.)

4  **B.  Post-Conviction Evidence Relevant to Claims For Relief**

5      In the course of demonstrating actual innocence in the federal court,

6  considerable evidence was presented that is relevant to Lisker's present claims for

7  relief,  especially his claim that his conviction was based on false evidence.

8      1.  <u>Weather Conditions on March 10 and March 23, 1983</u>

9      Meteorologist Kenneth Clark testified as to the nature and extent of the sky

10  cover and sun light on the mornings of March 10 and March 23, 1983 in and about

11  the area of 15472 Huston Street, Sherman Oaks.  (Evidentiary Hearing Transcripts

12  (EHT Vol. I: 150-169.)  Clark testified based on the National Oceanographic and

13  Atmospheric Administration (NOAA) Surface Weather Observation records for

14  March 10, 1983, and March 23, 1983, taken from the Van Nuys Airport (EH Exh.

15  18), as well as satellite photographs taken on March 10, 1983 and March 23, 1983

16  which depict the cloud/sky cover in the area of 15472 Huston Street, Sherman

17  Oaks.  (CR 112 at 18.)

18      Clark testified it was *not* bright and sunny on the morning of March 10, 1983,

19  but was instead "pretty cloudy" to"overcast" and also hazy.  (EHT Vol. I: 150-51,

20  157-60, 165-67; EH Exh. 18:2-3; EH Exh 19 ("Sky Cover & Visibility"): 1; CR

21  112 at 18.)  In contrast, the morning of March 23 *was* "a 'bright, sunny morning,"

22  Clark testified. (EHT Vol. I: 168-69; CR 112 at 20; EH Exh 18: 5-6; EH Exh 19:

23  2.)  Clark confirmed there was a "considerable difference" between the sky cover

24  and brightness of the sun on the morning of March 10 and the morning of March

25  23.  (EHT Vol. I: 168-69; CR 112 at 20.)[8]

26  _____

27  [8] The NOAA Surface Weather Observation records taken at the Van Nuys

28                                                                    (continued...)

1    Respondent called Michael Wilson, the LAPD photographer who took the

2    photographs in 1983 and testified at trial.  As the federal court concisely stated,

3    "[t]he sum of Wilson's testimony was that his photographs show that the morning

4    of March 10, 1983, was 'bright' and 'sunny.'" (CR 112 at 18.)  On cross-

5    examination, however, Wilson admitted he was not even at the crime scene the

6    morning of March 10.  (EHT Vol. II: 85-86.)  This admission contradicted

7    Wilson's trial testimony that he started taking pictures at the scene on March 10 at

8    11:30 in the morning.  (RT 979; EHT Vol. II: 84-86; CR 112 at 9, 20.)

9    Wilson tried to explain his trial testimony by stating that he had mistakenly

10    referred to the time he received the call to come to the scene as the time when he

11    started taking photographs.  This too was proved false by the records, which

12    showed that he was not even called to go to the scene until sometime after 12:35

13    p.m.  (EHT Vol. II: 83-86.)

14    Meteorologist Clark examined the photograph that Wilson had said at trial

15    showed that March 10 was a bright, sunny day because there were distinct

16    shadows in the picture.  Clark testified that based on the position of the sun in the

17

18    ─────────────────────

19    [8](...continued)
Airport, on March 10, 1983 reflect that at 10:45 a.m., eight-tenths of the sky was

20    covered by obscuring phenomena aloft, and  eight-tenths of the sky was actually

concealed from view by obscuring phenomena aloft.  At 11:45 a.m. ten-tenths of

21    the sky was covered by obscuring phenomena aloft, and ten-tenths of the sky was

22    actually concealed from view by obscuring phenomena aloft. (EH Exh 18: 2-3; EH

Exh 19: 1; CR 112 at 20.)

23

24    The NOAA Surface Weather Observation records taken at the Van Nuys

Airport, on March 23, 1983, reflect that at 10:45 a.m., two-tenths of the sky was

25    covered by obscuring phenomena aloft, and two-tenths of the sky was actually

26    concealed from view by obscuring phenomena aloft.  At 11:45 a.m. four-tenths of

the sky was covered by obscuring phenomena aloft, and four-tenths of the sky was

27    actually concealed from view by obscuring phenomena aloft. (EH Exh 18: 5-6; EH

28    Exh 19: 2; CR 112 at 20.)

1   photograph, it was taken in the afternoon.  Moreover, as the federal court noted,

2   the sky is consistent the NOAA records, as it was gray or white, which does not

3   indicate it was a bright, sunny day.  (EHT Vol. I: 163-164, 171-74; CR 112 at 19.)

4       The federal court provided additional detailed reasons why it was troubled by

5   Wilson's hearing testimony and why he was not a credible witness.  (See CR 112

6   at 19-20.)  After hearing all of the evidence, the federal court stated in its ruling

7   that:

8               The evidence before this Court overwhelmingly showed that

9           the morning of March 10, 1983 in the area of the Lisker home was

10          not bright and sunny.  It was overcast, cloudy and hazy.  On the

11          other hand, March 23, 1983, the date on which photographs were

12          taken showing a bright glare on the back window of the Lisker

13          house, was, without question, a "bright, sunny day. . . . In satellite

14          photographs from March 23, one can see almost all of the ground,

15          in contrast to the images from March 10 showing heavy cloud

16          cover.

17  (CR 112 at 20, *citing* EHT Vol. I: 168-69; *see also* CR 112 at 18 ("March 10,

18  1983, the day of the murder, was not a bright, sunny day as Monsue and Wilson

19  repeated so many times at trial.").)

20      2.   View Evidence and Line of Sight

21          Crime scene reconstruction experts Frank Terrio (called by Petitioner) and

22  Mike Varat (called by Respondent) visited the former Lisker residence at 15472

23  Huston Street address in advance of the December, 2005 evidentiary hearing.

24  Terrio and Varat testified how they were able to use special techniques and

25  computer models to determine from the original crime scene photographs the

26  location and position of the rug in the entryway, which contained the blood stains

27  that the prosecution fixed as the location of Dorka Lisker's head.  They were also

28  able to recreate the view from outside the sliding glass door looking north toward

1  the entryway through the dining room, including the position and height of the

2  original table and planter.   (EH Exh 20-14;EHT Vol. I: 104-19, 139-40; EHT Vol.

3  IV: 102-127; CR 112 at 21.)

4      Terrio testified and presented exhibits which established that if Dorka Lisker's

5  head was in the position of the blood stains on the carpet (as the prosecution

6  contended at trial), it would have been visible to a person of Lisker's height who

7  was standing outside the house and looking in through the dining room, and that

8  the person's line of sight would not be obstructed by either the dining room table

9  or the interior planter.  (EH Exh 20-3; 20-16(3-7) EHT Vol. I: 119-30; CR 112 at

10  21.)

11      Varat agreed that with the head in the position of the blood stains, it would be

12  visible from the patio looking through the dining room.[9]  (EHT Vol IV: 137-139,

13  154, 159-161; CR 112 at 21-22.)

14      The reconstruction experts also examined the view from outside the living

15  room window looking toward the entryway.  The Respondent's expert, Varat

16  testified the victim's feet would have been visible through the living room

17  window; Terrio said it was inconclusive.  (EHT Vol. I: 130-31; EHT Vol. IV: 138-

18  139; CR 112 at 22.)

19      The prosecutor who tried the case, former Deputy District Attorney Philip

20  Rabichow, visited the Huston Street residence in March, 2005, with two Los

21

22      [9]  Varat testified that if one were to stand on the extreme left (west) of the patio
    door, the head would not be visible, but that is not the position Lisker said he was

23  in when he saw his mother.

24      Varat also examined the view with the head in two other locations, one
    which he referred to as the "Lovato version" and the other as the "Monsue

25  version."  With the head in the "Monsue version" location, it would not have been

26  visible to a person looking in through the dining room but, as the Court explained,
    the "Monsue version" was not supported by the scene reconstruction, the evidence

27  at trial and was contrary to the position the prosecution fixed at trial, based on

28  Monsue's testimony.  (EHT Vol. IV: 133-137; CR 112 at 22.)

Angeles Times' reporters, to determine if Dorka Lisker's head would have been visible to Lisker from outside the dining room.  Mr. Rabichow had never visited the scene previously; he relied on information from Detective Monsue in telling the jury it would have been impossible for Lisker to have seen his mother.  (EHT Vol. I 150-51; CR 112 at 22.)  Rabichow testified that after the scene was recreated to be consistent with the trial record, he was able to see what would have been Dorka Lisker's head from the patio area outside the dining room in the location from which Petitioner had said he saw his mother's head.  (EHT Vol. I: 61-74, 102-03; CR 112 at 22.)

After hearing the evidence, the federal court made the following finding:

> The reconstruction diagrams and photographs, in conjunction with the crime scene photographs convince this Court that the victim's head, if not her whole upper body, would have been visible from the dining room sliding glass door, as Petitioner described.

(CR 112 at 22.)

3.  <u>Shoe print evidence</u>

LAPD Criminalist Ronald Raquel, an expert in shoeprint comparison, examined and compared photographs of the soles of the Pacer shoes worn by Lisker on March 10, 1983 with the photographs of the crime scene shoeprints that the prosecution asserted were made by Lisker's Pacer shoes.  (See EH Exh 12 (Analyzed Evidence Report, April 20, 2005, LAPD Criminalist Ronald Raquel); EH Exh 11(LAPD Follow-Up Investigation Report, March 5, 2005,with photographs).)

Raquel determined and testified that the shoe impression on the dirt path on the east side of the house actually contained impressions from two different shoes. (EH Exh 12; EH Exh 11: 2-3.)  One of the impressions (labeled B-1), was consistent with Lisker's Pacer shoes, but the other impression (labeled B-2), was

1    made by a shoe with a herringbone sole pattern and could not have been made by

2    Lisker's shoes, which had a wavy sole pattern. (EHT Vol. I: 188-90, 194-95; CR

3    112 at 23.) The B-1 impression that was consistent with the Pacer shoes was

4    pointed south (toward the kitchen window from the front of the house), and the B-

5    2 herringbone pattern impression was pointed north. (EHT Vol. I: 185-90.)

6        Raquel also concluded and testified that the blood marked shoeprint in the

7    bathroom (labeled G) was made by a shoe with a herringbone sole pattern, and

8    could not have been made by Lisker's Pacer shoes.[10] (EHT Vol. I: 190, 194-95;

9    EH Exh 11: 1; CR 112 at 23.) Raquel further testified that the shoe that was the

10   source of the bloody shoeprint in the bathroom ('G') could be the source for

11   herringbone pattern shoeprint in the dirt heading away from the house (B-2).

12   (EHT Vol. I: 190, 194-95; EH Exh 11: 2, 4.)

13       Criminalist Raquel also examined autopsy photographs of Dorka Lisker's

14   shaved head which revealed a patterned impression behind her right ear. He

15   examined and analyzed the autopsy photographs in comparison with the crime

16   scene shoeprint photographs and the photographs of the Pacer shoes. Criminalist

17   Raquel testified that: the patterned impression behind the right ear was a

18   shoeprint; the shoe impression behind Dorka Lisker's right ear is similar in size

19   and dimension to the herringbone pattern shoeprint labeled 'G' (found in the

20   bathroom) and is dissimilar in size and dimension to the Pacer shoes Bruce Lisker

21   was wearing at the time of his arrest. (EHT Vol. I: 193-96, Vol. II: 17-18, 38.)

22       Sandra Wiersema of the Federal Bureau of Investigations, was called by

23   Respondent. Ms. Wiersema, an expert working exclusively in shoe prints and tire

24   tread evidence, examined and compared the photographs of the crime scene

25

---

26       [10] Raquel could not examine the other blood marked shoeprint (near the sink)
     that Monsue testified also "quite closely resembled" the soles of Lisker's shoes,
27   and which the prosecutor asserted was from Lisker, because it was never
28   photographed. (CR 112 at 23, n. 4; RT 306.)

footprints and the Pacer shoes Lisker was wearing on March 10, 1983. (See EH Exh 15(FBI Reports of Shoeprint Photos and Evidence, July 21, 2005 and Oct. 31, 2005).) Wiersema testified that the shoe print identified as B-2 and the print identified as G had characteristics similar to each other, and could not have been made by the Lisker's Pacer shoes. (EHT Vol. IV: 34-64, 69-71; EH Exh. 15: 2.)

Criminalist Wiersema also examined and analyzed the autopsy photographs of the patterned impression behind Dorka Lisker's right ear in comparison with the crime scene shoeprint photographs and the photographs of the Pacer shoes. Wiersema testified that she did not find anything to suggest the impression was made by a shoe, but she also acknowledged she could not conclude it was not made by a shoe. (EHT Vol. IV: 73-79, 90-96.) Moreover, she acknowledged that in the autopsy photo that was taken with the camera pointed directly at the impression, the spacing between the parallel lines in the patterned impression was the same as the spacing in the herringbone pattern footprint labeled 'G.' (EHT Vol. IV: 73-79, 90-96; CR 112 at 26.)

