# EXHIBIT A

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

**BRUCE E. LISKER,**

On Habeas Corpus.

S150233

Los Angeles County Superior Court No. A804566
The Honorable Richard G. Kolostian, Judge

**INFORMAL RESPONSE TO PETITION
FOR WRIT OF HABEAS CORPUS**

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

PAMELA C. HAMANAKA
Senior Assistant Attorney General

KRISTOFER JORSTAD
Deputy Attorney General

JOHN YANG
Deputy Attorney General

ROBERT DAVID BRETON
Deputy Attorney General
State Bar No. 73686
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone: (213) 897-2279
  Fax: (213) 897-6496
  Email: Robert.Breton@doj.ca.gov

Attorneys for Respondent

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ... 1

STATEMENT OF FACTS ... 4

SUMMARY OF ARGUMENT ... 5

ARGUMENT ... 7

    I. PETITIONER'S PIECEMEAL PRESENTATION OF CLAIMS BARS THEIR CONSIDERATION ... 7

    II. PETITIONER'S DELAY IN THE PRESENTATION OF CLAIMS BARS THEIR CONSIDERATION ... 14

    III. PETITIONER IS NOT ENTITLED TO A SECOND APPEAL ... 15

    IV. PETITIONER HAS FAILED TO SATISFY THE FUNDAMENTAL-MISCARRIAGE-OF-JUSTICE EXCEPTION TO THE PROCEDURAL BAR AGAINST SUCCESSIVE AND UNTIMELY PETITIONS WITH UNREFUTABLE EVIDENCE THAT POINTS UNERRINGLY TO HIS FACTUAL INNOCENCE ... 17

        A. Lie Detector ... 26

        B. Petitioner's Confession To Robert Hughes (Hughes) ... 27

        C. Guilty Plea ... 30

        D. Statement To Probation Officer Barron ... 30

        E. Statement To Dr. LeGassick ... 32

**TABLE OF CONTENTS  (continued)**

| | | Page |
|---|---|---|
| F. | Statement To Dr. Fukushima | 32 |
| G. | Statement To Dr. Davis | 33 |
| H. | Statement To Dr. Holland | 33 |
| I. | Statement To Correctional Counselor Guss | 34 |
| J. | Statement To Dr. Martin | 34 |
| K. | Statement To Correctional Counselor Rianda | 35 |
| L. | Statement To 1992 Parole Board | 35 |
| M. | Statement To Correctional Counselor Mayol | 39 |
| N. | Statement To 1993 Parole Board And Confession To His Attorney | 39 |
| O. | Statement To Correctional Counselor Kong | 40 |
| P. | Calculated Delay Of The Claim Of Innocence | 40 |
| Q. | Attorneys Advised Petitioner To No Longer Admit Guilt | 42 |
| R. | Circumstantial Evidence Confirming Petitioner's Factual Guilt | 44 |
| S. | No Forced Entry And Neatly Stacked Glass Panes | 44 |
| T. | Blood Spatter Evidence | 45 |
| U. | Petitioner's Suspicious Statements And Actions At The Scene | 51 |

000081

**TABLE OF CONTENTS  (continued)**

Page

V.  Petitioner's Suspicious Statement To The Police (Claim To Have Seen Victim From Outside The Living Room Window)                                         54

W.  Suspicious Statement To The Police:  His Claim To Have Seen His Mother's Head From The Dining Room Sliding Door                                       58

X.  Other Statements To Monsue                                   65

Y.  Motive Evidence:  Stronger Than At Trial               66

Z.  Lack Of Sufficient Third-Party Culpability Evidence   70

   1.  Theft And Assault By Adopted Son; Not Robbery By Third Party                                              70

   2.  Money Hidden In Attic:  Monsue's Letter Involved An Innocent Misrecollection                               71

   3.  Ryan Not Connected To Crime Scene               75

      a.  Not A DNA Case                               75

      b.  No Motive Evidence                         76

      c.  No Third-Party Confession Evidence   76

      d.  Telephone Call From Lisker Residence   77

      e.  No Eyewitness Testimony Placing Ryan At Scene                                              79

      f.  Shoe Impressions Left At The Scene Were Not Ryan's                                         79

      g.  The Impression On The Victim's Head Was Not A Shoe Impression                           86

iii

## TABLE OF CONTENTS (continued)

Page

h.    Even If Ryan Were Somehow Involved, That
      Would Not Show Petitioner's Innocence          91

V.    **NONE OF PETITIONER'S CLAIMS ESTABLISH
      A PRIMA FACIE CASE FOR RELIEF**                92

A.    Claim That Petitioner's Conviction Was Obtained
      Through The Presentation False Evidence That
      Contributed To The Verdict                     95

B.    Claim That Petitioner Was Denied Effective Assistance
      Of Counsel At Trial                            98

C.    Claim That The State Knowingly Exploited An
      Opportunity Interrogate Petitioner Without Counsel   101

D.    Claim That The Cumulative Effect Of The Above
      Constitutional Errors Justifies Relief         105

CONCLUSION                                           106

# TABLE OF AUTHORITIES

Page

**Cases**

*Araujo v. Chandler*
(7th Cir. 2005) 435 F.3d 678 ..... 75

*Arizona v. Fulminante*
(1991) 499 U.S. 279
111 S. Ct. 1246, 113 L. Ed. 2d 302 ..... 21

*Blackledge v. Allison*
(1977) 431 U.S. 63 ..... 20

*Bousley v. United States*
(1998) 523 U.S. 614
[118 S. Ct. 1604, 140 L. Ed. 2d 828] ..... 13, 19

*Bruton v. United States*
(1968) 391 U.S. 123
88 S. Ct. 1620, 20 L. Ed. 2d 476 ..... 21

*Calderon v. Thompson*
(1998) 523 U.S. 538
[118 S.Ct. 1489, 140 L.Ed.2d 728] ..... 13

*Carriger v. Stewart*
(9th Cir. 1997) 132 F.3d 463 ..... 25, 26

*Escamilla v. Jungwirth*
(7th Cir. 2005) 426 F.3d at 868 ..... 21, 23, 24

*Gideon v. Wainwright*
(1963) 372 U.S. 335 ..... 16

*Giglio v. United States*
(1972) 405 U.S. 150
[92 S.CT. 763, 31 L.Ed.2d 104] ..... 95

## TABLE OF AUTHORITIES  (continued)

Page

*Griffin v. Johnson*
(9th Cir. 2003) 350 F.3d 956                                          23

*Herrera v. Collins*
506 U.S. 390
[113 S. Ct. 85, 861, 122 L. Ed. 2d 203 (1993)          13, 20-22, 40, 94

*House v. Bell*
(2006) ___ U.S. ___
[126 S.Ct. 2064, 2087, 165 L.Ed.2d 1]                   13, 20, 24, 66, 76

*In re Alvernaz*
(1992) 2 Cal.4th 924                                                 99

*In re Avena*
(1996) 12 Cal.4th 694                                                99

*In re Clark*
(1993) 5 Cal.4th 750                       5, 7-9, 11, 14, 15, 92, 94, 105

*In re Cudjo*
(1999) 20 Cal.4th 673                                                99

*In re Dixon*
(1953) 41 Cal.2d 756                                                 15

*In re Hall*
(1981) 30 Cal.3d 408                                     11, 12, 95, 105

*In re Hardy*
(2007) 41 Cal.4th 977                                             5, 76

*In re Harris*
(1993) 5 Cal.4th 813                                              15-17

*In re Imbler*
(1963) 60 Cal.2d 554                                                 95

vi

## TABLE OF AUTHORITIES  (continued)

| | Page |
|---|---|
| *In re Neely*<br>(1993) 6 Cal.4th 901 | 102 |
| *In re Robbins*<br>(1998) 18 Cal.4th 770 | 92-93 |
| *In re Ross*<br>(1995) 10 Cal.4th 184 | 99 |
| *In re Sanders*<br>(1999) 21 Cal.4th 697 | 14 |
| *In re Sassounian*<br>(1995) 9 Cal.4th 535 | 95 |
| *In re Stankewitz*<br>(1985) 40 Cal.3d 391 | 14 |
| *In re Swain*<br>(1949) 34 Cal.2d 300 | 92 |
| *In re Waltreus*<br>(1965) 62 Cal.2d 218 | 15, 76 |
| *In re Weber*<br>(1974) 11 Cal.3d 703 | 5, 18, 105 |
| *In re Williams*<br>(1994) 7 Cal.4th 572 | 103, 104 |
| *In re Winchester*<br>(1960) 53 Cal.2d 528 | 16 |
| *In re Wright*<br>(1978) 78 Cal.App.3d 788 | 105 |

## TABLE OF AUTHORITIES  (continued)

           **Page**

*Kuhlmann v. Wilson*
(1986) 477 U.S. 436
[106 S. Ct. 2616, 91 L. Ed. 2d 364]         12, 27, 102

*Maine v. Moulton*
(1985) 474 U.S. 159
[106 S.Ct. 477, 88 L.Ed.2d 481]         102

*Massiah v. United States*
(1964) 377 U.S. 201
[84 S.Ct. 1199, 12 L.Ed.2d 246]         2, 29, 102

*McCleskey v. Zant*
(1990) 499 U.S. 467
[111 S.Ct. 1454, 113 L.Ed.2d 517]         12

*Miranda v. Arizona*
(1966) 384 U.S. 436
[86 S.Ct. 1602, 16 L.Ed.2d 694]         1

*Murray v. Carrier*
(1986) 477 U.S. 478
[106 S. Ct. 2639, 91 L. Ed. 2d 397]         12, 13

*Napue v. Illinois*
(1959) 360 U.S. 264
[79 S.Ct. 1173, 3 L.Ed.2d 1217         95

*People v. Arguello*
(1965) 63 Cal.2d 566         102

*People v. Beeler*
(1995) 9 Cal.4th 953         99

*People v. Berryman*
(1993) 6 Cal.4th 1048         99

# TABLE OF AUTHORITIES  (continued)

                                                                    Page

*People v. Cudjo*
(1993) 6 Cal.4th 585                                                  99

*People v. Cunningham*
(2001) 25 Cal.4th 926                                                 99

*People v. Duvall*
(1995) 9 Cal.4th 464                                               92, 99

*People v. Earp*
(1999) 20 Cal.4th 826                                                105

*People v. Fairbank*
(1997) 16 Cal.4th 1223                                               103

*People v. Farnam*
(2002) 28 Cal.4th 107                                                 99

*People v. Gonzalez*
(1990) 51 Cal.3d 1179                                        11, 93, 102, 105

*People v. Green*
(1980) 27 Cal.3d 1                                                    98

*People v. Hinton*
(2006) 37 Cal.4th 839                                                 98

*People v. Holt*
(1997) 15 Cal.4th 619                                                 99

*People v. Hovey*
(1988) 44 Cal.3d 543                                                 102

*People v. Howard*
(1988) 44 Cal.3d 375                                                 103

*People v. Huggins*
(2006) 38 Cal.4th 175                                                102

## TABLE OF AUTHORITIES  (continued)

Page

*People v. Karis*
(1988) 46 Cal.3d 612                                                                99

*People v. Mattson*
(1990) 50 Cal.3d 826                                                                98

*People v. Maury*
(2003) 30 Cal.4th 342                                                               98

*People v. Medina*
(1990) 51 Cal.3d 870                                                               103

*People v. Memro*
(1995) 11 Cal.4th 786                                                          103, 104

*People v. Miranda*
(1987) 44 Cal.3d 57                                                            102, 103

*People v. Pensinger*
(1991) 52 Cal.3d 1210                                                         102, 103

*People v. Romero*
(1994) 8 Cal.4th 728                                                                93

*People v. Visciotti*
(1996) 14 Cal.4th 325                                                               93

*People v. Whitt*
(1984) 36 Cal.3d 724                                                           102-104

*People v. Williams*
(1988) 44 Cal.3d 1127                                                              104

*People v. Williams*
(1997) 16 Cal.4th 153                                                              103

## TABLE OF AUTHORITIES  (continued)

Page

*Sawyer v. Whitley*
(1992) 505 U.S. 333
[112 S. Ct. 2514, 120 L. Ed. 2d 269]                    12, 76

*Schlup v. Delo*
(1995) 513 U.S. 298
115 S. Ct. 851, 130 L. Ed. 2d 808          3, 12, 13, 26, 27, 40, 79, 94

*Schlup v. Delo*
(E.D. Mo. 1995) 912 F. Supp. 448                         27

*Strickland v. Washington*
(1984) 466 U.S. 668
[104 S.Ct. 2052, 80 L.Ed.2d 674]                         99

*United States v. Agurs*
(1976) 427 U.S. 97
[96 S.Ct. 2392]                                          95

*United States v. Bagley*
(1985) 473 U.S. 667
[105 S.Ct. 3375, 87 L.Ed.2d 481]                         95

*United States v. Henry*
(1980) 447 U.S. 264
[100 S.Ct. 2183, 65 L.Ed.2d 115]                        102

**Constitutional Provisions**

U.S. Const., Amend. VI                                  102

## TABLE OF AUTHORITIES  (continued)

|  | Page |
|---|---|
| **Statutes** | |
| 28 U.S.C. § 2244 | 3 |
| Evid. Code § 351.1 | 27 |
| Penal Code: | |
| § 187 | 1 |
| § 189 | 1 |
| § 5011 | 23 |
| § 12022 | 1 |
| **Court Rules** | |
| Cal. Rules of Ct., Rule 8.380 | 4 |

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

**BRUCE E. LISKER,**

On Habeas Corpus.

