As to this point, even Clark had to admit that no matter the degree of cloud coverage during daytime, there would still be some measure of sunlight that penetrated the existing clouds. (Pet. Exh. CCC 181.) In fact, Clark acknowledged that while he would not classify March 10, 1983, as a "true bright, Southern California day," there was at least "dull sunshine" or "filtered sunshine." (Pet. Exh. CCC 182.) More directly, Robert Lisker himself testified at trial that when he returned to his residence at noon on the day of the murder, "there was some sun." (Pet. Exh. BBB at 948.)

But other evidence showed that the outside of the house was sufficiently bright that it was highly unlikely that Petitioner would be able to see his mother's feet as he had claimed. Wilson's photograph in Exhibit 64-2 supplies an objective verification of how bright it was outside the Lisker residence. Based on the approximate amount of time it would take to shoot each photograph and the various clocks visible in some of the chronologically-arranged crime-scene photographs (Exh. ; Ex. 64), Wilson was able to approximate that Exhibit 64-2 was taken at about 1:10 p.m. on the day of the murder. (Pet. Exh. CCC 586.) Although Ex. ; Exhibit 64-2 did not depict a cloudless blue sky, it clearly showed a day bright enough that both the detectives in the photographs and the roof of the house itself were casting distinct shadows outside the Lisker residence. As Clark had to admit, but as the federal court failed to acknowledge, this photograph, although taken at around 1:10 p.m., approximates the lighting conditions at 11:00 a.m. (the time that Petitioner claimed to have looked through the living room window), because based on the weather chart, the weather conditions at 1:10 p.m. were approximately the same as at 11:00 a.m. (Pet. Exh. CCC 172-73.)

Examining that photograph even more closely, the disparity in lighting conditions between that of the outside and the inside of the house (as seen through the open front door) was substantial. This stark contrast is confirmed

by looking at other crime scene photographs Wilson took on March 10, 1983, including Exhibit 64-18, which showed the inside of the Lisker residence at the time of the crime to be extremely dark compared to the outside.

It is thus the disparity in lighting which is crucial, because it is the disparity that shows the intensity of the reflection appearing on the living room window when looking into the house from the outside. (Pet. Exh. CCC 578 [Wilson's testimony that lighting disparity caused window reflections].) Whether any reflection would be eliminated by pressing one's face to the glass was rendered moot by Petitioner when he indicated to Monsue that he did not approach the living room window, but had merely "duck[ed] way down low" at the sidewalk. (Exh. R at 170; see also Exh. BBB at 267-268.) Meanwhile, from Wilsons's March 23, 1983 photograph of that same living room window (See Exh. U at 2), one can see that the window was *capable of* reflections which prevented anyone from seeing any appreciable distance beyond it.[5] Thus, the stark contrast in lighting between the outside of the house and the inside of the house as depicted in Exhibit V at 2, and in other crime-scene photographs meant that the reflection appearing on that living room window at about 11:00 a.m. would have been significantly obstructive. This evidence effectively destroyed Petitioner's claim to Monsue that he was able to see his mother's feet through that window. And none of this critical evidence can be found in the report issued by the federal court. (Pet. Exh. CCC.)

Even more importantly, however, there is additional evidence not considered by the federal court that undermined Petitioner's claimed ability to see his mother through the window. Robert Lisker testified at trial that he conducted a visibility test on March 11, 1983 of that same window and he could

---

5.    Wilson testified at trial, when his memory was fresher, that the photographs now designated as Exhibits 74-1 and 74-2 depicted what the naked eye would see on March 23, 1983. (Pet. Exh. BBB 972-73.)

"barely see through the window to the fireplace" and "was unable to see beyond that point." (Pet. Exh. BBB at 925.) As to the weather condition, he testified that "the 10th was very similar to the 11th," noting that on March 10, 1983, "there was sun when [he] got to the house in the afternoon late" and "there was some sun when [he] got there at noon." (Pet. Exh. BBB at 948.)

The weather charts for March 11, 1983, confirmed this similarity. They reflect weather conditions on March 11, 1983 that were comparable to, if not darker, than the conditions at 11:00 a.m. on March 10, 1983. The charts for March 11 report overcast weather (ten out of ten cloud coverage) from 6:05 a.m. through 11:45 a.m., and broken clouds (eight out of eight cloud coverage) from 12:45 p.m. to 4:42 p.m. (Pet. Exh. U at 4.) This evidence, offered in testimony by Petitioner's own father, effectively confirmed the prosecution's point at trial that Petitioner lied when he said he saw his mother's feet at the other end of the living room.[6]

The federal court did not merely overlook the strong testimony of Mr. Lisker. It also misapprehended the significance of weather evidence as a whole. The federal court observed that "photographs taken from outside the sliding door on March 23 appear to show that even with the glare on that day, it was possible to see through all the way to the entryway of the house. (See Exh. W at 3-5.)" (Pet. Exh. B at 21.) But, Exhibits 3 and 5 were photographs

---

6. This evidence also renders moot testimony from Wilson at the evidentiary hearing. The federal court questioned Wilson's current testimony that he actually looked at the living room window on March 10, 1983 (Pet. Exh. B at 19), because Wilson had testified at trial that he did not remember doing so. As to Detective Monsue's visibility test, he did not testify to the exact time of the day of the murder when he conducted his test. (Pet. Exh. BBB 267-69, 489.) But based on Detective Monsue's testimony that he was trying to "approximate" the location where Bruce Lisker said he stood (Pet. Exh. BBB 267), it appears that the tests were conducted after his interview with Lisker at the police station, which began at 1:00 p.m., according to the interview transcript. (Exh. R at 158.)

taken not of the living room window, to which the weather evidence primarily pertained, but of the dining room sliding door. More importantly, as can be seen from the photographs themselves, the only reason one could see through the sliding door as reflected in Exhibit W at 3 through 5 was that the lens of the camera was placed close to the glass, and the photographer's hands were used to block out the sunlight from the sides. (Pet. Exh. BBB 987-88.) Lisker, as previously noted, did not bring his face up to the glass of the living room window and use his hands to block out the sunlight. Rather, he admittedly remained on the sidewalk and thus, had to contend with strong reflections from the window, i.e., the same ones which inhibited his father from seeing past the fireplace.

In sum, because the R&R understood the factual issue as simply whether March 10, 1983 was "bright and sunny," it overlooked crucial evidence proving the prosecution's argument at trial that Petitioner could not have seen his mother's feet as he claimed.

## W.    Suspicious Statement To The Police:    His Claim To Have Seen His Mother's Head From The Dining Room Sliding Door

The federal court indicated that the evidence convinced the Magistrate Judge "that the victim's head, if not her whole upper body, would have been visible from the dining room sliding glass door, as Petitioner described." (Pet. Exh. B at 22.) This conclusion was based on the testimony of crime-scene reconstruction experts Frank Terrio and Michael Varat that a body placement based on the bloody portion of the rug shown in a crime scene photograph demonstrates that Petitioner could have seen his mother's head from the dining room window. (Pet. Exh. B at 21-22.) The federal court also rejected the "Lisker/Monsue version" of the body placement as being inconsistent with the evidence. (Pet. Exh. B at 22.)

The federal court did not explain, yet alone justify why its conclusions were the only reasonable ones that could be drawn. First, the federal court mistakenly assumed that it was possible to reconstruct fully and accurately the exact placement of the body at the time Petitioner claimed to have looked through the window based *only* on a crime-scene photograph. The federal court apparently adopts the body placement theory that the head of the victim rested on the bloody portion of the rug (hereinafter the "Terrio version") and rejected the body placement theory in which the victim was actually touching the planter (hereinafter the "Lisker/Monsue version"). However, the Terrio version was a reconstruction based not on eyewitness testimony as to where the victim actually lay, but on Exhibit V at 91, a crime-scene photograph of the rug at the foyer taken by Mike Wilson when he arrived much later in the afternoon. (Pet. Exh. CCC 109, Pet. Append. at 3.) This meant that the Terrio version was based on a photograph taken not at the time Petitioner claimed to have seen his mother, but hours later, when many intervening events had already compromised the crime scene.

Even more basically, neither Exhibit V at 91 nor any other photograph actually captured Mrs. Lisker's body position at the crime scene, because she had been transported to the hospital shortly after the paramedics found her. (Pet. Exh. BBB 182.) Even if someone had managed to take a photograph before she was removed, however, that photograph would still not be an accurate depiction of where she was lying at the time when Petitioner allegedly saw her through the window. This was because she apparently had been moved several times prior to being found by the paramedics.

When paramedic Lovato found Mrs. Lisker, she was lying face down on her stomach with her head extending several inches past the eastern border of the planter. (Pet. Exh. BBB 184-87.) Her body was also diagonally oriented, i.e., her head was southeast of her feet. (See Pet. Exh. BBB 185.) Assuming,

as does the Terrio version (which was apparently adopted by the federal court), that Mrs. Lisker's head injury accounted for the blood concentration found on the carpet, Mrs. Lisker's body, as found by Lovato, was not in the location of that blood concentration, which was near the western end of the planter. (See Exh. V at 91.) In fact, even if the source of the blood was from the stabbing wounds to Mrs. Lisker's back, Lovato's observations would still be inconsistent with the location of the concentration of the blood.

This clearly meant that Mrs. Lisker's body had been moved a significant distance after her body left that puddle of blood.[7] Aggravating this uncertainty about the location of her body is the fact that the concentration of blood, which is now being used as a frame of reference, was on a non-stationary rug, which was skewed by about three to five degrees (Pet. Exh. CCC 678) as depicted in Exhibit V at 91. This indicates that the rug was shifted from its original position prior to the photograph. It follows that a reconstruction based on the blood concentration is entirely unreliable, especially when no one knows or can tell how many times the body was moved, from which position, and when. Since the federal court's conclusion is based entirely on an unreliable reconstruction, it cannot be sound.

Just as importantly, the federal court overlooked the fact that for purposes of evaluating the truth of Petitioner's claim to have seen his mother through the door, what matters is where Petitioner said the body was located when he looked in and whether physical evidence contradicted or supported what he said. This is where the Lisker/Monsue version became important, because it is the version that is based on Petitioner's own descriptions of where the body was located.

---

7. The possibilities are that Mrs. Lisker moved by herself, that the killer moved her, or that Petitioner (assuming arguendo he was not the killer) moved her.

Petitioner drew a diagram for Detective Monsue during his interview, which was marked at trial as Exhibit 53 and shown to all parties, the judge, and the jury.  (Pet. Exh. BBB 332.)  This exhibit is no longer available as it apparently had been destroyed along with all other exhibits from trial.  That exhibit however, contained a rough diagram of the Lisker residence layout and a stick figure representing Mrs. Lisker's body. (Pet. Exh. BBB 338.)  Monsue described this diagram for the record at different points during trial, on direct and on cross-examination, thereby providing enough facts upon which a body-placement reconstruction could be done based on Petitioner's descriptions. These descriptions by Monsue are highly credible because they were made in open court in front of both the prosecutor and the defense, both of whom had Petitioner's diagram (Trial Exhibit 53) in hand to immediately verify the accuracy of those descriptions.

