1                UNITED STATES OF AMERICA

2              CENTRAL DISTRICT OF CALIFORNIA

3        THE HONORABLE RALPH ZAREFSKY, JUDGE PRESIDING

4

5

6  BRUCE E. LISKER,              )
                                 )
7                   Petitioner, )
                                 )
8              vs.               )   NO. CV-04-2687-VAP(RZ)
                                 )
9  MICHAEL KNOWLES, Warden,      )   EVIDENTIARY HEARING
                                 )
10  _____Respondent. )

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                 FRIDAY, OCTOBER 31, 2008

15

16

17

18  APPEARANCES:

19   (See Next Page)

20

21

22

23

24  Reported By:
    WALTER R. LEDGE, CCR #B-1875
25  U.S. PANEL COURT REPORTER

```
 1   APPEARANCES:

 2   FOR THE PETITIONER:      NASATIR, HIRSCH, PODBERESKY &
                                  GENEGO
 3                            BY:  VICKIE I. PODBERESKY,
                                   Attorney at Law
 4                                 WILLIAM J. GENEGO, Esq.
                                   RICHARD G. HIRSCH, Esq.
 5                            Main Street Law Building
                              2115 Main Street
 6                            Santa Monica, California 90405
                              (310) 399-3259
 7

 8

 9   FOR THE RESPONDENT:      STATE OF CALIFORNIA
                              DEPARTMENT OF JUSTICE
10                            OFFICE OF THE ATTORNEY GENERAL
                              BY:   ROBERT D. BRETON, Deputy
11                                  KRISTOFER JORSTAD, Deputy
                                    JOHN YANG, Deputy
12                            300 South Spring Street
                              Suite 1702
13                            Los Angeles, California 90013
                              (213) 897-2279 (Mr. Breton)
14                            (213) 897-2275 (Mr. Jorstad)
                              (213) 897-2283 (Mr. Yang)
15

16

17

18

19

20

21

22

23

24

25
```

Walter R. Ledge, Court Reporter

```
1                         INDEX

2               Direct   Cross   Redirect   Recross

3  WITNESSES FOR THE
   PETITIONER:
4

5  Sue Sarkis          96      104        xx

6

7

8  WITNESSES FOR THE
   RESPONDENT:
9

10 Dennis Mulcahy      11      68        82      92

11

12 REBUTTAL:

13 Dennis Mulcahy:    118      xx

14

15 CLOSING ARGUMENT BY PETITIONER:  Page 140

16 CLOSING ARGUMENT BY RESPONDENT:  Page 128

17

18 EXHIBITS:                          Marked   Received

19   157   No Description Furnished      xx        9

20   158   No Description Furnished      80       94

21

22

23

24

25
```

Walter R. Ledge, Court Reporter

1    LOS ANGELES, CALIF.; FRIDAY, OCTOBER 31, 2008;  10:00 A.M.

2                          --oOo--

3              THE CLERK:  Calling Calendar Item No. 1, case

4    number CV-04-2687-VAP(RZ), BRUCE E. LISKER VERSUS MICHAEL

5    KNOWLES, WARDEN.

6              Counsel, please state your appearances.

7              MR. GENEGO:  Good morning, Your Honor; William

8    Genego on behalf of petitioner, who is not present and who

9    filed a waiver of presence.  I am present in court on his

10   behalf.  Miss Podberesky is also here.  And Mr. Richard

11   Hirsch is also here on behalf of petitioner.

12             THE COURT:  All right.

13             Mr. Genego, have you heard from the government?

14             MR. GENEGO:  I have not, Your Honor, but there is

15   a box here.

16             THE COURT:  Mr. Genego, I think you should have on

17   your desk a copy of the protective order which I approved

18   based on what both parties have submitted.  Have you had a

19   chance to review it?

20             MR. GENEGO:  We have, Your Honor.

21             THE COURT:  Do you have any objections to it?

22             MR. GENEGO:  The only thing that I would request a

23   slight change in is paragraph 3.  What petitioner would

24   propose is that --

25             THE COURT:  Okay.  Just a moment.

1          (Pause.)

2          It appears that we have an earlier version of the

3   order that we prepared, or at least I have an earlier

4   version.

5          MR. GENEGO:  Because you don't have paragraph 3

6   begins, "Confidential evidence."

7          THE COURT:  Yes, but that paragraph was changed.

8          MR. GENEGO:  Okay.

9          I can tell the Court what the subject matter was

10  and perhaps the Court, being familiar with it, we may be --

11         THE COURT:  Go ahead.

12         MR. GENEGO:  Essentially, the way that is worded

13  here is that it is limited to criminal proceedings.  And we

14  thought that there could be parole proceedings or other non-

15  criminal proceedings --

16         THE COURT:  That's covered in the revision.  The

17  revision says something like any further proceedings in

18  state court including any retrial, any parole proceedings,

19  or essentially any proceedings of any sort other than these

20  federal habeas proceedings in the appeal.

21         MR. GENEGO:  Again, the only thing that I was

22  wondering about that was whether you should limit it to

23  state court.  I mean, if there are proceedings in federal

24  court that were not related to the habeas proceedings for

25  any reason.

1           THE COURT:  As I recall the revision has a catch-

2  all as well as the specificity.

3           MR. GENEGO:  That would be our only concern, Your

4  Honor.

5           THE COURT:  Proceed.

6           (Pause.)

7           Is Commissioner Mulcahy here?

8           MR. MULCAHY:  Yes, sir

9           THE COURT:  Thank you for coming, sir.

10          (Respondent's attorneys enter the courtroom.)

11          Would respondent like to make its appearances?

12          MR. BRETON:  Good morning, Your Honor.  I

13  apologize for the tardiness in arriving here, I walked over.

14          My name is Robert Breton, Deputy Attorney

15  General, for the respondent.

16          MR. YANG:  Good morning, Your Honor; John Yang,

17  Deputy Attorney General, also on behalf of the respondent.

18          THE COURT:  Good morning.

19          MR. JORSTAD:  Good morning, Your Honor; my name

20  is Kristofer Jorstad.  I'm a colleague and deputy

21  attorney general.

22          THE COURT:  Good morning.

23          You have on your table a copy of the protective

24  order, but ignore it because it's the wrong version.

25  You'll get a new version in just a moment.

Walter R. Ledge, Court Reporter

1                    All right.  If you will take a moment or two to

2      review that, we can then proceed.

3                    (Pause.)

4                    Mr. Genego, have you had time to review the order?

5                    MR. GENEGO:  We have, Your Honor.

6                    THE COURT:  Any objections?

7                    MR. GENEGO:  None at all.

8                    And for the record, I wanted to make one

9      clarification:  In the evidentiary hearing memorandum we

10     filed, we had asked the Court to have an in-camera

11     hearing as to any conversations that were privileged.  In

12     light of this order, I would just want to make it clear

13     for the record that we are withdrawing that request.

14     That will no longer be necessary.

15                    THE COURT:  Thank you.

16                    Mr. Breton, have you had a chance to review the

17     order?

18                    MR. BRETON:  I have, Your Honor.  It appears

19     mainly to parallel the Court's concerns and comments at the

20     last hearing, and we have no objection to this.

21                    THE COURT:  All right.  So I'll sign it and that

22     will govern the proceedings.

23                    MR. BRETON:  May I ask a question, Your Honor?

24                    THE COURT:  Yes.

25                    MR. BRETON:  This states flatly in paragraph 2

Walter R. Ledge, Court Reporter

```
 1  that disclosure shall not be made to any other persons or

 2  agencies without an order from this Court; the contents of

 3  anything that occurs in here during these proceedings

 4  regarding the material disclosed by plaintiffs and/or

 5  counsel.

 6          And for that purpose, I'm asking the Court if

 7  it wouldn't be advisable, then, to not have spectators

 8  because we have no control over what would be divulged

 9  from the State of California or its agencies or

10  prosecutorial personnel or the parole board other than

11  the three of us that are here today.

12          THE COURT:  And that's what this order marks.

13          MR. BRETON:  Correct.

14          THE COURT:  I'm not going to close the hearing.

15          All right.  So if you'll take care of getting

16  that filed.

17          Now, there are two or three other matters.

18  There was one additional exhibit that you folks proposed

19  from the previous exhibits.  You numbered it, I think,

20  152.  The problem is there was already a 152.  There were

21  several exhibits that were added at the end of the

22  hearing last time so that your new exhibit will be --

23          Is that 157, Ilene?

24          THE CLERK:  Yes.

25          THE COURT:  Your new exhibit will be 157.
```

Walter R. Ledge, Court Reporter

1              MR. BRETON:  Can we, during the break, renumber

2    these?

3              THE COURT:  Yes.

4              Also, we submitted with your exhibit list the

5    exhibit list previously submitted which included some

6    exhibits which were not admitted at the last hearing.

7              So the only exhibits that are in for this

8    hearing in addition to the newly new exhibit are the

9    exhibits which were admitted at the last hearing, not the

10   exhibits that were proposed at the last hearing that were

11   not admitted.  Is that understood?

12             MR. BRETON:  Yes.

13             THE COURT:  All right.  And just for the record,

14   the new exhibit, which is now numbered 157, will be

15   admitted.

16             (Exhibit 157 was received into evidence.)

17             Is there any other matter that we need to

18   address before we proceed to the taking of testimony?

19             MR. BRETON:  No.

20             MR. GENEGO:  Not on behalf of the petitioner.

21             THE COURT:  Mr. Breton?

22             MR. BRETON:  No, Your Honor.

23             THE COURT:  All right.  Mr. Breton, it's your

24   witness, I believe, so let's go ahead.  Call your witness.

25             MR. BRETON:  Thank you, Your Honor.

1          We would call Commissioner Dennis Mulcahy.

2          THE COURT:  Commissioner Mulcahy, step forward

3    please.

4          THE CLERK:  Please raise your right hand.

5          (The oath was administered by the Clerk.)

6          THE WITNESS:  I do.

7          THE CLERK:  Thank you.  Please be seated and

8    please state and spell your name for the record.

9          THE WITNESS:  Dennis, D-e-n-n-i-s Mulcahy,

10   M-u-l-c-a-h-y.

11                    DENNIS MULCAHY,

12          A witness herein, called on behalf of the

13          respondent, was sworn by the Clerk and testified as

14          follows:

15          THE COURT:  Commissioner Mulcahy, I understand

16   that you've recently had some problems with your back, and I

17   notice that you are walking fairly gingerly.

18          THE WITNESS:  I'm being careful because of what

19   happened a couple weeks ago.

20          THE COURT:  If you find that you need to take a

21   break, if you will let me know, I'll do what I can to

22   accommodate you.

23          THE WITNESS:  Thank you.

24          THE COURT:  Mr. Breton, go ahead.

25   /////

1                    DIRECT EXAMINATION

2   BY MR. BRETON:

3   Q.  Good morning, Commissioner Mulcahy.

4   A.  Good morning, Mr. Breton.

5   Q.  How long have you been a member of the California state

6   bar?

7   A.  Since December 22, 1976.

8   Q.  When and where did you start in criminal practice?

9   A.  I started my practice with the Los Angeles County Public

10  Defender's office approximately February of 1977.

11  Q.  And how long have you stayed with the public defender's

12  off?

13  A.  I stay with the Los Angeles County Public Defender's

14  office since July 4, 1980.

15  Q.  Then what did you do?

16  A.  I went into private practice with two other attorneys.

17  Q.  Criminal?

18  A.  Yes, sir.

19  Q.  Were you certified in any specialty?

20  A.  No, I was not certified in any specialty.

21  Q.  Were you certified to handle death penalty cases?

22  A.  Yes, I was.

23  Q.  How many have you done?

24  A.  Death penalty cases, probably handled about ten; murder

25  cases, 30 or more.

```
 1   Q.   So murder cases, death penalty and nondeath penalty?
 2   A.   Correct.
 3   Q.   Have you ever been reported to the state bar for
 4   ineffective assistance?
 5   A.   No, I have not.
 6   Q.   Have you ever been accused of ineffective assistance as
 7   far as you are aware?
 8   A.   Not that I am aware.
 9   Q.   Are you a member of the local bar association?
10   A.   Currently?
11   Q.   No, have you been?
12   A.   Yes.
13   Q.   And when was that?
14   A.   During my practice, I was a member of the Los Angeles
15   County Bar as a member of the Criminal Courts Bar
16   Association, a member of the California Attorneys for
17   Criminal Justice, the California Public Defender's office --
18   I mean, California Public Defender's Association.  I am also
19   admitted to practice law in the state of Illinois.
20   Q.   And have you been an officer in any of these
21   organizations?
22   A.   I was president of the San Fernando Criminal Bar
23   Association somewhere in the late '80s.
24   Q.   And when were you appointed commissioner?
25   A.   I was sworn in September 30, 2003.  I'm into my sixth
```

1  year.

2  Q.  Are you satisfied regarding the waiver of the privilege

3  in these proceedings?

4  A.  What do you mean by "satisfied"?

5  Q.  Do you feel that you've been sufficiently assured by the

6  Court's order and the protective order that was just signed

7  that Mr. Lisker has waived his attorney-client privilege

8  with regard to your testimony here and that you are not

9  going to be in conflict with any of the canons of ethics?

10  A.  As I understand the order, yes.

11  Q.  Do you have any concerns?

12  A.  I'm always concerned when it involves client

13  representation and what may or may not have been said on a

14  particular occasion.

15  Q.  What was your usual practice in pretrial preparation

16  when you got a case, especially a murder case?

17        MR. GENEGO:  Objection, Your Honor.  Vague and

18  ambiguous and over --

19        THE COURT:  Sustained.

20        How about a time frame, Mr. Breton, to start

21  with.

22  BY MR. BRETON:

23  Q.  When you were handling murder cases in the 1980s and

24  1990s --

25        MR. GENEGO:  Okay, Your Honor, I think that he's

Walter R. Ledge, Court Reporter

```
 1  not giving any time frame about when he handled murder cases
 2  (unintelligible).
 3  BY MR. BRETON:
 4  Q.  Could you give us a time frame for when you handled
 5  murder cases.
 6  A.  From the time I left the Los Angeles County Public
 7  Defender's office until the time I concluded practice.
 8  Q.  And during that time frame, what -- did you have a
 9  specific methodology or specific way in which you handled --
10  began your preparation, pretrial preparation and
11  investigation of murder cases?
12          MR. GENEGO:  Objection, Your Honor.  I think that
13  any time beyond 1984 is irrelevant.  Yeah, 1984.
14          THE COURT:  Sustained.
15  BY MR. BRETON:
16  Q.  Before 1984, could you describe your practice.
17  A.  With respect to discovery?  Initially, I would file a
18  discovery motion.  That was the time before 1054 of the
19  Penal Code, so it did not require an informal request as to
20  my recollection; but file a motion, sit down, generally,
21  with the prosecutor and/or the investigating officer to make
22  sure I got all of the material that was required in a murder
23  case.  I get the murder book, coroner's report, all witness
24  statements; sit down, generally, either with the prosecutor
25  or the investigating officer to make sure that I have the
```

Walter R. Ledge, Court Reporter

1   exact pages of the murder book that they had and that there

2   wasn't nothing missed in duplication or photocopying.

3            And then from there, after I reviewed that

4   material, I would make decisions as to what I needed to do

5   on a particular case.

6   Q.  And did you -- did that include reading and reviewing

7   the autopsy reports?

8   A.  Yes.

9   Q.  And forensic and scientific reports?

10  A.  All reports that were provided to me were read.  In my

11  murder books, I would generally highlight them with a

12  highlighter.  I would generally underline them again when I

13  read them again with a pen or another type of device.

14           I would generally make marks on the reports and do

15  little notes.  And then I'd have a tablet, and I'd make

16  other notes as to what I thought was appropriate and for

17  what I needed to do.

18  Q.  Now, was this a murder case?

19  A.  The Lisker case?  Yes.

20  Q.  Was it a capital case?

21  A.  No, it was not.

22  Q.  And were you appointed to represent Bruce Elliott Lisker

23  in the superior court case number A804556?

24  A.  I believe I was appointed and not retained.

25  Q.  Was this before Richard --

Walter R. Ledge, Court Reporter

1  A.  This was before Judge Richard Kolostian.

2  Q.  (Unintelligible.)

3  A.  I'm not sure which department in Van Nuys, but it was in

4  a superior courtroom in Van Nuys.

5  Q.  And was Richard Kolostian the judge at both the first

6  and the second trial?

7  A.  Yes.

8         THE COURT:  Mr. Breton, among other things, the

9  witness has a back problem sitting still for a long time.

10  So let's not go over things we all know.

11         MR. BRETON:  Thank you, Your Honor.

12         THE COURT:  All right.

13  BY MR. BRETON:

14  Q.  How many years of your life did you spend on this case?

15         MR. GENEGO:  Objection, Your Honor.  Vague and

16  ambiguous.

17         THE COURT:  And it's not particularly relevant.

18  Let's go on.  Let's get to the issues.

19  BY MR. BRETON:

20  Q.  Now, was -- do you recall how many motions, pretrial

21  motions, you filed in this case?

22  A.  Exactly?  No.  Some of them, yes.

23  Q.  Did you file a motion regarding third party culpability?

24  A.  I don't believe I filed a motion.  I believe

25  Mr. Rabichow took a peremptory step to prevent me from

Walter R. Ledge, Court Reporter

1   attempting to get in information regarding that issue.

2   Q.  Did you seek appointment of an investigator?

3   A.  I have reviewed two motions that were given to me.  Yes,

4   there were two investigators that were appointed in this

5   case.

6   Q.  Who was the first investigator that was --

7   A.  Sue Sarkis.

8   Q.  Sue Sarkis?  And do you recall for what purpose you were

9   asking her to be appointed?

10  A.  To assist in the investigation of the case, to interview

11  witnesses, probably to go to the crime scene.  In addition

12  to that, I recall having an investigator -- I don't remember

13  which -- to go to the jail, photograph the jail cell,

14  photograph the hole in the wall between the cells because

15  there was an issue regarding a jailhouse informant.

16          There were other areas that I probably told them

17  to do things, but without either a memo written by me or a

18  report that they made, I cannot specifically tell you.

19  Q.  Do you recall whether you asked for the appointment of

20  Sue Sarkis to specifically interview three jailhouse

21  informants?

22          MR. GENEGO:  Objection, Your Honor.  Relevance.

23          THE COURT:  Overruled.

24          Go ahead.

25          THE WITNESS:  I would have asked one of the

1    investigators to do so.  I cannot answer that specifically

2    if it was Sue Sarkis.

3    BY MR. BRETON:

4    Q.  And who was the second investigator that you sought the

5    court to appoint?

6    A.  Mike Wagner.

7    Q.  What was he appointed to do?

8    A.  To further continue the investigation.  It was unusual

9    for me to have more than one investigator on a case.

10   Normally, I would start the case with one investigator and

11   finish it.  I do not know why I requested a second

12   investigator in this case, but one was requested to further

13   the investigation.

14   Q.  Would that include interviewing Michael Ryan?

15   A.  If that was not done by the first investigator, I would

16   have made a request of him to interview Michael Ryan.  I

17   also would have made a request of him to interview any

18   jailhouse informants or anyone that I thought would be of

19   assistance in the preparation on this case.

20   Q.  Now, what is your understanding regarding the threshold

21   that you must meet in order to gain admission of third-party

22   liability evidence?

23        MR. GENEGO:  Objection, Your Honor.  Relevancy.

24        THE COURT:  There's some other problems with it,

25   too.

Walter R. Ledge, Court Reporter

1          Sustained.

2          You can rephrase it and try again.

3    BY MR. BRETON:

4    Q.  What limitations does California place on the admission

5    of third-party culpability evidence as you understood it in

6    1983?

7          MR. GENEGO:  Same objection, Your Honor.

8          THE COURT:  Overruled.

9          You may answer.

10         THE WITNESS:  My understanding was I would have to

11   show specific connection between the third party and the

12   crime alleged in order to tie that person to this crime

13   specifically in order to be allowed to introduce that

14   evidence.

15   BY MR. BRETON:

16   Q.  Was it your understanding that it would be sufficient to

17   show motive or criminal disposition?

18   A.  Speculation, conjecture, in and of itself would be

19   insufficient.

20   Q.   Is there a difference between presenting a third-party

21   liability defense and a defense of creating reasonable doubt

22   in the minds of the jurors as to whether Lisker committed

23   the crime?

24   A.  There would be a difference because it would be -- if

25   you were allowed, you would be calling a witness to attempt

Walter R. Ledge, Court Reporter

1  to show that that witness perpetrated the crime.

2         If you were foreclosed from doing that by the

3  court, you could not mention that or go into that.  We would

4  have to go a different route.  And reasonable doubt would be

5  a different type of presentation and argument once you were

6  foreclosed from that area.

7  Q.  And what was your strategy -- what strategy did you

8  develop before the first trial?  What defense did you decide

9  you were going to pursue?

10  A.  You're talking about in the first trial that did not go

11  all the way?

12  Q.  Correct.  Before that trial.

13         And you had -- we mentioned already you had the

14  prosecutors in-limine motion to preclude third-party

15  liability evidence which you opposed.  What was your --

16  A.  I didn't oppose the third-party liability.  The

17  third-party liability issue was raised by the prosecutor, as

18  to my recollection, as foreclosing me from presenting any

19  argument or any issue regarding that.

20  Q.  I'm sorry if misspoke.  It was the prosecutor's in-

21  limine motion to preclude you from presenting that evidence,

22  and you opposed that motion; correct?

23  A.  Yes.

24  Q.  And at that time, what did Judge Kolostian -- how did he

25  rule?

1           THE COURT:  Mr. Breton, we know all this.  We have

2    the transcript.  We don't have this witness before.  Ask the

3    witness something we don't know yet.

