O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BRUCE E. LISKER, | ) | CASE NO. CV 04-02687 VAP (RZ) |
| Petitioner, | ) | |
| | ) | SECOND REPORT AND |
| vs. | ) | RECOMMENDATION OF UNITED |
| | ) | STATES MAGISTRATE JUDGE |
| MICHAEL KNOWLES, WARDEN, | ) | |
| Respondent. | ) | |

Pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California, the undersigned submits this Second Report and Recommendation to the Honorable Virginia A. Phillips, United States District Judge.  The undersigned recommends that the Court grant the Second Amended Petition for Writ of Habeas Corpus as to its second, third, and fourth claims if the State of California does not retry Petitioner.  The undersigned recommends that the Second Amended Petition be denied as to its first claim for relief.

## I.

## PROCEDURAL BACKGROUND

On November 21, 1985, Petitioner Bruce E. Lisker was convicted of second degree murder.  The court sentenced Petitioner to 16 years-to-life in State prison. (Clerk's

Transcript ("CT") 368, 378-79; Reporter's Transcript ("RT") 1221-23, 1237.)   The
California Court of Appeal affirmed Petitioner's conviction on December 22, 1988.
(Respondent's May 18, 2004 Motion to Dismiss the Petition ("Motion to Dismiss"),
Exh. B.)  Petitioner did not petition for review in the California Supreme Court on direct
appeal, but instead filed a petition for writ of habeas corpus in that court in 1989.  (Motion
to Dismiss, Exh. F.)   The court denied habeas relief on April 25, 1989, finding that
Petitioner failed to allege sufficient facts in support of his claims.  (Motion to Dismiss,
Exh. G.)

Petitioner again sought collateral review in State court fourteen years later
when, on January 31, 2003, he signed a petition for writ of habeas corpus for filing in the
Los Angeles County Superior Court; the court denied the petition on March 6, 2003.
(Motion to Dismiss, Exhs. H; I.)  On July 28, 2003, Petitioner filed a petition for writ of
habeas corpus in the California Court of Appeal which the court denied on August 5, 2003.
(Motion to Dismiss, Exhs. J; K.)   In both petitions, Petitioner argued that his delay in
raising the claims therein should be excused pursuant to California's "fundamental
miscarriage of justice" exception.  (*See* Motion to Dismiss, Exhs. H, at 127-28; J, at 238-
40); *In re Clark*, 5 Cal. 4th 750, 797, 21 Cal. Rptr. 2d 509 (1993) (a petition's untimeliness
may be excused where a petitioner presents facts showing that an error of constitutional
magnitude led to a trial so unfair that, absent the error, no reasonable juror could have
convicted the petitioner).  Neither petition was denied as untimely.  On August 18, 2003,
Petitioner filed in the California Supreme Court a petition for review of the appellate
habeas denial; the court denied the petition without comment on October 29, 2003.
(Motion to Dismiss, Exhs. L; M, at 304.)  Justices Werdegar and Kennard stated that the
petition should have been granted.  (*See* Motion to Dismiss, Exh. M, at 304.)

On April 16, 2004, Petitioner filed the Petition for Writ of Habeas Corpus by
a Person in State Custody pursuant to 28 U.S.C. § 2254 initiating the present action in this
Court.  Petitioner filed his First Amended Petition, deleting an unexhausted free-standing
claim of actual innocence, on May 12, 2004.  Also in May 2004, Respondent moved to

dismiss the action as untimely.  Prior to deciding the motion, the Court held an evidentiary hearing over seven days from December 1 to December 9, 2005.  Thereafter, the Court recommended that the Motion to Dismiss be denied because Petitioner showed that it was "more likely than not that no reasonable juror would have convicted him in the light of the new evidence" and therefore that his failure to comply with the statute of limitations should be excused.  *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) (developing rule in procedural default case); *see also House v. Bell*, 547 U.S. 518, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) (applying *Schlup* standard in procedural default case).[1] On October 10, 2006, the District Court accepted the Report, adopted its recommendation, and denied Respondent's Motion to Dismiss.  *See Lisker v. Knowles*, 463 F. Supp. 2d 1008 (C.D. Cal. 2006).

On October 16, 2006, this Court ordered Respondent to file an Answer to the merits of the First Amended Petition.  Before the Answer was filed, on November 3, 2006, Petitioner requested leave to file a Second Amended Petition to add claims which had arisen from the evidence adduced at the 2005 evidentiary hearing.  Respondent opposed the request and declined to waive the requirement that new claims must first be exhausted in State court.  On January 12, 2007, the Court granted Petitioner leave to file the Second Amended Petition and also granted his request to stay the proceedings while he returned to State court to exhaust the new claims.  The proposed Second Amended Petition was ordered filed the same day.

On February 13, 2007, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (*See* Petitioner's February 13, 2007 Notice of Filing of State Petition for Writ of Habeas Corpus.)  In a 106-page informal response, Respondent argued at length that Petitioner's claims were successive and untimely raised and therefore procedurally barred.  (*See* Traverse, Exh. A, at 98-183.)  The State court agreed and, on

---

[1] The Court did not earlier, and does not now, make any factual finding about whether Petitioner did or did not commit the murder.  *Schlup* requires no such finding for passage through its gateway.

November 14, 2007, denied the petition as untimely. (*See* Petitioner's November 21, 2007 Application for Order Vacating Stay ("Petitioner's App. to Vacate Stay"), Exh. A.)

On December 4, 2007, this Court ordered Respondent to file an Answer to the merits of the Second Amended Petition.  Respondent filed his Answer on April 2, 2008. Petitioner filed his Traverse on June 2, 2008.

On July 2, 2008, the Court ordered both parties to clarify by motion whether they were requesting a further evidentiary hearing.  Petitioner did not request a further hearing on any claim of his own, but, in an unusual move, on July 28, 2008, Respondent moved for an evidentiary hearing on Petitioner's second claim for relief, a claim alleging that Petitioner received ineffective assistance of counsel.  Petitioner opposed the motion, asserting that the claim could be resolved on the existing record.  After a hearing on August 18, 2008, the Court granted  Respondent's motion.  The second evidentiary hearing was held on October 31, 2008.  In late November 2008, the parties submitted post-hearing briefing.

## II.

## PETITIONER'S CONVICTION

The facts of Petitioner's conviction are recited in this Court's earlier Report. *See Lisker v. Knowles*, 436 F. Supp. 2d 1008.  A portion of the factual background is repeated here to make the record complete.

At 11:26 a.m. on March 10, 1983, Petitioner telephoned paramedics to report that his mother, Dorka Lisker, had been stabbed.  The paramedics arrived shortly thereafter and administered emergency care, then transported Mrs. Lisker to the hospital.  There she died around 3:00 that afternoon.

Mrs. Lisker had been stabbed multiple times, more than twice in the back, with two knives which were recovered at the house.  Also at the scene were a trophy and an exercise bar, both of which police suspected were used to bludgeon Mrs. Lisker, who had extensive injuries to her head and one arm.

Los Angeles Police transported Petitioner to jail where Detective Andrew Monsue interviewed him at length. Petitioner was 17 years old at the time. He told police that, from outside the house through the back windows, he saw his mother lying on the floor in the front entryway. Detective Monsue did not believe this or other aspects of Petitioner's account. Soon after the interview with Detective Monsue, Petitioner was charged with murder.

Petitioner continued to assert his innocence to police, telling Detective Monsue that he believed the actual killer was another juvenile named Michael Ryan. Detective Monsue investigated Ryan's possible involvement and traveled to Mississippi to interview Ryan. Monsue's notes state that Ryan was "convincingly cleared" by further investigation. The case against Petitioner went forward.

Petitioner's murder trial began in November 1984, but was aborted on December 4, 1984, when Petitioner agreed to plead guilty conditioned on his being placed in the California Youth Authority ("CYA"). Such placement would have meant that Petitioner could not be held beyond his 25th birthday. State officials determined, however, that Petitioner was not amenable for CYA placement and, the condition to the plea having failed, Petitioner withdrew his guilty plea.

Trial began anew in October 1985. The prosecution case against Petitioner consisted of various pieces of circumstantial evidence, the first and most important of which was Petitioner's critical and, in the prosecutor's words, "most condemning" lie that, from outside his house, he saw his mother lying on the entryway floor. (RT 1081-82, 1092.) Petitioner did not testify at his trial. His statements were introduced to the jury by way of his interrogation by Detective Monsue.[2] (*See* Exhibit from Federal Evidentiary

---

[2] In fact, the California Court of Appeal found that the introduction of Petitioner's statements from the police interrogation violated Petitioner's constitutional rights because Detective Monsue failed, until halfway through the interrogation, to inform Petitioner of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). (*See* Motion to Dismiss, Exh. B, at 27.) The appellate court denied relief to Petitioner, however, because it found the error harmless. (*Id*., at 28-29.)
(continued...)

Hearings ("Exh.")[3] 86, at 158-209; RT 321.)  The jury could tell Petitioner was lying, the prosecutor said, because it was shown that the day of the murder was bright and sunny, and therefore there was a severe glare on the back windows making it impossible to see into the house, and also because the victim's body would not have been visible from the back windows even absent the glare.  (*See e.g.* RT 268, 272-73, 996-97.)

Second, there was no evidence that anyone other than Petitioner and his mother had been inside the house at the time of the murder.  (RT 1117-21.)  Only Petitioner's shoe prints and fingerprints were found in the house and there was no sign of forced entry, just the louvers Petitioner said he had removed from the kitchen window.  (RT 248, 263, 274-75, 766.)

Third, Petitioner's statement to Detective Monsue was filled with inconsistencies beyond the crucial lie about seeing his mother, and Petitioner's actions at the scene were suspicious.[4]  (RT 1072-81.)

Fourth, the blood on Petitioner's clothing demonstrated his guilt.  Photographs introduced at trial showed blood spatters on the walls, floor,  carpet, and rug inside the Lisker house.  (*See* RT 295-311, 725-33.)  Petitioner had seven small drops and a small

_____

[2](...continued)
The great majority of Petitioner's allegedly inculpatory statements from the Monsue interview were made prior to when Petitioner was finally informed of his rights pursuant to *Miranda*, and therefore should not have been admitted against him.  Petitioner does not raise a *Miranda* claim here.

[3]  "Exh." standing alone refers to an exhibit from the two federal evidentiary hearings.

[4]  The statements or actions which prosecutor Phillip Rabichow argued were suspicious, and therefore some additional proof of Petitioner's guilt, included the following: Petitioner took the knives out of his mother's body to preserve evidence; Petitioner only described being in rooms where there were obvious signs of struggle; when Monsue asked Petitioner about a knife in his car, Petitioner responded, "I wouldn't kill my mom"; Petitioner didn't want to get blood on himself; Petitioner's statements indicated he was concerned about how his actions would be interpreted by authorities; there was no mess around the kitchen sink where Petitioner said he entered the house; Petitioner checked his mother's purse to see if she had been robbed; Petitioner carefully removed the window panes when he entered the house; Petitioner did not break in immediately once he saw his mother lying on the floor; and Petitioner mentioned the book about Charles Manson, Helter Skelter. (RT 1072-81, 1120.) Rabichow characterized Petitioner's lie about seeing his mother from outside as the only one of Petitioner's statements that Rabichow could prove was false. (*See* RT 1081-82.)

number of smears of blood on his clothing.  (RT 734-44, 767-68.)  Police blood spatter analyst Ronald Linhart testified that the blood on Petitioner's clothing was the result of blunt force trauma or castoff, but that the spatters could have resulted from the acts Petitioner described in tending to his mother.  (RT 734-53.)  Rabichow argued to the jury that despite bludgeoning his mother with the trophy and the exercise bar, Petitioner did not have more blood on his clothing because most of the victim's blood would spatter away from Petitioner as he was "swinging away, obviously" when he hit the victim with the weapons.  (RT 1116-17.)  Linhart, the blood spatter expert, did not testify to this effect, however.  Based on Petitioner's statement to Monsue that he hugged his bleeding mother, and based on Monsue's description of how Petitioner physically showed him that he hugged the victim, Rabichow argued that Petitioner should have had *more* blood on him and that the lack of blood on Petitioner further demonstrated Petitioner's deceit and guilt.  (RT 345-46, 1093-95.)

Fifth, Petitioner had ongoing difficulties with his parents and was not living at his parents' house.  (Exh. 86, at 179, 203.)  He did not have a key to the house and the family members argued frequently.  (*Id.*; *see also* RT 950-54.)  Robbery and animosity towards his mother were suggested as motives for the crime.  Missing was $150 cash Petitioner's father gave Petitioner's mother the evening before the murder; Monsue testified the money never was found.  (RT 224, 442.)

Sixth, Petitioner confessed to a jailhouse informant, Robert Hughes, who repeated Petitioner's confession at trial.  (RT 547-692.)

Seventh, the defense did not suggest anyone else who might have committed the murder; it did not appear anyone else had either the motive or the opportunity to commit the crime.  (RT 1117-21.)

At the close of the prosecution case, the defense successfully moved to dismiss the first degree murder charge.  (RT 783-90.)  On November 21, 1985, after nearly three days of deliberation following a ten day trial, the jury convicted Petitioner of second degree murder.  The court sentenced Petitioner to 16 years-to-life in State prison (CT 255-

68, 368-69, 378-79; RT 1221-23, 1237), where Petitioner has remained incarcerated. Petitioner has been in custody since his arrest in 1983.

### III.

### PROCEDURAL DEFAULT

The AEDPA allows a State to waive the exhaustion requirement and, if the requirement is waived, permits the federal court to adjudicate unexhausted claims. 28 U.S.C. § 2254(b)(3). Respondent declined to waive the exhaustion requirement in connection with Petitioner's motion to amend his First Amended Petition to add new claims which had arisen from the first evidentiary hearing. (Transcript of November 27, 2006 Court Hearing, at 18:7-9.) Respondent acknowledged that there were new facts, and that the development of new facts in this Court also transformed the previously-adjudicated claims into new claims. (*Id.*, at 17:23-18:2.) Respondent then argued that exhaustion would not be futile; Respondent said that Petitioner could not cite any authority to show that the claims "automatically [would be] reject[ed] as successive or as barred under timeliness grounds." (*Id.*, at 18:9-21.) Respondent argued that the State courts were "ready to consider, to analyze these new claims, to look at the newly developed facts, predicate facts in support of the old claims. And they deserve under principles of comity and federalism that opportunity." (*Id.*, at 18:11-16.) Stating that "[a] lot of evidence has been developed here" (*Id.*, at 26:16), Respondent said that the state courts "will have that opportunity either to issue an order to show case, to hold a hearing, to make a ruling. And it is not beyond the realm of possibility." (*Id.*, at 26:18-20.) Counsel even told this Court, "We suggest to this Court that this Court may never see this case again. That this case may go to the State courts and it can be resolved there on the merits." (*Id.*, at 26:9-11.) Respondent insisted that it was "certainly an insult to the State of California to claim that the State courts are going to give short shrift and a blind eye and shrug off claims of false evidence or claims of perjury . . ." (*Id.*, at 27:18-21.)

/ / /

When Petitioner returned to State court, however, Respondent did not emphasize that "a lot of evidence ha[d] been developed" here or that Petitioner was raising new claims.  Respondent did not urge the State court to "issue an order to show cause" or to "hold a hearing."  Respondent did not urge serious State court consideration of perjury or false evidence, or ask the court in any way to consider Petitioner's claims on their merits.  Instead, Respondent used the opportunity to re-argue many of the matters previously rejected by this Court, and asserted vigorously not that the claims should be considered, but rather that all four of Petitioner's claims were defaulted. (Traverse, Exh. A, at 98-183.) Respondent took this position despite his earlier argument to this Court that exhaustion was necessary so that the State courts could have the opportunity to review the merits of the claims, and that, in the interests of comity and federalism, the State court deserved that chance.  The State court agreed with Respondent's State court position on default and declined to reach the merits of Petitioner's claims. (Petitioner's App. to Vacate Stay, Exh. A.)

