EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
PAMELA C. HAMANAKA
Senior Assistant Attorney General
SCOTT A. TARYLE
Supervising Deputy Attorney General
JOHN YANG
Deputy Attorney General
ROBERT DAVID BRETON
Deputy Attorney General
State Bar No. 73686
    300 South Spring Street, Suite 1702
    Los Angeles, CA  90013
    Telephone: (213) 897-2279
    Fax: (213) 897-6496
    Email: DocketingLAAWT@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BRUCE E. LISKER,**<br><br>Petitioner,<br><br>v.<br><br>**MICHAEL KNOWLES, Warden,**<br><br>Respondent. | CV-04-02687-VAP(RZ)<br><br>**RESPONDENT'S OBJECTIONS TO SECOND REPORT AND RECOMMENDATION** |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 2

   I.   **THE SECOND REPORT AND RECOMMENDATION WRONGLY CONCLUDES THAT PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL** ............................................................................. 2

      A.  Applicable Law ................................................................... 2

      B.  Analysis Of Ineffective-Assistance-of-Counsel Claim ......... 6

          1.  Defense Counsel Acted Diligently And Reasonably In Opposing The Motion Before The First Trial ............... 6

          2.  Defense Counsel Made A Reasonable Tactical Decision Before The Second Trial To Forego The Defense Of Third-party Liability, And The Second R&r Fails To Give Adequate Consideration To An Enormously Probative Body Of Incriminating Evidence: Petitioner's Numerous, Detailed Confessions ....................................................... 16

              a.  Factual Background ..................................... 16

                   (1)  Petitioner's Confession To Robert Hughes ........ 17

                   (2)  Petitioner's Guilty Plea ........ 18

                   (3)  Statement To Probation Officer Barron ........ 18

                   (4)  Statement To Dr. LeGassick ........ 20

                   (5)  Statement To Dr. Fukushima ........ 20

                   (6)  Statement To Dr. Davis ........ 21

                   (7)  Statement To Dr. Holland ........ 21

                   (8)  Testimony Before Parole Board ........ 22

               b.  The Second R&R Unreasonably Discounts And Dismisses Petitioner's Confessions ........ 23

               c.  Legal Background ........ 23

               d.  Defense Counsel's Strategy Was Reasonably Informed By The Facts He Faced And Was Properly Constrained By His Ethical Obligations ........ 26

i

## TABLE OF CONTENTS  (continued)

**Page**

    3.   The Second Report And Recommendation Fails To Take Into Account That Petitioner Failed To Show Any Prejudice From Counsel's Alleged Failings ........................................ 38

    4.   Conclusion ................................................................ 52

**II.    THE SECOND REPORT AND RECOMMENDATION WRONGLY CONCLUDES THE PROSECUTOR KNOWINGLY PRESENTED FALSE EVIDENCE** ......... 55

A.  Applicable Law ................................................................ 55

B.  Analysis Of False-Evidence Claim ................................. 57

    1.   The Evidence Presented To Show That Petitioner Could Not Have Seen His Mother In The Manner He Described To Detective Monsue Was Not False ................................. 57

        a.   The Weather On March 10, 1983 ................. 57

        b.   Comparison Of Weather Conditions On March 23, 1983 And March 10, 1983 ................. 59

        c.   Time When Crime-Scene Photographs Were Taken ........ 59

        d.   The Victim's Body In A Position Not Visible To Petitioner ........ 61

    2.   The Evidence Presented To Show That The Only Footprints Left By The Perpetrator Were Petitioner's Was Not False ................. 64

        a.   Bloody Shoeprints Inside The House Not Made By Anyone Other Than Lisker ................. 65

        b.   Shoeprints Outside The House Not Made By Anyone Other Than Lisker ................. 70

        c.   The Marked Impression On The Victim's Head Was Not A Shoeprint ................. 72

C.  Summary ................................................................ 76

**III.   THE SECOND REPORT AND RECOMMENDATION WRONGLY FINDS RELIEF WARRANTED BY ALLEGED CUMULATIVE ERROR** ................. 78

## TABLE OF CONTENTS  (continued)

**Page**

IV.    **THE SECOND REPORT AND RECOMMENDATION WRONGLY REPROVES RESPONDENT OF SEEKING ONLY TO DELAY THE PROCEEDINGS BY NOT WAIVING EXHAUSTION AND BY NOT REQUESTING A RULING ON THE MERITS WHEN HE RESPONDED TO THE STATE PETITION IN THE CALIFORNIA SUPREME COURT** .......... 78

CONCLUSION .......... 80

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Aguilar v. Alexander*
125 F.3d 815 (9th Cir. 1997)                                                  34

5

*Allen v. Woodford*
6    395 F.3d 979 (9th Cir. 2005)                                            57

7    *Ames v. Endell*
856 F.2d 1441 (9th Cir. 1988)                                               53

8

9    *Anderson v. Calderon*
232 F.3d 1053 (9th Cir. 2000)                                                4

10   *Arizona v. Fulminante*
499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)                     25

11

12   *Babbitt v. Calderon*
151 F.3d 1170 (9th Cir. 1998)                                              3, 4

13   *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*
289 F.3d 589 (9th Cir. 2002)                                                 66

14

15   *Bashor v. Risley*
730 F.2d 1228 (9th Cir. 1984)                                                4

16   *Bean v. Calderon*
163 F.3d 1073 (9th Cir. 1998)                                                4

17

18   *Bell v. Cone*
535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002)                      3

19   *Benn v. Lambert*
283 F.3d 1040 (9th Cir. 2002)                                               56

20

21   *Blackledge v. Allison*
431 U.S. 63, 97 S. Ct. 2098, 52 L. Ed. 2d 126 (1977)                        24

22   *Bonin v. Calderon*
59 F.3d 815 (9th Cir. 1995)                                                  5

23

24   *Bowling v. Parker*
344 F.3d 487 (6th Cir. 2003)                                                16

25   *Bruton v. United States*
391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)                       25

26

27   *Cacoperdo v. Demosthenes*
37 F.3d 504 (9th Cir. 1994)                                                  4

28

## TABLE OF AUTHORITIES  (continued)

**Page**

*Campbell v. Wood*
18 F.3d 662 (9th Cir. 1994) .......................................................... 3

*Carothers v. Rhay*
594 F.2d 225 (9th Cir. 1979) ....................................................... 56

*Carriger v. Stewart*
132 F.3d 463 (9th Cir. 1997) ....................................................... 37

*Chambers v. Mississippi*
410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) .............. 78

*Clayton v. Gibson*
199 F.3d 1162 (10th Cir. 1999) ................................................... 16

*Coleman v. Calderon*
150 F.3d 1105 (9th Cir. 1998) ...................................................... 3

*Cooks v. Spalding*
660 F.2d 738 (9th Cir. 1991) ........................................................ 5

*Cooper v. Calderon*
255 F.3d 1104 (9th Cir. 2001) ...................................................... 5

*Denham v. Deeds*
954 F.2d 1501 (9th Cir. 1992) ...................................................... 5

*Edwards v. LaMarque*
445 F.3d 1121 (9th Cir. 2007) ................................................ 53, 54

*Escamilla v. Jungwirth*
426 F.3d at 868 (7th Cir. 2005) .................................................. 24

*Gallego v. McDaniel*
124 F.3d 1065 (9th Cir. 1997) ...................................................... 6

*Gentry v. Roe*
320 F.3d 891 (9th Cir. 2003) ........................................................ 5

*Gerlaugh v. Stewart*
129 F.3d 1027 (9th Cir. 1997) ...................................................... 3

*Giglio v. United States*
405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) ............... 56

*Goodman v. Bertrand*
467 F.3d 1022 (7th Cir. 2006) .................................................... 54

*Griffin v. Johnson*
350 F.3d 956 (9th Cir. 2003) ...................................................... 25

v

## TABLE OF AUTHORITIES  (continued)

**Page**

*Guzzardo v. Bengston*
643 F.2d 1300 (7th Cir. 1981)                                      34

*Hamilton v. Ayers*
458 F. Supp. 2d 1075 (E. D. Cal. 2006)                            11

*Hamilton v. Vasquez*
17 F.3d 1149 (9th Cir. 1994)                                        6

*Hardamon v. United States*
319 F.3d 943 (7th Cir. 2003)                                        5

*Harding v. Sternes*
380 F.3d 1034 (7th Cir. 2004)                                      16

*Harris v. Vasquez*
949 F.2d 1497 (9th Cir. 1990)                                    4, 5

*Hayes v. Brown*
399 F.3d 972 (2005)                                               56

*Hayes v. Woodford*
301 F.3d 1054 (9th 2002)                                           5

*Herrera v. Collins*
506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)            24

*Holmes v. South Carolina*
547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)       10, 15

*House v. Bell*
547 U.S. 518, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006)         24, 36

*In re Clark*
5 Cal. 4th 750, 21 Cal. Rptr. 2d 509 (1993)                       79

*Jackson v. Brown*
513 F.3d 1057 (9th Cir. 2008)                                     56

*Jackson v. Calderon*
211 F.3d 1148 (9th Cir. 2000)                                      5

*James v. Borg*
24 F.3d 20 (9th Cir. 1994)                                         5

*Johnson v. Alabama*
256 F.3d 1156 (11th Cir. 2001)                                    16

*Kimmelman v. Morrison*
477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)             3

# TABLE OF AUTHORITIES  (continued)

**Page**

*Knowles, Warden v. Mirzayance*
___ U.S. ___ 2009 WL 746274 (March 24, 2009) .......................... 3

*LaGrand v. Stewart*
133 F.3d 1253 (9th Cir. 1998) .......................... 4

*Lambert v. Blackwell*
387 F.3d 210 (3d Cir. 2004) .......................... 57

*Lang v. Callahan*
788 F.2d 1416 (9th Cir. 1986) .......................... 4

*Massiah v. United States*
377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) .......................... 18

*McElvain v. Lewis*
283 F. Supp. 2d 1104 (C.D. Cal. 2003) .......................... 56, 57

*Middleton v. Roper*
455 F.3d 838 (8th Cir. 2006) .......................... 5

*Milone v. Camp*
22 F.3d 693 (7th Cir. 1994) .......................... 34

*Mobley v. Head*
267 F.3d 1312 (11th Cir. 2001) .......................... 5

*Moore v. Deputy Commissioners of Sci-Huntington*
946 F.2d 236 (3d Cir. 1991) .......................... 3

*Morales v. Woodford*
336 F.3d 1136 (9th Cir. 2003), amended on other grounds, 338 F.3d at 1179 .......................... 56

*Morales v. Woodford*
388 F.3d 1159 (9th Cir. 2004) .......................... 56

*Morgan v. Bunnell*
24 F.3d 49 (9th Cir. 1994) .......................... 5

*Morris v. California*
966 F.2d 448 (9th Cir. 1992) .......................... 3, 5

*Morris v. Ylst*
447 F.3d 735 (9th Cir. 2006) .......................... 56

*Murtishaw v. Woodford*
255 F.3d 926 (9th Cir. 2001) .......................... 52, 56

*Napue v. Illinois*
360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) .......................... 55, 56

vii

## TABLE OF AUTHORITIES  (continued)

**Page**

*Nix v. Whiteside*
475 U.S. 157, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) ... 4, 25, 34

*O'Brien v. Marshall*
453 F.3d 13 (1st Cir. 2006) ... 16

*Paradis v. Arave*
954 F.2d 1483 (9th Cir. 1992) ... 5

*Parle v. Runnels*
505 F.3d 922 (9th Cir. 2007) ... 78

*Pavao v. Cardwell*
583 F.2d 1075 (9th Cir. 1978) ... 56

*People v. Alcala*
4 Cal.4th 742, 15 Cal. Rptr. 2d 432 (1992) ... 10

*People v. Alvarez*
14 Cal 4th 155, 58 Cal. Rptr. 3d 385 (1996) ... 12

*People v. Arline*
13 Cal. App.3d 200, 91 Cal. Rptr. 520 (1970) ... 11

*People v. Avila*
38 Cal.4th 491, 43 Cal. Rptr. 3d 1 (2006) ... 12

*People v. Babbitt*
45 Cal. 3d 660, 248 Cal. Rptr. 69 (1988) ... 12, 13

*People v. Blankenship*
167 Cal. App. 3d 840, 213 Cal. Rptr. 666 (1985) ... 12

*People v. Bradford*
15 Cal.4th 1229 (1997) ... 10

*People v. Clark*
3 Cal. 4th 41, 10 Cal. Rptr. 2d 554 (1992) ... 10

*People v. Edelbacher*
47 Cal. 3d 983, 254 Cal. Rptr. 586 (1989) ... 13

*People v. Geier*
41 Cal.4th 555 (2007) ... 9

*People v. Green*
27 Cal.3d 1, 164 Cal. Rptr. 1 (1980) ... 9, 10

*People v. Guillebeau*
107 Cal. App. 3d 531, 166 Cal. Rptr. 45 (1980) ... 9

**TABLE OF AUTHORITIES  (continued)**

**Page**

*People v. Hall*
41 Cal.3d 826, 226 Cal. Rptr. 112, 718 P. 2d 99 (1986)                    9, 10, 13

*People v. Karis*
46 Cal. 3d 612, 250 Cal. Rptr. 659 (1988)                                   11

*People v. Kaurish*
52 Cal.3d 648 (1990)                                                      9, 11

*People v. Kegler*
197 Cal. App.3d 72, 242 Cal. Rptr. 897 (1987)                               11

*People v. Lewis*
26 Cal.4th 334, 110 Cal. Rptr. 2d 272 (2001)                                10

*People v. Marshall*
13 Cal. 4th 799, 55 Cal. Rptr. 2d 347 (1996)                                11

*People v. Panah*
35 Cal.4th 395 (2005)                                                        9

*People v. Pride*
3 Cal.4th 195, 10 Cal. Rptr. 2d 636 (1992)                                  10

*People v. Sandoval*
4 Cal. 4th 155, 14 Cal. Rptr. 2d 342 (1992)                                 13

*People v. Von Villas*
10 Cal. App. 4th 201, 13 Cal. Rptr. 2d 62 (1992)                            11

*People v. Wright*
39 Cal.3d 576, 217 Cal. Rptr. 212 (1984)                                    11

*People v. Yeoman*
31 Cal. 4th 93, 2 Cal. Rptr. 3d 186 (2003)                                  10

*Perry v. Rushen*
713 F.2d 1447 (9th Cir. 1983)                                               10

*Rodriguez v. United States*
286 F.3d 972 (7th Cir. 2002)                                                34

*Roe v. Flores-Ortega*
528 U.S. 470, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000)                      4

*Rose v. Lundy*
455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982)                      79

*Routly v. Singletary*
33 F.3d 1279 (11th Cir. 1994)                                               57

ix

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Royal v. Taylor*
188 F.3d 239 (4th Cir. 1999) ............................................. 53

*Sanders v. Ratelle*
21 F.3d 1446 (9th Cir. 1994) ............................................. 53

*Sayre v. Anderson*
238 F.3d 631 (5th Cir. 2001) ............................................. 34

*Schriro v. Landrigan*
550 U.S. 465 (2007) ............................................. 54

*Siripongs v. Calderon*
133 F.3d 732 (9th Cir. 1998) ............................................. 4

*Smith v. Stewart*
140 F.3d 1263 (9th Cir. 1998) ............................................. 6

*Spivey v. Rocha*
194 F.3d 971 (9th Cir. 1999) ............................................. 9, 57

*Stephens v. Hall*
407 F.3d 1195 (11th Cir. 2005) ............................................. 57

*Strickland v. Washington*
466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ............................................. 2-5, 26, 53

*Thompson v. Calderon*
109 F.3d 1358 (9th Cir. 1997) ............................................. 3

*Turk v. White*
116 F.3d 1264 (9th Cir. 1997) ............................................. 4

*United States v. Agurs*
427 U.S. 97, 96 S. Ct. 2392 (1976) ............................................. 55

*United States v. Bagley*
473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) ............................................. 55

*United States v. Berry*
814 F.2d 1406 (9th Cir. 1989) ............................................. 5

*United States v. Chambers*
918 F.2d 1455 (9th Cir. 1990) ............................................. 4

*United States v. Croft*
124 F.3d 1109 (9th Cir. 1997) ............................................. 57

*United States v. Etsitty*
130 F. 3d 420 (9th Cir. 1997) ............................................. 56

x

# TABLE OF AUTHORITIES (continued)

**Page**

*United States v. Layton*
855 F.2d  1338 (9th Cir. 1988)                                    4

*United States v. Martinez*
883 F.2d 750 (9th Cir. 1989)                                    34

*United States v. Mayo*
646 F.2d 369 (9th Cir. 1981)                                     4

*United States v. Murray*
751 F.2d 1528 (9th Cir. 1985)                                    5

*United States v. Necoechea*
986 F.2d 1273 (9th Cir. 1993)                                   57

*United States v. Olson*
925 F.2d 1170 (9th Cir. 1991)                                    5

*United States v. Omene*
143 F.3d 1167 (9th Cir. 1998)                                   34

*United States v. Popoola*
881 F.2d  811 (9th Cir. 1989)                                    5

*United States v. Sherlock*
962 F.2d 1349 (9th Cir. 1992)                                   57

*United States v. Weatherspoon*
410 F.3d 1142 (9th Cir. 2005)                                   66

*United States v. Young*
17 F.3d 1201 (9th Cir. 1994)                                    57

*United States v. Zuno-Arce*
44 F.3d 1420 (9th Cir. 1995)                                    57

*Wade v. Calderon*
29 F.3d 1312 (9th Cir. 1994)                                  6, 53

*Wade v. Mantello*
333 F.3d 51 (2d Cir. 2003)                                     11

*Wiggins v. Smith*
539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)        54

*Wiggins v. Smith*
539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)        53

*Williams v. Taylor*
529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)     3, 5, 79

## TABLE OF AUTHORITIES  (continued)

**Page**

*Wilson v. Henry*
185 F.3d 986 (9th Cir. 1999)                                     53

*Winfield v. Roper*
460 F.3d 1026 (8th Cir. 2006)                                   34

*Workman v. Bell*
160 F.3d 276 (6th Cir. 1998)                                    56

*Yarborough v. Gentry*
540 U.S. 1, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003)               54

**Constitutional Provisions**

U.S. Const.  amend. VI                                           2

**Statutes**

28 U.S.C. § 2254                                             54, 79

Cal. Evid. Code:

    § 31                                                    14, 27

    §  350                                                  15, 52

    § 352                                                 8, 15, 52

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   PAMELA C. HAMANAKA
    Senior Assistant Attorney General
4   SCOTT A. TARYLE
    Supervising Deputy Attorney General
5   JOHN YANG
    Deputy Attorney General
6   ROBERT DAVID BRETON
    Deputy Attorney General
7   State Bar No. 73686
        300 South Spring Street, Suite 1702
8       Los Angeles, CA  90013
        Telephone: (213) 897-2279
9       Fax: (213) 897-6496
        Email: DocketingLAAWT@doj.ca.gov
10
    Attorneys for Respondent
11
                    IN THE UNITED STATES DISTRICT COURT
12
                    FOR THE CENTRAL DISTRICT OF CALIFORNIA
13

14
    **BRUCE E. LISKER,**                          CV-04-02687-VAP(RZ)
15
                            Petitioner,           **RESPONDENT'S
16                                                OBJECTIONS TO SECOND
                                                  REPORT AND
17      **v.**                                    RECOMMENDATION**

    **MICHAEL KNOWLES, Warden,**
18
                            Respondent.
19

20

21          Respondent respectfully objects to the Second Report and Recommendation.

22   As explained in the attached Memorandum of Points and Authorities, Petitioner has

23   failed to establish either ineffective assistance of counsel or the presentation of false

24   evidence by the prosecutor.  Consequently, Petitioner has not established any singular

25   or cumulative prejudice from the alleged constitutional errors.

26   //

27   //

28   //

                                          1

1        Thus, this Court should reject the proposed findings and deny the Second

2   Amended Petition for Writ of Habeas Corpus.

3        Dated:  April 8, 2009

4                              Respectfully submitted,

5                              EDMUND G. BROWN JR.
                               Attorney General of the State of California
6                              DANE R. GILLETTE
                               Chief Assistant Attorney General
7
                               PAMELA C. HAMANAKA
8                              Senior Assistant Attorney General

9                              SCOTT A. TARYLE
                               Supervising Deputy Attorney General
                               JOHN YANG
10                             Deputy Attorney General

11

12

13                             /s/ Robert David Breton
                               ROBERT DAVID BRETON
14                             Deputy Attorney General

15                             Attorneys for Respondent

16   RDB:lh
     LA2004FH0213
17   Lisker - Objections 2d R&R.wpd

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Respondent respectfully objects to the Second Report and Recommendation (Second R&R).  The Second R&R finds that Petitioner's trial attorney was incompetent for failing to investigate and present a third-party liability defense. (2R&R at 32-53.)  The Second R&R further finds that the prosecutor presented false evidence when he merely argued reasonable inferences from the evidence presented during closing argument.  (2R&R at 53-67.)

With due respect, these conclusions fail to take adequate account of uncontroverted evidence to the contrary, including evidence that Petitioner pled guilty to murdering his mother, that he made an unbroken series of detailed confessions and admissions in which he explained that he murdered his mother, and that he tried to set someone else up for the crime and that Petitioner did not reverse course and begin to assert his innocence until after the alleged third party, Michael Ryan, conveniently had died, and until after his father, Robert Lisker, who had advised him to plead guilty, also died.

In reaching its unprecedented conclusions, the Second R&R misconstrues or overlooks many critical facts presented at both evidentiary hearings and at trial. Moreover, the Second R&R appears to have lost sight of the double deference to be accorded the state's court's determination that counsel was not ineffective. Regarding the claim of false evidence, the Second R&R fails to recognize that the prosecutor did not actually present any evidence that was either perjurious or false.

