# PSYCHOLOGICAL EVALUATION: SUBSEQUENT
# FOR THE BOARD OF PAROLE HEARINGS
# MARCH 2009 CALENDAR
# FORENSIC ASSESSMENT DIVISION
# MULE CREEK STATE PRISON

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | Lisker, Bruce |
| CDC Number: | D 22678 |
| DOB (Current Age): | 06/24/1965 (currently 43 years old) |
| Controlling Offense: | Murder 2nd Degree with a weapon |
| Date of Offense (Age at time): | 03/10/1983 (then 17 years old) |
| Sentence: | 15 years to life plus one year |
| County of Commitment: | Los Angeles County |
| Date Entered into CDCR: | 03/05/1986 |
| Date Received at MCSP: | 11/08/1989 |
| Placement Score: | 28 points (11/2008) |
| CDCR Forensic Evaluator: | M. Lehrer Ph.D. |
| Date of Evaluation: | 11/20/2008 |

## II. SOURCES OF INFORMATION

This appears to be the 10th Psychological Evaluation done on Inmate Bruce Lisker. Some previous evaluations may not formally have been requested for parole purposes. Additionally, when an inmate refuses to be evaluated, this may have been indicated by the filing of a brief clinical note or chrono, or an evaluation may have been done using available materials of record. For this reason, the actual number of reviewed Board of Parole Hearings (BPH) evaluations may be different than the total as listed above. This review included the Psychological Evaluation reports authored by Dr. Weber dated 10/19/2006 and 04/22/2005, by Dr. Roston dated 02/20/2001, by Dr. Powell dated 04/22/1999, by Dr. Stotland dated 02/21/1998, by Dr. White dated 03/13/1996, by Dr. Martin dated 09/22/1993 and 08/10/1991 and by Dr. Geiger dated 03/1989.

The Inmate's Central File and Unit Health Record (UHR) were reviewed. He was informed that the interview was not confidential, and a report with the results of the evaluation would be submitted to the Board of Parole Hearings (BPH) to assist in determining his suitability for parole. The Inmate appeared to understand the nature and purpose of the evaluation, and the possible consequences of the interview to the best of the inmate's ability. Unless otherwise indicated, the inmate agreed to participate in the interview. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Review of his DEC lists no need

for adaptive supports related to the evaluation. Also, it is the conclusion of the undersigned examiner that it was *not* necessary to provide auxiliary aids or assistance to achieve adequate communication. In this respect, effective two-way communication was established by virtue of a series of questions by this evaluator and appropriate responses by the inmate. The inmate was additionally able to acknowledge the options available to him relative to this report, as noted in the italicized paragraph at the end of this evaluation. This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate.

The Inmate's Central File and Unit Health Record (UHR) were reviewed. The information used to come to the following conclusions and clinical findings was based on a review of the inmate's C-File and UHR. The reader is respectfully referred to the prior records for a full background and summary of the inmate's psychosocial background and history. Although all of the available documents were reviewed in detail, for the sake of brevity and clarity, only summary information, as it pertains to the referral questions, is provided herein.

## III. PSYCHOLOGICAL QUESTIONS TO BE ANSWERED IN EVALUATION

1) The prisoner's violence potential in the free community;

## IV. BACKGROUND INFORMATION

The Inmate has been interviewed many times and has also provided written information concerning his history in a letter included in his files dated 02/16/2001. The most recent three psychological assessments also summarize his background information in sufficient depth so that this material will be referenced to and only new information will be included in these sections.

CHILDHOOD/ADOLESCENCE: Inmate Lisker states he was born 06/24/1965. His records indicate he was raised in and near Van Nuys, California. As per his 02/20 2001 Psychological Evaluations, Dr. Roston indicated "Inmate Lisker's central file indicates he was adopted when three days old. He says there were no complications with his birth and assumes he reached the usual developmental milestones within normal limits. He states his health as a child was fair and writes "my father smoked and I seem to have above average incidences of upper respiratory infections." Records indicate he was diagnosed with Attention Deficit Hyperactivity Disorder and treated with Ritalin when he was eight years old. His central file states he set fires in the age range of seven to ten. Mr. Lisker maintains he was not a bedwetter, nor cruel to animals. His central file quotes him as saying he was "the neighborhood crazy." His father was quoted as saying his son didn't get along with his peers and did not perform adequately in school. Records and statements by Mr. Lisker and his father prior to his second trial suggest he and his mother had a chaotic relationship involving mutual violence and verbal abuse. He now denies major family dysfunction and claims he and his father were misled by his attorney who suggested they exaggerate family problems, his substance abuse

problems and any related difficulties. Mr. Lisker denies any abuse in the family and writes he is "not an abuser."