Respondent called two of the officers who responded to the crime scene, DeRosseau and Prado, to suggest that one of them might have been the source of the blood marked shoeprint in the bathroom. At the evidentiary hearing, some 22 years after the crime, DeRosseau testified he "probably" stepped in blood and Prado said it was possible he left the bloody footprint in the bathroom. (EHT Vol. III: 13-16,45-47,54-55; CR 112 at 24.)

At trial, in contrast, both officers testified they had attempted not to disturb the crime scene. Prado testified he was careful not to step on any blood spots or blood stains. (RT 856.) DeRosseau testified he avoid[ed] stepping in any blood spots," and added that "we were definitely told by homicide not to do that." (RT 874.) Similarly, in the reports they prepared at the time, neither officer included the guest bathroom in the list of rooms they had entered as they did a protective sweep, and neither testified to having entered the guest bathroom where the

1  bloody footprint was found.  (EHT Vol III: 28-29, 50-51; CR 112 at 24.)

2        The federal court concluded that "[t]he officers' testimony [at the evidentiary

3  hearing] regarding their search was not credible for many reasons, not the least of

4  which was the officers' claimed ability to remember minute details such as

5  whether they noticed specific blood stains during their quick search 20 years

6  earlier." (CR 112 at 25.)  As the Court also noted, "neither officer remembered

7  anything about the shoes he wore that day, so any suggestion that one of the two

8  left the prints would be pure speculation." (CR 112 at 25.)

9        Based on the evidence at the hearing, the federal court ruled that "Petitioner

10 has demonstrated to this Court that the bloody shoe print in the guest bathroom

11 and one of the shoe impressions in the dirt outside the house were left by someone

12 other than himself, disproving the State's 1985 theory of his guilt." (CR 112 at

13 25.)

14        4.  Blood spatter evidence

15        The California Court of Appeal, in affirming Lisker's conviction on direct

16 review, said that "compelling[]" evidence of his guilt was provided by "an expert

17 in forensic serology and bloodstain pattern interpretation [who] determined, based

18 on his examination of appellant's clothing and photographs of the murder scene,

19 that the blood on appellant's clothing, which was of his mother's type, spattered

20 onto it at the moment when his mother suffered a blunt force injury." (Motion to

21 Dismiss Exh. B: 14.)

22        Mr. Linhart testified at the evidentiary hearing and said that "he did not reach

23 the conclusion attributed to him by the California Court of Appeal, that blood was

24 transferred onto Petitioner's clothing at the moment when the victim suffered a

25 blunt force injury." (CR 112 at 28; EHT Vol. III: 87.)  Indeed, there is nothing in

26 Linhart's trial testimony that supports the Court of Appeal's statement.  (RT 700-

27 756.)  In fact, Linhart's trial testimony was "that the blood evidence was as

28 consistent with Petitioner's innocence as it was with the prosecution's theory of

1    guilt." (CR 112 at 27.)

2        As noted above, the prosecutor argued at trial that one of the Lisker's

3    "unreasonable" statements was that he held or hugged his mother because, the

4    prosecutor asserted, he would have had a significant amount of blood on his shirt,

5    and much more than the microscopic droplets identified by Linhart. (RT 1093;

6    CR 112 at 27.)  At the evidentiary hearing, Linhart testified that "whether

7    Petitioner would have been spattered with any specific amount of blood as he held

8    or hugged his mother was entirely dependent on Petitioner's and his mother's

9    body positions," and the evidence as to this point was simply inconclusive.  (CR

10   112 at 27; EHT Vol. III: 68-86.)

11       At trial, the prosecutor tried to neutralize the exculpatory absence of blood on

12   Lisker's clothes (because given the vicious and bloody attack, one would expect

13   the perpetrator to have far more blood on his person and clothing than the few dots

14   found on Lisker's shirt cuff and shoes), by asserting that the blood would spatter

15   away from Lisker as he struck his mother. (RT 1117; CR 112 at 27.)  As the

16   federal court recognized, there was no trial testimony to support that argument and

17   Respondent's counsel made no attempt to elicit support for that argument in his

18   examination of Linhart at the hearing.  (CR 112 at 27.)

19       5.  Motive

20       The prosecution's theory of motive at trial was that Lisker wanted the $150

21   that Robert Lisker had given Dorka Lisker the night before, and that Lisker and his

22   mother had an acrimonious relationship.  As noted above, the prosecutor, in

23   support of this theory of motive, asserted in his summation: "He went over there to

24   get the money and he, in fact, got the money because there was no money found . .

25   ." (RT 1080.)  Monsue provided testimony to support this argument, by stating

26   that there was no money in the purse and no money was found at the house, and

27   that he couldn't recall one way or the other if Lisker had money on his person

28   when he was arrested.  (RT 411-12, 1080.)

1   Lisker introduced the evidence custodian's record at the evidentiary hearing

2   which showed there was money in Mrs. Lisker's purse.   On November 21, 1985,

3   the exhibit custodian recorded the contents of Dorka Lisker's purse as including a

4   wallet which contained "5 $20 bills - 1 Ten dollar bill, 1 five dollar bill & 5 one

5   dollar bills," for a total of $120.00.  (EH Exh 21; EHT Vol. IV: 557-61; CR 112 at

6   28.)

7       A witness at the evidentiary hearing did testify to the animosity between

8   Lisker and his mother, but as the federal court noted, while the witness said Lisker

9   and his mother argued, the witness never saw Lisker use physical force against his

10  mother.  (CR 112 at 28.)  The federal court also listened to the 911 call made by

11  Lisker after discovering his mother's body and concluded that Lisker "certainly

12  could be described as hysterical," which was consistent with the description of his

13  behavior at the scene by the responding officers.  (CR 112 at 28.)

14      6.  Jailhouse informant testimony

15      At trial, Robert Hughes testified he was certain that Lisker told him that he

16  had called his father first before calling 911.  (RT 556.)  Detective Monsue never

17  obtained the telephone records.  (RT 497-98, 519-20, 523.)  The telephone records

18  were produced at the evidentiary hearing and they showed only two calls between

19  11:00 a.m. and 11:30 a.m.; the first call was at 11:26 a.m. and was to 911, and the

20  next call was three minutes later, at 11:29 a.m., and was to a number frequently

21  called from the house, consistent with it being Robert Lisker's office number.  (CR

22  112 at 29, n.5; EH Exh 40 (telephone bill).)  This was consistent with Robert

23  Lisker's testimony, who testified that he asked his son if he had called 911 and he

24  said he had.  (RT 230-31.)

25      The evidence at the hearing also established that on April 21, 1983, Detectives

26  Monsue and Landgren interviewed two other inmates (Dowtu and Wallace), who

27  claimed Lisker had confessed to them.  During the course of the interview with

28  one of them, the detectives engaged in what LAPD Sergeant Albert J. Gavin

1 | testified was a tactic referred to as a "wink and a nod." (EHT Vol. II: 167-168.)
2 | The transcript which reflected this tactic being employed was the following:

3 |         Dowtu:     If this guy – I'd be talking to him. If he comes up with
4 |                      something else.
5 |         Detective: Well, a, now if I was to tell you to go ahead and talk to him
6 |                      some more, you'd be acting as my agent.
7 |         Dowtu:     Oh, I see.
8 |         Detective: And you can't do that, but we will be coming back up here
9 |                      to see you again.

10 | (EHT Vol. II: 167-168; EH Exh 86: 314-321; CR 112 at 29-30.)

11 |     The reports and records of Hughes' involvement in the case were incomplete
12 | and at least in one instance affirmatively incorrect. The first, and only, interview
13 | with Hughes that Detectives Monsue and Landgren documented occurred on July
14 | 6, 1983, months after Lisker had supposedly confessed to him. During the July 6
15 | interview with Detective Monsue, Hughes made reference to having previously
16 | spoken with Detective Landgren, but there is no record of any such
17 | communication. (EHT Vol. II: 169-170; CR 112 at 30.) The only indication in
18 | the detectives' murder book as to how the detectives came to know Hughes had
19 | information about the case, is an entry in the chronological log which refers to a
20 | Beverly Hills Police Department sergeant who was reportedly acting on Hughes'
21 | behalf. The date of that entry, however, is October 10, which cannot be reconciled
22 | with either Hughes' testimony or the detectives' representation that the first
23 | interview of Hughes occurred on July 6, 1983. (EHT Vol. II: 169-70; CR 112 at
24 | 30.)

25 |     Lisker also introduced at the evidentiary hearing the report of the extensive
26 | investigation conducted by the Los Angeles County Grand Jury into the use of
27 | jailhouse informants, which determined that it had become common practice for
28 | jailhouse informants to provide false testimony in an effort to obtain personal

1    benefit.  (EH Exh 38.)  Hughes' testimony as to the circumstances of Petitioner's

2    confession to him bear characteristics that the Grand Jury found to be indicative

3    of and associated with false claims and testimony by informants of purported

4    confessions and admissions by other inmates.

5         Based on the trial record and the new evidence regarding Hughes presented at

6    the hearing, the federal court found that "Hughes was not credible and his report

7    of Petitioner's confession cannot be accorded any significant weight." (CR 112 at

8    31.)

9         7.   <u>Alternative suspect</u>

10            Testimony and documentary evidence was presented at the hearing

11   implicating an alternative suspect, Michael Ryan, as the person who murdered

12   Dorka Lisker.

13        Shortly after he was arrested, Lisker wrote Detective Monsue (on March 30,

14   1983), telling him he had information as to who might have murdered his mother

15   and he asked Detective Monsue to visit him. (CR 112 at 31; EH Exh 42 (Letter of

16   Bruce Lisker, March 30, 1983).)  Detective Monsue visited Lisker on April 1 and

17   Lisker provided him with information he believed indicated Mike Ryan committed

18   the murder. (CR 112 at 31;  EH Exh 43(Det. Monsue's notes of April 1, 1983

19   interview).)

20        Ryan had been Lisker's roommate for a period of time, he knew Lisker's

21   mother and had done work for her at the Lisker residence.  Sometime prior to

22   March, 1983, Ryan had moved to Mississippi where his father lived. (CR 112 at

23   31.)

24        On May 4, 1983, Detective Monsue interviewed Michael Ryan who was then

25   in custody in Mississippi on an unrelated charge.  A transcript of the interview was

26   introduced at the evidentiary hearing. (EH Exh 48)  At the outset of the interview,

27   Detective Monsue told Ryan that Bruce Lisker was in custody for the March 10

28   murder of his mother and that "Lisker has told me he thinks that you are involved

1    in this thing, and that you might be responsible for the murder.  That is the reason

2    I am here and that is the reason we are going to talk."  (EH Exh 48: 2.)  During the

3    course of the interview, Monsue told Ryan, "I'm just trying to eliminate you more

4    than I am anything else."  (EH Exh 48: 29; CR 112 at 33.)

5         Monsue told Ryan he knew he had left Mississippi on March 6 and was in

6    California until March 11.  Ryan told Detective Monsue that he had come to

7    California to join "Job Corps" and that he always planned to return to Mississippi.

8    (EH Exh 48: 5, 6, 16, 21; EHT Vol. II: 141-142; CR 112 at 32..)  Both these

9    statements were false.  Ryan had been put on a bus in Mississippi to take him to

10    California because his Mississippi parole supervision had been transferred to

11    Ventura County California, where his mother lived.  (EHT Vol. II: 141-142.)

12         Ryan told Monsue he had been at the Lisker residence on March 9 to use the

13    telephone.  (EH Exh 48: 7.)  Ryan, however, contradicted himself several times as

14    to whether Mrs. Lisker was present at the house when he was there on March 9.

15    As the federal court observed, "the inconsistency appeared to depend on how

16    Monsue framed the question to him, *i.e.*, whether Monsue was accusing Ryan of

17    involvement in the murder."  (CR 112 at 32; EHT Vol. II: 146-48; EH Exh 48: 7

18    (victim was home), 12 (victim was not home), 14 (victim was home).)