S150233

## PRELIMINARY STATEMENT

The Los Angeles County District Attorney filed an information charging Petitioner with murder and deadly-weapon use (Cal. Penal Code §§ 187, 189, 12022(b)). After the trial had begun and extremely incriminating evidence had been introduced, Petitioner stopped the proceedings and pled guilty to second-degree murder, conceding that there was factual basis for the plea. He was sent to the Youth Authority to be evaluated, but when it was determined he was not amenable to treatment, he was returned to the superior court, and a second jury trial was commenced. (CT 229; Exh. A; Pet. Exh. CCC 508.)

Following the jury trial, Petitioner was convicted of second-degree murder with use of a deadly weapon. On February 7, 1986, he was sentenced to state prison for an indeterminate term of sixteen years to life. (CT 379; Pet. Exh. E.) The California Court of Appeal affirmed the judgment of conviction on December 22, 1988, after finding that (1) the admission of Petitioner's statements in violation of Petitioner's *Miranda*[1] rights was harmless beyond a reasonable doubt; and (2) there was no evidence that an jailhouse informant had

---

1. *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

been placed as a government agent to interrogate Petitioner in violation of *Massiah*[2]. (Pet. Exh. F.)

On January 13, 1989, Petitioner filed a petition for rehearing in the Court of Appeal (Pet. Ex. G), which denied it on January 20, 1989 (Exh. H). Petitioner attempted to file a untimely petition for review, but this Court denied his request for leave to file the petition late. (Pet. 5.) On March 31, 1989, Petitioner filed a habeas corpus petition in this Court, alleging that (1) his conviction was based on the false testimony of that jailhouse informant; (2) his trial attorney provided ineffective representation with regard to the missing money evidence, the blood spatter evidence, and the jailhouse informant evidence; and (3) the California Court of Appeal's harmless error determination should have been submitted to a jury. (Pet. Exh. I), and on April 25, 1989, the petition was denied "for failure to allege sufficient facts." (Pet. Exh. J.)

Fourteen years later, on February 24, 2003, Petitioner filed a habeas corpus petition in the Los Angeles County Superior Court, alleging (1) the same *Massiah* violation; (2) ineffective assistance of counsel as a result of defense counsel's alleged failure to present third-party-culpability evidence; and (3) presentation of false evidence through the testimony of the jailhouse informant. (Pet. Exh. K.) On March 6, 2003, the Superior Court denied the habeas petition on the merits, finding that Petitioner's assertions were based on false assumptions, were not supported by the facts, and were "a stretch of credibility immersed in speculation," and noting that Petitioner had previously entered a guilty plea (before he was found unsuitable for placement at the Youth Authority and was sent back for trial), and that he had admitted to counselor for the Youth Authority before trial and to the parole board after his conviction that "he did kill the victim." (Pet. Exh. L.)

---

2. *Massiah v. United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246].

On July 28, 2003, Petitioner filed a habeas petition in the California Court of Appeal, making the same claims of *Massiah* violation, ineffective assistance of counsel regarding presentation of third-party-liability evidence, and presentation of false testimony. (Pet. Exh. M.) The California Court of Appeal denied the petition on the merits on August 5, 2003. (Pet. Exh. N)

On August 18, 2003, Petitioner filed in this Court a petition for review following the Court of Appeal's denial of the habeas corpus petition. In the petition for review, he advanced the same three claims that he had presented to the California Court of Appeal. (Pet. Exh. L.) This Court denied the petition for review on October 29, 2003, with two justices stating that the petition for review should be granted. (Pet. Exh. A.)

On April 16, 2004, Petitioner filed a Petition for Writ of Habeas Corpus with the United States District Court of California (hereinafter referred to as federal court), and amended it on May 12, 2004, alleging the *Massiah* violation and ineffective assistance of counsel. (Pet. Exh. P.) Respondent moved to dismiss, arguing the action was barred under the one-year statute of limitations of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) because it was filed seven years past the one-year deadline. (Pet. Exh. Q, Item # 10; see 28 U.S.C. § 2244(d).) Petitioner countered that he should be exempt from the timeliness bar because he could make a credible gateway showing of actual innocence under *Schlup v. Delo* (1995) 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (*Schlup*). (Pet. Exh. Q, Item # 20.) After considerable briefing on the legal issue of whether a *Schlup* gateway innocence showing could excuse untimeliness under the AEDPA, and following an evidentiary hearing to develop some of the facts surrounding the actual innocence claim (Pet. Exh. Q, Items # 78-94), the magistrate judge recommended in his Report and Recommendation that the federal court deny the motion to dismiss and that the merits of the petition be reached despite its untimeliness. (Pet. Exh. B.) On

3

October 10, 2006, the federal court issued its Order accepting the Report and Recommendation, and adopting it as its own findings and conclusions. (Pet. Exh. C.)

Petitioner then filed a motion to amend his federal habeas petition to add a false evidence claim based on the evidence developed at the evidentiary hearing, and a cumulative error claim, conceding that these two claims were unexhausted since the facts presented at the hearing in support of the false evidence claim were not presented to this Court in the previous petition for review following denial of the habeas corpus petition. (Pet. Exh. Q, Item # 123.) Respondent opposed the motion on exhaustion grounds, maintaining that this Court should be given the opportunity to consider the new facts and order an evidentiary hearing on both the interrelated actual innocence and false evidence claims. (Pet. Exh. S.) On January 12, 2007, the magistrate judge granted Petitioner's motion to file a Second Amended Petition and then stayed the proceedings so that Petitioner could seek relief in this Court. (Pet. Exh. D.)

On February 13, 2007, Petitioner filed the instant "exhaustion" petition for writ of habeas corpus (Petition), and lodged 55 exhibits. On August 8, 2007, he lodged an additional exhibit. By letter dated August 24, 2007, this Court requested respondent to file an informal response on the merits to the petition pursuant to Rule 8.380 of the California Rules of Court.

## STATEMENT OF FACTS

Respondent adopts and incorporates by reference the Statement of Facts set forth in the opinion of the California Court of Appeal. (Pet. Exh. F.)

## SUMMARY OF ARGUMENT

In the instant Petition, Petitioner raises the following claims for relief:  (1) false
evidence; (2) ineffective assistance for failure to investigate and present a third-
party culpability defense; (3) the *Massiah* violation; and (4) cumulative impact
of these three claims.  (Pet. 3-4B.)

The Petition should be denied on procedural grounds since it is untimely
and  successive and attempts to achieve a second appeal of the conviction.
Petitioner has failed to demonstrate that he qualifies under California's actual
innocence exception to these procedural defaults, and he does not even present
a substantive actual innocence claim to this Court.  (See *In re Hardy* (2007) 41
Cal.4th 977, 1016-1018; *In re Clark* (1993) 5 Cal.4th 750, 790; *In re Weber*
(1974) 11 Cal.3d 703, 724.)   Instead, Petitioner disingenuously tries to
shoehorn his innocence claim into the exception for constitutional error leading
to a trial so fundamentally unfair that absent the error no reasonable jury would
have convicted him, but this argument is unavailing since, in assigning as
constitutional error the presentation of false "evidence," he points only to new
evidence that was *not* presented to the jury, rather than to any false evidence
that *was* presented.

Throughout the Petition, Petitioner refers to, and relies upon, certain
conclusions reached by the federal court on his actual innocence claim.
Respondent takes exception to the federal court's flawed findings.  The federal
court's review of the record was one-sided, leaning over backwards to reach
questionable deductions from isolated pieces of evidence and ignoring relevant
all evidence to contrary.  It simply did not consider whether the evidence could
.be interpreted to permit the conclusion that there is probably at least one juror
who would reasonably find Petitioner guilty, based on all the evidence,
including his numerous confessions and his initial guilty plea.

Instead, the federal court strained to identify and rely on only those facts and inferences that undermined the state's position, and it discounted all the rest. An even-handed consideration of this case would acknowledge that the evidence as a whole certainly did not establish that Petitioner is so clearly, unerringly, and unmistakably innocent of the crime of murdering his adoptive mother that not one single reasonable juror would likely vote to convict him. Put differently, the totality of the evidence of guilt is so overwhelming that a single juror who found Petitioner guilty could not be accused of being unreasonable.

It is not unreasonable to conclude, respondent submits, that when a defendant pleads guilty and confesses that he is pleading guilty because he actually committed the crime, he must be guilty. It is not unreasonable to conclude that when a defendant tells fifteen different persons in fifteen different serious settings that he actually killed his mother, explains why he did it, and expresses remorse for doing so, he must be telling the truth. Petitioner is not innocent in any sense of the word, and the conclusion is inescapable: he is guilty, legally and factually.

Regarding the merits, the grounds presented in the Petition cannot carry the day. Petitioner has failed to state a prima facie case as to his federal constitutional claims, and most significantly, he has not presented an affidavit or declaration from defense counsel regarding any of counsel's alleged deficiencies. If this Court finds that Petitioner has stated a prima facie case and issues an order to show cause, returnable in the superior court, each of the factual assertions can be countered, in addition to their cumulative effect and any claim that the judgment has been undermined and actual innocence shown.

# ARGUMENT

## I.

## PETITIONER'S PIECEMEAL PRESENTATION
## OF CLAIMS BARS THEIR CONSIDERATION

This is the third time Petitioner has sought habeas corpus relief from this Court. His first habeas petition was filed in 1989, presenting claims of false testimony from the jailhouse informant and ineffective assistance of counsel relating to missing money evidence, blood spatter evidence, and jailhouse informant evidence. (Pet. Exhs. I, J.) He filed his second petition in 2003, advancing claims of a *Massiah* violation and ineffective assistance of counsel resulting from an allegedly inadequate investigation and presentation of third-party-culpability evidence. (Pet. Exhs. A, L.) He returns now to present claims of false evidence, ineffective assistance for failure to present third-party-culpability evidence, a *Massiah* violation, and cumulative effect. (Pet. 4-4B)

Piecemeal collateral attacks on a final judgment are not condoned. (*In re Clark, supra,* 5 Cal.4th at pp. 769-770.) Therefore, before the claims in this successive petition may be entertained on their merits, Petitioner must either (1) explain and justify his failure to present them in a prior habeas corpus petition or (2) allege facts demonstrating a fundamental miscarriage of justice. (See *id.* at pp. 774-775.) "Whether there has been a change of counsel is irrelevant to whether the merits of claims raised for the first time in a successive petition should be entertained." (*Id.* at p. 779.)

If the factual basis of a claim was previously unknown to the petitioner, and he had no reason to know of the claim, the claim will be considered on the merits if asserted promptly even when presented in a successive petition. (*In re Clark, supra,* 5 Cal.4th at p. 775.) However, the Court will look to not just what the petitioner himself knew but also to what his then counsel, at the time of the prior habeas corpus petition, knew and to whether the facts *could* have

been discovered earlier, either by the petitioner or by his attorney. (*Id.* at pp. 775, 779.) Therefore, initially, Petitioner

> must show that the facts upon which he relies were not known to him and could not in the exercise of due diligence have been discovered by him at any time substantially earlier . . . .

(*Id.* at p. 779.)

Here, all of Petitioner's claims are based on facts which were known to him, or could and should have been known to him, at the time of his appeal and his earlier habeas corpus petitions. As to those claims, the proffered explanations and justifications for not including the claims in an earlier habeas corpus petition are inadequate, since they arise from facts apparent in the trial or stem from facts that either were known or could have been known -- through the exercise of reasonable diligence -- at the time of trial or at the time of the filing of the earlier habeas corpus petition. Moreover, his two of his claims are repetitious, in that he presented them to this Court in his prior petitions.

Even if Petitioner were to allege that his claims were discovered only after new counsel prepared his second round of habeas petitions starting in 2003, this assertion would be unavailing. As stated above, a change of counsel is inconsequential to the inquiry. The Court looks to what Petitioner and/or his then counsel knew or could have known at the time of the filing of the earlier appeal and habeas corpus petitions, not when subsequent or current counsel learned of the information.