Concerning how far east the body was, Monsue testified: "He places the head right next to the northwest corner of the planter with the body in this direction which is west from the head with the feet resting in this area here." (Pet. Exh. BBB 338.)  Later, Monsue again testified that Mrs. Lisker's head "lay adjacent" to the northwest corner of the planter.  (Pet. Exh. BBB 359.) Under cross-examination, in reference to the diagram, Monsue clarified that the head was at the western portion of the planter but closer to the middle than to the edge.  (Pet. Exh. BBB 434.)

As far as the body's proximity to the planter, Detective Monsue testified that Petitioner told him Mrs. Lisker's arms were "curled up against the planter." (Pet. Exh. BBB 473.)  This was confirmed by Petitioner's statement in the interview that Mrs. Lisker "was on her side, she was like this, with her arms like up to her face." (Exh. R at 164.)  Petitioner also indicated, "She like bleeding, she was leaning on this, okay." (Exh. R at 172.)  This evidence showed that

Mrs. Lisker was so close to the planter that her arms, curled up in front of her while she lay on her side, were "leaning" against the planter.

Based on these descriptions, Varat generated a three-dimensional diagram in which an observer, looking through the dining room sliding door from the best vantage point possible, could *not* see Mrs. Lisker's body. (Exh. S at 3.) This is strong proof that Petitioner was lying about being able to see his mother through the dining room sliding door.

The federal court discounted this version merely because it was contrary to "Monsue's description of Petitioner's sketch, which placed the victim's body at least partially on that rug." (Pet. Exh. B at 22.) But the federal court failed to consider the fact that the rug was not stationary, while the planter was, and that there were three paramedics who entered the foyer and performed emergency treatment on that rug. During the flurry of activity to save Mrs. Lisker, the paramedics moved the body several times, at least once turning it over (Pet. Exh. BBB 182) and another time, placing it in a pressure suit (Pet. Exh. BBB at 180). The rug most certainly shifted during this commotion, and the fact that it appears awkwardly skewed (see, e.g., Exh. S at 1) confirms this fact. The proximity of the southwest corner of the carpet to the victim's head in the Monsue version also supports a strong possibility that the rug, during the commotion of the treatment, was shifted from an earlier location where its southwest corner was touching parts of the victim's body.[8] Petitioner himself, who moved Mrs. Lisker's body at least once by "hugging, holding her" (Exh. ; Ex. 86 at 167) and had admittedly hurried around the house in panic (see Exh.

---

8. In light of the blood evidence, violent activity obviously occurred on the rug. Thus, the rug may have shifted from an earlier position prior to the struggle. Ultimately, it is entirely possible that at some point in time, the rug was touching the victim as she was "curled up" against the planter (Monsue version).

R at 164-66), could also have caused the rug to move some more. Between a stationary planter and a movable rug that showed indications of being shifted and in fact was the locus of the crime and the subsequent rescue effort, the most reliable choice of reference to reconstruct a body position has to be the planter. Hence, contrary to the federal court's finding, the Monsue version of the body placement is fundamentally reliable.

Indeed, corroborating the Monsue version is Exhibit V at 89, which is a photograph of the northern edge of the planter showing blood spots on the northern wall of the planter. The photograph also reflects that directly below those spots were what Frank Terrio and the prosecutor both acknowledged to be discolorations or stains to the wooden floor. (Pet. Exh. CCC; Pet. Exh. CCC 78, 137.) The fact that the stains were below the bloody spots on the planter supports the reasonable inference that the victim's head, consistent with the Monsue version, had at some point in time been very close to that area, depositing blood stains to the wooden floor and possibly serving as a source of blood, to which the application of blunt force would have caused tiny blood drops to be deposited on the wall of the planter.

Finally, the federal court also failed to consider the fact that, as some of the crime scene photographs show, the inside of the house was dark. This means that even if Petitioner had a vantage point from the dining room window that technically allowed him to see Mrs. Lisker based on the Terrio version, he would have to know where to look to see her, demonstrating that he knew the location of the body before looking in. The darkness of the inside of the house is confirmed by the very photographs the federal court cited to show one can see all the way to the entryway. Close examination of the photographs in Exh. W at 3-5, which were taken on what the federal court characterized as a brighter day than March 10, 1983, shows that as the view moves from the ceiling of the entryway to the floor, it becomes so dark that any attempt to discern objects

near the floor becomes difficult. If the federal court is correct that March 10, 1983 was a darker day because it was cloudy and hazy (Pet. Exh. CCC at 20), it further supports the inference that the inside of the house on March 10, 1983 was that much darker, and it was that much more difficult for Petitioner to obtain a view of his mother from the dining room window, even under the Terrio version.

In sum, the federal court hastily dismissed the Lisker/Monsue version based on a perceived shortcoming that, in fact, could easily be explained and accepted by a reasonable juror. In doing so, the federal court further overlooked the fatal problems that infected the Terrio version.[9] At the very least, the federal court failed to demonstrate why a reasonable juror could not believe the Monsue version instead of the Terrio version, let alone why that juror could not reasonably conclude that Petitioner lied when he claimed that he could see his mother's body through the dining room door, under any of the reconstructions, given the darkness inside the house.

Furthermore, and more importantly, even if Petitioner could have seen the victim from outside the house, that possibility does not show innocence. Petitioner had ample time to stage the crime scene, and he admitted doing so in his statements to Dr. Holland and to the parole board. Setting up the scene to make it look like someone else had broken into the house would have required a relatively simple plan.

After killing his mother, and after deciding to allege that he arrived at the locked house to work on his car and became worried when his mother did not

---

9.  Contrary to the federal court's suggestion (Pet. Exh. B at 22), Rabichow's surprise (upon his recent visit to the Lisker residence at the invitation of newspaper reporters) about the possibility that one could see Mrs. Lisker's body were it placed as he had argued at trial is of little consequence in view of the fact that as respondent has demonstrated, the Lisker/Monsue version of the placement of the body is the one most pertinent to Lisker's guilt.

come to the front door when he knocked, Petitioner realized that he should verify that if he went outside to the back yard, he could actually see his mother's body from either the living room window or the dining room window, or both. That would provide him with a story of how he discovered that his mother had been attacked. But the alleged sighting of the body through the rear windows was merely part of the cover-up. The removal of the louvered window panes was another essential part of the cover story.

The problem with this story, however, is that regardless of the weather conditions, the difference between the dark interior and the relatively bright exterior, including the bright reflection of the swimming pool in the living room window, as well as the chair that obscured any view of Dorka Lisker's body, would have made it virtually impossible for anyone to see her body. And even if one could see a small part of her body, that person would have to have been standing right up against the living room window, in the middle of the muddy planter area, not back seven or eight feet on the sidewalk. In addition, a person looking to see if someone was inside would not have seen that tiny portion of Dorka Lisker's body unless they already knew the exact spot where she was lying. Only someone who knew where to look for the body would have noticed the body. Only the murderer knew where to look.

## X. Other Statements To Monsue

Petitioner made several other statements that were highly suspicious and inconsistent with comments that would have been expected from a loving son concerned only for his mother's welfare. For example, Petitioner told Monsue that he did not want to get blood on himself, which betrayed his concern about how his actions would be interpreted by the authorities. It is also not the sort of reservation that would occur to a frantic son, just discovering his mother bleeding to death on the floor. (Pet. Exh. BBB 1081-82.)

Other statements Petitioner made at the time of the crime show clear-cut consciousness of guilt. For instance, when Monsue asked Petitioner about a knife that was in Petitioner's car, Petitioner's incongruous and non-responsive reply was, "I wouldn't kill my mom." (Pet. Exh. BBB 1072-81, 1120.) Petitioner also helpfully dropped a hint to the detectives when he volunteered, with no prompting, that the manner of killing looked like a Charlie Manson murder. (Pet. Exh. BBB 1083-85.)

## Y. Motive Evidence: Stronger Than At Trial

Much of the newly developed evidence only strengthened the case against Petitioner by showing that he alone had a powerful motive to assault his mother. The only person who claimed that robbery was the motive for the murder was Lisker himself. He knew it was not the motive, but he had to make it look like it was. Therefore, he took the money out of the purse and hid it.

Evidence presented to the federal court clearly showed that Petitioner had constantly fought with his mother. Many of these were very heated arguments, resulting in violence. Petitioner told the psychologists and psychiatrists about these physical fights, and he actually hit his mother in front of James Zeilan, the drug counselor, only a few months before the murder. Petitioner told Mr. Zeilan that he hated his mother and that he was "going to get her." (Pet. Exh. CCC 693-696; see *House v. Bell, supra,* 126 S.Ct. at 2087 *20.

Petitioner's comments to Dr. LeGassick also demonstrated that he had a deep-seated hatred toward his adoptive mother. He felt that she resented having adopted him, and he hated her for kicking him out of the house and refusing to continue to fund his drug habit by giving him money. (Exhs. E, R at 179.)

The manner of killing had all the earmarks of classic rage resulting in what is typically termed "overkill." The methods used were far more violent

and excessive than any random burglar would have used. Petitioner hit her with the trophy, he bashed her head in with the Bullworker exercise bar, he stabbed her with not one, but two knives, and then he placed a rope around her neck. No house burglar would have any animus to inflict such bizarre, repeated assaults with multiple weapons upon an elderly female, especially after the initial blows to the victim's head had rendered her unconscious.

There was additional motive evidence pointing to Petitioner in the form of his admitted desperate need for money. Petitioner told Hughes, Monsue, Probation Officer Barron, and Dr. Holland that he had a drug habit, that he frequently stole money from his parents, and that he needed money on the day of the murder. (Pet. Exh. BBB 551-52.) He said he went to the house to get money from his mother, and when she found him going through her purse, she picked up the trophy to threaten him with it, whereupon he grabbed it from her and banged her in the head with it. (Pet. Exh. BBB 223-26.) A reasonable juror would take Petitioner's statement at face value.

Based on the fact that $120 was found in Mrs. Lisker's purse years after the trial by an exhibits clerk, however, the federal court concludes that "one of the suggested motives for the murder, the robbery of Mrs. Lisker, is not supported by the evidence." The federal court further questions the evidence pertaining to Petitioner's history with his parents. (Pet. Exh. B at 28.) These conclusions are not borne out by the evidence.

Contrary to the federal court's suggestion, the discovery of the $120 in Mrs. Lisker's purse does nothing to change the strength of the government's trial evidence as to motive. The fact remains that Petitioner was aware that Robert Lisker, on the day before the murder, had given his wife $150 for shopping. (Pet. Exh. BBB 223-26.) The evidence remains that Petitioner had drug problems. (Pet. Exh. BBB 551, 952.) The evidence remains that Petitioner, who was kicked out of the house and did not have a job (Pet. Exh.