4           MR. BRETON:  Thank you, Your Honor.

5    Q.  What did you decide to do, then, after Judge Kolostian

6    granted the in-limine motion?

7    A.  To attempt to show that there was reasonable doubt in

8    this case.

9           I raised other motions regarding the blood spatter

10   expert to try to either exclude or show that he should not

11   be believed in what he was stating.

12          There were informant issues.  I believe there were

13   multiple informants, but the one that I recall is Hughes.  I

14   made motions to exclude that testimony on constitutional

15   grounds; state action because of the hole in the wall and

16   other issues.  Those were unsuccessful.

17          There were other motions that I brought to the

18   court's attention.  And after certain rulings were not

19   favorable to the defense, I was attempting to demonstrate

20   that Mr. Lisker -- they could not prove the case again him

21   beyond a reasonable doubt.

22          My -- whether or not Mr. Lisker was going to

23   testify in the first trial, I cannot really tell you because

24   I do not recall.  That option was always open.  There were

25   concerns and issues regarding that, but it's the defendant's

1  right, if the defendant so desired, to testify.

2  Q.  Were you contemplating any type of mental defense?

3  A.  I believe at some point I had a psychologist or a

4  psychiatrist appointed in this case.  I believe some type of

5  evaluation was done.  Based on the information that I had, I

6  don't believe, after that, one was contemplated.

7  Q.  Now, did you, in preparing your opposition to the in-

8  limine motion and trying to present third-party culpability

9  evidence, did you thoroughly read or listen to the tape of

10  the interview that Det. Monsue had with Ryan in Mississippi?

11  A.  There was an out-of-state interview.  I would have

12  listened both to the tape and read the interview.  And I

13  probably would have done it on multiple times.

14          THE COURT:  Excuse me, Commissioner.  When you say

15  you would have done it, do you have a recollection of having

16  done it?

17          THE WITNESS:  Specifically back in 1983?

18          THE COURT:  Or '84, whenever it was.  Do you have

19  a recollection of having done it?

20          THE WITNESS:  I can't honestly tell you whether 25

21  years ago that I read it.

22          THE COURT:  That's fine.  I'm not asking you to

23  say you did if you didn't, but I just want to know for sure.

24  Your testimony is not that you did but that it would have

25  been your practice to have done so.  Is that your testimony?

```
 1              THE WITNESS:  Yes.  I cannot specifically tell
 2    this Court that I read any specific document 25 years ago
 3    unless I was shown a document and that document had my
 4    handwriting or something, some markings on that document
 5    which would assure me that I had that document.
 6              I do recall that there was an interview, and I
 7    do recall that it was an important issue.  And I recall
 8    that Mr. Lisker had written a letter to the detective
 9    regarding this issue.  And as I indicated to the Court, I
10    would have reviewed all the material.
11              THE COURT:  Thank you.
12              Mr. Breton.
13    BY MR. BRETON:
14    Q.  In your presentation to Judge Kolostian, didn't you ask
15    him to, and didn't he say on the record, that he had
16    listened to that interview?
17    A.  I have reviewed a portion of a transcript where there
18    were several motions that were made, and that is in the
19    transcript.  And, yes, I did pass -- something was presented
20    to Judge Kolostian, and Judge Kolostian listened to the
21    tape, according to the transcript.  And reasons were stated
22    regarding that issue.
23    Q.  Did you discuss your strategy with Mr. Lisker?
24    A.  The answer would be yes.
25    Q.  Did you have several discussions or interviews with him?
```

1  A.  I had multiple interviews with Mr. Lisker, both in

2  juvenile hall and when he was placed for a short period of

3  time in county jail.  This case transpired, it was something

4  like a year, year and a half, period; maybe up to two years

5  when he was in juvenile hall.  I believe some of it was in

6  Eastlake facility, and I would go down routinely and go over

7  the case with him.

8  Q.  Did he deny killing his mother?

9  A.  Never to me.

10  Q.  Are you, as you tried to look back into your pretrial

11  preparation, can you recall any forensic or physical

12  evidence at that would tie Michael Ryan to the scene of the

13  crime on the morning of the crime?

14  A.  Based on my review of the material that I had, any

15  investigation that I had conducted, what I had was what I

16  presented to Judge Kolostian.

17          Judge Kolostian ruled that it was not specific

18  enough in order to tie Michael Ryan to that homicide on the

19  specific date and time in question.

20  Q.  Was there any evidence of a motive on the part of Ryan?

21          MR. GENEGO:  Objection, Your Honor.  I think

22  that's overbroad with regard to what this witness's

23  information was or his understanding was.

24          THE COURT:  And I'm not clear by what you mean by

25  "evidence."  You mean evidence in court, evidence that was

Walter R. Ledge, Court Reporter

 1  presented or --

 2              MR. BRETON:  No.

 3              THE COURT:  Why don't you try it again.

 4  BY MR. BRETON:

 5  Q.  Did you come across anything in the murder book or

 6  anything in your conversations with Robert Lisker or with

 7  Bruce Lisker that would lead you to believe that there

 8  was -- that you could establish motive, that Ryan had a

 9  motive to enter the home and to kill Dorka Lisker?

10  A.  I believe a letter that Bruce wrote to Det. Monsue

11  referred to Ryan stealing.  That might be considered a

12  motive.

13  Q.  To what?  To rob?

14  A.  Yes.

15  Q.  To burglarize?

16  A.  If you could extrapolate that part, yes.

17  Q.  Now, did you discuss the case with Robert Lisker?

18  A.  Bruce's father?  Yes, on many occasions.

19  Q.  Did he say anything to you that was inconsistent with

20  the belief that his son was guilty?

21              MR. GENEGO:  Objection, Your Honor.

22  (Unintelligible.)

23              THE COURT:  What's the nature of the objection?

24              MR. GENEGO:  Hearsay.

25              THE COURT:  Mr. Breton?

Walter R. Ledge, Court Reporter

```
 1              MR. BRETON:  It goes to the mental state of the
 2   defense attorney whose tactics and strategy we're trying to
 3   reveal and uncover at this time.  That would guide -- he
 4   should be guided by the statements not only of the client
 5   but of the client's father with whom -- who had been
 6   visiting the client on a daily basis for months.
 7              THE COURT:  What was the question again, whether
 8   he said anything --
 9   BY MR. BRETON:
10   Q.  Did Robert Lisker declare to you anything that would be
11   inconsistent with his belief that his son was guilty?  Did
12   he tell you that his son was innocent?
13              THE COURT:  Wait, one question at a time.  Which
14   is your question?
15   BY MR. BRETON:
16   Q.  Did he say anything to you that would be inconsistent
17   with his belief that his son was guilty?
18              MR. GENEGO:  Your Honor, it's vague and ambiguous
19   and assumes facts not in evidence --
20              THE COURT:  Sustained on that ground.
21   BY MR. BRETON:
22   Q.  Did you discuss the case with Robert Lisker?
23              THE COURT:  That's been answered.  The answer is
24   yes.
25   /////
```

BY MR. BRETON:

Q.  Did you discuss possible alternative defense's with

Robert Lisker?

A.  I would think I probably did.  I discussed the case on

numerous occasions with his father and with another

attorney, Bob Johnson, which was a friend of Robert Lisker.

        To tell you specifically what those conversations

were, I'm not capable of doing that without any notes.

Q.  Do you recall whether Robert Lisker mentioned anything

to you about a third party having committed this crime?

A.  I can't answer that.  I'm sure he was aware of

everything that I had, the materials that I had.  I just

can't answer that.  I don't know.

        THE COURT:  Commissioner Mulcahy, I want you to

understand:  Nobody faults you for not remembering

conversations 25 years ago.  So don't strain if you don't

remember.  If you do remember, we want you to tell us.

BY MR. BRETON:

Q.  Now, did Bruce Lisker say that -- tell you that he saw

someone else leaving the house as he arrived at his mother's

house?

A.  I do not recall that.

Q.  How did you propose to establish a third-party liability

claim if you could have gotten past the threshold?

A.  Well, if I had enough evidence to demonstrate that Ryan

```
 1  was at the house at the time of the murder and some specific

 2  independent evidence to tie him specifically to that, then I

 3  would be able to do that.

 4          But as I recall, I did not have that enough,

 5  according to the judge's ruling.

 6  Q.  Did you ask Bruce Lisker whether he would testify in

 7  support of the third-party liability claim?

 8  A.  I'm sure we discussed it.  Do I remember specifically,

 9  no.

10  Q.  Would you have put Michael Ryan on to testify based on

11  your reading or your memory of the reading of the interview

12  that you had with Det. Monsue?

13          MR. GENEGO:  Objection, Your Honor.  That

14  misstates the testimony.  He said he did not remember

15  reading it.  That would have been his practice.

16          THE COURT:  Sustained.

17  BY MR. BRETON:

18  Q.  Would it refresh your recollection if I were to show you

19  a copy of the interview if you had read it or not?

20  A.  If I -- it might.

21          THE COURT:  What exhibit is that, Mr. Breton?

22          MR. ARIAS:  Exhibit 86-936.  It's in the binder.

23          (Mr. Breton hands document to the witness.)

24          THE COURT:  Mr. Breton, let's observe proper

25  procedure here.  The Clerk places exhibits in front of the
```

Walter R. Ledge, Court Reporter

```
 1   witness.
 2             MR. BRETON:  I'm sorry, your Honor.
 3             THE CLERK:  It was 86-936?
 4             MR. BRETON:  Yes.
 5             (The Clerk hands document to the witness.)
 6             THE CLERK:  Exhibit 86-936 is before the witness.
 7             (long pause.)
 8             THE COURT:  Mr. Breton, your question was whether
 9   seeing this report would refresh his recollection as to
10   whether he had reviewed it before?
11             MR. BRETON:  Yes, Your Honor.
12             THE WITNESS:  Yes.
13   BY MR. BRETON:
14   Q.  Do you recall presenting this to Judge Kolostian in
15   support of your third-party liability claim?
16   A.  I believe the transcript and the tape was both supplied
17   to Judge Kolostian.
18   Q.  And do you recall from this, the transcript of this
19   interview, whether Monsue was confrontational with Ryan as
20   to his involvement in the crime?
21             MR. GENEGO:  Objection, Your Honor.  I don't think
22   there is any basis for him answering that question based on
23   (unintelligible).
24             THE COURT:  Sustained.
25   BY MR. BRETON:
```

Walter R. Ledge, Court Reporter

```
 1  Q.  Did the interview contain accusations by Det. Monsue

 2  that Ryan had fabricated a false alibi by asserting that he

 3  checked into the motel in the morning around 11:00 whereas

 4  he actually checked in at 3:00?

 5            MR. GENEGO:  Your Honor, objection.

 6            Your Honor, the document speaks for itself.

 7  And I believe that question is vague and ambiguous as to

 8  characterization.

 9            THE COURT:  The document does speak for itself.

10  Is there some reason that it's important to know whether

11  the witness remembers that that's what it said?

12            MR. BRETON:  Because it would -- it would guide

13  him in whether he would decide to seek further --

14            THE COURT:  Do you remember that's what it said,

15  Commissioner Mulcahy?

16            THE WITNESS:  Yes, I do.

17            THE COURT:  All right.

18  BY MR. BRETON:

19  Q.  Do you recall sending an investigator to look into the

20  motel receipt matter?

21  A.  I do not recall that.

22  Q.  During the interview --

23            (Pause.)

24            What did the -- did the interview lead you to do

25  with regard to further investigations so that you could meet
```

1  the statement by Judge Kolostian that he would welcome

2  further evidence into reopening the issue, reopening the

3  motion further down the line if you were to come up with

4  more evidence?

5  A.  I directed an investigator to go and locate and

6  interview Ryan.

7  Q.  And do you recall if that was done?

8  A.  If it was actually completed, I do not know.  I don't

9  recall.

10  Q.  Is it in your files?

11  A.  I do not have any files.  I turned the file over to

12  Bruce Lisker via his father many years after this case had

13  concluded.

14  Q.  Do you recall approximately when that was?

15  A.  Maybe five years after.  I'm not exactly sure.  Some

16  lengthy period of time after the case was concluded.

17  Q.  If your investigator interviewed Ryan either by

18  telephone or in person, would you have requested a report

19  and expect a report to be in your defense files?

20  A.  Yes.

21        MR. GENEGO:  Objection, Your Honor.  That calls

22  for speculation.

23        THE COURT:  Sustained.

24        MR. GENEGO:  And I move to have the answer

25  stricken.

1          THE COURT:  So ordered.

2    BY MR. BRETON:

3    Q.  Did you have any reason to look further into Michael

4    Ryan's criminal past?

5    A.  At what stage of the proceeding?

6    Q.  At that stage, after Judge Kolostian had denied you the

7    opportunity to present third-party liability evidence but

8    said that you could come forward with more if you found

9    something --

10         MR. GENEGO:  Objection, Your Honor.  That's vague

11   and ambiguous because he actually tried to do it twice and

12   the court did not rule on it twice.  I'm not clear what time

13   he is referring to.

14         THE COURT:  I think perhaps you could sharpen your

15   question.

16   BY MR. BRETON:

17   Q.  At the end of the first in-limine motion, which is in

18   the reporter's transcript at 391, 392, et seq., at which

19   time Judge Kolostian allowed you to make a further proffer

20   if you were to find anything else that would directly tie

21   Ryan to the commission, to the actual commission of this

22   crime, did you at that point undertake any investigation of

23   Michael Ryan's criminal background?

24   A.  That occurred during the in-limine motions during the

25   first trial.  I don't recall how much time it was before the

Walter R. Ledge, Court Reporter

1  trial.  My answer would be yes.

2          (Pause.)

3  Q.  Would you be able to introduce evidence of Michael

4  Ryan's propensity for violence at the trial of Bruce Lisker?

5          MR. GENEGO:  Objection, Your Honor.

6  (Unintelligible.)

7          THE COURT:  Say that again?

8          MR. GENEGO:  He's not competent to answer that

9  question.  He can offer it, but he certainly can't decide

10  whether or not to admit it.

11          THE COURT:  He is competent, but it does call for

12  a legal conclusion.

13          Sustained.

14          Which I think is what you really meant to say.

15          MR. GENEGO:  Thank you, Your Honor, for the

16  Court's clarification.

17  BY MR. BRETON:

18  Q.  Now, after the interview of Ryan by your investigator,

19  would you have subpoenaed him to testify if he had

20  discovered anything that you thought would have been

21  beneficial to your client?

22  A.  Only if --

23          MR. GENEGO:  Objection.  Calls for speculation.

24  It's unclear whether he's referring to Ryan or the

25  investigator.

```
 1              THE COURT:  Sustained.
 2   BY MR. BRETON:
 3   Q.  Would you have subpoenaed Ryan to testify?
 4   A.  Only if the information was favorable.  If it was
 5   unfavorable to my client and not helpful, no.
 6   Q.  And were you obligated to turn over any written report
 7   to the prosecution of an interview with Ryan?
 8   A.  No.
 9   Q.  Now, after jury trial began in November of 1984 and
10   three witnesses testified -- four witnesses testified, on
11   the afternoon of December 3rd, Bruce Lisker entered a guilty
12   plea.  Do you remember that?
13   A.  Yes.
14   Q.  Do you remember what you were seeking to obtain as a
15   result of a guilty plea?
16   A.  Yes.
17   Q.  What was that?
18   A.  A negotiated settlement for a second-degree murder where
19   he would be committed to the California Youth Authority
20   where he would only serve until age 25 or 26 and have to be
21   released.  It would be a straight Youth Authority
22   commitment.
23   Q.  Did you have any reason to believe that that would be
24   granted?
25   A.  Judge Kolostian accepted the plea, indicating that he
```

Walter R. Ledge, Court Reporter

1    was willing to accept it.  But during the plea, it was

2    stated on the record that this was entered for commitment to

3    the Youth Authority, and if for some reason the court could

4    not go along with what settlement, Mr. Lisker would have the

5    right to withdraw the plea and go to trial.

6    Q.  Do you recall if the report that was written in advance

7    of the DENNIS H. hearing, or the fitness hearing, stated

8    that he appeared, in light of his age, maturity, and in

9    light of his criminal background, that he appeared to be

10   amenable to treatment, that he could be treated?

11   A.  Are you talking about a probation report?

12   Q.  Yes.  A report that was filed before the first trial,

13   that was filed -- that you attached to your motion to have

14   him removed to and placed in juvenile hall.

15            THE COURT:  You know, I have lost your question,

16   if there is a question there.  So perhaps you can restate

17   it.

18   BY MR. BRETON:

19   Q.  Did you have any reason to believe, based on a prior

20   report, that he would be found suitable for treatment?

21   A.  Yes.

22   Q.  And what do you base that opinion on?

23   A.  There was a private psychiatrist or psychologist that

24   was used by me in this case and wrote a report.  And I

25   believe that report was also submitted to the court

1  regarding the issues.

2           However, that report did not have any specific

3  statements regarding the offense in it, to my recollection,

4  by Mr. Lisker.

5  Q.  Well, did you not seek the appointment of a Dr. Legasic?

6  A.  Yes.

7  Q.  Would this be -- in your practice at that time, was this

8  something that would be considered unusual to ask for a

9  psychiatric report that would be piggybacked upon or a

10 supplement to a C.Y.A. report?

11          MR. GENEGO:  Objection, Your Honor,

12 (unintelligible).

13          THE COURT:  This does seem to be pretty far from

14 this hearing purpose, Mr. Breton.  Can you show me some --

15          MR. BRETON:  Well, I think it's relevant to show

16 Your Honor that he took reasonable steps regarding the

17 guilty plea.  And it's foundational to show that when the

18 report came back he was surprised.  And that influenced what

19 he did at the second trial as far as trial strategy.

20          It also influenced Judge Kolostian as to what

21 he would accept at the second trial.

22          THE COURT:  Sustained.

23 BY MR. BRETON:

24 Q.  When Bruce entered his guilty plea, were you -- would

25 you have advised him to plead guilty if he were insisting

1  that he was innocent?

2  A.  No, I would not.

3  Q.  Would you have let him plead guilty if he insisted that

4  he was innocent?

5  A.  I would have asked the court for an in camera and

6  advised the court of a situation where I would not join or

7  concur in that type of plea.

8  Q.  Was this a WEST plea?

9  A.  This was not a PEOPLE VERSUS WEST plea where he thought

10  it was in his best interest.  This was not a PEOPLE VERSUS

11  WEST plea.

12  Q.  Did you state anything at the guilty plea, taking of the

13  guilty plea?

14  A.  I have reviewed the plea transcript, and the answer is,

15  yes, it refreshes my recollection as to making a statement

16  of what I had done on the case; also that I interviewed, or

17  caused to interview several witnesses and reviewed their

18  statements.

19          In addition to that, it was placed on the record

20  that attorney Robert Lisker and -- which is Bruce's

21  father -- and attorney Robert Johnson were also present;

22  consulted with Mr. Lisker at that time prior to entering the

23  plea.

24          The people offered a second.  There was a -- the

25  parameters for the court for the commitment to the youth

```
 1   authority unless the court could not live with that plea,
 2   then it would be withdrawn.
 3   Q.  Did you mention anything regarding what you had done
 4   with the witnesses?  In other words, were you basing your
 5   factual basis submission merely on the prelim or on the
 6   police reports?
 7   A.  No.
 8            MR. GENEGO:  Objection, Your Honor.  Relevancy.
 9   Move to strike.
10            THE COURT:  Overruled.
11            Mr. Breton, the guilty plea isn't an issue in
12   these proceedings.
13            MR. BRETON:  The next question will reveal why
14   this is --
15            THE COURT:  Go ahead.
16   BY MR. BRETON:
17   Q.  Did you tell the court that you had thoroughly
18   investigated this case, talking to many witnesses including
19   Ryan?
20   A.  Yes.  The plea transcript specifically -- I used the
21   word "talking."
22   Q.  Do you know if that meant that you were referring to
23   your personal talking to Ryan or one of your investigators?
24   A.  It would have meant one of my investigators.
25   Q.  At that time was the guilty plea then based on factual
```

1  guilt?

2  A.  Yes.

3  Q.  Did Mr. Lisker tell the court when he was asked by

4  Mr. Rabichow that the reason he was pleading guilty was

5  because, in fact, he was guilty?

6  A.  Yes.

7  Q.  Had he discussed all the possible defenses and potential

8  defenses with you prior to pleading guilty?

9  A.  Yes.

10  Q.  Was there any indication by Bruce Lisker that he did not

11  want to plead guilty because he thought he was innocent?

12  A.  None whatsoever.

13  Q.  Did Judge Kolostian express any doubt as to whether

14  there was a factual basis for the plea?

15  A.  None.

16  Q.  Now, did you discuss with Robert Lisker the guilty plea,

17  the possibility of entering a guilty plea?

18  A.  Yes.  He was in court.

19  Q.  And did he say anything to you which indicates to you

20  his own opinion or belief as to his son's guilt or

21  innocence?

22  A.  He was not objecting to the entry of the plea to

23  second-degree murder.

24  Q.  Do you believe he was guilty?

25  A.  Yes.

Walter R. Ledge, Court Reporter

 1            MR. GENEGO:  Objection, Your Honor.  I think

 2  that's irrelevant.  It's opinion.  I would move to strike.

 3            MR. BRETON:  Based on his conversations with the

 4  client?

 5            MR. GENEGO:  If he's got a conversation, that's

 6  one thing, but an opinion is not enough.  I think it's

 7  irrelevant, and I think that it should be stricken.

 8            THE COURT:  If a defense attorney believes his

 9  client is guilty, the defense attorney still has the same

10  obligations to give him a whole defense; correct?