In the end then, Respondent's insistence that Petitioner return to State court so that the State court could have the opportunity to review the merits of the claims, coupled with his subsequent entreaties to that court *not* to review the claims' merits, resulted in a one-year delay in this Court's adjudication of Petitioner's claims.  Now the Court must review the claims having the benefit of no greater State court review than had been conducted a year ago when Petitioner sought to add the new claims here.  In fact, counsel for Petitioner predicted just such a delay, a delay without purpose. (Transcript of November 27, 2006 Court Hearing, at 37:18-38:6.)

Now, also, Respondent asks this Court to deny at least Petitioner's third and fourth claims as defaulted.  (Answer, at 63-67, 87.)  Even setting aside Respondent's previous statements to this Court that Petitioner's claims, conceded by Respondent to be new claims, would not be given "short shrift" or "shrugged off" in State court, *see Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) (the State may not argue inconsistently in State and federal court in ongoing habeas proceedings), this argument is not well taken.

The Court already has found that Petitioner satisfied a miscarriage of justice exception to the federal statute of limitations. *Lisker v. Knowles*, 463 F. Supp. 2d 1008; *Schlup*, 513 U.S. 298. That exception had its origin in procedural default cases, and thus clearly applies to the procedural default argument asserted by Respondent here. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Schlup*, 513 U.S. 298; *see also House*, 547 U.S. at 536-37 (explaining development of rule). For the reasons articulated in detail by the Court in denying the Motion to Dismiss, any State court default by Petitioner is excused by his gateway actual innocence showing. *Lisker v. Knowles*, 463 F. Supp. 2d 1008; *Coleman*, 501 U.S. at 750. Petitioner's claims must be addressed on their merits.

## IV.

### PETITIONER'S CLAIMS FOR RELIEF

Petitioner presents four claims in his Second Amended Petition. They are:

1.    Petitioner's right to counsel was violated by the introduction of a confession obtained by a police agent;

2.    Petitioner's right to effective counsel was violated when his trial attorney failed to investigate and present a third-party culpability defense;

3.    Petitioner's due process rights were violated when he was convicted on the basis of false evidence;

4.    Petitioner's due process rights were violated by the cumulative impact of the above three constitutional violations.

(Second Amended Petition, at 5-6, att.; *see also* Traverse.)

/ / /

/ / /

/ / /

# V.

## RIGHT TO COUNSEL

Petitioner contends that the State violated his right to counsel by introducing a confession obtained by placing him in a jail facility known for housing "jailhouse snitches," one of whom was Robert Hughes, the inmate who testified that Petitioner confessed the murder to him.  (Second Amended Petition, at 5, att.; Traverse, at 48-55.)  As Petitioner notes, the Government violates a defendant's Sixth Amendment right to counsel when it introduces statements which a Government agent deliberately elicited from the indicted defendant outside the presence of defense counsel.  *See Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

## A.     The Claim is Not Forfeited

Petitioner maintains that he did not actually confess to Hughes but rather that Hughes manufactured a confession using information solicited from Petitioner.  (*See e.g.* Traverse, at 52-53.)  Petitioner nevertheless argues that it was a violation of his right to counsel to allow Hughes to testify about the supposed confession.  Respondent argues that Petitioner cannot challenge the introduction of his confession while maintaining that he did not confess to Hughes.  (Answer, at 27.)

In *Lee v. Mississippi*, 332 U.S. 742, 68 S. Ct. 300, 92 L. Ed. 330 (1948), the Supreme Court held to the contrary:

> A conviction resulting from such use of a coerced confession, however, is no less void because the accused testified at some point in the proceeding that he had never in fact confessed, voluntarily or involuntarily.  Testimony of that nature can hardly legalize a procedure which conflicts with the accepted principles of due process.  And since our constitutional system permits a conviction to be sanctioned only if in conformity with those

- 11 -

principles, inconsistent testimony as to the confession should not
and cannot preclude the accused from raising the due process
issue in an appropriate manner.

*Id.*, 332 U.S. at 745; *see also Beaty v. Schriro*, 509 F.3d 994, 997 n.2 (9th Cir. 2007)
("Although Beaty contends he never confessed to Dr. O'Connor, he may still argue that the
confession, which was introduced at his trial, was coerced within the meaning of the Fifth
Amendment. *See Lee v. Mississippi*, 332 U.S. 742, 745, 68 S. Ct. 300, 92 L. Ed. 330
(1948)"), *cert. denied*, __ U.S. __, 129 S. Ct. 405, 172 L. Ed. 2d 295 (2008). Petitioner has
not forfeited this claim.

## B.    The Standard of Review

In the usual case, a federal court would assess a State prisoner's habeas
petition pursuant to the AEDPA and could grant relief on a claim only where the State
court's denial of that claim either was "contrary to, or involved an unreasonable application
of, clearly established Federal law, as determined by the Supreme Court of the United
States, or resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).
In this as in so many other ways, however, Petitioner's case is not the usual one. Given the
path of Petitioner's State court review, this Court must determine, separately for each of
Petitioner's four claims, which State court decision it should review and whether it should
conduct such review pursuant to the AEDPA.

Petitioner presented his right-to-counsel claim to the California Court of
Appeal on direct appeal. In denying relief in 1988, the appellate court found that
Petitioner's housing in an adult jail facility violated State law, but that Hughes was not a
police agent when he spoke with Petitioner because Hughes had not yet met with police
concerning Petitioner. (Motion to Dismiss, Exh. B, at 31-34.) Therefore, the court

1   determined, Petitioner's right to counsel was not violated by the introduction of Hughes'

2   testimony.  (*Id*., at 34.)

3          In his 2003 series of State habeas petitions, Petitioner again argued that the

4   introduction of Hughes' testimony was a violation of his constitutional right to counsel.

5   (*See* Motion to Dismiss, Exhs. H, at 112-29; J, at 218-40.)  The Los Angeles County

6   Superior Court denied the petition filed there because Petitioner had been given "more than

7   his day in court" and because "[n]othing in the lengthy petition gives [the] court any reason

8   to grant the writ."  (Motion to Dismiss, Exh. I, at 162.)  The California Court of Appeal

9   denied without explanation the subsequent habeas petition containing this same claim.

10  (Motion to Dismiss, Exh. K.)  The California Supreme Court denied Petitioner's petition

11  for review in an unexplained one-line denial.  (Motion to Dismiss, Exh. M, at 304.)

12         During the 2005 evidentiary hearing in this Court, some evidence was taken

13  regarding Hughes.  Then, after Respondent's Motion to Dismiss was denied, Petitioner

14  obtained a stay from this Court to exhaust claims in State court.  When Petitioner returned

15  to the California Supreme Court in 2007 to file his habeas petition there, he included anew

16  his right-to-counsel claim.  (*See* Petitioner's July 27, 2007 Motion for Release on Bail

17  ("Petitioner's Bail Motion"), Exh. D, at 95-100.)  As noted, Respondent urged the

18  California Supreme Court to deny the petition on procedural grounds; when that court did

19  so, it did not reach the merits of any of the four claims raised therein.  (Petitioner's App.

20  to Vacate Stay, Exh. A.)

21         Given this procedural history, Petitioner argues that, under *Killian v. Poole*,

22  282 F.3d 1204 (9th Cir. 2002), his first claim should be reviewed *de novo*; he says that,

23  since 2003 when the State Supreme Court denied the claim on its merits, new supporting

24  facts emerged at the federal evidentiary hearing in 2005.  (*See* Traverse, at 6-7, 47-48;

25  Petitioner's Bail Motion, Exh. D, at 98.)  In *Killian*, the Ninth Circuit held that where new

26  facts underlying a constitutional claim are discovered in federal habeas proceedings, review

27  of a State court's denial of relief to the petitioner is *de novo* – even if an earlier State court

28  denial was on the merits.  *Id.*, 282 F.3d at 1208; *see also Monroe v. Angelone*, 323 F.3d

286, 297-98 (4th Cir. 2003) (a federal court should not defer to a State court judgment on a constitutional claim where new evidence was disclosed for the first time in federal court)[5]; *see also Lambert v. Blodgett*, 393 F.3d 943, 968 (9th Cir. 2004) ("In sum, our opinions indicate that the decisive factor necessary to trigger AEDPA deference . . . is whether the state court adjudicated the defendant's claims.  In each case we ask, did the state court decide the claim on the merits?").  Petitioner contends that his first claim for relief now is supported by new evidence which the California Supreme Court never has reviewed and therefore that this claim never has been reviewed by the State court on its merits.

Of course Petitioner also presented this claim to the California Supreme Court in 2007, *after* the federal evidentiary hearing, and at that time included the new evidence adduced at the federal proceedings.  (*See* Petitioner's Bail Motion, Exh. D, at 98.)  Had the State court denied the 2007 habeas petition on its merits, then the *Killian* rule would not be relevant and this Court could look to that merits denial as the last reasoned State court opinion concerning claim number one.  The California Supreme Court in 2007, however, did not review the merits of this or any other claim presented then; it rejected the entire petition on procedural grounds.

Where the California Supreme Court rejects a petitioner's claim for procedural reasons, review is not conducted pursuant to the AEDPA, but must be conducted under pre-AEDPA standards, as there is no State court decision to which the federal court may defer. *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).  Review of legal determinations and mixed questions of fact and law must be *de novo.  Id.*; *accord Tanner v. McDaniel*, 493 F.3d 1135, 1139 (9th Cir.), *cert. denied*, _ U.S. __, 128 S. Ct. 722, 169 L. Ed. 2d 565 (2007).  In such a situation, however, State court factual determinations still are presumed

---

[5]  In *Holland v. Jackson*, 542 U.S. 649, 653, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004), the Supreme Court noted the *Monroe* decision, but declined to address its standard of review determination.

correct and can be rebutted only by clear and convincing evidence.  *Pirtle*, 313 F.3d at
1167-68 (citing *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)).

In sum, with respect to claim number one, if in the State proceedings prior to
the 2007 proceedings the California Supreme Court was not able to consider the claim as
it stands now in this Court, *i.e.*, including pertinent facts adduced at the federal evidentiary
hearing, then review of claim number one should be *de novo*.  *Killian*, 282 F.3d at 1208;
*Pirtle*, 313 F.3d at 1167-68.

The question for the Court then becomes:  Since its denial by the California
Supreme Court in 2003, was new evidence adduced in support of claim number one such
that the claim is now a new and different claim from the one decided by the State courts
in 2003?  The only new evidence suggested by Petitioner is a police interview of another
potential informant in which the police suggest surreptitiously that the informant continue
to question Petitioner.  (Traverse, at 51; Transcript from December 2005 Evidentiary
Hearing ("EHT") II 167-68.)  Although this is new evidence, it does not involve Hughes
himself or show that Hughes had an ongoing relationship with police in April 1983.  It is
not by itself enough to transform this claim into one "for which no adjudication on the
merits in state court was possible."  *Killian*, 282 F.3d at 1208.  For purposes of determining
the standard of this Court's review, Petitioner's right to counsel claim is unchanged by the
new evidence and the California Supreme Court in 2003 considered the same right to
counsel claim now presented to this Court.

Therefore, this Court is required to consider deferentially the 2003 State court
denial of claim number one under the AEDPA, which, as noted,  provides in relevant part:

(d)    An application for a writ of habeas corpus on behalf
of a person in custody pursuant to the judgment of a State court
shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless the
adjudication of the claim –

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.  Under the AEDPA, a federal court shall presume that a determination of factual issues made by a State court is correct, and a petitioner has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The Supreme Court has elaborated on the deferential standard of review of legal determinations as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  A State court's decision is an "unreasonable application" of Supreme Court precedent if it is "objectively unreasonable" which "requires the state court decision to be more than

incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). Thus, "an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *accord Price v. Vincent*, 538 U.S. 634, 643, 123 S. Ct. 1848, 155 L. Ed. 2d 877 (2003) (even where reviewing court might find that error occurred, habeas relief is not warranted where state court denial of claim is "at least reasonable").

The Supreme Court has held, regarding State court factual findings:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).

*Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).

## C.    The Introduction of the Confession

At the time of his arrest, Petitioner was a 17 year old juvenile on suicide watch in an adult jail unit, Module 7000 of the Los Angeles County Jail, known as the "Snitch Tank." (*See* Augmented Reporter's Transcript ("ART") 357-59; Exh. 38.) The cell into which Petitioner was placed had holes in the walls to both adjoining cells; the inmates in the cells on either side spoke to Petitioner through these holes. (*See* Motion to Dismiss, Exh. B, at 33; Exh. 86, at 314.) On one side was Robert Hughes and on the other side were two inmates, Sherman Wallace and Michael Dowtu, both of whom also reported that Petitioner confessed to them (one of them reported that Petitioner said he stabbed his mother with a fork). (EHT II 163-68; Exh. 86, at 311-21.) Hughes was an experienced

informant who had testified in two previous murder trials; he received the benefit of a shortened prison stay in return for testifying against Petitioner. (*See* RT 571-74, 660-76; ART 372; EHT III 90-91, 97, EHT IV 23-27; Exh. 86, at 685, 712-17.)

Hughes testified that he met Petitioner in April 1983, when he ministered to Petitioner through the hole in the wall between their cells. (RT 547-50, 579-80, 646.) According to Hughes, Petitioner immediately told Hughes that he wanted to confess to him. (RT 549-50.) Petitioner told Hughes, "I killed my mother and I fucked up." (RT 550.) According to Hughes, Petitioner's mistake was forgetting to get rid of his clothes which were spattered with blood from beating the victim. (RT 550-51.) Hughes recounted to the jury what he said was Petitioner's detailed account of the murder. (*See* RT 551-57.)

**D.    Analysis of Petitioner's Claim**

In *Massiah*, the Supreme Court held that a defendant's Sixth Amendment right to counsel was violated "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.*, 377 U.S. at 206. In that case, after the defendant was indicted, retained a lawyer, pleaded not guilty, and was released on bail, his co-defendant decided to cooperate with police and agreed to discuss with Massiah their criminal activities while police listened via a radio transmitter placed in the co-defendant's car. *Id.*, 377 U.S. at 201-03. The Court held that

> it was entirely proper to continue an investigation of the suspected criminal activities of the defendant . . . even though the defendant had already been indicted. . . . [But] [d]efendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial.

1   *Id.*, 377 U.S. at 207.

2         Subsequently, the Supreme Court decided *United States v. Henry*, 447 U.S.

3   264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), in which it found the Government had

4   violated Henry's Sixth Amendment right to counsel by "intentionally creating a situation

5   likely to induce Henry to make incriminating statements without the assistance of counsel."

6   *Id.*, 447 U.S. at 274.  After Henry was arrested, arraigned and jailed for bank robbery,

7   federal agents contacted Henry's cellmate, Nichols, and instructed him to "be alert" to

8   Henry's statements regarding robbery, but not to initiate any conversation or to question

9   Henry regarding the robbery.  *Id.*, 447 U.S. at 265-66.  The Court determined that "under

10  the facts of this case a Government agent 'deliberately elicited' incriminating statements

11  from Henry" because: (1) "Nichols was acting under instructions as a paid informant for

12  the Government;" (2) Henry did not know Nichols was anything other than a cellmate; and

13  (3) Henry was in custody when engaged in conversation by Nichols.  *Id.*, 447 U.S. at 270.