Finally, apart from the merits of the Petition, the Second R&R's unwarranted conclusions regarding Respondent's purported dilatory tactics are particularly unfair and should be rejected and excised therefrom.  Respondent sought a merits determination as well as a ruling on procedural grounds in the state court.

For all these reasons, the Court should decline to adopt the Second Report and Recommendation.

1

**ARGUMENT**

**I.**

**THE SECOND REPORT AND RECOMMENDATION WRONGLY CONCLUDES THAT PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL**

The Second R&R concludes that defense counsel was derelict in investigating a third-party-culpability defense and less than diligent in opposing the prosecutor's in limine motion to exclude such evidence. It finds fault with the extent of defense counsel's pre-trial preparation of an alternate-perpetrator defense and questions the reasons for defense counsel's tactical decisions regarding the presentation of such a defense at the second trial. It takes defense counsel to task for failing to bring to the attention of the trial court at the hearing on the in limine motion certain minor pieces of evidence, such as the facts that Michael Ryan liked knives, had done odd jobs for victim Dorka Lisker in the past, checked into a Hollywood motel on the day of the murder under a false name, was in need of money, and somehow inexplicably obtained sufficient money to buy a bus ticket back to Mississippi. (2R&R 24-53.)

The finding is clearly without merit. The testimony adduced at the evidentiary hearing shows that defense counsel was diligent in investigating and advancing such a defense before the first trial. The testimony also shows counsel's decision to forego further preparation and presentation of a third-party-liability defense before the second trial was based on legitimate tactical considerations and ethical concerns.

**A.  Applicable Law**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (*Strickland*). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's conduct

2

1  fell below an objective standard of reasonableness, and that the defendant was
2  prejudiced by counsel's acts or omissions. *Id.* at 687-88; *Bell v. Cone*, 535 U.S. 685,
3  695, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Williams v. Taylor*, 529 U.S. 362,
4  390, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). *Strickland* imposes a "highly
5  demanding" standard upon the defendant to prove "gross incompetence" (*Kimmelman*
6  *v. Morrison*, 477 U.S. 365, 381-82, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986))
7  (*Kimmelman*). Since judicial scrutiny of counsel's performance is highly deferential,
8  a court must indulge a strong presumption that counsel's conduct fell within the wide
9  range of reasonable professional assistance. *Knowles, Warden v. Mirzayance*, ___
10 U.S. ___ 2009 WL 746274 (March 24, 2009); *Kimmelman*, 477 U.S. at 381-82.;
11 *Strickland*, 466 U.S. at 689.

12      In assessing a trial attorney's pre-trial acts and omissions, a reviewing court
13 must conduct an objective review of counsel's performance, measured for
14 "reasonableness under prevailing professional norms." *Kimmelman*, 477 U.S. at 381-
15 82; *Strickland*, 466 U.S. at 688. This includes a context-dependent consideration of
16 the challenged conduct as seen "from counsel's perspective at the time," and "every
17 effort [must] be made to eliminate the distorting effects of hindsight." *Id.* at 689; *see*
18 *also Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998); *Campbell v. Wood*,
19 18 F.3d 662, 673 (9th Cir. 1994). Even the best lawyers would not defend their client
20 in the same way, and the question is not what the best lawyer would have done or
21 even what most good lawyers would have done, but whether a reasonable lawyer at
22 trial could have acted as defense counsel did. *Strickland*, 466 U.S. at 689; *Coleman*
23 *v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998); *Moore v. Deputy Commissioners*
24 *of Sci-Huntington*, 946 F.2d 236, 246 (3d Cir. 1991).

25      Reasonable tactical decisions are virtually immune from attack, even if they
26 prove unsuccessful. *Strickland*, 466 U.S. at 699; *see also Gerlaugh v. Stewart*, 129
27 F.3d 1027, 1033 (9th Cir. 1997); *Thompson v. Calderon*, 109 F.3d 1358, 1365-65 (9th
28 Cir. 1997); *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1992). Thus, tactical

decisions  regarding which evidence to present, which witnesses to call, and which defenses to advance or forego are left to the sound judgment of the defense attorney and will not be second guessed. *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986); *United States v. Layton*, 855 F.2d  1338, 1420 (9th Cir. 1988); *United States v. Chambers*, 918 F.2d 1455, 1461-62 (9th Cir. 1990).

"Strategic choices made after thorough investigation of law and facts relevant to the plausible options are virtually unchallengeable." *LaGrand v. Stewart*, 133 F.3d 1253, 1271 (9th Cir. 1998), *citing Strickland*, 466 U.S. at 490-91; *see also Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir. 1994).  The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable and informed.  *Babbitt v. Calderon*, 151 F.3d at 1173; *Siripongs v. Calderon*, 133 F.3d 732,  736 (9th Cir. 1998); *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990).  A difference of opinion as to trial tactics does not constitute denial of effective assistance, and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Lang v. Callahan*, 788 F.2d 1416, 1418 (9th Cir. 1986); *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984); *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

A defense attorney has a general duty to make reasonable investigations, but defense counsel can reasonably decide not to carry out a particular investigation or can make a reasonable strategic decision that makes a particular investigation unnecessary. *Strickland*, 466 U.S. at 691.  Thus, if counsel reviews the preliminary facts of the case and reasonably decides to pursue only one of two conflicting defense theories, for example, he need not investigate the abandoned defense theory further. *Anderson v. Calderon*, 232 F.3d 1053, 1095 (9th Cir. 2000); *Bean v. Calderon*, 163 F.3d 1073, 1082 (9th Cir. 1998); *Turk v. White*, 116 F.3d 1264, 1266-67 (9th Cir. 1997).  An attorney may appropriately decide not to continue with a particular

investigation when the defendant's own statements to the authorities or to defense counsel disclose that such a pursuit would be fruitless. *Strickland*, 466 U.S. at 691; *Paradis v. Arave*, 954 F.2d 1483, 1491 (9th Cir. 1992); *Harris v. Vasquez*, 949 F.2d at 1525; *Morgan v. Bunnell*, 24 F.3d 49, 52 (9th Cir. 1994); *Mobley v. Head*, 267 F.3d 1312, 1318-19 (11th Cir. 2001); *Middleton v. Roper*, 455 F.3d 838, 848 (8th Cir. 2006).

With respect to the required showing of prejudice, it is not enough for a petitioner to show that counsel's errors had some conceivable effect on the outcome of the trial. *Strickland*, 466 U.S. at 693; *Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001); *Cooks v. Spalding*, 660 F.2d 738, 740 (9th Cir. 1991); *United States v. Olson*, 925 F.2d 1170, 1174 (9th Cir. 1991). He must demonstrate how the defective performance actually and substantially "prejudiced the defense." *Strickland*, 466 U.S. at 687-88, 692-94; *see Gentry v. Roe*, 320 F.3d 891, 900 (9th Cir. 2003); *Hayes v. Woodford*, 301 F.3d 1054, 1066 (9th 2002); *Bonin v. Calderon*, 59 F.3d 815, 833 (9th Cir. 1995). Unsupported speculation or conclusory allegations as to the effect of an attorney's substandard performance are not sufficient to show prejudice. *Williams v. Taylor*, 529 U.S. at 399; *Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994); *Morris v. California*, 966 F.2d at 455-56.

Consequently, a claim of inadequate investigation is undeveloped where it fails to show how the investigation was deficient and what would have been produced if done otherwise. *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003); *United States v. Popoola*, 881 F.2d 811, 813 (9th Cir. 1989). Allegations of failure to investigate must show what additional investigation would uncover and what testimony the additional witnesses would have provided. *Denham v. Deeds*, 954 F.2d 1501, 1505-06 (9th Cir. 1992); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1989); *United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985). Ineffectiveness is not shown where the petitioner provides no information as to what further

1  investigation would have produced, whether it would have been admissible, and how

2  it would have changed the result. *Gallego v. McDaniel*, 124 F.3d 1065, 1077 (9th

3  Cir. 1997); *Hamilton v. Vasquez*, 17 F.3d 1149, 1157 (9th Cir. 1994); *Wade v.*

4  *Calderon*, 29 F.3d 1312, 1318 (9th Cir. 1994).

5      Speculation that a different approach might have led to a different outcome

6  simply will not carry the day. *Smith v. Stewart*, 140 F.3d 1263, 1273 (9th Cir. 1998).

7  **B.  Analysis Of Ineffective-Assistance-of-Counsel Claim**

8      **1.  Defense Counsel Acted Diligently And Reasonably In
           Opposing The Motion Before The First Trial**

9

10      Here, contrary to the conclusions drawn in the Second R&R, the record

11  shows that defense counsel used all available evidence in opposing the prosecutor's

12  in limine motion regarding third-party-culpability evidence prior to the first trial.

13  Defense counsel investigated, litigated, and attempted to present evidence of third

14  party culpability.  He scrupulously read and studied the murder book, read all the

15  reports, listened to the tape recording of Detective Monsue's interview with Ryan,

16  and had his defense investigator, Michael Wagner (appointed June 21, 1984) contact

17  and interview Ryan.  (Hg. RT at 14-15, 18, 22, 30-33, 65-66, 73-75, 82-84, 89-90;

18  Aug. RT at 389-99; CT 124, 126, 145-50, 151, 153.)[1]

19      At the November 15, 1984 hearing on the prosecution's in limine motion

20  before the first trial, defense counsel indicated he had listened to a tape of Detective

21

22      1.  Sue Sarkis was previously appointed at defense counsel's request to assist
    him in interviewing three jailhouse informants in preparation for the preliminary

23  hearing and for the *Massiah* motion.  (CT at 30, 32, 34; Hg. RT at 82-83, 87-88.)  Ms.
    Sarkis testified at the evidentiary hearing that she asked for funds to fly to Mississippi

24  to interview Ryan, but that Robert Lisker refused to provide any money for that

25  purpose, and defense counsel told her that the trial court would not approve such an
    expenditure.  (Hg. RT at 99, 111-12.)  However, Mr. Mulcahy testified that she never

26  made such a request, that her assignment was limited to one task, and that he

27  discontinued using her services as soon as it became apparent that she wanted to

28  control the investigation and to carry out other unassigned tasks in her own way.
    (Hg. RT at 17-18, 82, 87-89, 119.)

Monsue's interview with Ryan, and he presented the tape and a 41-page transcript of this tape to the court to show that Ryan's statements demonstrated that Ryan, like Petitioner, had a motive, opportunity, and means to commit the murder, but unlike Petitioner, was not demonstrably present at the scene.  He pointed to statements made by Ryan that he was at the Lisker house the day before the murder, that he left the state the day after the murder, that he was unable to account for the money he spent while in California, and that he had a knife.  Defense counsel offered to prove that Ryan was in the neighborhood on the night before the murder, that he needed money, that he had tried to borrow money from Mrs. Lisker in the past, and that the money missing from Mrs. Lisker's purse was not found on Petitioner.  (Hg. RT 22-23; Aug. RT at 389-99; Hg. RT at 22-23, 70-72; Ex. 48.)

There was no need for defense counsel to pinpoint the various pieces of information contained in the transcript of Detective Monsue's interview of Ryan or to argue their suspicious nature to the trial court.  Commissioner Mulcahy gave his copy of the taped interview to the trial court, and the court listened to it.  (Hg. RT at 23, 72.)  By presenting a transcript of Detective Monsue's interview of Ryan to the court, defense counsel presented the same proffers of proof that Petitioner now insists should have been offered.  (Hg. RT at 24; Aug. RT 390-93, 398.)

Thus, defense counsel was thoroughly familiar with Ryan's statements to Detective Monsue[2] and to his own defense investigator.  (Hg. RT at 23-24; Aug. RT 391; CT 151, 153.)  He used these interviews to argue that certain pieces of information cast some suspicion on Ryan because he had the opportunity, the means, and the motive to commit a burglary at the Lisker residence (Aug. RT 391-92).

2.  A fair reading of Detective Monsue's interview shows that, contrary to Petitioner's suggestion, the interview was quite accusatory and confrontational, The detective accused Ryan of lying to him and confronted him with contrary information about the time he actually checked into the motel and the false name he used.  He told him that his story about the amount of money he spent and how much money he had left over to pay for the bus trip just did not add up.  (*See* Exs. 45, 86.)

1    Therefore, contrary to the Second R&R's conclusion (2R&R at 25-26, 34), defense

2    counsel vigorously argued at the pre-trial hearing on an in-limine motion that he be

3    allowed to present evidence of Ryan's possible culpability. (Aug. RT 389-98.)

4         The trial court granted the prosecutor's motion without prejudice because,

5    as stated by the prosecutor, there was "zero" evidence directly connecting Ryan to the

6    actual perpetration of the murder, and Ryan was not found with any of the weapons

7    that were used in the murder.  The court agreed with the prosecutor's assessment that

8    "anybody in the County of Los Angeles theoretically had the opportunity" to

9    burglarize the Lisker residence, that "anybody can pick up an exercise bar, a trophy

10   or two knives and stab," that Ryan could have gotten his money for the return bus trip

11   from any one of thousands of sources, that there was no evidence of any animosity

12   between Ryan and Mrs. Lisker, and no evidence that Ryan ever tried to steal money

13   or anything else from her.  The court also concurred with the prosecutor's keen

14   observation that even if it could be proved that Ryan was at the scene when the

15   murder was committed, that would "not tend to prove [Petitioner] innocent," and "the

16   jury might start speculating" that Ryan was merely an accomplice.  (Aug. 395-396;

17   Hg. RT 24, 28.)

18        That the trial court found the offer of proof lacking, however, does not

19   demonstrate ineffective assistance of counsel.  It only shows that no evidence existed

20   tying Ryan directly to the actual commission of the crime (nor does any such

21   evidence exist today, for that matter), and that the minimal relevance of the evidence

22   presented was substantially outweighed by the strong likelihood that it would mislead

23   the jury, consume an inordinate amount of time, and prejudice the People by

24   encouraging the jurors to engage in conjecture.  (Aug. RT at 399; *see* Cal. Evid. Code

25   § 352.)  As stated by the prosecutor at the hearing, "[U]nless there is some link with

26   the crime, [any evidence about Ryan] is speculation and should be excluded."  (Aug.

27   RT at 374; see also Aug. RT at 389, 402.)

28        Although the trial court left the door open for Petitioner to present additional

8

1   evidence -- even in "an in camera hearing" if he so desired (Aug. RT 396, 397, 399) --

2   defense counsel knew he had a very difficult evidentiary burden to overcome, and

3   nothing offered now by Petitioner closes the evidentiary gap or even remotely rises

4   to the level of meeting that burden.   The evidence that Petitioner insists defense

5   counsel should have emphasized in his argument to the trial court -- including Ryan's

6   checking into the motel under a false name and then lying or misstating the time he

7   checked in -- only tenuously suggests that Ryan may have had a motive to hide his

8   identity for a reason completely unrelated to this case, such as his possible

9   commission of another crime somewhere in Los Angeles County that day.

10          There was nothing tying Ryan directly to the actual perpetration  of the

11   murder.  (Hg. RT 27-28.)  Indeed, Ryan told his mother he did not do it.  (Ex. 107.)

12   In Ryan's interview with Detective Monsue, Ryan denied being at the house that day.

13   (Ex. 86.)

14          Defense counsel was well aware of the obstacles he faced in gathering and

15   presenting sufficient evidence to the trial court to present the third-party defense.

16   (Hg. RT 19-20, 27-28.)   In California, mere evidence of a third person's motive,

17   opportunity, violent propensity and criminal disposition is not admissible unless it is

18   "coupled with substantial evidence tending to *directly connect* that person with the

19   *actual commission* of the offense."  *People v. Green*, 27 Cal.3d 1, 22, 164 Cal. Rptr.

20   1 (1980); *see also People v. Geier*, 41 Cal.4th 555, 581 (2007); *People v. Panah*, 35

21   Cal.4th 395, 481 (2005); *People v. Kaurish*, 52 Cal.3d 648, 684-86 (1990); *People*

22   *v. Guillebeau*, 107 Cal. App. 3d 531, 549, 166 Cal. Rptr. 45 (1980) (holding that

23   evidence showing a "possible ground for suspicion" will not suffice).  Evidence of

24   third party culpability cannot be presented without some physical evidence directly

25   "linking the third person to the actual perpetration of the crime."  *People v. Hall*, 41

26   Cal.3d 826, 833-34, 226 Cal. Rptr. 112, 718 P. 2d 99 (1986), quoted in *Spivey v.*

27   *Rocha*, 194 F.3d 971, 978 (9th Cir. 1999) (upholding refusal to allow "purely

28   speculative" evidence that did not "link" the third party to the murder, and noting that

"motive or opportunity is not enough"); *see also Holmes v. South Carolina*, 547 U.S. 319, 327, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (recognizing that "frequently, matters offered in evidence for this purpose [to show that someone else committed the crime] are so remote and lack such connection with the crime that they are excluded [because] it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial"); *Perry v. Rushen*, 713 F.2d 1447, 1451 (9th Cir. 1983); *People v. Yeoman*, 31 Cal. 4th 93, 140-41, 2 Cal. Rptr. 3d 186 (2003).

Thus, evidence offered to show that a third party committed the crime requires physical or other evidence directly linking the third party to the "actual perpetration" of the crime, and mere evidence of motive, general disposition, or opportunity, without more, will not suffice to *raise a reasonable* doubt about the defendant's guilt. *People v. Pride*, 3 Cal.4th 195, 237-38, 10 Cal. Rptr. 2d 636 (1992); *People v. Hall*, 41 Cal. 3d at 831-35; *People v. Clark*, 3 Cal. 4th 41, 131-33, 10 Cal. Rptr. 2d 554 (1992); *People v. Green*, 27 Cal. 3d at 22-23. In addition, it is not enough to present evidence proving, through direct or circumstantial evidence, that the third party committed the crime; the proffered evidence must at the same time exonerate or at least raise a reasonable doubt as to the defendant's own culpability by showing that the defendant did *not* commit the crime. In other words, the evidence offered must exculpate the defendant at the same time that it inculpates the third party by excluding the possibility that the third party committed the crime *with* the defendant and was merely the defendant's accomplice or an innocent on-looker. *People v. Hall*, 41 Cal.3d at 831; *see also People v. Lewis*, 26 Cal.4th 334, 372, 110 Cal. Rptr. 2d 272 (2001); *People v. Bradford*, 15 Cal.4th 1229, 1324-25 (1997); *People v. Alcala*, 4 Cal.4th 742, 792, 15 Cal. Rptr. 2d 432 (1992).

Based on the colloquy that took place at the hearing on the in limine motion (Aug. RT 389-99, 402), defense counsel knew that to satisfy the trial court's

insistence that there be evidence connecting Ryan to the "actual commission" of the murder would require finding "competent and substantial proof of a probability" that Ryan did it, and that "the *mere possibility*" that Ryan did it was "not enough." *People v. Arline*, 13 Cal. App.3d 200, 203-204, 91 Cal. Rptr. 520 (1970); italics added; *see* Hg. RT 19-20.  Petitioner has failed to show that the trial court would have ruled any differently on the in-limine motion regarding the admissibility of third-party-liability evidence even if defense counsel had investigated the matter further, had reiterated to the trial court the facts and speculative arguments the Second R&R now alludes to.  *See People v. Marshall*, 13 Cal. 4th 799, 836, 55 Cal. Rptr. 2d 347 (1996) (trial court not required to allow "unlimited inquiry into collateral matters; the proffered evidence must have more than slight relevancy"); *People v. Karis*, 46 Cal. 3d 612, 637, 250 Cal. Rptr. 659 (1988); *People v. Kaurish*, 52 Cal.3d at 685; *People v. Wright*, 39 Cal.3d 576, 588, 217 Cal. Rptr. 212 (1984).  Thus, contrary to the Second R&R, Petitioner has failed to show how further investigation or argument at the hearing would have changed anything. *See Hamilton v. Ayers*, 458 F. Supp. 2d 1075, 1110-11 (E. D. Cal. 2006) (no evidence of third-party involvement or of what would have been discovered with further investigation).

More specifically, contrary to the Second R&R, Petitioner has not shown how defense counsel could have overcome such significant, if not insurmountable, hurdles without having Ryan and/or Petitioner testify.  Petitioner has failed to demonstrate any direct link by Ryan to the actual perpetration of the murder.  *See Wade v. Mantello*, 333 F.3d 51, 61 (2d Cir. 2003) (noting that relevance cannot rest "at the end of a brittle chain of inferences").  Indeed, in denying Petitioner's habeas corpus petition on this claim of ineffective assistance of counsel, the superior court decried Petitioner's assertions of ineffective assistance of counsel as based on false "assumptions" that were "not supported by facts" and were "a stretch of credibility immersed in speculation."  (MTD, Ex. I at 161-62; *see People v. Von Villas*, 10 Cal. App. 4th 201, 264-65, 13 Cal. Rptr. 2d 62 (1992); *People v. Kegler*, 197 Cal. App.3d

1    72, 80, 242 Cal. Rptr. 897 (1987); *People v. Blankenship*, 167 Cal. App. 3d 840, 848,

2    213 Cal. Rptr. 666 (1985).)

3         The conclusions urged by Petitioner and accepted by the Second R&R in this

4    regard are based on pure conjecture, and the remote evidence Petitioner claims should

5    have been discovered and presented to the trial court does not meet the minimum

6    threshold in California for admitting evidence of third party culpability that would

7    tend to exculpate Petitioner. *See People v. Avila*, 38 Cal.4th 491, 576-78, 43 Cal.

8    Rptr. 3d 1 (2006) ("evidence which produces only speculative inferences is

9    irrelevant"); *People v. Alvarez*, 14 Cal 4th 155, 201, 58 Cal. Rptr. 3d 385 (1996);

10   *People v. Babbitt*, 45 Cal. 3d 660, 682, 248 Cal. Rptr. 69 (1988).  There was no direct

11   evidence that Ryan went to the Lisker residence on the morning of the murder.  what

12   is more, even if such evidence existed, that would not show that Petitioner did *not*

13   commit the murder, with or without Ryan.