The later evaluations of 04/22/2005 and 10/19/2006 both by Dr. Weber seem to similarly indicate that the Inmate had significant conflicts with his family and was sent to a Boy's home in Susanville from age 12 to 15 due to drinking. The Probation Officer's report also indicates early on and chronic usage of Cocaine and in the Supplemental Report dated 01/05/1986 indicates that a consulting Psychiatrist who examined the Inmate stated:

"BRUCE GREW UP IN A VERY CHAOTIC FAMILY WHERE THERE WERE SIGNIFICANT CONFLICTS WITH HIS MOTHER WHO APPEARS TO HAVE AT LEAST PSYCHOLOGICALLY ABUSED HIM. THERE WAS ALSO A GREAT DEAL OF CONFUSION BY HIS IDENTITY IN THE CIRCUMSTANCES OF HIS ADOPTION THAT PROBABLY CONTRIBUTED TO HIS PROBLEMS. HE HAS HAD CHRONIC BEHAVIORAL PROBLEMS, DIFFICULTIES IN ADJUSTING TO BOTH SCHOOL AND PEER RELATIONSHIPS AND HAS HAD A SIGNIFICANT HISTORY OF ALCOHOL AND COCAINE ABUSE. THERE ARE ALSO INDICATIONS THAT INCLUDE OTHER RELATIONSHIPS THAT HE HAS HAD DIFFICULTY IN CONTROLLING HIS AGGRESSIVE IMPULSES. HE HAS A VERY LOW SELF-ESTEEM AND IS VERY SENSITIVE TO FEELINGS OF REJECTION. ...HE CONTINUES TO MINIMIZE AND RATIONALIZE HIS OWN BEHAVIOR."

EDUCATION: The Inmate states that he completed his 10th high school. He got his GED while in the California Youth Authority. His 2001 Evaluation (Education Section) indicates that his substance use drugs and disruptive behavior were primarily responsible for Inmate Lisker's poor achievement and multiple placements, but he later scored higher prior to incarceration in State Prison.

While incarcerated the Inmate stated he has participated successfully in vocational educations and training in Computers and Related Technology and also completed an Apprentice program as well in 1995. He also completed the Para Legal Certificate, and since his most recent Board Hearing completed a State recognized Hotel and Restaurant Management Certificate program. Inmate Lisker was assessed as having normal cognitive functioning, without related adaptive needs (NCF), on 10/11/2002 by the prison psychology staff.

FAMILY HISTORY: In the 2001 Evaluation it is indicated that his adoptive father, Robert Bruce Lisker was an attorney. Prior to Mr. Lisker's adoption, his mother, Dorca, was a film cutter. She then became a full time homemaker. His father was ten years younger than his mother. His mother was forty-nine years old at his adoption. Review of Central file records suggest Mr. Lisker saw his mother as a nervous, depressed, moody, irritable and perfectionist woman who was rather persecutory in her thinking. He regarded his father as easy going, fair, friendly and good natured. Central file data provided by Mr. Lisker and his father indicate their

family entered family therapy four times with four separate therapists. Central file records depict a woman who could not manage a hyperactive child who was to become "a wild teenager." The same record suggests he was overindulged, primarily by his father.

Contact with others outside of prison: The Inmate reports he has maintained contact with his family. His father remarried after his mother was murdered. Both his father and his step mother have now died. He states he had very frequent contact with them until they died. Now he maintains contact with his stepmother's widower whose name is Jerry who lives in Encino. "He visits and we talk over the phone every few days. He also maintains contact with a close friend of the family and other friends (about 4) from long ago. He also has acquaintances from outside as well and other friends of the family. "It is difficult to completely connect on the prison telephone system, but over time these are contacts with people I can trust and it is a vital lifeline for me. I love each and every one of them. They are good people. I also can get visits from my ex wife and we write to each other. She has a cell phone so we can't call. We got married in 1994 and divorced in 1996. We remain on good terms".

PSYCHOSEXUAL DEVELOPMENT / SEXUAL ORIENTATION: The Inmate says he is heterosexual and previously has stated he had three sexual partners, all female. He has stated he was infected with Herpes during one of his sexual experiences.

MARITAL / RELATIONSHIP HISTORY: The Inmate was married from 1994 to 1995 to a woman he had corresponded with as a pen pal. He states they still write to each other.

ADULT PEER RELATIONSHIPS / GANG AFFILIATIONS: The Inmate denies any affiliation with gangs.

Leisure time: Inmate Lisker indicates that he does a lot of reading. "I just finished "The Innocent Man" by John Grisham. It was a difficult read for me. I read a lot of magazines and periodicals on computer architecture and the LA Sunday Times. I try to be aware of what is going on outside. I watch some TV but not a lot. Now I can watch PBS when I can on a small set I have. I should be running, but will get back to it. I don't have the wind I once had".

MILITARY HISTORY: The Inmate has never served in the Military.

EMPLOYMENT / INCOME HISTORY: Previous reports (2001) indicate the Inmate Lisker was only employed sporadically prior to his incarceration doing jobs such as cleaning film and delivering furniture. It was further indicated that he has a trust fund and appears capable of administering funds.

PAROLE PLANS IF GRANTED A RELEASE: The Inmate states upon release he would be able to live with the widower of his former step mother in Encino. He also has alternatives with other friends of the family. "Nobody in my friends or family circle uses any substance with the exception of occasional use of alcohol. I would never be a user of anything again. I don't ever have cravings or desire to use".

Missing from the Inmate's plan is consideration of residential substance use programs upon parole. Given the documentation of his chaotic upbringing, early and ongoing substance use prior to his controlling offence, it would seem that there is a need for programming on parole that closely follows the Inmate's ability to remain conforming to pro-social guidelines over a period of time, prior to being on parole with fewer observations on his behavior.