19         As noted above, Detective Monsue never obtained the phone records for the

20    Lisker residence.  (RT 497-98, 519-20, 523; EHT Vol. II: 144; CR 112 at 32.)  The

21    phone records were, however, introduced at the evidentiary hearing.  The records

22    showed a call from the Lisker residence to a number (492-8972) that matched

23    Ryan's mother's telephone number except the last digit was different and the area

24    code was not dialed, (805-492-8976).  The call was made not on March 9,

25    however, but on March 10, the day of the murder and it was made at 10:22 a.m.,

26    consistent with the time of the murder.  (EH Exh 40; EHT Vol. II: 145-46; CR 112

27    at 32.).  The call was for the minimum billing time of one minute.  (CR 112 at 32;

28    EH Exh 40.)

1    Even before Ryan was told that the murder likely happened at about 11:00

2    a.m. on March 10th, Ryan lied to Monsue about where he was at the time. Ryan

3    told Monsue he had checked into a motel in Hollywood at 10:00 a.m. (EH Exh

4    48: 8, 13.) Ryan also said that after checking into the hotel, he was involved in a

5    knife fight and stabbed a "colored guy." (EH Exh 48: 8, 9, 13, 25.)

6        In fact, Ryan had checked into the motel at 3:00 p.m.. (EHT Vol. II: 148-50;

7    EH Exh 46 (murder book chrono excerpt); EH Exh 48: 8, 13; CR 112 at 33.) Ryan

8    had also checked in using a false name, "Mark Smith." (EHT Vol. II: 150-51; EH

9    Exh 47 (receipt with alias): EH Exh 48: 25.) Ryan's explanation for why he used

10    the alias was that he was scared because of the knife fight he had been in. This of

11    course contradicted his earlier story that he had been in the fight after checking

12    into the motel.(EH Exh 48: 8, 9, 13, 25.)

13        Ryan told Monsue that he had $53 with him when he left Mississippi. (EHT

14    Vol. II: 154-156; Exh 48: 9-11.) Ryan's expenses far exceeded $53, however.

15    When Monsue questioned him about the discrepancy, Ryan had no explanation.

16    (EHT Vol. II: 154-56, 172-73; EH Exh 48: 9-11, 16, 17, 29.) In fact, even after

17    Monsue told Ryan "I do not think you have [sic] helped kill his mom, I think

18    Bruce killed his Mom. I never thought you killed his Mom," he added, "[t]he

19    biggest problem I have is the money." (EHT Vol. II: 172-73;EH Exh 48: 29; CR

20    112 at 33.)

21        Monsue had done a criminal records check on Ryan and noted in his

22    investigation that Ryan did not have a criminal record. (EH Exh 41 (LAPD

23    Memorandum):) Monsue, however, had used the wrong date of birth, even though

24    his report of his interview of Ryan reflected the correct birth date. (EH Exh 48: 1;

25    CR 112 at 32.) In fact, Ryan did have a prior record. On April 25, 1982, less than

26    a year prior to Dorka Lisker's murder, Ryan was arrested in Ventura County,

27    California, after he had pulled a knife on Brian Simpson and placed it on his

28    throat, threatened to kill him and demanded that Simpson give him $12.00. (EH

1  Exh 49, 50, 51.)

2      8.  <u>Investigating officer's credibility</u>

3       Post-conviction evidence bearing upon Detective Monsue's  credibility

4  and bias was also presented at the hearing.

5      On November 4, 1991, the Board of Prison Terms issued a notice that Bruce

6  Lisker was to receive a parole hearing during the week of December 30, 1991.

7  (EH Exh 1.)   Sometime after this notice was issued, and prior to Lisker's parole

8  hearing in January, 1992, LAPD Detective Andrew Monsue wrote the Board of

9  Prison Terms stating, *inter alia*, that "[t]he inmate hide [*sic*] approximately

10  $140.00 he had taken from his mother's purse," and "[a]lthough the robbery

11  allegation were [*sic*] not proven during the trial, I still feel the circumstances of the

12  case merited a first-degree murder handling by the courts." (Exh OO.)  Detective

13  Monsue further stated in the letter that "I strongly recommend that the inmate be

14  retained in custody for the longest period of time as prescribed by law."  (<u>Id</u>.)

15  Nowhere in his 1991 letter did Monsue state anything about money being found or

16  recovered in the house after the crime.

17      More than six years later, on April 7, 1998, Detective Monsue wrote another

18  letter to parole authorities.  In his 1998 letter, Monsue stated that

19          Several years after this crime occurred, I met with the new

20          owners of the house where this crime occurred.  They informed me

21          they had found some money and several other items hidden in the

22          attic of Bruce Lisker's old bedroom.  The amount of cash found by

23          the new owner was approximately $150, which is the amount that

24          was reported missing from the victim's purse the day of the

25          murder.  This revelation confirmed our initial theory that Mr.

26          Lisker had in fact robbed his mother.

27  (EH Exh 2.)

28      The "new owners of the house," were Morton Borenstein and his wife, who

1  purchased the Huston Street residence from Robert Lisker and took title on April

2  3, 1984. (EHT Vol. II: 43-44; CR 112 at 34.) Mrs. Borenstein passed away in

3  April, 1992, after a serious battle with cancer, and was bedridden for several

4  months prior to her death. (EHT Vol. II: 46-51.) Borenstein continued to own and

5  occupy the house until 1995. (EHT Vol. II: 46-47; CR 112 at 34.)

6      Borenstein testified that he had contacted Detective Monsue on one occasion,

7  and that it was before he purchased the house in 1984. (EHT Vol. II: 45; EH Exh

8  3.) Borenstein "had no memory that either he or his wife ever found money

9  anywhere in the house," and he "had no memory of contacting Detective Monsue

10  to report finding money." (CR 112 at 34; EHT Vol. II: 47.) As the federal court

11  noted, Borenstein, "who was a criminal defense attorney, testified that he 'just

12  couldn't believe that such a significant thing would have totally escaped me.'"

13  (CR 112 at 34; EHT Vol. II: 62.) Moreover, as the federal court found, "it was

14  apparent that Borenstein's wife, who was not well, would not have found the

15  money in the attic, which could be accessed only with a ladder, and then called

16  Monsue without Mr. Borenstein's knowledge." (CR 112 at 34; EHT Vol. II: 46-

17  51.)

18      Lisker discovered Monsue's 1998 letter to parole authorities in his prison file

19  and filed a complaint with the Los Angeles Police Department. (Exh QQ.) LAPD

20  Sergeant Albert J. Gavin was assigned to investigate Lisker's complaint in June,

21  2003. (EHT Vol. II: 97.)

22      Gavin interviewed Detective Monsue on May 6, 2004 about his letter and the

23  reported finding of money by the new owners. Detective Monsue told Gavin "that

24  he received a phone call from a female, and the female stated that several years

25  prior, she had discovered money in her house; and when talking to the neighbors,

26  they indicated to her that a murder had occurred in that house and money was

27  missing." (EHT Vol. II: 180; CR 112 at 34.) This, of course, is not what Monsue

28  stated in his letter. (EH Exh 2; EHT Vol. II: 180-181.)

1    Los Angeles Police Department Chief William J. Bratton wrote a letter on

2    June 23, 2005, addressed to the Board of Prison Terms, in which he requested that

3    it remove Detective Monsue's April 7, 1998 letter from its files.  Chief Bratton

4    also stated the Board should not give the letter any consideration in the future,

5    explaining that "[t]he Los Angeles Police Department cannot guarantee the

6    veracity of the facts represented in the letter."  (EH Exh 13; CR 112 at 34.)

7

8                                   **IV.**

9                               **ARGUMENT**

10   **A.  The Court Should Deny Respondent's Procedural Defenses**

11       (1) <u>Respondent's Statute of Limitations Defense Should Be Denied</u>

12       Respondent asserts that all of Petitioner's grounds for relief are untimely under

13   AEDPA and therefore should be denied for the reasons set forth in Respondent's

14   motion to dismiss.  RM at 2, 63-64, & 87.  The Court should reject and deny this

15   defense based on, and for the same reasons as, the Court's earlier ruling denying

16   Respondent's motion to dismiss the First Amended Petition as time-barred.  (CR

17   112.)  The Court's ruling denying that motion on grounds that Mr. Lisker satisfied

18   the miscarriage of justice gateway exception of <u>Schlup</u> and that <u>Schlup's</u>

19   miscarriage of justice exception tolled the limitations period, is law of the case and

20   Respondent does not suggest any reason why it should not be applied as such.

21       Respondent, in fact, appears to  concede that the Court's ruling applies equally

22   to Grounds Three and Four and merely reiterates all of the arguments he

23   previously made in opposing application of the miscarriage of justice exception. [11]

24

25       [11]  Respondent asserts in his answer that "Petitioner's claim of actual innocence

26   (as a gateway to excuse untimeliness) is still unexhausted."  RM at 2.  To the
     extent Respondent's reference is to the <u>Schlup</u> miscarriage of justice gateway,
27   there is no requirement of exhaustion because it is not a claim, nor could it be

28                                                              (continued...)

1  RM at 63.

2      2.   Respondent's Procedural Default Defense Should Be Denied

3      Respondent also asserts that the California Supreme Court's order

4  procedurally bars this Court from reaching the merits of Lisker 's Third and Fourth

5  Grounds for relief because it ruled Lisker's petition was untimely and successive.

6  RM at 64-67; 87. This procedural default doctrine relied upon by Respondent only

7  bars federal review when five requirements are satisfied:

8      (1) A petitioner has actually violated an applicable state procedural rule;

9      (2) The procedural violation provides "adequate" and "independent" state

10  ground for denying petitioner's federal constitutional claim;

11      (3) The highest state court to rule on the claim clearly and unambiguously

12  relied on the procedural violation as its reason for rejecting the claim;

13      (4) the state adequately and timely asserted the default as a bar to federal

14  habeas corpus relief; and

15      (5) The petitioner cannot "excuse" the default by showing either:

16          (a) that there was "cause" for the default and "prejudice therefrom; or

17          (b) the case falls within a category of cases the Supreme Court has

18

19      [11](...continued)

20  exhausted because it does not apply to state courts and California has no

21  equivalent exception to procedural default.  If Respondent is asserting that
   Petitioner was required to make a claim of actual innocence in California state

22  court in order to rely on the Schlup gateway in federal court, Respondent assertion

23  is wrong because California's actual innocence exception is a substantive claim,
   not a gateway through procedural default, and also because the elements of the

24  claim are different than the Schlup miscarriage of justice gateway.  In re Clark, 5

25  Cal.4th at 797-98, n. 33 (to establish actual innocence, a petitioner must present
   "newly discovered, irrefutable evidence of innocence of the offense," such that it

26  "undermine[s] the entire prosecution case and point[s] unerringly to innocence,"

27  and the "new evidence" must be relevant to an issue that was not disputed at trial.;
   the petitioner bears "a heavy burden of satisfying the court that the evidence of

28  innocence could not have been, and presently cannot be refuted.")

1  denominated "fundamental miscarriage of justice."

2  Hertz and Liebman, *Federal Habeas Corpus Practice and Procedure* (5ᵗʰ Ed.)

3  §26.1 at 1250-51. Here, Respondent's procedural defenses do not bar this Court's

4  adjudication of the merits of Mr. Lisker's claims three separate reasons.

5      (a) *Miscarriage Of Justice*

6      The Schlup miscarriage of justice gateway applies to procedural bars.

7  Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed.2d 640

8  (1991). This Court's finding and ruling that Petitioner has satisfied the Schlup

9  miscarriage of justice standard applies to Respondent's procedural default defense

10  as well, and provides a gateway to the Court's consideration of the merits of

11  Petitioner's claims. Respondent "does not contest the applicability of the Schlup

12  gateway to procedurally defaulted claims," but notes his disagreement with the

13  Court's finding that it was satisfied "in order to preserve the issue." RM at 67.

14      (b) *The State Default Is Not Adequate To Bar Federal Review*

15      In Morales v. Calderon, the Ninth Circuit explained that a state procedural rule

16  is not an "adequate" ground to bar federal review if either (1) the "state procedural

17  rule . . . is so unclear that it does not 'provide[] the habeas petitioner with a fair

18  opportunity to seek relief in state court,'" or (2) the state procedural rule is "not

19  applied consistently" by the state.[12] The Court in Morales concluded that:

20      California's rule on timeliness was not 'clear, consistently

21

22      [12] Morales v. Calderon, 85 F.3d 1387, 1390 (9th Cir. 1996), *quoting,* Harmon

23  v. Ryan, 959 F.2d 1457, 1462 (9th Cir. 1992) *and citing,* Hathorn v. Lovorn, 457 U.S. 255, 262-63, 102 S. Ct. 2421, 2426-27 (1982). The requirement that a

24  procedural rule be consistently applied and strictly enforced to constitute an "adequate" independent state ground has been consistently recognized by the

25  Supreme Court and the Ninth Circuit. *See, e.g.,* Dugger v. Adams, 489 U.S. 401,

26  410-11 & n.6 (1989); Johnson v. Mississippi, 486 U.S. 578, 587 (1988); Calderon v. U.S. Dist. Ct. (Hayes), 103 F.3d 72, 74-75 (9th Cir. 1996), *cert. denied,* 117 S.