Consideration may be given, of course, to a claim that prior habeas corpus counsel did not adequately represent counsel. But "mere omission" of a newly developed claim does not establish prior habeas corpus counsel incompetency. (*In re Clark, supra,* 5 Cal.4th at pp. 779-780.) The petitioner must allege "with specificity" the facts underlying an assertion that the omission of a claim reflects incompetence of counsel. (*Id.* at p. 780.)

This means petitioner must allege with factual specificity that the issue is one which would have entitled the petitioner to relief had it been raised and adequately presented in the initial petition, and that counsel's failure to do so reflects a standard of representation falling below that to be expected from an attorney engaged in the representation of criminal defendants.

(*Ibid.*)

Here, Petitioner fails to make the requisite showing. Indeed, he does not even attempt to do so, instead conceding that "[his] present petition is a successive and presumptively untimely petition as he has twice before sought habeas relief from this Court." (Memo. 4, 73; see also Pet. 6-6B.)   Having failed to adequately explain and justify not raising the above-listed claims in his prior habeas corpus petitions, those claims will be barred unless Petitioner has alleged facts demonstrating a fundamental miscarriage of justice. (*In re Clark, supra*, 5 Cal.4th at p. 797.)

A fundamental miscarriage of justice is established by showing: (1) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (2) that the petitioner is actually innocent of the crime or crimes of which he was convicted; (3) that the death penalty was imposed by a sentencing authority which had such a grossly misleading profile of the petitioner before it that absent the error or omission no reasonable judge or jury would have imposed a sentence of death; or (4) that the petitioner was convicted under an invalid statute.

(*In re Clark, supra*, 5 Cal.4th at p. 759.)

As to all the unjustified successive claims cited above, Petitioner has alleged certain "facts," developed by counsel for Petitioner at the evidentiary hearing in the federal district court, which, according to Petitioner, demonstrate

a fundamental miscarriage of justice so as to permit consideration of his claims on the merits. (Pet. 6B.) He avers that this evidence satisfies the fundamental-miscarriage-of-justice exception by demonstrating that "no reasonable judge or jury would have convicted [him] of the murder of his mother based on what the prosecution's case would have been absent the false evidence." (Memorandum of Points and Authorities in Support of Petition (Memo.), at 73-74.) These "facts" include: (1) weather reports showing that it was not bright and sunny at the time of the murder; (2) expert opinion that a bloody shoeprint found in the guest bathroom and bloody shoeprint in the kitchen were not Petitioner's; (3) a statement from an exhibits clerk that she found money in the victim's purse after the trial; (4) a receipt showing that Ryan checked into the Hollywood Tropicana Motel under an alias on the day of the murder; (5) a telephone bill showing that a short call (under one minute) was placed on the morning of the murder from the victim's house to a number that was one digit removed from Ryan's mother phone number, but with the wrong area code; (6) Ryan's criminal record years after the murder in this case; and (7) evidence of a patterned imprint of unknown origin on the victim's head. (Memo. 49-52, 60, 63-64.)

However, close examination of these above newly developed facts reveals that Petitioner has not pointed to *false* evidence that was *actually* presented to the jury. Instead, he is pointing to what he calls *new* evidence that was *not* adduced at trial and that he insists *should* have been presented because it would have pointed to his innocence. Hence, not only does his false evidence claim flounder, but so does his fundamental-miscarriage-of-justice claim, at least under the rubric of error of constitutional magnitude resulting in fundamental unfairness.

In other words, Petitioner is deftly trying to avoid calling a spade a spade. The real exception to which he must resort to overcome his procedural

default is the same exception he relied on to excuse the same procedural bar in the federal district court -- the exception for actual innocence -- which in California courts is not even limited to error of constitutional dimension, and which permits consideration of "newly discovered, irrefutable evidence of innocence" not presented to the jury. (See *In re Clark, supra,* 5 Cal.4th at pp. 759, 790, 796-797, 798 fn. 33.) Thus, try as he may to couch his miscarriage-of-justice claim as a claim of unconstitutional presentation of false evidence, Petitioner cannot avoid labeling his miscarriage-of-justice claim for what it really is: an actual innocence claim. And since he relies entirely on the evidence he presented in federal court in support of his actual innocence claim as well as on the federal court's reasoning and findings that the appropriate actual innocence standard had been met, it is obvious that he is attempting to establish his miscarriage-of-justice claim by similarly showing this Court that he is actually innocent within the meaning of *In re Clark.* (See *id.*)

The standard that must be met here to show factual innocence was set forth in *Clark*: Petitioner must demonstrate that he is "actually innocent of the crime or crimes of which the petitioner was convicted." (*Id.* at pp. 797-798.) To do this, Petitioner must present "newly discovered, irrefutable evidence of innocence of the offense . . . of which the Petitioner was convicted. (*Id.* at p. 798, fn. 33.) Then, he must show, to the court's satisfaction, that "the evidence was such that it would 'undermine the entire prosecution case and point *unerringly* to innocence or reduced culpability.'" (*Id.* at p. 797, fn. 32, p. 797, fn. 33, quoting *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1246; italics added.)

As pointed out by this Court in *Clark,* "it is not sufficient that the [newly discovered] evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury." (*In re Clark, supra,* 5 Cal.4th at p. 766, citing *In re Hall* (1981) 30 Cal.3d 408, 417.) The new evidence "must . . . point unerringly to innocence." (*People v. Gonzalez, supra,* 51

11

Cal.3d at p. 1246.) Thus, even new evidence that a third party has admitted his involvement, has lied, has given false alibis, threatened violence and other coercive behavior to dissuade witnesses, has ineffectually explained his incriminating behavior, and his possession of a knife, all of which would definitely have presented a more difficult decision for the jury and might well have created in the minds of the jurors a reasonable doubt as to the Petitioner's guilt, is "not enough . . . to conclude petitioner has carried his heavy burden of demonstrating he is actually innocent." (*In re Hardy, supra,* 41 Cal.4th at pp. 1017-1018.)

This standard is *higher* than the federal miscarriage-of-justice standard. In California,

> [t]he requirement that a petitioner demonstrate his or her innocence requires more than a showing that the evidence might have raised a reasonable doubt as to the guilt of the petitioner. The Petitioner must establish *actual* innocence, a standard that cannot be met with evidence that a reasonable jury could have rejected.

(*Id.* at p. 798 fn. 33). This poses a "heavy burden of satisfying the court that the evidence of innocence could not have been, and presently cannot be, refuted." (*Ibid.*)

By way of contrast, in federal courts, the actual-innocence "gateway" to overcome the successive-petition bar only requires proof -- by preponderance of the evidence -- that it is *more likely than not* that no reasonable juror would have convicted the Petitioner. (*Schlup v. Delo* (1995) 513 U.S. 298 [314-15, 115 S. Ct. 851, 130 L. Ed. 2d 808] (*Schlup*); see also *Sawyer v. Whitley* (1992) 505 U.S. 333, 336, 339 [112 S. Ct. 2514, 120 L. Ed. 2d 269]; *McCleskey v. Zant* (19) 499 U.S. 467, [111 S.Ct. 1454, 113 L.Ed.2d 517]; *Murray v. Carrier* (1986) 477 U.S. 478, 496 [106 S. Ct. 2639, 91 L. Ed. 2d 397]; *Kuhlmann v. Wilson* (1986) 477 U.S. 436, 452, 454 [106 S. Ct. 2616, 91 L. Ed. 2d 364].)

Thus, the *Schlup* standard involves a "probabilistic" assessment of what the chances are that a jury would convict in light of the new evidence. (*Bousley v. United States* (1998) 523 U.S. 614, 623 [118 S. Ct. 1604, 140 L. Ed. 2d 828]; *Schlup*, 513 U.S. at 326-327, 329.)  Even the relatively low standard set forth in *Schlup* is such that, given the extreme rarity of such evidence and the requirement that a case be truly extraordinary in light of the conclusive presumption of guilt, allegations of actual innocence have been summarily rejected in virtually every case in which it has been made. (*Calderon v. Thompson* (1998) 523 U.S. 538, 559 [118 S.Ct. 1489, 140 L.Ed.2d 728]; *Schlup*, 513 U.S. at pp. 321, 324; *Murray v. Carrier*, 477 U.S. at p. 496.)

The standard set by this Court in *Clark*, however, requires the petitioner to "establish" his factual innocence with evidence that "cannot be refuted" and that points "unerringly" innocence – and not merely evidence that casts doubt on whether the jury would have convicted him.  This stringent standard is more akin to the standard applied by the United States Supreme Court to substantive, freestanding claims of innocence. (*House v. Bell* (2006) ___ U.S. ___ [126 S.Ct. 2064, 2087, 165 L.Ed.2d 1]; *Herrera v. Collins*, 506 U.S. 390, 400-404, 417, 423, 430 [113 S. Ct. 85, 861, 122 L. Ed. 2d 203 (1993).)  "Actual innocence means factual innocence, not mere legal insufficiency." (*Bousley v. United States*, *supra*, 523 U.S. at p. 623.)

Petitioner has not met this standard.  Predictably, he insists this Court should decide the issue "without the need for further evidentiary proceedings," claiming the record in support of his actual innocence claim in the federal court was "fully developed" and is "compelling proof that . . . his conviction was based on false evidence." (Memo. 2.)  However, the federal court severely restricted the evidence that could be adduced at the hearing and precluded respondent from presenting highly probative evidence to rebut Petitioner's assertion of factual innocence.  In addition, as will be shown below, the

findings and conclusions reached by the federal district court are untenable and unreasonable.

Petitioner has failed to meet his burden under *Clark* to establish his innocence. As will be shown below, the new evidence is not irrefutable and certainly does not point unerringly to Petitioner's actual innocence. On the contrary, new evidence presented at the hearing convincingly establishes Petitioner's guilt, the most compelling of which is Petitioner's damning out-of-court confessions and solemn declarations of guilt, made to at least 15 officials over a 15-year period, and not heard by the jury at trial. (See Arg. IV, *post.*)

## II.

## PETITIONER'S DELAY IN THE PRESENTATION OF CLAIMS BARS THEIR CONSIDERATION

A successive petition, such as this one, "is, of necessity, a delayed petition." (*In re Clark, supra*, 5 Cal.4th at p. 770.) Just as piecemeal collateral attacks on a final judgment are not condoned, so too are untimely ones. All petitions for writs of habeas corpus should be filed without substantial delay. (*In re Clark, supra*, 5 Cal.4th at pp. 782-786; *In re Stankewitz* (1985) 40 Cal.3d 391, 396, fn.1.)

A petition for writ of habeas corpus in a *capital* case will be presumed timely filed, i.e., without substantial delay, if done so within 90 days of appellant's reply brief. (*In re Sanders* (1999) 21 Cal.4th 697, 704-705.) Petitioner's appeal having concluded in 1988, patently the instant petition would not be presumptively timely even if it were a capital case. Moreover, Petitioner does not even attempt to allege with specificity any facts showing the petition was filed within a reasonable time after Petitioner or counsel knew, or should have known, of facts supporting a claim, and became aware, or should

have become aware, of the legal basis for the claim. (*In re Clark, supra*, 5 Cal.4th at p. 786.)

Thus, the merits of Petitioner's claims cannot be considered absent application of an exception to the procedural bar. (*In re Clark, supra*, 5 Cal.4th at p. 799.) Since the reasons, if any, for the delay must found wanting, and since Petitioner candidly admits that the petition is untimely (Pet. 6, 6B; Memo. 4, 73), his unjustifiably delayed claims are barred unless the Petition has alleged facts that establish a fundamental miscarriage of justice has occurred. This is the same miscarriage-of-justice exception considered when a claim is presented for the first time in a successive petition. (*Id*. at pp. 797-798; see Arg. I, *ante*.)

As will be seen below, Petitioner has failed to met his burden. (See Arg. IV, *post*.)

## III.

## PETITIONER IS NOT ENTITLED TO A SECOND APPEAL

In asserting the *Massiah* violation in Ground 3, Petitioner again alleges the same constitutional claim that was raised and rejected on appeal. (Pet. Exh. F) As a general rule, a convicted criminal defendant may not use habeas corpus as a second appeal. Neither issues which were actually raised on appeal (*In re Waltreus* (1965) 62 Cal.2d 218, 225), nor issues which could have been but were not raised on appeal (*In re Dixon* (1953) 41 Cal.2d 756, 759), will be considered on habeas corpus absent strong justification or the applicability of at least one of four narrow exceptions. (*In re Harris* (1993) 5 Cal.4th 813, 825-829, & fn. 3.)

Absent the necessary justification, an appellate issue will not be entertained on habeas corpus unless: (1) "the claimed constitutional error is both clear and fundamental, and strikes at the heart of the trial process" (*In re*

*Harris*, *supra*, 5 Cal.4th at p. 834); (2) the confining court lacked subject matter jurisdiction (*id*. at p. 836); (3) the confining court acted in excess of its jurisdiction (*id*. at p. 840); or (4) the issue is based on intervening new law (*id*. at p. 841). Petitioner does not assert that these exceptions apply to his *Massiah* claim. (Pet. 6, 6B; Memo. 4, 73.) Even assuming that he did, the first exception goes beyond a "mere assertion that one has been denied a 'fundamental' constitutional right." (*In re Harris*, *supra*, 5 Cal.4th at p. 834.)