BBB 950, 952-53, 955) and admittedly used the last of his money to buy transmission fluids (Exh. R at 159), was in constant need of money.   The evidence remains unchanged that Petitioner had admittedly rummaged through Mrs. Lisker's purse.  (Exh. R at 196 .)

Petitioner also confessed to Robert Hughes that he needed money to buy PCP and that he had searched Mrs. Lisker's purse only to be stopped by Mrs. Lisker.  (Pet. Exh. BBB 551-52.)  Because such evidence already showed that Petitioner was motivated by the need for money, whether he in fact succeeded in taking the money was inconsequential.   Indeed, according to Hughes, Petitioner himself admitted that he tried to search for money, but was unsuccessful when Mrs. Lisker interrupted him.   Hence, twenty some years later, the fact that money was ultimately found inside the purse is simply inconsequential.

Indeed, even assuming arguendo the discovered $120 was part of the $150 Mr. Lisker gave Mrs. Lisker the previous night, that in no logical way disproves Petitioner's need of money as a motive.   Nor does it disprove there was an unsuccessful attempt to obtain money from Mrs. Lisker's purse.   This is because Petitioner (Exh. R at 196), Rabichow (Pet. Exh. CCC 74), and the police detectives in this case (Exh. R at 39)   [property report of the police murder book]), all looked through that purse and found no money.   This simply means that the money was stored in a hidden compartment that was difficult to discover -- nothing more.[10/]

Thus, if anything, the motive evidence is even stronger now than it was at trial, since Petitioner confirmed numerous times to CYA and correctional personnel his immense addiction to drugs, the fact that before the day of the

---

10.  It is noteworthy that if the "missing" money was indeed in Mrs. Lisker's wallet all along, such a fact, if anything, tends to show that Ryan did not steal from Mrs. Lisker and that he was telling the truth when he accounted for his expenses during his trip to and from California.

murder he and his mother argued about money, and the fact that his mother caught him rummaging through her purse, sparking the violent confrontation that resulted in her death.   (See, e.g., Exhs. D - K.)

Nor did the federal court ever address the equally likely possibility -- raised by Respondent at the hearing (Pet. Exh. CCC 562) -- that the $120 was not part of the $150 given to Mrs. Lisker the previous day and taken by Petitioner on the day of the murder.  First, the amount is different.  Second, the fact that many have searched through that same purse without finding amount of cash showed that it was difficult to find.  Under these circumstances, there is a reasonable possibility that the $120 was another cash amount hidden in a secret compartment, which was discovered only after a thorough search by an exhibits clerk trained and experienced in searching articles for court documentation.

The federal court also discounts the extremely significant motive evidence pertaining to Petitioner's difficult relationship with his mother.  The federal court observed that the witnesses who heard arguments did not witness physical violence. (Pet. Exh. B at 28.) This analysis overlooks the tumultuous mother-son relationship that Petitioner and his father recounted to correctional personnel, which included occasions of "roaring arguments," "violent outbursts of anger toward each other," an instance when Petitioner took  "defensive actions" against his mother striking him, and another instance when Mrs. Lisker threw dishes at him. (See, e.g., Exh. E at 10-13.)

It also unreasonably discounts the possibility that the deadly confrontation was the culmination of an escalating, hostile and volatile relationship between Petitioner and his mother.  Indeed, the gruesome nature of the crime is consistent with an explosion of pent-up rage.  Hence, the federal court's implicit suggestion that there was no past history consistent with Petitioner's capacity to commit the instant crime cannot be accurate.

In sum, the totality of the evidence showed that motive evidence relating to the need of money and the past history between Petitioner and his mother remains strong and in fact, is stronger today due to the availability of Petitioner's out-of-court confessions to correctional personnel.

## Z.  Lack Of Sufficient Third-Party Culpability Evidence

### 1.  Theft And Assault By Adopted Son; Not Robbery By Third Party

All the evidence recovered at the scene shows that the murder was committed by Petitioner.  There was no forced entry, and the front door was locked.  The murder was carried out with multiple weapons and showed unmistakable signs of overkill, committed out of hatred, in a fit of rage, apparently triggered by Petitioner's mother's refusal to give him money for drugs.  Furthermore, valuable items were left behind in the house, and no one was seen leaving the residence at or after the time that, according to the deputy coroner, the victim was receiving the fatal blows, i.e., the blows and stab wounds that would have lead to immediate death if resuscitation had not taken place within 20 minutes.

Moreover, the murderer took the time to carry the bloody Bullworker all the way back to the master bedroom, to wipe off the fingerprints with a towel, and to neatly place it in corner.  Those are not the actions of a thief who kills upon being suddenly and unexpectedly discovered and confronted by the victim.  No thief would go to the trouble of returning an exercise bar to its proper place in the farthest room of the house from the entry way after bashing in the skull of his victim.

## 2. Money Hidden In Attic: Monsue's Letter Involved An Innocent Misrecollection

The federal court concluded that Monsue's credibility has been further undermined when his letter to the parole board -- indicating the "new owners" of the Lisker residence told him that they found the missing $150 in the attic above Petitioner's old room -- was contradicted by Martin Borenstein, who bought the house from Robert Lisker. (Pet. Exh. B at 33-34.) However, the federal court appears to have considered only Petitioner's submissions, and shows no sign of considering plausible and persuasive alternative arguments pointing to a contrary conclusion.

Monsue's letter to the parole board, written on April 7, 1998, states in pertinent part:

"Several years after this crime occurred, I met with the new owners of the house where this crime occurred. They informed me they had found some money and several other items hidden in the attic of Bruce Lisker's old bedroom. The amount of cash found by the new owner was approximately $150, which is the amount of money that was reported missing from the victim's purse the day of the murder. This revelation confirmed our initial theory that Mr. Lisker had in fact robbed his mother."

(Pet. Exh. PP.)

The federal court noted that Borenstein, who bought the house in April of 1984 and sold the house in 1995, had no memory that either he or his wife ever found money in the house. The federal court also noted that Borenstein testified that he "just couldn't believe that such a significant thing would have totally escaped me." (Pet. Exh. CC 264.) However, the federal court overlooked several aspects of Borenstein's testimony which allow for the

71

000162

possibility that Mrs. Borenstein may in fact have called Monsue about the money.

First, there is significant evidence that Borenstein's memory was severely flawed. Prior to the above-quoted testimony about "such a significant thing" not escaping him, Borenstein testified that there is a possibility, which he characterizes as "slim" but nonetheless a possibility, that he had indeed forgotten this event. He explained that it would have occurred during an especially stressful time during which his wife died after a prolonged illness, so that "because of the stress of what had occurred and the passage of time, I put it out of my mind somehow." (Pet. Exh. CCC 264.)

This possibility may not be as slim as Borenstein represents. Indeed, Borenstein demonstrated significant memory confusion when testifying that he could not recall having researched Monsue's reputation. After being shown a transcript detailing his statement to Detective Gavin to this effect, he speculated that he perhaps was confusing Monsue with another police detective, Rick Swanston. But this explanation is questionable, because if Swanston, who played no part in the Lisker case at all, was the person he had in mind, there is no plausible explanation why he would try to ascertain Swanston's reputation in connection with the Lisker murder. Indeed, the very fact that he forgot he told Gavin in July 11, 2003, about his research of a detective's reputation also demonstrates that his memory was fallible. And, if he in fact confused Swanston and Monsue during Gavin's interview of him, that in and of itself also demonstrates that Borenstein was capable of forgetting significant events. The fact that he was a defense attorney means he must involve himself in many criminal investigations and acquaint himself with numerous cases and facts, thus posing a greater likelihood of his confusing one set of facts for another.

Moreover, there was other evidence that was consistent with money being found in the attic. As Borenstein admitted during the hearing, after

buying the house, a significant amount of work was done to it, including major constructions involving the flooring, the driveway, the plumbing, and the roof. (Pet. Exh. CCC 257-259.)  These projects required workers to be inside the house at times when Borenstein was not there. (Pet. Exh. CCC 259.)  When asked whether these projects would require workers to enter the attic, such as when electrical circuits are involved, he could only say, "I don't know." (Pet. Exh. CCC 258.)

Under these circumstances, there was a likelihood that a particular construction project required a worker to enter the attic, where the money was found.  The federal court did not address this point when it suggested the unlikelihood of Mrs. Borenstein, while frail from cancer, finding the money after accessing the attic through a ladder.  (See Pet. Exh. B at p. 34.)  Indeed, during the interview with Gavin, Monsue clarified that it was a female caller who informed him of the money: "he received a phone call from a female, and the female stated that several years prior, she had discovered money in her house; and when talking to neighbors, they indicated to her that a murder had occurred in that house and money was missing." (Pet. Exh. CCC 382.)

Under these circumstances, it would be reasonable to infer that Mrs. Borenstein had made the call to Monsue after the money was found in the attic during a construction project and that she had informed Mr. Borenstein, who due to the stress of her illness and the passage of time had simply forgotten that piece of information.  Indeed, Borenstein acknowledged that his wife was able to use the telephone and could have used it in his absence.  (Pet. Exh. CCC 259.)

Respondent acknowledges that Monsue wrote in his letter that he received this information about the money when he "met with the new owners of the house." (Exh. PP.)  On its face, this account is not the same as saying a

female had called him about the money.  The federal court stresses this fact. (Pet. Exh. B at 34.)

However, it is difficult to conclude, based on this fact alone, that the letter was somehow a product of intentional fabrication.  Monsue presumably knew at the time that this letter would be kept as part of the parole records, and if it contained fabrications which could easily be discovered, it might very well one day affect his reputation and his employment.  It appears unlikely that Monsue would deliberately engage in such a course of conduct in light of the fact that whether the new owners had given a certain information could easily be verified by speaking with those new owners.

Moreover, the letter was written in opposition to Lisker's parole.  To engage in the extra effort of setting forth a considerably detailed fabrication, just to convey a relatively unimportant point that Petitioner intended to rob his mother, does not make sense.  If there was anything that would keep Petitioner behind bars, it would be the viciousness of the murder, Petitioner's sophisticated and deliberate efforts to stage the crime scene to make it look like another person did it, his subsequent cold-blooded attempt to lay the blame on a former friend, and his lack of remorse, all of which were also detailed in the same letter written by Monsue.  Motive, ranking very low in this hierarchy, was already substantiated by various evidence produced at trial.  Indeed, money was just one conceivable motive, and pure rage -- arising from the past history of the relationship -- would arguably be a better explanation of the crime and would better convey to the parole board Petitioner's dangerousness.  In sum, there simply was very little incentive for Monsue to go out of his way to risk his career by fabricating new evidence relating to an unimportant issue that was already amply supported by trial evidence.