11            MR. BRETON:  That's right.  Although it changes

12  the strategy and the tactics and method in which he presents

13  that defense in order to maintain ethical proprieties.

14            MR. GENEGO:  Your Honor, I would respectfully

15  disagree with that.  I think if the lawyer has evidence that

16  shows his client is guilty he can't present evidence that

17  would be untrue or false or mislead the court.  But if you

18  personally believe your client is guilty and there's no

19  evidence to support that, you still have the same obligation

20  as if there weren't any --

21            THE COURT:  I agree with that.

22            The objection is sustained and the answer is

23  stricken.

24  BY MR. BRETON:

25  Q.  What was the result of the C.Y.A. report and study?

                    Walter R. Ledge, Court Reporter

1  A.  The report was negative and adverse to my client.  The

2  court was very upset with that report.  I remember Judge

3  Kolostian being angry, and he did not at that point want to

4  go along with the settlement.

5           And because of if the report, which is necessary

6  in order to get a C.Y.A. commitment, he would not accept it.

7  So the plea was withdrawn.

8  Q.  At that point, what were your options?

9  A.  Reset the case for trial.

10  Q.  Did you talk to Bruce Lisker about the possibility of

11  not withdrawing the guilty plea and proceeding with a guilty

12  plea and a sentence?

13  A.  We discussed it, and his father was present.  But

14  because life sentences mean life sentences.  Yes, you are

15  eligible for parole.  Mr. Lisker, meaning Bruce, decided to

16  withdraw the plea.

17  Q.  Do you recall going through, taking the time to go

18  through the murder book with Bruce Lisker?

19  A.  Yes.

20  Q.  And did you ask him about the portion in the murder book

21  where he was found by the polygraph examiner to be

22  deceptive?

23           MR. GENEGO:  Objection, Your Honor.  First of all,

24  vague as to time, but I also think it's irrelevant and

25  inadmissible.

```
 1              MR. BRETON:  I'm not asking for the results.  I'm

 2  asking whether he discussed the matter with Bruce and what

 3  Bruce's reaction was to having been declared "as the most

 4  deceptive I've ever seen in a polygraph exam."

 5              THE COURT:  And what's the relevance to what we're

 6  doing here today?

 7              MR. BRETON:  If Bruce admitted to him that he

 8  flunked the polygraph exam because he did it, that would be

 9  highly relevant.

10              MR. GENEGO:  He can ask him that question, Your

11  Honor, I just don't feel that that's (unintelligible).

12              THE COURT:  The objection is sustained.

13              Rephrase your question.

14  BY MR. BRETON:

15  Q.  Did you discuss the polygraph results with Bruce and ask

16  him for his reaction and whether -- why he failed it and

17  whether he felt -- whether he was guilty?

18              MR. GENEGO:  Objection, Your Honor.  I think

19  that's a compound question --

20              THE COURT:  Sustained.

21  BY MR. BRETON:

22  Q.  Did you discuss the result of the polygraph exam with

23  Bruce?

24  A.  Yes.

25  Q.  Did you ask him why he flunked it?
```

Walter R. Ledge, Court Reporter

```
 1              MR. GENEGO:  Objection, Your Honor.  I think that
 2  is an opinion of the examiner.  And it's overbroad also --
 3              THE COURT:  Sustained.
 4  BY MR. BRETON:
 5  Q.  Did he tell you that he had flunked it?
 6              MR. GENEGO:  Objection, Your Honor.  That's not
 7  relevant.
 8              THE COURT:  He does not know the answer to that.
 9              Go ahead.  Next question.
10  BY MR. BRETON:
11  Q.  Did he tell you that he did it?
12  A.  He never denied it.
13              THE COURT:  That wasn't the question.
14              THE WITNESS:  I understand.
15              MR. GENEGO:  Move to strike.
16              THE WITNESS:  The answer is no.
17  BY MR. BRETON:
18  Q.  Now, did you read Dr. Legasic's report?
19  A.  Yes.
20              MR. GENEGO:  Objection, Your Honor.  Relevancy.
21              THE COURT:  Overruled.
22  BY MR. BRETON:
23  Q.  Did you read the entire C.Y.A. and inability study?
24  A.  Yes, sir.
25  Q.  Do you recall reading references in the study as well as
```

```
 1  to Dr. Legasic's report to Bruce's assertion that he tried
 2  to make it look like Ryan or someone else had committed this
 3  crime?
 4  A.  Yes.
 5  Q.  Now, when you went -- excuse me.
 6           When he went to C.Y.A. for the study and to
 7  Dr. Legasic for the interviews, did you tell Bruce to lie?
 8  A.  No.
 9  Q.  Would you?
10  A.  No.
11  Q.  Have you ever told a client to lie?
12  A.  No.
13  Q.  Would you have told him not to say anything inconsistent
14  with his guilt because they might use it as a basis for
15  rejecting him?
16  A.  I don't understand your question.  Can you rephrase it
17  please?
18  Q.  Did you tell him not to tell them that he was innocent?
19  A.  No.
20  Q.  Did you tell him to feign responsibility for the crime?
21  A.  No.
22  Q.  Did you tell him to pretend to be remorseful?
23  A.  No.
24  Q.  Did you tell him not to say that he was innocent?
25  A.  No.
```

1    Q.  What did you tell him?

2    A.  In preparation for an interview, I told him that the

3    court is going to be looking at this report and that he has

4    to be honest and candid.

5    Q.  Did you tell him it would be better for him if he

6    expressed remorse?

7    A.  No.

8    Q.  Did he ever tell you that he had tried to make it look

9    like Ryan committed this crime?

10   A.  I don't recall.

11   Q.  As the second trial was about to commence, what -- how

12   did Judge Kolostian handle all of the previous pretrial

13   motions that had been made -- Miranda and (unintelligible)

14   and all the other motions?  Did he ask you to reargue them

15   or present new evidence or to submit them?

16        THE COURT:  We have the transcript, Mr. Breton.

17   Go on to something else.

18   BY MR. BRETON:

19   Q.  What did he say with regard to the third-party

20   liability -- the previous third-party liability issue?

21        MR. GENEGO:  Your Honor, I think that's vague, but

22   it's also (unintelligible).  I would object.

23        THE COURT:  If you are trying to lay some

24   foundation for something --

25        MR. BRETON:  I am.  I'm trying to lay a foundation

Walter R. Ledge, Court Reporter

1  for the very question that this Court asked at the last

2  hearing which was why did he present the letter to Judge

3  Kolostian at the second hearing.

4          THE COURT:  Perhaps you could ask the question.

5          MR. BRETON:  Well, I'm trying to lay a foundation

6  for that question.

7          THE COURT:  All right.  But you don't need to go

8  into what did Judge Kolostian do with all the previous

9  motions, do you?

10  BY MR. BRETON:

11  Q.  Did Judge Kolostian allow you to present new evidence on

12  the third-party culpability issue or claim?

13  A.  He asked if there was anything additional.  I presented

14  him with a letter.  I believe the letter was written by

15  Bruce -- that's what my recollection is -- asking him to

16  consider that and that information to allow that third-party

17  claim.

18  Q.  Now, after reading the C.Y.A. study and Dr. Legasic's

19  report, had you made any decision regarding the viability or

20  advisability or futility of proceeding with third-party

21  liability investigation?

22  A.  At that point I felt that no further investigation was

23  necessary after reviewing the detailed explanation in the

24  C.Y.A. report as to how Bruce killed his mother.

25  Q.  Did you also base that on a review of his detailed -- of

Walter R. Ledge, Court Reporter

1  his statements that he had tried to make it look like a

2  third party had done this?

3  A.  Yes.

4  Q.  Did you conclude that a third-party investigation would

5  not be reasonable?

6  A.  I concluded that I would not be following my oath of

7  office if I further presented any testimony in that area

8  that would be untrue.

9  Q.  So why did you present the letter to --

10  A.  I presented the letter to preserve the record for all

11  the issues on appeal.  Once the plea was withdrawn and the

12  statements were made by Mr. Lisker, it put the case in an

13  entirely different posture to try.

14          I felt that Mr. Lisker could not be called to

15  testify.  If he would say anything different than what he

16  said to C.Y.A. because that would be suborning perjury.

17  Q.  So at that point, obviously, the letter was hearsay.

18  But was -- were you presenting it possibly under the -- with

19  the chance that the prosecutor would not object to it and

20  that it would be admitted into evidence?

21          MR. GENEGO:  Objection, Your Honor.  Leading.

22          MR. BRETON:  Strategy.

23          THE COURT:  Sustained.  It is leading.

24  BY MR. BRETON:

25  Q.  Is there any other reason why you would present the

```
 1  letter and proffer it to -- in support of either a
 2  third-party liability or a reasonable doubt defense?
 3  A.  I would present it and be hopeful that I could be
 4  allowed to argue that position even if I did not have that
 5  witness testify to try to cast the blame on another
 6  individual causing more reasonable doubt in my argument in
 7  addition to attacking all the different things in the case
 8  to try to show doubt.
 9  Q.  Now, at the penal code section Motion for Judgment of
10  Acquittal, do you recall how the judge ruled on that?
11             THE COURT:  It presumably did not --
12             THE WITNESS:  That is right.  I'm going to assume
13  he denied it, or we would not be here.
14  BY MR. BRETON:
15  Q.  Did he grant it as to first-degree murder?
16  A.  I don't recall.
17  Q.  How did you prepare, then, for the second trial?
18             MR. GENEGO:  Objection, Your Honor.  Overbroad.
19             THE COURT:  Sustained.
20  BY MR. BRETON:
21  Q.  What did you do regarding the third-party culpability
22  defense?  Did you simply forego it completely?
23             MR. GENEGO:  Objection, Your Honor.  I think that
24  that was not his option.  I think the court made a ruling on
25  it.
```

 1          MR. BRETON:  Well, I'm distinguishing between

 2  investigation, which was the prior question.  And he's

 3  answered that, that he decided not to investigate further.

 4          Now I'm asking him if he decided not to pursue

 5  it in the sense of advocacy.

 6          THE COURT:  Are you asking about before Judge

 7  Kolostian ruled at the start of the second trial?

 8          MR. BRETON:  Yes.

 9          MR. GENEGO:  Your Honor, it's vague and ambiguous

10  because I'm not sure what he means by (unintelligible).

11  There's an argument in the transcript, and it speaks for

12  itself.  I don't know if he's using that for some other

13  term.

14          THE COURT:  I'm also unclear, Mr. Breton, as to

15  what you are asking.  So perhaps you can ask it again and

16  maybe the light will go on.  Just ask him a question.

17          MR. BRETON:  I'm trying to delve into tactics.

18  Q.  What tactical decision did you make regarding the

19  defense that you were going to present at the second trial?

20  A.  After the motions were renewed and the rulings were made

21  by Judge Kolostian, tactically, I decided to argue that

22  there was insufficient evidence to prove the case beyond a

23  reasonable doubt.

24          (Pause.)

25  Q.  And what are some of the points that you made regarding

Walter R. Ledge, Court Reporter

```
 1   reasonable doubt during the second trial?
 2               What were you attacking to raise reasonable doubt
 3   at the second trial?
 4               MR. GENEGO:  Objection, Your Honor.  Relevance.
 5               THE COURT:  Sustained.
 6   BY MR. BRETON:
 7   Q.  Were you -- was the thrust of your defense on reasonable
 8   doubt an attack on Monsue's credibility?
 9               MR. GENEGO:  Objection, Your Honor.  Relevancy.
10               THE COURT:  What is the relevance of that,
11   Mr. Breton?
12               MR. BRETON:  I want to lay the ground work for
13   showing that the next items that we're going to get into,
14   which are specific pieces of evidence that have been cited
15   by counsel for petitioner in support of the ineffective
16   assistance of counsel claim were items that he was able to
17   successfully attack during the trial.
18               THE COURT:  Overruled.
19               Do you remember the question?
20               THE WITNESS:  I'm sorry, I do not.
21               THE COURT:  Would you ask the question again,
22   Mr. Breton?
23   BY MR. BRETON:
24   Q.  Was one of your tactics that of impeaching Det. Monsue's
25   testimony regarding the visibility from the patio and the
```

1    ability that Mr. Lisker allegedly had to be able to see his

2    mother through the reflections in the window?

3    A.  Yes.

4            MR. GENEGO:  Objection, Your Honor.  We do not

5    cite that as a basis for the third-party culpability claim.

6    So it's irrelevant.

7            THE COURT:  Overruled.

8            Mr. Breton, I'll remind you that you thought

9    you could conclude with this witness within two hours, so

10   let's move it along.

11           MR. BRETON:  Thank you, Your Honor.

12   Q.  Did you review the autopsy report?

13   A.  Yes.

14   Q.  And in reviewing that report, did you notice a marked

15   impression on the back of the skull, if you recall?

16   A.  I don't recall.

17   Q.  Would it possibly refresh your recollection if we could

18   show you what I'm referring to from the autopsy report from

19   the murder book?

20   A.  I don't know.

21           MR. BRETON:  My we present the evidence to --

22           THE COURT:  Which exhibit do you want?

23           MR. BRETON:  It would be 71-13.

24           THE CLERK:  Exhibit 71-13?

25           MR. BRETON:  Correct.  We have Exhibit 71-18, but

Walter R. Ledge, Court Reporter

 1   then it's crossed out and it says 13.

 2              MR. GENEGO:  Your Honor, may I address the Court?

 3              THE COURT:  Just a moment.  Let's make sure we all

 4   agree which exhibit.

 5              THE CLERK:  71-13, counsel.

 6              THE COURT:  Now do you have an objection,

 7   Mr. Genego?

 8          (Pause.)

 9          Mr. Genego?

10              MR. GENEGO:  I do, Your Honor, and I have a copy

11   of the autopsy report here from the murder book, and it does

12   not include the photographs.  And my recollection is that

13   those photographs were not provided until sometime after

14   that.  So I just think he needs to make foundation as to

15   whether this was something I saw.

16              THE COURT:  So far, the witness has testified he

17   does not remember.  Now this exhibit is being placed in

18   front of him to see if it refreshes his recollection about

19   having reviewed the autopsy report.

20          So why don't you ask the question, Mr. Breton,

21   and see if it refreshes his recollection.

22   BY MR. BRETON:

23   Q.  Well, do you recall if the murder book contained

24   photographs?

25   A.  Yes.

Walter R. Ledge, Court Reporter

1    Q.  Do you recall seeing something like this -- or this

2    photograph?

3    A.  I can't honestly tell you that yes or no.

4    Q.  Well, that is -- do you recall seeing in this or any

5    other photo the small marks that are through the

6    approximately eleven o'clock of the right here?

7             THE COURT:  Excuse me.  You have to do a little

8    better than that, Mr. Breton.  Eleven o'clock to the right

9    here?

10   BY MR. BRETON:

11   Q.  About and slightly behind the right ear.

12            THE COURT:  I'm sorry, "the right ear?"

13            MR. BRETON:  "Ear."  Yes.

14   Q.  That are slightly behind the right earlobe and are

15   approximately 1-inch long.  Do you recall seeing those?

16   A.  I don't recall the photograph, so I can't answer that

17   question.

18   Q.  Okay.  Does that look like a show print to you?

19            MR. GENEGO:  Objection.

20            THE COURT:  Sustained.

21            MR. BRETON:  If we could present Exhibit 86-624

22   from the murder book.

23            THE COURT:  Through this one?

24            MR. BRETON:  Yes, Your Honor.  It's an area,

25   again, of 608.

```
 1              THE CLERK:  Sorry?  What --

 2              MR. BRETON:  It's an entire report that starts

 3   with 86-608 of the autopsy report.  But I'm referring to

 4   specifically to page 624.

 5              THE CLERK:  You just want the one page before the

 6   witness?

 7              THE COURT:  Property report?

 8              No, I'm sorry.  624.

 9              THE CLERK:  Exhibit 86-624 before the witness.

10         (Discussion between Mr. Breton and Mr. Genego out

11         of the hearing of the reporter.)

12              THE COURT:  All right.  86-624 is now before the

13   witness.

14              MR. BRETON:  Exhibit 40 please.

15         (Long pause.)

16              THE CLERK:  Exhibit 40 is before the witness.

17   BY MR. BRETON:

18   Q.  Have you seen this, Commissioner Mulcahy?

19   A.  There's nothing on this document to demonstrate to me

20   that I saw it or did not see it.

21   Q.  Do you recall seeing it?

22   A.  I don't recall.

23   Q.  Do you recall questioning Det. Monsue at the trial why

24   he did not get the phone bill?

25   A.  I don't specifically recall that.  I may have, but I
```

1  don't specifically recall it as I sit here.

2  Q.  What was the issue regarding the phone bill at trial --

3  or not the phone bill, but regarding the sequence of phone

4  calls, if you recall?

5            MR. GENEGO:  Your Honor, I do not believe the

6  issue at trial concerning the telephone bill is relevant to

7  the third-party culpability defense.  They are separate

8  issues.

9            THE COURT:  Well, they are separate issues, but --

10  they may or may not be separate issues.  So let's get the

11  answer to the question.  The question is do you recall.

12            THE WITNESS:  The answer is I do not recall.

13  BY MR. BRETON:

14  Q.  Was there an issue as to whether Robert Hughes' version

15  of what Bruce Lisker told him regarding calling his father

16  first or making a 911 call first or calling somebody and

17  making another call first, was there an issue as to the

18  credibility of Robert Hughes' statement to Monsue that could

19  be contradicted by looking at the telephone bill?

20  A.  Yes.

21  Q.  Did you ask Det. Monsue if he obtained a copy of the

22  telephone bill in order to verify that?

23  A.  I don't recall, unless you have a specific transcript

24  regarding that.

25  Q.  If I were to tell you that there is a phone number on

1  the phone bill of a phone call made at 10:22 in the morning

2  to the Long Beach area, would that refresh your recollection

3  as to whether you ever discussed that with Robert Lisker or

4  discussed that with Bruce Lisker?

5          MR. GENEGO:  Your Honor, I think that's vague and

6  ambiguous and compound.  I'm not sure how it's related, if

7  at all, to the prior question.  But I guess I'm not sure why

8  it would be relevant.

9          THE COURT:  It may or may not be relevant, but it

10  is vague and ambiguous and compound and not related to the

11  prior question.

12  BY MR. BRETON:

13  Q.  Well, you were seeking a copy -- were you seeking a copy

14  of the phone bill?

15  A.  In order to challenge the credibility for Hughes, yes.

16  Q.  Did you obtain one?  Did you obtain a copy of the phone

17  bill?

18  A.  I don't recall.

19  Q.  Do you recall whether Robert Lisker mentioned anything

20  on his phone bill regarding the calls that would have been

21  made before the murder or on the morning of the murder?

22          MR. GENEGO:  Objection, Your Honor.  Relevance.

23          THE COURT:  Overruled.

24          THE WITNESS:  I don't have any specific

25  recollection.

Walter R. Ledge, Court Reporter

1  BY MR. BRETON:

2  Q.  Would a phone call at 10:22 be relevant and therefore

3  something that you would want to verify and present at

4  trial?

5  A.  It would be relevant.  It would be something that I

6  would want to verify and check out to see if it's something

7  I wanted to present.

8  Q.  How would you verify that?

9         MR. GENEGO:  Objection.  I think it calls for

10  speculation unless --

11         THE COURT:  Sustained.

12  BY MR. BRETON:

13  Q.  Do you recall asking an investigator or asking Robert

14  Lisker to dial that number to ascertain the identity of that

15  number?

16         THE COURT:  Just a moment.  He's testified that he

17  doesn't recall seeing the phone bill.  He's testified he

18  doesn't recall talking to Mr. Lisker the elder.  So how

19  could he have asked to have it dialed?

20  BY MR. BRETON:

21  Q.  Well, do you recall discussing the matter of other phone

22  calls on the morning of the murder at the Lisker residence

23  with Robert Lisker?

24  A.  I have no recollection unless I have a copy of an

25  investigative report from my investigator or some personal

Walter R. Ledge, Court Reporter

1    notes that I wrote regarding this incident.

2    Q.  You worked quite a bit, or at least consulted quite a

3    bit, with Robert Lisker on this case, the entire case,

4    didn't you?

5              MR. GENEGO:  Objection.  Relevancy, and asked and

6    answered.

7              THE COURT:  Overruled.

8              THE WITNESS:  I consulted with his father

9    regularly regarding this case.

10   BY MR. BRETON:

11   Q.  Regarding strategy and pretrial preparation and

12   investigation and other matters?

13   A.  I would talk with him about the facts of the case.  It's

14   highly unlikely I would discuss strategy with somebody who

15   was not co-counsel in the case.

16   Q.  Would it be reasonable for you to assume that if Robert

17   Lisker had seen anything that was worthy of further

18   investigation from the phone bill that he would have talked

19   to you about that?

20             MR. GENEGO:  Objection, Your Honor.  Relevancy and

21   speculation.

22             THE COURT:  Sustained.

23             MR. BRETON:  Your Honor, I think we're ready to go

24   back to the autopsy report.

25             THE COURT:  Which exhibit now?

 1              MR. BRETON:  This would be 86-641.

 2              THE COURT:  You are through with the phone bill,

 3  Mr. Breton?

 4              MR. BRETON:  Yes.

 5              THE CLERK:  641 is a one-page diagram?

 6              MR. BRETON:  It's a diagram.

 7              THE CLERK:  Exhibit 86-641 is before the witness.

 8  BY MR. BRETON:

 9  Q.  And I direct your attention to the drawing of the head

10  in the lower left-hand quadrant on this page.

11              Do you recall seeing this in your preparation for

12  the trial?

13  A.  It has Dorka Lisker's name on it.  I reviewed the

14  autopsy report, but do I recall specifically this document

15  as I sit here today?  I don't recall.