14        Five years later, the Supreme Court decided *Maine v. Moulton*, 474 U.S. 159,

15  106 S. Ct. 477, 88 L. Ed. 2d 481 (1985).  There, Moulton and his co-defendant Colson

16  were indicted and pleaded not guilty to theft charges.  *Id.*, 474 U.S. at 162.  Colson

17  confessed to police (and also told them Moulton had suggested killing a witness) and

18  accepted a deal wherein no further charges would be filed against him if he cooperated in

19  prosecuting Moulton.  *Id.*, 474 U.S. at 162-63.  Colson agreed to place a recording device

20  on his phone and to record incoming calls from Moulton.  *Id.*, 474 U.S. at 163.  When

21  Moulton and Colson planned a meeting to discuss defense strategies, Colson agreed to

22  wear a recording device.  *Id.*, 474 U.S. at 164-65.  Although the police instructed Colson

23  not to question Moulton, when the two met, Colson feigned forgetfulness and asked

24  Moulton to recount details of their crimes.  *Id.*, 474 U.S. at 164-66.

25        The Court held that the police violated Moulton's Sixth Amendment rights:

26

27        [T]he Sixth Amendment is not violated whenever – by luck or

28        happenstance – the State obtains incriminating statements from

the accused after the right to counsel has attached.  However,
knowing exploitation by the State of an opportunity to confront
the accused without counsel being present is as much a breach
of the State's obligation not to circumvent the right to the
assistance of counsel as is the intentional creation of such an
opportunity.  Accordingly, the Sixth Amendment is violated
when the State obtains incriminating statements by knowingly
circumventing the accused's right to have counsel present in a
confrontation between the accused and a state agent.

*Id.*, 474 U.S. at 176 (citation omitted).  "[P]roof that the State 'must have known' that its
agent was likely to obtain incriminating statements from the accused in the absence of
counsel suffices to establish a Sixth Amendment violation."  *Id.*, 474 U.S. at 176, n.12.

As the Court wrote, "[T]he Sixth Amendment also imposes on the State an
affirmative obligation to respect and preserve the accused's choice to seek . . . assistance
[of counsel;] . . . at the very least, the prosecutor and police have an affirmative obligation
not to act in a manner that circumvents and thereby dilutes the protection afforded by the
right to counsel."  *Id.*, 474 U.S. at 170-71.

The main inquiry in Petitioner's case is whether Robert Hughes was a police
agent when he spoke to Petitioner.  If not, then Petitioner's *Massiah* claim must fail; the
Sixth Amendment is violated only when the State or police, *through their agent*,
deliberately elicit incriminating statements, or create a situation likely to induce a
defendant to make such statements.  *Henry*, 447 U.S. 264; *and see Randolph v. People of
the State of California*, 380 F.3d 1133, 1144 (9th Cir. 2004) (holding that it is the creation
of a cooperative relationship between the informant and the Government that creates an
agency relationship); *Creel v. Johnson*, 162 F.3d 385, 394 (5th Cir. 1998) ("Even if [the
informant] had 'deliberately elicited' incriminating statements from Creel, his right to
counsel was not violated because [the informant] was not an agent of the state."); *United

*States v. Love*, 134 F.3d 595, 604 (4th Cir. 1998) ("The behavior of an informant who initiates contact with an indicted defendant – whether because of conscience, curiosity, or even potentially to curry an unpromised future favor from the government – cannot be attributed to the government.").

The trial and appellate courts found that Hughes was not a police agent when he spoke to Petitioner. (ART 379-80; RT 12, 1227; Motion to Dismiss, Exh. B, at 33-34); *Williams v. Woodford*, 384 F.3d 567, 599 (9th Cir. 2004) (whether informant is an agent is a factual finding). The Supreme Court has not clearly identified the specific factors to analyze to determine whether an informant is a government agent pursuant to *Massiah*; in the Supreme Court cases interpreting *Massiah*, agency was not the central issue. *See Matteo v. Superintendent*, 171 F.3d 877, 893 (3d Cir. 1999); *Creel*, 162 F.3d at 393.

In *Henry*, the Supreme Court did find that the police, through their agent, had "deliberately elicited" information from Henry because, among other facts, the informant/agent was paid and acted pursuant to government instructions. *Henry*, 447 U.S. at 270. The Ninth Circuit has relied on the absence of either of these two factors to determine that an informant was *not* a government agent. *Brooks v. Kincheloe*, 848 F.2d 940, 945 (9th Cir. 1988). Other circuit courts have more expressly held that determining the presence or absence of these two factors is a reasonable test for determining agency. *See Creel*, 162 F.3d at 393 (finding that two-prong agency test of *quid pro quo* agreement and instructions from police is consonant with Supreme Court authority); *Love*, 134 F.3d at 604 (agreement with government and payment for information are "crucial indicia" of agency); *cf. United States v. Chahia*, 544 F.3d 890, 900 (8th Cir. 2008) ("[A]n informant becomes a government agent for purposes of [*Massiah*] only when the informant is instructed by police to get information about the particular defendant.") (citation omitted). On the other hand, there need not be an express agreement between police and the informant for the informant to become an agent as "it is the relationship between the informant and the State . . . that is the central and determinative issue." *Randolph*, 380 F.3d at 1144.

The California Court of Appeal made a factual determination that Hughes spoke to Petitioner on his own initiative and that he was not asked by police to question Petitioner.  (Motion to Dismiss, Exh. B, at 33.)  From this determination, the court found that Hughes was not a police agent in April 1983.  (*Id*., at 34.)

On the other hand, police records conflicted about when the police first met with Hughes, although none specifically mentions a meeting as early as April 1983.[6] Hughes testified that he immediately wrote notes of Petitioner's confession and had the notes during his police interview, but he did not have the notes at trial and could not remember anything about the physical appearance of the notes.[7]  (RT 581-82, 631-32, 689-90.)  Hughes' testimony was inconsistent in numerous other respects as well.[8]  Hughes previously had testified against at least two other defendants in murder cases and testified that he "always" expected to get something in return for testifying against a defendant.  (RT 574, 584-85, 660-62.)  Hughes was released early because of Rabichow's efforts on his behalf.  (RT 571-73, 663-76; *see also* ART 372.)  Before Hughes approached the police with information about Petitioner, police were contacted by two other inmates who

---

[6]  The police recorded only one contact with Hughes with respect to Petitioner's statements – Hughes' July 6, 1983 interview with Monsue, but in that interview Hughes said he previously had spoken with Detective Landgren.  (EHT II 169-70; Exh. 99, at 8.)  In the chronological record contained in the police "murder book," the first entry regarding Hughes is noted, out of chronological order in the record, as having occurred on October 10, when a Beverly Hills Police Department sergeant reported that he had an informant to whom Petitioner had "copped out."  (EHT II 170-72; Exh. 86, at 8.)

[7]  Hughes testified he destroyed or threw away the notes.  (RT 582, 632, 649, 683.)  He also testified that he either did give or may have given the notes to police.  (RT 581-82, 632.)  Hughes said he was sure he had the notes during his interview with police but there is no indication in the interview transcript that Hughes had any notes.  (RT 582, 633-34, 689.)

[8]  Hughes both denied and admitted asking Petitioner for money and goods.  (RT 580, 588, 591-92, 606, *and see* RT 937.)  Hughes denied, but prosecutor Rabichow agreed, that Hughes wrote letters to Petitioner acknowledging Petitioner's innocence.  (RT 602-06, 620-21, 626-30, 644-45, 657-58.)  Hughes remembered minute details about Petitioner's confession, but remembered essentially nothing about how he "ministered" to Petitioner.  (*See* RT 595-98.)  Petitioner's father, Robert Lisker, testified that Hughes told Petitioner and Mr. Lisker he knew Petitioner was innocent.  (RT 936, 941.)

1   reported that they also had solicited confessions from Petitioner.[9]  (Exh. 86, at 311-21.)

2   Finally, in 1990 the Los Angeles County Grand Jury issued a Report on police abuses in

3   the use of informants in the 7000 Module.  (*See* Exh. 38.)

4          The State courts reasonably could have decided that there was sufficient

5   circumstantial evidence to find an agency agreement between Hughes and the police prior

6   to April 1983.  *See Moulton*, 474 U.S. at 176 n.12 (the Sixth Amendment is violated where

7   government "must have known" that the informant would take affirmative steps to procure

8   incriminating statements).  Nevertheless, under the AEDPA, this Court cannot determine

9   the evidence anew to review this factual determination; it must judge only whether the

10  State court's finding was so far afield as to be objectively unreasonable or, based on new

11  evidence, clearly in error.  28 U.S.C. § 2254(d)(2), (e).  Because Petitioner does not present

12  any specific, compelling evidence that Hughes had an agreement with police *prior to April

13  1983*, it was neither.  *Miller-El*, 537 U.S. at 340.  Petitioner's failure to make a sufficient

14  showing of an early relationship between Hughes and the police is fatal to his claim under

15  the AEDPA.  28 U.S.C. § 2254(d).

16  / / /

17  / / /

18  / / /

19

20  _____

21      [9]  Detective Monsue and his partner Detective Landgren also interviewed, in April 1983, inmate
    Dowtu, who was housed in the cell on the other side of Petitioner's.  (EHT II 165-66; Exh. 86, at 314-

22  321.)  That interview contains the following exchange between Dowtu and one of the detectives:

23          Dowtu: If this guy – I'd be talking to him.  If he comes up with something else.
            Detective: Well, a, now if I was to tell you to go ahead and talk to him some more,

24      you'd be acting as my agent.
            Dowtu: Oh, I see.

25          Detective: And you can't do that, but we will be coming back up here to see you

26      again.

27  (EHT II 167-68.)  To Los Angeles Police Department Internal Affairs Investigator James Gavin, this
    exchange showed the detective's telling Dowtu through a "wink and a nod" to question Petitioner.

28  (EHT II 168.)  (This is the item of evidence not previously considered by the State courts.)

# VI.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's second claim is that his trial attorney, Dennis Mulcahy, was ineffective in failing to investigate and present evidence showing that Michael Ryan was responsible for the murder. (Second Amended Petition, at 5, att.; Traverse, at 55-66.) In the Second Amended Petition, Petitioner did not assert that counsel failed to investigate Ryan's involvement as separate from counsel's alleged failure to present the evidence already in his possession. (*See* Second Amended Petition, at 5, att.) Nevertheless, the parties have proceeded as if the failure to investigate allegation were included in the claim. Respondent answered the assertion in the Answer (*see* Answer, at 34, 37, 40-63), and Petitioner clarified in the Traverse that the claim does include an allegation that counsel failed to investigate Ryan adequately. (Traverse, at 55-66.) From their briefing and argument, it is clear that the parties have understood the failure to investigate allegation to be one of the two parts of the ineffective assistance of counsel claim. (*See* Respondent's Nov. 21, 2008 Post Evidentiary Hearing Brief ("Respondent's 11/21/08 Post-Hearing Brief"); Petitioner's November 22, 2008 Post-Hearing Memorandum; Respondent's July 28, 2008 Motion for Hearing; Petitioner's August 4, 2008 Opposition to Motion for Hearing; Respondent's August 11, 2008 Reply to Petitioner's Opposition to Motion for Hearing.)

Before the start of Petitioner's first trial, on November 15, 1984, prosecutor Rabichow moved to suppress any evidence suggesting that Michael Ryan, Petitioner's former roommate, was involved in the killing. (ART 389.) In opposing the prosecutor's motion, defense counsel told the court that he had a tape and transcript of an interview Detective Monsue had conducted with Ryan during which Ryan admitted going to the Liskers' house the day before the murder. (ART 390.) Counsel relayed that Ryan said he saw the victim that day and asked to use her phone and if she had any work for him to do. (*Id*.) Counsel summarized the rest of the Monsue interview as follows:

[Ryan] talks about . . . that he had a knife.  Detective
Monsue[,] and I don't remember where it was in here, asked him
about how he got all the way out of State only having so much
money, and it was impossible for him to have left basically with
just so much money and eating and where and how he explained
the scenario of events in this 41 pages to Detective Monsue.

Ryan never admitted being involved.  Never admitted
having anything to do with this incident.  But in reading this one
is under the distinct impression that Monsue at least believes it
is impossible for Ryan's story to fit that he had left the next day
and how he got to where he got with just the money.  He could
be placed at the location.  He can be placed in the neighborhood
of the location.  He can be placed having some problems with
Dorka Lisker.  He can be placed the day before by his own
statements.

. . . He had some problems with Dorka Lisker from
obtaining money from her.  She apparently became a friend of
this Ryan through her son, Bruce.

(ART 390-91.)

Counsel told the court that he had a "private investigator also contact Ryan,
but by the time my private investigator contacted Ryan, he was out of state.  He was in San
Francisco [*sic*]."  (ART 391.)  Finally, counsel referenced an interview of Ryan by two
private investigators, noting that in the interview, Ryan did not admit committing the
crime.  (*Id*.)  Contrary to the State's assertion here, the trial record does *not* indicate that

counsel provided the court with a copy of the Monsue interview, or any other interview
with Ryan.[10]

    After a recess, the following colloquy occurred:

        The Court:  Okay.  As I understand it then, the offer of
    evidence basically is that this person was formerly a friend of
    the defendant's.  Was a roommate at some time previously at
    that house, the victim's house.  Was there the day before; is that
    correct?
        Mr. Mulcahy:  That is correct.
        The Court:  I believe you said that he had tried to borrow
    money from her that day?
        Mr. Mulcahy:  That's correct.
        The Court:  The day before and then there was some
    reference to having a disagreement.  Was that just that he didn't
    get any money or what?

_____

[10] Counsel testified here that he believed the trial transcript showed that the judge listened to the
tape and had the transcript of the Monsue/Ryan interview, but counsel had no independent recollection
of providing the judge with either. (Transcript from October 2008 Evidentiary Hearing ("2 EHT") 23,
29, 70-72.) (Counsel testified that he did not even remember whether *he* listened to the tape or read the
transcript. (2 EHT 22.)) Counsel's reading of the transcript is the basis for Respondent's assertion that
the judge reviewed the interview himself; nowhere does Respondent offer any citation to the trial record
to support the argument.  (*See* Respondent's Nov. 21, 2008 Post-Hearing Brief, at 5-6.)
    The record does not show that the trial judge reviewed either; it demonstrates to the contrary.
Regarding the evidence of Ryan's guilt, Judge Kolostian told counsel, "I got the impression the evidence
is the tape that the prosecution gave you.  Is there any other evidence?" (ART 397.) Counsel responded
that there was not.  (ART 398.)  The judge then summarized the evidence suggesting Ryan's guilt by
referencing *only* the facts relayed by counsel in his argument.  (*Id.*) (The court also did not reference any
facts from the Monsue interview in granting the prosecution's motion at the second trial.  (RT 12-13.))
As will be clear, it is inconceivable that the court would have agreed that these were the only relevant
facts to be gleaned from the Monsue interview.  It is unreasonable to conclude that the judge reviewed
the interview himself.

1    Mr. Mulcahy:   There has been prior – I can produce

2    evidence that there were prior disagreements between Ryan and

3    Dorka Lisker about doing chores for money.

4    The Court:  Okay.

5    Mr. Mulcahy:  For whatever value that has.

6

7    (ART 398.)   Based on this showing by the defense, the court granted the prosecutor's

8    motion and ruled that evidence concerning Ryan was inadmissible. (ART 399.) The court

9    told counsel that if he had other evidence at a later time, "we will get into this again." (*Id.*)

10    On October 23, 1985, as the second trial began nearly a year later, prosecutor

11    Rabichow renewed his motion to exclude evidence of Ryan's involvement.   (RT 2.)

12    Mulcahy opposed the motion again and in opposition attempted to introduce a letter written

13    by Petitioner and/or an interview by Monsue of Petitioner in which Petitioner suggested

14    Ryan's guilt.  (RT 2-16.)   Counsel argued that the letter should be allowed in as an

15    admission under State law because the prosecution – the party opponent – was attempting

16    to keep it out.   (RT 3-4.)   The prosecutor correctly countered that under California's

17    hearsay rules, Petitioner could not introduce his own out-of-court exculpatory statement.