14        The motive for this vicious and horrendous "overkill" -- committed with

15   multiple types of weapons (two knives, an exercise bar, a trophy, and a rope) on a

16   small, elderly lady -- was not theft, but rather hatred and rage.  There was no evidence

17   that Ryan had ever displayed any animosity toward Mrs. Lisker, had ever fought with

18   or said anything bad about her, had any animus against her.  No evidence has been

19   presented to indicate why, if Ryan actually did try to take money from Ms. Lisker,

20   and she caught him, he would not simply leave, or if she confronted him and he felt

21   he needed to present her from calling the police by knocking her out or even by

22   killing her, he would not simply kill her with one knife, instead of two, or just with

23   the bullworker.

24        There is nothing in the purported motive or alias evidence that would

25   distinguish Ryan from any other person in Los Angeles who needed some money that

26   morning.  And even if Ryan did obtain money unlawfully that morning and then took

27   steps to avoid detection, he could have done so in any number of ways and at any

28   number of places in Los Angeles County, thereby arguably proving a reason for him

12

1   to check in to a motel under an assumed name.

2        The Second R&R posits that evidence of Ryan's having checked into a motel
3   in Hollywood on the day of the murder under an alias is suspicious because it shows
4   he wanted to elude detection.  (2R&R 28, 33.)  The 2R&R theorizes that Ryan's
5   sudden decision not to stay in California but to return immediately to Mississippi also
6   shows that he was trying to escape from something, and hypothesizes that his having
7   obtained money from some unknown source to pay for the return bus trip shows that
8   he must have done something that prompted him to flee.  (2R&R 28, 32-33, 41.)
9   Finally, the Second R&R postulates that a telephone call made to a number that is
10  different than the phone number for Ryan's mother was so close to her number that
11  it might have been Ryan trying to call his mother, or using this as a pretext to get into
12  the Lisker residence.  (2R&R 28, 40-41.)

13       But none of these conjectures links Ryan to the actual perpetration of the
14  murder of Mrs. Lisker.   They point only remotely to a possible motive or a
15  conceivable opportunity or an imaginable consciousness of guilt after having
16  committed some theft or robbery somewhere in the County of Los Angeles.  These
17  facts do not add up to relevant evidence to show third-party complicity, since they
18  would merely show "a *possible* ground of *possible* suspicion."  *People v. Hall*, 41
19  Cal.3d at 832; italics added; *see also People v. Sandoval*, 4 Cal. 4th 155, 176, 14 Cal.
20  Rptr. 2d 342 (1992); *People v. Edelbacher*, 47 Cal. 3d 983, 1017-18, 254 Cal. Rptr.
21  586 (1989); *People v. Babbitt*, 45 Cal.3d at 684.

22       Ryan may well have had other reasons to lie to the police about the time that
23  he registered into the motel in Hollywood, and he may have obtained money from any
24  number of legitimate or illegitimate sources to pay for his return trip to Mississippi.
25  Indeed, a telling fact to which the Second R&R alludes -- that money was found in
26  Mrs. Lisker's wallet after the second trial -- demonstrates that Ryan did not obtain his
27  money from Mrs. Lisker and that the motive for killing Mrs. Lisker was not robbery.
28       Hence, Petitioner relies on a leap of logic which the Second R&R appears

1   to have countenanced -- that Ryan must have gotten money from Mrs. Lisker because

2   he told her the night before the murder that he needed money, and because Ryan had

3   money with which to purchase a bus ticket back to Mississippi the day after the

4   murder.  That tenuous leap is not persuasive and must be rejected.  In addition, Ryan

5   may have had any number of reasons to depart and travel back to Mississippi, and any

6   argument that it might have been an attempt to avoid being arrested for the murder

7   of Mrs. Lisker is utterly speculative.  And even if Ryan were involved some way as

8   Petitioner's  accomplice, that would not exclude Petitioner's status as principal.  *See*

9   Cal. Penal Code § 31.

10   That Ryan might have had a temper and even a criminal record does not

11   show identity.  That he was in the greater Los Angeles area on the morning of the

12   murder does not show identity.  That he lied about his reason for coming to California

13   or that he returned home does not show identity.  That he was Petitioner's former

14   friend and roommate does not show identity.  That he had done yard work for Mrs.

15   Lisker in the past does not show identity.  That he needed money does not show

16   identity.  And that he went to the Lisker residence the night before the murder to use

17   the telephone does not show identity, notwithstanding the Second R&R's conclusion

18   to the contrary.  (2R&R 28, 33, 51.)

19   Ryan had no motive to *kill* Mrs. Lisker – much less to commit such an

20   "overkill" with *two* knives, an exercise bar, a trophy, and a rope -- if he was there

21   only to steal money from her.  The crime was much more consistent with a rage-

22   killing by a violent, out-of-control drug-addicted teenager.  Moreover, if Ryan

23   borrowed or stole money from someone to return to Mississippi, it was not from Mrs.

24   Lisker, since money was found in a compartment of Mrs. Lisker's wallet, and since

25   Petitioner admitted having taken other money from the same wallet and having

26   hidden it in the attic.

27   What is more, there was a complete lack of eyewitness testimony placing

28   Ryan at the scene of the crime.  There were no witnesses saying that they saw Ryan

1    enter or leave the Lisker residence that morning.  At no time did Petitioner ever tell

2    defense counsel that he saw someone else leaving the house after he arrived on the

3    morning of the murder, and all the evidence recovered at the scene shows that the

4    murder was committed by Petitioner.  (Hg. RT 27.)

5        There was no forced entry, and the front door was locked.  The murder was

6    carried out with multiple weapons and showed unmistakable signs of overkill,

7    committed out of hatred, in a fit of rage, apparently triggered by Petitioner's mother's

8    refusal to give Petitioner money for drugs the night before and that morning.

9    Furthermore, valuable items were left behind in the house, there was no ransacking,

10   and no one was seen leaving the residence at or after the time that, according to the

11   deputy coroner, the victim was receiving the fatal blows, i.e., the blows and stab

12   wounds that would have lead to immediate death if resuscitation had not taken place

13   within twenty minutes.  (RT at 1117-20.)

14       Moreover, the murderer took the time to place rope around the victim's neck

15   and to carry the bloody Bullworker all the way back to the master bedroom, to wipe

16   off the fingerprints with a towel, and to neatly place it in a corner.  Those are not the

17   actions of a thief who kills upon being suddenly and unexpectedly discovered and

18   confronted by the victim.  No thief would go to the trouble of returning an exercise

19   bar to its proper place in the farthest room of the house from the entry way after

20   bashing in the skull of his victim.  (RT at 1120-21.)

21       Thus, there was no physical evidence connecting Ryan to the crime scene.

22   Petitioner makes no showing that the trial court would have admitted conjectural

23   evidence as to third party involvement over the prosecutor's inevitable objections that

24   such evidence was hearsay, irrelevant, confusing, and unduly prejudicial.  *See* Cal.

25   Evid. Code, §§ 350, 352; *see generally Holmes v. South Carolina*, 547 U.S. at 326-27

26   (upholding "well-established rules of evidence [that] permit trial judges to exclude

27   [third-party guilt] evidence if its probative value is out-weighed by certain other

28   factors such as unfair prejudice, confusions of the issues, or potential to mislead the

1    jury”); *Harding v. Sternes*, 380 F.3d 1034, 1048 (7th Cir. 2004); *Clayton v. Gibson*,

2    199 F.3d 1162, 1178 (10th Cir. 1999) (rejecting ineffective assistance claim because

3    “there is not a shred of credible evidence, either direct or circumstantial, linking [third

4    parties] to the murder”).  Thus, statements from Ryan’s interviews would have been

5    ruled irrelevant hearsay, as would have been the motel receipt under the name Mark

6    Smith and Ryan’s criminal record, unless Ryan testified.  (RT 2-13.)  In addition, the

7    telephone bill, while curious or interesting, was not relevant to any material issue.

8    *See O’Brien v. Marshall*, 453 F.3d 13 (1st Cir. 2006) (third-party-culpability evidence

9    may not be based upon hearsay); *Bowling v. Parker*, 344 F.3d 487, 505 (6th Cir.

10   2003) (counsel not derelict for failing to investigate a “farfetched” theory that another

11   suspect, whose only connection to the murder was “tenuous,” was the killer); *Johnson*

12   *v. Alabama*, 256 F.3d 1156, 1180 (11th Cir. 2001).

13        In sum, contrary to the Second R&R’s findings, Petitioner has not shown that

14   the trial court would have denied the prosecutor’s in limine motion had defense

15   counsel made the arguments he now makes.

16        **2.   Defense Counsel Made A Reasonable Tactical Decision Before
             The Second Trial To Forego The Defense Of Third-party
17           Liability, And The Second R&r Fails To Give Adequate
             Consideration To An Enormously Probative Body Of
18           Incriminating Evidence:  Petitioner’s Numerous, Detailed
             Confessions**

19

20                    **a. Factual Background**

21        A review of Petitioner’s multiple confessions, in which he often explained

22   in gruesome and revealing detail how and why he murdered his adoptive mother, and

23   how he tried to make it look like Ryan had done it, proves just the opposite of the

24   conclusion reached in the Second R&R.  That review proves the soundness of defense

25   counsel’s decision not to pursue a futile investigation of, or attempt to present, a

26   third-party liability claim.  In addition, Mr. Mulcahy testified at the evidentiary

27   hearing that his decision to advise Petitioner to plead guilty and not to pursue the

28   alternate-perpetrator theory was partly based on his interview of Ryan.

### (1)  Petitioner's Confession To Robert Hughes

While in jail awaiting trial, Petitioner confessed to Hughes that he killed his mother when she refused to give him money, caught him going through her purse, and hit him.  Petitioner told Hughes that he stabbed his mother in the back with two knives, hit her in the head with a trophy, hit her repeatedly with an exercise bar, and placed a rope around her neck.  (RT at 547-692.)  These details match the forensic evidence found at the scene of the crime, thus corroborating Hughes' account.  Contrary to the Second R&R's conclusion (2R&R at 67), Hughes was credible because he received nothing in return for his testimony and because the information he provided in two other criminal cases proved to be reliable, in that one case the defendant pled guilty, and in the other case, the jury convicted the defendant even without Hughes's testimony.

In addition, Hughes's statements to Detective Monsue and his trial testimony regarding Petitioner's confession were self-corroborating, since they related facts known only to the actual killer.  Hughes told Monsue that Petitioner said he hit his mother with a "Bullworker," which is an unusual brand name for a particular type of exercise bar.  The police report in this case referred only to an "exercise bar,"and even then, it was only listed inconspicuously as one of dozens of items that were seized at the Lisker house.  The report did not refer to this exercise bar as a Bullworker – only Lisker did.  This significant detail strongly corroborates Hughes.

But there were other details Hughes reported that confirm that Lisker told him about the crime.  Hughes said that Lisker had made two calls.  This was true: Lisker called both the paramedics and his father.  Hughes had no way of knowing this unless Petitioner had confessed it to him, and there was no reason for Hughes to make up a story that Petitioner had called both.

Hughes also said that Lisker *used* multiple weapons.  This was true, and only Lisker knew it.  Hughes gave the complete sequence of events, and correctly described all the rooms in which the confrontation and assault took place.  (RT at

547-692.)  Although the police reports contained some references to property seized and forensic evidence collected, there was no evidence presented that Hughes ever had access to these reports, that Petitioner ever showed them to him, or that one could have gleaned from the reports sufficient information to manufacture a confession regarding which of the items seized had been use as a weapon, in what order they had been used, and where they had been used.  (RT at 1103-1104.)

Moreover, since Petitioner challenges the government's alleged exploitation of his placement in a jail cell next to Hughes and its use of Hughes as an agent to elicit Petitioner's confession, Petitioner is admitting that he actually confessed to Hughes.  Neither at trial nor in these proceedings has Petitioner ever denied that he made the statements to Hughes.  Thus, the confession is accurate and shows guilt. (*See Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) [observing that although the confession must be excluded to serve other policies of overriding importance, the confession was "relevant, reliable and highly probative of the issue which the trial court [had] before it–whether the accused committed the act with which he [was] charged"].)

### (2)  Petitioner's Guilty Plea

On December 4, 1984, he entered a plea of guilty to second-degree murder,  stating that he had discussed his rights and any potential defenses with his attorney and that he was pleading guilty "because *in truth* and *in fact*" he was guilty.  (CT 229; RT Plea at 4-10, italics added; Ex. A; Pet. Ex. 508.)  Defense counsel agreed that there was a factual basis for the plea, and the trial court amplified on that concession:  "There is certainly not the slightest doubt there is a factual basis for his plea."  (Ex. A; RT Plea at 11.)  Thus, defense counsel not only allowed Petitioner to plead guilty; he advised him to do so after having discussed the case many times with Petitioner, and knowing that at no time did Petitioner ever claim that he had not killed his mother.

### (3)  Statement To Probation Officer Barron

On or about January 7, 1985, Petitioner told Deputy Probation Officer

1   Dennis Barron that he was taking $100 twice a week from his parents to support his

2   cocaine habit and that he used amphetamines, LSD, tranquilizers, and psilocybin.

3   Petitioner's father, Robert Lisker, told Deputy Probation Officer Barron that when

4   Petitioner "became abusive and disruptive of the family, he was moved into his own

5   apartment in May, 1982, which was paid for by his parents."  Petitioner told Officer

6   Barron that he was having "arguments and fights" with his mother and that the

7   arguments "led to his mother physically striking him and his taking defensive

8   actions." During the interview with Officer Barron, Petitioner's "composure was cool

9   and calm up to the point of discussing the date of the murder, when his composure

10  started to deteriorate."  (Ex. D; Hg. Ex. 100.)

11          Petitioner told Officer Barron that during the week of the murder, he and his

12  mother argued about money and about the fact that he only went to his parents' home

13  "when he needed things."  He stated that the day before the murder, he went to his

14  parents' home asking for food and money, and he argued with his mother.  When he

15  returned to the home later that evening for more money, his mother "became angrier"

16  and they both became "highly agitated."  (Ex. D; RT at 772-773, 819-820, 826-820;

17  Ex. 100.)

18          Petitioner told Officer Barron that on the day of the murder, he went to his

19  parents' home to get money, but his mother was still angry and upset about the

20  arguments the prior day.  Frustrated about not being able to ask for more money,

21  Petitioner saw his mother's purse in the hallway near a bedroom and started taking

22  money from it.  Petitioner stated that his mother came towards him with a trophy and

23  hit him on the shoulder with it.  Petitioner said he grabbed it away from her and hit

24  her in the head with it, causing her to fall to the floor.  He stated that he "felt a lot of

25  anger."  (Ex. D; Ex. 100.)

26          On or about January 7, 1985, Petitioner amplified his account of the murder.

27  He told Officer Baron that he "panicked," ran around, and looked down at his mother.

28  Petitioner said that he did not have any recollection of how his mother got into the

19

1  bedroom and then back, did not recall how or why a rope was placed around her neck,

2  and did not remember how his mother got to the entryway, just inside the front door.

3  Petitioner said he did remember taking two knives out of the kitchen.  (Ex. 100.)

4  ### (4)  Statement To Dr. LeGassick

5      In January, 1985, Petitioner's father, Robert Lisker, told Dr. Richard

6  LeGassick (court-appointed) that  Petitioner had "a long history of emotional upset

7  with his mother," a "long-standing conflict between [him] and his mother," and that

8  he had threatened her.  (Ex. E; Ex. 96.)  Petitioner told Dr. LeGassick that he had a

9  fascination with fire and liked to light fires.  Petitioner said he had read "Helter

10  Skelter" when he was nine, and then another book on Charles Manson, "The Family."

11  Petitioner stated that he carried a switch blade and loved to shoot guns.  (Ex. E; Ex.

12  96.)

13      Petitioner told Dr. LeGassick that he killed his mother.  He stated it was an

14  "awful" and "stupid" thing he had done, that he felt that Satan wanted him to kill his

15  mother, that he did not know why he was so "enraged . . . over so little money."

16  Petitioner did not show any empathy toward his mother.  He expressed no remorse

17  and distanced himself from the experience.  (Ex. E; Ex. 96.)

18  ### (5)  Statement To Dr. Fukushima

19      On or about March 4, 1985, Petitioner told Dr. Susan Fukushima of the

20  California Youth Authority (CYA) that at time of the murder, he "needed the money"

21  and was "justified in stealing money from his mother because he had money coming

22  to him from a trust fund, and his mother was "keeping [his] money from [him]."  He

23  said he could not remember stabbing his mother and said "it could have gone either

24  way because of their highly conflictual and explosive relationship."  He stated that

25  there was "a lot of rage" between him and his mother because she was "highly critical

26  of him," often "antagonistic," and constantly berated him."  (Ex. F; Ex. 96.)

27      Petitioner told Dr. Fukushima that he and his mother had frequent arguments

28  and that his mother would throw things at him and would frequently push and hit him.

He said that following the murder, he had "trouble sleeping because he was constantly thinking about what he had done." He stated that on several occasions he had nightmares about the event. (Ex. F; Ex. 96.)

Petitioner told Dr. Fukushima that he had "a great deal of confusion about being adopted," that he "felt rejected about not being wanted," and was at times very suspicious of his adoptive parents. He stated that was "frequently angry and was a 'time bomb.'" He stated he was using marijuana, cocaine, amphetamines, and barbiturates, and was stealing money from his parents to support his drug habit. (Ex. F; Ex. 96.)

### **(6)  Statement To Dr. Davis**

Petitioner told Dr. Adrienne Davis (CYA) that he and his mother were having "violent, rageful arguments that sometimes lasted entire days." He said he was involved with drugs. He said the "genuinely felt badly about killing his mother" and the circumstances surrounding it. (Ex. G; Ex. 96.)

### **(7)  Statement To Dr. Holland**

On or about April 5, 1985, Petitioner told Dr. Judith J. Holland (CYA) that he had a history of "ongoing, unrestrained arguments and 'uproar'" with his mother, all of which grew even more "intense and violent" by the time he was in the seventh grade. He said that he was a chronic and heavy substance abuser, that his parents were very critical of this, and that he his mother constantly argued, "accompanied by both of them physically dashing and scrambling around the house, upsetting furniture," and engaging in physical violence. He stated that, with regard to the circumstances surrounding the crime, "He remembers more than he would like to." (Ex. H; Ex. 96.)

Petitioner told Dr. Holland that when his mother discovered him going through her purse for money, she grabbed a trophy and hit him in the shoulder. Petitioner stated that he grabbed the trophy from her and hit her over the head with it, knocking her unconscious. He said that when he realized the seriousness of the

1  wound he had inflicted, he set about premeditating the actual murder, planning to

2  make it appear that intruders had killed his mother.   He said he stabbed her in the

3  back twice, beat her with the trophy and with an exercise bar, and then tied a rope

4  around her neck.  (Ex. H; Ex. 96.)

5  Petitioner told Dr. Holland that he might have "unconsciously" been copying

6  the modus operandi of the Helter Skelter murder scenes.   He said that he had

7  "begged" his mother to buy him the book "Helter Skelter" when he was seven to nine

8  years old.  Petitioner said he devised an elaborate plan to make it look like someone

9  else had committed the murder, and he told the police that an ex-roommate, Michael

10  Ryan, was the perpetrator.  (Ex. H; Ex. 96.)

11  ### (8)  Testimony Before Parole Board

12  After his trial and conviction, when Petitioner appeared before the parole

13  board for his Initial Parole Consideration Hearing, Petitioner averred that he

14  murdered his mother, that he remembered everything about how he carried it out and

15  why he did it. He admitted that before he called the paramedics, he staged the scene

16  to make it look like somebody had broken into the house and killed his mother, and

17  that he later tried to frame or set-up his former roommate, Michael Ryan.  He said he

18  "never denied [committing the murder] to [his] father or to his Attorneys" or to

19  anyone else.  (Ex. 104.)

20  Petitioner stated that his trial attorney recommended that he plead guilty to

21  "try to get in CYA," but then, "when the Judge would not accept that," his attorney

22  "didn't let [him] plead guilty," although he "wanted to."   He denied telling the

23  authorities that he had only pled guilty to get the plea bargain.  He wanted to plead

24  guilty because he was factually guilty.  (Ex. 104.)

25  Petitioner admitted taking the polygraph examination and "flunking" it.  He

26  said that the weekend after the murder, when his father came up to visit him at

27  juvenile hall, he confessed to his father that he had committed the murder.

28  Petitioner's attorney at the parole board hearing admitted that Petitioner "screwed up

big time by doing this [murder]," that "it was wrong for him to try and cover it up,"
that by doing that, "he screwed up again," because "it's wrong for him to blame
somebody else for it, again, his mistake.  And we're not trying to make an excuse for
it, because it happened."  (Ex. 104.)

Mr. Mulcahy testified that at no time did Petitioner ever claim to him that he
did not commit the murder.  He testified that if Petitioner had ever said he was
innocent, he never would have advised him to plead guilty.  He testified he never
instructed Petitioner to lie to the probation officer or to the counselors at CYA for any
reason, and that he told him to tell the truth.

### b.   The Second R&R Unreasonably Discounts And Dismisses Petitioner's Confessions

The Second R&R acknowledges that Petitioner's trial counsel testified at the
evidentiary hearing that after Petitioner's guilty plea and numerous confessions to
CYA authorities in the period between the two trials, defense counsel decided for
tactical and ethical reasons to forego presentation of a third-party-liability defense,
and instead, to present a reasonable-doubt defense.  (2R&R at 36.)  The Second R&R
posits, however, that defense counsel's decision was ill-considered and contrary to
his professional obligations because, in light of Petitioner's "obvious and weighty
strategic incentive to admit his guilt," his "admissions in conjunction with his
strategic plea were anything but convincing evidence of his guilt . . . , rendering them
an unreliable barometer of what actually happened."  (2R&R at 38.)  The Second
R&R concedes that a defense attorney may not present evidence where counsel has
a "firm factual basis" for concluding that it is false, but then concludes that
Petitioner's string of detailed confessions and solemn guilty plea provided no "firm
factual basis" for believing that Ryan was not involved in the crime.  (2R&R at 39.)