The issue of what degree of ongoing personal therapy would be indicated on parole should be assessed by the Parole Outpatient Clinic in connection with the recommendations from other community therapeutic resources such as the recommendations from a friend of the family regarding a therapist who is an expert in substance abuse treatment issues that the Inmate mentioned having access to.

Another important issue regarding parole planning is the need for the Inmate to be able to discuss how he will go about determining which field of work makes most sense for him to pursue. He appears to have a number of viable alternatives but that in itself is not a plan.

## V. CLINICAL ASSESSMENT

MENTAL HEALTH HISTORY: the Inmate's mental health history is well documented in Dr. Roston's 2001 Evaluation. ."At age fifteen or sixteen Mr. Lisker was admitted to the Palmer Drug Program, a treatment program that, in all probability, included psychological and psychiatric intervention.

Following Mr. Lisker's placement in CYA he was evaluated by Susan Fukushima, M.D., who characterized him as a bright young man, "narcissistic" and possessing "moderate anti-social traits." She also regarded him as unmotivated for change. She commented upon a chaotic family with significant conflicts between himself and his mother. She posited Mr. Liskers mother "appears to have at least psychologically abused him." She also noted chronic behavioral problems, alcohol and cocaine abuse and a tendency to minimize and rationalize his difficulties.

Adrienne Davis, Ph.D. tested Mr. Lisker in CYA and measured his I.Q. at 116. Studying the data, this psychologist suspects the score was low and that Mr. Lisker might well function in the superior range. Though personality tests showed no chronic psychopathology, they did indicate impulsiveness, explosiveness, and aggressiveness. Dr. Davis appears to have believed him dangerous because his defenses and cognitive control "quickly disintegrate" when emotionally provoked. She also regarded him as demanding, self-centered, impulsive and functioning with low frustration tolerance. She opined he was not amenable to treatment at CYA.

Richard Le Gassick, Ph. D., also at CYA, found Mr. Lisker detached, indifferent, cautious, mistrusting, and angry. He also found him lacking in empathy.

In March 1989, John Geiger, M. D., suggested Mr. Lisker's violence potential was less than average for a prison population. He regarded Mr. Lisker as "improved" and displaying "no serious problems."

In August 1991, Clyde Martin, M. D., diagnosed Mr. Lisker as suffering Polysubstance Dependence and Adult Anti-Social Behavior. He assigned a G.A.F. score of 90, indicating Mr. Lisker had a good adaptation to his environment. Dr. Martin indicated Mr. Lisker's ability to function in society centered about his ability to avoid substance abuse. He re-examined Mr. Lisker in 1993 and made, basically, the same comments. It is noted that Dr. Martin's reports were not cited by Mr. Lisker in the document he gave to this psychologist on February 20, 2001.

In March 1996, W.J. White, Psy.D., examined Mr. Lisker and suggested Mr. Lisker had less than acceptable understanding and knowledge of 12-Step Programs he claimed helped him. He also explored Mr. Lisker's conversion to Christianity and believed Mr. Lisker was superficial in his understanding of the religion he adopted. In the document provided to this psychologist, Mr. Lisker made no mention of Dr. White's less than positive comments, but included positive ones.

In February 1998, Randy Stotland, Ph.D., wrote that his diagnosis was consistent with diagnoses of previous examiners. It is not clear whether the diagnoses to which he refers include those offered by CYA mental health examiners. Further, Dr. Stotland did not appear to make a clear recommendation but seemed to assume Mr. Lisker would continue his incarceration.

It is the report of Katherine R. Powell, Ph. D. dated 04/22/99, that distressed and angered Mr. Lisker. She diagnosed Mr. Lisker as suffering Polysubstance Dependency in Institutional Remission and also as Personality Disorder NOS with Narcissistic and Anti-Social features. She described his personality disorder as severe. She assigned a G.A.F of 90, indicating good current adjustment. Dr. Powell's report is unequivocal. She cites his specific and subtle narcissism, his single dimensional emotionality, mild grandiosity, feelings of entitlement, lack of expressed remorse or empathy and gross defensiveness in which he tended to minimize all negative aspects of his life. She indicates his thinking is rational and logical and his memory is intact. She recommended against granting parole. Discussing that report with this psychologist, Mr. Lisker could not accept that his accusation Dr. Powell falsified facts of his road rage arrest may have been due to a very poorly written paragraph in his central file. This psychologist read the statement and was confused regarding the identities of the "defendant" and the "victim." Mr. Lisker suggested Dr. Powell was not sufficiently thorough to get to the bottom of a confusing paragraph. When asked why he'd not appealed the report and ask that it not be considered, he stated he sent a letter to the "psychiatric department." When informed he might, as a paralegal, know an

appeal was a legal issue and not a psychiatric one, Mr. Lisker could not relinquish the notion that the "psychiatric department" should have acted.

Dr. Roston dated 02/20/2001 in this comprehensive review opined Polysubstance Dependence in Institutional Remission on AXIS I and Personality Disorder NOS with narcissistic and antisocial features, mild on AXIS II

Inmate Lisker has been in CCCMS since 05/06/2004 diagnosed with Depressive Disorder NOS, Post Traumatic Stress Disorder and Polysubstance Dependence on AXIS I and No Diagnosis on AXIS II.