27  Ct. 2532 (1997); Calderon v. U.S. Dist. Ct. (Bean), 96 F.3d 1126, 1130-31 (9th

28  Cir.), *cert. denied,* 117 S. Ct. 1569 (1997).

1      applied, and well-established' at any time after Morales's

2      convictions were affirmed and before he filed his first state habeas

3      petition. (Citation omitted) It consequently cannot serve as an

4      adequate and independent state ground to support a procedural

5      default.

6   Morales, 85 F.3d at 1390, 1393.

7      While Morales addressed defaults before In re Clark, 5 Cal.4th 750 (1993), the

8   same conclusion must be reached with respect to post-Clark timeliness defaults.

9   In Jones v. Ayers, the court specifically addressed the post-Clark timeliness issue.

10  Jones v. Ayers, 2008 WL 906302, *22 (E.D. Cal. 2008). Relying on the Ninth

11  Circuit's decision in Morales and the decision in Dennis v. Brown, 361 F.Supp.2d

12  1124 (N.D. Cal. 2005), the Jones court found that the state could not meet the

13  ultimate burden of proof as to the adequacy of the timeliness default as a bar to

14  federal review, since its is most often imposed by the state court without any

15  analysis and it is thus impossible to determine whether it is being imposed

16  consistently. Id. at *23 (noting that "the state would like to have it both ways by,

17  on the one hand, summarily denying claims as untimely without explanation and,

18  on the other hand, arguing that this court should somehow be able to overlook the

19  lack of explanation in determining adequacy."); see also  Dennis v. Brown, 361

20  F.Supp.2d 1124 (N.D. Cal. 2005). The timeliness default is further rendered

21  inconsistent in its application by the fact that departures from the timeliness rule

22  are not subject to clear guidelines. Clark, 5 Cal.4th at 763.  The Jones court

23  concluded:

24      Because of the complexity of the timeliness analysis, and given

25      that such determinations are most often made in the context of

26      post-card denials without the benefit of rationale, it is impossible to

27      determine whether the procedural default is strictly or regularly

28      applied.  Morales, 85F.3d at 1392. It is also impossible to

1    determine whether judicial discretion is exercised ". . . according to
2    standards that, at least over time, can become known and
3    understood within reasonable limits." *Id.*  As the Ninth Circuit
4    observed in <u>Morales</u>, imposition of the timeliness default without
5    any analysis renders it difficult to discern a relationship between
6    the denial and findings concerning timeliness. *See id.*
7    <u>Jones</u>, 2008 WL 906302, *23. Consequently, a timeliness default post-1993 does
8    not constitute an adequate state ground to bar federal review.
9        To determine whether the state procedural rule is or is not applied consistently
10   by the state, the Court need not look beyond the instant case.  Mr. Lisker filed a
11   successive (second) state habeas petition in the Los Angeles Superior Court on
12   January 31, 2003, 14 years after his first petition had been denied and
13   approximately 10 years after <u>In re Clark</u>.  (CR 112 at 3; Motion to Dismiss, Exh.
14   H.)  In addition to being a successive petition, it was also presumptively untimely.
15       The Superior Court denied the petition without ruling it untimely, and when
16   Mr. Lisker filed a habeas petition with the Court of Appeal on July 28, 2003 that
17   Court similarly denied the petition without finding it untimely.[13]  (CR 112 at 3-4;
18   Motion to Dismiss, Exhs I, J & K.)  Mr. Lisker then petitioned the California
19   Supreme Court on August 18, 2003 to review the denial of his habeas petition, and
20   the Court denied relief without indicating  his petition was untimely or successive.
21
22

---

[13] Mr. Lisker asserted in both the Superior Court and Court of Appeal petitions
that his delay should be excused under California's "fundamental miscarriage of
justice" exception.  (CR at 112, at 3-4; Motion to Dismiss, Exhs H & J.)
Presumably neither court relied on that exception in failing to find the petition
untimely, because it had, it would also have granted Mr. Lisker relief, as it the
exception requires a petitioner to show that "an error of constitutional magnitude
led to a trial that was so unfair that absent the error, no reasonable juror could have
convicted the petitioner." CR 112, at 4, *citing*, <u>In re Clark</u>, 5 Cal.4th at 797; CR
112 at 4.

1    (CR 112 at 4; Motion to Dismiss, Exhs L & M.)  Yet when Mr. Lisker filed a state

2    petition in 2007, based on evidence obtained and developed at the federal

3    evidentiary hearing, the Court denied the petition and cited three cases to indicate

4    it was doing so on procedural grounds.  (CR150.)

5          Respondent also argues, though not with any specificity, that the rule against

6    successive petitions is an adequate ground to bar federal review.  RM at 64.  Once

7    a respondent has asserted the defense, the petitioner need only place the defense in

8    issue and "need not provide any *evidence* or *prove* or *establish* anything; instead ,

9    "because it is the State who seeks dismissal based on the procedural bar, it is the

10   State who must bear the burden of demonstrating that the bar is applicable."[14]

11   Federal district courts have found that there is inconsistent application of the

12   successive petition bar by the California Supreme Court. *See*. <u>Dennis</u>, 361 F.3d at

13   1133; <u>Jones</u>, 2008 WL 906302 at *33.  Consequently, this procedural default is

14   not an adequate ground to bar federal review of Mr. Lisker's claims.

15          (c) *Judicial Estoppel  Precludes Respondent's Procedural Bar Defense*

16   "'Judicial estoppel, sometimes also known as the doctrine of preclusion of

17   inconsistent positions, precludes a party from gaining an advantage by taking one

18   position, and then seeking a second advantage by taking an incompatible

19   position.'" <u>Whaley v. Belleque</u>, --- F.3d ----, 2008 WL 763774 (9th Cir. 2008),

20   quoting, <u>Rissetto v. Plumbers & Steamfitters Local</u>, 343, 94 F.3d 597, 600 (9th

21

22   _____

23   [14] <u>Dennis v. Brown</u>, 361 F.3d 1124, 1131-32 (9th Cir. 2005); *see also* <u>Ayala v. Ayers</u>, 2007 WL 2853934, *5 (S.D. Cal. 2007), *citing*, <u>King v. La Marque</u>, 464

24   F.3d 963, 967 (9th Cir. 2006). Where, "the Ninth Circuit has found a procedural rule to be too ambiguous to bar federal review during a specific time period,

25   simply 'contesting the adequacy' of that rule is sufficient to meet a petitioner's burden under *Bennett*."The Ninth Circuit has previously held that untimely and

26   successive procedural bars "were not firmly established and consistently applied at

27   least prior to 1993."<u>Cooper v. Calderon</u>, 255 F.3d 1104, 1111(9th Cir. 2001);

28   <u>Fields v. Calderon</u>, 125 F.3d 757, 765 (9th Cir. 1997).

Cir.1996). "'Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from playing fast and loose with the courts.'" Whaley v. Belleque, --- F.3d ----, 2008 WL 763774 (9th Cir. 2008), quoting, Wagner v. Prof'l Eng'rs in Cal. Gov't., 354 F.3d 1036, 1044 (9th Cir.2004) (internal quotation marks omitted).

In Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.1990), the Ninth Circuit ruled "held that judicial estoppel bars a state from taking different legal positions in state and federal court in order to create a procedural default that would otherwise bar a habeas petition. " Whaley v. Belleque, ___ F.3d ___, 2008 WL 763774 (9th Cir. 2008). Respondent in this case did exactly that.

Respondent argued to this Court in 2006 that Lisker **still had** available state court remedies and should be made to exhaust them before his Second Amended Petition was adjudicated. (Respondent's Opposition to Petitioner's Motion to File Second Amended Petition, CR 124 at 6, ("Contrary to Petitioner's assertion, there is, and has been, no 'absence of available state corrective process' with regard to the two proposed constitutional claims.")) Once Mr. Lisker returned to State court, however, Respondent argued to the California Supreme Court that he **did not** have any available state remedies and that he did not satisfy any of California's exceptions for successive and/or delayed petitions. (*See*, Respondent's Informal Response, submitted as Exh A.)

Respondent should now be precluded under the doctrine of judicial estoppel from relying on the procedural bar that he urged the California Supreme Court to apply but which he originally claimed to this Court was not an impediment to his new claims.

## B. The Court's Decision Is Not Constrained by or Subject to § 2254(d)

The deference that § 2254(d) requires a federal court to give to a state court only applies to a state court adjudication on the merits of a claim. Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002), *cert. denied* 537 U.S. 1179 (2003). The

1    California Supreme Court's 2007 decision did not adjudicate the merits of Lisker's

2    claims, but instead summarily denied them on procedural grounds.  Consequently,

3    this Court is not constrained by § 2254(d) in its decision as to whether habeas

4    relief is warranted.

5         Respondent contends that two of Lisker's grounds for relief – denial of the

6    right to counsel and denial of the effective assistance of counsel (Grounds One

7    and Two) – are subject to review under § 2254(d) because the legal claims that

8    form the basis of these grounds for relief were previously adjudicated on the

9    merits by earlier state court decisions.  (RM at 23-26.)  As presented in Mr.

10   Lisker's 2007 petition to the California Supreme Court, however, these grounds

11   for relief included new and additional facts that were not included obtained and

12   developed at the December, 2005 federal evidentiary hearing.  (*See*  Petition to

13   California Supreme Court, CR 138, at 3 - 4-B)  The earlier state court decisions

14   therefore did not, and could not have adjudicated the merits of the grounds for

15   relief on all relevant and pertinent facts, as these facts were only first presented in

16   Lisker's 2007 state petition. *See* Killian, 282 F.3d at 1208 ("AEDPA deference

17   does not apply to Killian's perjury claim in this case because the state courts could

18   not have made a proper determination on the merits. Evidence of the perjury, after

19   all, was adduced only at the hearing before the magistrate judge.") Accordingly,

20   neither this Court's determination of Lisker's first two grounds for relief, nor its

21   determination of his third and fourth grounds for relief are subject to § 2254(d).

22   Even if Grounds One and Two were subject to review under § 2254(d), it would

23   not affect Lisker's right to relief, as the earlier state court decisions denying the

24   claims were objectively unreasonable.

25

26   **C.  Ground 1:        Petitioner's Sixth Amendment Right Was Violated By  the**

27   **State's Knowing Exploitation  of An Opportunity to**

28   **Confront Him Without Counsel**

1  (1) <u>Introduction</u>

2      It is well established that the Sixth Amendment right to counsel attaches

3  upon the filing of a formal charge and that once the right attaches, the state may

4  not "deliberately elicit" incriminating statements from an accused in the absence

5  of counsel. <u>United States v. Henry</u>, 447 U.S. 264, 270, 100 S. Ct. 2183, 65 L.

6  Ed.2d 115 (1980)  On the other hand, this Sixth Amendment right is not violated

7  where the state "by luck or happenstance" obtains evidence of an incriminating

8  statement the accused made in the absence of counsel. <u>Maine v. Moulton</u>, 474

9  U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed.2d 481 (1985)

10     The state, however, may not accomplish indirectly what it may not do directly,

11 and thus "knowing exploitation by the State of an opportunity to confront the

12 accused without counsel being present is as much a breach of the State's

13 obligation not to circumvent the right to counsel as is the intentional creation of

14 such an opportunity." <u>Maine v. Moulton</u>, 474 U.S. at 176.  Moreover, as the U.S.

15 Supreme Court stated in <u>Moulton</u>, "at the very least, the prosecutor and police

16 have an affirmative obligation not to act in a manner that circumvents and thereby

17 dilutes the protection afforded by the right to counsel." <u>Id.</u>, 474 U.S. at 171.

18     The State violated Lisker's Sixth Amendment right to counsel in this case by

19 his continued detention in the 7000 module of the Los Angeles County jail,

20 commonly known as the "snitch tank," even after learning that  adult jailhouse

21 informants were attempting to elicit information from the 17 year old Lisker that

22 they could provide to prosecuting authorities for their own benefit.  The evidence

23 in this case shows that the prosecution not only failed to fulfill its affirmative

24 obligation not to act in a manner that circumvents the right to counsel, but created

25 and then knowingly exploited the opportunity to obtain information from Lisker in

26 the absence of counsel.

27

28

1    2.  <u>Relevant Facts and Proceedings</u>

2        (a) *Trial Court Proceedings*

3        Prior to trial, Lisker filed a motion to exclude the testimony of Robert

4    Hughes.  The grounds for the motion were both that Hughes was acting as an

5    agent for the prosecution and that Lisker's confinement in the Los Angeles County

6    Jail was unlawful because he was a juvenile.  (ART 333, 379-80.)

7        Lisker was 17 at the time of his March 10, 1983, arrest.  He was initially

8    housed at Juvenile Hall.  In early April, however, Lisker was transferred to the Los

9    Angeles County Jail and placed in the 7000 module even though he was still a

10   juvenile. The 7000 module at the County Jail where Lisker was transferred was

11   commonly referred to as the "snitch tank" because it was populated by informants.