Rarely will a denial of a fundamental constitutional right be one which also "strik[es] at the heart of the trial process." (*Id*. at p. 836.) Although the Court has not yet defined the exact boundaries of this exception (*ibid*.), it is narrower than ordinary reversible error which results in a miscarriage of justice. (*Id*., at p. 834 [*Waltreus* exception for error which results in a miscarriage of justice, discussed in *In re Winchester* (1960) 53 Cal.2d 528, 532, is inappropriately broad].) Arguably the exception may encompass only errors which can never be harmless, e.g., complete denial of counsel (*Gideon* v. *Wainwright* (1963) 372 U.S. 335).

Here, Petitioner's claim of *Massiah* error is based on the police reports and trial record, and it was raised on appeal. The only new "evidence" is a grand jury report issued four years after Petitioner's trial, which does not contain relevant evidence that specifically pertains to Petitioner or supports his claim. (Pet. Exh. AAA.) The *Massiah* claim is therefore barred.

In any event, Petitioner's conclusory and general, across-the-board assertion that all of his procedural defaults should be overlooked under the miscarriage-of-justice of justice exception (Pet. 6, 6B; Memo. 4, 73) is inadequate and not well-founded. Even assuming *arguendo* the claimed error might ordinarily be ordinarily reversible, it does not fall within the boundaries of errors that are both clear and fundamental errors and ones which strike at the heart of the trial process. (*In re Harris*, *supra*, 5 Cal.4th at p. 834.) This is

especially so inasmuch as the informant was cross-examined at trial concerning all the circumstances surrounding Petitioner's confession to him, any contact he had with law enforcement personnel before he spoke to Petitioner, and any inducements offered by the People in exchange for his testimony. (See Arg. V, 3, *post*.)

In addition, Petitioner has raised the same claim in his two previous habeas petitions. Consequently, he is merely reworking a claim previously rejected, and the exception to the no-second appeal rule does not apply. Thus, the *Massiah* claim is procedurally barred.

## IV.

### PETITIONER HAS FAILED TO SATISFY THE FUNDAMENTAL-MISCARRIAGE-OF-JUSTICE EXCEPTION TO THE PROCEDURAL BAR AGAINST SUCCESSIVE AND UNTIMELY PETITIONS WITH UNREFUTABLE EVIDENCE THAT POINTS UNERRINGLY TO HIS FACTUAL INNOCENCE

As demonstrated above (Arg. I, *ante*), Petitioner bears an unusually heavy burden to show that he qualifies under the fundamental-miscarriage-of-justice exception for procedural bars. He must show, to the court's satisfaction, that new evidence that cannot be refuted points *unerringly* to his innocence. (*Id.* at p. 797, fn. 32, p. 797, fn. 33.) If anything, the new evidence presented at the hearing in the United States District Court points unerringly to Petitioner's guilt.

At the hearing, Respondent presented uncontroverted evidence that Petitioner pled guilty to murdering his mother, then made an unbroken series of detailed confessions and admissions over the following 15 years to at least 15 people in which he explained over and over again that he murdered his mother and tried to set someone else up for the crime. Indeed, Petitioner did not reverse course and begin to assert his innocence until shortly after the death

of three critical figures in the case -- his adoptive father, who advised him to plead guilty, the family attorney, who also advised him to plead guilty, and the alleged "real killer." Under these circumstances, no reasonable juror would vote to *acquit* Petitioner.

It bears noting at the outset what this case is not. This is not a case in which DNA evidence shows that Petitioner "couldn't have done it." It is not a case in which Petitioner is finally able to establish an air-tight alibi. It is not a case in which "the real killer" finally confesses. (See *In re Weber, supra,* 11 Cal.3d at p. 724.) It is not a case in which an unimpeachable eyewitness comes forward to testify that someone else did it. Most remarkably of all, it is not even a case in which Petitioner has ever stated under oath that he is innocent, let alone subjected himself to cross-examination to test the facially incredible explanation for his decision to reverse course.

No defendant who pleads guilty and then continues to confess in all solemnity and sobriety for the next 15 years that he really did murder his mother can meet the uniquely stringent actual innocence standard and pass through the gateway permitting review of procedurally defaulted claims. Here, the federal district court simply lost sight of the limitations of this uniquely high standard and reached an indefensible result. This Court should under no circumstances adopt the district court's findings or follow the district court's reasoning.

The federal court characterized the evidence adduced at the evidentiary hearing as having "effectively dismantled the case the prosecution presented at trial." (Pet. Exh B at 17.) A comprehensive examination of the evidence, new and old, shows that this conclusion is untenable. While one premise of the prosecutor's case at trial may no longer be valid, it has now been replaced with equally compelling evidence which, along with the other evidence at trial, convincingly establishes Petitioner's guilt. Most compelling of all are

18

Petitioner's damning out-of-court confessions and admissions, made to at least *15 people over 15 years*, and not heard by the jury at trial.

Petitioner's extraordinary and compulsive self-incrimination has now converted the government's evidence into an overwhelming case against him. Yet the federal court shrugged off this unbroken chain of confessions with the astounding conclusion that not one single reasonable juror could possibly believe that fifteen confessions over fifteen years were true. It is difficult to imagine what number of confessions over what period of years would be enough. Whatever the actual innocence standard is, this case does not satisfy it.

No state prisoner who has entered an unqualified guilty plea and then repeatedly admitted his factual guilt following his conviction has ever succeeded in sustaining his burden of showing actual innocence. Indeed, respondent has not located another case where such a prisoner has even been afforded an evidentiary hearing.[3] Yet the federal court discarded in one fell swoop Petitioner's multiple admissions and confessions, all of which are completely credible. In order to reach its extraordinary conclusion, the federal court had to have concluded that *no* reasonable juror could believe that Petitioner was telling the truth when he entered a plea of guilty to murder, then

---

3. In *Bousley v. United States, supra*, 523 U.S. 614, the Supreme Court did hold that a Petitioner who pled guilty may *assert* the *Schlup* gateway to try to pass through a procedural default. (*Id.* at pp. 1611-12.) But the Petitioner in *Bousley*, who pled guilty to possession of drugs for sale and to "using" a firearm "during and in relation to a drug trafficking crime," was *not* alleging that he was factually innocent because he did not possess the drugs for sale or because he did not have the guns in his bedroom, but rather was asserting that *after* he pled guilty, *the law changed* regarding the elements of gun possession during a drug trafficking crime, requiring the prosecution to prove active, rather than passive, employment of the firearm, during the drug transaction. (*Id.* at p. 1606.) Thus, Bousley, unlike Petitioner, claimed that his guilty plea was uninformed. This is hardly the case here, where Petitioner pled guilty to – and stipulated to a factual basis for – a crime whose elements have not changed.

confessed to killing his mother at least 15 more times over 15 years. Put differently, the federal court found that *all reasonable jurors would have believed* Petitioner's about-face, executed years after the crime, and, conveniently, shortly after the deaths of his adoptive father and the "real killer," Ryan. On the contrary, it is far more plausible to conclude that no reasonable juror would be so credulous.

A review of Petitioner's multiple confessions, in which he often explained in gruesome and revealing detail how and why he murdered his adoptive mother, and how he tried to make it look like Ryan had done it, proves just the opposite of the conclusion reached in the R&R. That review proves Petitioner's guilt.

Admissions *matter*, and multiple confessions over a sustained period of time confirm and re-confirm guilt, more than merely "at first blush." (Pet. Ex. B 54.) The United States Supreme Court recently relied on two extrajudicial admissions in arriving at its decision on an actual innocence claim. (*House v. Bell, supra*, ___ U.S. at ___, 126 S.Ct. at p. 2087.) Even more pointedly, Justice O'Connor noted in *Herrera* that "the most compelling piece of evidence" and "the most damaging piece of evidence" defeating the actual innocence claim was the state prisoner's (Herrera's) own confession. (*Herrera v. Collins, supra*, 506 U.S. at pp. 422-423 (O'Connor, J. concurring opn.).) "One could hardly ask for more unimpeachable–or more unimpeached–evidence of guilt." (*Id.* at 424.)

A guilty plea is a solemn declaration in open court that a defendant in fact is guilty of the offense with which he is charged and it carries "a strong presumption of verity." (*Blackledge v. Allison* (1977) 431 U.S. 63, 74, 97 S. Ct. 2098, 52 L. Ed. 2d 126 (1977).) The most critical factual shortcoming of the federal court is that it characterized Petitioner's *unqualified* guilty plea, accompanied by a stipulated factual basis, as procedural posturing conducted

20

only to obtain a CYA commitment for a crime he probably did not commit. But by pleading guilty, Petitioner admitted the truth of every element of the crime, and courts do not allow prisoners to start with clean slates after their convictions and argue 'actual innocence' as if the [guilty plea] had not occurred." (*Escamilla v. Jungwirth* (7th Cir. 2005) 426 F.3d at 868, 871.)

A guilty plea -- confirmed and corroborated by years of additional confessions -- must surely carry a conclusive presumption of verity. These principles are not novel, or controversial, or untested. They are bedrock elements of the legal system. Yet these principles are entirely absent from the federal court's analysis.

The Supreme Court has observed that a defendant's own confession "is like no other evidence," and "'is probably the most probative and damaging evidence that can be admitted against him . . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.'" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296, 111 S. Ct. 1246, 113 L. Ed. 2d 302, quoting *Bruton v. United States* (1968) 391 U.S. 123, 139-140, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (dis. opn. of White, J.).

Petitioner's confessions are the "most compelling piece[s] of evidence" available because they are "entirely of Petitioner's own making." (*Herrera v. Collins*, *supra*, 506 U.S. at p. 422.) Petitioner pled guilty and then confessed the crime over and over, in multiple contexts and serious settings. His present assertions of innocence ring hollow and are barely audible when surrounded and covered by the reverberating, deafening blasts of his multiple confessions.

Of course, Petitioner belatedly protests his innocence, asserting he merely wanted to curry favor with the prison counselors, psychiatrists, psychologists, sociologists, and parole board members. The Supreme Court has cautioned that an assertion that a Petitioner's last-minute, self-serving

declaration that he is innocent and that someone else committed the murder should be treated "with a fair degree of skepticism," since it was made "at the eleventh hour with no reasonable explanation for the . . . delay," and even more so because Petitioner "blame[s] a dead man – someone who will neither contest the allegations nor suffer punishment as a result of [Petitioner's allegations]." (*Id.* at 423.) Here, the federal court replaced that sound and reasonable skepticism with credulity.

Petitioner completely failed the polygraph examination that was administered the day of the crime, and soon thereafter he admitted to a jail inmate the details of the crime, how and why he committed it, and how he staged the crime scene and tried to make it look like an intruder had done it. This is *not* a case involving a single jail-house informant of dubious reliability, however. Petitioner's confessions and admissions kept accumulating for years.

After Petitioner pled guilty to the crime and stipulated to a factual basis for the plea, he fully admitted to various probation officers, correctional counselors, psychologists, psychiatrists, and the parole board that he committed the matricide and he told them why he killed his adoptive mother. The sheer number and nature of his admissions of guilt is the most relevant and reliable evidence of all on the issue of factual innocence. This vast accumulation provides a complete picture, showing conclusively how and why Petitioner committed the matricide, since no one knows better that Petitioner actually committed the crime than Petitioner himself. These admissions of guilt -- to his father, the police, the jailhouse informant, the trial court, the probation officers, the counselors and psychologists at CYA, the counselors and psychologists at state prison, and the parole board -- refute the district court's conclusion that a credible claim of actual innocence had been demonstrated.

Yet incredibly, the federal court made short shrift--and minimized the significance of--these multiple confessions and admissions of guilt, stating that

there was no factual basis for the plea, that very little detail was provided by Petitioner in each of his confessions, and that the confessions were obviously made only in an attempt to gain placement in the California Youth Authority (CYA) or to secure a parole date. (Pet. Exh. B at 35-38, 55-56.) But as noted in an actual innocence case decided by the Ninth Circuit, confessions made to prison doctors and psychologists are highly reliable. (*Griffin v. Johnson* (9th Cir. 2003) 350 F.3d 956, 964 (crediting the Petitioner's statement to prison doctor, which "strongly suggests that [he] killed the victim deliberately with full appreciation of the nature of his conduct.")