In light of all this, an innocent explanation exists which would much better account for the discrepancy between the letter and the facts.  Mrs.

Borenstein died in April of 1992 (Pet. Exh. CCC 249), but Monsue wrote his letter on April 7, 1998. Hence, if Mrs. Borenstein was the caller who informed Monsue about the money, the letter would have been written at least six years, if not more, after the conversation. It could very well be the case that, just as Borenstein had forgotten at the time of the Gavin interview whether he was thinking of Monsue or Swanston, Detective Monsue could have had a confused memory regarding: (1) whether he talked to both of the owners or just one of them and (2) the method of contact. Such innocent mis-recollections are commonplace, as recognized by standard jury instructions. (See, e.g., CALJIC No. 2.21.2 (failure of recollection is common, and innocent misrecollection is not uncommon).)

In sum, the federal court failed to consider innocent explanations for Monsue's letter that a reasonable juror would evaluate before coming to the conclusion that the letter undermined Monsue's credibility.

### 3.  Ryan Not Connected To Crime Scene

#### a.  Not A DNA Case

Here, there was no physical evidence connecting Ryan to the crime -- no fingerprints, no hair, no blood, and no footprints or shoe prints. The only fingerprints found were Petitioner's, and they were on one of the kitchen window panes. This is not a DNA case, such as the recent case of *House v. Bell*, where a third person's DNA was found on the victim's clothes. *House v. Bell, supra*, 126 S.Ct. at 2087.

On the contrary, the only support for Petitioner's claim "involved facts which were subject to interpretation -- that is, the claim of innocence was not clear cut." *Araujo v. Chandler* (7th Cir. 2005) 435 F.3d 678, 681. "It was not DNA evidence conclusively ruling him out as the perpetrator." *Id.* On this basis alone, the uniquely high *Schlup* standard has not been met.

### b. No Motive Evidence

There is no evidence whatsoever to demonstrate that Ryan had any motive to kill Dorka Lisker with two knives, an exercise bar, a trophy, and a rope. No evidence has been presented to show that he had ever fought with her or had ever said anything bad about her. No evidence has been presented to indicate why, if he actually did try to take money from her and she caught him, he would not simply leave, or if she confronted him and he felt he needed to prevent her from calling the police by knocking her out or even by killing her, why he would not simply kill her with one knife, instead of two, or just with the Bullworker.

That Ryan might have had a temper does not show identity. That he was in the Los Angeles area, to wit, Hollywood, does not show identity. That he was Petitioner's former friend and roommate does not show identity. That he had done yard work for Mrs. Lisker in the past does not show identity. And that he went to the Lisker residence the night before the murder to use the telephone does not show identity. (Pet. Exh. B at pp. 31-32.)

### c. No Third-Party Confession Evidence

Proof of actual innocence consists of proof that "the State has convicted the *wrong person* of the crime," such as where "another person has credibly confessed to the crime, and it is *evident* that the law has made a *mistake*" (*Sawyer v. Whitley, supra,* 505 U.S. at p. 340; italics added). In the recent case of *House v. Bell*, another person confessed twice to having committed the crime (*House v. Bell, supra,* 126 S.Ct. at 2087 *20-21), and this Court has noted that a confession of guilt by a third party, if reliable and trustworthy, is evidence of such character as would completely undermine the structure of the case. (*In re Hardy, supra,* 41 Cal.4th at p. 1016; *In re Weber, supra,* 11 Cal.3d at p. 724.)

Here, however, there was no confession; indeed, Michael Ryan told his mother he did not do it.

### d. Telephone Call From Lisker Residence

The federal court appears to give considerable weight to what a telephone record shows to be a 10:22 a.m. telephone call placed from the Lisker residence to the number "492-8972," which the court observed was "different by one digit (and without the area code) from Ryan's mother's home phone number."[11] (Pet. Exh. B at 32, 56-57.)  Petitioner's interpretation of this call is that Ryan must have made it.

This conclusion does not make sense.  Ryan's mother, Linda Clelland, attested that Ryan had lived with her for some time at her home and when not living with her, often called her from various places in the country.  (Exh. X.)  Meanwhile, it is undisputed that Ryan had, for a period of time, lived with Petitioner at Petitioner's apartment minutes away from the Lisker residence.  (Pet. Exh. FF at 37, 40 [Ryan talking about living with Petitioner]; Exh. R at 98 [Petitioner's address being listed as "6500 Sepulveda Blvd. Van Nuys"]; Exh. R at 141 [Petitioner informing Monsue that Ryan lived with him for two months].)  Knowing his mother's number by heart, and knowing the difference in the area code after having lived with Petitioner, it is not plausible that Ryan would mis-dialed in this way.  And if he misdialed, there was no conceivable reason he would not dial again, using the correct telephone number.

The federal court apparently connected the March 10, 1983 call with Ryan's account to Monsue of his visit to the Lisker residence on March 9, 1983, to make a call.  The federal court noted the fact that the telephone records

---

11. It is not disputed that the telephone number of Ryan's mother, Linda Clelland was and is (805) 492-8976, and the telephone number for the Lisker residence was (213)789-2535 in 1983.

showed that no call was placed to Clelland's residence from the Lisker residence on March 9, 1983. But this assumed, without any basis, that the person Ryan *planned* to call at the Lisker residence was his mother and not someone else. Indeed, Ryan only said during the interview, "I stopped by Mrs. Lisker's house to use her phone and a to see how she was, you know, and I was gonna ask her if she had some work for me to do." (Pet. Exh. FF at 7.)

There is a very plausible explanation for the telephone call near the time of the murder. Mrs. Lisker had actually met Linda Clelland at the Palmer Drug Abuse Center. This is shown by various pieces of evidence. First, as James Zeilan, former counselor at the Palmer Drug Abuse Center, has testified, both Petitioner and Ryan attended counseling sessions at the center. (Pet. Exh. CCC 692.) There, the youths formed a group while their parents formed another group. (Pet. Exh. CCC 690-692.) Zeilan remembered Mrs. Lisker attending the adults meetings. (Pet. Exh. CCC 692.) Although Zeilan could not remember one way or the other whether Clelland attended (Pet. Exh. CCC 692), Clelland said that she did go to meetings with Ryan. (Exh. X at 2.)

That Mrs. Lisker and Clelland became acquainted during those group meetings and had possibly exchanged telephone numbers is confirmed by the police interview notes of Linda Clelland. Those notes reflect that when interviewed on April 12, 1983, Clelland told the police that she received a call from Ryan, on March 7, 1983[12], informing her that he was leaving Mississippi to come to California. (Exh. R at 354.) Apparently, Ryan never contacted her after his arrival and Clelland began "calling around" to find him. Apparently, *Clelland had Mrs. Lisker's telephone number*, which she used to reach Robert Lisker, who in turn, informed Clelland about the murder. (Exh. R at 354.)

---

12.   Respondent assumes the "April 7, 1983" date written on the interview note as the date Clelland received a call from Ryan about leaving Mississippi was a mistake and that the correct date should have been March 7, 1983. (Exh. R at 354.)

Under these circumstances, rather than assuming what is almost impossible, that Ryan has misdialed and had not called again, the more plausible explanation was that Mrs. Lisker had misdialed. That is, after having spoken to Ryan on March 9, 1983, Mrs. Lisker had decided to call Clelland on March 10, 1983, to inform her that her son had arrived in California and had actually been to her house. Possibly because Mrs. Lisker had made a mistake in jotting down Clelland's number, she dialed a telephone number that was off by one digit and was missing the required area code. A reasonable juror could readily accept this account. The federal court did not consider it.

### e.   No Eyewitness Testimony Placing Ryan At Scene

The Supreme Court has repeatedly stated, however, that proof of actual innocence consists of proof that "the State has convicted the *wrong person* of the crime," such as where there are "trustworthy eyewitness accounts" identifying someone else as the culprit. (*Schlup*, *supra*, 513 U.S. at p. 324.) Here, there were no eyewitnesses who said they saw Ryan enter or leave the Lisker residence that morning.

### f.   Shoe Impressions Left At The Scene Were Not Ryan's

The federal court concluded that Petitioner had demonstrated "that the bloody shoe print in the guest bathroom and one of the shoe impressions in the dirt outside the house were left by someone other than himself, disproving the State's 1985 theory of his guilt. Moreover, it appears likely that the shoe prints were not left by police personnel." Respondent concurs that there were shoe prints, found outside the house ("shoeprint B2") and in the guest bathroom ("shoeprint G"), which were similar in characteristics to each other but did not belong to Petitioner, as testified by FBI analyst Sandra Wieserma. (Pet. Exh. CCC 567-577, 582-584.) Respondent, however, takes exception to the federal

court's conclusion that "it appears likely that the shoe prints were not left by police personnel." The federal court's conclusion in this regard is inadequately supported by the evidence, and based on flawed credibility determinations.

The federal court questioned Officer DeRousseau's credibility by indicating that his testimony at the evidentiary hearing -- that he "probably" stepped in blood -- was contrary to his trial testimony. (Pet. Exh. B at 24.) However, DeRousseau's testimony at the hearing is readily reconcilable with his trial testimony. At trial, DeRousseau responded, "yes" when asked whether he was "careful not to disturb any potential evidence." (Pet. Exh. BBB 874.) He also answered, "Yes" when asked whether he "avoid[ed] stepping in any blood spots." He clarified that he was told by the homicide unit not to step in blood spots. (Pet. Exh. BBB 874.) This testimony was true as far as DeRousseau's knowledge was concerned at the time of trial. There was no indication that he reviewed any other document in preparation for trial other than the "notes and reports that [he] made regarding the incident." (Pet. Exh. BBB 867.)

However, this all changed prior to the federal evidentiary hearing. As DeRousseau testified, he refreshed his recollection before the hearing with the crime scene photographs. (Pet. Exh. CCC 410, 413, 415.) As he looked at the photographs, he noticed red stains he could not remember seeing when he was engaged in his protective sweep. (See, e.g., Pet. Exh. CCC 436-437.) But even then, he was careful not to rush to a conclusion that he in fact stepped on blood. Rather, knowing more now than he did at trial, he reasonably left open a possibility which he had excluded at trial. Indeed, George Prado, who entered the house with DeRousseau, testified that officers often could not see blood on the floor or carpet as they conduct their preliminary search of a premise. (Pet. Exh. CCC 446.) Under these circumstances, there was nothing incredible about DeRousseau's modification to his trial testimony.

The federal court also questioned the officers' credibility by finding that, contrary to the officers' testimony at the evidentiary hearing, neither of them indicated in their March 10, 1983, reports, and did not testify at trial, that they entered the guest bathroom containing shoeprint "G." (Pet. Exh. B at p. 24.) Such an analysis, attacking the credibility of officers based not on directly inconsistent statements but on what was omitted from their past reports, overlooks the purpose of a police report, i.e., to summarize activities and observations, as opposed to recording all details. As to the scrutiny of past trial testimony, the federal court likewise loses sight of the gist of the officers' trial testimony and at the same time, overlooks the nature of the questions asked of these officers and whether they were of the type that would elicit answers the federal court faulted the officers for not supplying.