16  Q.  Can you read what is written with the line that is going

17  down -- four parallel lines above the ear?  Can you read

18  that?

19              MR. GENEGO:  Objection.  He does not remember

20  seeing it.

21              THE COURT:  Let's just see if he can read it.

22              Can you read it?

23              THE WITNESS:  Part of it.  It appears to be "ABR"

24  for "abrasion," two-and-a-half inches.  And the last portion

25  under that, I cannot read.

```
 1            THE COURT:  I don't think that was the line

 2   Mr. Breton was referring to.

 3            Was it, Mr. Breton?

 4   BY MR. BRETON:

 5   Q.  Well, it says the one above behind "ear," but I'm

 6   referring to the two words that are just above that with a

 7   sort of a semi-circle around them.

 8   A.  The one that appears to be M.A.T.T.?

 9   Q.  Yes.

10            THE COURT:  The question is can you read it.  If

11   you can read it, fine; if you can't read it --

12   BY MR. BRETON:

13   Q.  Does that look like "pattern abrasions," or "ABR,

14   pattern ABR" --

15   A.  "ABR abrasion."  I can't make out what the top portion

16   is.

17   Q.  Does this -- does this -- do you recall Dr. Golden's

18   testimony with regard to this?

19            MR. GENEGO:  Objection.  Vague and ambiguous.  I'm

20   not sure what "this" is, but if it's something about he does

21   not remember seeing, I don't know how he can answer that

22   question.

23            THE COURT:  What do you mean by "this"?

24            MR. BRETON:  With regard to the pattern abrasion.

25            THE COURT:  All right.
```

```
 1  BY MR. BRETON:

 2  Q.  Do you recall his testimony with regard to an impression

 3  on her head, a pattern abrasion or impression on her head,

 4  while reading his report regarding a pattern abrasion?

 5  A.  I remember Dr. Golden.  I remember Dr. Golden

 6  testifying.  But as to the specifics, I have no independent

 7  recollection.

 8  Q.  Do you recall seeing the motel receipt --

 9          MR. BRETON:  We're through with this exhibit, Your

10  Honor.

11          Actually, we're not.  I'm sorry, one more

12  question.

13          THE COURT:  All right.

14  BY MR. BRETON:

15  Q.  At the top of that page, what does it state between the

16  two heads at the top?

17  A.  I'm not sure.

18  Q.  Okay.  Thank you.

19          THE COURT:  All right.  Are you now through with

20  this exhibit?

21          MR. BRETON:  Yes.

22          THE COURT:  Okay.  Go ahead, Mr. Breton.

23  BY MR. BRETON:

24  Q.  Now, Exhibit 86-7.

25          THE CLERK:  Exhibit 86-7 is before the witness.
```

```
 1              THE COURT:  Go ahead, Mr. Breton.
 2   BY MR. BRETON:
 3   Q.  Do you recall reading the second entry here regarding
 4   the ten o'clock or ten hundred hours, April 19, 1983?
 5   A.  Yes.
 6   Q.  Does it state there that he received the registration
 7   card from the manager?
 8   A.  Yes.
 9   Q.  And did you view that registration card in the murder
10   book?
11   A.  I have no independent recollection of that.  But I would
12   have requested it so that I could have seen it.
13              MR. GENEGO:  Objection, Your Honor.  I think it's
14   nonresponsive.  I also think it's --
15              THE COURT:  Well, the last part is nonresponsive,
16   but the first part was responsive.  Did he review it.  He
17   has no independent recollection.
18              MR. BRETON:  If we could then present him with the
19   receipt to see if it refreshes his recollection, and that
20   would be Exhibit 86-788.
21              THE CLERK:  Exhibit 86-788 is now before the
22   witness.
23              THE COURT:  Do you have a question, Mr. Breton?
24   BY MR. BRETON:
25   Q.  Do you recognize this, or do you remember seeing it?
```

1    A.   Yes.

2    Q.   Do you remember arguing to Judge Kolostian regarding

3    this receipt?

4    A.   I don't recall.

5    Q.   Did you attempt to use this as part of your third-party

6    liability claim or third-party liability evidence by

7    presenting it in support of your third-party liability

8    argument?

9            MR. GENEGO:   Objection, Your Honor.   He just

10   answered the question that he doesn't remember using it.

11           THE COURT:   Well, I suppose Mr. Breton can ask it

12   a different way.   So it's overruled.

13           THE WITNESS:   I don't recall, Mr. Breton.

14   BY MR. BRETON:

15   Q.   Okay.   Could we then go to the augmented reporter's

16   transcript at 397.

17           THE COURT:   Do we have an exhibit number?

18           MR. GENEGO:   Your Honor, I have an extra copy if

19   the Court would like.

20           THE CLERK:   Do you have an exhibit number?

21           MR. GENEGO:   I do not believe that the reporter's

22   transcripts were marked as separate exhibits.

23           THE COURT:   You may be right.

24           Go ahead.

25           Would you pass it to the Clerk, Mr. Genego.

Walter R. Ledge, Court Reporter

```
 1              All right.  This is the Reporter's Transcript
 2    on Appeal of November 13, 15, and 29, 1984, Mr. Breton?
 3              MR. BRETON:  Correct.
 4              THE COURT:  What page do you wish the witness to
 5    look at?
 6              MR. BRETON:  397.
 7              THE COURT:  All right.
 8              Would you place that in front of the witness.
 9              You are not going to ask him to review anything
10    other than that one page; right?  I don't want to take
11    the Court's time having him read the reporter's
12    transcript of the proceedings.
13              MR. BRETON:  No, that's not correct, Your Honor.
14              THE COURT:  It's not correct?
15              MR. BRETON:  It's not correct.
16              THE COURT:  You are going to ask him to look at
17    other pages, too?
18              MR. BRETON:  Yes.
19              THE COURT:  Do you have another area of
20    exploration you might go into and we can return to this one,
21    Mr. Breton?  Or is this your last area?
22              (Pause.)
23              MR. BRETON:  Well, I would like to inquire, then,
24    of petitioner:  Is he conditioning the claim of ineffective
25    assistance of counsel that trial counsel was deficient in
```

```
 1   not investigating further the lone footprint in the
 2   bathroom?
 3           THE COURT:  Mr. Breton, now is not the time for
 4   you to have discussions with petitioner's counsel.  We have
 5   a witness here.  If you have questions for the witness, ask
 6   questions of the witness.
 7           MR. BRETON:  Your Honor, this is the last area.
 8           THE COURT:  All right.
 9       (Pause.)
10   BY MR. BRETON:
11   Q.  I would direct your attention, then, to page 391.
12           THE CLERK:  Page 391 is now before the witness.
13   BY MR. BRETON:
14   Q.  Commissioner Mulcahy, on approximately line 16, if you
15   can read that, and does that refresh your recollection
16   regarding a private investigator?
17   A.  My page does not have numbers on it.
18   Q.  Sorry, okay.  It would be down about three-fourth of the
19   way down, or two-thirds of the way down:
20           "Mr. Mulcahy:  I had a private investigator."
21           Do you see that?
22   A.  Yes, I do.
23           THE COURT:  What is your question?
24   BY MR. BRETON:
25   Q.  My question is do you recall who that private
```

Walter R. Ledge, Court Reporter

1  investigator was?

2          MR. GENEGO:  Your Honor, I'm not sure --

3          THE COURT:  Why don't you read into the record the

4  statement you are inquiring about.

5          MR. BRETON:  This is the statement:

6              "MR. MULCAHY:  I had a private

7          investigator also contact Ryan.  And by the

8          time my private investigator contacted Ryan, he

9          was out of state, he was in San Francisco.

10          There were two private investigators present

11          during that interview.  He did not admit to the

12          crime, did not cop out to the crime, so to

13          speak."

14          THE COURT:  What is your question?

15  BY MR. BRETON:

16  Q.  My question is do you recall who the investigators were?

17  A.  Specifically, no.

18  Q.  And from your reading of this, do you recall that as

19  having been an interview that took place in state or out of

20  state?

21  A.  San Francisco.

22          THE COURT:  So when you said "out of state," you

23  meant San Francisco?

24          THE WITNESS:  I'm sorry.  In the State of

25  California.

Walter R. Ledge, Court Reporter

```
 1          (Pause.)

 2          MR. BRETON:  I'm sorry, Your Honor, I can't find

 3  the reference where he argues regarding the motel receipt

 4  and the conflicts --

 5          THE COURT:  I'm sure you will find it for me in

 6  your argument, Mr. Breton.

 7          MR. BRETON:  Yes.  No further questions.

 8          THE COURT:  All right.

 9          Mr. Genego, how long do you envision for

10  cross-examination -- or Miss Podberesky, whoever is going

11  to do the examination.

12          MR. GENEGO:  I was going to do the examination,

13  Your Honor.

14          THE COURT:  Ballpark.  If it's five minutes, we'll

15  do it right now.

16          MR. GENEGO:  I wasn't going to say I think it will

17  be more than five minutes.  Miss Podberesky suggested to me

18  it may be an hour.  I do not think it will go that long.  I

19  believe it will be considerably shorter, but I don't know it

20  will be five minutes.

21          THE COURT:  We'll take our lunch break and return

22  at one o'clock for the cross-examination.

23          We will be in recess.

24          (Court recessed at 11:55 A.M. and reconvened at

25          1:00 P.M. with all counsel present.)
```

Walter R. Ledge, Court Reporter

```
 1              THE CLERK:  Please remain seated and come to
 2   order, court is again in session.
 3              Mr. Mulcahy, you are reminded you are under
 4   oath.
 5                      CROSS-EXAMINATION
 6   BY MR. GENEGO:
 7   Q.  Good afternoon, Mr. Mulcahy, how are you?
 8   A.  Fine.  Good afternoon.
 9   Q.  You testified in direct examination that you had
10   reviewed some documents concerning this matter before your
11   testimony today.
12   A.  Yes, sir.
13   Q.  Okay.  When did you review those documents?
14   A.  Over the last week and last night.
15   Q.  And what documents were they -- well, strike that.
16              Who provided you with the documents that you
17   reviewed, if anyone?
18   A.  Mr. Breton.
19   Q.  What documents did he provide you with?
20   A.  I reviewed the plea transcript.  I reviewed the C.Y.A.
21   report.  I reviewed Dr. Legasic's report.
22              There was a transcript that did not have a front
23   page on it which was regarding the motions that were
24   presented.
25              I was provided newspaper articles back from the
```

1   time that this case occurred -- '84, '83 -- some of which

2   were undated.

3           There was a summary of final argument which was

4   not of great quality and of no assistance.

5           There may have been another document or two, but I

6   don't recall.

7   Q.  In other words, there was the specific documents that

8   you can remember right now having been given; you were not

9   provided with a copy of the entire trial transcript; is that

10  correct?

11  A.  That's correct, I was not.

12  Q.  And you were not provided with a copy of the entire

13  murder book; is that correct?

14  A.  That is correct.

15  Q.  One of the investigators that you had working on the

16  case with you was Sue Sarkis; correct?

17  A.  Yes.

18  Q.  You would meet with Sue Sarkis on occasion, as you

19  recall, in preparation for the investigation parts of the

20  case?

21  A.  I would assume I did.  I have no independent

22  recollection of doing so.

23  Q.  That would have been your standard practice?

24  A.  Yes, sir.

25  Q.  Do you recall meeting with Sue Sarkis and Bruce Lisker

1   together?

2   A.   I have no recollection of that, sir.

3   Q.   Would that have been consistent with your regular

4   practice?

5   A.   At times I would meet with the client and the

6   investigator.  At other times, I would not.

7   Q.   You testified in direct examination that in arguing in

8   opposition to the district attorney's motion to exclude

9   evidence concerning Michael Ryan that you offered a copy of

10  the transcript and the tape to Judge Kolostian.

11          Do you remember that testimony?

12  A.   Yes, sir.

13  Q.   That recollection is based on reviewing the transcript;

14  is that correct?

15  A.   Yes, sir.

16  Q.   Do you have -- strike that.

17          You do not have in your mind a specific

18  recollection of having ever actually handed the transcript

19  or the tape to Judge Kolostian; is that true?

20  A.   That's a true statement.

21  Q.   So whatever your memory is, it's based on what's in that

22  written transcript; correct?

23  A.   It depends.  I mean --

24  Q.   Let me see if I can clear up a few --

25          Do you remember what it is that you read in the

1  transcript that caused you to believe that you provided a

2  copy of the transcript and the tape to Judge Kolostian?

3  A.  There was information regarding the transcript and the

4  tape during the arguments, from what I recall.

5  Q.  Let me see if I can clarify that.

6        You talked about the transcript and the tape

7  during your argument; correct?

8  A.  Yes.

9  Q.  Was there anyplace in the transcript that you can

10  recall -- and you are free to review a copy if you'd like --

11  where you remember that indicated that you offered or

12  provide a copy of the tape to Judge Kolostian?

13  A.  There is nothing that indicates specifically that I gave

14  the tape and the transcript that I reviewed.  It may have

15  been provided by the prosecutor.  I can't give you a better

16  answer than that.

17  Q.  Then I would ask the same question about the transcript:

18        Do you contend that there was anything in the

19  transcript that reflected that you provided a copy of that

20  transcript to Judge Kolostian?

21  A.  Nothing specifically stating that I provided it but that

22  Judge Kolostian did have it.

23  Q.  So your recollection is that there was something in the

24  transcript that indicated to you that Judge Kolostian had a

25  copy of the transcript in his possession at the time of the

1   hearing?

2   A.   And the tape, yes.

3   Q.   Do you remember what that was in the transcript that

4   caused you to have that belief?

5   A.   There was a mention of the tape and a mention by the

6   judge, if I recall, that he listened to the tape.

7   Q.   One of the items that you mentioned in support of your

8   opposition to the prosecution's motion to exclude evidence

9   about Michael Ryan was some footprint evidence.

10          Do you remember that?

11  A.   No, I don't, sir.

12          MR. GENEGO:  Your Honor, could I ask the Clerk to

13  put a copy of the Amended Reporter's Transcript, page 394,

14  in front of the witness to see if that might refresh his

15  recollection?

16          THE CLERK:  Page 394 of the Reporter's Transcript

17  on Appeal is before the witness.

18  BY MR. GENEGO:

19  Q.   Would you please read that, Mr. Mulcahy.

20  A.   Yes, sir.

21          (Pause.)

22          I've completed it, sir.

23  Q.   Does that refresh your recollection you had that one of

24  the points you raised in arguing in opposition to the motion

25  was footprint evidence?

Walter R. Ledge, Court Reporter

1  A.  There's an argument regarding footprint evidence, but I

2  don't know if this argument was regarding the motion at page

3  394.

4          MR. GENEGO:  Your Honor, could I ask the witness

5  to look at the excerpt of the transcript right there just to

6  make sure --

7          THE COURT:  If that's what the reference is

8  about --

9          MR. BRETON:  Page 394, there's a reference on my

10 page to --

11         THE COURT:  The context of the argument in

12 opposition to the motion?

13         MR. BRETON:  Yes.

14         THE COURT:  All right.  That's all we need.

15 BY MR. GENEGO:

16 Q.  You did not do any further investigation, defense

17 investigation, with regard to the footprints; is that right?

18 A.  I don't recall.

19 Q.  You also testified in direct examination that you

20 interviewed Michael Ryan or had an investigator interview

21 Michael Ryan?

22 A.  Yes, based on the information I saw in the transcript.

23 Q.  That was my point.  Again, that is based on your reading

24 the transcript rather than an independent recollection of

25 having someone tell you that they interviewed Michael Ryan;

```
 1  correct?
 2  A.   Yes, sir; that's correct.
 3           MR. GENEGO:   Could I ask the Clerk to place
 4  Exhibit 86 at page 791 through 794 in front of the witness.
 5           THE CLERK:   Exhibit 86 at page 791 is before the
 6  witness.
 7           THE COURT:   That includes through page 794;
 8  correct?
 9           MR. GENEGO:   Correct.
10           THE COURT:   Make sure the witness has that.
11           THE CLERK:   Yes, Exhibit 86, page 791 through 794,
12  is before the witness.
13           THE COURT:   Go ahead, Mr. Genego.
14  BY MR. GENEGO:
15  Q.   Do you recognize this as one of the reports that was
16  included in the murder book that you were provided -- or let
17  me start.
18           Do you remember this is one of the reports that
19  you reviewed in connection with your representations of
20  Mr. Lisker?
21  A.   I remember reading an interview of him from the state of
22  Mississippi and being provided reports.   I can't tell you if
23  this was the specific report that I reviewed.
24  Q.   Thank you.
25           And that report that you remember reviewing was
```

1  separate and apart from Det. Monsue's interview of Mr. Ryan;

2  correct?

3  A.   Yes.

4  Q.   And is it true that the report that's in front of you,

5  the Exhibit 86 at page 792, is an interview of Mr. Ryan that

6  was done by two investigators out of state?

7  A.   According to the report, yes.

8  Q.   And now, isn't it also true that when you made reference

9  in your argument to the court at the hearing on the

10  third-party culpability motion that what you actually

11  represented to the Court was that your investigator tried to

12  contact Ryan but he was already out of the state at the time

13  you tried to contact him; isn't that right?

14  A.   I don't believe that's what's stated in the transcript

15  that I saw here this morning.

16         MR. GENEGO:  Does the witness still have the

17  Amended Reporter's Transcript in front of him, page 391?

18         THE CLERK:  Yes, he still has that document.

19  BY MR. GENEGO:

20  Q.   Do you have that in front of you?

21  A.   Yes, sir, I do.

22  Q.   Could you look at page 391.

23  A.   I'm looking at that, sir.

24         (Pause.)

25         THE COURT:  Do you have a question, Mr. Genego?

Walter R. Ledge, Court Reporter

```
 1  BY MR. GENEGO:
 2  Q.  In that transcript, you represented to the court that
 3  you had a private investigator -- and that's singular --
 4  also contact Ryan; correct?
 5  A.  In the first paragraph that's (unintelligible) that
 6  would be a correct statement.  The follow-up paragraph says
 7  there were two private investigators present during the
 8  interview.
 9  Q.  Well, let me just follow-up, then.
10          If you would let me just ask the next question
11  which is, in the next sentence, you again use "private
12  investigator" in the singular; correct?
13  A.  Is that after --
14  Q.  It says "But by the time my private investigator
15  contacted Ryan, he was out of state."
16  A.  Correct.
17  Q.  Your use of the singular?
18  A.  In that paragraph; correct.
19  Q.  And one investigator you had on this case was Sue
20  Sarkis; right?
21  A.  Yes.  According to the motion that I read and reviewed,
22  she was appointed; that is correct.
23  Q.  Did you simultaneously have Miss Sarkis and some other
24  investigation, or did you have Miss Sarkis and then some
25  other investigator work on the case after her?
```

```
 1  A.  I believe it was just Miss Sarkis at the time.

 2  Q.  Now, below that in the next paragraph, as you pointed

 3  out, it says there were two private investigators during

 4  that interview.  That is a statement that you make there;

 5  correct?

 6  A.  Yes, sir.

 7  Q.  But you never had two private investigators working for

 8  you at the same time; correct?

 9         (Pause.)

10  A.  The only thing I can tell you, sir, is there were two

11  private investigators appointed in the case.  I do not

12  believe that they worked together on the case.

13  Q.  Having looked at the report from Mississippi where there

14  were two police investigators who interviewed Mr. Ryan out

15  of state, and going back to the transcript now and seeing

16  where you twice refer to your investigator in the singular

17  and then talk about another -- or then talk about two

18  private investigators, isn't it true that you were

19  confusing, in that representation to the court, the private

20  investigators with the two police officer investigators who

21  did interview Mr. Ryan out of state?

22  A.  I don't recall.

23         MR. GENEGO:  That's it with those exhibits, Your

24  Honor.

25         THE COURT:  Thank you.
```

```
 1  BY MR. GENEGO:

 2  Q.   You advised Mr. Lisker about the terms and conditions of

 3  the guilty plea that he was going to enter before the court

 4  before he did so; correct?

 5  A.   That's correct.

 6  Q.   On direct examination you testified that "life is life."

 7           Do you remember that testimony?

 8  A.   Yes.

 9  Q.   And I believe what you meant by that, but let me just

10  make sure.  What you meant by that is that if you are

11  sentenced to life, even though it's life without parole, if

12  you are sentenced to an indeterminate term of life, you end

13  up spending life in prison in the California state system.

14           Is that what you meant?

15  A.   What I meant is you are eligible for parole, you go to

16  parole hearings.  When you have a life tail, there were not

17  people being released on life tail, notwithstanding their

18  parole hearings.

19  Q.   Is that something that you would have advised Mr. Lisker

20  of at the time you were representing him?

21  A.   Yes.

22  Q.   It's also true, is it not, that Mr. Lisker's guilty plea

23  was conditioned upon him getting a Youth Act or a youth

24  commitment; correct?

25  A.   That's correct.
```

```
 1   Q.  And isn't it also true that you advised Mr. Lisker and
 2   in fact represented in the transcript that if he was
 3   accepted into the youth program and the court accepted his
 4   guilty plea, that he would be out by age 23?
 5   A.  That is -- I don't believe that is correct.  He should
 6   be out by age 25 to 26 on a Youth Authority commitment
 7   directly to the Youth Authority, not housing in the Youth
 8   Authority.
 9   Q.  Twenty-five to 26, then.
10   A.  Correct.
11   Q.  When you would receive investigative reports, you would
12   include them with your case file and case materials?
13   A.  Yes.
14   Q.  When you turned over the files to Mr. Lisker, did you
15   turn over everything you had at that point in time?
16   A.  I turned over the entire file to Mr. Lisker.  The file
17   is the client's.
18              THE COURT:  Excuse me, Mr. Genego.  In that
19   question are you referring to Mr. Lisker the elder or --
20              MR. GENEGO:  I'm sorry.  That was a poor question.
21   Q.  When you turned over your file to Mr. Robert Lisker
22   senior, Bruce's father, you provided him with all the file
23   material that you had; correct?
24   A.  That's correct.
25   Q.  That would have included any investigative reports you
```

Walter R. Ledge, Court Reporter

1    would have done; correct?