18    (RT 3, 8, 10-11.)   Counsel soon agreed, stating that the information in the letter is

19    "probably hearsay granted and it is not relevant." (RT 10.) After a lunch break, counsel

20    again argued for the admission of Petitioner's letter, this time as evidence of Petitioner's

21    state of mind.  (RT 15-16.)  The court found that the letter was "certainly not admissible."

22    (RT 16.)  Counsel argued in sum that he should be able to introduce evidence that Ryan

23    was in the neighborhood the day before the murder and that the victim would have opened

24    the door for him because she knew him.  (RT 10.)  The court disagreed and again granted

25    the prosecution motion.  (RT 12-13, 16.)

26    / / /

27    / / /

28    / / /

**A.    State Court Review & the Standard of Review in this Court**

In his 2003 petitions for collateral review, Petitioner argued to the State courts that counsel was constitutionally ineffective in failing to present the jury with evidence suggesting Michael Ryan was responsible for the murder. (*See* Motion to Dismiss, Exhs. H, at 142-47; J, at 256-63.)  In support of the claim, Petitioner presented new evidence, including the transcript of Monsue's 1983 interview with Ryan, a motel check-in receipt for the day of the murder showing that Ryan checked in under an assumed name and police notes showing he lied to Monsue about his check-in time, a phone record from the Lisker residence showing a call on the day of the murder to a number nearly identical to Ryan's mother's phone number, Ryan's lengthy and violent criminal record, and interviews of Ryan's parents.  (Motion to Dismiss, Exh. H, at 129-40; J, at 240-68.) According to Petitioner, all of these materials either were in counsel's possession when he opposed the *in limine* motions or were easily obtainable at that time, and, had they been introduced, would have led to a denial of the *in limine* motion and a different result at trial. (*See id.*)

The State courts denied relief on this claim without supplying any reasoning beyond the Los Angeles County Superior Court's finding that in general Petitioner had been given "more than his day in court" and that his claims were speculative. (Motion to Dismiss, Exh. I.)  The California Supreme Court denied Petitioner's 2003 petition for review without opinion, although two justices found that the petition should have been granted.  (Motion to Dismiss, Exh. M, at 304.)

As with claim number one above, Petitioner argues that this claim should be reviewed *de novo* under *Killian* and *Pirtle* because, since the time that the State supreme court denied it on its merits in 2003, Petitioner discovered new facts in support of the claim and because the later State court denial, in 2007, was based on a procedural ground only. (*See* Traverse, at 6-7, 47-48.)

In fact, much of the evidence Petitioner proffers now in support of this claim *was* presented to the State courts in 2003.  Importantly, however, Petitioner did not present

in 2003 the newly-developed shoe print evidence he offers in support of his claim now and which, by itself, could show that someone other than Petitioner was in the house at the time of the attack. (*See* Traverse, at 59.)  In opposing Petitioner's motion to amend without exhaustion, Respondent seemed to concede that the ineffective assistance of counsel claim is a new one because new facts have "significantly altered that claim and created – and formed it into a new posture." (Transcript of November 27, 2006 Court Hearing, at 17:24-18:2.)

The shoe print evidence is critical to the analysis of claim number two as it negates the prosecution's theory that only Petitioner could have been the killer; it made a third-party culpability defense far more plausible.  Because it is critical to the analysis of the claim, the addition of the shoe print evidence thus renders the present claim one "for which no adjudication on the merits in state court [in 2003] was possible." *Killian*, 282 F.3d at 1208.  Therefore, the State courts have not addressed the merits of the ineffective assistance of counsel claim now before this Court.  *Killian*, 282 F.3d at 1208 (where new facts are discovered in federal habeas proceedings, review of a State court's denial is *de novo*); *Pirtle*, 313 F.3d at 1167-68 (where the California Supreme Court rejects a petitioner's claim for procedural reasons, AEDPA does not apply).  For these reasons, Petitioner's ineffective assistance of counsel claim must be reviewed *de novo*.

## B.    Analysis of Petitioner's Claim

Petitioner claims here that counsel unreasonably failed to present to the trial court the compelling evidence he possessed of Ryan's involvement and that counsel unreasonably failed to further investigate Ryan's involvement by examining shoe prints at the Lisker house and autopsy photos and by obtaining the Lisker phone bill and Ryan's criminal record.  (Second Amended Petition, at 5, att.; Traverse, at 55-66.)

In order to show a violation of the Sixth Amendment, Petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80

L. Ed. 2d 674 (1984).  Petitioner bears the burden of establishing both components.  *Id.*
Deficient performance is performance which is objectively unreasonable under prevailing
professional norms.  *Id.*, 466 U.S. at 687-88.  Under *Strickland*, counsel's deficient
performance prejudices a petitioner where there is a "reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different."
*Id.*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine
confidence in the verdict."  *Id.*

In sum, Petitioner must show:  (1) that counsel performed deficiently by
failing to argue the import of the evidence he possessed and/or by failing to obtain and
present more compelling evidence of Ryan's involvement; and (2) that Petitioner's defense
was prejudiced thereby, *i.e*, that, had counsel performed effectively, the court would have
allowed the introduction of evidence of Ryan's guilt which then likely would have led to
a different result at trial.  More specifically, Petitioner must show that the evidence now
proffered would have been admissible under the California law in effect at the time of his
trials (1983-85) – the *Mendez-Arline* rule – which provided that evidence of third-party
culpability was admissible "only if it constitutes substantial evidence tending to directly
connect that person with the actual commission of the offense."  *See People v. Hall*, 41
Cal. 3d 826, 831-32, 226 Cal. Rptr. 112 (1986) (explaining the rule and citing *People v.
Mendez*, 193 Cal. 39 (1924) and *People v. Arline*, 13 Cal. App. 3d 200, 91 Cal. Rptr. 520
(1970)); *see also People v. Green*, 27 Cal. 3d 1, 22, 164 Cal. Rptr. 1 (1980) (citing rule);
*Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983) (same).  The court applied this test
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

at Petitioner's trial to exclude evidence of Ryan's involvement.[11] (*See* ART 389-99, RT 2-16.)

The passage of nearly 25 years since Petitioner's trial necessarily dims memories.  At various times during the second evidentiary hearing, counsel could not remember whether he did or said certain things.  This is entirely natural, and not a basis for drawing adverse inferences.  The Court also is aware that hindsight has a clarity rarely present in the hurly-burly of ongoing litigation.  The Court has taken these things into consideration, and has given counsel the benefit of the doubt; the law in fact requires the Court to indulge presumptions in favor of the constitutionally effective assistance of counsel.  *Strickland*, 466 U.S. at 689.  The Court has done so here.

The passage of time also means that certain witnesses no longer are available.  The Court has taken this fact into account also.  However, the parties have not demonstrated that any witness, once but no longer available, would have given evidence which could affect the outcome of Petitioner's claim.  Therefore, although Michael Ryan and Petitioner's father Robert Lisker both since have died, their presence or absence does not affect the outcome of this claim.[12]

---

[11]  The California Supreme Court in 1986 (during the pendency of Petitioner's appeal) rejected the *Mendez-Arline* rule "to the extent that it create[d] a distinct and elevated standard for admitting" third-party culpability evidence.  *People v. Hall*, 41 Cal. 3d 826, 834, 226 Cal. Rptr. 112 (1986).  The court held that "[r]ather than speaking in terms of a *Mendez-Arline* 'rule,' courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion."  *Hall*, 41 Cal. 3d at 834.  In 1983, the Ninth Circuit noted the peculiarity of the *Mendez-Arline* rule and stated: "[W]e do not doubt that in some situations application of the *Mendez-Arline* rule would violate the Constitution."  *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983)  Petitioner did not challenge the application of the rule in his trial, only his attorney's failure to satisfy its requirements.

[12]  Certainly it does not affect analysis of the claim in the way counsel for Respondent has so many times suggested, which is that Petitioner's allegation that Ryan was the killer must be entirely discounted because Petitioner did not make the assertion until after both Robert Lisker and Michael Ryan died.  (*See e.g.* Answer, at 42; Traverse, Exh. A, at 131-32; Objections, at 25 ("Petitioner shrewdly waited until after Robert Lisker had died [and] Michael Ryan had died . . . before launching his brilliantly orchestrated campaign to assert his innocence.").)  In fact, immediately upon his arrest in 1983, Petitioner proclaimed his innocence and soon thereafter urged the police to investigate Ryan; both Ryan and Robert

(continued...)

**1.      Counsel Performed Deficiently When He Failed to Present Evidence Already in His Possession**

Monsue's interview with Ryan, combined with evidence contained in the police "murder book" – both of which were in counsel's possession before trial – contained more evidence implicating Ryan in the killing than Mulcahy suggested in his argument to the trial court.  (*See* ART 390; Transcript from October 2008 Evidentiary Hearing ("2 EHT") 22-23, 41, 51, 61-63.)  Counsel unreasonably ignored the most compelling of this evidence in his argument to the court.

For example, he did not tell the court that during the interview with Monsue, Ryan was inconsistent with respect to whether Mrs. Lisker was home when he said he went to the Lisker house on March 9, and the inconsistency appeared to depend on how Monsue framed questions to him, *i.e.*, whether Monsue was accusing Ryan of involvement in the murder.  (EHT II 146-48; *see* Exh. 48, at 7 (victim was home), at 12 (victim was not home), at 14 (victim was home).)  Counsel also did not tell the court that Ryan left California the day after the murder.  (Exh. 48, at 9.)

Although in the first trial Mulcahy mentioned that Monsue told Ryan he appeared to have spent more money than he had, counsel did not explain the specifics or the significance of this observation, which was that money was missing from the victim's purse.  (ART 390-91.)  In fact, Monsue was correct that Ryan's explanations did not add up and Monsue pressed Ryan on this subject, at least to some degree.  (Exh. 48, at 9-12, 16-17, 27-30.)  But counsel did not explain this issue to the trial court in any helpful way (certainly he did not place it in context by noting that *Petitioner* did not possess any of the stolen money); the court was left with only a vague reference to money.[13]

---

[12](...continued)
Lisker were living at that time.  (*See e.g.* Exhs. 42; 43.)

[13]  At the first evidentiary hearing here, it developed that some of the missing money may have
(continued...)

Counsel did not inform the court that Ryan lied about what time he checked into a motel on the day of the murder or that Ryan checked in under an assumed name. Even without being informed that the murder likely occurred around 11:00 that morning, Ryan told Monsue that he checked into a Hollywood motel at 11:00 a.m. on March 10. (Exh. 48, at 8.)  Earlier, Ryan told Detective Landgren that he checked into the motel at 10:00 a.m.  (Exh. 44.)  In fact, included in the "murder book" were the police notes showing that Ryan did not check in until 3:00 p.m. that day.  (Exh. 86, at 7.)

Counsel also did not tell the court that when Ryan checked into the motel on March 10, he did so under an alias, Mark Smith.  (Exhs. 44; 45; 47; 48, at 25.)  Ryan told Monsue he used the alias because he was scared after being in an altercation in which he stabbed a "colored guy."  (Exhs. 45; 48, at 8-9, 25.)  This explanation was not credible, however, as Ryan already had checked into the motel before he allegedly was involved in the knife fight.  (Exhs. 45; 48, at 8-9, 25.)  No innocent explanation for Ryan's lies was offered.[14]

Counsel therefore could have offered to the court, from the evidence already in his possession, a motive for Ryan to commit the crime (the theft of the money), his numerous lies indicating a consciousness of guilt (whether the victim was home when he visited, his false alibi of the motel check-in, his reason why he used an alias at the motel), and his flight out of State the day after the murder.  And in conjunction with the few items counsel did point out to the court (that Ryan went to the victim's house and was granted entry by the victim), the unmentioned facts significantly linked Ryan to the crime.  From the facts counsel possessed – but did not argue to the court – a jury could have determined

---

[13](...continued)
remained inside the victim's purse.  (EHT IV 44-48; Exh. 21.)  But that money was not the full amount given to the victim the night prior by her husband, meaning some money still was missing from the Lisker residence.  (*See* RT 223, 226.)

[14]  Mulcahy testified here that he did not recall sending an investigator to look into the motel receipt but that he did remember reading in the "murder book" about the motel receipt.  (2 EHT 30, 62.)

that Ryan had as much motive, means, and opportunity to commit the murder as did Petitioner.  Yet counsel mentioned none of them.

Respondent argues that counsel's performance was nevertheless reasonable and strategic.  As to the first trial, Respondent asserts that counsel did a proficient job of opposing the prosecution motion *in limine*.  (Answer, at 37, 44; Respondent's 11/21/08 Post-Hearing Brief, at 5-6.)  Specifically, Respondent says that Mulcahy provided the entire transcript and tape-recording of the Monsue/Ryan interview to the court and that the court read the transcript and listened to the tape.  (Respondent's 11/21/08 Post-Hearing Brief, at 5-6.)  As noted above, this assertion is unsupported by the record; the Court finds that counsel did not provide the judge with the Monsue interview.  Instead, counsel told the court only about some of the information in the interview and did not mention or explain the most compelling evidence therein.  By his failure to inform the trial court of the exculpatory evidence in his possession, Mulcahy lost his only opportunity to present the jury with a credible argument that someone other than Petitioner committed the murder.  And, when the court said that it would take the matter up again if defense counsel had further evidence and defense counsel produced none, except as indicated below, he led the court to believe that he had provided *all* the evidence he possessed suggesting Ryan's involvement.  This was not the case.

Of course, "[u]nder *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill," *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000), and in reviewing counsel's performance, this Court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.  Petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* (quotation omitted).  The Court acknowledges the difficulty of re-creating the atmosphere of 25 years ago, and the need to presume, absent strong evidence to the contrary, that counsel performed within constitutional limits.

Even judged under these strict standards, however, counsel's performance in opposing the *in limine* motion was objectively unreasonably under *Strickland*.  His performance was inexplicable; no logical reason has been suggested or is apparent why counsel would not alert the court to the most compelling evidence of Ryan's guilt. Counsel possessed the information and its introduction carried no downside for Petitioner's defense. Counsel's defense strategy was to show that Petitioner did not commit the murder. Therefore, introducing compelling evidence that another person did commit the murder should have been Petitioner's strongest potential defense, but counsel did not proffer the evidence he possessed in support of this defense.  Counsel's performance, given every benefit of the doubt, was objectively unreasonable and thus constitutionally deficient. *Rompilla v. Beard*, 545 U.S. 374, 387-89, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (counsel perform deficiently where they fail to examine and utilize critical, readily available evidence); *Belmontes v. Ayers*, 529 F.3d 834, 864-66 (9th Cir. 2008) (counsel performs deficiently where he fails to provide trier of fact with most compelling evidence in his possession, even if he offers some evidence and argument in defendant's favor); *Alcala v. Woodford*, 334 F.3d 862, 870-72 (9th Cir. 2003) (counsel performs deficiently where he possesses but does not present the strongest evidence to support his chosen defense theory); *Lord v. Wood*, 184 F.3d 1083, 1093-95 (9th Cir. 1999) (counsel performs deficiently where he fails to present the strongest evidence in his possession of the defendant's innocence based on counsel's unreasonable determination about the value of the testimony); *Hart v. Gomez*, 174 F.3d 1067, 1070-71 (9th Cir. 1999) (attorney performs deficiently where he fails to present known valuable exculpatory evidence); *and see Strickland*, 466 U.S. at 688 ("Counsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994)  (counsel performs deficiently where there is "nothing in the record, apart from the fact of [his] incompetence, that suggests even a colorable explanation for his conduct.").