This conclusion runs contrary to the facts and to the law.

### c.   Legal Background

Admissions matter, and multiple confessions over a sustained period of time

23

1   confirm and re-confirm guilt.  The United States Supreme Court relied on two
2   extrajudicial admissions in arriving at its decision on an actual innocence claim.
3   *House v. Bell*, 547 U.S. 518, 548-51, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).  Even
4   more pointedly, Justice O'Connor noted in another case that "the most compelling
5   piece of evidence" and "the most damaging piece of evidence" defeating the actual
6   innocence claim was the state prisoner's own confession.  *Herrera v. Collins*, 506
7   U.S. 390, 422-423, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (O'Connor, J.
8   concurring opn.).  "One could hardly ask for more unimpeachable–or more
9   unimpeached–evidence of guilt."  *Id*. at 424.

10       A guilty plea is a solemn declaration in open court that a defendant in fact
11  is guilty of the offense with which he is charged and it carries "a strong presumption
12  of verity."  *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 2098, 52 L. Ed. 2d 126
13  (1977).  The most critical factual shortcoming of the Second R&R is that it
14  characterizes Petitioner's unqualified guilty plea as procedural posturing conducted
15  only to obtain a CYA commitment for a crime he probably did not commit.  But by
16  pleading guilty, Petitioner admitted the truth of every element of the crime, and
17  "[c]ourts do not allow prisoners to start with clean slates after their convictions and
18  argue 'actual innocence' as if the [guilty plea] had not occurred."  *Escamilla v.*
19  *Jungwirth*, 426 F.3d at 868, 871 (7th Cir. 2005).

20       A guilty plea confirmed and corroborated by years of additional confessions
21  must surely carry a conclusive presumption of verity.  These principles are not novel,
22  or controversial, or untested.  They are bedrock elements of the legal system.

23       Petitioner's confessions are the "most compelling piece[s] of evidence"
24  available because they are "entirely of petitioner's own making."  *Herrera v. Collins*,
25  506 at 422.  He pled guilty and then confessed the crime over and over, in multiple
26  contexts.  The Supreme Court has cautioned that an assertion that a petitioner's last-
27  minute, self-serving declaration that he is innocent and that someone else committed
28  the murder should be treated "with a fair degree of skepticism," since it was made "at

24

1  the eleventh hour with no reasonable explanation for the . . . delay," and even more

2  so because Petitioner "blame[s] a dead man – someone who will neither contest the

3  allegations nor suffer punishment as a result of [Petitioner's allegations]." *Id.* at 423.

4      Indeed, the Supreme Court has observed that a defendant's own confession

5  "is like no other evidence," and "'is probably the most probative and damaging

6  evidence that can be admitted against him . . . . [T]he admissions of a defendant come

7  from the actor himself, the most knowledgeable and unimpeachable source of

8  information about his past conduct.'" *Arizona v. Fulminante*, 499 U.S. 279, 296, 111

9  S. Ct. 1246, 113 L. Ed. 2d 302 (1991), quoting *Bruton v. United States*, 391 U.S. 123,

10  139-40, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (dis. opn. of White, J.).  As noted by

11  the Ninth Circuit, confessions made to prison doctors and psychologists are highly

12  reliable.  *Griffin v. Johnson*, 350 F.3d 956, 964 (9th Cir. 2003) (crediting the

13  petitioner's statement to prison doctor, which "strongly suggests that [he] killed the

14  victim deliberately with full appreciation of the nature of his conduct.")

15      The Second R&R mistakenly ascribes to Respondent an argument that has

16  *not* been made in these proceedings, to wit, that once a defense attorney receives

17  reliable information from his client or from other sources that his client actually

18  committed the proscribed act, he may abandon his client with impunity and refrain

19  from vigorously defending him.  (2R&R at 36-39.)  Respondent has made no such

20  suggestion and fully recognizes a defense attorney's duty to serve as a diligent

21  advocate on his client's behalf and investigate available defenses, to present

22  exculpatory evidence, and to argue reasonable doubt despite his client's admissions.

23  But there are ethical bounds and practical limits to what a defense attorney can and

24  should do, within the wide range of professional responses, in deciding how best to

25  represent his client.  *Nix v. Whiteside*, 475 U.S. at 165-176.

26      Thus, a defense attorney is not required to waste time and resources on an

27  avenue of investigation that he already knows cannot lead to relevant, admissible

28  evidence.  In addition, he is not obligated to pursue lines of attack that will serve only

to alienate the jury, expose his client or other defense witnesses to devastating cross-examination, or invite the presentation of damaging rebuttal evidence.  Most importantly,

> [C]ounsel's duty of loyalty and his 'overarching duty to advocate the defendant's cause' . . . plainly . . . is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth.  Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law.

*Id*. at 166; *see also Strickland*, 466 U.S. at 691 (noting that strategic choices may be determined or influenced by the defendant's own statements, and observing that a particular decision not to investigate should be assessed for reasonableness "in *all* the circumstances, applying a heavy measure of deference to counsel's judgments").

The Second R&R takes Petitioner's trial attorney to task for believing his own client.  But the sheer number and detailed quality of Petitioner's confessions, coupled with the numerous conversations Mr. Mulcahy had with Petitioner, Petitioner's father, Ryan, and other persons, both before and after the guilty plea, certainly presented Mr. Mulcahy with a firm factual basis for concluding that Petitioner's confessions were truthful.  Thus, Mr. Mulcahy  cannot be faulted for choosing to represent his client by obtaining a reduction of the charge to second-degree murder and by mounting an effective, vigorous reasonable-doubt defense, in lieu of a futile third-party-liability defense.

### d. Defense Counsel's Strategy Was Reasonably Informed By The Facts He Faced And Was Properly Constrained By His Ethical Obligations

As stated above, the Second R&R characterizes the evidence adduced at the evidentiary hearing as providing "substantial," "credible," or "compelling" evidence "linking" Ryan to the commission of the murder.  (2R&R at 34-35, 39, 48, 50-51.)  But a comprehensive examination of the evidence available to defense counsel before

26

commencement of the second trial shows that this conclusion is untenable.  Any possibility of successfully mounting a viable third-party-culpability defense at the second trial was destroyed by compelling evidence of Petitioner's guilt -- the most compelling of which were Petitioner's guilty plea and damning out-of-court confessions and admissions -- all of which informed and guided Petitioner's defense attorney's ethical and tactical choices.

As noted above, a defense attorney must decide which investigatory paths to follow and which to avoid based on the reliable information that is before him. Here, defense counsel reasonably determined that his best defense was a reasonable-doubt defense, not a third-party liability defense, as the latter not only could backfire, but would probably necessitate a violation of the canons of ethics.

The Second R&R fails to consider and evaluate another obvious and highly relevant possibility:  that Ryan, if involved at all, was Petitioner's accomplice.  None of the evidence presented at the first evidentiary hearing eliminated the possibility that Ryan was merely present when Petitioner murdered his adoptive mother and then fled.  Thus, even if the completely speculative evidence accurately implicated Ryan in any way, it would show only that Ryan was merely Petitioner's accomplice, acting in concert with Petitioner, or acting as an astonished, and then frightened, eyewitness.

It bears repeating that during the 911 call, when the dispatcher asked Petitioner, "Did you have a stabbing there?," Petitioner tellingly responded, "Yes, *we* did." Thus, the Second R&R fails to take into account the fact that Petitioner has not demonstrated prejudice if his third-party-liability evidence does not show that the third-party acted alone, i.e., *without* Petitioner.  Under California law, if Petitioner acted in concert with Ryan, he still was guilty of the murder as a principal.  (Cal. Penal Code, § 31.)

Defense counsel knew from the evidence collected at the scene that there was no physical evidence connecting Ryan to the crime -- no fingerprints, no hair, no blood, and no footprints or shoe prints.  The only fingerprints found were Petitioner's,

1   and they were on one of the kitchen window panes.  Defense counsel knew there were

2   no witnesses saying they saw Ryan enter or leave the Lisker residence that morning.

3          Defense counsel also knew that there was no evidence whatsoever to

4   demonstrate that Ryan had any motive to kill Dorka Lisker with two knives, an

5   exercise bar, and a trophy.  There was no evidence to show that he had ever fought

6   with her or had ever said anything bad about her.  There was no evidence to indicate

7   why, if he actually did try to take money from her and she caught him, he would not

8   simply leave, or if she confronted him and he felt he needed to prevent her from

9   calling the police by knocking her out or even by killing her, why he would not

10  simply kill her with one knife, instead of two, or just with the Bullworker.

11         The Second R&R appears to give considerable weight to what a telephone

12  record shows to be a 10:22 a.m. telephone call placed from the Lisker residence to the

13  number "492-8972," which the Second R&R observes is "different by one digit (and

14  without the area code) from Ryan's mother's home phone number."[3]  (2R&R at 40.)

15  Petitioner's speculative interpretation of this call is that Ryan made it.

16         This conjectural conclusion does not make sense.  Ryan's mother, Linda

17  Clelland, attested that Ryan had lived with her for some time at her home and when

18  not living with her, and often called her from various places in the country.  (Ex.

19  107:1.)  Meanwhile, it is undisputed that Ryan had, for a period of time, lived with

20  Petitioner at Petitioner's apartment minutes away from the Lisker residence.  (Ex. 48:

21  37,40 [Ryan talking about living with Petitioner]; Ex. 86:98 [Petitioner's address

22  being listed as "6500 Sepulveda Blvd. Van Nuys"]; Ex. 86:141 [Petitioner informing

23  Monsue that Ryan lived with him for two months].)  Knowing his mother's number

24  by heart, and knowing the difference in the area code after having lived with

25  Petitioner, it is not plausible that Ryan would have misdialed in this way.  And if he

26  _____

27         3.  The telephone number of Ryan's mother, Linda Clelland was (805) 492-

28  8976.  (Ex. 107:1.)  The telephone number for the Lisker residence was (213)789-
    2535 in 1983.  (Ex. 40:1.)

1   ever misdialed, there was no conceivable reason he would not immediately dial again,

2   using the correct telephone number and area code.

3           The Second R&R appears to connect the March 10, 1983 call with Ryan's

4   account to Monsue of his visit to the Lisker residence on March 9, 1983, to make a

5   call.  (2R&R at 40.)  The Second R&R then notes the fact that the telephone records

6   showed that no call was placed to Clelland's residence from the Lisker residence on

7   March 9, 1983.  (2R&R at 40.)  But this assumes, without any basis, that the person

8   Ryan planned to call at the Lisker residence was his mother and not someone else,

9   and it ignores the fact that a March 9, 1983 call by Ryan within the same area code

10  would not appear on the phone bill.  Ryan only said during the interview, "I stopped

11  by Mrs. Lisker's house to use her phone and a to see how she was, you know, and I

12  was gonna ask her if she had some work for me to do."  (Ex. 48:7.)

13          Under these circumstances, rather than assuming what is almost impossible --

14  that Ryan has misdialed his own mother's number and had not dialed again, as soon

15  as he realized he had misdialed -- the more plausible explanation was that Mrs. Lisker

16  or Petitioner had misdialed.  Moreover, defense counsel knew from Petitioner's own

17  statements that he had tried to frame Ryan and to stage the scene to make it look that

18  Ryan did it.  Thus, Petitioner tried to dial Ryan's mother to make it look like Ryan

19  was in the house at the time the murder was committed.

20          Petitioner's extraordinary and compulsive self-incrimination required

21  defense counsel to re-examine his planned trial strategy before the second trial.

22  Astonishingly, Petitioner told the Parole Board in 1992 that he wanted to plead guilty

23  at the commencement of the second trial, but that his trial attorney did not permit him

24  to do so.  This representation was refuted by Mr. Mulcahy at the evidence hearing.

25          Nonetheless, Petitioner's solid confessions strengthened the government's

26  case to the point of overwhelming and made it necessary for defense counsel to re-

27  think what strategy he would employ, since he now knew -- based on his client's own

28  words and solemn declarations, made in the most confidential settings -- that any

29

investigation into forensic evidence of Ryan's involvement would be fruitless.  Yet the Second R&R shrugs off this unbroken chain of confessions with the astounding conclusion that no attorney could possibly believe Petitioner's multifarious admissions and confessions.  (2R&R at 38, 40.)  It is difficult to imagine what number of confessions -- before and after a guilty plea with a factual basis -- would be enough.  Whatever the *Strickland* standard is, this case does not satisfy it.

Respondent has demonstrated that the evidence before the defense attorney did not merely defeat any possibility of presenting a third-party-liability defense, but it decimated it.  It conclusively established his actual guilt.  Thus, defense counsel had the benefit of several pieces of evidence and information which led him to discard a third-party liability defense.  He cannot be faulted for doing so, knowing what he knew.  And he advised Petitioner to plead guilty after speaking with Ryan.

As noted above, the first trial was aborted when Petitioner decided to halt it, to plead guilty, and to admit a factual basis for the plea.  At the hearing on the plea, defense counsel expressly stated that he had discussed the case with Petitioner, that he had "thoroughly investigated this case, *talking to many witnesses, including . . . Ryan*, . . . and based on everything. [he] concur[red] in [Petitioner]'s desire to enter this plea."  (Ex. 93 at 2-3; *see* Hg. RT at 34, 37-38.)  When Petitioner was reminded that he was admitting he was "in effect, . . . saying [he was factually] guilty," he stated that he understood, and when he was asked if he was pleading guilty "because in truth and in fact you are guilty," he answered, "Yes."  (Ex. 93 at 8, 10; *see* Hg. RT at 39.)

After speaking to Petitioner, Ryan, and others, defense counsel stipulated to a factual basis for the plea because it was a plea "based on factual guilt."  (Hg. RT at 38-39; Ex. 93 at 10.)  The trial court stated to Petitioner, "I have listened and watched you.  There is no doubt in my mind that you understood exactly what was happening this afternoon.  [¶]  There is certainly not the slightest doubt there is a factual basis for this plea, and it is a proper plea."  (Ex. 93 at 11; *see* Hg. RT 39.)  The trial court

1   complimented defense counsel on the fine job he had done for Petitioner, including

2   "the best [motions] I have seen." (Ex. 93 at 12; *see* Hg. RT 21.)

3          Defense counsel discussed the details of the case and trial strategy many,

4   many times with Petitioner and with Petitioner's father; at no time did Petitioner ever

5   tell defense counsel that he was innocent, and at no time did Petitioner's father ever

6   object to the entry of the guilty plea. (Hg. RT at 23, 25-27, 37, 39, 41, 58, 120.)

7   Petitioner "never denied" killing his mother. (Hg. RT at 43; *see also* Hg. RT at 39.)

8   Indeed, defense counsel testified that if in fact Petitioner had insisted at any time that

9   he was innocent, defense counsel would never had advised him to plead guilty to a

10  murder he did not commit. (Hg. RT 36-37, 39.)

11         After Petitioner was sent to the California Youth Authority (CYA) for a 90-

12  day diagnostic evaluation, he explained to several staff psychologists, counselors, and

13  Dr. Legassick why he committed the horrendous matricide, he described in detail how

14  the altercation started and how he murdered his mother, and he stated unequivocally

15  that he deliberately tried to make it look like -- and to tell the police that -- Ryan had

16  done it. (Ex. 96.) Petitioner stated to the parole board in 2007 that he revealed all

17  these facts because his attorneys had advised him to lie so that he would be found

18  amenable to treatment and be accepted by the CYA. (Ex. 157 at 92-93.) However,

19  defense counsel adamantly denied this, testified that he *never* told Petitioner to lie,

20  to falsely say he was guilty, to say he was not innocent, to feign responsibility, or to

21  pretend to be remorseful, and vehemently testified that the only instruction he gave

22  him was to be truthful, honest and candid. (Hg. RT at 43-45.)

23         Petitioner's conduct and statements after the guilty plea gave defense counsel

24  good reason not to conduct any further investigation into an alternate-perpetrator

25  theory, knowing from Petitioner himself that no forensic evidence could place Ryan

26

27

28

at the scene.[4/]  In light of Petitioner's guilty plea and highly detailed and incriminating statements to Robert Hughes, to the probation officer, to Dr. Legassick, and to the CYA – and especially his statements about how he tried to make it look like Ryan committed the murder -- defense counsel was neither professionally nor ethically bound to suborn perjury or to investigate and present evidence to support a theory that he knew not to be true.  What is more, defense counsel realized, after seeing how "upset" and "angry" the trial court was (once it read Petitioner's descriptions of how and why he carried out the matricide) that no further effort should be expended on a futile effort to seek admission of third-party-liability evidence at the second trial. (Hg. RT at 40-41, 46-47.)

Thus, defense counsel obviously made a strategic decision "after reviewing the detailed explanation in the CYA report as to how [Petitioner] killed his mother" that it would not be fruitful to continue the investigation and that the better course of action was to continue with a reasonable-doubt defense.  (Hg. RT 19-21, 46, 47-49.) He therefore decided to forego a third-party-culpability defense at the second trial, after Petitioner had pled guilty and had confessed regarding his attempt to make it look like someone else had committed the murder.  (Hg. RT 46-47.)  The defense of third-party-liability was deliberately abandoned at the second trial as a matter of trial tactics, partly due to defense counsel's ethical obligations, and partly because defense counsel knew that no amount of searching could produce any evidence linking Ryan to the murder.  (Hg. RT at 19-21, 27-28, 34, 46-47, 49.)  Counsel knew this because

---

4.  At the evidentiary hearing, Ms. Sarkis testified that she asked Mr. Mulcahy to obtain a footprint expert.  (Hg. RT 100, 102.)  Defense counsel did obtain a blood-spatter expert.  (CT 238-48.)  However, defense counsel obviously decided, after having read and considered Petitioner's multiple and detailed confessions, that a footprint expert would lead nowhere, and he also knew that the crime scene had been visited and therefore contaminated to some extent by several law enforcement personnel, such as police officers, police detectives, paramedics, photographers, and forensic technicians.

1   his client said so, repeatedly, to several people.

2       Thus, Petitioner's own detailed confessions informed and guided defense

3   counsel's decision to present a reasonable doubt defense rather than attempt to find

4   evidence of a non-existent alternative suspect.  Although the Second R&R concludes

5   that "the shoe print evidence significantly bolsters an argument that someone other

6   than Petitioner killed the victim" (2R&R at 46), defense counsel knew, based on

7   Petitioner's confessions, that the only footprints at the scene, other than those of the

8   police officers, paramedics and firemen, as well as Petitioner's father, Robert Lisker,

9   were of Petitioner himself, as stated by the prosecutor.  Defense counsel also had to

10  know that if he brought these extraneous footprints to the trial court's attention in an

11  attempt to strengthen his opposition to the prosecutor's in limine motion on the issue

12  of third-party culpability, it would merely have served to prod the prosecutor into

13  having a shoeprint expert obtain and examine the shoes of the all the officers,

14  paramedics, firemen, detectives, and visitors who were at the scene that day to

15  provide the inevitable explanation that defense counsel knew would be confirmed.

16      Defense counsel also knew from Petitioner's confessions and from his

17  discussions with Petitioner that a third-party-culpability defense was not only not

18  viable, but might very well backfire since it could not be presented without putting

19  Ryan or Petitioner or both on the stand to testify.  Calling Ryan to testify could have

20  led to disastrous results for Petitioner.  (Hg. RT 34.)  Even if Ryan had been involved

21  tangentially and was at the scene on the morning of the murder, he would have been

22  a witness or possibly an accomplice and could therefore provide devastating and

23  explosive incriminating testimony of Petitioner's active participation that would

24  conclusively demonstrate Petitioner's guilt.  (Hg. RT 19-20, 28-30, 34, 47.)

25      Thus, in assessing defense counsel's pre-trial performance regarding his

26  efforts to investigate the possibility of Ryan's involvement, it is quite plausible to

27  consider and evaluate another obvious and highly relevant possibility:  that Ryan, if

28  involved at all, was Petitioner's accomplice.  *None* of the evidence presented at the

first evidentiary hearing eliminated the possibility that Ryan was merely present when Petitioner murdered his adoptive mother and then fled.  Thus, even if the completely speculative evidence accurately implicated Ryan in any way, it would show only that Ryan was merely Petitioner's accomplice, acting in concert with Petitioner, or acting as an astonished, and then frightened, eyewitness who then fled upon witnessing the "overkill."  In short, calling Ryan would have been a reckless tactical choice, with the potential to eliminate any doubt, reasonable or not, of Petitioner's guilt in the eyes of the jury.

Even worse, having Ryan or Petitioner testify would have involved defense counsel in the presentation of false evidence and of suborning perjury, based on what he knew from Petitioner's confessions.  (Hg. RT at 21-22, 47.)  Defense counsel admirably opted not to even consider such a breach of ethics.  *See Nix v. Whiteside*, 475 U.S. at 169-175; *United States v. Omene*, 143 F.3d 1167, 1170-72 (9th Cir. 1998)).  Moreover, placing Petitioner on the witness stand would have exposed him to devastating cross-examination and to Ryan's accusatory and incriminating testimony in rebuttal (*see Rodriguez v. United States*, 286 F.3d 972, 984 (7th Cir. 2002); *Milone v. Camp*, 22 F.3d 693, 705 (7th Cir. 1994); *Guzzardo v. Bengston*, 643 F.2d 1300, 1305 (7th Cir. 1981)) and would have permitted the prosecution to introduce Petitioner's multiple, damaging confessions in rebuttal (*see Winfield v. Roper*, 460 F.3d 1026, 1033-35 (8th Cir. 2006); *Sayre v. Anderson*, 238 F.3d 631, 634-35 (5th Cir. 2001); *United States v. Martinez*, 883 F.2d 750, 755 (9th Cir. 1989).