Dr. Weber in his 04/22/2005 Evaluation provides Diagnoses of Depression NOS and Polysubstance Dependence in Institutional Remission on AXIS I and No Diagnosis on AXIS II. In the next Evaluation by Dr. Weber dated 10/10/2006 he provided Diagnoses of Polysubstance Dependence in Institutional Remission on AXIS I and No Diagnosis on AXIS II.

Finally, Dr. Litwiller dated 07/30/2007 indicated that the Inmate's original Diagnosis of Depressive Disorder NOS by mental health in 2004 had over time changed to Post Traumatic Stress Disorder. The Inmate's had discussed flashbacks regarding his mother's death. The Doctor gave diagnoses of PTSD by history with partial remission (per patient self report), Depression, remitted and Polysubstance Abuse, by history on AXIS I and Antisocial Personality Disorder on AXIS II.

The Inmate remains in the CCCMS program.

MEDICAL HISTORY: From other reports Inmate Lisker has a benign medical history. He has no history of serious accident, head injury, seizures or other neurological conditions. His medical record shows prescriptions of medications not often used in serious medical conditions. He has reported back pain, visual difficulties, a broken finger, abdominal pain, and some mild trauma following physical combat. He also has sinus problems, allergies, and a heart murmur and Herpes.

SUBSTANCE ABUSE HISTORY: the Inmate's substance use history is well summated in Dr. Weber's 2005 and 2006 Evaluations. "Mr. Lisker reported a long-term history of drug abuse before his incarceration. He said that he began using when he was about 11 years old. He said that he wanted to be accepted by the older kids in the neighborhood. He described some social anxiety that the marijuana and alcohol helped to alleviate as well. He said that his drinking and drug use was the reason why his parents sent him to a boys home in Susanville from age 12 until age 15. At 15 he came home from the home for Christmas and refused to go back. He immediately returned to drug use and began hanging out with the criminal element again. He knows that he is an addict and knows that he has to remain completely abstinent. He said that his attendance in NA has helped him to deal with his addictions. He knows the 12 steps and has worked through them thoroughly. He said that he plans to remain abstinent by being vigilant about his thoughts related to substance use. He is committed to abstinence and has worked through

those issues that were involved in his previous substance use. He no longer has a need to "fit in" and he no longer feels uncomfortable in social situations."

In other previous evaluations and in Central File reverences referred to in previous Evaluations and in the current evaluation the inmate had said that he had been a marijuana user since an early age perhaps ten or eleven. He also began drinking beer and alcohol at about the same time. He maintained that after age thirteen or so he experimented with LSD, speed, and heroin. He claimed a particular affinity for marijuana and cocaine and in one report "taking one hundred dollars, two times per week" to support his cocaine use.

Reference is made to Inmate Lisker being presumably discharged from the Palmer Drug Abuse Program at fifteen or sixteen because he was often under the influence of drugs and aggressive. According to his 1999 Life Term Mental Health Evaluation, he was said "to minimize his substance abuse history." In contrast, the Inmate maintained he and his father had exaggerated his drug usage because the Youth Authority had "drug and alcohol treatment programs and that the statements would help him to be accepted. "I also experimented, in the two months prior to my arrest, with amphetamine ('crank'). I used it perhaps a dozen times after being introduced to it by an acquaintance".

It would seem that at various times and for various reasons, the Inmate, and at times in conjunction with his father, was attempting to manipulate the system, especially in terms of how he was perceived in terms of his substance use. The overwhelming record demonstrates that he seemed very immersed in the use of multiple substances as part of a lifestyle which included reactions against authority, lack of social conformity, relationships with peers with similar irresponsible behavior and the inability to maintain relationships within his family structure with heightened conflict with his mother. What would also seem evident is that given these proclivities substance use could compound impulsiveness and loss of behavior control.

<u>CURRENT MENTAL STATUS / TREATMENT NEEDS / PERSONALITY DISORDERS</u>: Inmate Lisker is a forty three year old Caucasian male. He is slim to medium build with a shaved head and wears rimless glasses. He was dressed very cleanly and had a ironed shirt. "I keep one ready in case my ex wife comes up". He is quite social and friendly and smiles easily expressing a good range of emotions. His general mood seems happy and self reflective regarding his being in prison. "People say I like to be positive and that is true. Yet at times I try to keep happy on the outside and let that seep down on the inside too. Part of the reason is that I have learned in my therapy about cognitive behavior and how your outside can positively or negatively affect your inside". The Inmate is introspective and likes to consider his internal realities and what they mean about him as a person. His movements are a bit on the rapid side and he was perhaps overly quick to assist staff who came to the door to return some video and television equipment, rolling it in on a heavy cart. The impression is of a person who is mildly impulsive but (in this instance) with good intensions who does not hesitate to act.