12   (ART 357.)  Robert Hughes was placed in a cell next to Lisker at the County Jail.

13   The cell on the other side of Lisker was occupied by two inmates, Dowtu and

14   Wallace.  (ART 367.)

15   Lisker asserted his custody at the County Jail violated the order of the court that he

16   be housed at a juvenile facility, and the Welfare & Institutions Code which

17   required juveniles be housed separately.  (ART 335-43.) The trial court denied the

18   motion.  (ART 379-80.)

19       (b) *Direct Appeal*

20       Lisker challenged the court's ruling in his direct appeal. While, the Court of

21   Appeal agreed with Lisker that by law, he was supposed to have been held in a

22   juvenile facility,  (Motion to Dismiss Exh B: 16-17), the Court ruled that this did

23   not entitle Lisker to relief because his illegal placement in the County Jail did not

24   violate his Sixth Amendment right to counsel.

25       The Court also rejected Lisker's argument that his purported confession to

26   Hughes violated the Sixth Amendment.  The Court recognized that the State had

27   an affirmative obligation to "not to act in a manner that circumvents and thereby

28   diluties the protection afforded by the right to counsel."  (Motion to Dismiss Exh

B: 17, *quoting, Maine v. Moulton,* 474 U.S. at 171.)  The Court, however, found no evidence that the prosecution obtained the confession improperly, and thus no Sixth Amendment violation occurred.  (Motion to Dismiss Exh B: 17-19.)

       (c) *Prior Petition*

As noted above Lisker's 2003 habeas petition filed with the Court of Appeal alleged the same legal claim, as did his subsequent petition for review filed with the California Supreme Court.  (Motion to Dismiss Exh J: 40-61;  Exh L: 4-7.)

In support of the claim, Lisker submitted evidence not included in the original record, including (1) the 1990 Los Angeles County Grand Jury Report regarding the involvement of jailhouse informants in the criminal justice system; and (2) summary interview reports dated 4-21-83 of Dowtu and Wallace and transcripts of their interviews.  (Motion to Dismiss Exh J: 175-178 (listing exhibits submitted with petition).)

       (d) *Additional Facts*

The additional evidence regarding this claim presented at the federal evidentiary consisted of the testimony of LAPD Sergeant Albert J. Gavin. Sergeant Gavin testified that the exchange between police and Dowtu during Dowtu's interview,  was known as a "wink and a nod" tactic.

| | | |
|---|---|---|
| Dowtu: | If this guy – I'd be talking to him.  If he comes up with something else. | |
| Detective: | Well, a, now if I was to tell you to go ahead and talk to him some more, you'd be acting as my agent. | |
| Dowtu: | Oh, I see. | |
| Detective: | And you can't do that, but we will be coming back up here to see you again. | |

(EHT Vol. II: 167-68; CR 112, at 29.)

1    3.    <u>The Evidence Shows that the State Knowingly Exploited an Opportunity to</u>

2         <u>Confront Petitioner Without Counsel</u>

3    The Grand Jury Report sets the context and circumstances in which Lisker

4    supposedly confessed to jailhouse informant Hughes.  (EH Exh 38.)  It also

5    establishes that it was common knowledge that the jailhouse informants populated

6    the 7000 module of the County Jail and placement of in inmate in the 7000 module

7    would likely result in a purported confession to another inmate.  The Report also

8    noted that younger inmates were especially at risk of being taken advantage of by

9    adult informants, who would solicit information about a case and then claim it

10   included an admission of guilt.  (EH Exh 38 at 30, 31, n.16.)

11   The evidence in this particular case establishes that as of April 21, 1983,

12   Detective Monsue knew that adult inmates were attempting to take advantage of

13   the 17 year old Lisker by falsely claiming he had confessed.  (Exh TT (interview

14   summaries and transcript of Dowtu interview).)  The detective knew this because

15   the confession Dowtu and Wallace claimed Lisker had made to them was in error

16   as to critical facts, such as Dowtu's statement that Lisker said he stabbed his

17   mother with a fork (EH Exh 86:320).

18   Given this circumstance, Monsue's "affirmative obligation not to act in a

19   manner that circumvents and thereby dilutes the protection afforded by the right to

20   counsel," required that he not allow Lisker to remain exposed as prey for the adult

21   informants in the 7000 module.  Instead of fulfilling this obligation, Monsue

22   blatantly breached it, by coaching the informants on how together they could

23   circumvent the Sixth Amendment.  (EH Exh 151:11.)

24   The testimony by Sergeant Gavin independently confirmed Monsue's

25   exploitation of Lisker's custody situation. By leaving Lisker where he was, with

26   the knowledge that jailhouse informants were providing false information against

27   him in an attempt to gain personal benefits, and by encouraging these jailhouse

28   informants, with a "wink and a nod" to continue to obtain information from

1   Lisker, Monsue was "knowing[ingly] exploitat[ing] . . . an opportunity to confront

2   [Lisker] without counsel being present . . ." Maine v. Moulton, 474 U.S. at 176.

3   This knowing exploitation produced results when Hughes claimed that Lisker later

4   confessed to him.   This knowing exploitation of the opportunity to have the Sixth

5   Amendment violated, "is as much a breach of the State's obligation not to

6   circumvent the right to counsel as is the intentional creation of such an

7   opportunity," and renders Hughes' testimony inadmissible. Id.

8        4.   The Violation Had a Substantial and Injurious Effect

9        The Masiah violation warrants habeas relief if it "had substantial and injurious

10  effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507

11  U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed.2d 353 (1993), *quoting*, Kotteakos v.

12  United States, 328 U.S. 750, 776 (1946). Much has come to be known since Mr.

13  Lisker's trial that makes Hughes' testimony that Mr. Lisker confessed to him seem

14  suspect and implausible, if not flat out not believable.   The relevant question,

15  however, is the impact that the testimony likely had on the jury at the time of the

16  trial, and not how well it has fared in light of subsequent events.   The conclusion

17  that Hughes' testimony claiming that Mr. Lisker confessed to him had a

18  substantial and injurious effect is supported by two related considerations.   First,

19  the trial prosecutor devoted significant time to identifying details provided by

20  Hughes as to the crime scene and circumstances that at the time appeared to make

21  it seem as if he must have received the information from Mr. Lisker.   Second,

22  Hughes' testimony that Lisker confessed to killing his mother had a corroborating

23  and confirming effect on the rest of the prosecution's case for conviction.   For

24  these reasons, it "cannot [be said], with fair assurance, . . . that the judgment was

25  not substantially swayed by the error." O'Neal, 513 U.S. at 437, *quoting*,

26  Kotteakos, 328 U.S. at 764-65. To the contrary, the constitutional error "had

27  substantial and injurious effect or influence in determining the jury's verdict," and

28  accordingly habeas relief is warranted. O'Neal, 513 U.S. at 436, *quoting*, Brecht,

1    507 U.S. at 627, *quoting*, Kotteakos, 328 U.S. at 764-65.

2        5.    The State Court Decision Does Not Preclude Federal Habeas Relief

3        Respondent asserts that this Court's adjudication of this ground for relief is

4    subject to 28 U.S.C. § 2254(d) because Ground One of the Second Amended

5    Petition was "reject[ed] . . . on the merits" by the California Court of Appeal when

6    it affirmed Lisker's conviction on direct appeal in 1988, and that "the Los Angeles

7    County Superior Court . . . .[also] rejected the merits of Ground[] One . . . [in

8    2003] when it denied Petitioner's second state habeas corpus petition with a

9    reasoned decision," and that the "California Court of Appeal and California

10    Supreme Court also reached the merits of Ground[] One . . . when the California

11    Supreme Court denied Petitioner's first habeas corpus petition [in 1989] without

12    discussion or citation to authority and when the California Supreme Court and

13    California Court of Appeal issued silent denials to Petitioner's second habeas

14    corpus petition [in 2003] . . . " (RM at 25; CR 112 at 3; Motion to Dismiss, Exhs

15    B, G, I, K, M.)  Respondent further asserts that the relevant state court decision for

16    purposes of applying § 2254(d) is "the reasoning of the California Court of Appeal

17    on direct appeal . . . and . . . the Los Angeles  County Superior Court's explained

18    denial of the habeas corpus petition." RM at 25.

19        As explained above (Section IV. B.), Respondent's assertion that this Court's

20    adjudication of Ground One is constrained by § 2254(d) is based on the mistaken

21    premise that it is the same ground for relief that was presented in Mr. Lisker's

22    direct appeal and that was presented in his 1989 and 2003 state habeas petitions.

23    It is not.  The procedural history detailed above (Section IV. C.2.), reveals that Mr.

24    Lisker's 2007 state petition included new facts in support of his Masiah claim that

25    were not included in his direct appeal or in his prior state habeas petitions.

26    Consequently, Ground One for relief as presented in the 2007 state petition should

27    be deemed a new claim.  *Cf.* Hertz and Liebman, *Federal Habeas Corpus*

28    *Practice and Procedure* (5th Ed.) §23.3c(ii) at 1087-90, *citing, inter alia,* Aiken v.

Spalding, 841 F.2d 881, 883 (9th Cir. 1988).  Moreover, the prior state court
decisions on Mr. Lisker's Masiah claim did not and could have adjudicated the
present claim on the merits, and because the new claim was denied on procedural
grounds, and not on the merits, § 2254(d) does not apply. See Killian, 282 F.3d at
1208 ("AEDPA deference does not apply to Killian's perjury claim in this case
because the state courts could not have made a proper determination on the merits.
Evidence of the perjury, after all, was adduced only at the hearing before the
magistrate judge.")

Even if § 2254(d) were deemed to apply, the earlier state court decisions
would not affect Mr. Lisker's right to relief.  Under the AEDPA, a petitioner must
demonstrate that the state court's adjudication of the merits "resulted in a decision
that was contrary to, or involved an unreasonable application of clearly established
Federal law, as determined by the Supreme Court of the United State" (Williams v.
Taylor, 529 U.S. 362, 403-404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)), or  was
"based on an unreasonable determination of the facts in light of the evidence
presented in the State court proceeding." 28 U.S.C. § 2254(d).  The earlier state
court decisions were based on an unreasonable determination of the facts as
presented to the state court by Mr. Lisker in his 2007 state petition, as those earlier
decisions did not take into account the additional facts presented in the 2007
petition.

**D.  Ground 2:**　　　　**Petitioner Was Denied the Effective Assistance of
Counsel by His Counsel's Failure to Investigate  and
Advance a Third- Party Culpability Defense**

　　1.  Introduction

The United States and California Constitutions both provide a right to counsel.
(U.S. Const., Amend. VI; Calif. Const., Art I, § 15, clause 3.)  It is well-
established that "the right to counsel is the right to the effective assistance of

1   counsel." <u>McMann v. Richardson</u> 397 U.S. 759, 771, n.14, 90 S. Ct. 1441, 25 L.

2   Ed.2d 763 (1970).

3       The two-prong test established by the United States Supreme Court in

4   <u>Strickland v. Washington</u>, requires a petitioner to establish that: (1) counsel's

5   representation was deficient in some particular respect and (2) counsel's error

6   resulted in prejudice.  <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80

7   L. Ed.2d 674 (1984).

8       An attorney's representation "is deficient if, considering all the circumstances,

9   it falls below an objective standard of reasonableness measured under prevailing

10  professional norms." (<u>Strickland</u>, 466 U.S. at 691.)  An attorney must investigate

11  possible defenses suggested by the evidence unless there are reasonable and

12  legitimate strategic reasons not to do so. *See* <u>Towns v. Smith</u>, 395 F.3d 660 (6th

13  Cir. 2005)("trial counsel rendered ineffective assistance . . . by failing to

14  investigate a witness who admitted to the police . . . that he had been involved in

15  the crimes . . . and that [petitioner] had no played no part.")

16      The failure to investigate a defense in the absence of legitimate and reasonable

17  strategic justification is objectively unreasonable.  <u>Hoots v. Allsbrook</u>, 785 F.2d

18  1214, 1219-20 (4th Cir. 1986) (counsel's failure to interview eyewitnesses, and rely

19  on police reports was deficient because it simply cannot be ascribed to trial

20  strategy and tactics);  <u>United States v. Tucker</u>, 716 F.2d 576 (9th Cir.

21  1983)(conviction reversed where counsel failed to conduct investigation that

22  would have supported only plausible theory of defense - that defendant was an

23  outsider to criminal activity.)