The federal court hypothesized that the only reason Petitioner pled guilty was because his attorneys encouraged him to do so in order to take advantage of the favorable plea bargain, and that the only reason he confessed the crime and expressed remorse to the counselors and psychologists at CYA and at state prison was to obtain favorable recommendations regarding CYA amenability and parole. But in most, if not all of these confessions, Petitioner gave many more details than one who was merely trying to curry favor by acknowledging commission of the crime would ever do, including the way he killed her and how he tried to shift the blame to Ryan. And California law makes it unmistakably clear to state prisoners that they are not required to admit guilt in order to be considered for parole. (Pen. Code, § 5011(b).)

Petitioner's contention in federal court was that his full confession to the 1992 parole board was a outright lie. But Petitioner was sworn to tell the truth at the 1992 hearing, and he was therefore under oath.

It is difficult to see how a collateral attack based on the proposition that the Petitioner's own . . . testimony was a pack of lies has any prospect of success. Litigants must live with the stories that they tell under oath.

(*Escamilla v. Jungwirth, supra*, 426 F.3d at 870.) Since Petitioner did not testify at the actual innocence hearing in federal court, his only sworn

statements on this issue are those given at the 1992 hearing and at a hearing held before the parole board earlier this year.

Although Petitioner did not testify in federal court, he suggested through his present attorneys that he was confessing merely to curry favor with the parole board, in an effort to be granted parole. Many years later, Petitioner, on the advice of his attorneys, began to tell the parole board that he was innocent. But "[h]ow could any court credit statements made by a litigant such as [Petitioner] who trumpets a willingness (indeed, asserts an entitlement) to lie under oath whenever deceit serves his interests?" (*Id.* at p. 870.)

Furthermore, this purported reason for confessing is based on pure conjecture and is unsupported in the record. At the federal court hearing, Petitioner chose not to testify to explain just why he pled guilty and why he uttered each and every admission and confession to so many correctional counselors, probation officers, psychologists, psychiatrists, and parole board members. (See *House v. Bell*, *supra*, 126 S.Ct. at 2087 (the court could evaluate the credibility of the confessor because he testified at hearing). Consequently, there is no reliable, first-hand explanation of why Petitioner repeatedly admitted guilt, and his self-serving, hearsay disavowals of these confessions and his assertions that he did so just to try to impress the authorities ring hollow. The federal court accepted Petitioner's contorted and contradictory cover story on the basis of innuendo and arguments of counsel, not on reliable, direct evidence.

The federal court also made light of Petitioner's thoroughly reliable confessions, noting that his recounting of the manner in which he killed his adoptive mother and his expressions of remorse for doing so were sometimes described as "cold" or "matter-of-fact." (Pet. Exh B at 36-39.) The federal court deduced from this description of Petitioner's calculating or detached demeanor that Petitioner was merely stating what he thought he needed to say

in order to achieve the desired result of convincing the authorities that he was amenable to treatment in CYA or that he had been rehabilitated. (Pet. Exh B at 35-39. But this conclusion is wholly lacking in evidentiary or logical support.

If Petitioner had wanted to fool the authorities, he would have accompanied his false confessions with feigned emotion and fake feelings, knowing that to fail to do so would not accomplish the desired effect. But he did not, and that he did not do so is evidence that he killed his adoptive mother, not evidence that he did not kill her. Having hated and having fought with his mother for so long, and being so manipulative during each prison interview, Petitioner invariably would describe in a cold and calculating manner how and why he murdered her, with no pretense of being emotionally upset about having murdered her, and then tack on that he regretted killing her, arrogantly hoping that this expressionless statement of remorse would suffice to qualify him for CYA or release on parole.

The federal court discounted Petitioner's grave declarations of guilt and failed to give them the weight they deserve. In another actual innocence case decided by the Ninth Circuit, *Carriger v. Stewart* (9th Cir. 1997) 132 F.3d 463, Dunbar, who had testified against Carriger at the trial, later confessed several times, to several different people, that it was he (Dunbar), who had committed the murder, and that he had framed Carriger. The court found that Dunbar's multiple confessions, which were very similar to Petitioner's confessions in quantity and quality, were deemed "most dramatic," reliable, and very probative and persuasive on the issue of actual innocence because Dunbar had provided accurate details of the crime, had described how he tried to "set up" Carriger, and told how gruesome the crime was. (*Carriger v. Stewart, supra*, 132 F.3d at pp. 465, 467-68, 471, 473, 475-76, 478-79.) The court declared: "Considering [these] confessions . . . [,] [i]t is unlikely that any reasonable

juror, knowing that Dunbar confessed under oath to committing the murder, would nonetheless conclude beyond a reasonable doubt that the murder was committed by Carriger." (*Id.* at p. 478.)

The federal court concluded that Petitioner's confessions were not credible because he provided insufficient details and sometimes gave conflicting versions. (Pet. Exh B. at 35-39.) Respondent will review the evidence that undermines that finding. The following evidence establishes that Petitioner not only divulged minute details about the killing itself, but also provided an in-depth account of the genesis of the anger and hatred that motivated the matricide. In other words, Petitioner recounted time after time exactly how he killed his adoptive mother, and why. On the basis of these confessions alone, no reasonable juror would vote to *acquit* Petitioner.

## A. Lie Detector

Under *Schlup*, all relevant evidence is admissible at an evidentiary hearing, without regard to its admissibility at trial. (*Schlup, supra,* 513 U.S. at p. 324.) *Schlup* expressly holds that even "*illegally-obtained* evidence" is admissible to counter an actual innocence claim. (*Id.* at p. 328. Thus, evidence that would normally be excluded under statutory rules of evidence or suppressed as constitutionally protected is admissible at an actual-innocence hearing if it is probative to defeat the assertion of innocence. *Id.* at pp. 327-28.

Here, Petitioner voluntarily submitted to a polygraph examination on the night of the murder. The examiner concluded that Petitioner was "not truthful" in his denials that he had previously injured someone with a weapon, hit his mother with the trophy, that he had stabbed his mother, that he had hit his mother with the exercise bar, and that he had killed his mother. (Ex. B.) Polygraph evidence can be reliable evidence. Indeed, the district court in the *Schlup* case itself relied on polygraph evidence in reaching its conclusion

regarding the actual innocence claim. (See *Schlup v. Delo* (E.D. Mo. 1995) 912 F. Supp. 448, 455.)

The negative results of the polygraph examination are relevant to show why Petitioner confessed the crime shortly thereafter to a jailhouse informant and then pled guilty. Although the opinion of the polygraph examiner is not admissible in any *criminal* proceeding absent a stipulation (Cal. Evid. Code § 351.1(a)), the instant proceedings are not adversarial criminal proceedings. Since, under *Schlup*, all evidence is admissible without regard to its admissibility under the rules of evidence (see *Schlup, supra*, 513 U.S. at p. 328; see also *Kuhlmann v. Wilson, supra*, 477 U.S. at p. 455), the results of a lie detector test were highly relevant and should be considered herein.

### B. Petitioner's Confession To Robert Hughes (Hughes)

While in jail awaiting trial, Petitioner confessed to Hughes that he killed his mother when she refused to give him money, caught him going through her purse, and hit him. Petitioner told Hughes that he stabbed his mother in the back with two knives, hit her in the head with a trophy, hit her repeatedly with an exercise bar, and placed a rope around her neck. (Pet. Exh. BBB 548-557.) These details match the forensic evidence found at the scene of the crime, thus corroborating Hughes' account. Hughes was credible because he received nothing in return for his testimony and because the information he provided in two other criminal cases proved to be reliable, in that one case the defendant pled guilty, and in the other case, the jury convicted the defendant even without Hughes's testimony.

The federal court misstated what occurred between the prosecutor in this case and Robert Hughes. (Pet. Exh B at 14-16, 29-30.) When the prosecutor asked Hughes if he would testify in this case, Hughes asked for only one favor: that the prosecutor find out the status of a case in Orange County wherein

Hughes had testified, and wherein the trial court had indicated that it would
look into the possibility of helping Petitioner shorten his sentence or be granted
parole. Therefore, the only "assistance" that Hughes hoped to obtain from the
prosecutor in this case regarding a reduction of his sentence was merely a letter
of inquiry, not a promise to obtain a reduced sentence for Hughes. (Pet. Exh.
BBB 599, 663-676; Aug. CT 261-66; Exh. C; Pet. Exh. CCC 492-493, 499,
538-539.)

Here, the prosecutor told Hughes in the middle of Petitioner's
preliminary hearing that he had found out that nothing could be done to help
him, and, in the presence of defense counsel, explained to Hughes that Hughes
did not have to continue testifying at the preliminary hearing. He told Hughes
that if he decided to discontinue testifying, his entire testimony at the
preliminary hearing would be stricken, and could not be used at any trial, since
defense counsel had not yet had an opportunity to cross-examine him. After
thinking it over, Hughes told the prosecutor in front of defense counsel that he
had decided not to testify, and defense counsel relayed this information to the
trial court, in front of Petitioner. (Pet. Exh. BBB 673-675, 694-695.)

Hughes changed his mind, however, when he saw the smirk on
Petitioner's face when Petitioner was informed that Hughes would not testify.
Hughes felt it was not right for someone to get away with murdering his own
mother. When Hughes testified at Petitioner's trial, Hughes was already on
parole, and had nothing to gain from testifying. (Pet. Exh. BBB 673-675, 694-
695.)

In addition, Hughes's statements to Detective Monsue and his trial
testimony regarding Petitioner's confession were self-corroborating, since they
related facts known only to the actual killer. Hughes told Monsue that
Petitioner said he hit his mother with a "Bullworker," which is an unusual brand
name for a particular type of exercise bar. The police report in this case referred

only to an "exercise bar," and even then, it was only listed inconspicuously as one of dozens of items that were seized at the Lisker house. The report did not refer to this exercise bar as a Bullworker – only Lisker did. This significant detail strongly corroborates Hughes.

But there were other details Hughes reported that show that Lisker told him about the crime. Hughes said that Lisker had made two calls. This was true: Lisker called both the paramedics and his father. Hughes had no way of knowing this unless Petitioner had confessed it to him, and there was no reason for Hughes to make up a story that Petitioner had called both.

Hughes also said that Lisker *used* multiple weapons. This was true, and only Lisker knew it. Hughes gave the complete sequence of events, and correctly described all the rooms in which the confrontation and assault took place. (Pet. Exh. BBB 1103.) Although the police reports contained some references to property seized and forensic evidence collected, there was no evidence presented that Hughes ever had access to these reports, that Petitioner ever showed them to him, or that one could have gleaned from the reports sufficient information to manufacture a confession regarding which of the items seized had been use as a weapon, in what order they had been used, and where they had been used. (Pet. Exh. BBB 1103-04.)

Moreover, since Petitioner challenges the government's alleged exploitation of his placement in a jail cell next to Hughes and its use of Hughes as an agent to elicit Petitioner's confession, Petitioner is admitting that he actually confessed to Hughes. Neither at trial nor in these proceedings has Petitioner alleged that he never made the statements to Hughes. Thus, the confession is accurate and shows guilt. (See *Massiah*, *supra*, 377 U.S. at [observing that although the confession must be excluded to serve other policies of overriding importance, the confession was "relevant, reliable and highly

probative of the issue which the trial court [had] before it–whether the accused
committed the act with which he [was] charged"].)

       If this Court issues an order to show cause and to hold an evidentiary
hearing, Respondent is prepared to present evidence from Hughes himself that
neither Petitioner nor anyone else every gave him or showed him a copy of the
police report in this case.

### C.  Guilty Plea

       The first conclusive proof in any court of law that Lisker was *not
innocent* came from his own mouth: he *pled guilty*. On December 4, 1984, he
entered a plea of guilty to second-degree murder and admitted using a knife in
the commission of the murder, knowing that the sentence was up to the judge
and that the penalty for second-degree murder was fifteen years to life in state
prison, and stating that he had discussed his rights and any potential defenses
with his attorney and that he was pleading guilty "because *in truth* and *in fact*"
he was guilty.  (Exh. A; CT 229; RT Plea at 4-10, italics added; Pet. Exh. CCC
508.)  Defense counsel agreed that there was a factual basis for the plea, and the
trial court amplified on that concession:  "There is certainly not the slightest
doubt there is a factual basis for his plea."  (Exh. A; RT Plea at 11.)

### D.  Statement To Probation Officer Barron

       On or about January 7, 1985, Petitioner told Deputy Probation Officer
Dennis Barron that he was taking $100 twice a week from his parents to
support his cocaine habit and that he used amphetamines, LSD, tranquilizers,
and psilocybin.  Petitioner's father, Robert Lisker, told Deputy Probation
Officer Barron that when Petitioner "became abusive and disruptive of the
family, he was moved into his own apartment in May, 1982, which was paid for
by his parents."  Petitioner told Officer Barron that he was having "arguments

and fights" with his mother and that the arguments "led to his mother physically striking him and his taking defensive actions." During the interview with Officer Barron, Petitioner's "composure was cool and calm up to the point of discussing the date of the murder, when his composure started to deteriorate." (Exh. D.)