It is true that neither the officers' report nor their testimony at trial specifically indicate their entrance into the guest bathroom (Exh. R at 365-366; Pet. Exh. BBB 829-865, 866-876). It is also true, however, that the officers conducted a protective sweep in order to secure the *entire* residence, verifying that no criminal suspect was still inside the house. (Pet. Exh. BBB at 838-839 [Prado searched closet doors in every room, "went through" the entire house], 869 [DeRousseau "checked the house with Officer Prado for suspects"].) It is also undisputed that this procedure is of utmost importance as the officers' safety depended on it. (Pet. Exh. CCC 412, 446.) The federal court failed to acknowledge that the guest bathroom was part of the house which undoubtedly needed to be checked, and was almost certainly checked for possible suspects during the protective sweep.

In any event, the fact that the officers in the past omitted mention of the guest bathroom is of little or no consequence. They also omitted mention of two other bathrooms in the house (Pet. Exh. BBB 874-875 [DeRousseau checked the master bedroom and bathroom]; Pet. Exh. BBB 838-389 [Prado

testifying, "(DeRousseau) went to the right and I went to the left. So we covered different rooms"]; Exh. R at 365-365a [Prado's report indicating he searched the den, kitchen area, living room, two small bedrooms, exterior of residence]; Exh. ; Ex. 8: 366-367 [DeRousseau's report indicating he checked the master bedroom].) These other bathrooms, again, had to be, and unquestionably were checked, for suspects. The omitted mentions were not surprising. The officers' reports were summaries which detailed only the most important facts and may very well have left out mention of relatively unimportant parts of the house.

Likewise, at trial, the focus of their testimony was the appearance, demeanor, and statements of Petitioner (see, e.g., Pet. Exh. BBB 831-853, 867-872), not a comprehensive list of every area searched during the protective sweep. The testimony about which areas they searched was at best peripheral. (Pet. Exh. BBB 839, 872-73). Indeed, Prado did not even specify which rooms he went into, other than to say DeRousseau searched the right portion of the house while he handled the left. (Pet. Exh. BBB 839.) Hence, it is simply unfair to discount the officers's credibility simply because they had not specifically mentioned the guest bathroom while answering questions at trial propounded with an entirely different focus. In this regard, it bears emphasis that at no point were either officer directly asked at trial about entrance into any of the bathrooms.

Furthermore, contrary to the federal court's conclusion (Pet. Exh. B at 25), the evidence strongly suggests that shoeprint "G" in the guest bathroom was left by one of the officers during the sweep. As the crime scene photographs show (see, e.g., Exh. V at 89, 90, 91, 93, 95, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107) and as both officers acknowledged (Pet. Exh. BBB 423, 446), there was an abundance of blood in the residence. Although the officers were doing their best to avoid stepping on blood, their attention during

the protective sweep was devoted to the search of suspects, so it was not possible to guarantee non-disturbance of the scene. (Pet. Exh. BBB 446-447.) Meanwhile, as Exhibit Y at 1 shows, shoeprint "G" was not located in the middle of the bathroom, but was inches from the threshold and appears to point into the bathroom. This was perfectly consistent with an officer (who had previously stepped on blood accidentally) taking one quick step into the bathroom, ascertaining that no suspects was inside, and proceeding on to the next room.

In this regard, that shoeprint G may have been made by the same shoe that left the shoeprint on the dirt walkway east of the house (shoeprint B2) is no surprise. (See Pet. Exh. CCC 567-577, 582-584 [FBI Analyst testifying that prints B2 and G had characteristics similar to one another].) If anything, it confirms that both shoeprints were left by police personnel. This is because both Prado and DeRousseau had been to the east side of the house. (Exh. R at 365 [Prado's report indicating he checked exterior of residence including the east side]; [DeRousseau, in reply to question at trial about searching "exterior circumference of the residence," testifying he went to the east side of the house where he observed a broken window].) At the time they searched that part of the property, either of them could have walked through the dirt walkway in question and were thus perfectly capable of leaving shoeprint B2.

In attacking the credibility of the officers, the federal court cited the fact that DeRousseau had testified he went to the exterior of the house to search, but Prado did not see DeRousseau do so. (Pet. Exh. B at 25.) The federal court placed unwarranted significance on this observation. Prado testified expressly and unmistakably that he would not know whether DeRousseau had searched the side of the house, because during the times when he (Prado) was not at the east side of the house, DeRousseau "may have been tending to Mr. Lisker, or

he could have been checking a portion of the perimeter of the house. [He] just [didn't] know." (Pet. Exh. CCC 571.)

The federal court also found the officers not credible because of their "claimed ability to remember minute details such as whether they noticed specific blood stains during their quick search 20 years earlier." (Pet. Exh. B at 25.) But the memory of minute details of a gruesome murder scene, which not all officers come across on a regular basis, is not inherently implausible. Nor does the federal court acknowledge that memory can be refreshed by past written accounts and extensive crime-scene photographs now shown to the officers.

Citing the fact that "neither officer remembered anything about the shoes he wore that day," the federal court hastily concluded that "any suggestion that one of the [officers] left the prints would be pure speculation." (Pet. Exh. B.) Respondent disagrees. The fact that a protective sweep had to be conducted at a bloody murder scene, the location of shoeprint "G" being near the threshold, and that both of the officers that conducted the sweep had also been to the side of the house where a similar shoeprint was found, combined to yield a reasonable likelihood that the shoeprints in question were left by police personnel. A reasonable juror could certainly reach this conclusion.

Adding to this likelihood is the fact that such contamination is common, almost inevitable, and that it did in fact occurred in this case. FBI analyst Wieserma testified that according to her experience, there were "many cases" in which she was called to assist as a shoeprint analyst where she had determined that the scene was contaminated by paramedics or law enforcement officers. (Pet. Exh. CCC 595.) In fact, one such shoeprint contamination was detected in the instant case because of the print's extreme dissimilarity with Petitioner's shoe. It was established at trial that paramedic Lovato was the one who left shoeprint D, a shoe impression appearing to be in blood, found at the

porch of the residence. (Pet. Exh. BBB 184-85; Exh. Z at 3-4.) If paramedics stepped on blood in the foyer where they treated Mrs. Lisker and unwittingly left a shoeprint, then it is highly likely that the police officers who walked through that same foyer to conduct the protective sweep had unwittingly left bloody shoeprints at the scene.

Another important set of facts renders it unlikely that shoeprints B2 and G belonged to another assailant. According to police investigation, all doors, except the front door -- which Petitioner had apparently found to be initially locked but had later opened from the inside after he allegedly broke in -- were locked and all windows were nailed shut except the kitchen window, which was dismantled. The front door was not damaged in any way. (Pet. Exh. BBB 262-63, 248-49, 274-75, 289-90, 851-52.) Under these circumstances, the two possible ways this alleged third-party assailant could have gained entry into the house was to either break in through the kitchen window or enter through the front door.

The first possibility was excluded, as Petitioner took responsibility for the forced entry into the kitchen window. (Exh. R at 161.) This means that the alleged assailant had entered through the front door, thus rendering the need to walk around the perimeter of the house unnecessary. This scenario appears inconsistent with evidence tending to show that shoeprint B2, found at the dirt walkway, and shoeprint G in the bathroom were made by the same shoe. The combined circumstances, on the other hand, are more consistent with either Prado or DeRousseau being the source of both shoeprints G and B2 as a result of their activities in and out of the house.

In sum, the federal court overlooked evidence supporting the inference that the shoeprints were left by police personnel. Respondent acknowledges that the prosecution case at trial was based in part on the premise that all shoeprints inside the house belonged to Petitioner. But a reasonable juror

would understand the prosecutor's argument to mean that all shoeprints other than those of law enforcement personnel were those of Petitioner. In other words, the prosecutor was arguing that, based on the evidence, the only shoeprints left by anyone other than police officers or paramedics were Petitioner's. And given the evidence just summarized indicating that the shoeprints likely belonged to police personnel, it simply cannot be said with any degree of certainty that no reasonable juror would be persuaded that all the shoeprints found inside the house belonged to either Petitioner or police personnel rather than to a mysterious third-party assailant.

### g. The Impression On The Victim's Head Was Not A Shoe Impression

The federal court summarized certain testimony relating to the impression found on the skull at the back of the victim's head behind her ear, but did not draw any immediate conclusion. (Pet. Exh. B at 25-27.) Nonetheless, the federal court also appeared to draw a conclusion that the impression was "possibly" a shoeprint. (Pet. Exh. B at 56.) Respondent respectfully submits that this conclusion is not only speculative, but also is contrary to the evidence.

The federal court cited testimony by LAPD Criminalist Ronald Raquel, Coroner's Office tool mark expert Steven Dowell, and FBI analyst Wieserma, to highlight the fact no tool was ever produced to match the head impression. (Pet. Exh. B at 25-26.) The federal court unduly magnified the significance of this fact and overlooked evidence which militated against the suggestion that the impression in question was caused by a shoe. The federal court did not consider the fact that if the tool had been a produced in the early 1980's and late 1970's, which it would have been, it would be extremely difficult to now locate or reproduce that exact object.

More directly however, there is simply no credible evidence that demonstrates that the head impression was a shoeprint. Indeed, in relying on Raquel's opinion that the impression was made by a shoe (Pet. Exh. B at 25), the federal court failed to acknowledge that the opinion was formed with significant qualifiers that rendered it rather meaningless, and further omits any consideration of the critical problems that plagued Raquel's analysis. First, as Raquel had to acknowledge, he rendered that opinion within the "little world" of shoe comparison, and he went on to agree that he could "see that there are other things that are made that are not shoes that could have . . . made this impression." (Pet. Exh. CCC 227.) Moreover, even within this "world" of shoe impressions, Raquel had to acknowledge that the head impression contained none of the usual features of a footwear impression, i.e., the heel area, the arch area, the toe reach, and the edge contours. (Pet. Exh. CCC 227-228.)

Furthermore, although a tool was not produced at the evidentiary hearing to match the mark, no shoe or shoe impression matched the mark either. As Raquel acknowledged, a disparity in dimensions between the head impression and impressions G and B2 exists, i.e., the head impression exhibited six bars per inch and impressions G and B2, five bars per inch. (Pet. Exh. CCC 194 [impression G and B2 had five bars per inch]; Pet. Exh. CCC 219-220 [head impression had six bars per inch].) Indeed, the most that Raquel was willing to conclude regarding the comparisons was that the spacing of the impression was *more similar* to that of G and B2 than to Petitioner's Pacer shoes. (Pet. Exh. CCC 194.) Nor did Raquel render an opinion at the hearing that the impression on the back of the victim's head was of a herringbone pattern.