2    A.   That is correct.

3            MR. GENEGO:  Your Honor, I'd like to have an

4    exhibit marked if I might.  May I approach?

5            THE COURT:  Yes.

6            (Mr. Genego hands document to the Clerk.)

7            This will be Exhibit 158?

8            MR. GENEGO:  Yes, please.

9            (Exhibit 158 was marked for identification.)

10   Q.   Do you have that in front of you?

11           THE COURT:  No, he does not.

12           MR. GENEGO:  I'm sorry.

13           THE WITNESS:  I'm sorry?

14           (Pause.)

15           THE CLERK:  Exhibit 158 is before the witness.

16   BY MR. GENEGO:

17   Q.   Do you recognize that letter, Mr. Mulcahy?

18           THE COURT:  It's four or five pages, so give him a

19   moment to look at it.

20           MR. GENEGO:  Okay.

21           (Pause.)

22           MR. BRETON:  I don't know if this is the

23   appropriate time, but we would object --

24           THE COURT:  It's not the appropriate time.

25           MR. BRETON:  -- on hearsay.

```
 1              THE COURT:  There's no question pending.
 2   BY MR. GENEGO:
 3   Q.  In that letter you reference a receipt about the turn
 4   over of files; correct?
 5   A.  Correct.
 6   Q.  And that receipt is the last page of that exhibit?
 7   A.  Yes.
 8   Q.  And that is a receipt that you provided Robert Lisker at
 9   the time you turned over the file?
10   A.  Yes.
11   Q.  And that listed all the materials that you turned over
12   that you had in your possession at that time; correct?
13   A.  These are some of the materials, yes.
14   Q.  When you say "a summary," you didn't identify each page,
15   but you listed each item that you had.  Is that a correct
16   statement?
17              (Pause.)
18   A.  That appears to be so, yes.
19              MR. GENEGO:  No further questions.
20              THE COURT:  Any redirect, Mr. Breton?
21              MR. BRETON:  Yes, Your Honor.
22              If I could, Your Honor, if we could show the
23   witness pages 30 and 34 of the Clerk's transcript.
24              THE COURT:  Do you have an extra copy of those
25   handy, 30 and 34?
```

Walter R. Ledge, Court Reporter

```
 1              MR. BRETON:  Thirty and 34, I don't, Your Honor.
 2              THE COURT:  Move to another area, Mr. Breton, and
 3    we'll take a break when you are done and we'll make extra
 4    copies of this.  I apologize, we did not bring the full set
 5    of transcripts.
 6                        REDIRECT EXAMINATION
 7    BY MR. BRETON:
 8    Q.  With regard to this latest communication that you were
 9    just shown --
10              MR. BRETON:  I don't know how we're referring to
11    that.
12              THE COURT:  Exhibit 158.
13    BY MR. BRETON:
14    Q.  Exhibit 158, does this refresh your recollection as to
15    the location of the files and as to what you turned over --
16    you turned over everything?
17    A.  No, everything was turned over.  There was nothing left
18    in storage regarding this case.
19    Q.  Now, Sue Sarkis was appointed in June of 1983.  Is that
20    your recollection?
21    A.  I know she was appointed, but I can't tell you the date.
22    Q.  Okay.  That's why we need the transcript.
23              Do you recall when Mr. Wagner, Michael Wagner, was
24    appointed?
25    A.  My recollection is that he was appointed subsequent and
```

1   prior to the trial.

2   Q.  And I'm not sure if you still have that -- do you still

3   have the transcript in front of you of the first -- the

4   hearing on the first third-party liability?

5   A.  No, sir, I don't --

6               THE COURT:  What's the page number, Mr. Breton?

7               MR. BRETON:  That would be the Augmented

8   Reporter's Transcript we just looked at.

9               THE COURT:  Page number?

10              MR. BRETON:  I'm trying to find out where it

11  begins.

12              At 376, page 376.

13              THE CLERK:  It starts at page 389.

14              THE COURT:  What page number do you want him to

15  look at?

16              MR. BRETON:  376.

17              THE CLERK:  It starts with page 389.

18              MR. BRETON:  If I could simply, with counsel's

19  permission, just read -- the only point I'm making is the

20  date of the hearing.

21              THE COURT:  Is there any objection as to the date,

22  Mr. Genego?

23              MR. GENEGO:  I would accept Mr. Breton's

24  representation of the date.

25              MR. BRETON:  November 15, 1984.

Walter R. Ledge, Court Reporter

1          THE COURT:  Was the day of what?

2          MR. BRETON:  The date of the hearing before

3  Judge Kolostian on the presentation of third-party liability

4  evidence.  That was before the first trial.  That was only

5  two weeks before the guilty plea.  And that was when

6  Judge Kolostian first denied that motion.  That was in

7  November of '84.

8          THE COURT:  All right.

9          MR. GENEGO:  Could I have just one second, Your

10  Honor?

11          THE COURT:  Yes.

12          MR. GENEGO:  Yes, I agree.

13          THE COURT:  All right.

14          Go ahead.

15  BY MR. BRETON:

16  Q.  Now, two final points, and that is with regard to the

17  sentence ultimately that you were able to achieve in this

18  case.

19          At sentencing, did you ask the judge to once again

20  consider granting him a straight commitment to C.Y.A.?

21          MR. GENEGO:  Objection, Your Honor.  I don't think

22  it's relevant; also beyond the scope of cross-examination.

23          THE COURT:  Overruled.

24          THE WITNESS:  Without seeing the document to

25  refresh my recollection, I do not recall.

Walter R. Ledge, Court Reporter

```
 1  BY MR. BRETON:
 2  Q.  Okay.  This would be in Volume V of the reporter's
 3  transcript.  This would be page 1230.
 4          THE COURT:  Mr. Genego, is there any doubt as to
 5  whether he had any objection?
 6          MR. GENEGO:  No, Your Honor.
 7          THE COURT:  You have a objection as to relevance,
 8  I understand, but you agree that he did request commitment
 9  to the C.Y.A. again at sentencing?
10          MR. GENEGO:  Yes.
11  BY MR. BRETON:
12  Q.  And do you recall the judge splitting the baby --
13  prosecutor Rabichow was asking for a straight state prison;
14  you asked for a straight commitment to C.Y.A., and
15  Judge Kolostian said I'm going to send him to state prison,
16  but before that, to be housed at C.Y.A.  Is that correct?
17  Do you remember that?
18          THE COURT:  I'm not sure that's splitting the
19  baby.
20          THE WITNESS:  What the judge did was he committed
21  him to the state penitentiary with housing in California
22  Youth Authority until such time as he should then be
23  transferred to the state prison.  That is different than a
24  straight commitment to the California Youth Authority.
25  /////
```

Walter R. Ledge, Court Reporter

```
 1  BY MR. BRETON:
 2  Q.  One question that I neglected to ask -- in all of the
 3  capital cases, how many have you handled?
 4  A.  Homicide cases, about 30; capital cases, about 10.
 5          MR. GENEGO:  Your Honor, I would like a time frame
 6  -- how many before 1984 and how many after.
 7          THE COURT:  I don't know if it's relevant or not.
 8  BY MR. BRETON:
 9  Q.  I'm simply going to ask, in any of the 11 or 12 capital
10  cases that you have handled, has the defendant been given
11  the death penalty?
12  A.  Never.
13          MR. GENEGO:  Objection, Your Honor.
14  (Unintelligible.)
15          THE COURT:  That's not relevant.
16          MR. BRETON:  Until we find that transcript.
17          THE COURT:  So it's pages 30 and 34 of the
18  transcript that you wish duplicated?
19          MR. BRETON:  Correct, of the Clerk's Transcript,
20  the regular Clerk's Transcript.
21          THE COURT:  And those are the only remaining
22  questions?
23          MR. BRETON:  We also have an impeachment rebuttal
24  witness who is present and ready to testify, which I think
25  would be relatively short.
```

Walter R. Ledge, Court Reporter

```
 1              THE COURT:  It won't take long to get these pages
 2    duplicated.  We'll take a ten-minute break and then finish
 3    with Commissioner Mulcahy.
 4              (Recess taken from 1:32 P.M. 1:45 P.M.)
 5              THE CLERK:  Back on the record.
 6              THE COURT:  Mr. Breton.  Does the witness have the
 7    Clerk's -- the Clerk's transcript at page 30?
 8              THE CLERK:  Excerpt of the Clerk's Transcript of
 9    page 30 through 41 is before the witness.
10    BY MR. BRETON:
11    Q.  Mr. Mulcahy, is this one of the motions that you made
12    for appointment of a private investigator?
13              MR. GENEGO:  Objection.  Assumes facts not in
14    evidence.
15              THE COURT:  Is this a motion?
16              MR. BRETON:  Yes, Your Honor.
17              THE COURT:  Did you make more than one?
18              THE WITNESS:  Yes.
19    BY MR. BRETON:
20    Q.  Could you have made more than two?
21    A.  It's possible, but I don't know.
22    Q.  Now, this motion was made on what date, according to
23    the --
24    A.  The motion was file stamped June 2nd, 1983.
25    Q.  Okay.  The murder occurred in March of '83.  I'd like to
```

Walter R. Ledge, Court Reporter

1  ask if you could look at page 5.

2  A.  That would be page 34 of the transcript?

3  Q.  I'm sorry, page 34 of the transcript.

4          And look at the second full paragraph that begins

5  with "A review."

6          THE COURT:  You want him to read just that one

7  paragraph?

8          MR. BRETON:  That's right.

9  Q.  And does this refresh your recollection as to your

10 thinking and the purpose behind your request for the

11 appointment of Sue Sarkis?

12 A.  Yes.

13 Q.  What was that?

14 A.  To have her appointed prior to the preliminary hearing

15 and to conduct limited investigation prior to the

16 preliminary hearing.  That's when the court was both

17 municipal court and superior court.  It was not consolidated

18 at that time.

19 Q.  And for what purpose did you ask for her appointment?

20 To do what?  To carry out what type of interview?

21 A.  To interview the three jailhouse informants.

22 Q.  And do you read anything on here that would indicate

23 that you would need her or ask her or asking funds for her

24 to do any other investigation?

25 A.  No.

1  Q.  If you could look at page 36, please.

2          What were the total number of fees that you were

3  asking?

4  A.  $1,500.  It was issued by Judge Jane Sat of the

5  municipal court.

6          MR. BRETON:  I would ask counsel if we could

7  stipulate without having to stop and Xerox the second

8  request for appointment of the second investigator.  If he

9  could stipulate that the appointment for the next

10  investigator was for the appointment of Michael Wagner on

11  June 21, 19 (unintelligible).

12          (Pause.)

13          MR. GENEGO:  Your Honor, I would stipulate that

14  there was a second motion on the date reflected in the

15  Clerk's Transcript.

16          THE COURT:  Which is June 21, 1984?

17          MR. GENEGO:  Correct.

18          THE COURT:  Is that sufficient, Mr. Breton?

19          MR. BRETON:  And if he could stipulate that the

20  request was for $3,000.

21          MR. GENEGO:  I would stipulate to that.

22          THE COURT:  All right.

23  BY MR. BRETON:

24  Q.  Now, without having to go back and look at that

25  reporter's transcript, we saw that the first hearing on the

Walter R. Ledge, Court Reporter

```
 1  in-limine motion regarding third-party liability took place
 2  in November of '84, which would be five months later;
 3  correct -- five months after the appointment of Michael
 4  Wagner?
 5  A.  Yes.
 6  Q.  What was your thinking in the appointment of Michael
 7  Wagner?
 8  A.  To conduct further interviews, contact further witnesses
 9  for the preparation of motions for trials in the superior
10  court.
11  Q.  Okay.  Did you consider having Ryan testify in this
12  case?
13  A.  Yes.
14  Q.  And what was your thinking?
15  A.  After review of all the materials, that I would not call
16  him.
17  Q.  Because?
18  A.  Because I thought that it would be detrimental to my
19  client.
20  Q.  Now, on the documents that I provided to you by way of
21  fax or messenger, I simply want to clarify something for the
22  record:
23          Is it not true that about a month ago when the
24  hearing was first set, or this hearing was first set, that
25  you called me and asked me not to send you anything from
```

1  this trial?

2  A.   That is correct.

3  Q.   And why did you not want me to?

4  A.   I did not want to taint any independent memory that I

5  had with reading materials that might cause me to just

6  remember what was in the materials and not be a result of my

7  independent memory.

8  Q.   And do you understand that the reason some of these

9  documents were sent to you by me was simply so we could

10  speed up this hearing and preclude the wasting of several

11  minutes, if not hours, of time to refresh your recollection

12  and go through the very documents that we referred to here

13  today?

14          MR. GENEGO:  Your Honor, I think that's

15  self-serving and not relevant.

16          THE COURT:  It's not important, Mr. Breton.  Your

17  credibility is not at issue.

18          MR. BRETON:  But the question was asked, Your

19  Honor, as to what was sent and what was not sent.  And out

20  of concern for his back problem and this Court's time --

21          THE COURT:  Let's move on, that's not important.

22          MR. BRETON:  No further questions.

23          THE COURT:  There was some new material in there.

24          Do you have any recross?

25          MR. GENEGO:  I do, very brief.

```
 1                    RECROSS-EXAMINATION

 2   BY MR. GENEGO:

 3   Q.  Commissioner Mulcahy, could you look at page 34 of the

 4   Clerk's Transcript if you still have it in front of you.

 5   And if not, I would ask the Clerk to put it in front of you.

 6   A.  I do not have it.

 7            THE CLERK:  Page 34 of the Clerk's Transcript is

 8   before the witness.

 9   BY MR. GENEGO:

10   Q.  Do you have that in front of you?

11   A.  Yes, sir.

12   Q.  Isn't it true, sir, that you represented to the court

13   that Miss Sarkis was an expert investigator and that she was

14   particularly well qualified for this case?

15   A.  Based on that declaration, yes, sir.

16   Q.  Do you remember when the preliminary hearing occurred in

17   the case?

18   A.  Not exactly, sir.

19   Q.  Do you recall if you did any investigation or had

20   Miss Sarkis do any investigation from the time period of

21   June 1983 when this motion was made and when the subsequent

22   motion was made a year later for the appointment of

23   Mr. Wagner?

24            I don't know if this was a very well phrased

25   question.
```

```
 1              THE COURT:  It was not.
 2   BY MR. GENEGO:
 3   Q.  Did you have an investigator working on the case from
 4   the period of 1983 until the time of Mr. Wagner's
 5   appointment in 1984?
 6   A.  She was appointed pre-preliminary hearing.  Mr. Wagner
 7   was appointed after arraignment on the information in the
 8   superior court.  That's the best I can answer that.
 9   Q.  It's true, then, that they were not working together at
10   the same time; correct?
11   A.  I don't believe they were.
12              MR. GENEGO:  No further questions.
13              THE COURT:  All right.
14              Has Commissioner Mulcahy finished his
15   testimony?
16              MR. GENEGO:  We have no further --
17              THE COURT:  Mr. Breton?
18              MR. BRETON:  No.  Thank you, Your Honor.
19              THE WITNESS:  Thank you, Your Honor.  Am I excused
20   or should I remain?
21              MR. GENEGO:  We would excuse him, Your Honor.
22              THE COURT:  Mr. Breton?
23              MR. BRETON:  No, Your Honor.  Depending on the
24   rebuttal witness, we don't have a proffer.  We don't know
25   who the rebuttal witness is going to be.  So we might need
```

```
 1   him.
 2          THE COURT:  All right.
 3          Sorry, Commissioner Mulcahy, we would ask you
 4   to remain.
 5          THE WITNESS:  I'll remain in the hallway, Your
 6   Honor.
 7          THE COURT:  Thank you very much.
 8          Mr. Breton, that was your only witness
 9   designated in the pre-hearing report.
10          MR. BRETON:  That's correct, Your Honor.
11          THE COURT:  And the only exhibit you had was 157,
12   which was admitted.
13          What about 158, Mr. Genego?
14          MR. GENEGO:  We would offer that in evidence, Your
15   Honor.
16          THE COURT:  Mr. Breton?
17          MR. BRETON:  No objection.
18          THE COURT:  All right.  158 will be admitted.
19          (Exhibit 158 was received into evidence.)
20          So the attorney general rests?
21          MR. BRETON:  We rest.
22          THE COURT:  Mr. Genego?
23          MR. GENEGO:  We have Sue Sarkis, and
24   Miss Podberesky is going to do the examination.
25          MR. YANG:  Your Honor, I hate to ask this but we
```

 1   didn't know what Mr. Breton was ask going to ask.  I just

 2   need five minutes with the witness to go over this portion

 3   of the transcript that Commissioner Mulcahy testified to.

 4              THE COURT:  All right.  We'll take a five-minute

 5   break.

 6              Miss Podberesky, do you anticipate using any

 7   portions of the transcript?

 8              MISS PODBERESKY:  I do not, Your Honor.

 9              THE COURT:  If either side thinks they might

10   during this break, let the Clerk know so we can make those

11   arrangements.

12              (Court recessed and reconvened at 2:04 P.M.)

13              THE CLERK:  Please remain seated and come to

14   order, this court is again in session.

15              Please raise your right hand.

16              (The oath was administered by the Clerk.)

17              THE WITNESS:  So help me God, I do.

18              THE CLERK:  Please be seated and state and spell

19   your name for the record.

20              THE WITNESS:  Sue Sarkis.  S-a-r-k-i-s.

21                         SUE SARKIS,

22          A witness herein, called on behalf of the

23          petitioner, was sworn by the Clerk and testified as

24          follows:

25

Walter R. Ledge, Court Reporter

```
 1                    DIRECT EXAMINATION

 2   BY MISS PODBERESKY:

 3   Q.  Good afternoon, Miss Sarkis.

 4   A.  Good afternoon.

 5   Q.  Miss Sarkis, how are you employed right now?

 6   A.  I'm a private investigator.

 7   Q.  And how many years have you been a private investigator?

 8   A.  I've been investigating for about 40.  I've had my own

 9   agency for 32.

10   Q.  Do you know a person by the name of Bruce Lisker?

11   A.  Yes, Ma'am.

12   Q.  And how do you know him?

13   A.  He's a former client.

14   Q.  Do you recall working as a private investigator for

15   Mr. Lisker and his attorney Dennis Mulcahy?

16   A.  Yes, Ma'am.

17   Q.  And do you know when -- were you appointed -- let me ask

18   you that -- by the court to be an investigator for

19   Mr. Lisker?

20   A.  Yes, I was.

21   Q.  Do you recall when that appointment was approximately?

22   A.  Twenty-five, 26 years ago.

23   Q.  If I told you was in June of 1983, would that seem about

24   right to you?

25   A.  Yes.
```

1  Q.  And as an investigator on Bruce Lisker's case, do you

2  recall reviewing any discovery in that case?

3  A.  Yes, Ma'am.

4  Q.  What do you recall reviewing?

5  A.  I read the entire murder book, what I call the murder

6  book.

7  Q.  And when we say the "murder book," would that be all the

8  police reports and autopsy reports and photographs?

9  A.  Yes.

10 Q.  And as a private investigator on Mr. Lisker's case, do

11 you recall having meetings with his defense counsel Dennis

12 Mulcahy?

13 A.  Yes.

14 Q.  And do you also recall, while you were appointed as an

15 investigator for Mr. Lisker, having meetings with Mr. Lisker

16 down at the L.A. County Jail?

17 A.  Yes.

18 Q.  Do you recall back in 1983 how much you were paid by the

19 court as an appointed investigator?

20 A.  I believe in the early '80s we were still paid 15.  It

21 might already have been raised to 25.  I know we were

22 fighting to get us a raise.

23 Q.  When you say "15," you mean $15 an hour?

24 A.  Yes, Ma'am.

25 Q.  Do you recall -- when you were a private investigator

Walter R. Ledge, Court Reporter

1   for Mr. Lisker, do you recall having meetings with his

2   father Robert Lisker?

3   A.  Yes.

4   Q.  Do you recall approximately how many meetings you would

5   have had with Robert Lisker?

6   A.  At least eleven.

7   Q.  Do you recall where those meetings took place?

8   A.  Yes.

9   Q.  Where?

10  A.  Different places.  Quite a few times at his residence.

11  There were one or two times where I met with him at a

12  restaurant where he had his friends.  There would be times

13  when we would meet with us down by the jail where Bruce was

14  housed.  And he wouldn't come in with us, but he'd be there.

15  Q.  Do you recall any meetings that you had with Robert

16  Lisker and Dennis Mulcahy at Mr. Mulcahy's office?

17  A.  Yes.

18  Q.  Do you also recall if there were meetings between you,

19  Bruce Lisker, and Dennis Mulcahy down at the L.A. County

20  Jail?

21  A.  Yes, there were.

22  Q.  At any time do you recall a meeting or meetings with

23  Bruce Lisker, between Bruce Lisker and you, where Bruce

24  Lisker denied killing his mother?

25  A.  Yes.

Walter R. Ledge, Court Reporter

1  Q.  Do you recall how many times Mr. Lisker, Bruce Lisker,

2  denied to you that he killed his mother?