But Petitioner was not convicted at the first trial, so the Court also must examine counsel's performance at the second trial. As noted, at the second trial counsel did not restate the evidence he relied on to oppose the motion in the first trial, except to note that Ryan was in the neighborhood the day before the murder and that the victim would have opened the door for him. (RT 10.) The only other step counsel took was to attempt to introduce Petitioner's own letter and/or statements to Monsue in which Petitioner suggested Ryan's guilt, a predictably futile effort as the contents of both were inadmissible hearsay. (RT 2-16.)

Respondent now argues that counsel's performance was reasonable because, at the second trial, counsel made a tactical decision *not* to oppose the prosecutor's *in limine* motion. Counsel's testimony in this Court implied at one point that he did make such a decision. He testified that, after Petitioner pleaded guilty and admitted his guilt to CYA authorities in the period between the two trials, and, according to counsel, never denied committing the murder, counsel could not ethically suggest Ryan's guilt and Petitioner's innocence. (2 EHT 46-47.) In fact the record shows, however, that counsel *did* attempt to do just that by opposing Rabichow's motion *in limine* and asking the court to consider Petitioner's own letter suggesting Ryan was the killer. Counsel also testified here that he presented Petitioner's letter in hopes of arguing that Ryan committed the murder. (2 EHT 47-48.)

And, even if the Court were to disregard the record and presume, as Respondent and Mulcahy suggest, that Mulcahy made a tactical decision not to oppose the motion *in limine*, that underlying decision would have been unreasonable. Merely labeling a decision "strategic" does not insulate it from Sixth Amendment review. *Sanders*, 21 F.3d at 1456 (labeling counsel's decision "strategy" does not demonstrate by itself the reasonableness of his tactics under *Strickland*); *United States v. Tucker*, 716 F.2d 576, 586 (9th Cir. 1983) ("Certain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective."). As Petitioner's defense attorney, Mulcahy had a duty to fully investigate and present a defense regardless of

whether Petitioner failed to proclaim his innocence, or pleaded guilty, or admitted his guilt to CYA authorities.

As the Ninth Circuit has explained:

> A defendant's admission of guilt to his lawyer does not absolve the lawyer of his duty to investigate the crime. The professional norms in existence [in the mid-1980's] and recognized by the Supreme Court clearly state that counsel must "explore all avenues leading to facts relevant to the merits of the case. . . . The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt. . . ." *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.) (internal quotation marks omitted)).

Strategic decisions based on information provided by the defendant are often reasonable and entitled to deference. *See, e.g.*, *Strickland*, 466 U.S. at 691, 104 S. Ct. 2052 ("Counsel's actions are usually based, quite properly, . . . on information supplied by the defendant."). However, counsel must consider all of the defendant's statements, not just those that make his job easier. Even if we were to give credence to the State's dubious allegation that [the defendant] confessed to [counsel], which we do not, the glaring inconsistencies in [the defendant's] reported accounts of the murder made it unreasonable for [counsel] to rely on any one of [the defendant's] statements in isolation when making tactical decisions about investigating the crime.

*Duncan v. Ornoski*, 528 F.3d 1222, 1238-39 (9th Cir. 2008), *pet. for cert. filed* (Nov. 24, 2008) (No. 08-7440) (review sought by petitioner/prisoner); *and see* ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980) ("The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."); *Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g.*, ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable. . .); *Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1256 (W.D. Wash. 1994) ("The duty to investigate is not eliminated by the client's own conclusions or admissions of guilt, because the client's beliefs may not coincide with the necessary elements of proof to establish guilt in law.").

This is all the more true when, as here, Petitioner had an obvious and weighty strategic incentive to admit his guilt in order to obtain a placement in the Youth Authority for the limited time of approximately seven years, as compared to the 25 years-to-life sentence he faced if convicted of first degree murder (or the 16 years-to-life sentence he received for his second degree murder conviction). *See Lisker v. Knowles*, 463 F. Supp. 2d at 1029-30, 1040-41. Counsel even testified here that he would have informed Petitioner that a sentence of life with parole actually would have meant a lifetime in prison, as parole was rarely granted, further increasing Petitioner's incentive to plead guilty regardless of his actual guilt or innocence. (2 EHT 41, 78.) In addition, and as this Court also previously has found, Petitioner's admissions in conjunction with his strategic plea were anything but convincing evidence of his guilt: they were truncated or inconsistent descriptions of the crime and often contained no details at all about the murder, *Lisker v. Knowles*, 463 F. Supp. 2d at 1029-30, 1040-41, rendering them an unreliable barometer of what actually happened.

Despite all of this, counsel's testimony in this Court showed that he assumed Petitioner's statements to CYA authorities were truthful and that he therefore believed that any later suggestion that Petitioner was not the murderer – or apparently even any

investigation of a third party – would be unethical (although, as noted, apparently not to such an extent that it prevented him from presenting Petitioner's letter to argue that Ryan was the murderer. (2 EHT 46-47; *see also* Respondent's 11/21/08 Brief, at 18.)  A defense attorney may not present evidence where counsel has a "firm factual basis" for concluding that it is false, *Lord*, 184 F.3d at 1095 n.9, but for all the reasons discussed above, Petitioner's statements did not by themselves provide a "firm, factual basis" to conclude that evidence of Ryan's involvement would have been false.  A mere belief in Petitioner's "guilt certainly [could not] create an ethical bar against introduction of exculpatory evidence." *Id.*  Therefore, a decision to abandon opposition to the prosecutor's motion, to the extent it even could be labeled "strategic," would have been so unreasonable as to constitute deficient performance.[15]

In fact, however, counsel did attempt to oppose the prosecution's motion *in limine*, but his efforts were inadequate.  As noted, counsel ignored many pieces of compelling evidence already in his possession and instead made confusing and ineffective arguments based on unimportant, irrelevant, and/or inadmissible information.  Importantly, his arguments rested on a basic misunderstanding of California evidentiary law, which precluded the admission of all of his newly proffered evidence.  *Williams v. Taylor*, 529 U.S. at 395 (counsel performs deficiently where his actions are based on mistaken interpretation of State evidentiary law); *United States v. Span*, 75 F.3d 1383, 1389-90 (9th Cir. 1996) (defense counsel performs deficiently where his actions are based not on strategy, but on misunderstanding of the law); *Cheung v. Maddock*, 32 F. Supp. 2d 1150, 1161 (N.D. Cal. 1998) (counsel performs deficiently where, based on his misunderstanding of California evidentiary law, he does not introduce third party's inculpatory statement).

---

[15] In fact, counsel was nearly unwilling to admit that Petitioner actually *never* confessed his guilt to him. When asked directly by counsel for Respondent whether Petitioner ever admitted to counsel that "he did it," counsel evaded, "He never denied it." (2 EHT 43.)  The Court told counsel that he had not answered the question put to him.  (*Id.*)  He responded, "I understand," then paused before eventually stating, "The answer is no." (*Id.*)  There does not appear to this Court to be any good reason why counsel would hesitate to answer this question.

In sum, it is clear that counsel *did* attempt to present a third-party defense at the second trial.  Therefore, Respondent's suggested explanation for why counsel decided *not* to present a defense – that Petitioner admitted his guilt– is irrelevant.  And, even if the Court examines this rationale, it does not withstand any level of scrutiny in light of counsel's duty to defend his client.  Finally, presenting an opposition to the prosecutor's motion in the way counsel did – based on a misunderstanding of State evidence law and with little to no support from the evidence in his possession – was deficient performance.  For all these reasons, counsel performed deficiently with respect to his presentation of this potential defense, that someone else (Ryan) committed the murder.  *Strickland*, 466 U.S. 668; *Belmontes*, 529 F.3d at 865-66; *Alcala*, 334 F.3d at 870-72.

**2.      Counsel Performed Deficiently by Failing to Further Investigate Ryan's Involvement**

Petitioner also argues that counsel should have further investigated Ryan's involvement: counsel should have examined the shoe prints at the Lisker house and the autopsy photos and should have obtained the Lisker phone bill and Ryan's criminal record.  Had he done so, counsel would have discovered further compelling evidence linking Ryan to the crime.

Had counsel obtained the Liskers' phone bill from Petitioner's father Robert Lisker, he would have discovered a critical link between Ryan and the scene of the crime.  Although Ryan told Monsue that he went to the Liskers' house to use the telephone on March 9, 1983 (EHT II 143-44; Exhs. 45; 48, at 7), the Liskers' telephone bill showed that, at 10:22 a.m. on March 10, 1983, the date of the murder, a maximum one-minute call was placed to a phone number different by one digit (and without the area code) from Ryan's mother's number.  (EHT II 145-46, 162; Exhs. 39; 40.)  Ryan's mother had no memory of speaking on the phone with, or even meeting, Mrs. Lisker.  (Exh. 107.)  There was no call made to Ryan's mother on March 9, the day Ryan *said* he went to the Liskers' home to use the phone.  (EHT II 144-45; Exhs. 39; 40.)

Counsel testified in this Court that he had sought a copy of the Lisker phone bill in order to challenge Robert Hughes' testimony regarding the order in which Petitioner placed calls after discovering his mother's body. (2 EHT 56.) Counsel also testified that a phone call placed at the time the one was made (nearly) to Ryan's mother's phone number would have been relevant to the defense and should have been investigated. (2 EHT 57.) It is entirely unclear to this Court why counsel would have had any difficulty in obtaining the bill, as he was in regular contact with Petitioner's father Robert Lisker, even discussing possible defenses with him, (*see* 2 EHT 27), and, of course, could have subpoenaed the bill from the phone company if Mr. Lisker did not have it.

Counsel also easily could have discovered and presented to the court, but did not, evidence that Ryan had a significant and violent criminal record both prior to and after 1982, including vicious crimes committed with knives. (EHT II 156-62; *see also* Exhs. 49-53; 59.) Counsel testified in this Court that after the trial court granted the first *in limine* motion, he investigated Ryan's criminal background. (2 EHT 32-33.) Whether he investigated it or not, counsel did not inform the court of Ryan's violent criminal past, which potentially could have been admitted at trial. CAL. EVID. CODE § 1101(b) (1985); *People v. Rivera*, 41 Cal. 3d 388, 392, 221 Cal. Rptr. 562 (1985); *People v. Brown*, 119 Cal. App. 3d 116, 134-35, 173 Cal. Rptr. 877 (1981).

If counsel had investigated Ryan's criminal record, he also could have discredited Ryan's statement to Monsue that he came to California in early March 1983 from Mississippi to join "Job Corps" and that he always planned to return to Mississippi. (EHT II 140-41; Exh. 48, at 5.) In fact, Ryan was on probation in Mississippi and that probation was transferred to California so that he could live with his mother here; Mississippi officials placed Ryan on a bus to California. (EHT II 141-42.) There was no reasonable explanation for why Ryan left California the day after the murder.

Finally, a new pivotal aspect of the claim arose from the 2005 evidentiary hearing in this Court: the shoe print evidence. At Petitioner's 1985 trial, the prosecution presented evidence that only Petitioner was in the house at the time of the murder; with the

exception of shoe prints left by the paramedics on the front porch, only Petitioner's shoe prints were found in or around the house. (RT 1121, 1195.) Detective Monsue testified that bloody shoe prints found in the guest bathroom and in front of and facing the kitchen sink, and shoe print impressions found outside in the dirt, "resembled quite closely" Petitioner's Pacer brand of shoes, which had a "similar pattern on them." (RT 278-79, 300-06, 326.) The jury was shown photographs of the prints in the guest bath and outside the house; no photographs were taken of the bloody print left in front of the kitchen sink. (*See* RT 304-05.) The shoe print found in front of the kitchen sink was important to the prosecution case because it discredited Petitioner's statement to Monsue that he had not approached the kitchen sink the morning of the murder. (RT 307, 326.) No shoe print expert was utilized by the police in the investigation or called as a witness by the prosecution; only Detective Monsue offered his opinion that the shoe prints were a match for Petitioner's Pacers. (*See* RT 326, 423-26, 468-69, 1121, 1195.) Prosecutor Rabichow stressed in closing that the prints were a match for Petitioner's shoes; he told the jury: "Only his footprint is in the blood."[16] (RT 1121.)

        At the first evidentiary hearing here, Petitioner demonstrated conclusively that the shoe print evidence actually was exculpatory; Petitioner did not leave the bloody and muddy prints at the murder scene. *See Lisker v. Knowles*, 463 F. Supp. 2d at 1022-24. As this Court found, in 2004, Ronald Raquel, a criminalist with the Los Angeles Police Department for 19 years, analyzed photographs of the shoe impressions the prosecution argued were made by Petitioner's shoes.[17] (EHT I 185-88; Exhs. 6; 11; 65; 68.) Raquel concluded that the shoe impression left outside in the dirt ("print B") actually contained the

_____

[16] At trial, the defense called two Los Angeles police officers to testify that Petitioner exhibited concern for his mother when they arrived at the scene. (*See* RT 829-35, 866-71.) Responding to one of the first questions from prosecutor Rabichow on cross-examination, each testified that he had been careful not to disturb the scene and had been careful not to step in blood. (RT 855-56, 874.) Rabichow suggested that the officers would not have left these shoe prints because "they preserved the scene." (RT 1121.)

[17] Obviously, no analysis was possible of the print allegedly left in the kitchen as it was never documented in a photograph or otherwise.

impressions of two different shoes.  (EHT I 188-89; Exhs. 6; 11; 14; 65; 67.)  One of these prints, labeled by the parties "print B-1," was consistent with Petitioner's shoes, but the other print, labeled "print B-2," was made by a shoe with a herringbone pattern and could not have been made by Petitioner's Pacers, which had a wave pattern on the sole.  (EHT I 188-90; Exhs. 6; 11; 14; 65; 67.)  Raquel concluded that the bloody shoe print left in the guest bathroom ("print G") was made by a shoe with a herringbone pattern and also could not have been made by Petitioner's shoes.  (EHT I 190; Exhs. 6; 11; 14; 65; 66.)  Raquel concluded that the shoes which left prints B-2 and G had a similar herringbone design; the prints could have been made by the same shoes.  (*Id*.)  Raquel's supervisor concurred with his findings.  (EHT I 190.)

Called as a witness by Respondent, FBI Analyst Sandra Wiersema, an expert working exclusively in shoe prints and tire tread evidence, agreed in a 2005 report with Raquel's findings that print B-2 and G had characteristics similar to one another and could not have been made by Petitioner's shoes.  (EHT IV 54-64, 69-71; Exh. 15.)

To cast doubt on Petitioner's suggestion that the shoe impressions were left by the perpetrator of the crime, Respondent introduced the testimony of former Los Angeles police officers DeRousseau and Prado, the two officers who first responded to the crime scene in 1983.  (EHT III 9-22, 42-43.)  Both claimed in 2005 to remember details not contained in their 1983 written reports or mentioned in their 1985 trial testimony about their two to three minute "protective sweep" of the Lisker house.   (EHT III 52.)  Conversely, it appeared to the Court that neither officer remembered the victim's name correctly or at all.  (EHT III 6, 37.)