Therefore, defense counsel wisely chose to present a defense of reasonable doubt.  (Hg. RT at 48-49.)  It is true that before commencement of the second trial, defense counsel sought admission of Petitioner's March 29, 1983 letter (Exhibit 86 at 144) and April 1, 1983 statements (Exhibit 86 at 137-43) to Detective Monsue regarding Ryan's complicity.  (RT at 2-13; Hg. RT at 46.)  Presenting this letter to the trial court without further information or hard evidence to back it up, however, did not show less than vigorous or "half-hearted" advocacy.  *See Aguilar v. Alexander*,

34

1   125 F.3d 815, 820-21 (9th Cir. 1997) (the degree to which a position is aggressively
2   pursued is a matter of strategy, tactics, and style, but does not necessarily show
3   ineffectiveness).  Counsel made it clear that the reason he did so was to preserve the
4   issue of the admissibility of third-party culpability for appeal.  (Hg. RT at 45-47.)

5        In this proceeding, the question for the Court is not whether the state court's
6   denial of Petitioner's claim was correct.   It is whether that adjudication was
7   objectively reasonable.   The record before the Court, including the evidentiary
8   hearing, shows that the Los Angeles County Superior Court properly and reasonably
9   found no basis for the claim of ineffective assistance of trial counsel.  The trial court
10  noted that when defense counsel was preparing to try the case, Petitioner entered a
11  guilty plea, and then admitted to staff members at the California Youth Authority that
12  he did kill his mother.  The Superior Court refused to conclude that defense counsel's
13  representation was deficient in any way, and it expressly found that Petitioner had
14  "more than his day in court," was well "represented by counsel at the trial," and that
15  "nothing in the lengthy petition gives this court any reason to grant the writ."  (MTD
16  Ex. I.)

17       No state prisoner who has entered an unqualified guilty plea and then
18  repeatedly admitted his factual guilt following his conviction has ever succeeded in
19  sustaining his burden of showing ineffective assistance of counsel.   Indeed,
20  Respondent has not located another case where such a prisoner has even been
21  afforded an evidentiary hearing.  The Second R&R fails to adequately consider
22  Petitioner's multiple admissions and confessions, all of which are completely
23  credible.  Indeed, to grant relief on Petitioner's claims, one would have to conclude
24  that *no one* could believe that Petitioner was telling the truth when he entered a plea
25  of guilty to murder, then confessed to killing his mother at least 15 more times over
26  15 years, but that all reasonably professional advocates would instead have believed
27  Petitioner's about-face, executed years after the crime, and, conveniently, shortly after
28  the deaths of his adoptive father and the "real killer," Ryan.  On the contrary, it is far

1  more plausible to conclude that no reasonable juror would be so credulous.

2      Petitioner completely failed the polygraph examination that was administered

3  the day of the crime (Exs. 86, 98), and soon thereafter he admitted to a jail inmate the

4  details of the crime, how and why he committed it, and how he staged the crime scene

5  and tried to make it look like an intruder had done it.  This is *not* a case involving a

6  single jail-house informant of dubious reliability, however. Petitioner's confessions

7  and admissions kept accumulating after he entered a guilty plea and stipulated that

8  he was doing so because he actually murdered his adoptive mother.

9      The Second R&R hypothesizes that the only reason Petitioner pled guilty

10  was because his attorneys encouraged him to do so in order to take advantage of the

11  favorable plea bargain.  (2R&R at 38.)  The Second R&R conjectures that the only

12  reason he confessed the crime and expressed remorse to the counselors and

13  psychologists at CYA was to obtain favorable recommendations regarding CYA

14  amenability.  (2R&R at 38.)  But in most, if not all of these confessions, Petitioner

15  gave many more details and explanations than one who was merely trying to curry

16  favor by acknowledging commission of the crime would ever do.

17      More importantly, however, Petitioner's trial attorney testified at the

18  evidentiary hearing that he never would have advised Petitioner to plead guilty if

19  Petitioner had ever protested his innocence to him.   His trial attorney also testified

20  that at no time did he ever counsel Petitioner to lie to the counselors or psychologists

21  at the CYA.  When presented with Petitioner's statement to the 1992 parole board that

22  he lied at CYA because his trial attorney had told him to so, Mr. Mulcahy adamantly

23  denied this charge and testified that he had never advised any client to lie.  (Hg. RT

24  at 36-37, 39, 43-45.)

25      Petitioner chose not to testify at -- or to even attend -- the evidentiary hearing

26  to explain just why he pled guilty and why he uttered each and every admission and

27  confession to so many correctional counselors, probation officers, psychologists,

28  psychiatrists, and parole board members.  *See House v. Bell*, 547 U.S. at 551-52

1   (court could evaluate credibility of confessor because he testified at hearing).

2   Consequently, there is no reliable, first-hand explanation of why he repeatedly

3   admitted guilt.  His self-serving, hearsay disavowals of these confessions and his

4   assertions that he did so just to try to impress the authorities ring hollow and are

5   barely audible when surrounded and covered by the reverberating, deafening blasts

6   of his multiple confessions.  The Second R&R accepts Petitioner's contorted and

7   contradictory cover story on the basis of innuendo and arguments of counsel, not on

8   reliable, direct evidence.

9          The Second R&R fails to give Petitioner's confessions the weight they

10  deserve.  In another actual innocence case decided by the Ninth Circuit, a Robert

11  Dunbar, who had testified against defendant Carriger at the trial, later confessed

12  several times, to several different people, that it was he (Dunbar), who had committed

13  the murder, and that he had framed Carriger.  The court found that Dunbar's multiple

14  confessions, which were very similar to Petitioner's confessions in quantity and

15  quality, were deemed "most dramatic," reliable, and very probative and persuasive

16  on the issue of actual innocence because Dunbar had provided accurate details of the

17  crime, had described how he tried to "set up" Carriger, and told how gruesome the

18  crime was.  *Carriger v. Stewart*, 132 F.3d 463, 465, 467-68, 471, 473, 475-76, 478-79

19  (9th Cir. 1997).  The Court declared: "Considering [these] confessions . . . [,] [i]t is

20  unlikely that any reasonable juror, knowing that Dunbar confessed under oath to

21  committing the murder, would nonetheless conclude beyond a reasonable doubt that

22  the murder was committed by Carriger."  *Id*. at 478.

23         The Second R&R concludes that Petitioner's confessions were not credible

24  because he provided insufficient details and sometimes gave conflicting versions.

25  2R&R at 38.  The evidence undermines that finding.  The evidence establishes that

26  Petitioner not only divulged minute details about the killing itself, but also provided

27  an in-depth account of the genesis of the anger and hatred that motivated the

28  matricide.  In other words, Petitioner recounted time after time exactly how he killed

his adoptive mother, and why. On the basis of these confessions alone, no competent defense attorney would attempt to investigate or present a third-party liability defense, knowing that he was ethically obligated not to present perjury and that, if he advanced the defense, the tactic would probably result in a witness who, if he was present at the scene, could testify for the prosecution and provide direct evidence of his client's guilt.

In all, Petitioner's numerous detailed confessions are damning evidence of his guilt. They warrant more consideration than that given them in the Second R&R.

### 3. The Second Report And Recommendation Fails To Take Into Account That Petitioner Failed To Show Any Prejudice From Counsel's Alleged Failings

Contrary to the findings of the Second R&R (2R&R at 50-53), Petitioner has utterly failed to meet his considerable burden of showing that he was prejudiced by defense counsel's tactical decision to abandon the third-party-liability defense. There has been no showing that the trial court would have found that the high threshold had been met and would have allowed presentation of evidence of third-party culpability. Moreover, there has been no showing that such a defense probably would have succeeded. This is particularly true in light of the strong evidence of guilt, none of which has been significantly undermined by Petitioner's showing on habeas.

Evidence presented at trial showed that there was no forced entry to the house. Petitioner told Monsue that he removed the louvered glass panes of the kitchen window to get into the house. The only fingerprints found in the house were those of Petitioner. (RT at 248, 263, 274-75, 766.)

The glass panes that Petitioner removed from the kitchen window had been carefully removed and very carefully and neatly stacked on the sidewalk outside the kitchen window. An intruder would not have taken the time to neatly stack the panes. And a son terribly concerned about his mother, who might be dead or dying, would immediately break the closest window -- such as the living room window or the dining room window -- to gain entry, and certainly would not make the extra effort

1   to walk to the side of the house and go to extra pains not to break any glass by

2   carefully removing the individual panes of glass and then stacking them in a

3   noticeably neat fashion.  (RT at 1072-81, 1120.)  Regardless of whether Petitioner

4   removed the panes to gain entry before he murdered his mother, or later, as part of his

5   improvised staging scheme, the fact is that he removed them so carefully that none

6   of them broke and then stacked them neatly, one on top of the next, leaving his

7   fingerprints on them.

8           At trial, blood spatter expert Ronald Linhart testified that two of the blood

9   stains on Petitioner's shoes, one on the left side of the right shoe and one on the left

10  side of the left shoe, resulted from the application of force to a source of blood.  This

11  meant that the droplets were either caused by castoff force or blunt force application.

12  (RT at 735-36, 737-38.)  Linhart also testified that the blood droplets appearing on

13  the right shoe were "coming down" rather than "coming from the floor up."  (RT at

14  747.)

15          Thus, without innocent explanations involving castoff force or blunt force,

16  it could be inferred that Petitioner was present at the time of the assault.  At the first

17  evidentiary hearing, however, Linhart effectively testified that if Petitioner had knelt

18  down on both of his knees "right next to" Mrs. Lisker as he told Monsue, the two

19  blood droplets on Petitioner's shoes could not be explained by the dropping of Mrs.

20  Lisker's fractured arm onto the floor or by the pulling out of the knives from her

21  back, because Petitioner's shoes would have been shielded by his legs from the flight

22  path of the blood.  (*See* EH III 69, 71.)  Moreover, Linhart effectively testified, again

23  by means of a hypothetical, that the lack of blood on Petitioner's clothing was

24  inconsistent with his statement to the police that he "hugged" his mother.  (*See* EH

25  III 72-75.)

26          Thus, the two droplets of blood on Petitioner's shoes defeat any claim that

27  he was prejudiced by the omission of a third-party-liability defense.  As previously

28  noted, these two blood droplets must somehow be accounted for, but the two

39

1  explanations offered by Petitioner, i.e., that  Mrs. Lisker's arm dropped into a blood

2  puddle, or that the droplets came from the removal of the bloody knives, could not

3  account for the blood on Petitioner's shoes if he was kneeling on both knees, as he

4  claimed.  (Ex. 86: 171.)  Moreover, Linhart testified that the arm was "an unlikely

5  source of that blood droplet" given the facts that it was a single droplet and that the

6  mere act of lifting would not provide sufficient velocity to produce a cast-off event.

7  (EH III at 82-83; RT at 707; Ex. 86:162.)

8      Petitioner's 911 call was highly suspicious.  After Petitioner made his initial

9  statements, the dispatcher told him the fire department was on the way and wrote

10  down his phone number.  When a fireman called Petitioner a few minutes later,

11  Petitioner answered in a matter-of-fact manner with a normal voice, and only after the

12  caller told him he represented the fire department did Petitioner strain to resume his

13  act of sounding hysterical by screaming.

14      Petitioner's statements to the 911 dispatcher are particularly suspicious.

15  When asked, "Did you have a stabbing there?," he replied, "Yes *we* did."  (Italics

16  added.)  When asked, "Who stabbed her?," he answered, "I."

17      Petitioner continued to feign hysteria after the paramedics arrived.  He yelled

18  at the paramedics and police to help his mother and tried repeatedly to re-enter the

19  house, even though he admitted that he had left his mother dying several times before

20  the paramedics arrived – despite the dispatcher's request that he continue to apply

21  direct pressure on the wounds to stop the bleeding – to look through his mother's

22  purse, to see if the intruder was still in the house, and to go outside to scream about

23  his dying mother so that the neighbors would think he was genuinely concerned about

24  her welfare.  (RT at 814, 821-22, 841-42, 868-71.)  The most plausible inference is

25  that Petitioner tried to re-enter the house in order to further contaminate the scene and

26  to verify that his mother had either died or at least had not regained consciousness.

27      Petitioner said he heard a "thud" inside the house, but he did not see anyone

28  leaving.  According to Petitioner, all the doors and windows were locked when he

40

approached the residence, including the front door.  If a burglar had been in the house when Petitioner arrived, he would have seen him leave, yet he did not see or hear anyone leaving the residence.  In addition, if an intruder had been in the house and had left the house before Petitioner arrived, there would have been either a sign of forced entry, or the front door would have been unlocked.  Yet there were no signs of forced entry, and the front door and all the windows were locked.

Petitioner said he gained entry through the kitchen window.  Yet there was no dirt or mud on the kitchen counter or in the kitchen sink, which was just inside the window, or on the floor in front of the kitchen sink.  (RT at 1072-81, 1120.)  This strongly suggested that Petitioner gained entry through the front door, killed his mother, and then later went outside to stage the scene by removing the panes of glass so he could assert that the burglar had entered through the kitchen window.

Petitioner carefully removed the two knives from mother's back and carefully set them down, but was quick to point out that he tried to do so without leaving his fingerprints so as to preserve the evidence.  RT 1072-81, 1120.  This is not what an adult son trying to save his bleeding, dying mother would do.  A truly concerned son would yank out the knives without any concern or even thought about fingerprints, and then would throw them to side, not place them neatly side by side.

After the 911 dispatcher instructed Petitioner to apply direct pressure to the wounds to try to stop the bleeding until the paramedics arrived, Petitioner said he took the time to go throughout the house looking for a burglar and that he took the time to open his mother's purse and to go through it to see if the intruder had taken anything.  (RT 1072-81, 1120.)  A son truly trying to save his mother's life and knowing that she was lying in a pool of blood and continuing to bleed to death would not take the time to do these things, but rather would try to stop the bleeding.  Furthermore, the only rooms Petitioner said he searched inside the house were the rooms where there were obvious signs of struggle.  If he had actually been trying to find an intruder, he would go to every room in the house.  Petitioner's account thus

1  strongly suggests that since he knew where he had carried out his assaults on his
2  mother, he wanted to provide an explanation for the possible presence of bloody
3  footprint evidence which would otherwise show he had been in those rooms.

4        On the issue of the weather conditions on the day of the crime, the 2R&R
5  appears to have drawn a conclusion which does not undermine the Respondent's
6  position.  But the 2R&R also has misconstrued and underestimated the evidence
7  supporting Respondent's key argument on this issue, that Petitioner's claim to have
8  seen his mother's feet from the living room window was a lie.  That evidence shows
9  that Petitioner's view from beyond the planter outside the living room window was
10 effectively obstructed by reflections of light caused by the difference between the
11 dark interior and the light-colored swimming pool behind him.

12       What matters is not the brightness of the outside weather in and of itself.
13 What matters is the relative disparity between the dark interior and the much brighter
14 exterior.   Thus, under the weather conditions that day, the sky was bright enough to
15 prevent Petitioner from seeing past the reflections of the living room window to see
16 his mother's feet as he claimed.

17       As to this point, even Meteorologist Kenneth Clark had to admit that no
18 matter the degree of cloud coverage during daytime, there would still be some
19 measure of sunlight that penetrated the existing clouds.  (EH at 181, Lines 19-23.)
20 In fact, Clark acknowledged that while he would not classify March 10, 1983, as a
21 "true bright, Southern California day," there was at least "dull sunshine" or "filtered
22 sunshine."  (EH at 182, Lines 7-8.)  More directly, Robert Lisker himself testified at
23 trial that when he returned to his residence at noon on the day of the murder, "there
24 was some sun."  (RT at 948.)

25       But other evidence showed that the outside of the house was sufficiently
26 bright that it was highly unlikely that Petitioner would be able to see his mother's feet
27 as he had claimed.  Wilson's photograph in Exhibit 64-2 clearly shows a day bright
28 enough that both the detectives in the photographs and the roof of the house itself

were casting distinct shadows outside the Lisker residence.  This photograph, although taken at around 1:10 p.m., approximates the lighting conditions at 11:00 a.m. (the time that Petitioner claimed to have looked through the living room window), because based on the weather chart, the weather conditions at 1:10 p.m. were approximately the same as at 11:00 a.m.  (EH at 172-73.)

Examining that photograph even more closely, the disparity in lighting conditions between the outside and the inside of the house (as seen through the open front door) was substantial.  This stark contrast is confirmed by looking at other crime scene photographs Wilson took on March 10, 1983, including Exhibit 64-18, which shows the inside of the Lisker residence at the time of the crime to be extremely dark compared to the outside.

It is thus the disparity in lighting which is crucial, because it is the disparity that shows the intensity of the reflection appearing on the living room window when looking into the house from the outside.  (*See* EH at 65 [Wilson's testimony that lighting disparity caused window reflections].)  Whether any reflection would be eliminated by pressing one's face to the glass was rendered moot by Petitioner when he indicated to Monsue that he did not approach the living room window, but had merely "duck[ed] way down low" at the sidewalk.  (*See* Ex. 86-170; see also RT at 267-268.)  Meanwhile, from Wilsons's March 23, 1983 photograph of that same living room window (*See* Ex. 74-1, 74-2), one can see that the window was *capable of* reflections which prevented anyone from seeing any appreciable distance beyond it.  Thus, the stark contrast in lighting between the outside of the house and the inside of the house as depicted in Exhibit 64-2 and other crime-scene photographs meant that the reflection appearing on that living room window at about 11:00 a.m. would have been significantly obstructive.  This evidence effectively destroyed Petitioner's claim to Monsue that he was able to see his mother's feet through that window.  All of this critical evidence was overlooked in the Second R&R.

Even more importantly, however, there is additional evidence not considered

43

in the Second R&R that undermines Petitioner's claimed ability to see his mother through the window.  Robert Lisker testified at trial that he conducted a visibility test on March 11, 1983 of that same window and he could "barely see through the window to the fireplace" and "was unable to see beyond that point."  (RT at 925.)  As to the weather condition, he testified that "the 10th was very similar to the 11th," noting that on March 10, 1983, "there was sun when [he] got to the house in the afternoon late" and "there was some sun when [he] got there at noon."  (RT at 948.) The weather charts for March 11, 1983, confirmed this similarity.  They reflect weather conditions on March 11, 1983 that were comparable to, if not darker, than the conditions at 11:00 a.m. on March 10, 1983.   The charts for March 11 report overcast weather (ten out of ten cloud coverage) from 6:05 a.m. through 11:45 a.m., and broken clouds (eight out of eight cloud coverage) from 12:45 p.m. to 4:42 p.m. (See Ex. 18-4.)  This evidence, offered in testimony by Petitioner's own father, effectively confirmed the prosecution's point at trial that Petitioner lied when he said he saw his mother's feet at the other end of the living room.

Petitioner, as previously noted, did not bring his face up to the glass of the living room window and use his hands to block out the sunlight.    Rather, he admittedly remained on the sidewalk and had to contend with strong reflections from the window, i.e., the same ones which inhibited his father from seeing past the fireplace.[5/]  In sum, because the Second R&R frames the factual issue as simply whether March 10, 1983 was "bright and sunny," it overlooked crucial evidence proving the prosecution's argument at trial that Petitioner could not have seen his mother's feet as he claimed.

The Second R&R indicates that the evidence convinced the Magistrate Judge

5.  In light of the fact that the crucial issue was the lighting disparity between the outside and the inside of the house on March 10, 1983, the Second R&R's observation about the difference in brightness between March 10, 1983 and March 23, 1983 (2R&R at 60-61) is of little or no import.

1  that the victim's head, if not her whole upper body, would have been visible from the

2  dining room sliding glass door, as Petitioner described.  (2R&R at 61-63, 67.)  This

3  conclusion was based on the testimony of crime-scene reconstruction experts Frank

4  Terrio and Michael Varat that a body placement based on the bloody portion of the

5  rug shown in a crime scene photograph demonstrates that Petitioner could have seen

6  his mother's head from the dining room window.  (2R&R at 61-62.)  The 2R&R also

7  rejects the "Monsue version" of the body placement as being inconsistent with the

8  evidence.  (2R&R at 62.)

9          The Second R&R does not explain, yet alone justify, why its conclusions

10  were the only reasonable ones that could be drawn.  First, the Second R&R

11  mistakenly assumes that it is possible to reconstruct fully and accurately the exact

12  placement of the body at the time Petitioner claimed to have looked through the

13  window based *only* on a crime-scene photograph.  The Second R&R apparently

14  adopts the body placement theory that rested the head of the victim on the bloody

15  portion of the rug (hereinafter the "Terrio version") and rejects the body placement

16  theory in which the victim was actually touching the planter (hereinafter the "Monsue

17  version").  However, the Terrio version was a reconstruction based not on eyewitness

18  testimony as to where the victim actually lay, but on Exhibit 64-91, a crime-scene

19  photograph of the rug at the foyer taken by Mike Wilson when he arrived much later

20  in the afternoon.  (EHI 109, Ex. 20-12.)  This meant that the Terrio version was based

21  on a photograph taken not at the time Petitioner claimed to have seen his mother, but

22  hours later, when many intervening events had already compromised the crime scene.

23          Even more basically, neither Exhibit 64-91 nor any other photograph actually

24  captured Mrs. Lisker's body position at the crime scene, because she had been

25  transported to the hospital shortly after the paramedics found her.  (RT at 182.)  Even

26  if someone had managed to take a photograph before she was removed, however, that

27  photograph would still not be an accurate depiction of where she was lying at the time

28  when Petitioner allegedly saw her through the window.  This was because she

1   apparently had been moved several times prior to being found by the paramedics.