The Inmate says he currently feels a little anxious regarding the evaluation. However he denies generally feeling depressed or anxious, "I do spend a lot of time thinking and it is a natural place I go to. I believe I have always been that way to some degree. I usually don't think of myself as being that social and I am different from a lot of the people in here". This attitude could be seen as narcissistic and or aloof but it did not appear so in the manner that he expressed these comments about way of experiencing. He is more intellectual than the majority of Inmates.

Inmate Lisker denies having hallucinations or thoughts of harming himself or others or having any psychological problems including anxiety and depression. He was clearly oriented in all spheres, his memory is intact; his thinking is rational and logical, his vocabulary excellent and he is very articulate. He shows no evidence of a thinking disorder or of delusional thinking. Active post traumatic stress responding does not appear evident.

Brief cognitive screening shows adequate concentration "My memory is pretty good". His memory for numbers is good. He has very good abstract reasoning and can reason both concretely and also move to the levels of abstraction. He has good social reasoning and can provide good solutions regarding how to deal with common social realities.

INSIGHT / SELF ASSESSMENT: the Inmate has the capability for good insight and self assessment. However, there are numerous references in past evaluations of him applying self serving reasoning consistent with personality disorder issues. It would seem that the Inmate overtime has been improving his insight with less self serving qualities perhaps based upon seeking and obtaining treatment within the mental health system.

MENTAL HEALTH CONCERNS OR PERSONALITY DISORDERS: Inmate Lisker had family therapy while he was on the streets. It has been previously reported he had been to family therapy with his mother and father to a number of family therapists (2-4 depending on the records) regarding his drug use, not getting along at home and poor grade at school. There were arguments including yelling and screaming but no reported physical arguments. His Dad had at one time reported there were violent outbursts but that was only verbal with no physical violence. "I was only spanked a couple of times during my life. I was adopted and my mom was 49 and my dad was 39. I experienced a lot of angst – I saw myself as a teenager as we loved each other a lot but didn't see eye to eye, I was more of a hippy and my dad was a marine and an attorney. I think the therapy helped. But as long as I was smoking pot it was my priority. I was getting together with my friends and everything else suffered".

I first got into therapy in CCCMS in 2003 for depression. I had struggled with depression for being wrongly convicted and it got worse and worse. I have been in CCCMS ever since but I am better. I partake in group programming and that continues to be helpful for me even though I don't have much in the away of symptoms now. I took psych meds (Prozac) which helped but I didn't like the artificiality and I learned to use cognitive therapy to help so I don't have to take any medications. Lately, I have some time of depression. Things don't happen very quickly and it is difficult because it does not move

forward at the rate I would hope it would do. I handle that by suffering though it but if I can catch the beginning I have learned how to lift myself out of it. If I don't catch it in time I get depressed for several days and then get out of it".

There does not appear to be any malicious intent or any desire for non prosocial behavior expressed in any of the contact during this evaluation. Rather, the Inmate is very much oriented toward wanting to do the right thing. At the same time he is not shy about conveying the difficulty he has had trying to come to terms with how to behave appropriately given his belief over 25 years in prison that he was incarcerated for a crime he did not do.

## V. DIAGNOSTIC IMPRESSION

| Axis: I | 304.80 | Polysubstance Dependence, by History, in Remission, In a Controlled Environment |
| | 309.81 | Post Traumatic Stress Disorder by history |
| Axis II: | 301.7 | Personality Disorder NOS with narcissistic and antisocial traits |
| Axis III: | | Non Contributory |

The Inmate stated using alcohol and then marijuana at the age of 11 or 12. He continued using both, but preferred pot. He would smoke every day by the age of 13 or 14 years old. He experimented with a number of other drugs but did not use them consistently. He says he had stated that he used cocaine more than he had in fact used. "Cocaine was so expensive so I rarely used it unless others had it. Pot tended to make me self conscious and it put me in another place. I made me feel I was a great poet. I could write and impress my girl friends. His pattern of frequent, varied and long term substance use is most consistent with Polysubstance Dependence.

"My parents put me in a boys program in Susanville to try to deal with the pot use when I was 13 years old. I left at 15 and refused to go back. I was using less pot but still was using it". The Inmate while never convicted of offenses other than his guilty plea to the controlling offense, has admitted to numerous antisocial acts that had then been investigated might have led to possible juvenile placement.

The review of his records especially of psychological evaluations in the several years after his crime provide an overall impression is of antisocial and narcissistic traits with some evidence that could point to a conduct disorder and antisocial personality disorder. While incarcerated he has had only one violence related Rule Violation which occurred for mutual combat in 2001 which he stated was caused by an Inmate with psychological problems..

This examiner believes that Personality Disorder NOS with narcissistic and antisocial traits best captures the quality reflected both in the early psychological accounts and the evaluations and behaviors of the Inmate over time even though it would be possible to consider Antisocial Personality Disorder as well. What is also evident is that substance use permeated all aspects of the Inmate's adolescence and prevented any chance of normalization of his personality development. For the last 5 years or so the Inmate has lessened or attenuated responding related to personality disorder. This may coincide with the Inmate s seeking and receiving ongoing therapy from the mental health staff.