24      A petitioner is prejudiced by counsel's objectively unreasonable errors where

25  "there is a reasonable probability that, but for counsel's unprofessional errors, the

26  result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 688,

27  694.  This standard does *not* require a petitioner to establish by a preponderance

28  (more likely than not) that but for counsel's error there would have been a

1  different outcome.  A "reasonable probability" means a probability sufficient to

2  undermine confidence in the outcome.  *Id.*

3        2.   Relevant Facts and Proceedings

4             (a) *Trial Court Proceedings*

5        Soon after his arrest, Lisker told Detective Monsue that he believed Michael

6  Ryan may have committed the murder and why he believed that.  (EH Exh 42, 43.)

7  Detective Monsue traveled to Mississippi to interview Ryan.  The interview was

8  taped and a transcript prepared.  (EH Exh 48.)  Defense counsel Dennis Mulcahy

9  was provided with a copy of the tape.  ( ART 390.)

10       Prior to Lisker's first trial, the prosecution moved to preclude the defense from

11  "rais[ing] the issue of Michael Ryan."  ( ART 389. )  The prosecutor said he would

12  not object to such a third party culpability defense if there was "some hard

13  evidence" implicating Ryan as the perpetrator, but asserted there was no evidence,

14  "none, zero," that Ryan had committed the crime.  (ART 389, 395.)

15       Defense counsel opposed the motion based on statements contained in the

16  transcript of Ryan's interview.  Counsel noted that Ryan had said he was at the

17  Lisker house the day before the murder, that he left the state, that he talked in the

18  interview about having a knife, and that he was unable to account for the money

19  he spent while in California.  (ART 390-91.)  Defense counsel asserted "he could

20  be placed at the location.  He can be placed in the neighborhood of the location.

21  He can be placed having some problems with Dorka Lisker.  He can be placed the

22  day before [*sic*] by his own statements."  (ART 391.)  When the court asked

23  defense counsel, "what were the problems [with Mrs. Lisker]?," defense counsel

24  provided no details but simply responded "He had some problems with Dorka

25  Lisker from obtaining money from her.  She apparently became a friend of this

26  Ryan through her son, Bruce."  ( ART 391.)  As the hearing on the motion

27  continued, defense counsel also added that "there is missing money [that Mrs.

28  Lisker was given the night before] and it is not on Bruce and Bruce is still there."

1  (ART 393.)

2      Prior to ruling, the court asked defense counsel, "I got the impression the

3  evidence is the tape that the prosecution gave you.  Is there any other evidence?"

4  Defense counsel responded, "Nothing that I can think of at this particular time.  If

5  anything came [sic] up subsequently I would ask to address the court." ( ART

6  397-98.)

7      The court then summarized the defense offer of proof implicating Ryan as

8  consisting of "that this person was formerly a friend of the defendant's.  Was a

9  roommate at some time previously at the house, the victim's house. He was there

10  the day before. . . . he had tried to borrow money from her . . .the day before and

11  there was some reference to having a disagreement." ( ART: 398.)  Defense

12  counsel consented to this summary as being his offer of proof, adding only that he

13  "could produce evidence that there were prior disagreements between Ryan and

14  Dorka Lisker about doing chores for money, . . . for whatever value that has."

15  (ART: 398.)

16      The court granted the motion, but advised defense counsel "if you have any

17  other evidence at any time, we will get into this again."  (ART: 399.)

18      On October 23, 1985, prior to the second trial (after the first trial was

19  terminated by a mistrial), the court again considered its ruling.  Defense counsel

20  did not offer any further evidence or argument in opposition to the motion.  The

21  court again concluded the evidence was insufficient and again granted the

22  prosecution's motion.  (RT: 12.)

23          (b) *Prior Petition*

24      As noted above, Lisker's 2003 habeas corpus petition filed with the Court of

25  Appeal alleged the same legal claim (Motion to Dismiss Exh J: 62-76), and he also

26  presented the claim to the California Supreme Court in his petition for review.

27  (Motion to Dismiss Exh L: 1, 8-12.)

28      In support of the claim, Lisker submitted evidence not included in the original

1   record, including (1) the transcript of Ryan's May 4, 1983 interview; (2) Ryan's

2   March 10 receipt for the Hollywood Tropicana under the alias Mark Smith; (3) the

3   excerpt from the murder book chronology showing that Ryan checked into the

4   hotel at 3:00 p.m. on March 10; (4) the telephone bill for the Lisker residence

5   which reflected the call on March 10 to a number that corresponded with Ryan's

6   mother's number; and (5) Ryan's criminal record.  (See EH Exh 40,46-51.)

7           (c) *Additional Facts*

8       The additional evidence developed and presented at the federal evidentiary

9   hearing pertaining to the shoeprint impressions, including the patterned impression

10  on Dora Lisker's head,was submitted in support of Lisker's 2007 State Petition.

11  (EH Exh 11,12,& 15 and EHT Vol. I: 185-96;  Vol. II: 6-42; Vol. IV: 54-97.)

12      3.   Counsel's Objectively Unreasonable Failure to Investigate and Advance

13          the Third-Party Culpability Defense Prejudiced Petitioner

14      *(a) Counsel's Failure to Investigate and Advance a Third-Party*

15          *Culpability Defense Was Objectively Unreasonable*

16      There is no dispute that defense counsel was on notice of the need to

17  investigate a third-party culpability defense against Michael Ryan and marshal any

18  evidence that supported such a defense in opposing the prosecution's motion.

19      The prosecution provided defense counsel with some of the evidence that

20  implicated Ryan, including the transcript of Ryan's May 4 interview, the

21  Hollywood Tropicana receipt and the murder book entry showing Ryan had

22  registered at 3:00 p.m..  Additional evidence supporting the defense could have

23  been obtained through investigation.  Defense counsel failed to employ the

24  evidence he had been provided, and failed to undertake the investigation that

25  would have yielded still further evidence.

26      Counsel, as noted above, did refer to selected facts from the Ryan interview

27  transcript, but either overlooked others that were far more probative and

28  incriminating.  For example, counsel never made mention of the motel receipt.

1   Nor did counsel tell the court Ryan lied about the time he checked into the motel

2 (10:00 a.m.), or explain the significance of that lie – *i.e.*, it would have given him

3 an alibi, nor did counsel bring out the even more incriminating fact that Ryan

4 offered the false 10:00 a.m. alibi even before being told the time the murder had

5 been committed. (EH Exh 48: 8, 13.)

6     Nor did defense counsel point out the suspicious reason Ryan gave for using

7 an alias, *i.e.,* he had been in a knife fight. (EH Exh 48: 8, 9, 13, 25.) Nor did

8 defense counsel bring out that Ryan's claim he used the alias because of the knife

9 fight was contradicted by his earlier statement that he had been in the fight after

10 checking into the motel. (EH Exh 48: 8, 9, 13, 25.)

11     Nor did defense counsel bring out that Ryan lied about why he came to

12 California, and lied about his suspicious return to Mississippi the day after the

13 murder. Ryan had not come to California to join "Job Corps," as he told Monsue,

14 nor did he come to California planning to return to Mississippi, as he offered to

15 explain his sudden departure the day after the murder. (EH Exh 48: 2, 5, 6, 16, 21;

16 EHT Vol. II: 141-42; CR 112 at 32.)

17     Ryan was sent to California because his Mississippi parole supervision had

18 been transferred to Ventura County California, where his mother lived. (EHT Vol.

19 II: 141-42.) Ryan did not plan on returning to Mississippi. His sudden departure

20 from Los Angeles was not only suspicious by itself, but made more incriminating

21 when he lied to make it appear as if he planned to return to Mississippi.

22     Counsel also failed to do rudimentary investigation that would be expected of

23 a reasonably competent criminal defense lawyer, especially in a murder case with

24 a penalty of life imprisonment. Basic investigation that would be called for

25 included having the shoeprints in and around the house, especially the bloody

26 shoeprint in the bathroom and the shoeprint impression found on the path outside

27 on the east side of the house, examined to determine if any print indicated the

28 presence of an intruder. Had defense counsel conducted such investigation, he

1  would obtained evidence that there was an intruder, and that the intruder stepped

2  in blood and also was headed north on the path on the east side of the house,

3  leaving the scene.  (CR 112 at 23; EHT Vol. I: 185-90; Vol. IV: 54-64, 69-71.)

4      Moreover, had counsel or a defense expert examined the autopsy photos, it

5  would have been discovered that there existed a patterned impression  resembling

6  a shoeprint on Dorka Lisker's head, behind her right ear.  (EHT Vol. II: 188-89.)

7  Examination of the photograph in comparison with the intruder's herringbone

8  pattern shoeprint would have provided evidence that the patterned impression on

9  the victim's head was similar to, and had the exact same spacing, as the

10  herringbone pattern from the shoeprint, and the only explanation for the patterned

11  impression was that it was a shoeprint.  (CR 112 at 25; EHT Vol. I: 192-93, Vol.

12  II: 24-25, 35-39, Vol. IV: 74-77, 90-94.)  As such, this additional evidence would

13  have established the intruder had placed his foot on the victim's head with a

14  sufficient degree of force to cause bruising of the skin, consistent with keeping the

15  head in a fixed position while administering a blow.

16      Further investigation of the third-party culpability defense would have

17  included obtaining the Lisker telephone bill, given Ryan's statement that he went

18  to the Lisker residence on March 9 to use the phone.  Had defense counsel

19  obtained the phone records, he would have obtained even more evidence

20  incriminating Ryan.

21      The phone records establish Ryan did not use the phone on March 9, but that

22  on March 10, at 10:22 a.m.,  near the time of the murder, someone dialed a phone

23  number (492-8972), that matched his mother's number except that the area code

24  was not dialed and the last digit was different (805-492-8976).  EH Exh 40; EHT

25  Vol. II: 145-146; CR 112 at 32.)  The call was for the minimum time of one

26  minute.  (CR 112 at 32; Exh 40.)  From this evidence it could be inferred that

27  Ryan went to the house on the 10th claiming to want to use the phone as a ruse, and

28  dialed a number with no intention of completing the call.

1    Had defense counsel investigated Ryan's prior record, he would have found
2    still further incriminating evidence. On April 25, 1982, only one year prior to the
3    murder of Dorka Lisker, Ryan was arrested in Ventura County, California, after he
4    had pulled a knife on Brian Simpson and placed it on his throat, threatened to kill
5    him and demanded that Simpson give him $12.00. (EH Exhs 49, 50, 51.) This
6    evidence also would have proved yet another lie Ryan told Monsue – that he had
7    never threatened to kill anyone. (EH Exh 48: 42.)
8         (b) *Counsel's Objectively Unreasonable Error Prejudiced Petitioner*
9    Lisker was prejudiced by his counsel's objectively unreasonable error because
10   "there is a reasonable probability that, but for counsel's unprofessional errors, the
11   result of the proceeding would have been different." (*Strickland*, 466 U.S. at 688,
12   694.) Lisker satisfies that standard because the effect of his counsel's error is
13   "sufficient to undermine confidence in the outcome." (Strickland, 466 U.S. at 694;
14   *see also*, Strickler v. Greene, 527 U.S. 263, 289-90, 119 S. Ct. 1936, 1952 (1999)
15   *quoting*, Kyles v. Whitley, 514 U.S. 419, 434-35, 115 S. Ct. 1555, 1556, 131 L.
16   Ed.2d 490 (1995)
17   But for counsel's error, the evidence incriminating Ryan as the perpetrator
18   would have included the following: Ryan left Mississippi for California on March
19   6 with $53. He was coming to California to live with his mother in Ventura
20   County because his parole supervision in Mississippi had been transferred to
21   Ventura County. On March 10, 1983, at 10:22 a.m., the approximate time of Mrs.
22   Lisker's murder, a number was dialed from the Lisker residence telephone to a
23   number that matched Ryan's mother's number, except the last digit was different
24   and the area code was not dialed. The call was for the minimum time of one
25   minute. At 3:00 p.m. that afternoon, Ryan checked into the Hollywood Tropicana
26   motel under the alias "Mark Smith." The very next day Ryan returned to
27   Mississippi, without having reported to Ventura County probation.
28        When Ryan was questioned about the murder, he lied to Monsue about why he

came to California and his planned departure.  He lied about using the phone at the

Lisker residence on March 9, and contradicted himself as to whether Mrs. Lisker

was present.   He lied about the time he checked into the hotel, claiming that he

checked into the motel at 10:00 a.m. even before being told the murder occurred at

approximately 11:00 a.m.  He lied about why he used an alias, even while

admitting he was in a knife fight.  Ryan was unable to offer any explanation as to

how he was able to pay his expenses from March 6 to March 11, which far

exceeded the $53 he had when he left Mississippi.  Ryan had used a knife to

commit a robbery less than a year earlier, in which he threatened to kill the person.