Petitioner told Officer Barron that during the week of the murder, he and his mother argued about money and about the fact that he only went to his parents' home "when he needed things." He stated that the day before the murder, he went to his parents' home asking for food and money, and he argued with his mother. When he returned to the home later that evening for more money, his mother "became angrier" and they both became "highly agitated." (Ex. D; Pet. Exh. CCC 772-773, 819-820, 826-820.)

Petitioner told Officer Barron that on the day of the murder, he went to his parents' home to get money, but his mother was still angry and upset about the arguments the prior day. Frustrated about not being able to ask for more money, Petitioner saw his mother's purse in the hallway near a bedroom and started taking money from it. Petitioner stated that his mother came towards him with a trophy and hit him on the shoulder with it. Petitioner said he grabbed it away from her and hit her in the head with it, causing her to fall to the floor. He stated that he "felt a lot of anger." (Exh. D.)

On or about January 7, 1985, Petitioner amplified his account of the murder. He told Officer Baron that he "panicked," ran around, and looked down at his mother. Petitioner said that he did not have any recollection of how his mother got into the bedroom and then back, did not recall how or why a rope was placed around her neck, and did not remember how his mother got to the entryway, just inside the front door. Petitioner said he did remember taking two knives out of the kitchen. (Exh. D.)

### E. Statement To Dr. LeGassick

In January, 1985, Petitioner's father, Robert Lisker, told Dr. Richard LeGassick (court-appointed) that Petitioner had "a long history of emotional upset with his mother," a "long-standing conflict between [him] and his mother," and that he had threatened her. (Exh. E.)

Petitioner told Dr. LeGassick that he had a fascination with fire and liked to light fires. Petitioner said he had read "Helter Skelter" when he was nine, and then another book on Charles Manson, "The Family." Petitioner stated that he carried a switch blade and loved to shoot guns. (Exh. E.)

Petitioner told Dr. LeGassick that he killed his mother. He stated it was an "awful" and "stupid" thing he had done, that he felt that Satan wanted him to kill his mother, that he did not know why he was so "enraged . . . over so little money." Petitioner did not show any empathy toward his mother. He expressed no remorse and distanced himself from the experience. (Exh. E.)

### F. Statement To Dr. Fukushima

On or about March 4, 1985, Petitioner told Dr. Susan Fukushima (CYA) that at time of the murder, he "needed the money" and was "justified in stealing money from his mother because he had money coming to him from a trust fund, and his mother was "keeping [his] money from [him]." He said he could not remember stabbing his mother and said "it could have gone either way because of their highly conflictual and explosive relationship." He stated that there was "a lot of rage" between him and his mother because she was "highly critical of him," often "antagonistic," and constantly berated him." (Exh. F.)

Petitioner told Dr. Fukushima that he and his mother had frequent arguments and that his mother would throw things at him and would frequently push and hit him. He said that following the murder, he had "trouble sleeping

because he was constantly thinking about what he had done." He stated that on
several occasions he had nightmares about the event. (Exh. F.)

Petitioner told Dr. Fukushima that he had "a great deal of confusion
about being adopted," that he "felt rejected about not being wanted," and was
at times very suspicious of his adoptive parents. He stated that was "frequently
angry and was a 'time bomb.'" He stated he was using marijuana, cocaine,
amphetamines, and barbiturates, and was stealing money from his parents to
support his drug habit. (Exh. F.)

### G. Statement To Dr. Davis

Petitioner told Dr. Adrienne Davis (CYA) that he and his mother were
having "violent, rageful arguments that sometimes lasted entire days." He said
he was involved with drugs. He said the "genuinely felt badly about killing his
mother" and the circumstances surrounding it. (Exh. G.)

### H. Statement To Dr. Holland

On or about April 5, 1985, Petitioner told Dr. Judith J. Holland (CYA)
that he had a history of "ongoing, unrestrained arguments and 'uproar'" with
his mother, all of which grew even more "intense and violent" by the time he
was in the 7th grade. He said that he was a chronic and heavy substance abuser,
that his parents were very critical of this, and that he his mother constantly
argued, "accompanied by both of them physically dashing and scrambling
around the house, upsetting furniture," and engaging in physical violence. He
stated that, with regard to the circumstances surrounding the crime, "He
remembers more than he would like to." (Exh. H.)

Petitioner told Dr. Holland that when his mother discovered him going
through her purse for money, she grabbed a trophy and hit him in the shoulder.
Petitioner stated that he grabbed the trophy from her and hit her over the head

with it, knocking her unconscious.   He said that when he realized the seriousness of the wound he had inflicted, he set about premeditating the actual murder, planning to make it appear that intruders had killed his mother.   He said he stabbed her in the back twice, beat her with the trophy and with an exercise bar, and then tied a rope around her neck.  (Exh. H.)

Petitioner told Dr. Holland that he might have "unconsciously" been copying the modus operandi of the Helter Skelter murder scenes.  He said that he had "begged" his mother to buy him the book "Helter Skelter" when he was seven to nine years old.  Petitioner said he devised an elaborate plan to make it look like someone else had committed the murder, and he told the police that an ex-roommate, Michael Ryan, was the perpetrator.  (Exh. H.)

## I.  Statement To Correctional Counselor Guss

On October 23, 1987, Petitioner told Correctional Counselor James Guss that he committed the murder.  He "expressed guilt, showed remorse, blamed [being] under the influence of narcotics as a reason for [the] offense, and indicated the desire to receive counseling and remain disciplinary free while confined."  (Exh. I.)

## J.  Statement To Dr. Martin

In August, 1989, Petitioner told Dr. Clyde Martin (state prison) that he had murdered his mother.  He blamed the murder on his drug use, stating he was on drugs and alcohol at the time of the matricide.  He expressed no remorse.  He acted "matter-of-fact" about the crime.  He did not appear to be lying.  (Exh. J.)

### K. Statement To Correctional Counselor Rianda

In November, 1992, Petitioner told Correctional Counselor Rianda that he murdered his mother after they argued about money. He said she hit him first with the trophy. He stated he had been drinking and taking methamphetamine that morning, but that he remembered the incident "clearly." Rianda had a vivid memory of Petitioner and his confession. Petitioner gave Rianda "an eerie feeling" and "made chills go up her spine" as he described "in vivid detail" how he killed his mother. His demeanor was very cold and "matter-of-fact" as he was talking. (Exh. K.)

### L. Statement To 1992 Parole Board

On January 3, 1992, Petitioner offered yet another detailed description of both how and why he murdered his mother when he appeared before the parole board for his Initial Parole Consideration Hearing. He was told that he had a right to review his file and to make any corrections or objections to its contents. The gory facts surrounding his commission of the crime were read to him at the hearing, including the sequence of events describing how he hit her in the head with a baseball trophy, causing it to cave in, he stabbed her with two knives, puncturing her left lung, put a rope around her neck, and beat her with an exercise bar. Petitioner was then asked, "Is that approximately what happened," and his reply was, "Essentially, yes." (Exh. L.)

At the January 3, 1992 hearing, Petitioner was asked if was stealing money from his mother's purse, or attempting to do so, and Petitioner answered, "Attempting to." Petitioner was asked, "And she caught you and you murdered her," to which he responded, "Yes, sir." He admitted that "The entire thing happened. It was all one incident to me." He remembered that the murder "happened in several rooms of the house," but "mostly in the family room." (Exh. L.)

35

Petitioner stated that he had been arguing with his mother that morning for about 30 minutes. He needed the money to pay off a drug debt, and his father had said that he could have the money. When he started taking the money, his mother hit him on the shoulder with the trophy, and he spun around, grabbed it from her, and killed her. He immediately decided to make it appear like somebody else had done it — even before he dialed 911. He "called the paramedics first and then [he] did the window." (Exh. L.)

Petitioner was asked if it was correct that he "set up the murder to [make it] look like somebody else had committed it." Petitioner said that, "As soon – the instant that I had committed the act, I . . . was in and out and I really lost it. I did a few things that I . . . . The money was all over the ground. I threw that in my old bedroom." (Exh. L.)

Petitioner averred, "I do remember everything. I'm not trying to deny that I remember everything." However, he could not remember why he put the rope around his mother's neck: "I asked myself why . . . ." He said, "In the moments of the assault [on his mother], I don't know my motives for it. I was enraged at the time. Totally and completely." He said that right after he stabbed her, he "couldn't attach words to it." (Exh. L.)

Petitioner was again asked if he "set the scene up so that it looked like somebody had broken into the house and killed [his] mother." Petitioner agreed, stating, "And then I went and took the panes out of the window and made it look like somebody broke in." When asked if he knew what he was doing, Petitioner stated, "I was planning to make it look like somebody else did it." Part of the staging of the murder was to use two knives and to place a rope around his mother's neck, as "a replica" of the Manson murders. He was "attempting to try and put it off on something else." However, he denied committing the murder in such a way as to reenact the Manson murders. (Exh. L.)

Petitioner was asked how he felt about the crime. He replied that it was "the most monumental turning point in [his] life," that it was "the worst thing that's ever happened to me," and it was "the one factor that caused me to effect change in my life." He said he had been addicted heavily to drugs and alcohol, that he had "no qualms" about stealing money from his parents, and that "it culminated in my murdering my mother." He agreed it was "a horrible murder" and reflected on "the enormity" of it. (Exh. L.)

Petitioner admitted he was "a spoiled brat." He said he started drugs at an early age and had "violent" arguments with his parents. He also admitted getting out of his car, throwing a screw driver at another driver during a road rage incident, and telling the driver he was going to kill him. He conceded he was a physically violent person. (Exh. L.)

Petitioner was asked about remorse, and he said that he felt remorse "immediately" upon killing his adoptive mother. He said he set it up to look like someone else had done it because he "wanted to escape that awful, tumultuous situation that [he] was right in the middle of." He stated that he denied committing the crime initially to the police, "and then after that, to essentially no one else." He said he "never denied it to [his] father or to his Attorneys" or to anyone else. (Exh. L.)

However, Petitioner conceded that two years after the murder, when interviewed by the second probation officer, he "continued to pretend that someone [else] murdered [his] mother." He "went so far as to blame [his] past roommate [Michael Ryan,] [which] required Officer Monsue to fly to Mississippi to interview that person." *Petitioner admitted this was just a set-up, and that he was the one who murdered his mother.* (Exh. L.)

Petitioner stated that his trial attorney recommended that he plead guilty to "try to get in CYA," but then, "when the Judge would not accept that," his *attorney "didn't let [him] plead guilty, although he wanted to.* He denied

telling the authorities that he had only pled guilty to get the plea bargain.  He
*wanted to plead guilty because he was guilty.*  (Exh. L.)

Petitioner was asked if he ever thought about the murder, and he
responded, "Absolutely, every single day."  When asked why he put a rope
around his mother's neck and why he stabbed her and beat her, he stated, "It
was a striking out, not only at my impotence that I felt as – as a man [of such
small stature] . . . .  And also, my anger at the . . . at the powerlessness that
drugs -- which were . . . supposed to bolster me – the powerlessness that they
made me feel  The weakness that they in turn gave back to me and I think that's
what I was striking out against."  (Exh. L.)

When a deputy parole commissioner remarked that Petitioner talked
about the murder "in a very academic way" and was not that emotional about
it, Petitioner stated:

I'm not trying to diminish the offense, I can't.  I can't attempt to
bring emotion to [it] — that would be empty, that would be acting.  I'm
not denying it, I do cry, I have cried, I cried a lot.  I do think about it
daily, not one day goes by that I don't think about the offense and my
mother.  And I can't hope to bring the enormity of the incident in my life
to this one hearing.  I'd like to.  I'd like to, I'd like very much to, so that
you could see that I . . . have gone through.  I don't think, in all honesty,
that she would have wanted me to destroy myself at this point.  All I can
do is change today and in the future, and I do that with all my heart.

(Exh. L.)

Petitioner admitted taking the polygraph examination and "flunking" it.
He said that the weekend after the murder, when his father came up to visit him
at juvenile hall, he confessed to his father that he had committed the murder.
Petitioner's attorney at the parole board hearing admitted that Petitioner
"screwed up big time by doing this [murder]," that "it was wrong for him to try

and cover it up," that by doing that, "he screwed up again," because "it's wrong for him to blame somebody else for it, again, his mistake. And we're not trying to make an excuse for it, because it happened." (Exh. L.)

## M.    Statement To Correctional Counselor Mayol

In November or December 1993, Petitioner was interviewed by Correctional Counselor Gilbert Mayol. When given an opportunity to talk about his version of the offense or to make any changes or corrections to the record, Petitioner stated that his previous version "remains the same." Mr. Mayol definitely would have put in his report any denials by Petitioner that he was involved in the murder. Petitioner expressed remorse during the interview. (Exh. M.)