Thus, the only basis upon which Raquel rested his current opinion that the head impression was a shoe impression is that he had seen, on one single past occasion, a similar impression on a human body, in the shoulder area, that was left by a shoe. (Pet. Exh. CCC 226-227.) This observation was further

weakened by his admission that he was not a pathologist or a medical doctor (Pet. Exh. CCC 228), had no idea regarding the distance between the skin and bones of the shoulder area as compared to the human head (Pet. Exh. CCC 231-232), and could envision other tools that could cause that mark (Pet. Exh. CCC 227). In short, a reasonable juror would readily decide that his opinion carried very little weight.

Indeed, the FBI shoe impression expert, Wieserma, confirmed as much. She testified unequivocally that there is no evidence that the impression on the head, a mere one inch by a half inch in size, was a shoe impression. (Pet. Exh. CCC 591, 594.) And, as the federal court had to acknowledge, because the available photographs yielded conflicting measurements, Wieserma found no basis to draw the conclusion from those photographs that the impression in question had the same dimensions as B2 and G. (Pet. Exh. B at 26.)

On the other hand, there is substantial evidence that the impression was not a shoeprint, much less one caused by the shoe that left impressions B2 and G. First, if the impression behind Mrs. Lisker's ear was made by a shoe that impacted her head, there is no explanation why only an incredibly minute fraction of that shoe, about the size of half a quarter (U.S. currency), became imprinted on the head, and not more. Wieserma testified that in all her years of experience, she had never seen any shoe impression that small on a human body. (Pet. Exh. CCC 591.) Second, even Raquel had to acknowledge a feature showing that the impression behind the victim's ear was a herringbone pattern. He admitted that as to that impression, the second bar from the left not only hooked toward the front of the face at the top of the bar, it also hooked toward the front of the face at the bottom. (Pet. Exh. CCC EH II 235-236.) The logical consequence is that all the bars, like the second bar, were not herringbone patterns, i.e., patterns that "zig zag" (Pet. Exh. CCC EH II at 210), but formed a series of "C" shaped impressions.

Raquel conditioned this concession on the predicate that the hook at the bottom of the second bar was part of the contusion forming the bar, and not a separate abrasion. (Pet. Exh. CCC 234.) A careful examination of Petitioner's Exhibit Y at 10, and of a close-up photograph, Petitioner's Exhibit Y at 11, reveals that while there was a separate abrasion at the bottom of the first bar, the part of the second bar that hooked back at the bottom was a continuous part of the same contusion that formed the second bar. (See also Exh. AA.) In fact, when these photographs are examined more closely, the bottom of the third and fourth bars, counting from the left, also hooked toward the front of the face. As such, there exists significant evidence, overlooked by the federal court, that this impression was not a herringbone pattern and thus, could not have been made by the shoe that left impressions B2 and G.

On the other hand, the smallness of the impression and the fact that it comprises "C" figures are consistent with a bracelet or wristwatch probably worn by Mrs. Lisker when she was being beaten. This very real possibility, strongly supported by the evidence, was presented at the close of the hearing (Pet. Exh. CCC 766-767) but not considered by the federal court. According to Robert Lisker's trial testimony, Mrs. Lisker regularly wore jewelry, including a wristwatch.[13] (Pet. Exh. BBB at 227.) Meanwhile, Steven Dowell, the tool expert, confirmed that the patterned impression on the victim's head would be consistent with a bracelet or a watchband that had features capable of producing the observed pattern. (Pet. Exh. CCC 767-768.) A reasonable juror would consider such evidence. The federal court apparently did not.

Various other items of evidence shows why such jewelry would account for the impression. As the defensive stab wounds on Mrs. Lisker's hands demonstrate (see Exh. AA at 10, 16), Mrs. Lisker shielded herself by holding

---

13. Lovato could not recall whether Mrs. Lisker was wearing a watch or any jewelry when he first found her at the foyer. (Pet. Exh. BBB 203.)

her arms up throughout the assault. And, when the blunt object (e.g., the exercise bar that had blood on it (Pet. Exh. BBB 93-94, 98, 299, 312, 496)) which caused the serious fractures to the back of her head (see Pet. Exh. Y at 10 [showing the head fracture]), was being used against her, it stands to reason that at some point, she shielded that general area of her head with her arms to protect against the blows. This would mean that she held her hands up against her the sides of her head, with her elbows forward, and her right wrist would at some point have been pressed against her right ear. Under these circumstances, as the exercise bar impacted her right arm, the resulting force caused her wrist area (where the bracelet or watch was worn) to impact the area behind her right ear, thereby leaving the impression in question. A reasonable juror could reach that conclusion. The federal court did not consider it.

Dr. Golden's autopsy report confirms this version of events as it documented a fracture to Mrs. Lisker's right arm (Exh. BB at 2); this fracture is an indication that the right arm was in the way of a vicious blow to a part of the body. Just as important, the autopsy report documented a bruise to Mrs. Lisker's right wrist (Exh. BB at 6), a physical sign consistent with the bracelet or watchband bruising the wrist as it impacted the back of the head.[14] With such physical evidence pointing to this sequence of events involving a bracelet or a wristband, the speculation that the impression in question was left by a shoe becomes even less worthy of consideration.[15]

---

14. During the federal hearing, the Court precluded respondent from inquiring of Dr. Golden as to whether this version of events was consistent with the impression in question. The apparent ground for the exclusion was that it called for speculation. (Pet. Exh. CCC 688.)

15. The federal court drew an inference that undermined its own conclusion. The federal court first referenced Dr. Golden's testimony that a major fracture to the head was found on the right side, near the base of the skull. The court then observed that the fracture was presumably near the impression in question. (Pet. Exh. B at 26.) From this, the federal court

For these reasons, the federal court's finding that the patterned impression on the back of the victim's head was "possibly" a shoe impression is contrary to the evidence. At the very least, it cannot be fairly concluded that not one reasonable juror would view the discovery of this impression as an inconsequential fact having no effect upon the strength of the prosecution case.

### h. Even If Ryan Were Somehow Involved, That Would Not Show Petitioner's Innocence

The federal court failed to consider and evaluate another *obvious* and *highly relevant* possibility: that Ryan, if involved at all, was Petitioner's *accomplice*. *None* of the evidence presented at the actual innocence hearing eliminated the possibility that Ryan was merely present when Petitioner murdered his adoptive mother and then fled. Thus, even if the completely speculative evidence accurately implicated Ryan in any way, it would show only that Ryan was merely Petitioner's *accomplice*, acting in concert with Petitioner, or acting as an astonished, and then frightened, eyewitness.

It bears repeating that during the 911 call, when the dispatcher asked Petitioner, "Did you have a stabbing there?," Petitioner tellingly responded, "Yes, *we* did." (Exh. T; italics added.) Thus, the federal court failed to take into account the fact that Petitioner has not demonstrated innocence if his third-party-liability evidence does not show that the third-party acted *without*

---

postulated that the same force that caused the impression in question also caused the major head fracture. If this were the case, then similar patterned impressions from the alleged shoe would presumably appear near that fracture. Yet, when Petitioner's Exhibit Y at 10 is reviewed, no such patterned impressions appear at or near that fracture. Hence, if the federal court is correct that the same force of impact caused both the patterned impression and the fracture, the suggestion that the impression in question was a shoeprint is undermined.

Petitioner. Under California law, if Petitioner acted in concert with Ryan, he still was guilty of the murder as a principal.

Thus, respondent takes serious exception with the federal court's findings. The evidence presented in federal court did not merely defeat Petitioner's claim of actual innocence. It conclusively established his actual guilt.

Consequently, he has failed to meet the stringent requirements under the miscarriage-of-justice exception sufficient to enable him to hurdle the procedural bar.

## V.

## NONE OF PETITIONER'S CLAIMS ESTABLISH A PRIMA FACIE CASE FOR RELIEF

A habeas petitioner must plead and prove sufficient grounds for relief by stating fully and with particularity the facts upon which relief is sought. The Petitioner must also provide copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations. An appellate court must summarily deny the petition if it determines that no prima facie case has been stated because, even assuming the petition's factual allegations are true, the petitioner would not be entitled to relief. (*People v. Duvall* (1995) 9 Cal.4th 464, 474-475, emphasis in original; see also *In re Robbins* (1998) 18 Cal.4th 770, 814; *In re Clark*, *supra*, 5 Cal.4th at pp. 764, 766-767, 781, 797-798; *In re Swain* (1949) 34 Cal.2d 300, 304.)

In *People v. Duvall, supra*, 9 Cal.4th 464, this Court enunciated the following principles applicable to these proceedings:

Our state Constitution guarantees that a person improperly deprived of his or her liberty has the right to petition for a writ of habeas corpus.

[Citations.] Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the Petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them. "For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; defendant thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended." [Citation.]

To satisfy the initial burden of pleading adequate grounds for relief, an application for habeas corpus must be made by petition, and "[i]f the imprisonment is alleged to be illegal, the petition must also state in what the alleged illegality consists." [Citation.] The petition should both (i) state fully and with particularity the facts on which relief is sought [citations] as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations. [Citations.] "Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing." [Citation.] We presume the regularity of proceedings that resulted in a final judgment [citation], and, as stated above, the burden is on the Petitioner to establish grounds for his release. [Citations.]

An appellate court receiving such a petition evaluates it by asking whether, assuming the petition's factual allegations are true, the Petitioner would be entitled to relief. [Citations.] If no prima facie case for relief is stated, the court will summarily deny the petition.

(*Id.*, 9 Cal.4th at pp. 474-475, emphasis in original; see also *People v. Visciotti* (1996) 14 Cal.4th 325, 351; *People v. Romero* (1994) 8 Cal.4th 728, 742; *In re Robbins, supra*, 18 Cal.4th at p. 814; *People v. Gonzalez, supra*, 51 Cal.3d

1179, 1258; *In re Clark, supra*, 5 Cal.4th at pp. 750, 764, 766-767, 781, 797-798.) A collateral attack on the validity of a judgment "is limited to challenges based on newly discovered evidence, claims going to the jurisdiction of the court, and claims of constitutional dimension." (*In re Clark, supra*, at pp. 766-767.)

In the instant matter, Petitioner has not alleged sufficient facts to entitle him to relief as to any claim in that they are speculative claims unsupported by sufficient evidence. In addition to relying on the facts set forth in the petition, Petitioner suggests as to every claim that certain facts developed at the federal evidentiary hearing are supportive of the claim. Irrespective of this Court's authority to judicially notice the federal proceedings and conceivably to attach significance to certain evidence presented therein, this Court is certainly not bound by the federal court's interpretation of that evidence.