3  A.  Yes.

4  Q.  How many times, would you say?

5  A.  Every time I saw him.

6  Q.  Do you recall any meeting where Mr. Mulcahy was present

7  with you and Mr. Bruce Lisker when Bruce denied killing his

8  mother?

9  A.  Yes, Ma'am.

10 Q.  And do you recall specifically what Bruce Lisker's

11 demeanor was like when he denied killing his mother?

12 A.  Yes.

13 Q.  What was it like?

14 A.  Tearful.  Sometimes he actually openly wept.

15 Q.  Do you recall him crying in front of Mr. Mulcahy?

16 A.  Yes, he did.

17 Q.  Do you recall as part of your investigation in this case

18 an individual by the name of Ryan?

19 A.  Yes.

20 Q.  And do you recall -- well, let me ask you this:

21         Did you ever attempt to interview Ryan?

22 A.  Did I ever actually -- no.

23 Q.  Why not?

24 A.  Well, Mr. Mulcahy wouldn't get the court-appointed funds

25 for me to go down, and Bob Lisker refused to pay for it.

1  Q.  Do you recall where Ryan was at the time when you were

2  trying to get the funds to interview him?

3  A.  Yes.

4  Q.  Where was he?

5  A.  Mississippi.

6  Q.  Did you have conversations with Mr. Mulcahy where you

7  asked him to obtain funds so you could interview Ryan?

8  A.  Yes, Ma'am.

9  Q.  And were you ever notified that funds were given so you

10 could go and do an interview?

11 A.  Yes.

12 Q.  Do you recall if there was footprint evidence in

13 Mr. Lisker's case?

14 A.  Yes.

15 Q.  Did you at any time have conversations with Dennis

16 Mulcahy about the need to hire an expert to review these

17 footprints?

18 A.  Yes.

19 Q.  What do you recall about those conversations?

20 A.  Well, because of the type of footprints and where they

21 were and the various locations in the house, out of the

22 house, I felt we needed a footprint expert to evaluate them.

23 I referred him to one.

24 Q.  And what if anything happened after you referred the

25 footprint expert to Mr. Mulcahy, if you know?

```
 1   A.   Nothing.
 2   Q.   Did there come a point in time where you ceased being
 3   the private investigator on this matter?
 4   A.   Yes, Ma'am.
 5   Q.   And do you have it in your mind as you sit here today
 6   and testify a clear recollection of Bruce Lisker's case?
 7   A.   Pretty much so, yes.
 8   Q.   Why do you have such a clear recollection?
 9   A.   There are just some cases that stick with you forever.
10   Special circumstance cases, for instance; cases where you
11   believe the innocence of your client, primarily or at least
12   beyond a reasonable shadow of a doubt.
13          And then there's always the quirky clients that
14   you never forget.
15   Q.   While you were appointed as an investigator on Bruce
16   Lisker's case, was there ever a time where you worked with
17   another investigator?
18   A.   No.
19          MISS PODBERESKY:  Can I have a moment?
20          THE COURT:  Yes.
21          (Discussion between the petitioner's attorneys, out
22          of the hearing of the reporter.)
23   BY MISS PODBERESKY:
24   Q.   Were you -- when you were appointed on Bruce Lisker's
25   case, were you made aware, if you recall, that there was an
```

Walter R. Ledge, Court Reporter

1  issue regarding jailhouse informants?

2  A.  Yes.

3  Q.  Okay.  Were you given any kind of assignment or task by

4  Mr. Mulcahy to do interviews or an investigation concerning

5  those informants, if you recall?

6  A.  I was supposed to interview a lot of witnesses, which

7  would have included jailhouse informants.

8  Q.  Is it fair to say that your assignments on the Bruce

9  Lisker case included not only interviewing jailhouse

10  informants but attempting to interview individuals who would

11  also be relevant to a defense in the case?

12  A.  Yes.

13  Q.  And as part of your effort, you went and located a

14  footprint expert; is that right?

15  A.  Yes, Ma'am.

16  Q.  Okay.  And once you got the name of the footprint

17  expert, did you provide that to Mr. Mulcahy?

18  A.  Yes, I did.

19  Q.  And did you have a conversation specifically with

20  Mr. Mulcahy about hiring this footprint expert?

21  A.  Yes, we did.

22  Q.  And what was your understanding about whether a

23  footprint expert was going to be hired or not?

24  A.  He was not going to be hired.

25  Q.  And why was it that the footprint expert was not going

1  to be hired, to your understanding?

2  A.  Mr. Mulcahy told me that he didn't want to impose upon

3  the judge and ask for the funds; he didn't want to ruffle

4  his feathers.

5  Q.  You indicated that this case -- you remember this case

6  clearly because you said that there are cases that stand out

7  in your mind.  Why does this case, though, in particular,

8  stand out in your mind?

9  A.  There's a lot of reasons.  I complained about Dennis

10  Mulcahy to quite a few judge friends of mine.  I was

11  infuriated.  I was really incensed.  He just was not willing

12  to do what I believe an attorney should have done on behalf

13  of his clients.

14          MR. BRETON:  Objection, Your Honor.  Nonresponsive

15  to the question, and irrelevant.  Move to strike.

16          THE COURT:  I don't think it's nonresponsive.

17  She's saying this is the reason she remembers the case.

18  That was the only question, and that's the only thing I'm

19  taking the answer for.

20          MR. BRETON:  Well, I move to strike as irrelevant

21  and hearsay.

22          THE COURT:  Overruled.

23          MISS PODBERESKY:  No further questions, Your

24  Honor.

25          THE COURT:  All right.

Walter R. Ledge, Court Reporter

```
 1          Mr. Breton.

 2                    CROSS-EXAMINATION

 3  BY MR. BRETON:

 4  Q.  Good afternoon, Miss Sarkis.

 5  A.  Good afternoon, sir.

 6  Q.  We spoke on the phone; correct?

 7  A.  Okay.  If you say so.

 8  Q.  No, I'm asking you.

 9  A.  If you're the gentlemen that called me a few weeks ago,

10  yes.

11  Q.  Thank you.

12          You were hired before the preliminary hearing;

13  correct?

14  A.  I believe so, yes.

15  Q.  When were your services terminated?

16  A.  When the case was over -- the first -- when the first

17  trial was over is when -- it's not a matter of terminated.

18  I didn't do any more work, but I didn't submit the bill

19  until the case was over because that's the way I do it.

20  Q.  Well, were you hired to assist in the first trial?

21  A.  Yes.

22  Q.  How do you know that?

23  A.  Excuse me?

24  Q.  How do you know that?

25  A.  How do I know that I was hired?
```

```
 1  Q.  To assist in the first trial as opposed to assist in the
 2  preparation for the preliminary hearing.
 3  A.  I was appointed at the municipal level.
 4  Q.  Yes?
 5  A.  And once we got past that, we would be going to the next
 6  level because it goes hand-in-hand.
 7  Q.  So you assume that you had the authority and that you
 8  would be paid if you continued to investigate the case
 9  through the first trial?
10  A.  Yes.  If Mr. Lisker had been held to answer and the case
11  moved on to superior, chances are most likely I would have
12  been reappointed by the superior court because that's the
13  way it was always done.
14  Q.  Were you?
15  A.  No.  I wouldn't.
16  Q.  Were you reappointed?
17  A.  No.
18  Q.  And were you appointed -- at the time that you were
19  appointed, was it your understanding that you would be given
20  a flat fee of $1,500, or not to exceed $1,500?
21  A.  That was the initial, yes.
22  Q.  The "initial"?
23  A.  Yes.
24  Q.  Was it ever changed?
25  A.  No, I never requested -- well, I take that back.
```

```
 1          I shouldn't say -- I can't say no.  I don't
 2   remember what my final bill was on the case.  I don't know
 3   whether or not there were additional funds for me.  I don't
 4   recall that much of the case.
 5          There are some things that I might have done on my
 6   own without, you know, for an extra few dollars, saying I'll
 7   do it myself.
 8          Do you understand what I'm saying?
 9   Q.  Yes.
10          Now, did you have your own ideas about how to
11   carry out the investigation?
12   A.  Repeat the question please.
13   Q.  Did you have your own ideas about how to carry out the
14   investigation?
15   A.  Yes.
16   Q.  Were you given specific instructions by Dennis Mulcahy
17   with regard to which witnesses to interview?
18   A.  Yes and no.
19   Q.  What do you mean?  Explain.
20   A.  Well, he would give me the murder book, tell me to read
21   it, make a determination.  When I finished reading the
22   murder book, he and I had a meeting to determine what to do
23   next.  And there were certain people he definitely wanted me
24   to interview.  And then he wanted me to take more pictures,
25   take more measurements.  And there are some things you just
```

1  do as you progress along.  You realize that things need to

2  be done.  It's not necessarily etched in stone and cut and

3  dried.

4  Q.  So in your meeting with Mr. Mulcahy, what did he

5  instruct you to do?

6  A.  The original meeting?

7  Q.  Yes.

8  A.  Or the first meeting after I read the book?

9  Q.  Yes, the first meeting after you read the book.

10  A.  I think the first thing he had me doing -- I think the

11  first thing he had me do was to go to the house and take

12  measurements and to make a determination as to a certain

13  time of day which you can and can't see through the window;

14  which way the sun is shining at that hour of the day;

15  interview some witnesses.  I know eventually he had me find

16  a hotel in Hollywood.

17  Q.  Which witnesses did he ask you to interview?

18  A.  Oh, I don't remember their names.

19  Q.  Were they jailhouse informants?

20  A.  One or two of them were, yes.

21  Q.  And who else?

22  A.  Interview the neighbors.  At some point we found a shirt

23  or hooded jacket he wanted month to investigate and find out

24  if it --

25  Q.  You found what?

```
 1   A.  Excuse me?

 2   Q.  You said "we found."

 3   A.  Yes.

 4   Q.  Who is "we"?

 5   A.  Myself and Mr. Lisker.

 6   Q.  Robert Lisker?

 7   A.  Yes, Robert Lisker.

 8   Q.  Did you turn that over to the police?

 9   A.  I turned it over to Mr. Mulcahy.

10   Q.  And where was this shirt found?

11   A.  In a wooded area, in the dead leaves wooded area right

12   across the street from the house.

13   Q.  When?  When did you find it?

14   A.  At some point in time in 1983.

15   Q.  How long after the murder?

16   A.  I couldn't say, sir.

17   Q.  Weeks?  Months?

18   A.  Oh, it would have been months.

19   Q.  When were you appointed?

20   A.  I think it was -- I think it was stated as June of '83.

21   Q.  Three months after the murder?

22   A.  Possibly, yes.

23   Q.  Now, why was Bruce crying?  Why was he tearful?  Why was

24   he weeping?

25   A.  Well, he was appearing, appearing to show remorse -- not
```

1    remorse but upset --

2    Q.  Remorse?

3    A.  Not remorse.  I'm sorry, I used the word wrong.

4           He was depressed, he was upset.  He was emotional.

5    Q.  Remorseful for having killed her?

6    A.  No, he wasn't remorseful for having killed her --

7    Q.  He wasn't?

8    A.  -- upset because she was dead.

9    Q.  He wasn't remorseful?

10          MR. GENEGO:  Objection --

11          THE WITNESS:  Sir, he always denied having any --

12          THE COURT:  One moment.

13          You have an objection?

14          MR. GENEGO:  He's assuming facts not in evidence,

15   which is that he was acknowledging having killed his mother,

16   and that's not what the witness testified.

17          THE COURT:  Overruled.

18          That's the question?  Was he remorseful for

19   having killed his mother is the question?

20          MR. BRETON:  Yes.

21          THE WITNESS:  He never said he killed his mother,

22   sir.

23   BY MR. BRETON:

24   Q.  Was he remorseful?

25   A.  He never said -- sir, I misused the word, I'm sorry.

Walter R. Ledge, Court Reporter

```
 1   Q.  Now --
 2   A.  He was --
 3   Q.  -- did you work with Bob Lisker on this case, Robert
 4   Lisker?
 5   A.  Worked with him?
 6   Q.  Yes.
 7   A.  He was around a lot.
 8   Q.  Did you meet with him?
 9   A.  Yes.
10   Q.  Did you go to the jail and interview the jailhouse
11   informants with him?
12   A.  No.  No, sir, he couldn't go in the attorney's room.
13   Q.  He was not with you when you interviewed Robert Hughes?
14   A.  No, sir.
15   Q.  And did you discuss the case with Robert Lisker?
16   A.  Minimally.
17   Q.  Minimally?
18   A.  I wouldn't give him -- I wouldn't tell him anything
19   outside attorney-client privilege.  If Mr. Mulcahy wanted to
20   share with him, that was Mr. Mulcahy's business.  I kept an
21   arm's length from Mr. Lisker, the father, Bob Lisker.
22   Q.  But not so lengthy as to not ask him for money to go to
23   Mississippi to interview Michael Ryan; correct?
24            MISS PODBERESKY:  Objection.  Argumentative, Your
25   Honor.
```

```
 1              THE COURT:  Sustained.
 2    BY MR. BRETON:
 3    Q.  Did you ask Robert Lisker for money?
 4    A.  Never.
 5    Q.  To go to Mississippi?
 6    A.  No.
 7    Q.  How do you know he refused to pay?
 8    A.  Because it was with Mr. Mulcahy and Mr. Lisker when Mr.
 9    Mulcahy asked Mr. Lisker.
10    Q.  So he said in your presence that he would not pay for an
11    investigator -- for you -- to go to Mississippi to interview
12    the possible culprit of the murder?
13    A.  Yes, sir.
14    Q.  He believed his son was innocent?
15              MISS PODBERESKY:  Objection.  Calls for
16    speculation.
17              THE COURT:  Sustained.
18    BY MR. BRETON:
19    Q.  Did he say in your presence that he believed that his
20    son was innocent?
21    A.  Yes, sir.
22    Q.  And he was not willing to pay for a trip to Mississippi?
23    A.  No, sir, he was not willing to pay for anything out of
24    his own pocket.
25    Q.  When did you give the footprint expert, the name of the
```

1  footprint expert to Dennis Mulcahy?

2  A.  Sir, I can't give you the exact date.  It was in a

3  written report.

4  Q.  Was it before the first trial?  Was it before the trial

5  commenced?

6  A.  Yes.

7  Q.  Did you have any misunderstandings with Mr. Mulcahy?

8         MISS PODBERESKY:  Objection.  Vague.

9  BY MR. BRETON:

10 Q.  Regarding your assignments?  Regarding what he wanted

11 you to do?

12         MISS PODBERESKY:  Objection.  Relevance.

13         THE COURT:  Overruled.

14         THE WITNESS:  No.  That's not where the issue was.

15 BY MR. BRETON:

16 Q.  What was the issue?

17 A.  The fact that he was not willing to file a motion for

18 additional funds with the court for me to go to Mississippi,

19 which I personally thought was a very, very important need.

20 Q.  Did you have a falling out as a result of that?

21 A.  I wouldn't call it a "falling out."  I just made it loud

22 and clear with the county and everyone involved that I would

23 never work with the man again if my life depended on it.

24         THE COURT:  And if that's not a falling out, what

25 is?

```
 1          (Laughter.)

 2              Go ahead.  What's the question?

 3              MR. BRETON:  Let me collect my thoughts here.

 4   Q.  At what time did you stop communicating with Dennis

 5   Mulcahy?  What time in the sequence between prelim and the

 6   first trial?

 7   A.  Well, we didn't stop communicating.

 8   Q.  You did not?

 9   A.  No.  The fact that I wouldn't work with someone does not

10   mean I'm not going to try and keep abreast of the case.

11   Q.  So how long did you follow this case?

12   A.  Until it ended.  I'm sorry, when I say "ended," I mean

13   the end of the first trial.

14   Q.  Until the guilty plea?

15   A.  Yeah, when there was a deal that was made and --

16              MR. GENEGO:  (Unintelligible.)

17   BY MR. BRETON:

18   Q.  So are you saying that you can't remember the point at

19   which Mr. Mulcahy said you're on your own time if you want

20   to continue investigating, but I'm not asking you to do this

21   and you are not going to get reimbursed for this.

22              Is that what you are saying?

23   A.  No, sir, that's not what I'm saying.

24   Q.  When did he say you are not authorized to do that any

25   more?  Was there ever a point where he said, I'm sorry,
```

```
 1  that's not what you were hired to do.  Thank you, but I
 2  don't need your services any more?
 3  A.  No, sir.
 4  Q.  It was an open-ended carte blanche understanding to go
 5  and investigate anything you wanted to investigate?  Is that
 6  how you understood the relationship?
 7  A.  Well, that's usually the way it is.  But what needed to
 8  be done had been done except one or two minor things --
 9  serious things that, you know, we didn't have the funds for.
10  Q.  So are you testifying, then, that all the way up until
11  the guilty plea you had his authority to continue carrying
12  out the investigation that you thought was advisable?
13  A.  No, sir, that's not quite what I'm saying.  What needed
14  to be done had been done except for interviewing one or two
15  people.
16         There was nothing left to be done other than,
17  like, have the expert appointed.  He wasn't going to do
18  that.  My going to Mississippi, he wasn't going to do that.
19  He wasn't going to file the motion.  There was really
20  nothing left to do.
21  Q.  About how many times do you estimate you had meetings
22  with Mr. Mulcahy and with Bruce together?
23  A.  With Mr. Mulcahy and Bruce Lisker together, that would
24  have been, I believe, fourish -- three, five, four.
25  Thereabouts.
```

Walter R. Ledge, Court Reporter

1  Q.  And how would you communicate with Mr. Mulcahy?  Was it
2  by telephone, or did you have regular face-to-face meetings?
3  A.  Usually, it was by telephone unless, you know, he wanted
4  to have a meeting.
5  Q.  And that's when the preliminary hearing was concluded,
6  it was your understanding that you were to continue working
7  on this case.
8  A.  I'm not sure at what point -- I don't remember whether
9  it was before the prelim or after the prelim when I had
10  finally decided I no longer wanted to work the case.
11          So I can't answer yes or no to pre- or post-
12  prelim.
13  Q.  Well, who told who this was going to end?
14  A.  I told Mr. Mulcahy that I couldn't work for him any more
15  because I didn't feel comfortable with what he was doing.
16          However, I needed him to keep me apprised because
17  with the circumstances of discovery being what they were
18  back then, I did not ever submit a bill on a court-appointed
19  case until the case was over.
20          There was a time frame.  We had to submit a bill
21  within 30 days of a case's disposition, which is why I
22  needed to be kept apprised.
23  Q.  And when did you inform him that you couldn't work for
24  him any more?
25  A.  I don't remember at what phase it was, sir.  It was --

Walter R. Ledge, Court Reporter

```
 1   it was the first case.  I don't remember when it was.

 2              MR. BRETON:  Thank you.  No further questions.

 3              THE COURT:  Redirect?

 4              MISS PODBERESKY:  No, Your Honor, nothing.

 5              THE COURT:  Thank you, you may step down.

 6              May this witness be excused?

 7              MISS PODBERESKY:  Yes, Your Honor.

 8              THE COURT:  Mr. Breton?

 9              MR. BRETON:  Yes.

10              THE COURT:  Thank you.  You are excused.

11              All right.  We have no other impeachment

12   witnesses?

13              MR. GENEGO:  No further witnesses.

14              THE COURT:  Mr. Breton, you asked that Mr. Mulcahy

15   remain available.

16              MR. BRETON:  Yes, and we would like to recall him.

17              THE COURT:  All right.

18              MR. BRETON:  Your Honor, while we're waiting can I

19   apologize to the Court again for arriving late.  What

20   happened is --

21              THE COURT:  I thought you had reset your clock a

22   little early.

23              MR. BRETON:  That's tomorrow night.

24              THE COURT:  My point exactly.  (Laughter.)

25              MR. BRETON:  What happened was a scene you don't
```

1  want to imagine.  We were crossing the street, and the

2  entire box of transcripts fell on the street in the

3  crosswalk and spilled out onto the street as cars were

4  coming -- on both sides of it as we were frantically trying

5  to pick them up.

6          THE COURT:  As an officer of the court, you

7  through yourself in front of the wells of an oncoming car to

8  protect the evidence.

9          MR. BRETON:  Thanks.

10         THE COURT:  Commissioner Mulcahy, would you retake

11  the stand please.

12         THE CLERK:  Commissioner Mulcahy, please recall

13  that you are still under oath.

14         THE WITNESS:  Yes, I do.

15         THE COURT:  And I'm sure Mr. Breton will be very

16  short with his questions.