Both officers testified at the 2005 hearing, in accordance with their testimony at trial, that they attempted not to disturb the crime scene or step in blood.  (EHT III 10, 21, 44, 52.)  DeRousseau testified here, however, that he could now see in crime scene photographs blood stains on the carpeting in the house that he independently remembered he did not see at the time.  (EHT III 34-35; Exh. 64, at 93-95, 101, 103.)  Prado did not go this far, but did testify that many times, officers cannot see blood on the floor or in carpet.

(EHT III 44.) DeRousseau testified that during the initial protective sweep, he "probably" stepped in blood. (EHT III 10.) Prado reluctantly answered that he avoided stepping in that blood near the victim's body but also testified that it was possible he left the bloody shoe print in the guest bathroom even though he didn't notice himself leaving bloody shoe prints at the time. (EHT III 46, 54-56.)

Both officers testified here that in their March 10 protective sweep, they entered the guest bathroom where print G was found. (EHT III 12-13, 42-43.) In their reports written on March 10, 1983, however, neither officer indicated that he had entered the guest bathroom. (EHT III 28-29, 50-51; Exh. 86, at 365-365a, 366-67.) Nor did either officer testify at trial, when asked which rooms he searched, that he entered the guest bathroom. (*See* RT 838-39, 869, 874-75.) DeRousseau explained that he never said he entered that bathroom because nobody ever asked him specifically whether he searched that bathroom – even though he was asked which rooms he searched. (EHT 25-28.) He also testified here that he went outside to search, although Prado did not see him do so, and therefore that his shoes could have made the impression in print B-2. (EHT III 15-16; Exh. 67.)

The officers' testimony regarding their search was not credible for many reasons, not the least of which was their claimed ability to remember minute details such as whether they noticed specific blood stains during their quick search 20 years prior. This Court also was troubled by the fact that the officers' reports and trial testimony were at odds with their testimony here. (*See* EHT III 23-30.) Of course, neither officer remembered anything about the shoes he wore that day, so any suggestion that one of the two left the prints would be pure speculation. (EHT III 13-14, 45, 54-55.)

Petitioner demonstrated to this Court that the bloody shoe print in the guest bathroom and one of the shoe impressions in the dirt outside the house were left by someone other than himself, disproving the State's 1985 theory of his guilt. Moreover, given the officers' lack of credibility on this point, it appears likely that the shoe prints were not left by police personnel. There is no suggestion that any other official party might

1   have left the prints.  The importance of the shoe print evidence, as conceded by prosecutor

2   Rabichow, is that it is inconsistent with the prosecution's argument at trial that Petitioner

3   committed the murder by himself.  (*See e.g.* EHT I 39-42.)

4         Petitioner suggested one more shoe print has been found as well.  In reviewing

5   autopsy photographs as part of a recent investigation of Petitioner's case, Los Angeles

6   police officer Albert James Gavin noticed what appeared to him to be a shoe impression

7   on the victim's head.  (EHT II 188.)  He contacted Raquel with the information.  Raquel

8   reported to Gavin that the impression on the victim's head, which measured 1.5 inches by

9   .5 inches, was made by a shoe.  (EHT I 193, EHT II 23-24, 35-36; Exhs. 12; 14; 16, at 1,

10  3.)  Raquel testified here, "I do foresee that there is a possibility out there in the world that

11  there is a tool [that could make this impression].  I haven't seen it yet.  But I do see shoe

12  prints, and this is similar to what I see in shoe comparison."  (EHT II 26.)

13        Respondent disputes that the impression on the victim's head was made by a

14  shoe, and conjectured that the impression might have been made by another tool used to

15  bludgeon the victim.  However, Steven Dowell, a tool mark expert for the Los Angeles

16  County Coroner's office, did not determine any specific tool that could have or did produce

17  the impression; he was provided with no such implement by the State.  (EHT V 37-43.)

18        Raquel concluded that the impression on the victim's head could not have

19  been made by Petitioner's shoe; it had no characteristics in common with the Pacer shoe.

20  (EHT I 193-96, EHT II 17-18, 38; Exhs. 12; 14.)  The impression, however, had

21  characteristics in common with prints B-2 and G; it appeared to be a herringbone pattern

22  with similar spacing between the lines.  (*Id.*)

23        While FBI analyst Wiersema did not find anything to suggest the mark was

24  made by a shoe, presumably aside from the fact that it matched to a degree the known shoe

25  prints in this case, she also could not conclude it was not a shoe print; she was provided

26  with no implement by the State which might have made the impression.  (EHT IV 77-78,

27  94-96.)  In comparing prints B-2 and G with the impression on the head using one of the

28  autopsy photographs, Wiersema concluded that the spacing between lines did not match.

(EHT IV 73; Exh. 16, at 1.)  Using a different autopsy photograph, however, which showed a ruler closer to the impression on the victim's head and therefore may have offered a more reliable measurement of the marking, the spacing between the lines in prints B-2, G, and the head impression was the same.  (EHT IV 74-77, 90-93; Exhs. 15, at 11; 71, at 2-3.) Because no other measurements could be made, Wiersema could not conclude the three prints were made necessarily by the same item.  (EHT IV 94.)

Of course, both officers testified that they did not step on the victim's head or any other part of her body.  (EHT III 21, 32-33, 56.)  Rabichow testified that at trial, he was not aware of the patterned impression on the victim's head; he had not previously reviewed the autopsy photograph showing the mark.  (EHT I 36-38.)  Dr. Golden, who performed the autopsy of the victim, and who testified at trial, testified here that the most severe injury to the victim's head was a fracture on the right side to the base of the skull, presumably near the location of the impression similar to the shoe prints in prints B-2 and G; the mark near the ear was noted in the March 1983 autopsy.  (EHT IV 166-72; Exhs. 72, at 4; 73, at 5.)

In sum, the shoe print evidence significantly bolsters an argument that someone other than Petitioner killed the victim.  *Lisker v. Knowles*, 463 F. Supp. 2d at 1023.

Defense Investigator Sue Sarkis, who assisted Mulcahy for a time, testified here that she believed the shoe print evidence warranted further investigation and that she referred counsel to a shoe print expert.  (2 EHT 100, 102, 111-12.)  She testified that counsel did not investigate the shoe print evidence further, however.  (2 EHT 100-03.) Counsel testified that he had no recollection of Sarkis's recommending a shoe print expert and that he could not remember whether he conducted any investigation of the shoe print evidence.  (2 EHT 73, 122-23.)

If counsel did conduct any of these investigations, then at least he should have attempted to introduce their results at trial.  There would have been no valid reason to keep any of the investigations from the court; all of the findings would have been critical to the

defense.  As to the shoe print evidence in particular, every police official who analyzed the prints – besides Detective Monsue – has agreed that they could not have been made by Petitioner's shoes.  If counsel did conduct these investigations, then his failure to present his findings to the court constituted deficient representation.  *Strickland*, 466 U.S. 668; *Belmontes*, 529 F.3d at 865-66; *Alcala*, 334 F.3d at 870-72.

And, in fact, while it is not surprising that memories on this point might differ after so many years, the evidence here shows that counsel did not conduct any of the above investigations.  It is inconceivable that counsel would have conducted an investigation into any of these items but not made a record of them in Petitioner's defense.  Counsel testified here that all investigative reports would have been included in the case file which he turned over in its entirety to Robert Lisker.  (2 EHT 79-80.)  At the hearing, counsel agreed that a receipt provided to Robert Lisker listed each item that was given to Mr. Lisker.  (2 EHT 80-81; Exh. 158.)  The list does not include any investigative reports; it includes only transcripts.  (*See* Exh. 158.)  If this file would have included all investigative reports, as counsel testified, and if this summary was an accurate representation of the contents of the file, as counsel agreed it was, then the Court can only conclude that no investigative reports were generated by the defense.

The State does not offer any rationale for counsel's actions other than that discussed above in conjunction with his failure to present the evidence already in his possession – counsel did not want to offer perjured testimony following Petitioner's admissions during the plea and CYA proceedings.  For all the same reasons discussed above, that rationale was an objectively unreasonable basis for conducting no investigation of Ryan's involvement.  *Duncan*, 528 F.3d at 1238-39; *see also Baylor v. Estelle*, 94 F.3d 1326, 1323-24 (9th Cir. 1996) (counsel performs deficiently where he does not investigate exculpatory evidence even in the face of defendant's detailed confession to police).

Counsel's only proffered defense at trial was that Petitioner did not commit the murder, and his failure to suggest an alternative perpetrator was damaging to that defense, as Rabichow argued to the jury.  (*See* RT 1117-21.)  Such a failure would be

excusable if no likely alternate suspect existed, but here, counsel not only could have pointed out such a suspect, he could have presented strong evidence that that suspect, Michael Ryan, committed the crime.  Counsel already possessed substantial evidence linking Ryan to the commission of the crime, and the information in the case file would have led a reasonably performing attorney to conduct a further investigation of Ryan's involvement.  The Ninth Circuit has

> repeatedly held that "[a] lawyer who fails adequately to investigate and introduce . . . [evidence] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999) (holding that counsel's failure to review key documents corroborating defense witness's testimony constituted deficient performance); *see also Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002) (holding that counsel's failure to investigate evidence that defendant's brother was the shooter constituted deficient performance); *Lord v. Wood*, 184 F.3d 1083, 1095-96 (9th Cir. 1999) (holding that counsel's failure to call key witnesses whose testimony undermined the prosecutor's case constituted deficient performance); *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994) (holding that counsel's failure to investigate evidence that someone else was the killer constituted deficient performance).  "The failure to investigate is especially egregious when a defense attorney fails to consider potentially exculpatory evidence." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002); *see also Harris v. Wood*, 64 F.3d 1432, 1435-37 (9th Cir. 1995) (holding that counsel's failure to retain

an investigator and interview many of the individuals identified
in the police reports was deficient performance).

*Duncan*, 528 F.3d at 1234-35.  Especially given the nature of the case against Petitioner,
counsel's failure to conduct a thorough investigation of Ryan was objectively
unreasonable.  *Strickland*, 466 U.S. at 691 (counsel "has a duty to make reasonable
investigations or to make a reasonable decision that makes particular investigations
unnecessary"); *Duncan*, 528 F.3d at 1234-39 (finding counsel performed deficiently where
he declined to investigate blood evidence based on defendant's admission that he was at
the murder scene and counsel's fear that test results might further tie defendant to the
crime).

Counsel's failure to investigate also makes his decisions about what evidence
to present to the court less reasonable as well, as they were made after less than thorough
investigation. "[D]ecisions that are made before a complete investigation is conducted are
reasonable only if the level of investigation was also reasonable." *Duncan*, 528 F.3d at
1234; *accord Sanders*, 21 F.3d at 1456.  As the Supreme Court held in *Wiggins v. Smith*,
539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003):

> Our opinion in *Williams v. Taylor* is illustrative of the
> proper application of [the *Strickland*] standards.  In finding
> Williams' ineffectiveness claim meritorious, we applied
> *Strickland* and concluded that counsel's failure to uncover and
> present voluminous mitigating evidence at sentencing could not
> be justified as a tactical decision to focus on Williams' voluntary
> confessions, because counsel had not 'fulfill[ed] their obligation
> to conduct a thorough investigation of the defendant's
> background.'" 529 U.S. at 396, 120 S. Ct. 1495 (citing 1 ABA

Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980)).

*Wiggins*, 539 U.S. at 522.

### 3.    Petitioner was Prejudiced by Counsel's Failure to Investigate and Present a Third-Party Culpability Defense

As noted above, California law in effect at the time of Petitioner's trial provided that evidence of third-party culpability was admissible "only if it constitutes substantial evidence tending to directly connect that person with the actual commission of the offense." *Hall*, 41 Cal. 3d at 831 (quotation omitted); *Mendez*, 193 Cal. 39; *Arline*, 13 Cal. App. 3d 200; *Perry v. Rushen*, 713 F.2d at 1449.  What was lacking from counsel's presentation, therefore, was evidence linking Ryan to the commission of the crime.  *See Mendez*, 193 Cal. 3d at 51 (although it is "always proper to show that some other person, and not the defendant, committed the crime with which he is charged," in order to do so, defendant must connect the third party to the commission of the crime) (citation omitted); *Arline*, 13 Cal. App. 3d at 203-04 (defendant must offer "competent and substantial proof of a probability" that a third party committed the crime); *Green*, 27 Cal. 3d at 22-23 (evidence of third-party's opportunity and general criminal disposition is insufficient without more to allow introduction of third-party culpability evidence); *People v. Whitney*, 76 Cal. App. 3d 863, 869-70, 143 Cal. Rptr. 301 (1978) (quoting *Arline*).

Petitioner has shown that the following evidence linking Ryan to the commission of the crime could have been presented had counsel conducted a reasonable investigation and offered a coherent argument to the court: (1) There was a maximum one-minute phone call placed from the Lisker residence very near the time of the attack on the victim.  The phone number dialed was one digit off (and without an area code) from Ryan's mother's number.  Ryan's mother stated that she did not meet or speak on the phone with the victim.  (2) Ryan told Monsue that he went to the Lisker house to use the phone the day

before the murder.  A similar phone call was not placed the day before the murder.
(3) Without being told any details about the murder, Ryan twice concocted an alibi for 10
or 11 a.m., the time of the murder, when he told police he checked into an area motel at that
time.  This was a lie.  Ryan checked in at 3 p.m. on the day of the murder.  (4) Ryan
checked into the motel using an alias.  When he lied to police about why he did so, he also
claimed to have been in a knife fight on the day of the murder.  (5) Ryan left the State the
day after the murder.  (6) Ryan lied about why he came to California (days before the
murder) and about why he returned to Mississippi (the day after the murder).  (7) Ryan
used more money than he told police he had during the trip to California.  At least some
money missing from Mrs. Lisker's purse never was recovered; it was not found on
Petitioner or at the crime scene.  (8) Mrs. Lisker knew Ryan and would have allowed him
to enter her house.  There was no sign of forced entry at the Lisker house.  (9) Shoe prints
at the crime scene (and possibly on the victim's head) were not made by Petitioner.  There
is no credible suggestion that they were made by police personnel.  (10) Ryan had a violent
criminal history, including crimes committed with knives both before and after the attack
on Mrs. Lisker.  (11) Ryan was inconsistent in his police interview about whether he saw
Mrs. Lisker at her house the day before the murder.

This evidence, taken as a whole, linked Ryan to the commission of the crime.
It was more than evidence of *mere* motive or opportunity; it constituted "competent and
substantial proof of a probability" that Ryan was involved in the crime.  Along with the
evidence already in counsel's possession showing a motive for the crime, Ryan's many,
critical lies indicating a consciousness of guilt, and his flight after the crime, the easily-
discoverable evidence showed Ryan's opportunity or means to commit the crime in the
phone call made nearly to his mother's number at the time of the crime, the shoe prints at
the crime scene not belonging to Petitioner, and the evidence of Ryan's previous crimes.
In sum, had counsel presented all of the evidence available to him in opposition to the
prosecution's motion, the trial court likely would have, under State law, allowed the
defense to introduce evidence suggesting that Ryan, not Petitioner, committed the murder.

*See Mendez*, 193 Cal. at 51; *Arline*, 13 Cal. App. 3d at 203-04; *see also Hall*, 41 Cal. 3d at 833 (trial court erred in excluding evidence of third party's guilt where his statements evidenced knowledge of facts of crime and evidence at crime scene suggested he could have been present there); *and compare People v. Perry*, 104 Cal. App. 3d 268, 270, 163 Cal. Rptr. 522 (1980) (third-party culpability evidence not admissible where it consisted only of other's commission of similar crimes and where identification of defendant demonstrated third party's non-involvement).