2   When paramedic Lovato found Mrs. Lisker, she was lying face down on her
3   stomach with her head extending several inches past the eastern border of the planter.
4   (RT at 184-87.)  Her body was also diagonally oriented, i.e., her head was southeast
5   of her feet.  (*See* RT at 185.)  Assuming, as does the Terrio version (which was
6   apparently adopted by the Second R&R), that Mrs. Lisker's head injury accounted for
7   the blood concentration found on the carpet, Mrs. Lisker's body, as Lovato found her,
8   was not in the location of that blood concentration, which was near the western end
9   of the planter.  (*See* Ex. 64-91.)  In fact, even if the source of the blood was from the
10  stabbing wounds to Mrs. Lisker's back, Lovato's observations would still be
11  inconsistent with the location of the concentration of the blood.  This clearly meant
12  that Mrs. Lisker's body had been moved a significant distance after her body left that
13  puddle of blood.[6/]  Aggravating this uncertainty about the location of her body is the
14  fact that the concentration of blood, which is now being used as a frame of reference,
15  was on a non-stationary rug, which was  skewed by about three to five degrees (EHIV
16  at 165) as depicted in Exhibit 64-91.  This indicates that the rug was shifted from its
17  original position prior to the photograph.  It follows that a reconstruction based on the
18  blood concentration is entirely unreliable, especially when no one knows or can tell
19  how many times the body was moved, from which position, and when.  Thus, the
20  Second R&R's conclusion is based entirely on an unreliable reconstruction.

21  Just as importantly, the Second R&R overlooks that for purposes of
22  evaluating the truth of Petitioner's claim to have seen his mother through the door,
23  what matters is where Petitioner said the body was located when he looked in and
24  whether physical evidence contradicted or supported what he said.  This is where the

25
26
27
28  6. The possibilities are that Mrs. Lisker moved by herself, that the killer moved
    her, or that Petitioner (assuming arguendo he was not the killer) moved her.

1   Monsue[7/] version became important, because it is the version that is based on

2   Petitioner's own descriptions of where the body was located.

3   Petitioner drew a diagram for Detective Monsue during his interview, which

4   was marked at trial as Exhibit 53 and shown to all parties, the judge, and the jury.

5   (RT at 332.)  This exhibit is no longer available as it apparently had been destroyed

6   along with all other exhibits from trial.  That exhibit however, contained a rough

7   diagram of the Lisker residence layout and a stick figure representing Mrs. Lisker's

8   body.  (RT at 338.)  Monsue described this diagram for the record at different points

9   during trial, on direct and on cross-examination, thereby providing enough facts upon

10  which a body-placement reconstruction could be done based on Petitioner's

11  descriptions.  These descriptions by Monsue are highly credible because they were

12  made in open court in front of both the prosecutor and the defense, both of whom had

13  Petitioner's diagram (Exhibit 53) in hand to immediately verify the accuracy of those

14  descriptions.

15  Concerning how far east the body was, Monsue testified:  "He places the

16  head right next to the northwest corner of the planter with the body in this direction

17  which is west from the head with the feet resting in this area here."  (RT at 338.)

18  Later, Monsue again testified that Mrs. Lisker's head "lay adjacent" to the northwest

19  corner of the planter.  (RT at 359.)  Under cross-examination, in reference to the

20  diagram, Monsue clarified that the head was at the western portion of the planter but

21  closer to the middle than to the edge.  (RT at 434.)

22  Regarding the body's proximity to the planter, Detective Monsue testified

23  that Petitioner told him Mrs. Lisker's arms were "curled up against the planter."  (RT

24  473.)  This was confirmed by Petitioner's statement in the interview that Mrs. Lisker

25  _____

26  7.  Respondent believes in retrospect that this version is more accurately
    labeled the "Lisker version" because it was Petitioner's own version.  Since

27  Respondent had referred to it as the Monsue version during the evidentiary hearing,
    Respondent will not change the label in these objections in the interest of consistency

28  and clarity.

1  "was on her side, she was like this, with her arms like up to her face."  (Ex. 86-164.)

2  Petitioner also indicated, "She like bleeding, she was leaning on this, Ok."  (Ex. 86-

3  172.)  This showed that Mrs. Lisker was so close to the planter that her arms, curled

4  up in front of her while she lay on her side, were "leaning" against the planter.

5       Based on these descriptions, Varat generated a three-dimensional diagram

6  in which an observer, looking through the dining room sliding door from the best

7  vantage point possible, could *not* see Mrs. Lisker's body.  (Ex. 155-3.)  This is strong

8  proof that Petitioner was lying about being able to see his mother through the dining

9  room sliding door.

10      The Second R&R discounts this version merely because it is contrary to

11 "Monsue's description of Petitioner's sketch, which placed the victim's body at least

12 partially on that rug."  (2R&R at 62.)  But the Second R&R fails to consider the fact

13 that the rug was not stationary, while the planter was, and that there were three

14 paramedics who entered the foyer and performed emergency treatment on that rug.

15 During the flurry of activity to save Mrs. Lisker, the paramedics moved the body

16 several times, at least once turning it over (RT at 182) and another time, placing it in

17 a pressure suit (RT at 180).  The rug most certainly shifted during this commotion,

18 and the fact that it appears awkwardly skewed (*see*, e.g., Ex. 155-1) confirms this fact.

19 The proximity of the southwest corner of the carpet to the victim's head in the

20 Monsue version also supports a strong possibility that the rug, during the commotion

21 of the treatment, was shifted from an earlier location where its southwest corner was

22 touching parts of the victim's body.[8]  Petitioner himself, who moved Mrs. Lisker's

23 body at least once by "hugging, holding her" (Ex. 86 at 167) and had admittedly

24 hurried around the house in panic (*see* Ex. 86 at 164-66), could also have caused the

25 _____

26      8.  In light of the blood evidence, violent activity obviously occurred on the
   rug.  Thus, the rug may have shifted from an earlier position prior to the struggle.

27 Ultimately, it is entirely possible that at some point in time, the rug was touching the

28 victim as she was "curled up" against the planter (Monsue version).

1   rug to move some more.  Between a stationary planter and a movable rug that showed

2   indications of being shifted and in fact was the locus of the crime and the subsequent

3   rescue effort, the most reliable choice of reference to reconstruct a body position has

4   to be the planter.  Hence, contrary to the Second R&R's finding, the Monsue version

5   of the body placement is fundamentally reliable.

6          Indeed, corroborating the Monsue version is Exhibit 68:89, a photograph of

7   the northern edge of the planter showing blood spots on the northern wall of the

8   planter.  The photograph also reflects that directly below those spots were what Frank

9   Terrio and the prosecutor both acknowledged to be discolorations or stains to the

10  wooden floor.  (EHI at 78, 137.)  The fact that the stains were below the bloody spots

11  on the planter supports the reasonable inference that the victim's head, consistent

12  with the Monsue version, had at some point in time been very close to that area,

13  depositing blood stains to the wooden floor and possibly serving as a source of blood,

14  to which the application of blunt force would have caused tiny blood drops to be

15  deposited on the wall of the planter.

16         Finally, the Second R&R also fails to consider the fact that as some of the

17  crime scene photographs show, the inside of the house was dark.  This means that

18  even if Petitioner had a vantage point from the dining room window that technically

19  allowed him to see Mrs. Lisker based on the Terrio version, Petitioner would have to

20  know where to look to see her, demonstrating that he knew the location of the body

21  before looking in.  The darkness of the inside of the house is confirmed by the very

22  photographs the Second R&R cites to show one can see all the way to the entryway.

23  Close examination of the photographs in Exs. 74-3 through 74-5, which were taken

24  on what the Second R&R characterizes as a brighter day than March 10, 1983, shows

25  that as the view moves from the ceiling of the entryway to the floor, it becomes so

26  dark that any attempt to discern objects near the floor becomes difficult.  If the

27  Second R&R is correct that March 10, 1983 was a darker day because it was cloudy

28  and hazy (2R&R at 20), it further supports the inference that the inside of the house

49

on March 10, 1983 was that much darker, and it was that much more difficult for Petitioner to obtain a view of his mother from the dining room window, even under the Terrio version.

In sum, the Second R&R hastily dismisses the Monsue version based on a perceived shortcoming that, in fact, could easily be explained and accepted by a reasonable juror.  In doing so, the Second R&R further overlooks the fatal problems that infected the Terrio version.[9/]

Petitioner had ample time to stage the crime scene, and he admitted doing so in his statements to Dr. Holland and to the parole board.  Setting up the scene to make it look like someone else had broken into the house would have required a relatively simple plan.  After killing his mother, and after deciding to allege that he arrived at the locked house to work on his car and became worried when his mother did not come to the front door when he knocked, Petitioner realized that he should verify that if he went outside to the back yard, he could actually see his mother's body from either the living room window or the dining room window, or both.  That would provide him with a story of  how he discovered that his mother had been attacked.  But the alleged sighting of the body through the rear windows was merely part of the cover-up.  The removal of the louvered window panes was another essential part of the cover story.

The problem with this story, however, is that regardless of the weather conditions, the difference between the dark interior and the relatively bright exterior, including the bright reflection of the swimming pool in the living room window, as well as the chair that obscured any view of Dorka Lisker's body, would have made

---

9.  Contrary to the Second R&R's suggestion (2R&R at 63),  Rabichow's surprise (upon his recent visit to the Lisker residence at the invitation of reporters) about the possibility that one could see Mrs. Lisker's body were it placed as he had argued at trial is of little consequence in view of the fact that as Respondent demonstrated at the hearing, Monsue's version of the placement of the body is the one most pertinent to Lisker's guilt.

1   it virtually impossible for anyone to see her body.  And even if one could see a small

2   part of her body, that person would have to have been standing right up against the

3   living room window, in the middle of the muddy planter area, not back seven or eight

4   feet on the sidewalk.  In addition, a person looking to see if someone was inside

5   would not have seen that tiny portion of Dorka Lisker's body unless they already

6   knew the exact spot where she was lying.  Only someone who knew where to look for

7   the body would have noticed the body.  Only the murderer knew where to look.

8        Petitioner made several other statements that were highly suspicious and

9   inconsistent with comments that would have been expected from a loving son

10  concerned only for his mother's welfare.  For example, Petitioner told Monsue that

11  he did not want to get blood on himself, which betrayed his concern about how his

12  actions would be interpreted by the authorities.  It is also not the sort of reservation

13  that would occur to a frantic son, just discovering his mother bleeding to death on the

14  floor.  (RT at 1081-82.)

15       Other statements Petitioner made at the time of the crime show clear-cut

16  consciousness of guilt.  For instance, when Monsue asked Petitioner about a knife

17  that was in Petitioner's car, Petitioner's incongruous and non-responsive reply was,

18  "I wouldn't kill my mom."  (RT at 1072-81, 1120.)  Petitioner also helpfully dropped

19  a hint to the detectives when he observed, with no prompting, that the manner of

20  killing looked like a Charlie Manson murder.  (RT at 1083-85.)

21       Thus, all the evidence recovered at the scene shows that the murder was

22  committed by Petitioner.  There was no forced entry, and the front door was locked.

23  The murder was carried out with multiple weapons and showed unmistakable signs

24  of overkill out of hatred.  Valuable items were left behind in the house, and no one

25  was seen leaving the residence at or after the time that, according to the deputy

26  coroner, the victim was receiving the fatal blows that would have led to immediate

27  death if resuscitation had not taken place within 20 minutes.

28       Moreover, the murderer took the time to carry the bloody Bullworker all the

51

way back from the front entryway back to the master bedroom at the rear of the house, to wipe off the fingerprints with a towel, and to neatly place it in corner. Those are not the actions of a thief who kills upon being suddenly and unexpectedly discovered and confronted by the victim.  No thief would go to the trouble of returning an exercise bar to its proper place in the farthest room of the house from the entry way after bashing in the skull of his victim.

The Second R&R does nothing to demonstrate just how Petitioner's defense attorney was supposed to overcome the considerable evidentiary hurdles and to introduce into evidence the telephone bill, Ryan's prior juvenile adjudication, Ryan's probationary status, the motel receipt, and Ryan's hearsay statements to Detective Monsue about his reason for coming to California, about going to the Lisker residence the day before the murder, and about how he paid for his return trip to Mississippi.  (2R&R at 50-51.)  The trial court justifiably would have excluded each of these pieces of evidence as irrelevant (Cal. Penal Code, § 350) or more prejudicial than probative (Cal. Penal Code, § 352) and as insufficient to meet the threshold standard for the introduction of third-party liability evidence, since evidence of motive or opportunity is insufficient, and since these evidentiary tidbits, whether taken individually or collectively, did *not* link Ryan directly to the actual commission of the crime.

### 4.   Conclusion

In sum, Petitioner has failed to demonstrate that his attorney was negligent in investigating or presenting the third-party-culpability to the trial court.  He has not shown that the trial court would have permitted this highly speculative and irrelevant evidence to be introduced.  He has failed to sustain his burden of demonstrating that counsel's decisions were not guided by reasonable tactical and ethical decision-making in light of the facts and circumstances known to him at the time. *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001).

*Strickland* itself establishes a *presumption* that the challenged actions of

1  counsel might be considered sound trial strategy. *Strickland v. Washington*, 466 U.S.

2  at 689, 699. And "[w]hen a defendant has given counsel reason to believe that

3  pursuing certain investigations would be fruitless or even harmful, counsel's failure

4  to pursue those investigations may not later be challenged as unreasonable." *Id.* at

5  691. Petitioner has not shown that defense counsel's decisions were not informed by

6  reasonable strategic decisions and driven by severe evidentiary and ethical

7  constraints.

8        Here, defense counsel had every reason to conclude that pursuing an

9  alternative-suspect defense would be futile. *See Ames v. Endell*, 856 F.2d 1441,

10  1444-45 (9th Cir. 1988) (noting that the duty to investigate is dependent upon the

11  facts known to the attorney at the time, and there is no need to investigate what

12  hypothetically *might* have happened factually). "Strategic theories made after less

13  than complete investigation are reasonable precisely to the extent that reasonable

14  professional judgments support the limitation on investigations." *Wade v. Calderon*,

15  29 F.3d at 1316. Thus, "a particular decision not to investigate must be directly

16  assessed for reasonableness in all the circumstances, applying a heavy measure of

17  deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. at 691; *see*

18  *also Wiggins v. Smith*, 539 U.S. 510, 522, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

19  Tactical choices may be based on the defendant's own statements or actions, and

20  when the defendant indicates that a certain investigation would be futile, counsel's

21  failure to investigate may not later be challenged as unreasonable. *Strickland v.*

22  *Washington*, 466 U.S. at 691; *Royal v. Taylor*, 188 F.3d 239, 245-49 (4th Cir. 1999)

23  (not investigating whether the defendant fired the fatal shot was appropriate, given

24  defendant's confession that he did); *Wilson v. Henry*, 185 F.3d 986, 989 (9th Cir.

25  1999).

26        A finding of a tactical purpose is a finding of fact. *Edwards v. LaMarque*,

27  445 F.3d 1121, 1126 (9th Cir. 2007) (en banc). The existence of a strategic choice

28  should appear "in the record." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.

53

1994).  Here, Petitioner's trial counsel set forth valid tactical reasons for not pursuing the third-party-liability defense.  *See Goodman v. Bertrand*, 467 F.3d 1022, 1029 (7th Cir. 2006).

Defense counsel had to play the cards he is dealt, which in this case was (1) a heinous "overkill"-type murder not at all characteristic of that committed during an ordinary burglary, but committed in a fit of rage and hatred, and (2) a client who had pled guilty, had confessed multiple times, and had admitted trying to frame Ryan. Petitioner failed to show that a reasonably diligent and competent attorney inevitably would have continued to pursue and follow through with further investigation on a lead that had no reasonable chance of providing exculpatory evidence.  The 2R&R fails to evaluate counsel's from the perspective he had at the time, in light of all the circumstances that were present then.

Deference is owed to trial counsel's decision not to do so, and additional deference is owed to the state court's determination that defense counsel's decision did not fall below the objective standard of counsel competence.  *See* 28 U.S.C. § 2254(d); *Schriro v. Landrigan*, 550 U.S. 465, 473, 478 (2007);  *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) (declaring that judicial review of a *Strickland* claim is "highly deferential," and "*doubly* deferential when it is conducted through the lens of federal habeas");  *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2534-35, 156 L. Ed. 2d 471 (2003); *Edwards v. LaMarque*, 475 F.3d at  1126 (describing the review as twice deferential).  Petitioner did not show that counsel's allegedly defective performance  impacted the trial court's ruling on a pre-trial motion in limine or that it probably affected the verdict.  Petitioner did show that, even if the trial court had denied the prosecutor's motion and had allowed Petitioner to attempt to present evidence of third-party liability, the evidence would have been admissible under the state's evidentiary rules and would have influenced the verdict.

The evidence as a whole certainly does not establish that the defense

attorney's tactical decision should be second-guessed or that the superior court's finding in this regard should not be given deference. It is not unreasonable to conclude that when a defendant pleads guilty and confesses that he is pleading guilty because he actually committed the crime, he must be guilty. It is not unreasonable to conclude that when a defendant tells fifteen different persons in fifteen different settings that he actually killed his mother, explains why he did it, and expresses remorse for doing so, he must be telling the truth. Petitioner's defense attorney therefore acted reasonably in deciding not to pursue the third-party liability defense, and the Second R&R's conclusion to the contrary is indefensible.

## II.

### THE SECOND REPORT AND RECOMMENDATION WRONGLY CONCLUDES THE PROSECUTOR KNOWINGLY PRESENTED FALSE EVIDENCE

The Second R&R has determined that the prosecution presented false evidence, in violation of Petitioner's rights to due process and a fair trial. The Second R&R found that the evidence presented at the actual-innocence hearing regarding weather conditions, sight line conditions, outside light conditions, bloody shoeprint patterns, blood spatter evidence, and unfound money in Mrs. Lisker's purse, all showed that the prosecutor presented false evidence at the trial. (2R&R at 53-67.) These findings are not supported by logic, the facts, or the law.

### A. Applicable Law

It is fundamentally unfair for a prosecutor to knowingly present false testimony to the trier of fact or to allow it to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *United States v. Bagley*, 473 U.S. 667, 678-82, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). The prosecution's knowing presentation of false evidence violates due process and renders a defendant's trial unfair if the false evidence is material to the verdict. *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392 (1976). Thus, a conviction obtained through the knowing presentation of material false evidence or perjured testimony must be set

1    aside if there is any reasonable likelihood that the false testimony could have affected

2    the judgment of the trier of fact.  *Giglio v. United States*, 405 U.S. 150, 154-55, 92

3    S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Benn v. Lambert*, 283 F.3d 1040, 1058 n.11 (9th

4    Cir. 2002).

5         However, the due process requirement voids a conviction only where the

6    false evidence is "known to be such by representatives of the State."  *Napue v.*

7    *Illinois*, 360 U.S. at 269.   Thus, the basis of the due process violation is the

8    misconduct by the government, *not* the perjury by the witness or the falsity of the

9    evidence itself.  *Morales v. Woodford,* 388 F.3d 1159, 1179 (9th Cir. 2004); *Pavao*

10   *v. Cardwell*, 583 F.2d 1075, 1077 (9th Cir. 1978); *McElvain v. Lewis*, 283 F. Supp.

11   2d 1104, 1114 (C.D. Cal. 2003) (no evidence prosecution knew of alleged error in

12   allegedly mistranscribed tape).   The mere allegation that false testimony was

13   introduced is *not* a violation absent *knowing* use by the prosecution.  *Morales v.*

14   *Woodford*, 336 F.3d 1136, 1152 (9th Cir. 2003), amended on other grounds, 338 F.3d

15   at 1179; *Murtishaw v. Woodford*, 255 F.3d at 959 ; *Carothers v. Rhay*, 594 F.2d 225,

16   229 (9th Cir. 1979).

17        Thus, under *Napue*, the defendant must show that: (1) the prosecution

18   knowingly presented false evidence or testimony at trial; and (2) there is a reasonable

19   likelihood that the false evidence or testimony could have affected the judgment of

20   the jury.  *Jackson v. Brown*, 513 F.3d 1057, 1071-76 (9th Cir. 2008); *Hayes v. Brown*,

21   399 F.3d 972, 984-85 (2005); *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006).  In

22   other words, the petitioner must point to something in the prosecutor's questioning,

23   or the answers given, that may be construed as reflecting an *intention* by the

24   prosecutor *to mislead the jury*.  *United States v. Etsitty*, 130 F. 3d 420, 424 (9th Cir.

25   1997).

26        To prevail upon the claim, there must be an allegation of specific evidence

27   that the prosecutor knew to be false, and the state prisoner must show the *falsity* of

28   some statement or piece of evidence *actually* presented to the jury.  *Workman v. Bell*,

56

1   160 F.3d 276, 284-85 (6th Cir. 1998) (physical evidence did not show falsity, but

2   only a different interpretation); *McElvain v. Lewis*, 283 F. Supp. 2d at 1114.  Mere

3   inconsistencies or conflicts in testimony do not establish knowing use of false

4   testimony.  *Allen v. Woodford*, 395 F.3d 979, 995 (9th Cir. 2005); *United States v.*

5   *Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997);  *United States v. Zuno-Arce*, 44 F.3d

6   1420, 1423 (9th Cir. 1995); *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir.

7   1992).  Discrepancies in testimony are insufficient to show perjury, and even the

8   prosecution's presentation of contradictory evidence is not improper.  *Lambert v.*

9   *Blackwell*, 387 F.3d 210, 249, 252 (3d Cir. 2004); *United States v. Necoechea*, 986

10  F.2d 1273, 1280 (9th Cir. 1993).

11          In addition, "[t]here is no due process violation resulting from prosecutorial

12  non-disclosure of false testimony if defense counsel is aware of it and fails to object."

13  *Routly v. Singletary*, 33 F.3d 1279, 1286 (11th Cir. 1994); *see Stephens v. Hall*, 407

14  F.3d 1195, 1206 (11th Cir. 2005).  Finally, even if a prosecutor unwittingly presents

15  false evidence, a petitioner is entitled to a new trial only if "there is a reasonable

16  probability that [without the evidence], the result of the proceeding would have been

17  different."  *United States v. Young*, 17 F.3d 1201, 1203 (9th Cir. 1994); *see Spivey v.*

18  *Rocha*, 194 F.3d at 979.