## VI. CRIMINAL HISTORY / REVIEW OF LIFE CRIME

JUVENILE AND ADULT RECORD / PRIOR PRISON COMMITMENTS: The Inmate stated he first got into trouble with the law in 1982. "I threw something at someone when using alcohol. I was 16 years old. I was counseled and released. This incident is well documented in Dr. Davis's report of 03/12/1985. The original charge of Assault with a deadly weapon (a screwdriver) was dropped to vandalism and then not prosecuted. The incident was evidently observed by the police and the Inmate has said to the police 'I was going to kill that son of a bitch. He had cut me off'. Dr. Davis also mentions that the Inmate had carried a large knife for protection and brandished it about several times. He also admitted to victimizing younger kids as he had been bullied by others when he was a child.

There was also one incident with an ex girl friend also related to alcohol when they broke up –also at 16. "She had slept around on me and I called her a slut. She slapped me and we broke up. When her brother found out he busted in and beat up my roommate and chocked me to almost unconsciousness. We filed a police report and they made all these allegations stating I had slapped around his sister and tried to rape her. Two or three years ago she made declarations that that was false. The police made an investigation and it was stated that by the DA that both sides had reason for fabrication".

The Inmate was convicted of three separate speeding violations from May of 1982 through March of 1983.

PRIOR PERFORMANCE ON SUPERVISED RELEASE: The Inmate has no previous record of probation.

INMATE UNDERSTANDING OF LIFE CRIME: The Inmate was convicted of Murder 2nd Degree with a weapon and sentenced to 15 years plus 1 year to Life.

Summary of the Crime: The following information was obtained from the Probation Officer's Report dated 11/07/198 and re-summarized in the Life Prisoner Evaluation for the March 2009 Calendar.

"On 3/10l83 at approximately 11:30 a.m., Bruce Lisker murdered his 66 year old adoptive mother, Dorka Lisker, by beating her on the head with blunt instruments and stabbing her with two knives. The victim remained unconscious until she died the same day approximately 3t27 p.m. The attack took place in several different rooms throughout the victim's house. The victim sustained severe blunt force injuries to her head, caving it in. There was a hole in her head, she had a broken arm, and there were two stab wounds in her back, one of which punctured her left lung. Bruce Lisker used a baseball trophy and an exercise bar with which to beat his mother and two knives with which to stab her in the back. Lisker vas going through his mother's purse when she confronted him, and the instant offense ensued".

<u>Inmate's Version</u>: The following information was obtained during the interview conducted by Dr. Lehrer on 11/20/2008.

"The account given to Dr. Weber in 2006 is what happened. There is not much more I can say other than there have been new articles in the papers since that time and new developments in the courts as well.

I am trying to get a new trial based upon constitutional actions that brought about my wrongful conviction.

I was denied begin able to grieve at my mother's services and was called her murder. I was unable to be with my dad for the last 12 year of his life and could never go to his services. Also couldn't be present with my step mother who I became very close with. My parent's never got to see the man I have become. I would have been present with my mom as I matured if I had had the chance.

Even though I am innocent, the conviction may have saved my life and let me develop as a responsible person and let me develop caring relationships with my family which I might not have ever done. It is a very strange situation, a backhanded blessing which I wish I never needed to have".

The Inmate does not admit to the crime. His responses concentrate upon his own needs and development. On the one hand they show a narcissistic quality and on the other some degree of maturation over time with prosocial orientation.

## VII. INSTITUTIONAL HISTORY / PROGRAMMING

<u>INSTITUTIONAL PROGRAMMING:</u>

<u>Work Assignments:</u> Inmate Lisker is currently assigned as a clerk in the Library. Before that he worked in the visiting room. "I really liked that because I dealt with a lot of people who were from the outside".

<u>Self Help Programming:</u> Since his last Board hearing in 2007 the Inmate has taken 10

self help programs including anger management, 99 days in a ghetto, victims awareness phase 2, framework for breaking barriers, justice programs, coping skills group number 2, participation in a mother's against drunk driving fund raiser, coping skills group 1, communication skills group, and a CCCMS anger management group. He also continues in centering prayer, the CCCMS lifer's group and NA. "I just sign up for everything and tell the facilitators that I get something out of the program and then go to the next one"

These programs are complimenting the Inmate's therapy in CCCMS and his participation in such programs is consistent with the impression of his over time gaining better insight and understanding and also working on issues that he has had since his late childhood and early adolescence.

Recent Disciplinary History: "I have had three RVRs. The first in 1989 for a failure to be at an assigned cell during count. Then next was in 2001 which was a mutual combat when an inmate who had gotten off of his psychiatric medications said he was going to kick my ass. I went to try to talk with him and he swung at me and I took him down and held him until the officers came. It was stupid of me to try to talk with him regarding his threat to me. The last and most recent RVR occurred in 12/30 2007 which was listed as behavior which could lead to violence occurred when a bucket I had just acquired for cleaning my clothing was confiscated and the officer said use the mop sink instead However that is used for mops with urine and other things and I just said I'll use the bucket. He stated his hand was on it when I took it back but it was not on it. In the future I would just use someone else's bucket since the majority of Inmates have a bucket for this purpose and the officers (generally-according to the Inmate) let them have them."

The Inmate might do well in writing up his account of this incident for the Board. It does appear to have involved some mild degree of impulsive action by the Inmate. He recognizes how he could have deal with the situation differently when currently questioned about it.