The shoeprint evidence would have added to this evidence, establishing there

was an intruder in the house, and that the intruder had stepped in blood, placed his

foot on Mrs. Lisker's head and left the house by the path on the east side of the

house.  Mrs. Lisker's familiarity with Ryan would have allowed him to gain entry

to the house and explains the absence of a forced entry.  The phone call at 10:22

would have made all of the above even more incriminating, because it collectively

supported, if not compelled, the inference that Ryan was in the house at or minutes

before the time of the assault.  The above evidence is sufficient not only to support

a third-party culpability defense, but to return a swift guilty verdict.

Counsel's error thus undermines confidence in the outcome because but for the

error, the jury would have been provided with persuasive proof that Ryan

murdered Mrs. Lisker, and not Bruce Lisker.  The prejudice from the error is made

even greater because the absence of the evidence allowed the prosecution to

capitalize on the seemingly irrefutable contention that Lisker had to be guilty

because there was no evidence of an intruder.

4.  <u>Respondent Fails to Offer a Plausible Strategic Justification For the Error and His Arguments That It Was Not Prejudicial Are Defeated by the Facts</u>

Respondent challenges the first prong of the <u>Strickland</u> test by asserting that

Lisker "has failed to demonstrate through a reasonably available affidavit, the

1    probability that learned counsel fully considered and rejected doing that which

2    Petitioner alleges should have been done," and that "[i]t remains his [Petitioner]

3    burden to eliminate the possibility that counsel's decisions were guided by

4    reasonable tactical decision-making." RM at 43.

5        Lisker, as demonstrated above, has met that burden by demonstrating by proof

6    of what counsel did and did not do that there are no plausible strategic or tactical

7    justifications for counsel's errors. Respondent not only fails to offer proof of a

8    plausible strategic justification for counsel's errors, but he fails even to offer a

9    strategic consideration that could explain or justify counsel's errors. Moreover,

10   Respondent's speculative assertions that trial counsel may have had a strategic

11   justification for not presenting a third-party culpability defense fails for one simple

12   reason – counsel did not consciously decide not to pursue a third-party culpability

13   defense. Rather, counsel made a half-hearted attempt to do so, and failed to utilize

14   available evidence to support his attempt to oppose the prosecution's in limine

15   motion and also failed to take reasonable steps to obtain additional evidence that

16   would have enabled him to successfully oppose the in limine motion.

17       Nor is this fatal deficiency in Respondent's argument overcome by

18   Respondent's unsupported assertion that he "has reason to believe that defense

19   counsel's strategy regarding whether to continue investigate and attempt to present

20   evidence of third party culpability was a product of his conversations with

21   Petitioner and Petitioner's father." RM at 43. Respondent contradicts his

22   unsupported assertion when in the very same paragraph he indicates (again

23   without providing a supporting declaration or other proof) that Lisker's trial

24   counsel has reportedly declined to discuss the matter. RM at 43. In any event, the

25   fact remains that the record shows trial counsel did not make a strategic decision

26   not "to continue investigate and attempt to present evidence of third-party

27   culpability." RM at 43. Counsel continue to attempt to oppose the prosecution's

28   motion, but simply did no investigation to support his effort and even failed to

1  utilize evidence readily available to him that would have supported his efforts.

2       Respondent alternatively argues that Lisker was not prejudiced by his

3  counsel's errors because the evidence of third-party culpability was insufficient in

4  anyevent.  RM at 45-61.  Respondent spends nearly 15 pages attempting to explain

5  away some of the evidence that implicated Ryan and supported a third-party

6  culpability defense.  RM at 46-61.  Respondent's attempt to explain away the

7  evidence is strained, speculative and selective.  Respondent's need to spend 15

8  pages in order to attempt to explain why evidence implicating Ryan does not do so

9  sufficiently is self-defeating as it serves to confirm that was substantial evidence.

10      5.   The State Court Decision Does Not Preclude Federal Habeas Relief

11      Respondent asserts that this Court's adjudication of Ground Two is subject to

12  28 U.S.C. § 2254(d) for the same reasons as Ground One — that "the Los Angeles

13  County Superior Court . . . rejected the merits of Ground[] . . . Two [in 2003]

14  when it denied Petitioner's second state habeas corpus petition with a reasoned

15  decision," and that the "California Court of Appeal and California Supreme Court

16  also reached the merits of Ground[] . . . Two when the California Supreme Court

17  denied Petitioner's first habeas corpus petition [in 1989] without discussion or

18  citation to authority and when the California Supreme Court and California Court

19  of Appeal issued silent denials to Petitioner's second habeas corpus petition [in

20  2003] . . . " (RM at 25; CR 112 at 3; Motion to Dismiss, Exhs G, I, K, M.)

21      Respondent's assertion fails here for the same reason as it fails with respect to

22  Ground One – the ineffective assistance of counsel claim that was presented as a

23  ground for relief in Mr. Lisker's 2007 state petition included new facts that were

24  not included in his prior state habeas petitions.  Consequently, Ground Two for

25  relief as presented in the 2007 state petition should be deemed a new claim.  *Cf.*

26  Hertz and Liebman, *Federal Habeas Corpus Practice and Procedure* (5th Ed.)

27  §23.3c(ii) at 1087-90, *citing, inter alia,* Aiken v. Spalding, 841 F.2d 881, 883 (9th

28  Cir. 1988).  Furthermore, the prior state court decisions on Mr. Lisker's ineffective

1   assistance of counsel claim did not and could have adjudicated the present claim

2   on the merits.  Because the new claim was denied on procedural grounds, and not

3   on the merits, § 2254(d) does not apply.  *See* Killian, 282 F.3d at 1208 ("AEDPA

4   deference does not apply to Killian's perjury claim in this case because the state

5   courts could not have made a proper determination on the merits. Evidence of the

6   perjury, after all, was adduced only at the hearing before the magistrate judge.")

7       Moreover, just as with Ground One, even if § 2254(d) were deemed to apply to

8   Ground Two, the earlier state court decisions would not affect his right to relief as

9   they were based on an unreasonable determination of the facts as presented to the

10  state court by Mr. Lisker in his 2007 state petition, as those earlier decisions did

11  not take into account the additional facts presented in the 2007 petition. 28 U.S.C.

12  § 2254(d); Williams v. Taylor, 529 U.S. at 403-404.

13

14  **E.  Ground 3**:      **Petitioner's Conviction Violates Due Process Because It**

15                **Was Based on False Evidence Material to the Verdict**

16

17      1.   Introduction

18      The prosecution's knowing presentation of false testimony violates due

19  process, and the resulting conviction must be reversed if there is "***any*** reasonable

20  likelihood that the false testimony ***could*** have affected the judgement of the jury."

21  United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2397, 49 L. Ed.2d 342 (1976)

22  (emphasis added); Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L.

23  Ed.2d 102 (1972);  Napue v. Illinois, 360 U.S. 264, 271, 79 S. Ct.  1173, 3 L.

24  Ed.2d 1217 (1959).  This standard applies when the prosecution "knew or should

25  have known" the testimony was false, or where the prosecution allows testimony it

26  knows is false to go uncorrected. Agurs, 427 U.S. at 103, *citing*, Mooney v.

27  Holohan, 294 U.S. 103, 110 (1935); Napue, 360 U.S. at 269.  Moreover, the

28  prosecution is deemed to have knowledge that evidence is false if any

representative of the state, including police officers, has such knowledge. Jackson v. Brown, 513 F.3d 1057, 1075 (9th Cir. 2008) (rejecting state's argument that because prosecutor personally did not know witness' testimony that he only received "protection" in return for testifying was false there was no Napue error and no duty on the prosecution to correct false testimony, given that promises were made to the witness by the police and sheriff's department, and noting that "[i]n Napue itself, the Supreme Court made clear: "[I]t is established that a conviction obtained through use of false evidence, *known to be such by representatives of the State,* must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (emphasis added by Jackson Court).)

This standard is purposefully strict "not just because [such cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." Agurs, 427 U.S. at 103. Indeed, as this Court has recognized, given the strict nature of this standard, "if it is established that the government knowingly permitted the introduction of false testimony reversal is '**virtually automatic.**'" Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005) (*en banc*) (emphasis added) (additional citations and quotation omitted); Killian v. Poole, 282 F.3d 1204, 208 (9th Cir. 2002).[10]

2. The False Evidence

As detailed above, the NOAA records and satellite photographs for March 10 and 23, 1983, the testimony of meteorologist Kenneth Clark presented at the federal evidentiary hearing (EHT Vol I: 150-151, 157-60, 165-69), the testimony

---

[10] If the prosecution unknowingly presents false testimony it is deemed material if "there is a reasonable probability that without the [false evidence], the result of the proceeding would have been different." Killian, 282 F.3d at 1208, *quoting*, United States v. Young, 17 F.3d at 1204, *citing*, United States v. Bagley, 473 U.S. at 682.

of former Deputy District Attorney Phil Rabichow, and reconstruction experts Frank Terrio and Mike Varat, establish that the following trial evidence and assertions of fact were false:

    (a) Detective Monsue's testimony that there were "similar conditions" on March 23 at the time the photographs looking into the house were taken, and March 10, when Lisker would have looked into the house (RT 265-66);

    (b) Detective Monsue's testimony that the photographs taken on March 23, 1983 of the view from outside the house looking into the house "accurately reflected" the view on March 10 (RT 269);

    (c) Detective Monsue's testimony that the sun was "very bright" on both March 10 and March 23 (RT 268);

    (d) Detective Monsue's testimony that on March 10, Lisker would not have been able to see from the backyard looking in through the living room window to the entryway area of the house where he said he thought he saw his mother's feet because of the "reflection that would come off that particular window . . . [b]ased upon the sun being very bright . . ." (RT 268);

    (e) LAPD photographer Wilson's testimony that he began taking pictures of the crime scene at 11:30 a.m. on March 10, 1983 (RT 979) (also proved false by cross-examination of Wilson at the evidentiary hearing, EHT Vol. II: 287-8);

    (f) LAPD photographer Wilson's testimony that March 10 and March 23, 1983, were both "bright, sunny" days (RT 971, 976 984, 993);

    (g) Detective Monsue's testimony that on March 10, Lisker would not have been able to see from outside the sliding glass patio door through the dining room to the entryway area where he said he observed his mother's head because of "light reflecting" on the glass door as shown

1    in the photograph taken on March 23rd (RT 273);

2    (h) Detective Monsue's testimony that on March 10 Lisker would not have

3    been able to see from outside the sliding glass patio door through the

4    dining room to the entryway where he said he observed his mother's

5    head because of his line of sight would have been obstructed by the

6    dining room table and the interior planter (RT 273);

7    The testimony of LAPD Criminalist Ronald Raquel and the testimony of FBI

8    expert Sandra Wiersema, together with their reports and related exhibits and

9    photographs establish that the following testimony was false:

10    (i) Detective Monsue's testimony that the bloody shoeprint found in the

11    guest bathroom near the entryway and the bloody shoeprint in the

12    kitchen "quite closely resembled" the sole of Lisker's Pacer shoes (RT

13    325-26);

14    The Los Angeles County Superior Court evidence custodian records establish

15    that the following trial evidence was false:

16    (j) Detective Monsue's testimony that there was no money in  Mrs.

17    Lisker's purse (RT 317, 411-12, 442, 473).

18

19    3.   The False Evidence Was Material

20    Detective Monsue "knew or should have known" his testimony as to items (a),

21    (b), (c), (d), (g), (h) and (i) and Officer Wilson "knew or should have known" his

22    testimony as to items (e) and (f) was false and should not have allowed it to go

23    uncorrected.  Because the prosecution knew or should have known this testimony

24    was false, and allowed it to go uncorrected, the false testimony is material, and

25    Liker is entitled to relief, if there is "*any* reasonable likelihood that the false

26    testimony *could* have affected the judgement of the jury." Agurs, 427 U.S. at 103-

27    104 (emphasis added).

28    As the Supreme Court has noted, this materiality standard "is stated in terms

1  that treat the knowing use of perjured testimony as error subject to harmless-error

2  review. " United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481

3  (1985). This standard reflects that the presentation of false testimony is a trial

4  error. In other words, it is an "error which occur[s] during the presentation of the

5  case to the jury, and which may therefore be quantitatively assessed in the context

6  of other evidence presented in order to determine" its effect or impact. Arizona v.