## N.    Statement To 1993 Parole Board And Confession To His Attorney

On November 10, 1993, Petitioner declined to appear at the hearing before the parole board. He signed a waiver of appearance. He also signed an "Olsen waiver," *declining the opportunity to contest any of the facts* contained in the prison packet. (Exh. N.)

But the record shows that Petitioner confessed yet again, this time to his own attorney. At the hearing, Petitioner's attorney, Patricia Cassady, told the parole board that "the Board report of November 1991, under 'Prisoner's Version,' reflects an *accurate* version of Mr. *Lisker's position on this crime*." She also stated that Petitioner "*admits* and takes full responsibility for this crime," that he understood the nature and the magnitude of the crime that he committed," and that he admitted that it was "a horrible" crime. She said that Petitioner "felt remorse" at the time of the crime and "a great deal of remorse" "right up until this time [1993]." (Exh. N.)

## O. Statement To Correctional Counselor Kong

In May 1996, Petitioner was interviewed by Correctional Counselor Lily Kong. She reviewed the facts summarizing his commission of the offense with him, and he had no changes or additions. If he had, at any time, denied committing the murder, she definitely would have included that in her report. Petitioner told her he was on drugs at the time he committed the murder. He said he needed money, so he went to his parents' house to get it. He met his mother there, and he ended up killing her. He was "emotionally detached" and "kind of cold." (Exh. O.)

## P. Calculated Delay Of The Claim Of Innocence

The fact that Petitioner did not present an actual innocence claim in his 1989 state habeas petition and did not even begin to assert his innocence until 1996, is all too telling. (Exh. P.) The federal court did not factor this into its actual-innocence calculus. This omission was crucial, because under *Schlup*, a court "may consider how the *timing* of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." (*Schlup, supra*, 513 U.S. at p. 332, italics added.)

It has aptly been noted that belated claims of actual innocence "are not uncommon," and are "an unfortunate although understandable occurrence," to be "treated with a fair degree of skepticism." (*Herrera, supra*, 506 U.S. at p. 423 (O'Connor, J., concurr. opn.).) This "new" evidence of innocence is "suspect, produced . . . at the eleventh hour with no reasonable explanation for the nearly decade-long delay," and especially suspect because the prisoner's allegations "blame a dead man – someone who will neither contest the allegations nor suffer punishment as a result of them." (*Id.*)

But it is not only the passage of a long period of time that is significant. Petitioner carefully calculated the moment when it would be safest and most

expedient to begin his about-face. Petitioner shrewdly waited until after his father, Robert Lisker, had died, Michael Ryan had died, Robert Johnson had died, and the trial exhibits had been destroyed and memories had faded, before launching his brilliantly orchestrated campaign to assert his innocence. (Exh. P.) That essential fact went unnoticed and unaddressed by the federal court in its report. (Pet. Exh. B.)

If Petitioner had presented his claims at his earliest opportunity, i.e., when they were first available to him: (1) Robert Lisker would have been alive, and respondent would be able to have him testify; (2) Michael Ryan would have been alive, and respondent would be able to put him on the stand; (3) the trial exhibits would have been preserved, such as Dorka Lisker's purse and wallet and the diagram made by Lisker of the position of the body; (4) respondent would have been able to track down and interview all the police officers, firemen, and other persons who contaminated the crime scene, and respondent could have recovered their shoes to see if they matched any of the unidentified shoe prints found in or around the house; (5) phone records would not have been destroyed by the phone companies and the companies with reverse-phone directories to determine to whom the phone was placed; and (6) the memories of Mr. Borenstein, the polygraph examiner, and the various psychologists and correctional counselors would not have faded so much. What is more, it would have been possible to obtain from the now-deceased court reporter her now-destroyed notes of the two hearings the trial court held after Petitioner was rejected by the CYA, during which the trial court rejected the plea bargain and supposedly discussed with Petitioner how he wanted to proceed in light of the trial court's apparent intent to accept nothing less than a guilty plea to murder, based on Petitioner's damaging admissions in the amenability evaluation. (Exhs. E - H.)

## Q. Attorneys Advised Petitioner To No Longer Admit Guilt

Petitioner did not simply change his story overnight. He eased his way into the new version, covering his machinations by claiming for the first time that he was unable to discuss the crime "on advice of counsel." On February 21, 1998, Petitioner was interviewed by Dr. Randy Stotland. He declined to discuss the facts of the crime "due to a current legal appeal." He admitted being a heavy drug user.

In May 1998, Petitioner was interviewed by Correctional Counselor Sheila Sells. When she referred to his previous versions of how he committed the offense, as contained in previous hearings, he had nothing to change or to add. If he had objected to any statement of fact, or if he denied committing the murder, she would have noted that in her report. (Exh. Q.)

On April 22, 1999, in an interview conducted by Dr. Katherine Powell, Petitioner refused to discuss the details of the crime, his feeling about the crime, or any issues related to the crime. He stated this was "on the advice of his attorney." (Exh. Q.)

In July 1999, Petitioner was interviewed by Correctional Counselor Sheila Sells. He stated he was "not at liberty to discuss his version of the commitment offense" because it was "currently pending litigation and he ha[d] been instructed by his attorney not to discuss it." If Petitioner had denied committing the murder, Ms. Sells would have put it in her report. (Exh. Q.)

In an interview with Dr. Ronald Roston, conducted on February 20, 2001, Petitioner appeared and offered a written statement, but declined to be interviewed regarding the facts of the offense. He admitted taking methamphetamine and "crank" during the two months leading up to the murder. He expressed absolutely no remorse for the offense or any expression of loss or grief. (Exh. Q.)

Finally, On August 11, 1999, 15 years after he pled guilty to murdering his mother, Petitioner decided it was safe to shift gears. When he appeared at the parole board hearing, the account of the offense contained in the probation report was read aloud into the record, and Petitioner was told that he could make "any corrections or clarifications to the record." "On advice of counsel," Petitioner provided only a brief written statement regarding the offense, "based upon the fact that the case will be presented to the courts." (Exh. Q.)

At that same hearing, Petitioner announced that he was "recanting everything" he had said in other hearings, but he could not explain why he had confessed to the murder time after time over the years. He stated to the parole board that he did not murder his mother and that he was not involved in the murder in any way, either before or during the murder. He said he "would not condone" it, but accepted "responsibility for the crime [he was] convicted of [committing]." (Exh. Q.)

In May, 2001, Petitioner was interviewed by Correctional Counselor Raymond Myrah. Petitioner did not ask to change any facts or statements contained in the evaluation report concerning the facts surrounding the offense. Mr. Myrah believed that Petitioner was working with the *Los Angeles Times* to secure his release from prison. (Exh. Q.)

On May 31, 2001, Petitioner appeared once again before the parole board. He did not want to discuss the facts of the case. He admitted having arguments with his mother and using drugs. He admitted using drugs, but showed "no remorse still to this day." He stated that when he was adopted, his adoptive mother (the victim in this case), did not want a child . . . so we didn't have a close relationship." (Exh. Q.)

In July 2003, Petitioner stated he was innocent of the crime. He claimed he was coerced into confessing the crime. But, significantly, he declined to answer any questions of the parole board. (Exh. Q.)

It should be noted that all of the above-listed statements to the probation officer, CYA psychiatrists and psychologists, CYA caseworkers, state prison intake officers, state prison psychiatrists, and state prison correctional counselors are -- and have always been -- part of Petitioner's central prison file. These were all openly discussed at the parole hearings and are part of the record. In addition, Petitioner signed a letter on February 4, 2005, authorizing release of his Central File to two reporters for the *Los Angeles Times*. (Exh. Q.)

## R. Circumstantial Evidence Confirming Petitioner's Factual Guilt

The extraordinary record of more than 15 years of confessions and admissions is far from the only evidence confirming Petitioner's guilt. Respondent will now review the crime scene evidence presented at trial and at the federal evidentiary hearing that strongly corroborates his confessions, and renders it certain that no reasonable juror would vote to acquit him.

## S. No Forced Entry And Neatly Stacked Glass Panes

Evidence presented at trial showed that there was no forced entry to the house. Petitioner told Monsue that he removed the louvered glass panes of the kitchen window to get into the house. The only fingerprints found in the house were those of Petitioner. (Pet. Exh. BBB 248, 263, 274-75, 766.)

The glass panes that Petitioner removed from the kitchen window had been carefully removed and very carefully and neatly stacked on the sidewalk outside the kitchen window. An intruder would not have taken the time to neatly stack the panes. And a son terribly concerned about his mother, who might be dead or dying, would immediately break the closest window -- such as the living room window or the dining room window -- to gain entry, and certainly would not make the extra effort to walk to the side of the house and go to extra pains not to break any glass by carefully removing the individual

panes of glass and then stacking them in a noticeably neat fashion. (Pet. Exh. BBB 1072-81, 1120.) Regardless of whether Petitioner removed the panes to gain entry before he murdered his mother, or later, as part of his improvised staging scheme, the fact is that he removed them so carefully that none of them broke and then stacked them neatly, one on top of the next, leaving his fingerprints on them.

## T. Blood Spatter Evidence

At trial, blood spatter expert Ronald Linhart testified that two of the blood stains on Petitioner's shoes, one on the left side of the right shoe and one on the left side of the left shoe, resulted from the application of force to a source of blood. This meant that the droplets were either caused by castoff force or blunt force application. (Pet. Exh. BBB 735-36, 737-38.) Linhart also testified that the blood droplets appearing on the right shoe was "coming down" rather than "coming from the floor up." (Pet. Exh. BBB 747.) The implication was that if there did not exist innocent explanations involving castoff force or blunt force, it could be inferred that Petitioner was present at the time of the assault.

On cross-examination at trial, Petitioner's counsel asked whether the dropping of a hand into a pool of blood on the floor could propel blood onto the shoes. Linhart, given such a general hypothetical, answered it was possible. (Exh. BBB 747-48.)  To foreclose this and one other possible innocent explanation for the blood droplets, Respondent recalled Linhart to testify at the federal evidentiary hearing. By that time, Linhart had an opportunity to read Petitioner's statement to Monsue. (Pet. Exh. CCC 469.) Via hypotheticals, Linhart effectively testified that if Petitioner had knelt down on both of his

knees "right next to" Mrs. Lisker as he told Monsue[4], the two blood droplets on Petitioner's shoes *cannot* be explained by the dropping of Mrs. Lisker's fractured arm onto the floor or by the pulling out of the knives from her back, because Petitioner's shoes would have been shielded by his legs from the flight path of the blood. (See Exh. CCC 471, 473.) Moreover, Linhart effectively testified, again by means of a hypothetical, that the lack of blood on Petitioner's clothing was *inconsistent* with his statement to the police that he "hugged" his mother. (See Pet. Exh. CCC 474-477.)

The federal court dismissed the blood spatter evidence as inconclusive. (Pet. Ex. B at p. 27.) As shown below, the blood stains in this case cannot be so easily dismissed. They clearly point to Petitioner's guilt.

The federal court first implied that the slight amount of blood on Petitioner's clothing was inconsistent with Petitioner bludgeoning his mother. The federal court acknowledged the explanation offered at trial by the prosecutor, Philip Rabichow, that blood would spatter away from Petitioner as he "swung away" with a weapon, but attacked that explanation based on the fact that Linhart did not so testify. The federal court further states that Rabichow's "conclusion appears to this Court as tenuous at best." (Pet. Exh B at p. 27.) The first problem with the federal court's analysis in this regard is that Linhart was never asked to testify as to this issue, and the federal court,

_____

4. Specifically, Petitioner told Detective Monsue: "At this point, at this point. I said, Oh My Lord! She's on the ground. And then I got to this point. And I screamed. I went down on my knees. Fell from here to here on my knees and landed right there, right next to her. And, I was saying Mom, it's going to be OK. They sure look nasty, can I take them out. And she wasn't talking. But, I could tell she was still breathing. I heard her and everything in ways. And so I, I pulled it out. And could feel these things rubbing against something." (Exh R at 171; Ex 86-171.)

Later in the interview, Petitioner said, "I didn't stumble. I fell to my knees." (Ex. R at188.)

while characterizing Rabichow's argument as "tenuous at best," does not offer an independent reason why this is so.

In any event, Linhart testified at trial that a stain on the wall was consistent with the bludgeoning of the victim while her head was close to the floor. (Pet. Exh. BBB at 733.) Hence, the bludgeoning could have taken place after Mrs. Lisker had already fallen to the floor. Under these circumstances, if blood spatter from the bludgeoning would appear on Petitioner's clothing at all, it would be found around the area of his legs or feet. In this regard, the two blood droplets on Petitioner's shoes and a number of blood stains found on the corduroy pants Petitioner was wearing (see Pet. Exh. BBB at 742-43 [various blood stains that could not be determined to be contact stain as opposed to blood droplets that were later smeared]) account for those blood stains that the federal court suggests are missing. Hence, there is no basis to conclude that the amount of blood on Petitioner's clothing is inconsistent with him having bludgeoned his mother.