Furthermore, it bears repeating that the purpose of the federal evidentiary hearing was solely to determine whether Petitioner had made a sufficient showing of actual innocence to enable him to pass through the *Schlup* gateway and have his otherwise barred claims heard on the merits. (See *Schlup*, 513 U.S. at p. 329; *Herrera v. Collins*, 506 U.S. at p. 404.) For that reason, the federal court severely restricted the scope of the inquiry and concomitantly curtailed the evidence that could be presented, not allowing respondent to present evidence material to a determination of the merits of the federal constitutional claims that was not also relevant to a determination on the actual innocence claim. Thus, if this Court issues an order to show cause, respondent will request an evidentiary hearing to permit him to present highly relevant evidence to rebut each of Petitioner's constitutional claims.

## A. Claim That Petitioner's Conviction Was Obtained Through The Presentation False Evidence That Contributed To The Verdict

In Ground One, Petitioner maintains that the prosecution's presentation of false evidence violated his right to due process and rendered the trial constitutionally unfair. He insists that the evidence presented at the federal evidentiary hearing regarding weather conditions, sight line conditions, outside light conditions, bloody shoeprint patterns, and unfound money in Mrs. Lisker's purse, all show that the prosecutor presented false evidence at the trial. (Pet. 47-55.) The contention is not supported by logic or the law.

The prosecution's presentation of false evidence violates due process and renders a defendant's trial unfair if the false evidence is material to the verdict. (*United States v. Agurs* (1976) 427 U.S. 97, 103 [96 S.Ct. 2392]; *Giglio v. United States* (1972) 405 U.S. 150, 154 [92 S.CT. 763, 31 L.Ed.2d 104]; *Napue v. Illinois* (1959) 360 U.S. 264, 269 [79 S.Ct. 1173, 3 L.Ed.2d 1217.) Thus, a conviction obtained through the presentation of material false or perjured testimony must fall. (*In re Hall, supra*, 30 Cal.3d at p. 424; *In re Imbler* (1963) 60 Cal.2d 554, 566.) False evidence is material if it is reasonably probable that it could have affected the outcome. (*United States v. Bagley* (1985) 473 U.S. 667, 678-682 [105 S.Ct. 3375, 87 L.Ed.2d 481]; *In re Sassounian* (1995) 9 Cal.4th 535, 546.)

Here, the "false evidence" that Petitioner refers to merely consisted of reasonable inferences from the evidence that was actually presented at trial. As argued above, none of the evidence upon which the prosecutor based these arguments to the jury was false. Monsue and Robert Lisker testified truthfully that when the tried to look, *they* could not see through the windows because of the reflection of the pool on the glass and because of the dark interior. In addition, Monsue testified truthfully that the unidentified footprint looked

"similar" to the shoes worn by Petitioner, not that they were identical. Monsue
testified truthfully that he could find no money in the wallet.

Thus, the prosecutor was merely asking the jurors to draw certain
reasonable inferences, based on the evidence presented, that the reflections in
the patio window and sliding door prevented viewing the body that lay in the
dark entryway, that there was no evidence of an intruder, that all of the bloody
shoeprints that were made before the police and paramedics arrived were those
of Petitioner, and that no money was found in the wallet. These were not
factual contentions or assertions of facts that had been proved, but rather
reasonable inferences from the evidence presented.

Respondent demonstrated at the federal evidentiary hearing that the
bloody footprint found in the bathroom was likely left by paramedics or by
police officers sweeping the scene and accidentally stepping in blood, which
was present in several areas of the house. There also is absolutely no evidence
the abrasion to the back of the victim's head was the made by a shoe. The
victim was acquainted with Ryan's mother from drug counseling and hence, she
would have her telephone number. The victim probably mis-dialed her number
in an attempt to inform her that Ryan had returned to California. Ryan, of
course, knew his mother's number by heart, and would either not mis-dial, or
would redial correctly.

Furthermore, any inaccuracy in Detective Monsue's letter did not
compare to its striking accuracy as to the occurrence of a remodeling, nor would
it be odd for a homicide detective who handled numerous murder cases to mis-
recollect minor inconsequential details as to whether in a particular case he
personally spoke with the husband or the wife or whether he spoke in person
or over the telephone. Nor did Detective Monsue have any reason to falsely
add one minor piece of motive evidence to a case clearly evidencing that the
murder was the explosion of pent-up rage. If Detective Monsue intended to

fabricate and risk his career in doing so, there was no reason to fabricate a verifiable fact. Finally, the presence of money inside the victim's purse shows nothing other than that it was so well hidden that not even Petitioner, Detective Monsue, or the prosecutor found it.

Thus, as set forth in more detail above (Arg. IV, *ante*), Petitioner's claim about being able to see his mother from either of two windows was disproved by the reflection that was present on the glass, the darkness of the inside of the house, and the location, described by him during police interviews, of his mother's body close to the planter making it nearly impossible to see from any standpoint at the dining room sliding door. The single bloody shoeprint in the bathroom and the shoeprint in the kitchen had to have been left by one of the police officers or paramedics, and Detective Monsue did not testify that these two footprints were identical to Petitioner's, but merely that the pattern was "similar" to Petitioner's – a fact that the jury could accept or reject upon viewing the photographs themselves.

And since *no one* – the prosecutor, Detective Monsue, or defense counsel – ever happened to look in the hidden compartment of Mrs. Lisker's wallet and find the money that only the very thorough exhibits clerk later found, the prosecutor cannot be accused of presenting false evidence regarding the missing money. After all, the wallet was an exhibit, and the jurors themselves could have looked to see if it contained any secret compartment. What is more, the prosecutor only argued that which Petitioner admitted – that money had been taken from the purse – which, by definition was not false.

The prosecutor's arguments, and the inferences the prosecutor asked the jury to draw, were not misleading or false. They are certainly not what Petitioner labels as "assertions of fact." (Pet. 52.) Petitioner has failed to demonstrate that the actual evidence presented was false or that it was material.

Therefore, no prima facie case for relief has been stated as to this claim.

## B. Claim That Petitioner Was Denied Effective Assistance Of Counsel At Trial

In Ground Two, Petitioner asserts he was denied his right to the effective assistance of counsel. He faults his trial attorney for failing to investigate and marshal more facts to support a third-party-culpability theory, and asserts that defense counsel was derelict in not finding and exploring the source of the strange patterned impression on Mrs. Lisker's skull and the phone records to identify the destination phone number that was dialed from Mrs. Lisker's home on the morning of the murder. (AOB 55-66.) The argument is not persuasive.

When the basis of a challenge to the validity of a judgment is ineffective assistance of trial counsel, a petitioner must demonstrate that counsel's performance was deficient in that his representation fell below an objective standard of reasonableness under prevailing professional norms and was not the result of an informed tactical decision. He must also show prejudice flowing from counsel's performance by showing a reasonable probability that, but for counsel's unprofessional acts or omissions, the result of the proceeding would have been different, and where prejudice is lacking, the claim may be rejected without addressing whether counsel was incompetent. When the allegedly defective performance is based on a failure to adequately prepare a motion, the petitioner must demonstrate not only the absence of any tactical reason for the omission, but also that the motion would have been meritorious. (*People v. Maury* (2003) 30 Cal.4th 342, 389; *People v. Hinton* (2006) 37 Cal.4th 839, 917; *People v. Mattson* (1990) 50 Cal.3d 826, 876; *People v. Green* (1980) 27 Cal.3d 1, 45-47.)

Mere conclusory allegations of defective performance and resulting prejudice are insufficient (especially when the petition was prepared by counsel); thus, the Petitioner must set forth fully and with particularity the facts supporting each claim of deficient performance and resulting prejudice, and, in

addition, must provide documentary support--in the form of reasonably available affidavits or declarations--for the alleged facts, as well as for his claim that counsel's action or inaction was not the result of a reasonable tactical decision. (*People v. Farnam* (2002) 28 Cal.4th 107, 147-148; *People v. Cunningham* (2001) 25 Cal.4th 926, 1031; *In re Cudjo* (1999) 20 Cal.4th 673, 687; *People v. Holt* (1997) 15 Cal.4th 619, 704; *In re Avena* (1996) 12 Cal.4th 694, 721; *In re Ross* (1995) 10 Cal.4th 184, 204; *People v. Beeler* (1995) 9 Cal.4th 953, 1009-1010; *People v. Duvall, supra,* 9 Cal.4th at pp. 474-475; *People v. Berryman* (1993) 6 Cal.4th 1048, 1108-1109; *People v. Cudjo* (1993) 6 Cal.4th 585, 623; *In re Alvernaz* (1992) 2 Cal.4th 924, 945-946; *People v. Karis* (1988) 46 Cal.3d 612, 656; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-694 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

Petitioner's allegation is wholly conclusory and unsupported by any affidavit by his trial attorney, Dennis Mulcahy, regarding his tactical decisions regarding the pre-trial investigation and his preparation of the in limine motion regarding the admissibility of evidence regarding Ryan. It is obvious that with Petitioner's guilty plea and highly incriminating statements to the CYA, defense counsel was not ethically bound to suborn perjury or present evidence to support a theory that he knew not to be true. Petitioner has failed to demonstrate, through a reasonably available affidavit, whether counsel considered and rejected doing that which Petitioner alleges should have been done.

Moreover, the record shows that defense counsel did litigate the third-party liability issue before trial. (Pet. Exh. BBB 1-12; Pet. Exh. SS 56-69.) Petitioner has not shown that the trial court would have ruled any differently on the in limine motion regarding the admissibility of third-party-liability evidence even if defense counsel had investigated the matter further and made the speculative arguments that Petitioner presents herein. Indeed, in denying

Petitioner's habeas corpus petition on this claim of ineffective assistance of counsel, the superior court decried Petitioner's assertions as false assumptions that were unsupported and were "a stretch of credibility immersed in speculation." (Pet. Exh L.)

The following evidence, set forth in more detail above (see Arg. IV, *ante*), demonstrates that the trial court correctly denied the in limine motion after finding that the evidence linking Ryan to the crime was extremely tenuous at best, or non-existent at worst. The neatly stacked window panes disproved that this was a break-in by a common burglar and showed that Petitioner was not in a panic when breaking into the house to supposedly save his mother. The blood spatter from blunt force applied to the victim's body, which appeared on both of Petitioner's sneakers, pointed to his presence when his mother was beaten.

Ryan had no motive to "overkill" Mrs. Lisker with two knives, an exercise bar, and a trophy if he was there only to steal from her. The crime was much more consistent with a rage-killing by a violent, out-of-control drug-addict teenager. Ryan never confessed to the crime, but Petitioner did.

There was a complete lack of eyewitness testimony placing Ryan at the scene of the crime. Ryan may well have had other reasons to lie to the police about the time that he registered into the motel in Hollywood. Ryan may have obtained money from any number of legitimate or illegitimate sources to pay for his return trip to Louisiana. Ryan may have had any number of reasons to depart and travel back to Louisiana. Even if Ryan were involved someway as Petitioner's accomplice, that did not exclude Petitioner's status as principal.