17         MR. BRETON:  Yes, I will, Your Honor.

18         THE COURT:  Mr. Breton.

19                  DENNIS MULCAHY,

20      A witness, recalled on behalf of the respondent,

21      Having been previously sworn by the Clerk, resumed

22      the stand and testified further as follows:

23  /////

24  /////

25  /////

Walter R. Ledge, Court Reporter

```
 1                        REBUTTAL

 2                  DIRECT EXAMINATION

 3   BY MR. BRETON:

 4   Q.  Good afternoon, again.

 5   A.  Good afternoon.

 6   Q.  Did you recognize the last witness?

 7   A.  No, I did not.

 8   Q.  Reviewing or remembering what we discussed --

 9          THE COURT:  He was not present in the courtroom

10   during the last witness's testimony.

11          MR. BRETON:  I mean, as she was walking out.

12   Q.  Did you notice the lady that went out into the hall?

13   A.  There was a lady that went out in the hall.

14   Q.  And did you recognize her?

15   A.  No, I did not.

16   Q.  We had discussed the terms under which she was appointed

17   before the prelim.  Do you remember that?

18   A.  Yes, sir.

19          THE COURT:  Excuse me.  You have since been told

20   who the witness was?

21          THE WITNESS:  I heard her name out in the hall.

22   Someone referred to her as "Sarkis."

23          THE COURT:  All right.

24          Go ahead, Mr. Breton.

25   /////
```

```
 1  BY MR. BRETON:
 2  Q.  Now, do you recall speaking to her, meeting with her,
 3  and giving her instructions?
 4  A.  Yes.
 5  Q.  Did you instruct her specifically to read the entire
 6  murder book?
 7  A.  No.
 8  Q.  In your normal practice, would you -- did you ask the
 9  investigator to carry out a wide-ranging carte blanche
10  avenues of investigation, or did you give them specific
11  assignments?
12  A.  Specific assignments.
13  Q.  And why?
14  A.  Because I'm the attorney guiding the case, and I wanted
15  specific things done at specific times.
16  Q.  What if an investigator comes to you and tells you that
17  they have been doing other investigations and pursuing other
18  leads, what do you tell -- what did you tell that
19  investigator if that ever happened?
20          MR. GENEGO:  Objection, Your Honor.  Calls for
21  speculation.  And not relevant.
22          THE COURT:  You're talking as a general practice
23  now, Mr. Breton?
24          MR. BRETON:  I'm talking as a general practice.
25  In his general practice --
```

```
 1              THE COURT:  Overruled.

 2              You may answer.

 3              THE WITNESS:  Not to do that; follow the specific

 4   instructions and conduct the investigation as they were

 5   ordered to do so.

 6   BY MR. BRETON:

 7   Q.  Now, did you meet -- do you recall meeting with

 8   Miss Sarkis and Bruce Lisker together?

 9   A.  I don't specifically recall that, no, sir.

10   Q.  Do you recall meeting with Bruce Lisker with Miss Sarkis

11   present at a time when he protested his innocence in front

12   of you?

13              MR. GENEGO:  Objection.

14              THE COURT:  What's the objection?

15              MR. GENEGO:  I think the answer to this question

16   is answered by the prior question.  If he didn't ever

17   remember meeting with them together, he couldn't remember

18   something about the meeting.

19              THE COURT:  That's not necessarily true.

20              Overruled.

21              THE WITNESS:  I don't recall.

22   BY MR. BRETON:

23   Q.  Do you recall ever being in Bruce Lisker's presence when

24   he said that he was innocent?

25   A.  No, sir.
```

Walter R. Ledge, Court Reporter

1   Q.  Do you recall meeting with her after and going over the

2   entire investigation with her based on her reading of the

3   murder book?

4   A.  No, I do not.

5   Q.  Do you recall instructing her to go to the house and to

6   take certain measurements?

7   A.  No, I do not.

8   Q.  Now, she was appointed in June.  The murder happened in

9   March.  Do you recall whether she ever came to you with

10  evidence of a shirt that she found across the street?

11  A.  Not at all.

12  Q.  What would you have done with a shirt, whether bloody or

13  not, in dead leaves?  What would you have done with the

14  shirt if she had turned it over to you as possible evidence

15  in this case?

16          MR. GENEGO:  Objection, Your Honor.  Calls for

17  speculation.  But it also assumes facts not in evidence.

18  She didn't say anything about blood being on the shirt.

19          THE COURT:  He said blood or not.

20          MR. BRETON:  I will delete that from the question,

21  Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  If it was actual physical evidence

24  of the crime, I believe I'm obligated to turn that over to

25  the authorities.

Walter R. Ledge, Court Reporter

1    BY MR. BRETON:

2    Q.   And do you recall her ever turning the shirt over to

3    you?

4    A.   She never did.

5    Q.   Now, was she hired with a not-to-exceed amount of $1,500

6    but to be paid in increments of a certain number of $15 an

7    hour or something like that?

8    A.   There is a county fee schedule, and I don't remember the

9    hourly amount, but it was an hourly amount based upon the

10   work that they did and submitted a declaration to the county

11   for payment.

12   Q.   And did you monitor the amount of fees that are being

13   accumulated and that are being charged?

14   A.   When an investigator submits the declaration, I must

15   review it and sign at the bottom of that declaration -- it's

16   the same type of form that's used for 987 -- before it gets

17   submitted to the judge.

18   Q.   So you would review the actual tasks that she was

19   performing?

20   A.   Yes.

21   Q.   And do you recall whether there came a time that she

22   presented to you the name of a blood expert -- a footprint,

23   a blood footprint expert that she wanted you to hire or have

24   the court retain?

25   A.   I have no recollection of that.

Walter R. Ledge, Court Reporter

1  Q.  You have no recollection of her mentioning a footprint

2  expert to you?

3  A.  No, sir, I do not.

4  Q.  Would that have been within the parameters of what you

5  asked her to do?

6  A.  No, it would not.

7  Q.  Did you ask her to visit the crime scene?

8  A.  No, sir.

9  Q.  Did you ask her to interview Ryan?

10  A.  No, sir.

11  Q.  Do you recall her coming to you and asking you to

12  present to the court a request for an increase in funds so

13  that she could go to Mississippi to interview Michael Ryan?

14  A.  I recall her requesting an increase in funds, for what

15  purpose I don't recall.  And I also recall her asking

16  Bruce's father for money.

17  Q.  And what did Bruce's father say?

18  A.  That, I don't recall.  But at a subsequent point, I

19  decided not to continue with her services as an investigator

20  and that's why I sought out the second investigator later.

21  Q.  Did you seek her original appointment for purposes of

22  the preliminary hearing, or for her to continue working

23  through the superior court level of the first trial?

24  A.  The appointment -- the approved appointment was for the

25  purposes of investigating three particular witnesses prior

Walter R. Ledge, Court Reporter

1  to the preliminary hearing.

2  Q.  And was she submitting invoices or asking for

3  reimbursement of funds for assignments or for tasks that she

4  was carrying out after the prelims, if you recall?

5  A.  No, not that I recall.

6  Q.  Did you instruct her not to continue investigating?

7  A.  She was probably informed that her services were no

8  longer needed in this particular case.

9  Q.  Had you worked with her before?

10  A.  No.  I believe this was the first case I had ever worked

11  with her on.

12  Q.  Did you work with her in subsequent cases?

13  A.  Never.

14  Q.  Now, if she were to say or to claim that she discussed

15  with you the need for money to go to Mississippi and that

16  you told her specifically that Judge Kolostian would not go

17  along with that and that you didn't want to incur any

18  disfavor with him, would you agree with that statement?

19  A.  No, I would not.  Judge Kolostian granted another $3,000

20  for investigation -- for another investigator.

21  Q.  Did you feel that it was advisable at the time that she

22  was hired before the prelim to ask for funds to send an

23  investigator to Mississippi?

24  A.  Not at that stage of the proceeding.

25  Q.  Had you read the transcript of Monsue's interview with

Walter R. Ledge, Court Reporter

1  Michael Ryan?

2  A.  I cannot tell you if I had it at that time of the

3  preliminary hearing or subsequent.

4  Q.  Do you recall in the stages of prelim versus beginning

5  of the trial in November of '84 and the guilty plea in

6  December of '84, do you recall anywhere in that entire stage

7  where she told you that she did not want to continue working

8  for you?

9  A.  Between November and December of '84?

10  Q.  No, between the prelim and the guilty plea.

11  A.  No, I do not.  I discontinued her services and requested

12  another private investigator.

13  Q.  Now, of course, there was a span of time.  The guilty

14  plea being December 4, 1984, in the availability study

15  coming back and then the setting for retrial in May of '85.

16  And you requested another investigator in June of '85, is

17  that not true?

18  A.  If that's the date on the motion, yes.

19  Q.  Now, is it possible that you asked for other

20  investigators and we simply don't have a record of that in

21  the Clerk's transcripts?

22        MR. GENEGO:  Objection.  Calls for speculation.

23        THE COURT:  Sustained.  What's the date of the

24  appointment of the second investigator, Mr. Breton?

25        MR. GENEGO:  I actually got it wrong.  It was '84.

Walter R. Ledge, Court Reporter

```
 1              THE COURT:  I thought you said it was June of '85
 2    and I believe the previous testimony was June of '84.
 3              MR. GENEGO:  Yes.
 4              THE COURT:  Is that correct?
 5              MR. BRETON:  Yes, Your Honor.
 6              May I have a second please?
 7              THE COURT:  Yes.
 8            (Discussion among the three people at respondent's
 9            table, out of the hearing of the reporter.)
10              MR. BRETON:  No further questions.
11              Thank you very much.
12              THE COURT:  Thank you.
13              Mr. Genego?
14              MR. GENEGO:  No questions, Your Honor.
15              THE COURT:  May this witness now be excused?
16              MR. GENEGO:  Yes, Your Honor.
17              MR. BRETON:  Yes, Your Honor.
18              THE COURT:  Commissioner Mulcahy, I hope your back
19    heals quickly.
20              THE WITNESS:  Thank you, sir.
21              THE COURT:  Am I correct that there are no further
22    witnesses from either side?
23              MR. GENEGO:  Yes, Your Honor.
24              MR. BRETON:  Yes, Your Honor.
25              THE COURT:  And all the evidence has been
```

1   received, so both sides rest?

2           MR. BRETON:  Yes, Your Honor.

3           MR. GENEGO:  Yes, Your Honor.

4           THE COURT:  What should we do about argument?

5           How much time do you want, Mr. Genego,

6   Mr. Breton?

7           MR. GENEGO:  Is the Court inquiring for arguing

8   all the claims or as to this particular claim based on new

9   evidence?

10          THE COURT:  The results of this evidentiary

11  hearing, does either side wish to argue what the evidence

12  showed or didn't show?

13          Let's start with you, Mr. Breton, since you are

14  the one who asked for the hearing.

15          MR. BRETON:  Could we submit it in writing?

16          THE COURT:  Yes.

17          MR. BRETON:  With a post-hearing submission of

18  brief?  Or would Your Honor prefer that we make an oral

19  argument and not written?

20          THE COURT:  Mr. Genego, do you wish to argue

21  orally?

22          MR. GENEGO:  No, I don't, Your Honor.  I would be

23  happy to submit a post-hearing memorandum presenting our

24  view of the evidence.

25          On the other hand, I think the Court might have

Walter R. Ledge, Court Reporter

1    questions about our presentation.  I would be certainly

2    more than happy to argue orally, but I don't feel that

3    that's necessary.  I think we could accomplish what we

4    would like to be able to do in a written memorandum.

5             THE COURT:  I think it might be useful to the

6    Court to have at least a summary of counsels' initial

7    thoughts.  I know we're talking about ten minutes each, and

8    then I'll give you the opportunity to submit final arguments

9    in writing as well.

10            So Mr. Breton, I'll hear from you first.

11                  RESPONDENT'S CLOSING ARGUMENT

12            MR. BRETON:  Thank you, Your Honor.

13            We submit that if the alternative perpetrator

14   theory was unreasonable in that it was not -- it could

15   not meet the tests required by STEBBY or by HALL and for

16   GREEN in the State of California, that counsel, then,

17   therefore acted reasonably; that he was not ineffective

18   in the manner in which he carried out his investigation

19   and that he was effectively, based on all of the

20   information that he had, arriving at reasonable tactical

21   strategic decisions about the best way with which to

22   create reasonable doubt in the minds of the jurors

23   without violating the canon of ethics, without trying to

24   get Lisker on the stand and subject him to

25   cross-examination but at the same time to have a

1  mechanism by which he could have Lisker testify to the

2  letter and --

3          THE COURT:  I still don't quite follow that

4  particular line of argument, so maybe you can help me with

5  it, Mr. Breton.

6          You believe that Commissioner Mulcahy thought

7  that he could not put Mr. Lisker on the stand, presumably

8  for a number of reasons.  Defense attorneys rarely put

9  their clients on the stand.  But one of those reasons

10 being that to do so might suborn perjury?

11         MR. BRETON:  Yes.

12         THE COURT:  And, yet, nevertheless he could submit

13 a letter which had the same effect simply because it was not

14 under oath.  Is that right?

15         MR. BRETON:  Yes.

16         THE COURT:  So he could commit a fraud on the

17 court but he couldn't be punished -- the client couldn't be

18 punished for it because he was not under oath.  Is that the

19 idea?

20         MR. BRETON:  Well, he wasn't --

21         THE COURT:  And Mr. --

22         MR. BRETON:  -- there was any false evidence he

23 was presenting, statements from his client as to what his

24 client believed about his prior relationship with Ryan and

25 about Ryan's activities before the event.

```
 1              It was all circumstantial.  So it wasn't truly
 2  false evidence.  Bruce was speculating as to the reasons
 3  why Ryan was doing this or that, but he was presenting
 4  what he considered from his viewpoint believed facts
 5  about Ryan's background, Ryan's fascination with knives,
 6  Ryan's suspicious trip to here and back; all of these
 7  circumstantial coincidences that were not in the -- what
 8  could be classified as false evidence.  They were
 9  impressions, they were speculative claims made by Lisker
10  as to the precise thing, the precise elements that are
11  held to be insufficient under third-party liability.
12              In other words, he was trying to show that Ryan
13  had a motive, he had the possible method or manner, the
14  ability to execute, that he was in the area.
15              These are not -- these are circumstances, but
16  not false evidence.  And I don't think for one minute
17  that Mulcahy was attempting to perpetrate a fraud on the
18  court.  He was simply trying to have the benefit of
19  having these suggestions, these speculative inferences
20  which were far short of false evidence but enough to
21  cause the jury to engage in a reasonable doubt; and the
22  precise thing for which Evidence Code 352 are designed to
23  exclude; that is, to mislead the jury into thinking and
24  into being confused about the possibility of another
25  individual.
```

Walter R. Ledge, Court Reporter

1          Now, we know that from the testimony that we

2    have heard that not only did Mulcahy know that Bruce had

3    committed the crime because he described it in great

4    detail, he went into this rage and he told Dr. Legasic

5    that Satan told him to do it.  And he went into great

6    detail about the fact that we also know from the analysis

7    about the entire facts -- the violent eruptions.

8          Even Kolostian says that he was a time bomb

9    waiting to happen.  And all of this is in the mind of

10   Mr. Mulcahy.

11         And he also knows that he told the counselors

12   and Dr. Legasic and Judith Hall and the probation officer

13   that he tried to make it look like someone else did it.

14         So he had no way to present that evidence, that

15   someone else actually did it.  He can't even investigate

16   that because he knows that if he sends out a blood

17   footprint expert, they're going to conclude that this was

18   the footprint of a paramedic or of a policeman.

19              THE COURT:  Where was the testimony on that?

20              MR. BRETON:  I'm talking about the stray footprint

21   in the bathroom.

22              THE COURT:  I know.  Where was the testimony that

23   Mr. Mulcahy knew that if he sent out an expert that it would

24   come back with the conclusion that this was a footprint --

25              MR. BRETON:  I tried to go into that.  There is no


                 Walter R. Ledge, Court Reporter

```
 1  testimony.  I tried to go into that, but I was precluded
 2  because, apparently, they're not claiming that that was
 3  ineffective assistance.  But that's simply an example of the
 4  type of investigation that would be totally a waste of
 5  energy, resources, and time because he knew -- let's take
 6  the mark on the head:  That that was totally meaningless.
 7  It would be the same, if it were a footprint, which we
 8  vehemently deny -- it would be the footprint of the same
 9  people that were around Dorka at that time.  And there's
10  absolutely nothing --
11          THE COURT:  This is your speculation.  There isn't
12  any evidence on that; right?
13          MR. BRETON:  There's no evidence as to the
14  footprint.
15          THE COURT:  I understand that.  And I understand
16  that that's your position.  But there's no evidence that
17  Mr. Mulcahy thought that it would be fruitless to
18  investigate that; right?  Meaning, when he was on the stand
19  here, he didn't recall seeing the particular exhibit.
20          MR. BRETON:  Correct.
21          THE COURT:  All right.
22          MR. BRETON:  Correct.  I'm simply arguing that
23  what he did testify was that he read all of those reports.
24  And because of the detail, because of the exhaustive
25  analysis and all of Bruce's statements and his -- what
```

1    everything that he testified to regarding the guilty plea.

2           He knew that it would be -- and he tactically

3    calculated that it would be absolutely fruitless to look

4    for forensic evidence of a third party.

5           So his tactics changed to one of creating

6    reasonable doubt.  And that is permitted under the law,

7    for a person -- I believe there's a U.S. Supreme Court

8    case for an attorney to decide that he's going to use

9    third-party liability evidence if it falls short of the

10   minimal threshold that he can at least use bits and

11   pieces of that in order to create reasonable doubt.

12          And that's what he was trying to do with the

13   letter.  He didn't want to put Lisker on the stand.  He

14   didn't want to put Michael Ryan on the stand.  And there

15   was no other way to present this.  And so he created four

16   days of deliberation on this case.  He created every

17   possible scenario for engendering reasonable doubt to

18   exist in this case.

19          He tried his best with what he had.  But he knew

20   that it would be useless for him at the second trial to try

21   to prove forensically that Ryan was directly connected to

22   the actual commission of this crime.

23          And he could not, even if he were to show that

24   Ryan was -- were in the house that morning, that would not

25   show, which the cases require, that would not disprove that

Walter R. Ledge, Court Reporter

 1  Lisker was in the house.  It would -- on the contrary, it

 2  would backfire because the jury would know that, of all the

 3  people on the earth, the only third-party who for the last

 4  third-party that Mr. Mulcahy should try to pin this on would

 5  be Ryan because the two had been roommates.  The two were

 6  friends.  The two were together.

 7          And so anybody that presented evidence of Ryan

 8  being at the scene is going to cause the jury to simply

 9  speculate they were both there together; they did it all

10  together.  And that explains the overkill by Lisker, but

11  possibly the second knife by another person.

12          In other words --

13          THE COURT:  Just a moment, let me see if I follow

14  you.

15          He wouldn't want to press the argument that

16  Ryan was there because the jury would conclude, since

17  Ryan and Lisker were former roommates and friends, that

18  Lisker was there as well.

19          MR. BRETON:  Yes.

20          THE COURT:  So why did he want the letter?

21          MR. BRETON:  Like I say, he wanted to create doubt

22  in the jurors' minds.

23          THE COURT:  He wanted a little doubt, but if he

24  got too much doubt, it would swing the other way --

25          MR. BRETON:  Well, he didn't have any other

Walter R. Ledge, Court Reporter

1   evidence that he could present based on what he knew from

2   his own client -- from what his client had said.

3           THE COURT:  The argument --

4           MR. BRETON:  -- he could not --

5           THE COURT:  The argument I don't understand,

6   Mr. Breton, is if he believed that the jury would link Ryan

7   and Bruce Lisker, why he would want the letter in.

8           MR. BRETON:  I'm not saying that he absolutely

9   believed that.  I'm saying that that would be a big chance

10  that he would be taking.

11          THE COURT:  So why would he want the letter?

12          MR. BRETON:  That he would be running the risk

13  that they would say, so what, they were accomplices.

14          THE COURT:  So why would he want the letter in?

15          MR. BRETON:  Because the letter was the only way

16  that he could show --

17          THE COURT:  That Ryan was there.

18          MR. BRETON:  That Ryan was there.  Or that if Ryan

19  took the stand --

20          THE COURT:  -- or run the risk that he and Lisker

21  were accomplices.

22          MR. BRETON:  Yes.  That they were there or that

23  Ryan was there not as an accomplice but that Ryan was there

24  and then left and was a witness in that --

25          THE COURT:  And this would help Bruce Lisker's

Walter R. Ledge, Court Reporter

```
 1  case?

 2            MR. BRETON:  No.

 3            THE COURT:  So why did he want the letter in?

 4            How does it create doubt?  It seems to me you

 5  are arguing that it doesn't create doubt, it creates

 6  confirmation of Bruce Lisker's guilt.

 7            MR. BRETON:  The letter?

 8            THE COURT:  Any suggestion that Ryan was there.

 9            MR. BRETON:  The letter doesn't directly suggest

10  that they were working together.

11            THE COURT:  Let's assume that Judge Kolostian had

12  allowed the letter in, all right?  Now it comes to final

13  argument:  What does Mr. Mulcahy argue about the letter?

14  What does it show?

15            MR. BRETON:  Well, ethically, he's simply going to

16  say that you have circumstantial evidence against my client

17  plus a confession.  And circumstantial evidence against

18  Ryan, that both had an opportunity; that both had -- used

19  knives in the past; that both had a need for money for

20  drugs.

21            And given those circumstances, you have to give

22  my client the benefit of the doubt and say both of those

23  are reasonable.  Therefore, you must decide -- when it's

24  based on circumstantial evidence, you must decide in

25  favor of innocence, assuming you discount the confession
```

Walter R. Ledge, Court Reporter

1  to Robert Hughes.

2          THE COURT:  All right.  Move on to something else.

3  I think we've exhausted that one.

4          MR. BRETON:  Okay.  There are times in this case

5  when, as I have read the transcripts, I am just amazed at

6  the quality of the representation.  Both times.

7          I think this Court has seen the demeanor of

8  Mr. Rabichow and the demeanor of Mr. Mulcahy, and they

9  were two fine attorneys.  And if I could read for the

10  Court at the conclusion of the guilty plea hearing --

11  this is on page 12 of the guilty plea hearing:

12              "Thank you, Mr. Mulcahy, I have to

13              compliment you on the motions in here.  They

14              are probably the best I have ever seen, and I

15              have seen some good motions."

16          At the conclusion of the case when the

17  sentencing was over -- and we have to remember he

18  succeeded in having it reduced to second degree, and

19  having him housed at Youth Authority; and that he thought

20  this was one of the longest closing arguments and one of

21  the most -- set of the most thorough cross-examinations

22  that you will ever see.

23          He presented more witnesses at this trial than

24  the prosecutor.  That's how thorough he was.