Once the third-party evidence was admitted, it is reasonably likely that it would have been sufficient to create reasonable doubt in the minds of the jurors. *See Duncan*, 528 F.3d at 1239-40 ("In determining whether a defendant was prejudiced by counsel's inadequate representation, we examine the evidence that could have been presented to the jury had counsel performed competently and compare that to the evidence that the jury actually heard."). In sum, the evidence admitted in Petitioner's case was the following: Robert Hughes recounted Petitioner's jailhouse confession but was not credible, as this Court already has found. *Lisker v. Knowles*, 463 F. Supp. 2d at 1025-27. Petitioner had a plausible explanation for his actions at the house which were not by themselves indicative of guilt. Petitioner had some blood on his clothing but it did not prove his guilt, according to the State blood-spatter evidence.[18] There was money missing from Mrs. Lisker's purse but it was never found on Petitioner or anywhere at the scene.[19] The jury was told that only one person was responsible for the murder and that all of the shoe prints

_____

[18] As noted, on direct appeal in 1988, the State court denied relief on Petitioner's *Miranda* claim because it found the violation harmless. (Motion to Dismiss, Exh. B, at 28-29.) In particular, the court found that the blood evidence – showing Petitioner had a total of seven drops and a small number of smears of blood on his person – proved Petitioner's guilt. (*Id.*, at 29; *see also* RT 735-44, 767-68.) The police blood-spatter expert who testified at Petitioner's trial did not make this same assertion. (*See* ART 471, 478; RT 698-753.) In his testimony here, he specifically stated that his analysis did *not* support the State appellate court's conclusion. (EHT III 87); *see also Lisker v. Knowles*, 463 F. Supp. 2d at 1024-25.

[19] As noted, some of the missing money actually remained in the victim's purse. The evidence here showed that none of the missing money ever was found at the Lisker house, contrary to Detective Monsue's report to parole authorities years later. *See Lisker v. Knowles*, 463 F. Supp. 2d at 1028-29.

found at the scene belonged to Petitioner, the sole murderer, but this was not the case. Finally, the jury had before it evidence of Petitioner's "crucial lie" (that he saw his mother from outside the house), indicating, according to the prosecution, Petitioner's consciousness of guilt.  As discussed below, however, that evidence, too, was false.  In many ways, the evidence against Ryan was the equal of the evidence against Petitioner. Even without being told of an alternative perpetrator, the jurors deliberated for nearly three days after hearing ten days of evidence in Petitioner's trial.  (*See* CT 255-68, 369.)

In the face of the relatively weak evidence of Petitioner's guilt, it is reasonably likely that, had the jury been offered a plausible alternative suspect (and been told that shoe prints at the scene were not made by Petitioner), the jurors would not have convicted Petitioner of murder.  *Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the verdict."); *Duncan*, 528 F.3d at 1239-47 (finding defendant prejudiced by counsel's failure to introduce exculpatory blood evidence suggesting defendant was not the actual killer where the prosecution theory at trial was that only one person was at the scene of the crime at its commission); *Lord*, 184 F.3d at 1095-96 (defendant prejudiced where "counsel had at their fingertips information that could have undermined the prosecution's case, yet chose not to develop this evidence and use it at trial"); *Baylor*, 94 F.3d at 1324-25 (defendant prejudiced by counsel's failure to investigate and present exculpatory blood evidence even where defendant gave detailed confession that was corroborated by victims' version of the crime).

Petitioner is entitled to relief on his claim that counsel was ineffective in failing to investigate and present third-party culpability evidence.  *Strickland*, 466 U.S. 668.

## VII.

## FALSE EVIDENCE

In his third claim, Petitioner argues that the prosecution violated his due process rights when it introduced false evidence at his trial, specifically:  (1) that the

weather and the victim's position in the house prevented Petitioner from seeing the victim through the back windows; and (2) that Petitioner was the one who left shoe prints at the crime scene. (Second Amended Petition, at 6, att.; Traverse, at 66-76.) This claim was presented to the California Supreme Court for the first and only time in Petitioner's 2007 habeas petition. (*See* Petitioner's Bail Motion, Exh. D, at 75-83.) The California Supreme Court rejected the 2007 petition on procedural grounds, and therefore it did not review this claim on its merits. Because there is no State court decision to which this Court may defer, this claim must be reviewed *de novo*. *Pirtle*, 313 F.3d at 1167-68; *Tanner*, 493 F.3d at 1139.

## A.    The Evidence At Trial

### 1.    The Morning of March 10 was Bright and Sunny

As noted, Petitioner did not testify at his trial but his statements were introduced in a tape of his interrogation by Detective Monsue and, to a lesser extent, through reports by other officers. (*See* Exh. 86, at 158-209; RT 321, 833, 868-71.) In his statement to Monsue, Petitioner said that he went to his parents' house to fix his car and became suspicious that something was wrong when his mother did not answer his knock at the front door. (Exh. 86, at 158-59.) Petitioner went to the back of the house to try to look inside. (Exh. 86, at 160.) Petitioner looked first through a back living room window, from which he thought he was able to see his mother's feet on the ground. (Exh. 86, at 170, 184.) Not sure what he had seen, Petitioner moved to the dining room sliding glass door, also on the back of the house, where he definitely saw his mother lying on the floor. (Exh. 86, at 170-71; RT 272, 347-55.)

According to the prosecution, Petitioner's assertion that he could see his mother from outside the house was his "most condemning lie," not only because it was false, but also because there was no reason to lie unless Petitioner was guilty. (RT 1082.) The State proved the assertion was a lie with evidence showing that the day of the murder, March 10, 1983, was a bright, sunny day and the glare from the sun made it impossible to

see into the house (*see* RT 268, 272-73, 971-72, 996-97), and that the victim lay in such a position that she was not visible from either the living room or dining room windows. (RT 272-73.)

Detective Monsue and police photographer Mike Wilson each testified that March 10, 1983 was a bright, sunny day and that there was therefore a bright glare on the back windows, making it impossible to see into the house as Petitioner said he did. (*See also* RT 489, 971-72, 984, 992-93.) Wilson took a series of photographs outside and inside the Lisker home on March 10, 1983, the day of the murder, and testified that he took the pictures at approximately 11:30 in the morning. (RT 971, 79.) The prosecution argued that the pictures showed the brightness of the sun on March 10 at the time of the murder. (*See* RT 971-72; *and see e.g.* Exh. 64, at 1-41.)

The prosecution also proved that there was a glare on the windows on March 10 with photographs Wilson took on March 23, 1983, 13 days after the murder, at 11:00 a.m. (RT 265-66, 972.) Monsue and Wilson both testified that March 23, 1983 was a bright, sunny day – just like March 10, 1983. (RT 265-66, 268-69, 976.) The photographs from March 23 showed a bright day and a corresponding glare on the windows. (*See* Exh. 74.)

## 2. The Victim's Body was not Visible from the Rear Windows

The prosecution also argued that Mrs. Lisker's body was positioned such that it would have been impossible to see her, even without a glare on the windows. When paramedics arrived at the scene, Mrs. Lisker's body was inside the foyer, lying in a pool of blood on an entryway rug. (RT 179, 184, 197-200.) Detective Monsue, who did not see the victim in the house and based his assessment of the victim's position on his interpretation of a sketch drawn by Petitioner during the "unMirandized" jailhouse interview, testified that the victim was in such a position that her body would not have been visible from the back windows. (*See* RT 272-73, 336-43, 358-59, 407, 431-35.) Rabichow

1  argued to the jury, based solely on Monsue's testimony, that the victim's body was not in

2  either of the lines of sight described by Petitioner.[20]  (RT 1086-92.)

3

4  **3.    Petitioner Left All of the Shoe Prints at the Murder Scene**

5  As explained fully in Section VI (B) (2) above, the prosecution proved, *via*

6  Detective Monsue's testimony, that only Petitioner left bloody and muddy shoe prints at

7  the crime scene.  Respondent contends that Monsue could not have testified falsely about

8  the shoe prints because he never actually said that Petitioner left any of the shoe prints. (*See*

9  Answer, at 77-78.)  This argument is disingenuous.  No shoe print expert was utilized by

10  the police in their investigation or called as a witness by the prosecution; only Detective

11  Monsue offered his opinion that the shoe prints were a match for Petitioner's Pacers.  (*See*

12  RT 326, 424, 469.)  The import of his testimony without a doubt was that the professional

13  opinion of the police was that Petitioner left the prints inside and outside the house.  If the

14  jurors had any doubt about the meaning of Monsue's testimony, Rabichow clarified it for

15  them in his closing argument:

16

17  Is there any evidence that there was any other person in

18  the house when the police arrived there?  Wouldn't you expect

19  a bloody footprint somewhere? The only bloody footprint is that

20  – there are some footprints outside, the same design and so forth.

21  We got the photographs.  You can look at Bruce Lisker's shoe.

22

23

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25      [20]  Robert Lisker testified that Monsue and his partner, Detective Landgren, assisted him in throwing away the blood-stained entry rug later in the day on March 10.  (RT 919-20.)  Monsue said he

26  left the rug at the Lisker house and did not do anything with the rug at any time, including taking it into evidence (RT 407-09), but notably in rebuttal did not contest Robert Lisker's testimony that he, Monsue,

27  threw the rug away on the day of the murder.  In fact, on cross-examination, Rabichow asked Robert Lisker only whether he had requested that the rug be thrown away, not whether it actually was thrown

28  away.  (RT 946.)

Footprint is in the bathroom.  A light one in the kitchen facing

the sink area.[21]

Another footprint leading out of the hallway up here by

the bathroom no. 2 with the same design as Bruce Lisker's gym

shoes.

If he is running through the house really quickly to look

for something and he had all of these footprints, why isn't there

an intruder's footprint somewhere? The only other footprint was

the same vibrim [*sic*] sole out here on the front porch by the

paramedics and we certainly know they were there before the

police came or at least, I mean, the police, the initial police

officers arrived, but they preserved the scene.  And the other

officers came there.  Only his footprint is in the blood.

(RT 1121.)  Clearly the State asked the jury to accept Monsue's testimony as expert police

testimony that only Petitioner left the shoe prints at the crime scene.  *See United States v.*

*Gutierrez*, 995 F.2d 169, 172 (9th Cir. 1993) (noting that "the expert testimony of a law

enforcement officer . . . often carries an aura of special reliability and trustworthiness")

(quotation omitted).

## B.    The Trial Evidence was False

Petitioner contends that all of this evidence was false and that the evidence

now before this Court proves that:  (1) the morning of March 10, 1983 was not bright and

sunny, and therefore there would have been no glare to make it impossible to see through

---

[21]  There was no photograph taken of this shoe print in the kitchen.  (RT 304-05.)  Therefore, even if the Court were to accept as reasonable Respondent's argument that the State did no more than ask the jurors to compare the photographs of the prints and Petitioner's shoe (which the Court does not), it would not explain away the impact of the print facing the sink, of which there was no photograph for the jury to judge.

the back windows at the Lisker house; (2) the weather on the morning of March 10 was not the same as the weather on March 23; (3) the crime scene photographs were not taken at 11:30 on March 10 but were taken later in the day when the weather had begun to clear; (4) the victim's body was visible from outside the house; and (5) the shoe prints at the crime scene were not all made by Petitioner. (*See* Second Amended Petition, at 6, att.)

In denying the Motion to Dismiss, the Court agreed with all of these assertions: the evidence introduced at Petitioner's trial was false. *See Lisker v. Knowles*, 463 F. Supp. 2d at 1018-24. Respondent's renewed criticisms of these factual findings (*see e.g.* Answer, at 69-86) do not cause the Court to alter them in any respect. They are repeated here for the sake of a full record.

### 1.    The Morning of March 10, 1983 was not Bright and Sunny

March 10, 1983 was not a bright, sunny day as Monsue and Wilson repeated many times at trial. At the first evidentiary hearing, Meteorologist Kenneth Clark provided meteorological charts and satellite images which demonstrated that the morning of March 10, 1983 between 10:30 a.m. and 11:45 a.m. in the area of the Lisker house was "pretty cloudy" to "overcast" and also hazy. (EHT I 150-51, 157-60, 166; Exhs. 18, at 2-3; 18A, at 2-3; 19, at 1.) From these charts and satellite images, Clark testified that the weather did not change significantly until sometime after 2:00 p.m., when the clouds moved away. (EHT I 161, 166-67; Exhs. 18, at 2-3; 18A, at 5; 19, at 1.) Clark testified that the clouds were of a high elevation on the morning of March 10, which would have allowed the penetration of more light than low clouds, but that these clouds also were thicker, all of which left only dull sunshine. (EHT I 158-59, 165-66, 182-83.) According to Clark, there would have been shadows cast that morning, but it was not "sunny" out, especially because there was haze in the morning as well. (*Id.*; Exhs. 18, at 2-3; 18A, at 3-4; 19, at 1.)

In response, Respondent introduced the testimony of Mike Wilson, the police photographer who took the photographs in 1983 and testified at Petitioner's 1985 trial.

(EHT II 65; Exh. 64.)  The sum of Wilson's testimony was that his photographs show that the morning of March 10, 1983 was "bright" and "sunny."

Wilson, however, did not take any photographs of the Lisker house on the morning of March 10, 1983; he was not even called to the scene until after noon.  (EHT II 85-86; Exh. 86, at 2, 10, 16.)  Wilson numbered his photographs in the order they were taken and the photograph shown on page 43 of Exhibit 64 (therefore, the 43rd photograph taken by Wilson on March 10, 1983) shows a clock with a time of 1:42.  (EHT II 67, 71; Exh. 64, at 43.)  Wilson testified that he could assume it took about one minute to take each photograph, so that he likely took his first photograph near 1:00 p.m. on March 10.  (EHT II 72-73; Exh. 64.)  This is in accordance with the police records which show that detectives were not notified until 11:35 a.m. and the photo department was not notified until 12:35 p.m.  (EHT II 85-86; Exh. 86, at 2, 10, 16.)

Wilson testified that the photograph on page two of Exhibit 64 (therefore, the second photograph taken by Wilson on March 10, 1983 and taken close to 1:00 p.m.) shows it was a sunny day because there are distinct shadows visible in the photograph.  (EHT II 67; Exh. 64, at 2.)  Clark testified that this same photograph was taken in the afternoon given the position of the sun in the sky, and that the visible sky comports with his weather reports; the sky was gray or white which does not suggest that it was a bright sunny day.  (EHT I 163-64, 171-74; Exh. 64, at 2.)

Mr. Clark's description of this photograph is far more accurate that Mr. Wilson's; the sky in the photograph is not blue.  Rabichow acknowledged this at trial, speculating that the photograph had been "overexposed."  Just as at trial, Wilson did not offer a similar theory in his testimony here.

The Court was troubled by Wilson's testimony here.  He testified that he now had, over 20 years later, an independent recollection of the view from outside the back windows into the Lisker house on March 10, 1983, and remembered that he "could see little or nothing inside the residence from outside" due to "[t]he reflection and the brightness level outside as contrasting to the lack of light inside." (EHT II 76-77.)  At trial

in 1985, however, when asked if he had a recollection of looking through this same window on March 10, 1983, Wilson answered, "I don't remember doing it."  (RT 987.)

Moreover, at trial, Wilson's answer to many questions on cross-examination was that he had no recollection of the particular photographs because it had been so long since he had taken them and he had taken so many other pictures since then.  (RT 979-89.) Here, Wilson also had no memory that he had returned to the residence and taken pictures there on July 1, 1983.  (EHT II 78-79; Exh. 16, at 4.)