19          **B.   Analysis Of False-evidence Claim**

20          **1.   The Evidence Presented To Show That Petitioner Could Not**
21          **Have Seen His Mother In The Manner He Described To**
            **Detective Monsue Was Not False**

22                  **a.   The Weather On March 10, 1983**

23          The Second R&R wrongly concludes the prosecution presented the following

24  false evidence:  that March 10, 1983 was a bright and sunny day, and glare on the

25  windows made it impossible to see inside from the place Petitioner claimed to have

26  been standing.  Petitioner failed to show falsity.  The Second R&R wrongly finds that

27  the evidence presented was actually false and that the prosecutor intended to mislead

28  the jury.  (2R&R at 54-55, 57-58.)

1    Evidence presented at the trial and at the evidentiary hearing showed that it
2    was bright and that the sun was out.  Exhibit 64-2, a photograph of two detectives
3    outside the Lisker residence on the day of the murders, reflects the two detectives
4    casting distinct shadows and the wall of the house being distinctively bright where
5    not covered by the shadows of the roof.  In fact, Robert Lisker testified at trial that
6    at noon on the day of the murders, "there was some sun."  (RT at 948.)  No falsity was
7    shown in this regard.

8    More importantly, the evidence showed that because of the disparity of
9    brightness between the outside and the inside of the house, there would have been
10   glare  or reflections on any of the windows of the house to obstruct one's view of the
11   inside from the outside.  As the evidence at the evidentiary hearing disclosed, the
12   crime scene photographs, including Exhibit 64-2, were taken at a time, around 1:10
13   p.m., when the weather was approximately the same as 11:00 a.m., the time Petitioner
14   claimed to have looked through the widows.  (Hr. Tr. at 172-73.)

15   These photographs, also including Exhibit 64-18, also showed a huge
16   disparity in lighting conditions between the inside of the house and the outside.  It is
17   this intense disparity that would have caused window reflections that prevented
18   anyone outside the house looking inside the house through a window from seeing any
19   appreciable distance.  (Hr. Tr. at 65.)  Meanwhile, photographs of the windows in
20   question taken on March 23, 1983 (Ex. 74-1, 74-2), while not taken on the same day
21   of the crime, demonstrate how intense the reflections can  become.

22   Indeed, Robert Lisker himself conducted a visibility test the day after the
23   murder on March 11, 1983, and could "barely see through the window to the
24   fireplace" and "was unable to see beyond that point."  (RT at 925.)  He himself
25   admitted that "the 10th was very similar to the 11th" in terms of weather condition.
26   (RT at 948.)  This trial testimony showed that any evidence and argument that
27   Petitioner could not have seen Mrs. Lisker from where he stood outside the house was
28   not false at all.

It must also be emphasized that the witnesses who testified that it was bright and sunny were basing their testimony on memory. It was not disputed that Detective Monsue and Mike Wilson were at the scene until and/or during the afternoon, when the conditions were not the same as the time of the murder in the morning, when it was cloudy according to an estimated cloud-cover report (Ex. 18-3). Hence, their descriptions regarding the weather conditions "that day" were based on their memory of the conditions the entire time they were at the crime scene. Examining the cloud-cover report in question (Ex. 18-3), it cannot be disputed that the weather conditions were better during the afternoon than that of the morning. Viewing Monsue and Wilson's testimony from this light, there simply can be no basis to impugn their testimony as being false.

Therefore, Petitioner failed to demonstrate that the prosecution presented false testimony as to the weather condition, the existing "glare" on the windows on the day of the murder, and the ability to see through those windows.

### b. Comparison Of Weather Conditions On March 23, 1983 And March 10, 1983

The Second R&R wrongly concludes that the prosecution falsely presented evidence that the sun and sky cover "was the same" on March 23, 1983 as it was on March 10, 1983. (2R&R at 55, 61.) The Second R&R is incorrect.

Contrary to the characterization in the Second R&R, the prosecution's evidence did not equate the "sky cover" of both days. Detective Monsue's testimony was only that the sun was "very bright" on both March 10 and March 23. (RT at 268.) LAPD photographer Mike Wilson likewise testified, when asked about each day, that they were bright and sunny days. (RT at 971, 976, 984, 993.) As explained previously, such descriptions of the weather conditions on the day of the murder were anything but false.

### c. Time When Crime-Scene Photographs Were Taken

The Second R&R also draws erroneous deductions from Wilson's testimony

59

1  that the photographs were taken at about 11:30 a.m. on the day of the murders.

2  (2R&R at 55, 59-60.)  Respondent acknowledges that it appears from the clocks

3  depicted in the photographs that they were taken at about 1 p.m.  But any attempt to

4  infer *Napue* error from the trial  testimony is untenable.

5      First, Mr. Wilson did not in any way attempt to give false testimony.  The

6  exact exchange was as follows:

7      Q    About what time of the day were you out there taking the photographs?

8          Do you recall?

9      A    I believe during our discussion this morning we established that it was

10         approximately at 11:30.

11     Q    So about 11:30 in the morning on March 10?

12     A    Yes, sir.

13  (RT at 979.)  It was clear from this exchange that prior to the testimony, both Wilson

14  and the prosecutor had attempted in good faith to approximate the time of the

15  photographs.  It appears that Wilson simply misrecollected in the process, having to

16  remember an incident that took place years earlier and after which he naturally had

17  photographed numerous other crime scenes  from other cases he worked on.

18     In any event, Petitioner did not show that the prosecutor, Mr. Rabichow,

19  knew at the time of trial that the approximation of the timing was inaccurate.  This

20  failure to demonstrate knowledge of falsity defeated Petitioner's *Napue* claim.  Nor

21  did Petitioner demonstrate that the inaccuracy was material, as is required for a *Napue*

22  claim.

23     As demonstrated during the evidentiary hearing, even Petitioner's own expert

24  witness acknowledged that the photographs taken approximated the lighting

25  conditions of the time period when Petitioner claimed to have looked inside the house

26  from the two windows.  (Hr. Tr. 172-73.)  Hence, as to the factual issue to which the

27  timing of the photographs pertained, the inaccuracy of the trial testimony was

28  immaterial.  In this respect, Petitioner's *Napue* claim must also fail, and the Second

1    R&R's conclusion to the contrary is not supported by the evidence.

2         **d.    The Victim's Body In A Position Not Visible To Petitioner**

3         The Second R&R wrongly concludes that the evidence that the Petitioner's

4    body was not visible from the living room and dining room windows was false.

5    (2R&R at 55-56, 61-63.)  This conclusion cannot survive close scrutiny.

6         The evidence in question is Detective Monsue's testimony at trial that he,

7    himself on the day of the murder could not see past the reflections of the living room

8    windows due to the brightness outside (RT at 268) and could not see the location of

9    the body based on the following:

10        The window itself because it has light reflecting on to it, the dining room

11        table, the plants, the way they were arranged inside of the planter and the

12        size and shape of the planter in relationship to where he had stated he had

13        observed his mother.

14   (RT at 273.)

15        But, as explained previously, the view from the living room window was

16   obstructed because of the strong reflections resulting from the intense disparity in

17   lighting conditions between the inside and the outside of the house.

18        As to the dining room sliding door, the evidence adduced at the hearing

19   confirmed Monsue's testimony.  For purposes of evaluating the truth of Petitioner's

20   claim to have seen his mother through the door,  what matters is where Petitioner said

21   the body was located when he looked in and whether physical evidence contradicted

22   or supported what he said.  This is where the "Monsue" version of where the body

23   was located became important, because it is the version that is based on Petitioner's

24   own descriptions of where the body was located.

25        Petitioner drew a diagram for Detective Monsue during his interview, which

26   was marked at trial as Exhibit 53 and shown to all parties, the judge, and the jury.

27   (RT at 332.)  This exhibit is no longer available as it apparently had been destroyed

28   along with all other exhibits from trial.  That exhibit however, contained a rough

61

diagram of the Lisker residence layout and a stick figure representing Mrs. Lisker's body.  (RT at 338.)  Monsue described this diagram for the record at different points during trial, on direct and on cross-examination, thereby providing enough facts upon which a body-placement reconstruction could be done based on Petitioner's descriptions.  These descriptions by Monsue are highly credible because they were made in open court in front of both the prosecutor and the defense, both of whom had Petitioner's diagram (Exhibit 53) in hand to immediately verify the accuracy of those descriptions.

Concerning how far east the body was, Monsue testified:  "He places the head right next to the northwest corner of the planter with the body in this direction which is west from the head with the feet resting in this area here."  (RT at 338.)  Later, Monsue again testified that Mrs. Lisker's head "lay adjacent" to the northwest corner of the planter.  (RT at 359.)  Under cross-examination, in reference to the diagram, Monsue clarified that the head was at the western portion of the planter but closer to the middle than to the edge.  (RT at 434.)

As far as the body's proximity to the planter, Detective Monsue testified that Petitioner told him Mrs. Lisker's arms were "curled up against the planter."  (RT 473.)  This was confirmed by Petitioner's statement in the interview that Mrs. Lisker "was on her side, she was like this, with her arms like up to her face."  (Ex. 86-164.)  Petitioner also indicated, "She like bleeding, she was leaning on this Ok."  (Ex. 86-172.)  This evidence showed that Mrs. Lisker was so close to the planter that her arms, curled up in front of her while she lay on her side, were "leaning" against the planter.

Based on these descriptions, Varat generated a three-dimensional diagram in which an observer, looking through the dining room sliding door from the best vantage point possible, could *not* see Mrs. Lisker's body.  (Ex. 155-3.)  This more than confirmed Monsue's trial testimony and clearly defeats Petitioner's current attempt to label that trial testimony as false.

1   The Second R&R discounts this version merely because it is contrary to

2   Monsue's description of Petitioner's sketch, which placed the victim's body at least

3   partially on that rug. (2R&R at 62.) But, the Second R&R fails to consider the fact

4   that the rug was not stationary, while the planter was, and that there were three

5   paramedics who entered the foyer and performed emergency treatment on that rug.

6   During the flurry of activity to save Mrs. Lisker, the paramedics moved the body

7   several times, at least once turning it over (RT at 182) and another time, placing it in

8   a pressure suit (RT at 180). The rug most certainly shifted during this commotion,

9   and the fact that it appears awkwardly skewed (see, e.g., Ex. 155-1) confirms this fact.

10   The proximity of the southwest corner of the carpet to the victim's head in

11   the Monsue version also supports a strong possibility that the rug, during the

12   commotion of the treatment, was shifted from an earlier location where its southwest

13   corner was touching parts of the victim's body.[10] Petitioner himself, who moved

14   Mrs. Lisker's body at least once by "hugging, holding her" (Ex. 86 at 167) and had

15   admittedly hurried around the house in panic (see Ex. 86 at 164-66), could also have

16   caused the rug to move some more. Between a stationary planter and a movable rug

17   that showed indications of being shifted and in fact was the locus of the crime and the

18   subsequent rescue effort, the most reliable choice of reference to reconstruct a body

19   position has to be the planter. Hence, contrary to the Second R&R, the Monsue

20   version of the body placement was fundamentally reliable.

21   Indeed, corroborating the Monsue version is Exhibit 68:89, which is a

22   photograph of the northern edge of the planter showing blood spots on the northern

23   wall of the planter. The photograph also reflects that directly below those spots were

24   what Frank Terrio and the prosecutor both acknowledged to be discolorations or

25

26   10. In light of the blood evidence, violent activity obviously occurred on the

27   rug. Thus, the rug may have shifted from an earlier position prior to the struggle.
     Ultimately, it is entirely possible that at some point in time, the rug was touching the

28   victim as she was "curled up" against the planter (Monsue version).

1   stains to the wooden floor.  (Hr. Tr. at 78, 137.)  The fact that the stains were below

2   the bloody spots on the planter supports the reasonable inference that the victim's

3   head, consistent with the Monsue version, had at some point in time been very close

4   to that area, depositing blood stains to the wooden floor and possibly serving as a

5   source of blood, to which the application of blunt force would have caused tiny blood

6   drops to be deposited on the wall of the planter.

7        Finally, it bear emphasis that as some of the crime scene photographs show,

8   the inside of the house was dark.  This means that even if Petitioner had a vantage

9   point from the dining room window that technically (with his face pressed against the

10  glass) would have provided a peek of Mrs. Lisker's body, based on the Terrio version

11  of where the body was located (based on the blood spot on the carpet), Petitioner

12  would have to know where to look to see her, demonstrating that he knew the location

13  of the body before looking in.  The darkness inside the house is confirmed by the very

14  photographs the Second R&R cited to show one can see all the way to the entryway.

15  Close examination of  the photographs in Exs. 74-3 through 74-5, which were taken

16  on what the Second R&R characterizes as a brighter day than March 10, 1983, shows

17  that as the view moves from the ceiling of the entryway to the floor, it becomes so

18  dark that any attempt to discern objects near the floor becomes difficult.  If the

19  Second R&R is correct in surmising that March 10, 1983 was a darker day because

20  it was cloudy and hazy (1R&R at 20), this supposition would in turn further support

21  the inference that the inside of the house on March 10, 1983 was that much darker,

22  and it was that much more difficult for Petitioner to obtain a view of his mother from

23  the dining room window, even under the Terrio version.

24       For these reasons, the Second R&R's conclusions regarding the falsity of

25  trial testimony about the glare and reflections in the window  are erroneous.

26       **2.   The Evidence Presented To Show That The Only Footprints
        Left By The Perpetrator Were Petitioner's Was Not False**

27

28  The Second R&R next concludes the prosecution knowingly presented false

64

1  evidence that various shoeprints belonged to Petitioner and that the prints matched

2  his Pacer brand footwear. (2R&R at 56-58, 63-67.) This conclusion is without merit.

3      The Second R&R misconstrues the testimony given at trial. As to the bloody

4  shoeprints inside the bathroom and the kitchen, the prosecutor's question was "Did

5  you see any shoes that had a similar pattern on them?" Monsue's answer was that the

6  pattern of Petitioner's shoe sole "resembled quite closely the patterns that were

7  imprinted on the floor." (Pet. 326.) Hence, Monsue did not claim the shoeprints

8  matched Petitioner's shoes, but only that they were similar. While subsequent

9  evidence showed that the shoeprints do not "match" Petitioner's shoes, Petitioner

10 cannot demonstrate that they were not "similar." As such, he cannot demonstrate the

11 trial testimony was false.

12     As to the shoeprints outside the house, the Second R&R does not cite, and

13 Respondent cannot find, any testimony within the trial transcript where a witness

14 attested Petitioner was the source of those outside shoeprints. As no such testimony

15 was given, no false evidence was possible.

16     Indeed, when the prosecutor, during closing argument, was discussing this

17 issue, he did little more than ask the jury to compare the prints for themselves. (RT

18 1121 [We got the photographs. You can look at Bruce Lisker's shoe."].)

19     In sum, no false testimony was presented regarding the shoe prints. As such,

20 the conclusion of the Second R&R must fail.

21         **a.  Bloody Shoeprints Inside The House Not Made By Anyone Other Than Lisker**

22

23     The Second R&R concludes that the prosecution presented false evidence

24 that the bloody shoeprints inside the house were not made by anyone other than

25 Petitioner. (2R&R at 41-46, 63-67.) But no one testified to this effect at trial. The

26 Second R&R's conclusion is directed at the prosecutor's argument to this effect at the

27 closing argument:

28     If he is running through the house really quickly to look for something and

65

1   he had all of these footprints, why isn't there an intruder's footprint

2   somewhere? . . . Only his footprint is in the blood.

3   (RT at 1121; *see* 2R&R at 41-42, 56-57.)   This clearly would not be a "false

4   evidence" claim, but one that challenges the propriety of the prosecutor's argument

5   regarding inferences drawn from the evidence presented.  *See Barcamerica Int'l USA*

6   *Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n. 4 (9th Cir. 2002) (counsel's

7   argument not evidence).  As such, the *Napue* claim in this regard  must fail.

8       Even if the propriety of the prosecutor's argument is examined, Petitioner's

9   complaint falls short.  "[P]rosecutors must have reasonable latitude to fashion closing

10  arguments, and thus can argue reasonable inferences based on the evidence, including

11  that one of the two sides is lying."  *United States v. Weatherspoon*, 410 F.3d 1142,

12  1147 (9th Cir. 2005).  Here, the prosecutor, faced with apparently similar shoe

13  patterns, did not act unreasonably in arguing that Petitioner was in fact the one that

14  left those shoeprints.  Although the position advanced was eventually disproven years

15  after the trial, Petitioner can point to nothing to show that the argument was not made

16  in good faith and not reasonably based on the evidence.

17      The Second R&R concludes that "the bloody shoe print in the guest

18  bathroom and one of the shoe impressions in the dirt outside the house were left by

19  someone other than himself, disproving the State's 1985 theory of his guilt.

20  Moreover, . . . , it appears likely that the shoe prints were not left by police

21  personnel."  (2R&R at 44.)  Respondent concurs that there were shoe prints, found

22  outside the house ("shoeprint B2") and in the guest bathroom ("shoeprint G"), which

23  were similar in characteristics to each other, but did not belong to Petitioner, as

24  testified by FBI analyst Sandra Wieserma.  (Hg. Tr. 567-77, 582-84.)  Respondent,

25  however, takes exception to the Second R&R's conclusion that "it appears likely that

26  the shoe prints were not left by police personnel."  (2R&R at 44.)

27      The Second R&R questions Officer Dairies's credibility by indicating that

28  his testimony at the evidentiary hearing -- that he "probably" stepped in blood -- was

66

1   contrary to his trial testimony.  (2R&R at 43-44.)  However, Dairies's testimony at

2   the hearing is readily reconcilable with his trial testimony.   At trial, Dairies

3   responded, "yes" when asked whether he was "careful not to disturb any potential

4   evidence." (RT at 874.)  He also answered, "Yes" when asked whether he "avoid[ed]

5   stepping in any blood spots."  He clarified that he was told by the homicide unit not

6   to step in blood spots.  (RT at 874.)  This testimony was true as far as Dairies's

7   knowledge was concerned at the time of trial.   There was no indication that he

8   reviewed any other document in preparation for trial other than the "notes and reports

9   that [he] made regarding the incident."  (RT 867.)

10          However, this all changed prior to the first evidentiary hearing in this Court.

11   As Dairies testified, he refreshed his recollection before the hearing with the crime

12   scene photographs.  (Hg. Tr. 410, 413, 415.)  As he looked at the photographs, he

13   noticed red stains he could not remember seeing when he was engaged in his

14   protective sweep.  (See, e.g., Hg. Tr. 436-437.)   But even then, he was careful not to

15   rush to a conclusion that he in fact stepped on blood.  Rather, knowing more now than

16   he did at trial, he reasonably left open a possibility which he had excluded at trial.

17   Indeed, George Prado, who entered the house with Dairies, testified that officers often

18   could not see blood on the floor or carpet as they conduct their preliminary search of

19   a premise.  (Hg. Tr. 446.)  Under these circumstances, there was nothing incredible

20   about Dairies's modification to his trial testimony.

21          The Second R&R also questions the officers' credibility by finding that,

22   contrary to the officers' testimony at the evidentiary hearing, neither of them

23   indicated in their March 10, 1983, reports, and did not testify at trial, that they entered

24   the guest bathroom containing shoeprint "G." (2R&R at 44.)  However, an attack on

25   the credibility of officers -- based not on directly inconsistent statements but only on

26   what was omitted from their past reports -- overlooks the purpose of a police report,

27   i.e., to summarize activities and observations, as opposed to recording all details.

28   Moreover, the questions asked of these officers at trial were not of the type that would

1   elicit answers which this Court faulted the officers for not supplying.

2        It is true that neither the officers' report nor their testimony at trial

3   specifically indicated their entrance into the guest bathroom.  (Hg. Ex 86:365-

4   366;Pet. RT at 829-65, 866-76.)  It is also true, however, that the officers conducted

5   a protective sweep in order to secure the *entire* residence, verifying that no criminal

6   suspect was still inside the house.  (RT at 838-39 [Prado searched closet doors in

7   every room, "went through" the entire house], 869 [Dairies "checked the house with

8   Officer Prado for suspects"].)  It is also undisputed that this procedure is of utmost

9   importance as the officers' safety depended on it.  (Hg. Tr. 412, 446.)  And the guest

10  bathroom was part of the house which undoubtedly needed to be checked, and was

11  almost certainly checked for possible suspects during the protective sweep.

12        In any event, the fact that the officers in the past omitted mention of the guest

13  bathroom is of little or no consequence.  They also omitted mention of two other

14  bathrooms in the house (RT at 874-75 [Dairies checked the master bedroom and

15  bathroom]; RT at 838-39 [Prado testifying, "(Dairies) went to the right and I went to

16  the left.  So we covered different rooms"]; Hg. Ex. 86:365-365a [Prado's report

17  indicating he searched the den, kitchen area, living room, two small bedrooms,

18  exterior of residence]; Hg. Ex. 8: 366-367 [Dairies's report indicating he checked the

19  master bedroom].)  These other bathrooms, again, had to be, and unquestionably were

20  checked, for suspects.  These omissions were not surprising.  The officers' reports

21  were summaries which detailed only the most important facts and may very well have

22  left out mention of relatively unimportant parts of the house.

23        Likewise, at trial, the focus of their testimony was the appearance, demeanor,

24  and statements of Petitioner (see, e.g., RT at 831-53, 867-72), not a comprehensive

25  list of every area searched during the protective sweep.  The testimony about which

26  areas they searched was at best peripheral.  (RT at 839, 872-73).  Indeed, Prado did

27  not even specify which rooms he went into, other than to say Dairies searched the

28  right portion of the house while he handled the left side.  (RT at 839.)  Hence, it is not

1  fair to discount the officers's credibility simply because they had not specifically

2  mentioned the guest bathroom while answering questions at trial propounded with an

3  entirely different focus.  At no point was either officer directly asked at trial about

4  entrance into any of the bathrooms.

5  Furthermore, the evidence strongly suggested that shoeprint "G" in the guest

6  bathroom was left by one of the officers during the sweep.  As the crime scene

7  photographs show (see, e.g., Hg. Ex. 64: 89, 90, 91, 93, 95, 98, 99, 100, 101, 102,

8  103, 104, 105, 106, 107), and as both officers  acknowledged (RT 423, 446), there

9  was an abundance of blood in the residence.  Although the officers were doing their

10  best to avoid stepping on blood, their attention during the protective sweep was

11  devoted to the search of suspects, so it was not possible to guarantee non-disturbance

12  of the scene.  (RT at 446-47.)  Meanwhile, as Exhibit 66-1 shows, shoeprint "G" was

13  not located in the middle of the bathroom, but was inches from the threshold and

14  appears to point into the bathroom.  (Hg. Ex. 66-1)  This was perfectly consistent with

15  an officer (who had previously stepped on blood accidentally) taking one quick step

16  into the bathroom, ascertaining that no suspects was inside, and proceeding on to the

17  next room.  For this reason, no mention of the minimal entry into the guest bathroom

18  was omitted from the reports.

19  In this regard, that shoeprint G may have been made by the same shoe that

20  left the shoeprint on the dirt walkway east of the house (shoeprint B2) is no surprise.

21  (See Hg. Tr. 567-77, 582-84 [FBI Analyst testifying that prints B2 and G had

22  characteristics similar to one another].)  If anything, it confirms that both shoeprints

23  were left by police personnel.  This is because both Prado and Dairies had been to the

24  east side of the house.  (Hg. Ex. 86-365 [Prado's report indicating he checked exterior

25  of residence including the east side]; RT at 872-73  [Dairies, in reply to question at

26  trial about searching "exterior circumference of the residence," testifying he went to

27  the east side of the house where he observed a broken window].)  At the time they

28  searched that part of the property, either of them could have walked through the dirt

walkway in question and were thus perfectly capable of leaving shoeprint B2.

**b.  Shoeprints Outside The House Not Made By Anyone Other Than Lisker**

In attacking the credibility of the officers, the Second R&R cites the fact that Dairies had testified he went to the exterior of the house to search, but Prado did not see Dairies do so.  (2R&R at 44.)  This places unwarranted significance on this observation.  Prado testified expressly and unmistakably that he would not know whether Dairies had searched the side of the house, because during the times when he (Prado) was not at the east side of the house, Dairies "may have been tending to Mr. Lisker, or he could have been checking a portion of the perimeter of the house. [He] just [didn't] know."  (Hg. Tr. 571.)

The Second R&R also finds the officers not credible because of their "claimed ability to remember minute details such as whether they noticed specific blood stains during their quick search 20 years prior."  (2R&R at 44.)  But the memory of minute details of a gruesome murder scene, which not all officers come across on a regular basis, is not inherently implausible.  Memory can refreshed by past written accounts and crime-scene photographs now shown to the officers.

Citing the fact that "neither officer remembered anything about the shoes he wore that day," the Second R&R concludes that "any suggestion that one of the [officers] left the prints would be pure speculation."  (2R&R at 44.)  Respondent disagrees.  The fact that a protective sweep had to be conducted at a bloody murder scene, the location of shoeprint "G" being near the threshold, and that both of the officers that conducted the sweep had also been to the side of the house where a similar shoeprint was found, combined to yield a reasonable likelihood that the shoeprints in question were left by police personnel.  This is certainly a reasonable conclusion.

Adding to this likelihood is the fact that such contamination is common, almost inevitable, and that it did in fact occurred in this case.  FBI analyst Wieserma

1    testified that according to her experience, there were "many cases" in which she was

2    called to assist as a shoeprint analyst where she had determined that the scene was

3    contaminated by paramedics or law enforcement officers. (Hg. Tr. 595.) In fact, one

4    such shoeprint contamination was detected in the instant case because of the print's

5    extreme dissimilarity with Petitioner's shoe. It was established at trial that paramedic

6    Lovato was the one who left shoeprint D, a shoe impression appearing to be in blood,

7    found at the porch of the residence. (RT at 184-85; Hg. Ex. 68:3-4.) If paramedics

8    stepped on blood in the foyer where they treated Mrs. Lisker and unwittingly left a

9    shoeprint, then it is highly likely that the police officers who walked through that

10    same foyer to conduct the protective sweep had unwittingly left bloody shoeprints at

11    the scene.

12          Another important set of facts renders it unlikely that shoeprints B2 and G

13    belonged to another assailant. According to police investigation, all doors, except the

14    front door -- which Petitioner had apparently found to be initially locked but had later

15    opened from the inside after he allegedly broke in -- were locked and all windows

16    were nailed shut except the kitchen window, which was dismantled. The front door

17    was not damaged in any way. (RT at 262-63, 248-49, 274-75, 289-90, 851-52.)

18    Under these circumstances, the two possible ways this alleged third-party assailant

19    could have gained entry into the house was to either break in through the kitchen

20    window or enter through the front door.

21          The first possibility was excluded, as Petitioner took responsibility for the

22    forced entry into the kitchen window. (Hg. Ex. 86:161.) This means that the alleged

23    assailant had entered through the front door, thus rendering the need to walk around

24    the perimeter of the house unnecessary. This scenario appears inconsistent with

25    evidence tending to show that shoeprint B2, found at the dirt walkway, and shoeprint

26    G in the bathroom were made by the same shoe. The combined circumstances, on the

27    other hand, are more consistent with either Prado or Dairies being the source of both

28    shoeprints G and B2 as a result of their activities in and out of the house.

1   In sum, there is substantial evidence supporting the reasonable inference that

2   the shoeprints were left by police personnel.  Respondent acknowledges that the

3   prosecution case at trial was based in part on the premise that all shoeprints inside the

4   house belonged to Petitioner.  But the prosecutor's argument must be reasonably

5   understood to have meant that all shoeprints other than those of law enforcement

6   personnel were those of Petitioner.  In other words, the prosecutor was arguing that,

7   based on the evidence, the only shoeprints left by anyone other than police officers

8   or paramedics were Petitioner's.  And given the evidence summarized indicating that

9   the shoeprints likely belonged to police personnel, it is much more reasonable to infer

10   that all the shoeprints found inside the house belonged to either Petitioner or police

11   personnel rather than to a mysterious third-party assailant.

12   **c.   The Marked Impression On The Victim's Head Was Not A Shoeprint**

13

14   The Second R&R concludes that a patterned impression on the victim's head

15   was a shoeprint.  The Second R&R deduces that since the impression could not have

16   been made by Petitioner's Pacer shoe, and since the officers testified that they never

17   stepped on the victim's head, this impression must have been left by a third-person

18   wearing a shoe with a herringbone pattern, similar to the one that left prints B-2 and

19   G.  (2R&R at 45-46.)   Respondent respectfully submits that this speculative

20   conclusion is belied by the evidence.

21   There is simply no credible evidence that demonstrates that the head

22   impression was a shoeprint.  Indeed, in relying on Raquel's opinion that the

23   impression was made by a shoe (2R&R at 45), the Second R&R fails to acknowledge

24   that the opinion was formed with significant qualifiers that rendered it rather

25   meaningless, and further omits any consideration of the critical problems that plagued

26   Raquel's analysis.  First, as Raquel had to acknowledge, he rendered that opinion

27   within the "little world" of shoe comparison, and he went on to agree that he could

28   "see that there are other things that are made that are not shoes that could have . . .

72

1   made this impression." (EH II at 25.)  Moreover, even within this "world" of shoe

2   impressions, Raquel had to acknowledge that the head impression contained none of

3   the usual features of a footwear impression, i.e., the heel area, the arch area, the toe

4   reach, and the edge contours.  (EH II at 25-26.)

5          Furthermore, although a tool was not produced at the evidentiary hearing to

6   match the mark, no shoe or shoe impression matched the mark either.  As Raquel

7   acknowledged, a disparity in dimensions between the head impression and

8   impressions G and B2 exists, i.e., the head impression exhibited six bars per inch and

9   impressions G and B2, five bars per inch.  (EH I at 194 [impression G and B2 had

10  five bars per inch]; EH II at 17-18 [head impression had six bars per inch].)  Indeed,

11  the most that Raquel was willing to conclude regarding the comparisons was that the

12  spacing of the impression was *more similar* to that of G and B2 than to Petitioner's

13  Pacer shoes.  (EH I at 194.)  Nor did Raquel render an opinion at the hearing that the

14  impression on the back of the victim's head was of a herringbone pattern.

15         Thus, the only basis upon which Raquel rested his current opinion that the

16  head impression was a shoe impression is that he had seen, on one single past

17  occasion, a similar impression on a human body, in the shoulder area, that was left

18  by a shoe.  (EH II at 24-25.)  This observation was further weakened by his admission

19  that he was not a pathologist or a medical doctor (EH II at 26), had no idea regarding

20  the distance between the skin and bones of the shoulder area as compared to the

21  human head (EH II at 29-30), and could envision other tools that could cause that

22  mark (EH II at 25).  In short, Raquel's opinion on tool marks carried very little

23  weight.

24         Indeed, the FBI shoe impression expert, Wieserma, confirmed as much.  She

25  testified unequivocally that there is no evidence that the impression on the head, a

26  mere one inch by a half inch in size, was a shoe impression.  (EH IV at 78, 81.)  And,

27  as the Second R&R has to acknowledge, because the available photographs yielded

28  conflicting measurements, Wieserma found no basis to draw the conclusion from

1  those photographs that the impression in question had the same dimensions as B2 and

2  G.  (2R&R at 45-46.)

3         On the other hand, there is substantial evidence that the impression was not

4  a shoeprint, much less one caused by the shoe that left impressions B2 and G.  First,

5  if the impression behind Mrs. Lisker's ear was made by a shoe that impacted her

6  head, there is no explanation why only an incredibly minute fraction of that shoe,

7  about the size of half a quarter (U.S. currency), became imprinted on the head, and

8  not more.  Wieserma testified that in all her years of experience, she had never seen

9  any shoe impression that small on a human body.  (EH IV at 78.)  Second, even

10  Raquel had to acknowledge a feature showing that the impression behind the victim's

11  ear was not a herringbone pattern.  He admitted that as to that impression, the second

12  bar from the left not only hooked toward the front of the face at the top of the bar, it

13  also hooked toward the front of the face at the bottom.  (EH II 33-34.)  The logical

14  consequence is that all the bars, like the second bar, were not herringbone patterns,

15  i.e., patterns that "zig zag" (EH II at 8), but formed a series of "C" shaped

16  impressions.

17         Raquel conditioned this concession on the predicate that the hook at the

18  bottom of the second bar was part of the contusion forming the bar, and not a separate

19  abrasion.  (EH II at 32.)  A careful examination of Exhibit 16-1 and a close-up

20  photograph, Exhibit 16-3, reveals that while there was a separate abrasion at the

21  bottom of the first bar, the part of the second bar that hooked back at the bottom was

22  a continuous part of the same contusion that formed the second bar.  In fact, when

23  these photographs are examined more closely, the bottom of the third and fourth bars,

24  counting from the left, also hooked toward the front of the face.  As such, there exists

25  significant evidence, overlooked by the Second R&R, that this impression was not

26  a herringbone pattern and thus, could not have been made by the shoe that left

27  impressions B2 and G.

28         On the other hand, the smallness of the impression and the fact that it

74

1    comprises "C" figures are consistent with a bracelet or wristwatch probably worn by

2    Mrs. Lisker when she was being beaten.  This possibility, strongly supported by the

3    evidence, was presented at the close of the hearing (EV VI at 40-41) but not

4    considered by the Second R&R.  According to Robert Lisker's trial testimony, Mrs.

5    Lisker regularly wore jewelry, including a wristwatch.[11/]  (RT at 227.)  Meanwhile,

6    Steven Dowell, the tool expert, confirmed that the patterned impression on the

7    victim's head would be consistent with a bracelet or a watchband that had features

8    capable of producing the observed pattern.  (EH V at 41-42.)  Thus, omission of this

9    evidence could not have impacted the verdict in this case.

10    Various other evidence shows why such jewelry would account for the

11    impression.  As the defensive stab wounds on Mrs. Lisker's hands demonstrate (see

12    Ex. 71:10, 16), she shielded herself throughout the assault.  And, when the blunt

13    object (e.g., the exercise bar that had blood on it (RT at 93-94, 98, 299, 312, 496))

14    which caused the serious fractures to the back of her head (see Ex. 16:1 [showing the

15    head fracture]), was being used against her, it stands to reason that at some point, she

16    shielded that general area of her head with her arms to protect against the blows.  This

17    would mean that her right wrist could at some point be in the area behind her right

18    ear.  Under these circumstances, as the exercise bar impacted her right arm, the

19    resulting force caused her wrist area (where the bracelet or watch was worn) to impact

20    the area behind her right ear, thereby leaving the impression in question.

21    Dr. Golden's autopsy report confirms this version of events as it documented

22    a fracture to Mrs. Lisker's right arm (Ex. 73:2); this fracture is an indication that the

23    right arm was in the way of a vicious blow to a part of the body.  Just as important,

24    the autopsy report documented a bruise to Mrs. Lisker's right wrist (Ex. 73:6), a

25    physical sign consistent with the bracelet or watchband bruising the wrist as it

26

27    _____

28    11.  Lovato could not recall whether Mrs. Lisker was wearing a watch or any
     jewelry when he first found her at the foyer.  (RT at 203.)

impacted the back of the head.[12/]  With such physical evidence pointing to this sequence of events involving a bracelet or a wristband, the speculation that the impression in question was left by a shoe becomes even less worthy of consideration.[13/]

 For these reasons, the Second R&R's finding that the patterned impression on the back of the victim's head was "possibly" a shoe impression is contrary to the evidence.

## C. Summary

 Here, the "false evidence" to which the Second R&R refers merely consisted of reasonable inferences from the evidence that was actually presented at trial.  As argued above, none of the evidence upon which the prosecutor based these arguments to the jury was false.  Monsue and Robert Lisker testified truthfully that when they tried to look, *they* could not see through the windows because of the reflection of the pool on the glass and because of the dark interior.  In addition, Monsue testified truthfully that the unidentified footprint looked "similar" to the shoes worn by Petitioner, not that they were identical.  Petitioner's claim about being able to see his

_____

 12. During the first evidentiary hearing, the Court precluded Respondent from inquiring of Dr. Golden as to whether this version of events was consistent with the impression in question.  The apparent ground for the exclusion was that it called for speculation.  (EH IV at 175.)

 13. The Second R&R appears to have drawn an inference that undermines its own conclusion.  The R&R first references Dr. Golden's testimony that a major fracture to the head was found on the right side, near the base of the skull.  The Second R&R then observes that the fracture was presumably near the impression in question.  (2R&R at 46.)  From this, the Second R&R appears to postulate that the same force that caused the impression in question also caused the major head fracture.  If this were the case, then similar patterned impressions from the alleged shoe would presumably appear near that fracture.  Yet, when Exhibit 16-1 is reviewed, no such patterned impressions appear at or near that fracture.  Hence, if the Second R&R is correct that the same force of impact caused both the patterned impression and the fracture, the suggestion that the impression in question was a shoeprint is severely undermined.

1  mother from either of two windows was disproved by the reflection that was present
2  on the glass (regardless of the amount of sunlight), the contrasting darkness of the
3  inside of the house, and the location (described by him during police interviews) of
4  his mother's body close to the planter, making it nearly impossible to see from any
5  standpoint at the dining room sliding door.

6        Evidence presented at the first evidentiary hearing demonstrated that the
7  bloody footprint found in the bathroom was likely left by paramedics or by police
8  officers sweeping the scene after accidentally stepping on some blood, which was
9  present in several areas of the house.  There also is absolutely no evidence the
10 abrasion to the back of the victim's head was made by a shoe.  In all likelihood, it was
11 made by the victim's own wrist watch as Petitioner clubbed her with the Bullworker.

12       The single bloody shoeprint in the bathroom and the shoeprint in the kitchen
13 had to have been left by one of the police officers or paramedics.  Detective Monsue
14 did not testify that these two footprints were identical to Petitioner's.  He only stated
15 that the pattern was "similar" to Petitioner's – a fact that the jury could accept or
16 reject upon viewing the photographs themselves.

17       Thus, the prosecutor was merely asking the jurors to draw certain reasonable
18 inferences, based on the evidence presented, that the reflections in the patio window
19 and sliding door prevented viewing the body that lay in the dark entryway, that there
20 was no evidence of forced entry by an intruder, that all of the bloody shoeprints that
21 were made before the police and paramedics arrived were those of Petitioner.  These
22 were not factual contentions or assertions of facts that had been proved, but rather
23 reasonable inferences from the evidence presented.

24       The prosecutor's arguments, and the inferences the prosecutor asked the jury
25 to draw, were not misleading, deceptive, or false.  They are certainly not what
26 Petitioner labels as assertions of fact.  The Second R&R wrongly concludes that the
27 actual evidence presented was truly "false" or that it was material.

28       Thus, the Second R&R's conclusion to the contrary must be rejected.

## III.

### THE SECOND REPORT AND RECOMMENDATION WRONGLY FINDS RELIEF WARRANTED BY ALLEGED CUMULATIVE ERROR

The Second R&R concludes that the cumulative impact of the alleged errors warrants habeas relief. (2R&R 68.)  Respondent strongly disagrees.

Petitioner has failed to demonstrate any federal constitutional error and is not entitled to habeas corpus relief.  He has failed to show that the state court's disposition of these claims was contrary to, or an unreasonable application of, Supreme Court precedent.  Petitioner's arguments, espoused by the Second R&R, cannot withstand scrutiny in that they rely an faulty findings of fact and flawed legal conclusions.  There was no knowing presentation of actually false evidence, and defense counsel was not derelict in deciding to forego further investigation into, and presentation of, a third-party-liability defense.  Therefore, the Second R&R's conclusion that the cumulative impact of the asserted errors requires granting the writ is also faulty.

The cumulative effect of constitutional errors can constitute a basis for relief, even if the errors individually do not.  *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007).  But here, each of the two claims of constitutional error fails for the reasons stated and is without merit.  Therefore, Petitioner is entitled to no relief based on a claim of cumulative prejudice.

## IV.

### THE SECOND REPORT AND RECOMMENDATION WRONGLY REPROVES RESPONDENT OF SEEKING ONLY TO DELAY THE PROCEEDINGS BY NOT WAIVING EXHAUSTION AND BY NOT REQUESTING A RULING ON THE MERITS WHEN HE RESPONDED TO THE STATE PETITION IN THE CALIFORNIA SUPREME COURT

The Second R&R unfairly criticizes Respondent for insisting on full exhaustion of all federal claims and wrongly reproves Respondent for not seeking a determination of Petitioner's claims on the merits in the state courts. (2R&R at 8-9.)

78

1    The former charge is unwarranted, since it was the state's interest that
2  Respondent was vindicating in requiring presentation of the unexhausted claims to
3  the state's highest court.  28 U.S.C. §§ 2254(b)(1), (b)(3); *Rose v. Lundy*, 455 U.S.
4  509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).  If anyone was dilatory, it was
5  Petitioner.  It was Petitioner who waited fifteen years after finality of his conviction,
6  and seven years after passage of the AEDPA, to present these claims to this Court.
7  It was Petitioner who failed to present all of his federal constitutional claims first to
8  the state courts before proceeding to this Court.  It was Petitioner who refused to
9  present a substantive actual innocence claim to the California Supreme Court, which
10 is clearly permitted under state law.  (*In re Clark*, 5 Cal. 4th 750, 759, 790, 796-798,
11 21 Cal. Rptr. 2d 509 (1993)), and which would have obviated all of these proceedings
12 had he prevailed on that claim.  Indeed, his gateway actual innocence claim remains
13 unexhausted to this day and precludes consideration of his underlying claims, since
14 neither the First nor the Second R&R even address this important issue.

15   The Second R&R accuses Respondent of misleading the Court by asserting
16 to the Magistrate Judge that the California Supreme Court should be given an
17 opportunity to address the merits of Petitioner's claims and then by not asking the
18 California Supreme Court to issue an order to show cause and order an evidentiary
19 hearing.  (2R&R at 8-9.)  However, Respondent in fact did urge the California
20 Supreme Court to reach the merits of Petitioner's claims and to deny his claim on the
21 merits so that Respondent could be entitled to deference.  (Traverse, Ex. A, at 52-55,
22 57, 59-60.)  In addition, Respondent specifically asked the Court to order an
23 evidentiary hearing if it issued an order to show cause so he could refute each of
24 Petitioner's claims.  (Traverse, Ex. A, at 4, 54, 57, 59.)  Indeed, it was to
25 Respondent's advantage to seek a merits determination in the state supreme court,
26 since such a determination would have been entitled to deference in this Court.  28
27 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. at 405-06, 411-13.  Hence, this Court
28 should decline to adopt this unnecessary and unfounded reproval.

**CONCLUSION**

For the stated reasons, Petitioner has not made out the required predicate showing of ineffective assistance of counsel or of the presentation of false evidence. In addition, there has been no showing of cumulative prejudice. Respondent therefore respectfully requests that this Court not adopt the Report and Recommendation, that it deny the Second Amended Petition, and that it enter judgment dismissing the Petition with prejudice.

Dated: April 8, 2009

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

PAMELA C. HAMANAKA
Senior Assistant Attorney General

SCOTT A. TARYLE
Supervising Deputy Attorney General

JOHN YANG
Deputy Attorney General


/s/  Robert David Breton
ROBERT DAVID BRETON
Deputy Attorney General

Attorneys for Respondent

RDB:lh
LA2004FH0213
Lisker - Objections 2d R&R.wpd

80

## CERTIFICATE OF SERVICE

Case Name:    **Lisker v. Knowles**          No.:    **CV-04-02687-VAP(RZ)**

I hereby certify that on <u>April 8, 2009</u>, I electronically filed the following document(s) with the Clerk of the Court by using the CM/ECF system:

## RESPONDENT'S OBJECTIONS TO SECOND REPORT AND RECOMMENDATION

I hereby certify that all participants in the case are registered CM/ECF users and that the service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on April 8, 2009, at Los Angeles, California.

Lily Hood
Declarant

Signature

LA2004FH0213
60399753.wpd