Interestingly, during the interview for this evaluation the Inmate was observed responding with a similar mild impulsive quality to assist some staff with a heavy cart. Some staff might have felt uncomfortable with an Inmate responding quickly even to assist them. The staff in the instance observed by this examiner thanked the Inmate for his assistance.

## VIII. ASSESSMENT FOR RISK OF VIOLENCE

The current research literature indicates that an empirically based approach is the most reliable and valid method for assessing risk of future violence. In the present evaluation, two separate assessment guides were used to help estimate this individual's risk for future violence in the community: the Psychopathy Check List – Revised (PCL-R) and The Historical – Clinical – Risk Management – 20 (HCR-20). In addition, the Level of Service/Case Management Inventory (LS/CMI) was utilized for assessment of general risk for recidivism, and not violence per se. The data for scoring these instruments were

obtained from information derived in both the inmate interview and the files reviewed. These measures are widely used and are supported by years of research in the risk assessment field. They have been cross-validated with various forensic populations, including United States males in correctional settings. Ultimately, whether an inmate will engage in future violence is a function of a variety of factors that include history, personal disposition, and situational variables. The evaluator has taken these factors into consideration in determining how much weight to allot each of the measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be presented categorically: low, moderate/medium, or high, relative to normative offender populations.

PCL-R: The PCL-R (Hare Psychopathy Checklist-Revised-2[nd] Edition) was scored on this measure on 11/20/2008. The PCL-R Manual (Revised- 2nd Edition) describes a psychopath as having a distinct personality pattern involving interpersonal, affective and behavioral symptoms:

> "Interpersonally, psychopaths are grandiose, egocentric, manipulative, dominant, forceful and cold-hearted. Affectively, they display shallow and labile emotions, are unable to form long-lasting bonds to people, principles, or goals, and are lacking in empathy, anxiety and genuine guilt and remorse. Behaviorally, psychopaths are impulsive and sensation seeking, and they readily violate social norms. The most obvious expressions of these predispositions involve criminality, substance abuse, and failure to fulfill social obligations and responsibilities".

> Information used in this assessment of psychopathy includes data from the Inmate's records and his verbalizations in the current interview. Psychopathy is a concept that is similar to Antisocial Personality Disorder; however, it represents a more extreme form of dangerousness.

Inmate Lisker obtained a total score the PCL-R, which places him in the *low* range of the clinical construct of psychopathy when compared to other male offenders. He scored lower than 77 percent of those offenders on this instrument.

The PCL-R also scores several grouped *"factors"* which can provide additional understanding of risk. The Inmate's *factor* scores are as follows:

> *Factor one* examines the extent of a selfish, callous, and remorseless use of others (interpersonal and affective traits). The Inmates score was at the 60th percentile relative to all male prison inmates.

> *Factor two* scores evaluate issues related to a chronically unstable and antisocial lifestyle (general social deviance). The Inmates score was at the 15th percentile relative to all male prison inmates.

> It should be noted that items must be scored within the lifetime of the individual rather than more recent behavior alone. There are indications from juvenile and adult

activity that the Inmate might have gotten higher scores had he not been incarcerated. He appears to have been not oriented very much toward prosocial attitudes and behaviors prior to his incarceration and his behaviors seemed very much driven by substance use. He is capable of explaining the progress he has made since then and how he intends to positively lead his life on parole. While he is able to describe how he is changing and taking on more responsibility in his actions, he still has had one recent rule violation. He attempts to portray himself in a slightly more positive light that his behavior can justify at this time. However, it is also evident that he has made gains in himself over the past 5 years or so and seems to have been helped by psychological counseling and the many self help programs he has taken.

The items which the measure *did* require some level of endorsement are historical from prior to incarceration, at the time of incarceration, during incarceration and/or are indicated at present in the recent past 5 years included: Being *Glib; Need for Stimulation; Pathological Lying; Conning/manipulative; Callous/Lack of Empathy; Poor Behavioral Controls; Early Behavior Problems; Lack of Realistic Long Term Goals; Impulsivity and Failure to Except Responsibility for Own Actions*. These are evidenced by indications from the Inmate's current psychological interview, from his previous juvenile and other history, from his file review and from his incarceration record which lend support of and/or confirm the basis for these scored items. It should be noted that even if some of these item are no longer evident at the same level as in the past, they can still be scored as and considered as risk factors if they were present at any time on this measure...

In the current clinical interview the Inmate *did not* present evidence of the following factors related to psychopathy. Some of these items may have been present during the Inmate's formative years or history up to incarceration, or possibly present during his early incarceration, but have not been significant factors for at least five years. For that reason they do not have to be currently indicated on this measure as contributing to elevated risk. They include: *Grandiose Sense of Self Worth; Lack of Remorse/Guilt; Shallow Affect; Parasitic Lifestyle; Promiscuous Sexual Behavior; Many Short Term Marital Relationships; Juvenile Delinquency; .Revocation of Conditional Release and Criminal Versatility*.

The Inmate's ongoing participation in mental health programming should continue to help him process long term difficulties as would counseling and substance abuse programs while in the community at large.

HCR-20: The HCR-20 was scored on 11/20/2008, based on data in Inmate Lisker's records and information obtained in the current interview, to assess for level of risk for violent recidivism. Inmate Lisker's overall score as measured by the HCR-20 placed him in the *low* risk category for violent recidivism

The Inmate's score is a composite of the following factors:

*Historical:* In the *Historical* domain of assessing likelihood of future violence, available information indicated that Inmate Lisker was 17 years of age at the time of the controlling offense. His controlling offense was his only offense/conviction. The conviction for the controlling offense does not appear as a further escalation of previous violence, but does appear to be an escalation in the pattern of his substance use effecting his judgment, ability to control his impulses and the expression of long-term built up anger against his mother.

> The Inmate's historical record shows sufficient indications to score issues that increase risk of violence related to previous violence, relationship instability, substance use/abuse problems, early maladjustment and personality disorder. These areas in the historical record used in this objective measure correlate with elevated risk of violent recidivism.
>
> Inmate Lisker has no evidence for violence at an early age, employment problems, major mental illness, psychopathy or prior supervision failure. He has maintained and developed some positive contact with his extended family over time. These elements did not contribute to his risk of re-offense and might be regarded as positive signs for lowered risk of violent recidivism within the historical domain of this instrument.
>
> Given that the bulk of data is historical, then by definition, these scores are not easily amenable to significant change regardless of the number of years of his incarceration.

*Clinical:* In the *Clinical* or more current and dynamic domain of risk assessment, Inmate Lisker has evidence of some mild impulsive responding which especially at higher levels can be a predictive factor related to violent recidivism, On the other hand, he does not appear to have active symptoms of a major mental illness. His insight is adequate ("insight" in the context of the HCR-20 is circumscribed primarily to a mental disorder), he does not display negativistic thinking and he has responded positively to treatment available to him.

Given that the bulk of the data comes from clinical assessment it is possible for there to be further improvements and or changes that result from ongoing therapy and self help programs the effects of making better decisions and dealing more effectively with issues over time. The Inmate is capable of using community resources to affect these changes if and when on parole.

*Risk Management* items on the HCR-20 identified concerns for future risk of dangerous behavior. Inmate Lisker's prospective plans for parole take into account the need for support issues from his family that may be available to him. He also has many possible job alternatives and financial support that could provide private therapy for him. However, he needs to explore transitional substance related residential placements given the severity of his previous substance use and the likelihood of its involvement in his controlling offense. Whether in such a program or not, he will face highly elevated destabilizing elements that even though present while incarcerated are quite different and

more present in the community at large. Finally, his long incarceration is associated with increased stress responding and he has been receiving psychological treatment. The transition to parole is very likely to bring additional stress which would be helped by further counseling, supportive community programs and family support over time.

Given that the bulk of the data comes from issues of future relevance it is possible for further improvements related to planning, gathering of information, new opportunities, ongoing self help, therapy and community support to continue to positively affect this dimension during incarceration or when on parole.

Level of Service/ Case Management Inventory (LS/CMI): The LS/CMI is an actuarial instrument designed to evaluate levels of risk to recidivate. This instrument is focused on risk of general recidivism and not violence per se. Inmate Lisker was scored on this instrument on 11/20/2008. Inmate Lisker's overall LS/CMI score indicates that he is in the low end of the *moderate* category, having scored lower than 89% of the North American sample of incarcerated male offenders.

> Factors which _increased his risk of recidivism_ were *having been incarcerated, having been punished for institutional misconduct, having been suspended or expelled from school, difficulties with authority figures, having criminal acquaintances and friends, having a history of substance related problems, having an official record of violence, having a personality disorder and having a history of impaired driving.*
>
> Factors which _decreased his risk of recidivism_ included *lack of arrest at an early age, lack of probation violations, positive work performance evaluations and ability to interact well with co-workers and supervisors, participation in organized activities, the presence of support from family, ability to make positive use of time, having non-criminal outside acquaintances or friends, lack or recent substance use, positive attitude regarding the conventions of society, positive outlook regarding future supervision/treatment, and lack of an antisocial mindset.*

OVERALL RISK ASSESSMENT: After weighing all of the data from the available records, the clinical interview, and the risk assessment data, it is opined that Inmate Lisker presents at the upper end of the _Low Risk_ range for violence in the free community.

Inmate Lisker's risk of violent recidivism would likely *increase* if he demonstrated behaviors that showed any contact with substance use, disregard for convention, aggressive/violent behaviors, procriminal activities or lack of participation in programs required as part of his parole planning.

He could *decrease* his risk of violence primarily by continuing to engage in prosocial activities, self help programming, counseling, substance use programming, further developing his parole planning, and have specific acceptances regarding resident treatment facilities and or/other community based programs available to him on parole.

*M. Lehrer, Ph.D.*

---

M. Lehrer, Ph.D., CA License # PSY-5224
Forensic Psychologist
Board of Parole Hearings / Forensic Assessment Division


Reviewed by: _____*Teal Kozel, Psy.D.*_____   Date Approved: 02/06/09
Teal Kozel, Psy.D; CA License #PSY-21923
Senior Psychologist, Supervisor
Forensic Assessment Division
Board of Parole Hearings
California Department of Corrections and Rehabilitation

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.