7  Fulminate, 499 U.S. 279, 308-09, 111 S. Ct. 1246, 113 L. Ed.2d 302 (1991). This

8  method of analysis requires the reviewing court to examine the evidence admitted

9  at trial to support the verdict, including the false evidence, and determine whether

10  there is any reasonable likelihood the jury's judgment could have been affected by

11  the false evidence.[11]  See, e.g., Hayes, 399 F.3d at 986 (knowing presentation of

12  false testimony as to a witness' credibility is material under Napue where the

13  substance of the witness' testimony bears upon guilty or innocence); Killian, 282

14  F.3d at 1208.

15      In this case, it is not only reasonably probable that the false testimony could

16  have affected the jury's verdict, it is inconceivable that it did not. The

17  prosecution's contention that Lisker was guilty rested squarely on the false

18  evidence, as illustrated by the prosecutor's summation. Deputy District Attorney

19  Rabichow endorsed and emphasized assertions of fact that were based squarely on

20  Monsue's false testimony, including that:

21

22  _____

23  [11]  As is illustrated by Hayes, in determining whether false testimony could
    have affected the jury's verdict, courts understandably discuss and consider the
24  effect that disclosure of the information that would have proved the testimony to
    be false would have had and the effect that truthful testimony would likely have
25  had. The court's consideration of the likely effect that disclosure or truthful
    testimony would have had for purposes of applying the materiality standard for
26  knowingly false testimony is and remains whether the false testimony presented to
    the jury could have affected their judgment.
27

28

1           (a) Lisker could not have seen his mother's feet from the backyard

2                 through the living room window because there was glare on the

3                 window (RT 1086);

4           (b) Lisker could not have seen his mother's head from the backyard

5                 looking in through the dining room because his view would be

6                 blocked by the dining room table and planter (RT 1091);

7           (c) the only bloody shoeprints in the house were from Lisker and no

8                 one else (RT 1121, 1195);

9           (d) there was no evidence an intruder was in the house (RT 1121,

10                1195).

11      The prosecutor persuasively argued that if Lisker lied about seeing his mother

12 it proved he was guilty because there was no other reason for him to make up such

13 a lie.  Similarly, the prosecutor argued Lisker had to be guilty because there was

14 no evidence of an intruder in the house. The prosecutor did not simply contend

15 that Lisker's guilt could be inferred from these facts, but argued that given these

16 facts, Lisker had to be guilty.

17      The basis for the prosecution's factual assertions was the false evidence.  To

18 prove Lisker lied, the prosecutor relied on the false testimony of Monsue and

19 Wilson, as described above.  To prove there was no evidence of an intruder the

20 prosecution relied on Monsue's false testimony that only Lisker's shoeprints were

21 found in blood.  The forcefulness with which prosecutor asserted the (false)

22 evidence was true, and that it meant Lisker had to be guilty further demonstrates

23 that it was the basis for the prosecution's contention that Lisker was guilty.[12] (RT

24

25      [12] See Hall, 343 F.3d at 984 ("[I]n closing argument, the prosecutor urged the

26 jury to rely on the [false evidence] as corroborating evidence of Hall's guilt.");

27 Killian v. Poole (2002) 282 F.3d 1204, 1209, cert. denied (2003) 537 U.S. 1179 (in finding false testimony was material court notes that prosecution "took

28                                  (continued...)

1081, 1082, 1086, 1092, 1121, 1195 ("impossible, not improbable, but impossible"; the "critical lie" and the "most condemning lie"; "you could not see it. You just can't. It is impossible."; "[I]f the defendant didn't do this," there would be evidence of an intruder; "[w]ouldn't you expect a bloody footprint somewhere?"; "Only [Lisker's] footprint is in the blood.").)

Given the nature and extent to which the prosecution's case rested on the false evidence, and the forcefulness and certainty with which the prosecutor asserted the false evidence was true and that it meant Lisker had to be guilty it cannot reasonably be disputed that there is a "reasonable likelihood that the false testimony *could* have affected the judgement of the jury." Agurs, 427 U.S. at 103-104 (emphasis added).

Even if one were to assume that there was no reason for Monsue and Wilson to know their testimony was false, and that the false testimony was presented unwittingly, Lisker would still be entitled to relief. Contrary to Respondent's assertion, Lisker's false claim does not stand or fall on whether the prosecution knew the testimony was false. RM at 69. Rather, as noted above, where false testimony is unwittingly presented by it is deemed material, and warrants relief, if "there is a reasonable probability that without the [false evidence], the result of the proceeding would have been different." Killian, 282 F.3d at 1208, *quoting*, Young, 17 F.3d at 1204, *citing*, Bagley, 473 U.S. at 682.

Contrary to the prosecution's assertion at trial, Lisker was able to see his mother, a fact the prosecutor conceded was consistent with his innocence. (RT 1082.) The false evidence also undermines confidence in the outcome because there was an intruder in the house. This fact fatally discredits the prosecution's trial theory that Lisker had to be guilty because there was no evidence of an

---

[12](...continued)

advantage of [the witness'] perjury" by relying on it in summation)

1    intruder.  The importance (and resulting materiality) of this evidence was

2    confirmed by the prosecutor's acknowledgment, as described by the Court, that the

3    post-conviction shoeprint evidence "is inconsistent with the prosecution's

4    argument at trial that Petitioner committed the murder by himself and that no one

5    else was present."  (CR 112 at 25, *citng*, EHT Vol. I: 139-42.)

6         4.   <u>Respondent's Attempt to Defend the Testimony As Not False Fails</u>

7         Respondent argues that Lisker has not demonstrated the any of the testimony

8    was false (RM at 69-84), and that reliance on the prosecutor's summation to prove

9    the materiality of the false evidence fails because "none of the evidence upon

10   which the prosecutor based these arguments to the jury was false," as the "the

11   'false evidence' that [*sic*] to which Petitioner refers merely consisted of reasonable

12   inferences from the evidence that was actually presented at trial . . ."  RM at 84.

13        Respondent's arguments that the evidence cited by Lisker is not false are

14   based on selective and untenable interpretations of the evidence that have already

15   been rejected by this Court.

16        (a)  *The Weather on March 10, 1983* (RM at 69)

17        Respondent asserts that Lisker cannot prove the testimony of Monsue that on

18   March 10, Lisker would not have been able to see from the backyard looking in

19   through the living room window to the entryway area of the house where he said

20   he thought he saw his mother's feet because of the "reflection that would come off

21   that particular window . . . [b]ased upon the sun being very bright . . ." (RT 268)

22   was false because: (i) a photograph of two detectives with their shadows projected

23   on the ground proves it was sunny (RM 69); (ii) Robert Lisker testified that at

24   noon on March 10 "there was some sun " (RM 69); and (iii) photographs taken at

25   1:10 p.m. "show a huge contrast in lighting conditions between the inside of the

26   house and the outside" and the "weather was approximately the same as 11:00

27   a.m." RM 70.

28        None of these facts defeat or rebut the objective proof, detailed above, that

Pet's Traverse & Supporting Memorandum          - 73 -          Case No. CV 04-02687 VAP (RZ)

1   Detective Monsue's testimony was false and that he knew or should have known it

2   was false.  The photograph of the two detectives (EH Exh 64-2) was taken in the

3   afternoon, not at the time Lisker would have been looking into the house.  Indeed,

4   the Court explained why Respondent's reliance on this photograph fails does not

5   even attempt to show otherwise.  (CR 112 at 19 ("Meteorologist Clark . . . testified

6   that this same photograph was taken in the afternoon given the position of the sun

7   in the sky, and that the visible sky comports with his weather reports; the sky was

8   gray or white which does not suggest that it was a bright sunny day. (EHT 1: 163-

9   64, 171-74, Exh 64:2)") Robert Lisker's testimony that there was "some sun"

10  confirms the sun was not "very bright."  Respondent's contention that the

11  photographs taken at 1:10 p.m. show a "huge contrast" in the lighting conditions

12  between the inside and outside of the house does not prove there was a reflection

13  on the window at 1:10 p.m. much less at 11:00 a.m., and even it did prove there

14  was a glare at 1:10 p.m. it would be meaningless because of the different position

15  of the sun in the sky at 11:00 a.m. and 1:10p.m.

16          (b) *Comparison of March 23, 1983 and March 10, 1983* (RM at 71)

17          As noted above, Detective Monsue testified that there were "similar

18  conditions" on March 23 at the time the photographs looking into the house were

19  taken, and March 10, when Lisker would have looked into the house (RT 265-66);

20  that the photographs taken on March 23, 1983 of the view from outside the house

21  looking into the house "accurately reflected" the view on March 10 (RT 269); and

22  that the sun was "very bright" on both March 10 and March 23 (RT 268), and

23  LAPD photographer Wilson testified that March 10 and March 23, 1983, were

24  both"bright, sunny" days (RT 971, 976 984, 993).

25          Respondent seeks to rebut the evidence proving this testimony false by

26  asserting that Lisker's contention is that there was testimony that the sky cover

27  "was the same" on March 23 as it was on March 10 and then asserts that this

28  contention is "incorrect" because "Detective Monsue's testimony was only that the

1    sun was 'very bright' on both March 10 and March 23." RM at 72, citing RT 971,

2    976, 984. Lisker never made the argument Respondent seeks to rebut but even if

3    he had, Respondent's attempt to defend it as not false would fail; Detective

4    Monsue's testimony and Wilson's testimony was that the lighting from the sun

5    was the same on March 10 and March 23, although they may not have used those

6    exact words, and that testimony was false and untrue.

7        (c) *Time at which the crime scene photographs were taken* (RM at 72)

8        Respondent does not dispute that Wilson's testimony that he began taking

9    pictures of the crime scene at 11:30 a.m. on March 10, 1983 was false and untrue,

10   but simply tries to show the prosecutor did not know it was false and that Wilson

11   did not intentionally lie. RM at 72-73. As explained above, it is of no

12   consequence that the prosecutor himself did not know Wilson's testimony was

13   false because Wilson was a representative of the prosecution. Jackson v. Brown,

14   513 F.3d at 1075. Moreover, even if Respondent were correct that Wilson did not

15   know or have reason to know his testimony was false, that would only affect the

16   standard to be applied in determining whether the false evidence was material.

17   *See* Killian, 282 F.3d at 1208, *quoting*, Young, 17 F.3d at 1204.

18       (d) *The position of the body was not visible to Lisker* (RM 73)

19       Respondent's argues that Monsue's testimony that Lisker's view to the

20   position of the body was obstructed by relying on the reconstruction photo of what

21   is referred to as the "Monsue version." RM at 74-75. The Court explained that

22   Respondent's contention fails because the trial evidence does not support it – the

23   "Monsue version" does not show the body in the location where Monsue said it

24   was, but rather shows the single location where the body would not have been

25   visible, which Respondent then conveniently described – without no supporting

26   evidence – as the "Monsue version." CR 112 at 22.

27       (e) *The shoeprints were Lisker and not another intruder* (RM at 77 & 78)

28       Respondent asserts that Lisker's contention is that Detective Monsue testified

1   the footprints "matched" his Pacer shoes.  Respondent then argues this claim is

2   meritless because Monsue only testified, when asked if he saw any footprints that

3   had a "similar pattern" to Lisker's shoes, that Lisker the shoeprints on the floor

4   "resembled quite closely" the pattern of Lisker's shoes.  In other words,

5   Respondent contends that the testimony was not false because Detective Monsue

6   did not say the shoe patterns matched each other, but only that they were "similar"

7   RM at 77.

8       Lisker did not and does not contend Detective Monsue said the footprint

9   "matched" but rather correctly quoted Monsue's testimony that the footprints

10   "resembled quite closely" Lisker's shoes.  Respondent's attempt to semantically

11   sanitize this testimony as not being false is unavailing.  Monsue's testimony that

12   Lisker's shoeprint and the shoeprint in blood were "similar" allowed for the

13   possibility that the bloody shoeprint was in fact made by Lisker's shoes.  As was

14   proved at the federal evidentiary hearing, that is not true, *i.e.*, it is false.  Both an

15   LAPD and FBI criminalist testified that they had conclusively determined that the

16   bloody shoeprint was not and could not have been made by Lisker's shoes.

17       Respondent's further argument that the other footprints at the scene may have

18   been left by police personnel and not an intruder is unavailing for the detailed

19   reasons the Court has articulated.  CR 112 at 24-26.

20

21

22

23

24

25

26

27

28

**F.  Ground 4:        The Cumulative Effect of the Errors Entitle Petitioner to Relief**

The cumulative effect of constitutional errors can constitute a basis for relief even if the errors individually do not.  See Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed.2d 297  (1973)  Whether Lisker's claims are viewed individually, or in combination, he was denied a fair trial.  See e.g. Whelchel v. Washington, 232 F.3d 1197, 1203 (9th Cir. 2000) ("Cumulative error applies where, `although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudiced a defendant'"); Jackson v. Calderon, 211 F.3d 1148, 1161 (9th Cir. 2000); see also Burns v. Wilson, 346 U.S. 137, 142,  73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (the cumulative effect of allegations in a habeas corpus petition can depict fundamental unfairness).  Accordingly, the errors discussed in this petition, both individually and cumulatively, warrant and require habeas relief.

## V.

## Conclusion

For all the above reasons, this Court should issue a conditional writ of habeas corpus directing that Petitioner be released from custody unless he is retried within 60 days.