Next, the federal court, citing pages 68 through 86 of the hearing transcript, appears to dismiss any inconsistency between the lack of blood on Petitioner's shirt and his claim that he hugged his mother, reasoning that the amount of blood transferred would depend on the different possible positions of Petitioner and his mother. (Pet. Exh B at p. 27.) This page citation is puzzling because it refers to Petitioner's cross-examination of Linhart concerning explanations for the two blood droplets on Petitioner's shoes, and those droplets were *caused by the application of force*. That issue is a separate and distinct issue from how much blood would have been transferred *by contact* if Petitioner had "hugged" his mother as he claimed. Hence, the federal court took note of the different bodily positions mentioned in connection with the analysis of the two droplets of blood and erroneously applied them to the issue of the bodily contact transfer.

At any rate, as to the contact transfer that would occur when Petitioner
was "hugging" his mother, the available permutations of different positions
between Petitioner and the victim is a small factor, because the permutations
were circumscribed by Petitioner's own description, repeated twice, that he
"was hugging" her. (Exh. R at 167.) To the extent that Petitioner is trying now
to claim that he "cradled" Mrs. Lisker's head, that is a distinctly different act
than "hugging" her, which would involve a wrapping of arms around Mrs.
Lisker. Linhart, duly noting the fact that Petitioner claimed to have "hugged"
Mrs. Lisker, concluded that such a claim was inconsistent with the slight
amount of blood on Petitioner's clothing. Even using the Court's hypothetical
raised during the hearing, that Petitioner cradled her mother's head in the crook
of his arm, Linhart pointed out he "would have expected blood stains to have
been in the crook of the arm, which were not present." (Pet. Exh. CCC 477.)
Either way, a reasonable juror could infer that Petitioner had lied yet again in
his statement to Monsue when he said he hugged his dying mother.

Moreover, the federal court failed to address the two droplets of blood
on Petitioner's shoes and their implications. As previously noted, these two
blood droplets must somehow be accounted for, but the two explanations
offered by Petitioner, i.e., that Mrs. Lisker's arm dropped into a blood puddle,
or that the droplets came from and the removal of the bloody knives, could not
account for the blood on Petitioner's shoes if he was kneeling as he claimed.

At the federal evidentiary hearing, Petitioner attempted to explain these
inconsistencies in two ways, both through arguments of counsel. It is important
to stress that Petitioner declined to take the risk of actually testifying. First, he
hypothesized that he may have been kneeling on one knee, exposing one shoe
to blood cast off from Mrs. Lisker's arm when Petitioner moved it. (Pet. Exh.
CCC 483-484.) This version fails as Linhart testified that the arm was "an
unlikely source of that blood droplet" given the fact that it was a single drop.

(Pet. Exh. CCC 484-485.) This version is also inconsistent with Petitioner's statement that he went down on both of his knees, instead of one knee. (Exh. R at 171.) Moreover, as Linhart testified, a cast-off event can only occur if the source of blood was moving at sufficient velocity. (Pet. Exh. BBB at 707.) However, Petitioner described his action as an act of "lifting" (Exh. R at 162), which could not have caused the arm to travel at a velocity sufficient to produce a castoff event.

At the federal evidentiary hearing, Petitioner also tendered another scenario, relating to cast-off blood, in which he might have dropped to his knees "and then quickly [gotten] up and move[d] an arm so that both feet were now in the flight path of potential blood . . ." (Pet. Exh. CCC 485.) Again, this version cannot be found in any way in Petitioner's contemporaneous account to Monsue. Furthermore, as previously indicated, Linhart found this cast-off event unlikely. And indeed, Petitioner merely lifting the arm could not have produced the requisite velocity for a cast-off event.

Moreover, in relation to Petitioner's suggestion that the victim's arm dropped into a blood puddle (Pet. Exh. CCC 485), none of the positions Petitioner speculates he might have been in explains the blood on his shoes. In this regard, Linhart's testimony that the blood spatter evidence in this case is "insufficient by itself" to prove guilt (Pet. Exh. CCC 489) is important. Indeed, Respondent does not deny that blood spatter evidence has to be considered with all other evidence in this case in order for it to be meaningful. But it is precisely that review of other evidence which renders Petitioner's current scenario implausible. According to Petitioner, he found his mother lying on her side (Exh. R at 164) and thereafter, he kept her on her side so that she would not suffocate (Exh. R at 167). In addition, according to Petitioner's descriptions to Monsue and, as illustrated by expert witness Mike Varat's diagram based on those descriptions, Mrs. Lisker at the time was lying adjacent

to the planter, facing it and touching it. (Exh. S at 155:3.) If Petitioner elevated Mrs. Lisker's fractured right arm as he claimed and allowed it to drop, it would not have dropped to the floor but on her other arm. No blood spatter event would likely occur. In any event, if it did drop to the floor, Mrs. Lisker's body would have shielded Petitioner from any spatter, which would naturally originate in the floor area between her body and the planter. The R&R does not examine these points in any way.

As to the removal of knives, Petitioner at the hearing elicited testimony from Linhart that if the shoes "were in the right position," blood could have been cast off the knife unto the shoes. (Pet. Exh. CCC 486.) However, according to Petitioner, pulling out the knives was the first thing he did when he dropped to his knees. (Exh. R at 171.) Given that Mrs. Lisker was lying on the ground with the knives to her back exposed to Petitioner, there was no reason for Petitioner to "get up" in any way or otherwise alter his body position to pull out the knives. In fact, all he had to do was to bend forward to pull out the knives, which meant that he would still be on his knees and his shoes would still be shielded from the flight path of cast-off blood. Hence, the scenario involving cast-off blood from the knives when they were removed is another inadequate explanation for the blood on Petitioner's shoes.

Finally, the federal court notes that Linhart had testified that the blood evidence was "insufficient by itself" to show Petitioner's guilt. The federal court also notes that Linhart denied reaching the conclusion attributed to him by the California Court of Appeals that blood stains were transferred to Petitioner's clothing during a blunt force injury. (Pet. Ex. B at pp. 27-28.) Respondent does not disagree with either observation, as neither of them changes the fact that the blood stain evidence in this case could not be adequately explained and that such evidence, although insufficient in itself to conclusively show Petitioner's guilt, pointed toward it. When combined with

other evidence in this case which Linhart did not consider, such as Mike Varat's reconstruction, a reasonable juror could readily find Petitioner guilty. In addition, as explained more fully below, a reasonable juror could also take into account the fact that Petitioner lied about being able to see his mother through the windows, and thus find, based on insufficient blood on Petitioner's clothing, that Petitioner likewise lied when he claimed to have hugged his mother. In short, the federal court made a significant analytical error in entirely dismissing the blood spatter evidence from consideration. The evidence, corroborated in several ways, positively supports that prosecution's view of the crime.

## U. Petitioner's Suspicious Statements And Actions At The Scene

Petitioner's 911 call was highly suspicious. After Petitioner made his initial statements, the dispatcher told him the fire department was on the way and wrote down his phone number. When a fireman called Petitioner a few minutes later, Petitioner answered in a ho-hum, matter-of-fact manner with a normal voice, and only after the caller told him he represented the fire department did Petitioner strain to resume his act of sounding hysterical by screaming.

Petitioner's statements to the 911 dispatcher are particularly suspicious. When asked, "Did you have a stabbing there?," he replied, "Yes *we* did." (Italics added.) When asked, "Who stabbed her," he answered, "I." (Exh. T.)

Petitioner continued to feign hysteria after the paramedics arrived. He yelled at the paramedics and police to help his mother and tried repeatedly to re-enter the house, even though he admitted that he had left his mother dying several times before the paramedics arrived – despite the dispatcher's request that he continue to apply direct pressure on the wounds to stop the bleeding – to look through his mother's purse, to see if the intruder was still in the house, and to go outside to scream about his dying mother so that the neighbors would

think he was genuinely concerned about her welfare. (Pet. Exh. BBB 814, 821-22, 841-42, 868-71.) The most plausible inference is that Petitioner tried to re-enter the house in order to further contaminate the scene and to verify that his mother had either died or at least had not regained consciousness.

Petitioner said he heard a "thud" inside the house, but that he did not see anyone leaving. According to Petitioner, all the doors and windows were locked when he approached the residence, including the front door. If a burglar had been in the house when Petitioner arrived, he would have seen him leave, yet Petitioner said he did not see or hear anyone leaving the residence. In addition, if an intruder had been in the house and had left the house before Petitioner arrived, there would have been either a sign of forced entry, or the front door would have been unlocked. Yet there were no signs of forced entry, and the front door and all other doors and windows were locked. The federal court makes no mention of these crucial facts.

Petitioner said he gained entry through the kitchen window. Yet there was no dirt or mud on the kitchen counter or in the kitchen sink, which was just inside the window, or on the floor in front of the kitchen sink. (Pet. Exh. BBB 1072-81, 1120.) This strongly suggested that Petitioner gained entry through the front door, killed his mother, and then later went outside to stage the scene by removing the panes of glass so he could assert that the burglar had entered through the kitchen window.

Inexplicably, the federal court reasons that Petitioner's confession to the 1992 parole board could not be true because if it were true that he dismantled the kitchen window panes to make it appear that an intruder had entered the house through the window to kill his mother, he would not have told Monsue that he was the one who had dismantled the windows and had broken into the house. (Pet. Exh. B at 37-38.) What the federal court failed to recognize is that a reasonable interpretation of Petitioner's contradictory statements is simply that

Petitioner lied to Monsue, and then told the parole board the truth.  It is
understandable that when Petitioner spoke to Monsue, he chose not to say that
it was the intruder who entered through the window, since he knew that the
police had discovered that there was no other point of forced entry and that
Petitioner did not have a key.   Furthermore, Petitioner admitted being
incoherent, disoriented and confused: "It's very foggy, very hazy . . . I was in
and out and I really lost it." (Exh. L at 55)

     Petitioner carefully removed the two knives from mother's back and
carefully set them down, but was quick to point out that he tried to do so
without leaving his fingerprints so as to preserve the evidence.  (Pet. Exh.
BBB1072-81, 1120.) This is not what an adult son trying to save his bleeding,
dying mother would do.  A truly concerned son would yank out the knives
without any concern or even thought about fingerprints, and then would toss
them aside, not place them neatly side by side.

     After the 911 dispatcher instructed Petitioner to apply direct pressure to
the wounds to try to stop the bleeding until the paramedics arrived, Petitioner
said he took the time to go throughout the house looking for a burglar and that
he took the time to open his mother's purse and to go through it to see if the
intruder had taken anything. (Pet. Exh. BBB 1072-81, 1120.)  A son truly
trying to save his mother's life and knowing that she was lying in a pool of
blood and continuing to bleed to death would not take the time to do these
things, but rather would try to stop the bleeding.  Furthermore, the only rooms
Petitioner said he searched inside the house were the rooms where there were
obvious signs of struggle.  If he had actually been trying to find an intruder, he
would go to every room in the house.   Petitioner's account thus strongly
suggests that since he knew where he had carried out his assaults on his mother,
he wanted to provide an explanation for the possible presence of bloody
footprint evidence which would otherwise show he had been in those rooms.

## V. Petitioner's Suspicious Statement To The Police (Claim To Have Seen Victim From Outside The Living Room Window)

On the issue of the weather conditions, the federal court inexplicably drew a conclusion consistent with respondent's position, but then misconstrued and underestimated the evidence supporting respondent's key argument on this issue: that Petitioner's claim to have seen his mother's feet from the living room window was a lie. That evidence showed that Petitioner's view from beyond the planter outside the living room window was effectively obstructed by reflections of light caused by the difference between the dark interior and the reflection on the window of the white or light-colored swimming pool behind him.

Citing meteorologist Kenneth Clark's testimony at the evidentiary hearing regarding the heavy cloud coverage on March 10, 1983 (Pet. Exh. B at 18) and alluding to LAPD Photographer Mike Wilson's lack of credibility as to various aspects of his present and past testimony (Pet. Exh. B at 18-20), the federal court concluded that the evidence "overwhelmingly showed that the morning of March 10, 1983 in the area of the Lisker home was not bright and sunny. It was overcast, cloudy and hazy." (Pet. Exh. B at 18-20.) The federal court apparently treated this fact as significantly exculpatory. But the federal court missed the key point: what mattered was not the brightness of the outside weather in and of itself, but rather the relative disparity between the dark interior and the much brighter exterior.

Respondent does not dispute that between 10:30 a.m. and 11:45 a.m. on March 10, 1983, there was cloud coverage or haze. (Pet. Exh. U at 2-3.) What respondent does contend is a point the federal court simply overlooked, i.e., that under the weather conditions that day, the sky was bright enough to prevent Petitioner from seeing past the reflections of the living room window to see his mother's feet as he claimed.