With regard to the patterned impression on Mrs. Lisker's skull, defense counsel cannot be faulted for failing to see it or question anyone about it. It was clearly too small an impression to be identified as to its source, and even now, there is no evidence to support Petitioner's suggestion that this was a footprint

at all. Furthermore, Petitioner has offered no declaration from defense counsel with regard to this matter or regarding the inconsequential phone call that was *not* made to Ryan's mother, but to another number in another area code.

Moreover, Petitioner has failed to show that counsel's alleged deficiencies probably affected the outcome at trial. It bears repeating that the evidence of Petitioner's guilt was particularly strong, and that any evidence of Ryan's complicity would not have excluded Petitioner from being a principal.

Petitioner has failed to demonstrate that his attorneys' representation on this point was deficient. Furthermore, since he has provided no declaration to support his allegation, he cannot show prejudice from defense counsels' having failed to hire an expert. Therefore, Petitioner has failed to state a prima facie case for relief as to this claim.

If this Court issues an order to show cause, respondent is prepared to offer a declaration from defense counsel on this issue, and to have him testify at any evidentiary hearing.

## C. Claim That The State Knowingly Exploited An Opportunity Interrogate Petitioner Without Counsel

In Ground Three, Petitioner complains that the state, through certain jail personnel and Detective Monsue, exploited an opportunity to place a known jailhouse informant next to Petitioner's jail cell for the purpose of eliciting a confession without counsel present, in violation of *Massiah*. He claims, as he did on appeal, and again in previous habeas corpus petitions, that Robert Hughes was acting as an agent for the state and that Hughes, whose credibility was suspect, and impeached at trial, provided false testimony regarding Petitioner's confession. (AOB 67-72.) The assertion is unavailing.

The government's use of an agent to deliberately elicit and receive a defendant's admission or confession in the absence of his attorney violates the

101

Sixth Amendment. (*United States v. Henry* (1980) 447 U.S. 264, 270-274 [100 S.Ct. 2183, 65 L.Ed.2d 115]; *Massiah, supra,* 377 U.S. at p. 206; *People v. Frye* (1998) 18 Cal.4th 894, 993; *People v. Arguello* (1965) 63 Cal.2d 566, 571.) "It is a denial of the Sixth Amendment right to counsel to admit evidence of an indicted defendant's incriminating statements deliberately elicited from the defendant by a government agent [in the absence of his counsel]." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1249; see *Kuhlmann v. Wilson, supra,* 477 U.S. at p. 456-460; *In re Neely* (1993) 6 Cal.4th 901, 918.) A government agent includes a jailhouse informant whom the state has hired or instructed to obtain incriminating statements, and such statements are inadmissible even if made voluntarily and without solicitation. (*Maine v. Moulton* (1985) 474 U.S. 159, 170-176 [106 S.Ct. 477, 88 L.Ed.2d 481]; *United States v. Henry, supra,* 447 U.S. at p. 274; *People v. Whitt* (1984) 36 Cal.3d 724, 741-742.)

The Sixth Amendment right is *not* implicated, however, where the state "by luck or happenstance" obtains evidence of an incriminating statement the accused made in the absence of counsel, such as "where an accused voluntarily makes statements to a cellmate who is not acting as a government agent." (*Maine v. Moulton, supra,* 474 U.S. at 176; ; *People v. Miranda* (1987) 44 Cal.3d 57, 86; see also *People v. Hovey* (1988) 44 Cal.3d 543, 557.) Thus, where a cellmate, "interrogates an accused, but acts on his own initiative rather than at the behest of the government, the government may not be said to have deliberately elicited the statements." (*People v. Whitt, supra,* 36 Cal.3d at p. 742; see *People v. Gonzalez, supra,* 51 Cal.3d at p. 1240; see also *People v. Huggins* (2006) 38 Cal.4th 175, 245 [inquiry is whether police have deliberately created a situation for the specific purpose of eliciting incriminating statements].) An informant's history of testifying for the government in other cases "does not automatically make an informant a state agent," and "no constitutional question arises unless the informant is an agent

of the state *at the time* he or she elicited the statements that would be the subject of later testimony." (*People v. Memro* (1995) 11 Cal.4th 786, 828; italics added; *In re Williams* (1994) 7 Cal.4th 572, 597-598; *People v. Miranda, supra,* 44 Cal.3d at p. 86.)

"[I]n deciding whether information has been 'deliberately elicited,' the courts must focus on the state's conduct as a whole, rather than on the informant's." (*In re Whitt, supra,* 36 Cal.3d at p. 741; see *People v. Champion* (1995) 9 Cal.4th 879, 911; *People v. Williams* (1997) 16 Cal.4th 153, 204; *People v. Medina* (1990) 51 Cal.3d 870, 892.) Thus, if the informant's contacts with the police arise from his own expectation or hope that he might receive a return for his information, "where there was no prior arrangement with the informant, 'the mere acceptance of his information, even with the promise to talk to the prosecutor, is not sufficient encouragement to hold the police accountable for [the informant]'s subsequent actions'" (*In re Whitt, supra,* 36 Cal.3d at p. 744; see also *People v. Pensinger, supra,* 52 Cal.3d 1210; *People v. Howard* (1988) 44 Cal.3d 375, 402.) The informant's conduct is not attributable to the government where his actions in another case were unknown to the police, received no lenient treatment for his testimony, and had not been promised any quid pro quo in return for evidence before he testified. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1246; *People v. Howard, supra,* 44 Cal.3d at p. 401; *People v. Whitt, supra,* 36 Cal.3d at pp. 743-744 ["the promise to speak to the prosecutor was in no way conditioned on [the informant's] providing any further information"].)

Here, it is patently clear from the record that Robert Hughes was "not an agent of the police in any way" (Pet. Exh. BBB 12) and was acting completely on his own initiative (Pet. Exh. SS 3-49, 53-55), that the government in no way induced or instructed him to obtain a confession from Lisker, that he had already informed the prosecutor he had decided *not* to testify in this case after

103

000194

learning that the Board of Prison Terms had rejected the Orange County judge's recommendation that he be given a slightly earlier parole release date, that the prosecutor in this case told him could do nothing for him, and that he changed his mind and decided to testify because he did not want to see a man get away with murdering his own mother.  Thus, although Hughes approached the detective with the hope that the Los Angeles County Deputy District Attorney handling Lisker's case could make an inquiry as to the status of an Orange County judge's offer to write a letter to the Department of Corrections in another case, the prosecutor entered into no quid pro quo agreement to ascertain the status, and he offered no leniency whatsoever to Hughes.  In the end, Hughes was prejudiced by his voluntary decision to testify in this case, since he lost valuable conduct credits that he could have been earning had he not been in the county jail.  (See *People v. Whitt, supra,* 36 Cal.3d at pp. 743-744.)

The identical claim advanced herein was rejected on the merits by the California Court of Appeal on direct appeal and by this Court when it denied the 1989 and 2003 habeas petitions.  (Pet. Exs. A, F, I, J.)  The California Court of Appeal correctly concluded that the record supported the conclusion of the trial court that Hughes was gathering information on his own initiative, not that of the state, and that, as such he was not a government agent.  (Pet. Exh. F at 17-19; see *People v. Memro, supra,* 11 Cal.4th at p. 828; *In re Williams, supra,* 7 Cal.4th at p. 598; *People v. Williams* (1988) 44 Cal.3d 1127, 1141.)  Petitioner has not shown any abuse of discretion in admitting the testimony, and no constitutional violation.

Hughes denied that Petitioner ever showed him a police report (1RT 608), and Petitioner presents no new facts in support of the claim, other than some information received about two other jail informants, Dowtu and Wallace, whose information was clearly fabricated and never credited by the police or introduced by the prosecutor at trial.  "Evidence relevant only to an issue

already disputed at trial, which does no more than conflict with trial evidence, does not constitute 'new evidence' that fundamentally undermines the judgment." (*In re Clark, supra*, 5 Cal.4th at p. 798 fn.33, quoting *Gonzalez, supra*, 51 Cal.3d at p. 1247; compare *In re Hall, supra*, 30 Cal.3d 408 with *In re Weber, supra*, 11 Cal.3d at p. 724; see also *In re Wright* (1978) 78 Cal.App.3d 788, 802.) Therefore, no prima facie case for relief has been stated as to this claim in these proceedings.

Moreover, if this Court issues an order to show cause and orders an evidentiary hearing in this case, respondent is prepared to present critical testimony from Robert Hughes on this issue.

## D. Claim That The Cumulative Effect Of The Above Constitutional Errors Justifies Relief

Finally, in Ground Four, Petitioner assigns as federal constitutional error the cumulative impact of the errors asserted as Grounds One, Two and Three. Petitioner has failed to establish a prima facie case for relief as to any individual alleged error. *A fortiori*, Petitioner has failed to make a prima facie case from any cumulative effect of errors.

There were no constitutional errors which, whether considered individually or cumulatively, deprived Petitioner of a fair trial. Therefore, no prima facie case for relief has been stated as to this claim. Thus, he is entitled to no relief. (See *People v. Earp* (1999) 20 Cal.4th 826, 904.)

## CONCLUSION

For the foregoing reasons, the habeas corpus petition should be denied on procedural grounds and on the merits.

Dated:  October 9, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

PAMELA C. HAMANAKA
Senior Assistant Attorney General

KRISTOFER JORSTAD
Deputy Attorney General

JOHN YANG
Deputy Attorney General

ROBERT DAVID BRETON
Deputy Attorney General

Attorneys for Respondent

RDB:lh
LA2007502971
60249201.wpd

## CERTIFICATE OF COMPLIANCE

I certify that the attached INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS uses a 13 point Times New Roman font and contains 34138 words.

Dated:  October 9, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

ROBERT DAVID BRETON
Deputy Attorney General

Attorneys for Respondent

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:  **In re Bruce E. Lisker**
No.:  **S150233**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>October 9, 2007</u>, I served the attached **INFORMAL RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 300 South Spring Street, Suite 1702, Los Angeles, CA 90013, addressed as follows:

William J. Genego
Vicki I. Podberesky
Nasatir, Hirsch, Podberesky & Genego
2115 Main Street
Santa Monica, CA 90405
(Two Copies)

Clerk
Central District, Grand Ave.
Los Angeles County Superior Court
110 N. Grand Avenue, #525
Los Angeles, CA 90012
(Courtesy Copy)

The Honorable Steve Cooley
District Attorney
Los Angeles County District Attorney's Office
Headquarters
210 West Temple Street, Suite 18000
Los Angeles, CA 90012-3210
(Courtesy Copy)

The one copy for the California Appellate Project was placed in the box for the daily messenger run system established between this Office and California Appellate Project (CAP) in Los Angeles for same day, personal delivery.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on October 9, 2007, at Los Angeles, California.

| | |
|---|---|
| Lily Hood | _Lily Hood_ (signature) |
| Declarant | Signature |

LA2007502971
60249153.wpd

000199