25              And at the conclusion of sentencing, the judge

Walter R. Ledge, Court Reporter

 1  said:

 2                  "Obviously, I have known both of you for

 3          quite a while, and it is doubtful that this

 4          case could be tried better by any lawyers

 5          anywhere."

 6          We submit that all of the evidence that is

 7  being presented to show that he was ineffective falls far

 8  short of the standard under STRICKLAND.

 9          He made reasonable tactical decisions,

10  reasonable investigative work product.  He was always

11  looking out for the best interests of his client.  More

12  than 13 motions.  He presented the best case that was

13  available to him to present.

14          And with the benefit of hindsight, it's easy

15  for us to second guess and say, well, more should have

16  been done along this line or along these lines.

17          (Unintelligible) even harsher with the light of

18  hindsight to judge this case and his behavior without

19  Robert Lisker here to testify; without Ryan here to

20  testify.  They're both dead.  So it's easy to try to

21  shoot holes.

22          The prosecutor had no way that he could have --

23  if he had tried this case against both of them, he would

24  not have been able to get the evidence in that they're

25  saying he should have.  You don't get in 1101 disposition

1   evidence.  You just -- he wouldn't have been able to get

2   in all the hearsay and all the wild speculative

3   inferences, the conjecture.

4           THE COURT:  The stuff that was in the letter.

5           MR. BRETON:  Yes.  He wouldn't have been able to

6   get that in.  And just because Mulcahy tried, doesn't mean

7   that he was ineffective.  He was trying to figure out a way,

8   probably at the insistence of Bruce Lisker, to get the jury

9   to start thinking and go down this avenue of a possible

10  other (unintelligible) and to latch on to that and to get

11  them guessing so that in the jury room they would speculate

12  about this and come to all kinds of wild conclusions.

13          But he at all points was making reasonable

14  tactical decisions based on what the client interviews

15  had told him and what he had read that his client told

16  him through those counselors, through the psychiatrists,

17  through the probation officer.

18          His client had told him "I pled guilty because

19  I did it."  It's factual.  It happened.

20          And we have had no testimony to the contrary,

21  that guided, informed, all of his strategic decision

22  making.

23          And the tenuous links in this chain of

24  speculation just don't connect.  The dots don't connect.

25          And he tried to get the court to allow him to

Walter R. Ledge, Court Reporter

1    present more.  He had an investigator interview Ryan, and

2    he concluded, that's it, there's nothing there, nothing

3    that will benefit my client.  That was a reasonable

4    tactical decision.  And we submit that, under STRICKLAND,

5    they have not met their burden.

6            Thank you.

7            THE COURT:  Thank you, Mr. Breton.

8            Mr. Genego, Miss Podberesky?

9                PETITIONER'S CLOSING ARGUMENT

10           MR. GENEGO:  Thank you, Your Honor.

11           Your Honor, this claim has two elements to it:

12   One is that Mr. Lisker's trial counsel did not do things

13   that a reasonably competent attorney who was appointed to

14   represent someone in a murder case would have done;

15           And the second element is that it undermines

16   confidence in the outcome when you talk about

17   (unintelligible).  Because I think that's where the

18   evidence comes in.

19           First of all, I think it's important to put

20   Mr. Breton's argument into context.  That argument is one

21   that he is making in support of his defense to our

22   deficiency argument.  And let me step back and unravel

23   that a little bit.

24           Before the first trial, we know, from the

25   transcript, that Mr. Mulcahy tried as best he could to

Walter R. Ledge, Court Reporter

1  get in evidence of third-party culpability.  In fact, he

2  said to the court at page 395 of the augmented

3  transcript, quote:  "But I think that it's substantial

4  evidence based on those cases," end quote.

5          That comes at the end of his argument.  He's

6  saying I've got enough here to prove that Michael Ryan is

7  the person who did this.

8          Now, that's what he does before the first

9  trial.  What Mr. Breton's argument is, is that, well, he

10  didn't -- when it came time for the second trial, the

11  reason he didn't do the stuff he should have done before

12  the first trial -- and I'll get to that in a moment

13  because I think I want to put his defense in context --

14  he's saying that the second trial, by that time

15  Mr. Mulcahy knew that Bruce Lisker did it.

16          Well, there's no evidence to that effect.  He's

17  saying that Mr. Lisker never denied it.

18          Well, Sue Sarkis contradicted that and has a

19  very specific clear recollection of that.

20          Mr. Mulcahy -- Mr. Mulcahy did not say it

21  didn't happen, he just said he didn't remember.

22          But also, he didn't need it from his client,

23  Your Honor.  Bruce Lisker was proclaiming his innocence

24  to everybody -- in the letter and to everybody who would

25  visit him.  And even afterwards, he continued to do it.

Walter R. Ledge, Court Reporter

1            What does he latch on?  He latches on to the

2   C.Y.A. sentence.  That's what he latches on.  He says,

3   well, that's the reason that Mr. Mulcahy at that point

4   could not put on a third-party culpability defense.

5            Your Honor, the transcript contradicts that

6   flatly because if you look at the transcript Mr. Mulcahy

7   continued to try to assert a third-party culpability

8   defense in the second trial.

9            If you go back and look at the transcript,

10  Mr. Rabichow stands up and says there's two issues, Your

11  Honor:  One is the third-party culpability defense, and

12  the other one is this letter that Mr. Mulcahy wants to

13  get in.

14           They're talking about those two things being

15  separate.  He continues to say that he wants to put on a

16  third-party culpability defense.  And in fact what he

17  says during that hearing is that the Amended Reporter's

18  Transcript, page 10, he says we have information about

19  burglaries.  That probably won't be relevant, but

20  according to Mr. Lisker's father, Ryan was there the day

21  before; nobody would have gotten in if the mother didn't

22  know him.

23           He goes on, he summed up, and he says, quote,

24  "And to totally exclude that, I believe that is relevant

25  evidence for a jury to hear."

Walter R. Ledge, Court Reporter

1          He's not talking about the letter there.  He's
2   talking about the third-party culpability.
3          So that completely decimates his argument about
4   Mr. Mulcahy didn't do this because he believes he was
5   guilty.
6          He didn't have any basis for believing he was
7   guilty.  The C.Y.A. report, we all know, now, very well,
8   that innocent people confess for lots of different
9   reasons.
10          And if you just listened to the testimony
11   today, you've got a young kid who was 17 who was
12   proclaiming his innocence from the day he was arrested.
13          Listen to the 9-1-1 tape:  He's screaming about
14   "help my mother, help my mother."
15          He's told life is life.  Or you can get out
16   when you're 25.  You are going to become the best story
17   teller in the world at that point, Your Honor.  I don't
18   care who you are.  He wasn't as good as (unintelligible)
19   probably.
20          I would have also said, yeah, I did it, and
21   this is where I made it.  I really should have been
22   (unintelligible) made me do it.  All this stuff.  That is
23   not credible evidence.  That is not enough for a lawyer
24   at that point to say, you know what?  I think my client
25   did it, and I'm now not going to suborn perjury.

Walter R. Ledge, Court Reporter

1              I think if you go back to look at the

2    transcripts and look at that remark about suborning

3    perjury, it's very carefully worded.  What he said is I

4    would not be able to suborn perjury.  And he left that

5    stand because that was just a general proposition.

6              He did not say that was why he didn't call

7    Mr. Lisker.  And he cannot say that that's why he didn't

8    put on a third-party culpability defense because right

9    here in the transcript he argued it.  He continued to

10   argue it.

11             And what's more, Your Honor, if you go into the

12   Augmented Reporter's Transcript, not only does he read

13   Bruce Lisker's letter into the record, but he reads into

14   the record the interview notes of Bruce Lisker's

15   interview by Det. Monsue where Bruce Lisker lays out

16   Michael Ryan and says that he didn't do it, that Michael

17   Ryan did it.

18             I mean, it was just a clear third-party

19   culpability defense.  There was no basis in the world for

20   getting that letter into evidence.  I mean, it was

21   preposterous to think that that letter would ever come

22   into evidence.  He was still trying to do it.  Maybe he

23   was trying to make a record.  But it was clear both from

24   that and from the argument I just pointed out that he was

25   forcefully arguing a third-party culpability defense.

Walter R. Ledge, Court Reporter

1          Now let's get to the point about Mr. Breton

2   where he says, well, that would have actually hurt

3   Mr. Lisker because it landed on Mr. Ryan because they

4   would have known they were there together.  Doesn't work.

5          Why?  The single perpetrator theory.  That's

6   why it doesn't work.  The prosecution always maintained

7   there was one person inside.  That's why the bloody shoe

8   prints are so important.  If you show that Michael Ryan

9   was the person who did it, the prosecution's theory

10  requires that you acquit Bruce Lisker.

11         So that's all to their defense.  Now let's get

12  to our case.  What didn't Mr. Mulcahy do?

13         Arguments that he didn't make.  I've got seven

14  of them here.  These are from the transcript, and I've

15  got to go through them quickly.  I can do it in writing.

16  I know there are a lot of them already in the record, but

17  I want to point them out because I think they're very,

18  very probative and very, very important.

19         These are arguments that were available to Mr.

20  Mulcahy from the very transcript that he was arguing

21  from.  And he just missed them.

22         Let's talk about the first one.

23         Michael Ryan says he came here to California

24  from Mississippi for the Job Corp.  Why did he say that?

25  Well, because then he would have a reason about why he

Walter R. Ledge, Court Reporter

1  was going back because he couldn't get a job; right?

2          That's not why he came to California.  He came

3  here because his probation was transferred.  He didn't

4  have freedom to go back.  That was a complete lie.  So

5  he's lying about why he came here.  He came here because

6  he was supposed to report to a probation officer.  Never

7  mentions that.

8          Second point, the motel.  He admits that he saw

9  the motel receipt.  Never mentioned it in his argument.

10  That's incredible because Michael Ryan doesn't have any

11  money.  How does he go off and stay in a motel room?

12  Never mentioned it to the judge.

13          What else doesn't he mention?  He doesn't

14  mention that he checked in under an alias.  Why would he

15  check in under an alias?  He doesn't mention that he

16  created a false alibi for himself by saying I checked in

17  at ten o'clock.

18          He didn't check in at ten o'clock.  He checked

19  in at three o'clock, after the murder, after he got the

20  pony.  Never mentioned it to the judge.

21          And when you think about that evidence, the way

22  they convicted Mr. Lisker in this case, the most

23  probative piece of evidence was he lied about seeing his

24  mother.  Why would he lie?  That was really their case.

25          He only had one reason to lie -- because he was

Walter R. Ledge, Court Reporter

 1  guilty.  Why else would Michael Ryan say he got there at

 2  ten o'clock in the morning when he knew he got there at

 3  three o'clock in the afternoon.  That's just as

 4  persuasive as their argument is.  Never mentioned it to

 5  the judge.

 6         Never mentioned -- he says in there, well, he

 7  had a knife.  He mentions he had a knife.  He didn't just

 8  say he had a knife, he said he got into a knife fight in

 9  case maybe somebody saw him with blood at the hotel.  Who

10  knows?

11         And then he says, he says, well, why did you

12  use an alias?  He said, well, because I got in a fight

13  with this guy and so, you know, I wanted to make sure

14  that he didn't know who I was.

15         Well, that's completely cockamamie because it's

16  not like (unintelligible).  He didn't know his name was

17  Michael Ryan to begin with.

18         But the point is that it's even less credible

19  than that because when he first talks about the knife

20  fight, and the knife fight occurs after he checks in.  So

21  it's another lie.  Never mentions it to the judge.

22         Then, also, he says I went back to Mississippi

23  because I wasn't really planning on staying here.  I

24  couldn't get a Job Corp, so I went back.  That's also a

25  lie.

1              He came here because he was supposed to stay

2     here.  Those are all arguments that are right here in the

3     transcript.  He's got it right there in front of him.  He

4     read it.  He didn't make those arguments, Your Honor.

5     There's no excuse for that.

6              I'm sorry, he may be a great lawyer, but I

7     don't know what explanation there is for not making those

8     arguments.  But I think that -- and we would submit that

9     a reasonably competent lawyer representing someone in a

10    murder case would go through that transcript and pick out

11    those arguments and make them to the court.

12             Now, back on what he had.  Let's look on what

13    he didn't do that he should have done.

14             One of the things that he mentions in his

15    argument -- and you've just got to scratch your head, I

16    think.  I mean, he said in his argument -- this is at page

17    390 of the reporter's transcript.  And here he's quoting

18    from the transcript.

19             Quote -- this is on line 19:  Quote, "I stopped by

20    Mrs. Lisker's house to use her phone."

21             Well, what are you going to do at that point?

22    He's saying he went there the day before to use the phone.

23    What are you going to do?

24             Well, let's get the phone records.  He never

25    subpoenaed the phone records.  He says it right in his

1  argument that one of the things that Michael Ryan did, he

2  did was he went there the day before to use the phone.  Did

3  he ever bother to look at the records to see if in fact

4  Michael Ryan used the phone the day before?  Never did.

5  Never did.  It wasn't until post-conviction time that

6  Mr. Lisker actually got them himself that that evidence came

7  out.

8         Why wouldn't you do that?  You're talking about

9  what Ryan said right here.  He would get the phone records.

10        And what would you find out if you got the phone

11 records?  Bingo.  That's where you get the third-party

12 culpability evidence in because what does it do?  It ties

13 Mr. Ryan to the scene at the time of the crime.

14        And how does it do that?  Because at 10:22 A.M.

15 for one minute just before the murder happens somebody

16 dialed the telephone number that's one digit off from

17 Michael Ryan's mother's number.

18        Can we prove that that was him dialing there?  No,

19 we can't.  But is that enough for a jury to find out that

20 when he was creating this excuse for himself, that's what he

21 was talking about and he purposely misdialed because he

22 wanted a ruse to get in the house.  He says it right here.

23        And the next day he's in there dialing the phone.

24 And at least, Your Honor, you would call up that number --

25 you would get the phone records and find out was he talking

Walter R. Ledge, Court Reporter

1  to somebody at the time she was killed.  You would

2  definitely track down who that 10:22 call was.  And if you

3  did, you would find out that nobody -- it was for one

4  minute, and the person got hung up on.  And they didn't know

5  Mrs. Lisker.

6          I mean, it's inconceivable that he wouldn't do

7  that investigation.  He doesn't do it.

8          The shoe prints.  In his argument he talks about

9  the shoe prints.  Page 394 of the transcript.  He

10  specifically said -- and this, again, he's arguing this for

11  purposes of third-party culpability evidence.  He's talking

12  about how this incriminates Mike Ryan.  And what he does --

13  I'll just sum it up -- he basically says, well, Det. Monsue

14  says the footprints are all going one way into the house.

15          And then he says, well, that can't be Bruce Lisker

16  because Bruce Lisker went both ways.  So you would have seen

17  footprints both ways.  That means somebody else was in the

18  house.

19          And he says right here.  There are a lot of things

20  that weren't done.  Yes, one of them is that nobody bothered

21  to compare the shoe prints.  And if you did compare the shoe

22  prints, you would have found out that they weren't Bruce's

23  shoes.  And that would have been, given their sole

24  perpetrator theory, that again would have required

25  Mr. Lisker's acquittal.  And it certainly would have

Walter R. Ledge, Court Reporter

1  supported the third-party culpability defense together with

2  the phone bills, together with the false alibi, together

3  with the alias, together with the hotel room, together with

4  the money, together with the false reason for coming.

5          What else doesn't he do?

6          THE COURT:  Mr. Genego, pardon me for

7  interrupting.

8          MR. GENEGO:  Yes.

9          THE COURT:  Almost everything you are telling me

10  has very little to do with what was testified to today.

11          MR. GENEGO:  No, I understand that.  If the Court

12  just wants to hear about what was testified to today, I'll

13  cut it short.

14          THE COURT:  Please.

15          MR. GENEGO:  I'm sorry, I thought you wanted to

16  hear argument about the claim (unintelligible).

17          THE COURT:  I am going to give you an opportunity,

18  as has been requested, to put it in writing.  But I'm more

19  curious as to what you think the hearing today showed or

20  didn't show.

21          MR. GENEGO:  I think that, in a word, Your Honor

22  -- not in a word, but in a couple of seconds -- is what it

23  showed was that he did not remember doing a lot of things.

24  And the evidence shows that he didn't do them.

25          The record does not support at all their

Walter R. Ledge, Court Reporter

1  attempt to create an affirmative defense that he couldn't

2  ethically do this because the transcript just flatly

3  rebuts that.

4        He's trying as hard as he can to get that

5  third-party culpability defense in at the end of the

6  first trial, as he was at the first trial (sic).  That

7  doesn't work as a defense.  This hearing was for their

8  defense, and it doesn't work because the transcript

9  rebuts it.

10       He did not have any tactical reason why he

11  didn't do the telephone bill, why he didn't investigate

12  the shoe prints, why he didn't use the motel receipt.

13  None of those things did he have a tactical reason for.

14       And he never said I didn't present that

15  evidence because I thought Mr. Lisker was guilty and I

16  didn't want to suborn perjury.  But that's not why he was

17  not putting on this evidence because, if you look at it,

18  he was actually trying to put that on.

19       So the sum and substance of this evidence, I

20  think, was that they did not present -- and the record

21  precluded them presenting -- any persuasive evidence that

22  showed that he had a tactical justification for not doing

23  the investigation that any competent attorney would have

24  done and for not making the arguments that any reasonably

25  competent attorney would have done.


Walter R. Ledge, Court Reporter

```
 1              Certainly, Your Honor --

 2              THE COURT:  On the phone bills for a moment,

 3   Mr. Genego.

 4              MR. GENEGO:  Yes.

 5              THE COURT:  Commissioner Mulcahy did not request

 6   them; is that correct?

 7              MR. GENEGO:  He testified that he did not remember

 8   seeing them.  I think that we have evidence from the

 9   evidentiary hearing.  I tried to look before, and I got it

10   wrong.  But I don't know what the record shows as to where

11   the telephone records came from, but I know they were not

12   available at the time of the trial because one of the things

13   that Mr. Mulcahy did ask is he asked Det. Monsue whether he

14   ever got the phone records.

15              THE COURT:  Well, maybe there is no answer to

16   this:  Wouldn't Mr. Lisker, the elder, have the phone

17   records for his own phone?

18              MR. GENEGO:  You would think that he would.

19              THE COURT:  But there's no evidence one way or the

20   other?

21              MR. GENEGO:  Your Honor, there's no evidence one

22   way or the other about whether Mr. Mulcahy ever asked him

23   for the telephone records.

24              But you do have to think, though, Your Honor --

25   and I think it's a reasonable inference that given there
```

Walter R. Ledge, Court Reporter

 1   was a call at 10:22 A.M., which is really, literally,

 2   within a few minutes of when this awful crime happened,

 3   that somebody would have looked into that and

 4   investigated and made an argument about that.  I mean,

 5   you've really got to believe that if Mr. Lisker had given

 6   them to Mr. Mulcahy that something would have been

 7   brought out about that.

 8           And so that is the only sort of inference that

 9   I think can be drawn from that.  But he certainly did not

10   present them in support of the argument.

11           THE COURT:  Okay.  These were not intended to be

12   complete arguments, just your initial thoughts.

13           Do you think two weeks is enough time to get in

14   briefs?

15           MR. GENEGO:  Yes.

16           THE COURT:  Mr. Breton?

17           MR. BRETON:  On the issue of ineffective

18   assistance?

19           THE COURT:  On the issue of this hearing.  You've

20   briefed everything else quite a bit.  So the only reason we

21   had this hearing was that you requested it, believing that

22   there was a need for further testimony to amplify or

23   disprove the claim of ineffective assistance of counsel.

24           So what I want is a brief from each of you

25   showing what you thought the hearing showed.  Two weeks

Walter R. Ledge, Court Reporter

```
 1   is enough?
 2            MR. BRETON:  That would be enough.
 3            THE COURT:  All right.
 4            MR. GENEGO:  May we get an expedited transcript?
 5   Is that possible?  I don't know.
 6            THE COURT:  Mr. Reporter?
 7            THE COURT REPORTER:  It would take at least a
 8   week, Your Honor, maybe ten days.
 9            MR. BRETON:  30 days, Your Honor?
10            MR. GENEGO:  I would prefer not to have 30 days.
11   I would rather keep it in two weeks.  We can make most of
12   the arguments already, and just check them with the
13   transcript.  I don't know that we need the transcript that
14   much in advance.
15            MR. BRETON:  Two weeks from the transcript?
16            THE COURT:  30 days and three week are essentially
17   the same since the last week is Thanksgiving week.  Let's
18   have everything in by November 21.
19            MR. GENEGO:  And after that, it will be submitted?
20            THE COURT:  Yes.
21            Thank you.  Anything further?
22            MR. GENEGO:  No, Your Honor.
23            THE COURT:  Mr. Breton, I hope you have more
24   success getting your exhibits back to the office than
25   getting them here.
```

```
 1              Thank you very much.  We will be in recess.

 2              (Court adjourned in this matter at 3:37 P.M.)

 3                          --oOo--

 4   I hereby certify that pursuant to Section 753, Title 28,

 5   United States Code, the foregoing is a true and correct

 6   transcript of the stenographically reported proceedings held

 7   in the above-entitled matter and that the transcript page

 8   format is in conformance with the regulations of the

 9   Judicial Conference of the United States.

10

11   Date:  November 15, 2008: _____

12                              Walter R. Ledge
                                U.S. Panel Court Reporter
13                              Certified Court Reporter B-1875
                                (909) 673-7678
14                              3244 Pony Drive
                                Ontario, CA 91761-5064
15                              wledge@msn.com

16

17

18

19

20

21

22

23

24

25
```

Walter R. Ledge, Court Reporter