Wilson also had an unreasonably hard time acknowledging that there might be, in general, different degrees of sunniness or cloudiness.  (EHT II 79.)  Wilson was asked to compare what appears to be blue sky visible in photograph 83, taken near 2:20 p.m., with the grey or white sky clearly visible in photographs 2 and 5, taken closer to 1:00 p.m.  (EHT II 80-81; Exh. 64, at 2, 5, 83.)  After a long pause, Wilson offered the following: "I would say that in 64:2 and 64:5, there are – there might have been some haze, but it was a bright, sunny day."  (EHT II 80-81; Exh. 64, at 2, 5, 83.)  Wilson similarly refused to acknowledge the hazy or gray sky in other earlier photographs as well.  (EHT II 81.)

Further, of course, is the serious misstatement in Wilson's 1985 testimony, which he agreed upon in advance, in discussion with unnamed persons, that he began taking photographs on March 10 at 11:30 in the morning.   When asked about this discrepancy, Wilson suggested that his testimony was that 11:30 would have been the time he received the call, not the time he went to the residence.  (EHT II 84).  Rabichow asked him at trial if he was misremembering the date.  (RT 991.)  Even Wilson's explanation here, of course, was wrong, as the photographic department was not notified until 12:35, an hour later.  (EHT II 85-86; Exh. 86, at 2, 10, 16.)

The evidence before this Court overwhelmingly showed that the morning of March 10, 1983 in the area of the Lisker home was not bright and sunny.  It was overcast, cloudy and hazy.

On the other hand, March 23, 1983, the date on which photographs were taken showing a bright glare on the back windows of the Lisker house, was without question a "bright, sunny day." According to the charts and satellite images provided and interpreted by Ken Clark, at 10:45 a.m. on March 23, there were only scattered clouds, which was a "considerable difference from the morning of March 10, 1983." (EHT I 168-69; Exhs. 18, at 5; 18A, at 8-9; 19, at 2.) According to Clark, the morning of March 23, 1983 was a "bright sunny morning" with "puffy little clouds." (EHT I 168-69.) In satellite photos, one can see almost all of the ground, which stands in contrast to the images from March 10. (EHT I 169; Exhs. 18A, at 8-9; 19, at 2.)

Wilson testified that he remembered being at the house on March 23, 1983 and taking the photographs there. (EHT II 73; Exh. 74.) Although this point was not developed, Wilson testified that he did not believe he had used a flash for the photograph looking through the sliding door on March 23 as he had on March 10. (EHT II 74-75; Exh. 64, at 10.) The photographs taken on March 23 looking through the back windows show a bright glare on the windows; they were taken looking directly in through the windows and sliding door on back of house. (EHT II 82; Exh. 74.) Wilson did not dispute that March 23 was "quite a bright day." (EHT II 83.)

In this Court's review of the photographs taken on the two days, there is a noticeable difference in the brightness of items outside the house, especially the pool and plants in the backyard. (*Compare* Exh. 74, at 1 *with* Exh. 64, at 9, 34.) On the other hand, photographs taken from outside the sliding door on March 23 show that even with the glare on that day, it was possible to see through all the way to the entryway of the house. (*See* Exh. 74, at 3-6.)

## 2. The Victim's Body was Visible from the Rear Windows

Whether Petitioner could have seen his mother from the backyard windows also depended on the placement of her body and the lines of sight from the two windows. Petitioner and Respondent offered testimony from reconstruction experts Frank Terrio (for

Petitioner) and Michael Varat (for Respondent) who agreed that they were able to determine, with various specialized techniques, the placement of specific objects inside the house such that they were able to theorize where Mrs. Lisker's body might have been lying on March 10. (*See* EHT I 115-19, EHT IV 104-27; Exhs. 20; 154; 155.)  The experts agreed on the placement of the entryway rug (and the blood stains thereon), the planter abutting the entryway, and the dining room table. (EHT I 115-20, 139-40, EHT IV 104-27.)

Terrio concluded that when he placed a model with her head in the position where the largest blood stain was located on the entry rug, in accordance with the prosecution theory at trial (*see* EHT I 102-03), the model's head and upper body were visible through the closed dining room sliding glass door from any vantage point over five feet. (EHT I 119-30; Exh. 20, at 16-17.)  Varat agreed that when the body was placed in this position, her head and upper body were visible through the dining room door. (EHT IV 137-39; Exh. 155, at 10.)  Varat concluded that the model's feet would have been visible from the living room window, while Terrio thought this view was inconclusive. (EHT I 130-31, EHT IV 138-39; Exh. 155, at 9.)

Varat also tested two other body placements; he labeled them the "Monsue version" and "Lovato version."  Varat concluded that only in the Monsue version would the victim's head not have been visible from the dining room window. (EHT IV 133-37; Exh. 155, at 3, 7.)  This placement of the body, however, is not supported by the reconstruction and placement of the entry rug and is not in accord with the prosecution's arguments at trial; Monsue himself never saw the victim at the scene.[22]  (RT 336-39, 358-59, 433-35; Exh. 86, at 13, 16.)

---

[22] As noted, Detective Monsue drew his conclusions about the victim's placement from his interpretation of Petitioner's statements to him during the first portion of the police interview, prior to when Petitioner was given his *Miranda* rights.  (*See e.g.* RT 336-42; Exh. 86, at 158-80.)  Therefore, none of the discussion about where Petitioner (as interpreted by Monsue) placed the victim should have been admitted at trial.

In fact, when he returned to complete a reconstruction of the scene in 2005 with two reporters from the Los Angeles Times, prosecutor Rabichow was surprised to discover that he could see from outside the dining room door a person lying in the position in which he had argued the victim had been lying.  (EHT I 61-74, 102-03.)  Rabichow had not visited the crime scene prior to trial; his argument that Petitioner lied was based only on information provided by Detective Monsue and through Mike Wilson's photographs.  (EHT I 50-51.)  Rabichow testified he had been made aware that Detective Monsue threw away the bloodied rug on March 10.  (EHT I 52.)

**3.    Someone Other than Petitioner Left the Bloody and Muddy Shoe Prints Found at the Crime Scene**

As explained in detail in Section VI (B) (2) above, Petitioner has proved conclusively that he did not leave the bloody and muddy shoe print impressions at the murder scene.  *See also Lisker v. Knowles*, 463 F. Supp. 2d at 1022-24.  The prosecution's evidence to the contrary was false.

**C.    Analysis of Petitioner's Claim**

The knowing use of false evidence by the State, or the failure to correct false evidence, may violate due process.  *Napue v. Illinois*,  360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1219 (1959); *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").  "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (imputing knowledge of false evidence to trial prosecutor to find due process violation) (quotation omitted); *see also Napue*, 360 U.S. at 269 ("The same result obtains when the State, although not soliciting false evidence, allows it to go

1    uncorrected when it appears."); *and cf. Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194,

2    10 L. Ed. 2d 215 (1963) (holding that suppression of material evidence justifies a new trial

3    "irrespective of the good faith or bad faith of the prosecution.").

4         Respondent seems to suggest that even if false evidence was introduced by the

5    State, no due process violation occurred because the trial prosecutor, Philip Rabichow, did

6    not himself know that the evidence was false.  (Answer, at 68-69.)  Judging Rabichow's

7    testimony here, the Court agrees that Rabichow did not *know* the evidence was false.

8    Instead, it appears that Rabichow relied exclusively on Detective Monsue to ensure the

9    veracity of the State's evidence against Petitioner.[23]  (*See* EHT I 50-54.)  Rabichow's

10   decision to rely solely on Monsue's judgment thus led to a trial tainted with false evidence.

11   Unlike Rabichow, Monsue (not called as a witness here) and police photographer Michael

12   Wilson (called as a witness here) understood the false nature of their testimony.

13        Given this finding, Rabichow's personal ignorance of the falsity of this

14   evidence does not preclude a due process violation.  In *Jackson v. Brown*, 513 F.3d 1057

15   (9th Cir. 2008), the Ninth Circuit rejected the State's argument that *Napue* did not require

16   the prosecution to correct a witness' perjury where the prosecutor himself was unaware of

17   promises made by police officials and therefore of the falsity of the government witness'

18   testimony.  The court reasoned:

19

20        [W]e disagree with the State's analysis.  *Napue* applies

21        whenever a prosecution "'knew or should have known that the

22        testimony was false.'"  *Hayes v. Brown*, 399 F.3d 972, 984

23        (9th Cir. 2005) (en banc) (quoting *United States v. Zuno-Arce*,

24

25   ───────────────

26   [23]  The one exception to this finding concerns Wilson's testimony about what time he took photographs on the 10th. From the trial testimony, it appears that Rabichow realized there was a problem with Wilson's testimony. (*See* RT 990-91.) At the very least, Rabichow, who possessed the police

27   "murder book" showing the falsity of Wilson's testimony, should have known that this testimony was false. *See Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (*citing United States v. Zuno-

28   Arce*, 339 F.3d 886, 889 (9th Cir. 2003)).

339 F.3d 886, 889 (9th Cir. 2003)). . . . [T]he prosecutor has a clear *Brady* obligation to investigate whether the police have evidence favorable to the defendant. [*Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)] ("[A]ny argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."); *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). If the prosecutor has a duty to investigate and disclose favorable evidence known only to the police, he "should know" when a witness testifies falsely about such evidence.

*Jackson*, 513 F.3d at 1075. The court also rejected the notion that application of this rule was in violation of the anti-retroactivity principle of *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). *See Jackson*, 513 F.3d at 1075 ("*Napue* and *Giglio* make perfectly clear that the constitutional prohibition on the "knowing" use of perjured testimony applies when *any* of the State's representatives would know the testimony was false.") (emphasis in original).

Rabichow's testimony here shows that he relied on Monsue and his photographer Wilson to present accurate evidence for the State. Monsue was essentially the sole investigator, was without a doubt the most important witness for the prosecution, and sat alongside Rabichow throughout the trial. Where the prosecutor's investigator has the responsibility for the integrity of the State's evidence, it cannot be the case that the prosecutor's technical ignorance of the falsity of that evidence insulates the proceedings against a due process claim. The accused is still convicted on the basis of false evidence

purposely introduced by the State; this presentation violates the fair trial rights outlined in *Napue* and *Giglio*. *Jackson*, 513 F.3d at 1075; *Hall v. Director of Corrections*, 343 F.3d 976, 981-84 (9th Cir. 2003) (granting habeas relief under AEDPA to petitioner who proved that material false evidence was used against him even where he made no allegation that the prosecutor knew of its falsity); *Killian*, 282 F.3d at 1209-10 (granting habeas relief on false evidence claim regardless of prosecutor's knowledge of witness' lies); *United States v. Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994) ("[A] government's assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence. A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness."); *see also Mastracchio v. Vose*, 274 F.3d 590, 600 (1st Cir. 2001) ("[A]s a legal matter, the Supreme Court precedent on this issue is clear. When any member of the prosecution team has information in his possession that is favorable to the defense, that information is imputable to the prosecutor."); *Boyd v. French*, 147 F.3d 319, 329-30 (4th Cir. 1998) ("[K]nowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution."); *United States v. Goldberg*, 776 F. Supp. 513, 520 (C.D. Cal. 1991) (noting that court should impute an investigator's knowledge to prosecutor where the investigator works closely with the prosecutor).

That a due process violation occurred does not end the inquiry, however. A conviction may be overturned as a result of a *Napue* violation only if the violation was material. *Jackson*, 513 F.3d at 1075-76. A violation is material if it led to a trial in which the court can no longer have confidence in the verdict. *Jackson*, 513 F.3d at 1076; *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc). "[A] *Napue* violation requires that the conviction be set aside whenever there is '*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'" *Jackson*, 513 F.3d at 1076 (*quoting Hayes*, 399 F.3d at 985) (emphasis added in *Jackson*).

Because each *Napue* violation "further undermines our confidence in the jury's decision" the Court must analyze the errors collectively. *Jackson*, 513 F.3d at 1076.

"Once . . . *Napue* claims are deemed material, there is no need for further harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)." *Jackson*, 513 F.3d at 1076 n.11; *Hayes*, 399 F.3d at 984-85.  Even though *Napue* violations do not *per se* require reversal, the Ninth Circuit has "gone so far as to say that 'if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" *Jackson*, 513 F.3d at 1076 (quoting *Hayes*, 399 F.3d at 978).

The *Napue* violations in Petitioner's trial were material.  Without the false evidence, as this Court already has found, there was very little to the State's case against Petitioner.  *See Lisker v. Knowles*, 463 F. Supp. 2d at 1018-31.  The testimony of Robert Hughes was so riddled with inconsistencies and demonstrated such an obvious motive to fabricate the confession that its value was minimal.  The blood evidence was equivocal and not compelling.  The remaining evidence of Petitioner's conduct at the scene was no more indicative of guilt than of innocence.  Prosecutor Rabichow relied heavily on the false evidence in his arguments to the jury (*see* RT 1081-82, 1187-93, 1195, 1198-1200, 1201-02), a relevant consideration in the materiality analysis.  *See e.g. Hall*, 343 F.3d at 984; *Killian*, 282 F.3d at 1209-10.  And it bears repeating that even this false evidence was relevant only because of another police error – the *Miranda* violation identified by the California Court of Appeal – which allowed Petitioner's interview into evidence and which the prosecution then rebutted with the false evidence.

In sum, the *Napue* violations leave this Court with no confidence in the jury verdict rendered against Petitioner, and for which Petitioner has been in custody for nearly 26 years.  They were therefore material, *Jackson*, 513 F.3d at 1075-76, and habeas relief is required.  And to the extent that further harmful error analysis might be contemplated, the Court also finds that, for these same reasons, given the nature of the case against Petitioner, the introduction of the false evidence had a "substantial and injurious effect or influence in determining the jury's verdict" and so requires relief.  *Brecht*, 507 U.S. at 637.

# VIII.

# CUMULATIVE ERROR

Petitioner's final claim is that the above three constitutional violations cumulatively prejudiced him to such an extent that habeas relief is required. (Second Amended Petition, at 6; Traverse, at 77.) As with his third claim for relief, the cumulative error claim was presented to the California Supreme Court only once, in Petitioner's 2007 habeas petition, and was rejected on procedural grounds. (*See* Petitioner's Bail Motion, Exh. D, at 100.) Therefore, the Court must conduct *de novo* review of this claim. *Pirtle*, 313 F.3d at 1167-68; *Tanner*, 493 F.3d at 1139.

The cumulative effect of multiple trial-type constitutional errors may render a defendant's trial constitutionally infirm even if the errors, considered individually, would not be considered harmful. *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007). Here, the Court has found two constitutional errors each of which requires on its own that habeas relief be granted. Even if this were not so as to the errors individually, those errors, viewed cumulatively, combine to make potent their impact on Petitioner's trial. Accordingly, a cumulative error analysis also would entitle Petitioner to relief.

# IX.

# CONCLUSION AND RECOMMENDATION

The Court decides only the claims presented – not those not presented, not those that might have been presented. The Court specifically does not find that the evidence exonerates Petitioner; that was not a claim presented. Rather, the Court found, in its first Report, that Petitioner was entitled to pass through the *Schlup* gateway for the purpose of testing the claims presented in the Second Amended Petition and evaluated in this Second Report.

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order (1) approving and accepting this Second Report; and (2) directing that Judgment be entered denying relief as to Petitioner's claim of a right to counsel violation,

but granting the Second Amended Petition for Writ of Habeas Corpus as to Petitioner's claims of ineffective assistance of counsel, due process violation, and cumulative prejudice if, within one hundred and twenty (120) days from the date the Judgment becomes final, or 120 days after appellate proceedings have concluded (whichever is later), the State court does not grant Petitioner a new trial.

DATED:   March 2, 2009

_____
RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE